IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE / JOHN DOES 1-144,<br><br>                              **Plaintiffs,**<br><br>            **v.**<br><br>CHIQUITA BRANDS INTERNATIONAL, INC.,<br>and DAVID DOES 1-10,<br><br>                              **Defendants.** | No. 1:07-cv-01048-PLF |

## <u>DEFENDANT'S MOTION TO DISMISS COMPLAINT</u>

Defendant Chiquita Brands International, Inc. hereby submits this motion to dismiss plaintiffs' Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

Plaintiffs, a group of Colombian nationals, seek to hold Chiquita responsible for the deaths of 173 Colombian nationals who were allegedly killed by left-wing guerilas and right-wing paramilitary groups in Colombia during a span of nearly 30 years. They assert claims under the 200 year-old Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, and District of Columbia tort law. The principal basis upon which plaintiffs allege that Chiquita should be adjudged liable for these deaths is that Chiquita's former Colombian subsidiary was forced to make extortion payments to the groups when they controlled the remote areas of Colombia in which Chiquita operated.

For the reasons stated in the accompanying memorandum in support of this motion, the claims asserted in the Complaint are deficient as a matter of law. Plaintiffs' ATS

and TVPA claims — which attempt through wholly conclusory and contradictory allegations to (a) transform murders by private armed groups into state-sanctioned executions or other purported international law violations, and then (b) make Chiquita into an accessory to these crimes solely because it provided a small fraction of the massive funds these organizations obtained through extortion, drug trafficking, kidnapping, and their other nefarious activities — do not come close to stating a cognizable claim over which the Court has jurisdiction.  Plaintiffs' state law claims also fail because D.C. law does not apply to the conduct at issue here, and plaintiffs have not stated viable claims under D.C. law in any event.  Chiquita therefore respectfully requests that the Court dismiss plaintiffs' Complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).

Counsel for Chiquita requests a hearing on this motion.

Respectfully submitted,

/s/  Eric H. Holder, Jr.

Eric H. Holder, Jr. (D.C. Bar No. 303115)
John E. Hall (D.C. Bar No. 415364)
James M. Garland (D.C. Bar No. 475509)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2401
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

*Attorneys for Defendant*
  *Chiquita Brands International, Inc.*

Dated:          December 10, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JANE / JOHN DOES 1-144**<br><br>                              **Plaintiffs,**<br><br>            **v.**<br><br>**CHIQUITA BRANDS INTERNATIONAL, INC.,**<br>**and DAVID DOES 1-10.**<br><br>                              **Defendants.** | **No. 1:07-cv-01048-PLF** |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS COMPLAINT

Eric H. Holder, Jr. (D.C. Bar No. 303115)
John E. Hall (D.C. Bar No. 415364)
James M. Garland (D.C. Bar No. 475509)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 662-5372 (telephone)
(202) 778-5372 (facsimile)
eholder@cov.com

*Attorneys for Defendant Chiquita Brands*
*International, Inc.*

## Table of Contents

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 2

ARGUMENT ........................................................................................................ 7

I.    CHIQUITA IS NOT LIABLE FOR THE ALLEGED "EXTRAJUDICIAL
      KILLINGS" COMMITTED BY PRIVATE PARAMILITARY GROUPS IN
      COLOMBIA. ............................................................................................. 10

      A.    Plaintiffs' ATS Claims Should Be Dismissed Because Plaintiffs Have Not
            Alleged And Cannot Allege State Action. ........................................... 11

            1.    Plaintiffs do not allege that the paramilitaries are state actors...... 11

            2.    Even if private action "under color of law" were cognizable under the
                  ATS, plaintiffs have insufficiently alleged such conduct. ......... 13

            3.    Plaintiffs cannot overcome the state action requirement through
                  conclusory allegations that the conduct at issue constituted "war
                  crimes." ...................................................................................... 15

            4.    Even if state action were properly alleged, an inquiry by an American
                  court into the complicity of the Colombian government's
                  involvement in these offenses would not be justiciable............. 18

      B.    Plaintiffs ATS Claims Should Be Dismissed Because There Is No Aiding
            and Abetting Liability As A Matter of Law, and In Any Event, Plaintiffs
            Do Not Allege Facts Necessary to Support Secondary Liability Against
            Chiquita. ............................................................................................. 21

            1.    There is no aiding and abetting liability for the claims asserted here........... 22

            2.    Even if aiding and abetting liability exists under the ATS, plaintiffs do
                  not — and cannot — plead sufficient facts to establish such a
                  claim.......................................................................................... 27

                  a)    Substantial Effect ............................................................ 28
                  b)    Mens Rea ......................................................................... 31

            3.    Plaintiffs' vague and conclusory conspiracy allegations do not
                  establish jurisdiction under the ATS........................................ 33

4. Plaintiffs do not allege facts to support their claim that the paramilitaries were Chiquita's "agents." ................................................... 37

5. The decision of the Southern District of Florida in *Sinaltrainal* illustrates the weakness of plaintiffs' extrajudicial killing claims............ 38

II. PLAINTIFFS' TVPA CLAIM SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM. ................................................................................................. 39

III. PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM. ................................................................................ 41

A. D.C. Law Does Not Apply Extraterritorially........................................................ 41

B. Plaintiffs Have Not Adequately Alleged Any State Law Tort Claim.................. 42

1. Plaintiffs Fail to State a Claim for Any Derivative Liability Tort................. 42

2. Plaintiffs Fail to State a Claim for Any Direct Liability Tort......................... 43

3. Plaintiffs Fail to State a Claim for Wrongful Death. ...................................... 44

C. Most of Plaintiffs' State Law Claims Are Time-Barred Under The Applicable    Statute of Limitations. .................................................................... 45

CONCLUSION................................................................................................................ 46

## Table of Authorities

### FEDERAL CASES

*Aetna Casualty & Surety Co. v. Leahey Construction Co., Inc.*,
219 F.3d 519 (6th Cir. 2000) ...................................................................28

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005) .................. 14-15

*Almog v. Arab Bank PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007)............................... 23, 28, 30-32

*American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40 (1999) .......................14

*Baker v. Carr*, 369 U.S. 186 (1962)........................................................................ 19-20

*Banks v. Gonzales*, 496 F. Supp. 2d 146 (D.D.C. 2007)....................................................2

*Bao Ge v. Li Peng*, 201 F. Supp. 2d 14 (D.D.C. 2000)....................................................15

*Barboza v. Drummond Co.*, No. 1:06-cv-61527 slip op. (S.D. Fla. July, 17, 2007)....................25

*Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161 (5th Cir. 1999)....................................34

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ..................................................9

*Bigio v. Coca-Cola*, 239 F.3d 440 (2d Cir. 2000)........................................................14

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) .................................................. 41-42

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) ........................................28, 31

*Bonaparte v. Tax Court*, 104 U.S. 592 (1881)..............................................................42

*Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2006 WL. 2455752
(N.D. Cal. Aug. 22, 2006)....................................................................................12, 23

*Brentwood Academy v. Tenn. Secondary Sch. Athletic Association*,
531 U.S. 288 (2001)............................................................................................13

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) ........................................23

*Cavitat Medical Tech., Inc. v. Aetna, Inc.*, No. 04-CV-01849-MSK-OES,
2006 WL. 218018 (D. Colo. Jan. 27, 2006)....................................................................35

*Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164 (1994) .................................. 26-27

*Cleveland v. Caplaw Enterprises*, 448 F.3d 518 (2d Cir. 2006)....................................................37

*Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wa. 2005)................................18, 23, 41

*Covad Commc'n Co. v. Bell Atlantic Corp.*, 407 F.3d 1220 (D.C. Cir. 2005) ...............................2

*Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005) .......................................... *passim*

*Echostar DBS Corp. v. Gemstar-TV Guide Int'l, Inc.*, No. 05 Civ 8510 (DAB), 2007
  WL. 438088 (S.D.N.Y. Feb. 8, 2007).......................................................................5-6, 29

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) .................................................. 8-9

*Gibson-Michaels v. Securiguard, Inc.*, No. 06-1937 (RMU),
  2007 WL 1322111 (D.D.C. May 4, 2007).......................................................................43

*Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191 (D.D.C. 2002) ...................................2, 5

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) ........................................................5

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ..................................................34

*Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006) ............................................................33

*Higgins v. Wash. Metropolitan Area Transit Authority*,
  507 F. Supp. 984 (D.D.C. 1981) ................................................................................45

*IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1975) ........................................................8

*In re Agent Orange Prod. Liability Litigation*, 373 F. Supp. 2d 7 (E.D.N.Y. 2005)...................23

*In re Sinaltrainal Litigation*, 474 F. Supp. 2d 1273 (S.D. Fla. 2006)................................. *passim*

*In re South African Apartheid Litigation*, 346 F. Supp. 2d 548 (S.D.N.Y. 2004) ........................23

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)........................................................... 9, 15-16, 40

*Khulumani v. Barclay National Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007)............................. *passim*

*Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457 (S.D.N.Y. 2006)............................23

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) .........................................9, 29, 38

*Lauritzen v. Larsen*, 345 U.S. 571 (1953) ................................................................42

*Maljack Products, Inc. v. Motion Picture Association of America, Inc.*,
  52 F.3d 373 (D.C. Cir. 1995) ....................................................................................9

*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005)........................41

*Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79 (D.D.C. 2000) ..................................45

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331 (S.D.N.Y. 2005) ...................................................................................................23

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633 (S.D.N.Y. 2006) ....................................................................................... 27-28, 33

*Rapoport v. Asia Electrics Holding Co., Inc.*, 88 F. Supp. 2d 179 (S.D.N.Y. 2000) ...................29

*Rayburn v. Hogue*, 241 F.3d 1341 (11th Cir. 2001) .......................................................14

*Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988 (S.D. Ind. 2007) ................................................42

*Saleh v. Titan Corp.*, 436 F. Supp. 2d 55 (D.D.C. 2006)..........................................................19

*Saperstein v. Palestinian Authority*, No. 1:04-cv-20225-PAS, 2006 WL. 3804718 (S.D. Fla. Dec. 22, 2006) ................................................................................ 16-17, 25

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).................................................................. *passim*

*Stutts v. De Dietrich Group*, No. 03-cv-4058, 2006 WL. 1867060 (E.D.N.Y. June 30, 2006) .............................................................................................................31

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) .................................15, 22, 25

*Williams v. United States*, 396 F.3d 412 (D.C. Cir. 2005)............................................................14

## STATE CASES

*Giles v. Shell Oil Corp.*, 487 A.2d 610 (D.C. 1985).......................................................43

*Odemns v. District of Columbia*, 930 A.2d 137 (D.C. 2007) .................................... 43-44

## DOCKETED CASES

*Carrizosa et. al v. Chiquita Brands International, Inc. et al.*, No. 07-60821 (S.D. Fla.) ...........................................................................................7

*Does 1-377 v. Chiquita Brands, International, Inc. et al.*, No. 07-CV-10300 (S.D.N.Y.) ........................................................................................7

*Does 1-7 v. Chiquita Brands International, Inc. et al.*, No. 07-3406 (D.N.J.) ..............................7

*Romero v. Drummond Co.*, No. CV-03-BE-0575-W (N.D. Ala. Mar. 5, 2007)............................42

*United States v. Chiquita Brands International, Inc.*, No. 07-CR-055 (D.D.C. Mar. 13, 2007).........................................................................................2

## FEDERAL STATUTES

18 U.S.C. § 2333 ..............................................................................................................28, 31

28 U.S.C. § 1331 .......................................................................................................................9

28 U.S.C. § 1350 ............................................................................................................ *passim*

28 U.S.C. § 1407 .......................................................................................................................7

42 U.S.C. § 1983 .....................................................................................................................12

50 U.S.C. § 1705(b) ..................................................................................................................2

## STATE STATUTES

D.C. Code § 12-301 .................................................................................................................45

D.C. Code § 16-2701(a) (2007) ...............................................................................................44

D.C. Code § 16-2702 (2007)....................................................................................................45

## MISCELLANEOUS

Curtis A. Bradley, et al., *Sosa, Customary International Law, and the Continuing
   Relevance of Erie,* 120 HARV. L. REV. 869, 927 (2007).............................................. 24-26

Antonio Cassese, International Criminal Law 197 (2003) ...........................................................34

Joshua Dressler, Understanding Criminal Law 475 (3d ed. 2001)...............................................31

## <u>INTRODUCTION</u>

Asserting claims under the 200 year-old Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, and District of Columbia tort law, plaintiffs in this action seek to hold an American corporation, Chiquita Brands International, Inc. ("Chiquita"), responsible for the deaths of 173 Colombian citizens who were allegedly killed by left-wing guerillas and right-wing paramilitary groups in Colombia during a span of nearly 30 years. The principal basis upon which it is alleged that Chiquita should be adjudged liable for these deaths is that Chiquita's Colombian subsidiary was forced to make extortion payments to the groups when they controlled the remote areas of Colombia in which Chiquita operated. Plaintiffs also assert that Chiquita assisted one of the groups in obtaining weapons, although the very documents upon which plaintiffs rely to make this false and incendiary allegation flatly contradict it. There is no allegation that anyone from Chiquita or its subsidiary participated in, facilitated, or even knew about any of the murders alleged in the Complaint.

The unprecedented theories asserted in this Complaint, which seek to hold Chiquita liable in tort for murders of which the company had no knowledge and in which it was not involved, are legally untenable. Plaintiffs' ATS and TVPA claims — which attempt through wholly conclusory and contradictory allegations to (a) transform murders by private armed groups into state-sanctioned executions or other purported international law violations, and then (b) make Chiquita into an accessory to these crimes solely because it provided a small fraction of the massive funds these organizations were able to obtain through extortion of individuals and businesses like Chiquita, drug trafficking, kidnapping, and their other nefarious activities — do not come close to stating a cognizable claim over which the Court has jurisdiction. Plaintiffs'

state law claims fail, as well, because the laws of the District of Columbia do not apply to the conduct at issue here, and even if they did, plaintiffs have not stated viable claims under those laws.

## BACKGROUND

With respect to Chiquita, the Complaint is based almost exclusively upon a federal criminal Information charging Chiquita with a single-count violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705(b).  That statute prohibits a United States person from engaging in transactions with a foreign organization or individual determined by the U.S. Secretary of State to be a "Specially Designated Global Terrorist" ("SDGT") without having first obtained a license from the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC").  The Information charging Chiquita with this offense was filed with the U.S. District Court for the District of Columbia on March 13, 2007, and Chiquita entered its plea of guilty on March 19, 2007.[1]  The instant Complaint was filed on June 7, 2007, less than three months after Chiquita's plea.

As set forth in the Information and alleged in the Complaint, Chiquita is headquartered in Cincinnati, Ohio, and is a producer, marketer, and distributor of bananas; until 2004, Chiquita's former Colombian subsidiary, C.I. Bananos de Exportación, S.A. ("Banadex"),

---

[1]    Plaintiffs allege that "Defendants have pled guilty in the pending criminal case, 07-CR-0555 [sic] (RCL)" (Compl. ¶ 229), and allegations regarding Chiquita's conduct are derived almost entirely, sometimes verbatim, from the Information filed in that case.  A copy of the Information filed in *United States v. Chiquita Brands International, Inc.*, No. 07-CR-055 (D.D.C. Mar. 13, 2007) is attached hereto as Exhibit A to the Declaration of John E. Hall ("Hall Decl.").  In deciding a motion to dismiss, the Court may consider "documents attached as exhibits or *incorporated by reference in the complaint*, and matters about which the Court may take judicial notice."  *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (emphasis added).  "A court may take judicial notice of public records from other proceedings." *Banks v. Gonzales*, 496 F. Supp. 2d 146, 148 (D.D.C. 2007) (citing *Covad Commc'n Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

owned and operated banana farms in two remote regions of Colombia known as Urabá and Santa Marta.  (Compl. ¶ 184; Information ¶¶ 1-2.)  From approximately 1989 to 1997, when left-wing guerilla groups known as the Revolutionary Armed Forces of Colombia ("FARC") and the Ejército de Liberación Nacional ("EPL" or "ELN") controlled Urabá and Santa Marta, Chiquita paid money to these groups.  (Compl. ¶ 207; Information ¶ 20.)

In or about 1997, the Autodefensas Unidas de Colombia (the United Self-Defense Forces of Colombia or "AUC"), an organization of loosely-affiliated, right-wing paramilitaries in Colombia, took control of these regions from the guerilla groups.  (Information ¶ 21.)  At this time, Banadex's General Manager was summoned to a meeting with the then-leader of the AUC, Carlos Castaño, and told by Castaño that Banadex must begin making payments to the AUC. (*Id.*)  Castaño instructed Banadex to make the payments through a "convivir," a type of private security company used by the AUC as a front to collect money from businesses.  (*Id.*)  As plaintiffs acknowledge in their Complaint, the AUC was "a violent, right-wing paramilitary organization" whose activities "include[d] assassinating union leaders and suspected guerilla supporters, drug trafficking, kidnapping, and indiscriminate murdering of civilians."  (Compl. ¶ 215.)  In the meeting with Banadex, Castaño "sent an unspoken but clear message that failure to make the payments could result in physical harm to Banadex personnel and property." (Information ¶ 21.)

As Castaño demanded, beginning in late 1997, Chiquita was forced to begin making semi-monthly payments to the AUC.  (*Id.*)  On October 31, 2001, the AUC was designated a SDGT by the Secretary of State, thus prohibiting any U.S. person from engaging in transactions with the AUC without first obtaining a license or other authorization from OFAC. (Information ¶ 8.)  On or about February 20, 2003, a Chiquita employee discovered that the AUC

had been designated a foreign terrorist organization by the U.S. government. (*Id.* ¶ 55.) Almost immediately thereafter, Chiquita consulted its outside counsel who advised the company that the payments had become illegal following the AUC's designation. (*Id.* ¶ 56.) In April 2003, following a report to Chiquita's Board of Directors, the Board directed that the payments be promptly disclosed to the Department of Justice. (*Id.* ¶ 59.)

On or about April 24, 2003, representatives of Chiquita and its counsel met with officials of the Justice Department and voluntarily disclosed the payments. (*Id.* ¶ 62.) The Justice Department officials told Chiquita that "the payments were illegal and could not continue," while at the same time acknowledging "that the issue of continued payments was complicated." (*Id.*) The precise content of the communications between Chiquita and the Justice Department in the April 24th meeting and thereafter, including in particular the question of how Chiquita should resolve the dilemma created by the AUC's threats of violence against Chiquita's employees if the payments were discontinued, is a subject of dispute; however, this dispute is immaterial to the present motion. In 2004, Chiquita sold its Colombian operations and discontinued the payments. (*Id.* ¶ 2.) On March 19, 2007, Chiquita entered its plea of guilty to the Information charging the violation of IEEPA. While many of Chiquita's payments to the AUC were made before the AUC was designated a SDGT, from the time of the Castaño meeting in 1997 to Chiquita's departure from Colombia in 2004, Chiquita made approximately 100 payments to the AUC totaling $1.7 million. (*Id.* ¶ 19.)

Except for the facts taken from the Information, the Complaint contains only one additional set of allegations regarding supposed wrongful conduct by Chiquita. Relying on a report from the Colombian chief federal prosecutor's office ("Prosecutor Report") and a report of the Organization of American States ("OAS Report"), plaintiffs allege that, in November 2001,

"a Banadex ship" was used to smuggle weapons into Colombia for the AUC, and that "Giovanny Hurtado Torres, Banadex's legal representative, [was] convicted in Colombia over the arms-smuggling scheme." (Compl. ¶ 224-25.)[2]  However, the very reports on which plaintiffs rely and incorporate by reference into the Complaint to support these allegations flatly contradict them.[3] First, the OAS Report makes clear that the ship involved in the November 2001 incident was owned by a Panamanian company — not Chiquita or Banadex.  (*See* OAS Report at 12 (describing the Otterloo ship as "owned by Panamanian-based Trafalgar Maritime Inc.") (attached as Exhibit B to Hall Decl.).)  Second, the Prosecutor Report explicitly exonerates Giovanny Hurtado Torres from any alleged criminal activity in connection with the November 2001 incident and states that the prosecutor's office closed its investigation against him.  (*See* Prosecutor Report at 28-29 ("With regard to Mr. YOVANNY HURTADO TORRES, we note that his conduct is . . . free of any guilt . . . .  [T]he activities of Mr. HURTADO TORRES should be regarded as not characterizing this offence, since they did not come within the punishable

---

[2]    *See* Report of the General Secretariat of the Organization of American States on the Diversion of Nicaraguan Arms to the United Defense Forces of Colombia, at 12 (Jan. 6, 2003), *available at* http://www.scm.oas.org/doc_public/ENGLISH/HIST_03/CP10739E06.DOC (attached as Exhibit B to Hall Decl.) ("OAS Report"); Report of the Colombian Prosecutor's Office, Prosecutor Delegated Before the Criminal Courts, Special Circuit, National Unit Against Terrorism, Office 18, File No. 59.516, dated July 23, 2004 (attached as Exhibit C to Hall Decl., with English translation and Affidavit of Accuracy) ("Prosecutor Report").

[3]    The Court may properly consider the Prosecutor Report and OAS Report, which are referred to and relied upon in the Complaint, for purposes of a motion to dismiss under either Rule 12(b)(1) or Rule 12(b)(6).  "[I]n deciding a 12(b)(1) motion, it is well established in this Circuit that a court is not limited to the allegations in the complaint but may consider material outside the complaint in an effort to determine whether the court has jurisdiction in this case." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 195 (D.D.C. 2002); *see also Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("In 12(b)(1) proceedings, it has been long accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to entertain the case.'") (citation omitted).  *See supra* n. 1; *Echostar DBS Corp. v. Gemstar-TV Guide Int'l, Inc.*, No. 05 Civ. 8510 (DAB), 2007 WL 438088, at *4 (S.D.N.Y. Feb. 8, 2007) ("if the allegations of a complaint are contradicted by documents incorporated in the complaint, the documents control and the court need not accept the allegations of the complaint as true").

conduct referred to in Article 366 of the Criminal Code, punishable conduct which was imputed to him and because of which he is involved in the investigation.  This fact leads us to order that the investigation against him in these proceedings is to be terminated, under Article 38 of the Criminal Procedure Code.") (attached as Exhibit C to Hall Decl.).)

Despite seeking damages from Chiquita in tort for 173 separate deaths, the Complaint is essentially bereft of any facts about those deaths.  The alleged victims and their family member-plaintiffs are identified by pseudonyms in a string of short, largely verbatim paragraphs that state only that the victim "was killed" or "was disappeared" on a particular date. (Compl. ¶¶ 10-183, 219-227.)  The dates of the alleged murders encompass a period of nearly 30 years, from 1975 to 2004.  (*Id.*)  In some cases, it is alleged in conclusory fashion that "the AUC" was responsible for the murder; in others, "the FARC"; and in still others, no group is identified, only that the killing was "by paramilitaries."  (*Id.*)

There is no description what allegedly happened in any of the incidents, and, significantly, no allegation that purports to link *any* of the murders to Chiquita.  The Complaint does not allege that there was any relationship between any victim and Chiquita, let alone that Chiquita had any involvement in, or even knowledge of, any of their alleged deaths.  Moreover, while apparently seeking to base liability and causation entirely upon the assertion that Chiquita "financed" or "supported" these groups, plaintiffs allege no facts regarding the significance of the $1.7 million extorted from Chiquita over seven years by the AUC relative to the overall resources of that group, and nothing whatsoever about the FARC, organizations that are estimated to have taken in several hundred million dollars in income *each year*.[4]

---

[4]    A recent United Nations report places the annual income of the self-defense forces (*i.e.*, the AUC) at $286 million, 70% of which is derived from drug trafficking, and of the FARC at (continued…)

On the basis of these allegations, plaintiffs assert nine causes of action. Count I pleads in conclusory fashion that Chiquita "aided and abetted," "conspired" with, or "hired" the paramilitaries to carry out what are alleged to be "extrajudicial killings" in violation of international law, so as to attempt to invoke the limited grant of federal subject matter jurisdiction provided by the ATS. Count II asserts a similar claim for extrajudicial killing under the Torture Victim Protection Act. The remaining counts assert common law claims for (III) wrongful death; (IV) negligence; (V) negligent hiring; (VI) negligent supervision; (VII) intentional infliction of emotional distress; (VIII) battery; and (IX) assault.[5]

## **ARGUMENT**

Neither the fact that Chiquita made payments to the paramilitaries, nor any other fact admitted by the company in the Information, suffices to establish liability here. The ATS provides, in full, that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Although enacted by the First Congress as part of the Judiciary Act of 1789, the ATS was rarely invoked during its first two hundred years, leading some courts to

---

$342 million, 40% of which is derived from drug trafficking. *See* United Nations Dev. Programme, El conflicto, callejón con salida: Informe nacional de desarrollo humano para Colombia [The Conflict, Alley with an Exit: National Report on Human Development for Colombia] 285 (2003) (attached hereto as Exhibit D to Hall Decl., with English translation and Affidavit of Accuracy).

[5]    Three other ATS lawsuits have been filed against Chiquita by Colombians who allege that they are legal heirs to individuals killed by paramilitaries in Colombia. *See Carrizosa et. al v. Chiquita Brands Intl, Inc. et al.*, No. 07-60821 (S.D. Fla.); *Does 1-7 v. Chiquita Brands Intl. et al.*, No. 07-3406 (D.N.J.); *Does 1-377 v. Chiquita Brands, Intl., Inc. et al.*, No. 07-CV-10300 (S.D.N.Y.). All four ATS lawsuits are based on the same factual allegations with respect to Chiquita and assert similar legal theories. On November 26, 2007, Chiquita filed a motion with the Judicial Panel on Multidistrict Litigation to transfer the other actions to this District for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.

observe that "no one seems to know whence it came." *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975) (describing the ATS as a "legal Lohengrin").

The modern era of ATS litigation began when, in *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), the Second Circuit concluded that certain acts of torture committed by state officials violate the law of nations and thus support jurisdiction under the ATS.  Since *Filartiga*, ATS litigation has proceeded in two distinct phases: an initial wave of lawsuits against individuals, typically state officials, alleged to have engaged directly in human rights abuses and, more recently, a series of largely unsuccessful lawsuits targeting U.S. corporations alleged to be liable indirectly for human rights abuses committed by others.  *See In re Sinaltrainal Litig.*, 474 F. Supp. 2d 1273, 1274 (S.D. Fla. 2006) (discussing ATS litigation against corporations and noting that there has yet to be any judgment against a corporate defendant under the ATS).

Recognizing the significant foreign policy consequences of ATS litigation and the concomitant impact on the U.S. judicial system, the Supreme Court recently announced stringent new requirements for recognizing a cause of action under the statute.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004).  In particular, the Supreme Court concluded in *Sosa* that the ATS provides subject matter jurisdiction only for those federal common law claims alleging well-accepted and clearly-defined offenses under international law.  *Id.*  The *Sosa* Court further instructed the federal courts to be "cautio[us]" when exercising their common law powers under the ATS to recognize and remedy purported violations of international law.  *Id.* at 725.

Chiquita moves to dismiss the ATS claim for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).  Because plaintiffs must allege a "violation of the law of nations" to establish subject matter jurisdiction under the ATS, the standard of pleading is

more stringent than in other contexts. Courts must "engage[] in a more searching preliminary review of the merits [at the motion to dismiss stage] than is required, for example, under the more flexible 'arising under' formulation" of 28 U.S.C. § 1331. *Filartiga*, 630 F. 2d at 887-88; *see also Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 24 (D.D.C. 2005) ("In assessing whether plaintiffs have stated a claim under the Alien Tort Statute, courts must conduct a more searching merits-based inquiry than is required in a less sensitive arena."). Plaintiffs cannot survive a motion to dismiss in an ATS case by "plead[ing] merely a colorable violation of the law of nations." *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995).

Moreover, even without regard to the ATS's heightened jurisdictional pleading standard, for plaintiffs to survive Chiquita's Rule 12(b)(6) motion, they must plead "enough facts to state a claim for relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 1974 (2007). Plaintiffs' allegations are presumed to be true, and all reasonable inferences are drawn in their favor. *See Maljack Prods, Inc. v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 375 (D.C. Cir. 1995). The Court, however, "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). "A plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 127 S. Ct. at 1964-65 (quoting Fed. R. Civ. P. 8(a)).

This Complaint fails entirely to satisfy Rule 8's "plain statement" requirement, let alone the heightened pleading standard imposed by the ATS, and thus runs directly afoul of the

restrained conception of ATS jurisdiction that the *Sosa* Court envisioned.  No court has *ever* imposed ATS liability based upon such an attenuated and indirect connection between the alleged injuries and the alleged misconduct as alleged in this case.  As an initial matter, plaintiffs' claims of extrajudicial killing fail because, while there is a recognized prohibition of summary execution when committed by a state, the private paramilitary groups at issue here were concededly not state actors; and plaintiffs do not and cannot plead facts showing that Republic of Colombia was complicit in each of the alleged 173 murders such that state action should be imputed.

In addition, as a matter of law, aiding and abetting by a private corporation does not constitute an established violation of international law actionable under the ATS, as this District has held.  And, even if aiding and abetting or other indirect theories of liability for extrajudicial killing were cognizable, plaintiffs do not and cannot allege that Chiquita substantially assisted any of the alleged killings or that Chiquita intended that the killings occur, both of which are essential elements of an aiding and abetting claim.  Plaintiffs' claims under the TVPA fail for similar reasons.

Finally, plaintiffs' state law claims should be dismissed because the laws of the District of Columbia do not apply to the conduct at issue here and, even if they did, plaintiffs have not stated viable claims under those laws.

## I.    CHIQUITA IS NOT LIABLE FOR THE ALLEGED "EXTRAJUDICIAL KILLINGS" COMMITTED BY PRIVATE PARAMILITARY GROUPS IN COLOMBIA.

Plaintiffs seek to hold Chiquita derivatively liable for the alleged "extrajudicial killings" of plaintiffs' family members.  (*See* Compl. ¶¶ 234-39.)  This theory suffers from two fundamental legal defects.  First, because extrajudicial killing is, by its very nature, a summary execution perpetrated by a *state*, not a private party, *see Exxon*, 393 F. Supp. at 25-26 (citing

*Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 206-07 (D.C. Cir. 1985)), there can be no international law violation here because these private paramilitaries were not "state actors." Any attempt by plaintiffs to impute state action to the paramilitaries, or to evade altogether this basic requirement under the facts pled here, is unavailing. Second, even disregarding plaintiffs' failure to allege state action, there is no basis for derivative liability against Chiquita. Corporate aiding and abetting of a purported extrajudicial killing is not a universally recognized violation of customary international law, and in any event, plaintiffs do not and cannot allege facts sufficient to sustain such a claim.

**A.** **Plaintiffs' ATS Claims Should Be Dismissed Because Plaintiffs Have Not Alleged And Cannot Allege State Action.**

Plaintiffs' ATS claims for extrajudicial killings must be dismissed for failing to satisfy the first requisite element in their theory, *i.e.*, that the "extrajudicial killings" alleged in the Complaint involved state action. By plaintiffs' own admission, these were private groups. Plaintiffs cannot satisfy the state action requirement by asserting in conclusory fashion that the alleged murders were perpetrated "under color of law," nor evade it by trying to label the murders "war crimes." Moreover, even if the plaintiffs could satisfy the state action requirement by pleading facts showing the complicity of the Colombian government in each of these alleged murders, a factual inquiry to test such allegations would necessarily intrude on the foreign affairs function of the political branches, and is therefore nonjusticiable.

*1.* *Plaintiffs do not allege that the paramilitaries are state actors.*

Plaintiffs' core claim is that Chiquita should be responsible for extrajudicial killings carried out by the paramilitaries. To sustain a claim for extrajudicial killing under the ATS, however, a plaintiff must plead facts establishing that the alleged killing constituted state action rather than conduct carried out solely by a private party. "Traditionally only states (and

not persons) could be liable under the Alien Tort Statute for . . . extrajudicial killing." *Exxon*, 393 F. Supp. 2d at 25-26 (citing *Sanchez-Espinoza*, 770 F.2d at 206-07).

        Plaintiffs do not and cannot allege that the armed groups purportedly responsible for their relatives' deaths are Colombian government entities; to the contrary, they are concededly private groups.  Indeed, plaintiffs describe the FARC as "a left-wing *guerilla* organization" (*see* Compl. ¶ 207), which allegation on its face is completely at odds with the notion that the FARC is a state actor.  Plaintiffs' likewise characterize the AUC as an organization of "loosely-affiliated *illegal* paramilitary groups" (*Id*. ¶ 215 (emphasis added)), *i.e.*, groups *outlawed by the Colombian government*, not officially condoned or sanctioned.  Rather than plead state action, plaintiffs instead aver in conclusory fashion that the AUC and the FARC acted "under color of law" in carrying out the murders alleged in the Complaint.  (*Id*. ¶¶ 235, 238.)  But these allegations, even if they could be substantiated (which they cannot), are insufficient to establish ATS jurisdiction.

        Although some courts have held that state action may be imputed to a private party through a "color of law" analysis applicable to claims asserted under 42 U.S.C. § 1983, this District has insisted that ATS jurisdiction lies only when the offending acts are performed by the state.  *Exxon*, 393 F. Supp. 2d at 26.  "Recognizing acts under color of law would dramatically expand the reach of the statute.  Just as aider and abettor liability for international law violations has been rejected by some courts as overly expansive and beyond Congress' mandate . . . basing liability for Alien Tort Statute violations on color of law jurisprudence is a similar overreach." *Id.  See also Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2006 WL 2455752, at *6 (N.D. Cal. Aug. 22, 2006) (holding that "it would be inappropriate to import 'color of law' jurisprudence

from § 1983 to expand the [ATS's] reach"), *modified on other grounds*, 2007 WL 2349341, at *7

(N.D. Cal. Aug. 14, 2007).

      The *Exxon* court determined that "[g]rafting § 1983 color of law analysis onto

international law claims would be an end-run around the accepted principle that most violations

of international law can be committed only by states."  393 F. Supp. 2d at 26.  Moreover, "it is

notoriously difficult to determine when a party has acted under color of law, making it harder for

courts to engage in 'vigilant doorkeeping,'" as required by *Sosa*.  *Id.* (citation omitted).  Of

particular relevance to the facts presented here, the *Exxon* court observed that, "[i]t is also highly

unfair to corporations operating in states with potentially problematic human rights records

which under the color of law rule may (or may not) be subject to liability for doing business

there and benefiting from the state's infrastructure."  *Id.*  Indeed, accepting "color of law"

allegations in an ATS context could expose companies operating throughout the world to

liability for acts of violence that occurred in countries where they operated, even with no

significant connection between the company and the illegal acts, while also opening U.S. courts

to a flood of litigation.  For these reasons, plaintiffs' "color of law" allegations cannot satisfy the

ATS's state action requirement.

      **2.**      ***Even if private action "under color of law" were cognizable under the ATS, plaintiffs have insufficiently alleged such conduct.***

      Even if the Court were to construe the ATS to permit claims based on the conduct

of private actors carried out "under color of law," plaintiffs have made only conclusory

allegations that the paramilitaries acted "under color of law."  As the Supreme Court has held in

the section 1983 context, "state action may be found if, though only if, there is such a 'close

nexus between the State and the challenged action' that seemingly private behavior 'may be

fairly treated as that of the State itself.'"  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic*

*Ass'n*, 531 U.S. 288, 295 (2001); *accord Williams v. United States*, 396 F.3d 412, 415 (D.C. Cir.

2005).  A private individual must act together with state officials or receive significant aid from

state officials to act "under color of law."  *See, e.g., Bigio v. Coca-Cola*, 239 F.3d 440, 448-49

(2d Cir. 2000).  Moreover, it is not enough merely to associate the private party with the state in

general; "the symbiotic relationship must involve the '*specific conduct* of which the plaintiff

complains.'"  *Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001) (citing *American Mfrs.*

*Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999)) (emphasis added).

       Plaintiffs fall well short of alleging the facts that would be necessary to establish

that, for each of the 173 murders alleged in the Complaint, the perpetrators were acting jointly

with and for the Colombian government.  The notion that the FARC — a *guerilla* group fighting

the government — was actually acting as the government in committing the murders alleged in

the Complaint is absurd and contradicted by the plaintiffs' own allegations.  Nor does plaintiffs'

description of the AUC — an admittedly "illegal" group (Compl. ¶ 215) — as "paramilitary

security forces [that] are permitted to exist, openly operate under the laws of Colombia, and are

assisted by government military officials" (Compl. ¶¶ 235, 238) sufficiently allege conduct

perpetrated under "color of law."  Plaintiffs fail to allege even one specific fact to support this

conclusory assertion, and there is obviously nothing to connect that general claim to the

individual murders alleged in the Complaint.  In any event, a state actor's mere inaction or

tolerance of wrongful conduct by a private party is insufficient to impute state action to a private

party; rather, the plaintiff must allege facts showing active involvement by the state actor.

       For example, in *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242

(11th Cir. 2005), the court rejected allegations similar to those pled here — *i.e.*, that the

government sanctioned the tortious acts of private security forces by permitting them to exist,

and that government officials knew of and deliberately ignored such acts.  As the *Aldana* court

held, the state's "registration and toleration of private security forces does not transform those

forces' acts into state acts."  *Id.* at 1248.  The court in *Aldana* ultimately concluded that the state

action requirement had been met because the plaintiffs in that case had alleged that a specific

public official, the Mayor, was himself an "armed aggressor, not a mere observer," and was

actively involved in the violent conduct.  *Id.* at 1249 (quotations omitted).

     *Aldana* makes clear that plaintiffs must allege facts that demonstrate the active

involvement of a state actor to establish that a private party was acting under "color of law."  The

general and conclusory color of law allegations in plaintiffs' Complaint plainly do not meet this

standard.

     **3.**     ***Plaintiffs cannot overcome the state action requirement through***
     ***conclusory allegations that the conduct at issue constituted "war***
     ***crimes."***

     In a half-hearted attempt to avoid the ATS's state action requirement, plaintiffs

allege, in a single passing reference, that because "the murders were committed in the course of a

civil conflict, and the victims were innocent civilians, these were also war crimes."  (Compl.

¶ 235.)  This conclusory allegation, unsubstantiated by any actual facts — and, indeed, wholly

inconsistent with plaintiffs' claims regarding the purported business motive underlying

Chiquita's "support" of the AUC — cannot justify the exercise of ATS jurisdiction.

     As the Second Circuit held in *Kadic*, violations of the laws of war (*i.e.*, "war

crimes") are among "'a handful of crimes to which the law of nations attributes individual

responsibility,'" 70 F.3d at 240 (quoting *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 795

(D.C. Cir. 1984) (Edwards, J., concurring)), and thus are actionable under the ATS even absent a

showing of state action, *id.* at 742.  *See also Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 22 n.5

(D.D.C. 2000) (accepting Second Circuit's conclusion in *Kadic* that ATS extends to war crimes

without requiring showing of state action). To establish a cognizable war crimes claim under the ATS, however, plaintiffs must do more than allege simply "the murder of an innocent civilian during an armed conflict." *Saperstein v. Palestinian Authority*, No. 1:04-cv-20225-PAS, 2006 WL 3804718, at *8 (S.D. Fla. Dec. 22, 2006). Rather, plaintiffs seeking to avail themselves of the war crimes exception to the ATS's state action requirement must allege that "the acts of murder, rape, torture, [or] arbitrary detention of civilians, [were] committed *in the course of hostilities*." *Kadic*, 70 F.3d at 242 (emphasis added).

Accordingly, courts have required plaintiffs advancing war crimes claims under the ATS to allege atrocities directly tied to, and committed in furtherance of, an armed conflict. In *Kadic*, for example, the Second Circuit found that ATS jurisdiction existed over plaintiffs' war crimes claims where plaintiffs had alleged that the defendant, a Bosnian-Serb general, "possess[ed] ultimate command authority over the Bosnian-Serb military forces, and the injuries perpetrated upon plaintiffs were committed as part of a pattern of systematic human rights violations that was directed by [defendant] and carried out by the military forces under his command." 70 F.3d at 237. By contrast, in *Saperstein*, the court rejected plaintiffs' bare assertion that defendants' alleged "'murder of [a] civilian[ ] in the course of an armed conflict'" was actionable as a war crime under the ATS. 2006 WL 3804718, at *8; *see also id.* ("Essentially, Plaintiffs are saying that if they allege a murder of an innocent person during an armed conflict, then they have alleged a per se violation of the law of nations and federal courts have subject matter jurisdiction over the dispute under the ATS. No court has so held.").

As in *Saperstein*, plaintiffs here fail completely to demonstrate any connection whatsoever between the alleged paramilitary murders and any armed conflict. While plaintiffs describe a conflict between and among various armed groups in Colombia's banana-growing

16

region (Compl. ¶¶ 206-214), they assert no facts indicating that the alleged murders of plaintiffs'

relatives were in any way related to that conflict.  (*See* Compl. ¶¶ 10-183 (alleging only that

plaintiffs' relatives were killed by the AUC or FARC, which "received support from Chiquita

and/or Banadex").)  And as the court in *Saperstein* explained, it is not enough for plaintiffs to

allege merely that their relatives were innocent civilians killed in the course of an armed conflict:

> [I]f Plaintiffs' specific allegation, i.e., the murder of an innocent
> civilian during an armed conflict, was sufficient for purposes of the
> ATS, then whenever an innocent person was murdered during an
> 'armed conflict' anywhere in the world, whether it be Bosnia, the
> Middle East or Darfur, Sudan, the federal courts would have
> jurisdiction over the dispute.  Clearly, such an interpretation would
> not only make district courts international courts of civil justice, it
> would be in direct contravention of the Supreme Court's specific
> prudential guidance admonishing lower courts to be cautious in
> creating new offenses under the law of nations.

2006 WL 3804718, at *8.

Plaintiffs' war crimes allegation is all the more futile when the indirect nature of

plaintiffs' claims is taken into account.  Plaintiffs have not sued the AUC or FARC, or their

members or commanders; rather, plaintiffs seek to hold Chiquita derivatively responsible for the

alleged torts committed by those groups.  But there are simply no facts asserted (and none exist)

that establish that Chiquita engaged in actions — or acted jointly with the AUC or FARC to

engage in actions — in furtherance of war hostilities.  *See Sinaltrainal*, 474 F. Supp. 2d at 1289

(rejecting war crimes claim under ATS based on corporate defendant's alleged secondary

responsibility for the AUC's tortious conduct; "[S]ome modicum of specificity regarding the

details of *affirmative* action, whether it be in the form of a conspiracy or joint action to

orchestrate hostilities, is required to adequately plead a violation of the law of nations on the

basis of war crimes.") (emphasis in original).

At bottom, the gravamen of plaintiffs' Complaint is the claim that Chiquita made payments to the AUC and FARC to further its own Colombian business interests, and thus should be liable for all crimes allegedly perpetrated by those groups.  (*See, e.g.,* Compl. ¶ 211 ("Chiquita's business boomed as the A.U.C. took over banana-growing lands and murdered thousands of people"); *id.* ¶ 220 ("The A.U.C. was paid to ensure that Chiquita's business ran smoothly.").)  But in this regard, plaintiffs' allegations of Chiquita's purported "business motives" are inconsistent with any alleged war crimes violation.  As the court in *Sinaltrainal* observed in rejecting a similar (though more specifically pleaded) theory of war crimes liability: "Alleging that the Defendants 'affirmatively acted to benefit from the civil war by making arrangements to have the paramilitaries target their union leaders' is a far cry from alleging that Defendants actually conspired with the paramilitaries to orchestrate hostilities."  474 F. Supp. 2d at 1289 (citation omitted).  "[I]ndirect economic benefit from unlawful state action is not sufficient to support jurisdiction over a private party under the Alien Tort Claims Act."  *Id.* (citing *Bigio*, 239 F.3d at 449).  For these reasons, plaintiffs' war crimes claim must be dismissed.

> **4.     Even if state action were properly alleged, an inquiry by an American court into the complicity of the Colombian government's involvement in these offenses would not be justiciable.**

Even if plaintiffs could make the allegations necessary to sustain a claim of state action, the claim would be equivalent to an assertion that the Colombian government was complicit in the summary executions of its own citizens by terrorist organizations.  Such a claim would present a nonjusticiable "political question" and should be dismissed because it "challenges the official acts of an existing government in a region where diplomacy is delicate and U.S. interests are great."  *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1032 (W.D. Wa. 2005), *aff'd*, No. 05-36210 (9th Cir. Sept. 17, 2007), *pet. for reh'g pending* (filed Oct. 9, 2007).

18

*See also Saleh v. Titan Corp.*, 436 F. Supp. 2d 55, 58 (D.D.C. 2006) ("[T]he more plaintiffs assert official complicity with the acts of which they complain, the closer they sail to the jurisdictional limitation of the political question doctrine."); *Exxon*, 393 F. Supp. 2d at 26-28 (dismissing ATS claim against a corporation because, among other reasons, a state action inquiry by the court "would create a significant risk of interfering in [a foreign government's] affairs and thus U.S. foreign policy concerns").

In cases that "touch on foreign relations," the political question doctrine requires the Court to conduct a "discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in light of its nature and posturein the specific case, and of the possible consequences of judicial action." *Baker v. Carr*, 369 U.S. 186, 211-12 (1962). A finding of state action in this case would directly contradict the foreign policy position of the United States, which sees Colombia as a staunch ally in the fight against terrorism, and would thus constitute unwarranted judicial interference in the foreign relations of the United States.[6] For years, the United States has consistently provided political, economic, and military support to the Colombian government, including support to Colombia's efforts to disarm and prosecute paramilitaries, and to provide reparations to their victims.[7] A judicial finding of "complicity" between Colombia and the AUC

---

[6]     *See, e.g.*, President George W. Bush, Remarks at a Press Conference in Crawford, TX (Aug. 4, 2005) (attached as Exhibit E to Hall Decl.) ("[The United States and Colombia] are working together to fight drug trafficking and terrorism, and to promote security, democracy and the rule of law throughout the Americas."), http://www.whitehouse.gov/news/releases/2005/08/20050804-2.html; Amb. Henry A. Crumpton, Coordinator for Counterterrorism, U.S. State Dep't, Remarks at a Press Conference in the U.S. Embassy in Colombia (Mar. 23, 2006) (attached as Exhibit F to Hall Decl.) ("Colombia is a staunch ally of the U.S. in the hemispheric fight against terrorism."), http://usinfo.state.gov/is/Archive/2006/Mar/27-412929.html.

[7]     *See, e.g.*, R. Nicolas Burns, Under-Secretary of State for Political Affairs, United States Dep't of State, Remarks Before the Council for the Americas (Oct. 22, 2007) (attached as (continued…)

in this case would be at odds with this policy and create the potential for disparate pronouncements by the executive and the judiciary on Colombia's terrorism policies.  *See Baker*, 369 U.S. at 217.

       Moreover, as a practical matter, discovery into these sensitive issues would be essentially impossible.  Litigation of the state action issue will require the parties to investigate each individual act of alleged violence to determine the extent of official involvement.  Such an investigation would be exceptionally difficult to conduct in a foreign country where the ordinary tools of civil discovery are unavailable and where certain of the paramilitary groups at issue continue to operate.  As set forth in plaintiffs' own filings with the court, the regions where plaintiffs reside (and, presumably, where the murders are alleged to have occurred) are "a hotbed of discontent and armed conflict among various armed guerrilla organizations."  (Decl. of Paul David Wolf in Support of Plaintiffs' *Ex-Parte* Motion to Commence & Proceed with Action Using Pseudonyms ¶ 3 (Dkt. 1).)  According to plaintiffs, the AUC "controls" and "maintain[s] a reign of terror" in the region, (*id.* ¶¶ 3, 7), where critical evidence about the state's participation in the alleged murders — again, assuming it could be properly alleged — presumably would be located.  In this context, there are simply no judicially manageable standards for resolving the state action issue.

---

Exhibit G to Hall Decl.) (noting, among other things, that "over many years and with bipartisan support, the United States has made a substantial investment in Colombia's successful struggle against narco-terrorism"), *available at* http://www.state.gov/p/us/rm/2007/93969.htm; U.S.A.I.D., Colombia Data Sheet: Support for Demobilization and Reintegration (Doc. No. 514-XXX) (attached as Exhibit H to Hall Decl.), *available at* http://www.usaid.gov/policy/budget/cbj2007/lac/pdf/co_514-XXX.pdf.

In light of these substantial practical difficulties, this Court should fulfill its responsibilities as a "vigilant doorkeep[er]," *Sosa*, 542 U.S. at 729, and dismiss plaintiffs claims at the threshold.

**B.      Plaintiffs ATS Claims Should Be Dismissed Because There Is No Aiding and Abetting Liability As A Matter of Law, and In Any Event, Plaintiffs Do Not Allege Facts Necessary to Support Secondary Liability Against Chiquita.**

Even if plaintiffs could satisfy the state action requirement, plaintiffs' theory that Chiquita can be held secondarily liable for the acts of the AUC or FARC groups is wrong. While plaintiffs assert in conclusory fashion various alternative theories of secondary liability — including aiding and abetting, conspiracy, and agency — they allege no facts showing that Chiquita directed, encouraged, or hired the AUC or FARC to commit these particular murders; or that Chiquita employees were present at the scene of, or in any way participated in these particular murders; or that Chiquita intended for these particular murders to occur; or that Chiquita even had any knowledge of the murders.  Plaintiffs do not even allege that any of the victims had *any* connections to Chiquita, Chiquita's business operations in Colombia, Chiquita's banana farms, or labor unions representing Chiquita's employees.[8]

Rather than make *particularized* allegations showing why Chiquita should be held responsible for *these* murders, plaintiffs instead appear to contend that because Banadex made payments to the paramilitaries, Chiquita should be held liable for *any* violent act committed by them.  Plaintiffs' claims, if sustained, would substantially expand ATS jurisdiction beyond

---

[8]      Plaintiffs go so far as to allege that Chiquita should be held responsible for several murders that were committed by the AUC *before* Chiquita even began making payments to the AUC.  (*See* Compl. ¶¶ 19, 27, 28, 29, 47, 51, 67, 79, 81, 113, 122, 147, 162, 165.)  Even worse, plaintiffs seek to hold Chiquita liable for several murders committed by the AUC even before the AUC, by plaintiffs' own allegations, came into existence.  (*Compare* Compl. ¶ 215 (alleging that the AUC "was formed on or about April 1997") *with* ¶¶ 19, 27, 28, 29, 47, 51, 67, 79, 81, 113, 122, 147, 162, 165) (alleging murders committed by the AUC prior to 1997).)

anything previously recognized and would stand in direct contravention to *Sosa*'s instruction that the ATS be construed with "caution." 542 U.S. at 725. Indeed, plaintiffs' theory of liability has no obvious limiting principle: if the mere fact of Banadex's payments is sufficient to establish Chiquita's liability for these 173 murders, then any third-party's provision of "support" to a primary violator of international law would create liability under the ATS, regardless of how attenuated such "support" might be from the primary violation, and regardless of the reasons for the "support."

Plaintiffs thus seek to convert the ATS into a vehicle through which all victims of alleged human rights abuses may recover reparations from any corporation that pays taxes, makes loans, sells goods, provides services, or otherwise conducts business with any person, government, or entity that, in turn, violates international law. Under *Sosa*, the ATS cannot be construed to allow such expansive and undefined liability. *See* 542 U.S. at 733 (directing courts to consider the "practical consequences" of making a particular ATS claim "available to litigants in the federal courts"); *cf. Tel-Oren,* 726 F.2d at 826-27 (Robb, J., concurring) (warning of the risks to the U.S. judicial system of making available terrorism-based claims under the ATS with "no obvious or subtle limiting principle in sight").

### 1. *There is no aiding and abetting liability for the claims asserted here.*

Plaintiffs' core contention is that Chiquita aided and abetted the murders committed by the paramilitaries because it paid money to them. (*See* Compl. ¶¶ 219, 224.) In so contending, plaintiffs rely on a theory of secondary liability whose continued viability following *Sosa* has been the subject of intense controversy among the courts and which has been strongly

opposed by the United States Government.[9]  While neither the Supreme Court nor the D.C.

Circuit have addressed this issue, at least one Judge in this District has held squarely that aiding

and abetting claims are not actionable under the ATS.  *See Exxon*, 393 F. Supp. 2d at 24

(Oberdorfer, J.).  In so holding, Judge Oberdorfer relied in large part on Judge Sprizzo's decision

in *In re South African Apartheid Litigation*, 346 F. Supp. 2d 548 (S.D.N.Y. 2004), in which the

court there rejected aiding and abetting claims brought by "three groups of black South Africans

[against] several multinational corporations that had done business in South Africa during the

apartheid years."  *Exxon*, 393 F. Supp. 2d at 24 (dismissing aiding and abetting claims "largely

for the reasons explained by the court in [*Apartheid*]").

Judge Sprizzo's decision, however, was recently reversed and remanded by a

sharply divided panel of the Second Circuit in a ruling that highlights the intensity of the

controversy regarding the viability of corporate aiding and abetting claims under the ATS.  *See*

*Khulumani v. Barclay Nat'l Bank Ltd*., 504 F.3d 254 (2d Cir. 2007).  Two members of the panel

in *Khulumani* (Judges Katzmann and Hall) agreed that the ATS recognizes claims for aiding and

abetting but were unable to reach consensus on the substantive legal standard applicable to such

claims.  *See* 504 F.3d at 277 (Katzmann, J., concurring); *id.* at 286 (Hall, J., concurring).  The

---

[9]        *Compare Exxon*, 393 F. Supp. 2d at 24 (rejecting claims of aiding and abetting liability
post-*Sosa*); *Corrie v. Caterpillar*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005) (same), *aff'd*, No 05-
36210 (9th Cir. Sept. 17, 2007), *pet. for reh'g pending* (filed Oct. 9, 2007) *with Presbyterian
Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331, 337-38 (S.D.N.Y. 2005)
(allowing claims of aiding and abetting liability); *Almog v. Arab Bank PLC*, 471 F. Supp. 2d 257,
287-88 (E.D.N.Y. 2007) (same); *Bowoto*, 2006 WL 2455752, at *3-4 (same); *Kiobel v. Royal
Dutch Petroleum Co.*, 456 F. Supp. 2d 457, 464 (S.D.N.Y. 2006) (same); *In re Agent Orange
Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 52-53 (E.D.N.Y. 2005) (same); *Cabello v. Fernandez-
Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005).  The United Sates Government has consistently
taken the position that no such liability exists under the ATS.  *See* Br. of United States as Amicus
Curiae in *Khulumani v. Barclay National Bank Ltd.*, Nos. 05-2141, 05-2326 (2d Cir.) (attached
as Exhibit I to Hall Decl.); Br. of United States as Amicus Curiae in *Corrie et. al. v. Caterpillar,
Inc.*, No. 05-36210 (9th Cir.) (attached as Exhibit J to Hall Decl.).

third member of the panel (Judge Korman) agreed with Judge Katzmann's articulation of the

appropriate standard, but rejected the predicate notion that the ATS permits claims for aiding and

abetting against corporations.  *See id.* at 330, 333 (Korman, J., concurring in part and dissenting

in part) (rejecting the "extraordinary proposition that Congress intended the [ATS] to permit

jurisdiction to be exercised over claims of aiding-and-abetting without regard to whether the

conduct at issue violated an international law norm").  We respectfully submit that Judge

Oberdorfer's decision in *Exxon*, and the opinions of Judges Korman and Sprizzo in the *Apartheid*

litigation, reflect what would likely be the decision of the Supreme Court if and when it is

presented with this issue.[10]  In any event, the cross-cutting divisions among multiple respected

federal judges belie any notion that there is a settled consensus as to whether claims for aiding

and abetting are actionable under the ATS.  *Cf. Sosa*, 542 U.S. at 728 (noting that courts should

not recognize "debatable violations of the law of nations").[11]

---

[10]     Defendants in the *Khulumani* litigation have stated that they intend to petition the
Supreme Court for a writ of certiorari on the question of whether claims of aiding and abetting
are consistent with the *Sosa* Court's narrow construction of the ATS.  *See* Defendants-Appellees'
Mot. to Stay the Mandates Pending Petition for Writ of Certiorari., Nos. 05-2141, 05-2326 (2d
Cir.) (filed Nov. 1, 2007) (attached as Exhibit K to Hall Decl.).

[11]     In applying the requirement that an alleged norm of international law must be of "definite
content" and sufficient "acceptance among civilized nations" to be actionable under the ATS,
*Sosa*, 542 U.S. at 725, the Supreme Court explained that "whether a norm is sufficiently definite
to support a cause of action" raises "a related consideration [of] whether international law
extends the scope of liability for a violation of a given norm *to the perpetrator being sued*, if the
defendant is a private actor such as a corporation or individual."  *Sosa*, 542 U.S. at 732-33 &
n.20 (emphasis added).  Notably, while several international tribunals have recognized aiding
and abetting liability for international law violations, they have done so only in the criminal
context.  *See* Curtis A. Bradley, et al., *Sosa, Customary International Law, and the Continuing
Relevance of Erie*, 120 Harv. L. Rev. 869, 927 (2007) (noting that while "the concept of aiding
and abetting liability is recognized as a general matter in international criminal tribunals," there
is no corollary consensus in favor of "civil liability for corporate aiding and abetting").  Under
*Sosa*, that there are norms of *criminal* aiding and abetting does not establish widespread
international acceptance of *civil* aiding and abetting liability.

Beyond the reasons stated in opinions of Judges Oberdorfer, Sprizzo, and Korman, plaintiffs' aiding and abetting claims should be rejected for at least three additional reasons. <u>First</u>, plaintiffs' aiding and abetting claims are a blatant attempt to circumvent well-established case law holding that terrorism-related allegations, including those premised on the provision of financial or other support to terrorists, are not actionable under the ATS. Notably, the central premise of plaintiffs' extrajudicial killing claim is that Chiquita "aid[ed] and abet[ed] all acts of violence committed with the *material support provided by Defendants to the terrorist groups they supported*." (Compl. ¶ 229 (emphasis added); *see also id.* ¶ 1 (alleging "material support [to terrorist groups]"; *id.* ¶¶ 10-183 (alleging that the AUC "received support from Chiquita"); *id.* ¶ 231 (alleging Chiquita provided "funding, equipment and other resources to the terrorist group responsible for the damages alleged herein"); *id.* ¶ 233 (alleging that the harm to the victims was caused by Chiquita's "provision of material support to terrorists"); *id.* ¶ 235 (alleging that Chiquita provided "financial support, arms, and other substantial assistance to the AUC").) But it is clear that plaintiffs could not state a direct claim under the ATS based on Chiquita's alleged provision of "material support to terrorists." *See Barboza v. Drummond Co.*, No. 1:06-cv-61527, slip op. at 3 (S.D. Fla. July, 17, 2007) (attached as Exhibit L to Hall Decl.) (allegations that defendant provided financial or other support to a terrorist organization, which resulted in death or other harm, not actionable under the ATS); *Saperstein*, 2006 WL 3804718 at *7 (same).[12]

---

[12]    Both *Barboza* and *Saperstein* are consistent with a leading pre-*Sosa* decision addressing terrorism-related allegations under the ATS, *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984). In *Tel-Oren*, victims of a 1978 terrorist attack in Israel sued several defendants, including private organizations accused of sponsoring terrorism. The D.C. Circuit rejected plaintiffs' attempt to bring terrorism-based claims under the ATS. *Id.* at 795-96. In a concurring opinion, Judge Robb warned of the potential consequences of making such claims (continued…)

Second, allowing an aiding and abetting claim to proceed based on the attenuated theory of liability asserted here would run afoul of a central premise of *Sosa*, *i.e.*, that courts should exercise "judicial caution when considering the kinds of individual claims that might implement the jurisdiction" conferred by the ATS. *Sosa*, 542 U.S. at 725; *see also* Curtis A. Bradley, et al., *Sosa*, *Customary International Law, and the Continuing Relevance of Erie*, 120 Harv. L. Rev. 869, 924 (2007) ("[The] best reading of *Sosa* is that ATS liability cannot be extended to corporations based on an aiding and abetting theory absent further action by Congress."). If allowed to proceed, plaintiffs' aiding and abetting claims, which are not based on any particularized allegations regarding the 173 murders at issue, *see* Part I.B.2., *supra*, would effect a substantial expansion of the ATS and result in a corresponding increased burden on the federal courts. *Cf. Sosa*, 542 U.S. at 732-33 (directing courts to consider the "practical consequences" when determining whether to make a particular "cause available to litigants in federal court"). Moreover, as noted in Part I.A.4., *supra*, plaintiffs' claims are likely to have substantial consequences for, and repercussions on, U.S. foreign relations. *See Exxon*, 393 F. Supp. 2d at 24-25 (warning of the foreign policy consequences of recognizing aiding and abetting claims). Such considerations strongly counsel against a finding of aiding and abetting liability for the claims alleged here.

Third, allowing aiding and abetting claims under the ATS would be inconsistent with settled law. In *Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164 (1994), the

---

available in U.S. courts: "The victims of international violence perpetrated by terrorists are spread across the globe. It is not implausible that every alleged victim of violence of the counter-revolutionaries in such places as Nicaragua and Afghanistan could argue . . . that they are entitled to their day in the courts of the United States. . . . Indeed, there is no obvious or subtle limiting principle in sight." 726 F.2d at 826-27. Judge Robb's observations, made more than ten years ago, are equally applicable to plaintiffs' claims in this case.

Supreme Court held that whether to allow aiding and abetting liability for civil claims is fundamentally a legislative choice for Congress, and not the courts, to make. *See id.* at 181-82, 189-90 (concluding that the availability of civil aiding and abetting liability under § 10(b) of the Securities Exchange Act of 1934 could not be inferred absent some indication that Congress intended such liability). The Court explained that "Congress has not enacted a general civil aiding and abetting statute . . . for suits by private parties" and that, as a consequence, "there is no general presumption that the plaintiff may sue aiders and abettors." *Id.* at 182 (further noting that the concept of aiding and abetting in a civil context is "at best uncertain in application"). *Central Bank* is especially relevant here, as there is no evidence that Congress intended aiding and abetting liability for international law violations. *See Exxon*, 393 F. Supp. 2d at 24. Given the absence of any indicia that Congress intended to impose aiding and abetting liability under the ATS, it would be highly inappropriate for a court to expand the scope of ATS jurisdiction to reach alleged aiders and abettors. *Cf. Sosa*, 542 U.S. at 726 (noting that the trend has been for federal courts to avoid "innovative" interpretations over substantive law in an area such as foreign relations, which rather should be left to Congress).

> **2.     *Even if aiding and abetting liability exists under the ATS, plaintiffs do not — and cannot — plead sufficient facts to establish such a claim.***

Even if plaintiffs' aiding and abetting claim is cognizable under the ATS, they have failed to plead the necessary facts in support of such a claim. Aiding and abetting liability under the ATS may be established only when the defendant "(1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime; and (2) [did] so with the purpose of facilitating the commission of the crime." *Khulumani*, 504 F.3d at 277 (Korman, J., concurring); *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 668 (S.D.N.Y. 2006). Other courts have articulated similarly stringent standards. *See, e.g.,*

*Almog v. Arab Bank PLC*, 471 F. Supp. 2d 257, 291-92 (E.D.N.Y. 2007) (aiding and abetting requires that defendant's actions have a "substantial effect" on the crime's perpetration and be carried out "intentionally and with knowledge"); *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1012 (7th Cir. 2002) (in case brought under the federal Antiterrorism Act, 18 U.S.C. § 2333, defendant must know about the primary actor's violation and substantially assist such violation to be liable for aiding and abetting).

Here, plaintiffs fail to allege facts that even come close to satisfying any standard for aiding and abetting liability under the ATS. Specifically, plaintiffs have failed to plead facts showing that Chiquita acted with the requisite *mens rea*, or that Chiquita's payments to the paramilitaries substantially assisted the particular murders alleged by plaintiffs here.

a)    *Substantial Effect*

To satisfy the "substantial effect" element of an aiding and abetting claim, plaintiffs must allege facts sufficient to show that Chiquita assisted the murders allegedly committed by the FARC and the AUC, and that the murders most probably would not have occurred in the same way without Chiquita's assistance. *See Presbyterian Church*, 453 F. Supp. 2d at 667; *see also Khulumani*, 504 F.3d at 277 ("actus reus component" of aiding and abetting liability requires "'practical assistance, encouragement, or moral support which has a *substantial effect* on the perpetration of the crime'") (citation omitted) (emphasis in original). Similarly, under the "substantial assistance" formula of liability for aiding and abetting, plaintiffs must plead facts sufficient to show that Chiquita's purported assistance to the paramilitaries proximately caused the murders alleged in the Complaint. *See, e.g., Aetna Cas. & Surety Co. v. Leahey Constr. Co., Inc.*, 219 F.3d 519, 537 (6th Cir. 2000) ("Establishing [the element of substantial assistance] requires the plaintiff to show that the secondary party proximately caused the violation.").

28

Mere conclusory assertions of proximate causation do not to satisfy plaintiffs' pleading burden. *See Kowal*, 16 F.3d at 1276. Thus, plaintiffs' bare allegations that "the harm to Plaintiffs was caused by the commissions or omissions of Defendants" (Compl. ¶ 73), or that the "tortious conduct alleged herein carried out by the terrorist groups receiving material assistance from Defendants was reasonably foreseeable" (*id.* ¶ 232), are not sufficient. Rather, plaintiffs must plead specific facts demonstrating how the financial "support" Banadex provided to the paramilitaries proximately caused or had a substantial effect on the murders at issue here.[13]

In this respect, the Complaint is woefully inadequate. Plaintiffs allege that Banadex made "over 100 payments totaling over $1.7 million to the AUC," and that the AUC "received support from Chiquita." (Compl. ¶¶ 10-183, 219.) Plaintiffs allege no facts, however, demonstrating how the funds extorted from Banadex proximately caused the particular murders in this case or had a substantial effect in their commission. (*See* note 4, *supra*, noting the AUC's estimated annual income of $286 million from multiple criminal enterprises.) Plaintiffs may not rely upon general allegations that the AUC or the FARC were "supported" by Chiquita as a

---

[13]    As noted *infra* at pp. 4-6, plaintiffs' allegations that Chiquita assisted the AUC with weapons-trafficking in November 2001 are shown to be untrue by the very documents that plaintiffs rely on and incorporate into their Complaint as support for their assertions. Based on these reports, which are referenced in the Complaint, and are central to plaintiffs' allegations that Chiquita was involved in weapons-trafficking, these allegations are facially deficient. *See Echostar DBS Corp. v. Gemstar-TV Guide Int'l., Inc.*, 2007 WL 438088, at *4 (S.D.N.Y. Feb. 8, 2007) ("if the allegations of a complaint are contradicted by documents incorporated in the complaint, the documents control and the court need not accept the allegations of the complaint as true"); *Rapoport v. Asia Elecs. Holding Co., Inc.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) (granting motion to dismiss where "documents [referenced but not attached to complaint] contradict Plaintiff's allegations.") Furthermore, even assuming that plaintiffs' allegations relating to Chiquita's involvement in arms smuggling were true, plaintiffs allege no facts demonstrating how the "support" allegedly provided to the AUC proximately caused the particular murders in this case. Plaintiffs may not rely upon general allegations that the AUC was financed by Chiquita or that arms were smuggled on a Chiquita ship as a substitute for specific allegations demonstrating how that support caused the murders in this case.

substitute for specific allegations connecting Chiquita's payments to the alleged murders in this case — especially when the funds provided were small in relation to the funds available to these organizations from other sources.

The gross deficiencies in plaintiffs' aiding and abetting allegations are demonstrated by comparison of this case to other ATS cases in which defendants were alleged to have aided and abetted murders committed by third-party actors. In *Arab Bank*, for example, U.S. and foreign plaintiffs alleged that the defendant, a Jordanian bank, aided and abetted the murders of multiple victims by knowingly providing banking and administrative services to organizations that conducted or facilitated suicide bombings in Israel. 471 F. Supp. 2d at 259-60. In sustaining plaintiffs' claims, the court emphasized that plaintiffs had alleged *specific facts* demonstrating that Arab Bank's services were *directly related to* the suicide bombings at issue, including, for instance, that the defendant administered benefits paid to the families of suicide bombers, that the defendant assisted in the preparation of lists of beneficiaries of individual suicide bombers, and that the defendant set up individual bank accounts in the names of those beneficiaries. *Id.* at 291-92; *see also id.* at 261-64 (summarizing the extensive factual allegations made by the plaintiffs). Because plaintiffs had "delineat[d] a *direct correlation* between the number of attacks, including suicide bombings, and the amount of Mujahideen Committee and Saudi Committee funds, some of which were eventually paid to the beneficiaries through Arab Bank," the defendant's motion to dismiss was denied. *Id.* at 292 (emphasis added).

Here of course, there are no allegations whatsoever "delineat[ing] a direct correlation" between the murders and the Banadex payments. *Arab Bank*, 471 F. Supp. 2d at 292. Rather, plaintiffs effectively ask this Court to *assume* substantial assistance from the bare allegation that Chiquita "financed" the AUC. Such conclusory pleading, if allowed, would

vitiate the proximate cause and substantial effect requirements and, in theory, expose Chiquita to liability for every wrongful act perpetrated by the AUC over the seven-year period during which Banadex was forced to make payments. *Cf. Boim*, 291 F.3d at 1011 (analyzing aiding and abetting claims under the Antiterrorism Act, 18 U.S.C. § 2333, and stating: "To say that funding *simpliciter* constitutes an act of terrorism is to give the statute an almost unlimited reach. Any act which turns out to facilitate terrorism, however remote that act may be from actual violence and regardless of the actors' intent, could be construed to 'involve' terrorism.") As in *Arab Bank*, plaintiffs must demonstrate a causal link between the purported misconduct — here, the Banadex payments — and the alleged murders. They have failed to do so.

      b)    *Mens Rea*

Plaintiffs likewise fail to plead facts demonstrating that Chiquita intended to facilitate the commission of the murders alleged in the Complaint, or even knew that Banadex's alleged assistance to the AUC would result in the murder of plaintiffs' relatives. *See Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring) (noting that aiding and abetting claims require a showing that the defendant acted "with the purpose of facilitating the commission of [the alleged] crime"); *id.* at 332-33 (Korman, J., concurring in part and dissenting in part) (same); *Arab Bank*, 471 F. Supp. 2d at 291 (noting that standards of aiding and abetting liability require a showing that defendant "acted intentionally and with knowledge that its conduct would . . . facilitate the underlying violations when it engaged in the acts alleged"); *see also Stutts v. De Dietrich Group*, No. 03-cv-4058, 2006 WL 1867060, at *2-3 (E.D.N.Y. June 30, 2006) (dismissing civil terrorism claim where plaintiffs failed to plead that defendant banks had knowledge that their financial credits would further terrorist activities committed by Saddam Hussein or that they had the requisite intent to further such terrorist activities); *cf.* Joshua Dressler, Understanding Criminal Law 475 (3d ed. 2001) ("Most [U.S.] courts . . . hold that a

31

person is not an accomplice in the commission of an offense unless he "share[s] the criminal intent of the principal; there must be a community of purpose in the unlawful undertaking.'"). Plaintiffs' failure to allege a single fact demonstrating Chiquita's intent or knowledge is yet another ground warranting dismissal of their aiding and abetting claims.

The only allegations in the Complaint concerning Chiquita's purported culpable mental state are entirely conclusory and devoid of any actual facts. (*See, e.g.*, Compl. ¶ 2 ("The Defendants were knowingly engaged in an ongoing campaign of terror against[the victims]."); *id.* ¶ 231 ("Defendants had reason to know and/or did know the nature and scope of the tortious conduct alleged herein . . . ."); *id.* ¶ 235 ("Defendants were aware of . . . the threats posed by [the AUC and other terrorist organizations].").) Indeed, plaintiffs do not allege a single incident or event demonstrating that any Chiquita employee knew that the alleged support provided to the AUC had been or would be used to carry out murders as a general matter, let alone facilitate the 173 specific murders alleged in the Complaint.

Again, a comparison of plaintiffs' allegations to the facts in *Arab Bank* reveals the inadequacy of plaintiffs' claims here. In *Arab Bank*, plaintiffs alleged multiple, specific facts demonstrating that the defendant intended to facilitate suicide bombings in Israel and had knowledge that its provision of banking and administrative services was in fact promoting such terrorist attacks. *Arab Bank*, 471 F. Supp. 2d at 268 (in support of aiding and abetting claim under the ATA, plaintiffs alleged that defendant bank "knew that the funds it received as deposits and transmitted to various organizations were to be used for conducting acts of international terrorism"); *id.* at 290 (noting that plaintiffs further alleged that defendant "knew that the accounts of these various organizations and individuals were being used to fund suicide

bombings and other attacks sponsored by the terrorist organizations" and "knew that the Saudi Committee was soliciting and paying funds to the families" of suicide bombers).

Plaintiffs' allegations relating to Chiquita's purported "knowledge" come nowhere close to the level of factual specificity described in *Arab Bank*. Allegations that Chiquita knew that the AUC was a dangerous organization do not establish that Chiquita provided support to the AUC with the intent of facilitating the commission of murders or had knowledge that the payments would be used to commit murders. Plaintiffs must plead specific facts demonstrating Chiquita's requisite state of mind, and their failure to do so requires dismissal of their aiding and abetting claims.

### 3. Plaintiffs' vague and conclusory conspiracy allegations do not establish jurisdiction under the ATS.

Plaintiffs allege that Chiquita "conspired" and/or "engaged in joint action" with the paramilitaries to carry out the 173 murders at issue in this case. (*See* Compl. ¶¶ 229, 235.) This conclusory allegation does not support ATS jurisdiction. As an initial matter, civil conspiracy is simply not an actionable claim under the ATS because there is no broad international norm providing for conspiracy liability. *See Sosa*, 542 U.S. at 732 (holding that the ATS gives rise to liability for only those violations of international law of "definite content" and of sufficient "acceptance among civilized nations"). As one district court recently concluded, international law recognizes conspiracy liability for a very small category of violations, which does not include extrajudicial killings. *See Presbyterian Church*, 453 F. Supp. 2d at 665-66 (dismissing ATS claims of conspiracy because only conspiracy to commit genocide and to wage aggressive war are recognized under international law); *see also Hamdan v. Rumsfeld*, 126 S.Ct. 2749, 2784 (2006) (plurality) ("[I]nternational sources confirm that the crime charged [conspiracy] here is not a recognized violation of the law of war. . . . And the only 'conspiracy'

33

crimes that have been recognized by international war crimes tribunals . . . are conspiracy to commit genocide and common plan to wage aggressive war."); Antonio Cassese, International Criminal Law 197 (2003) ("[I]n international law no customary rule has evolved on conspiracy on account of the lack of support from civil law countries for this category of crime.").  Because plaintiffs do not allege (nor could they) that Chiquita conspired to commit genocide or wage aggressive war, their civil conspiracy claims fail under *Sosa*.

Even if conspiracy to commit extrajudicial killings was an actionable violation under the ATS, plaintiffs have failed to plead sufficient facts in support of such a theory to survive a motion to dismiss.  A claim of civil conspiracy requires a showing that: "(1) two or more persons agreed to commit a wrongful act, (2) [the defendant] joined the conspiracy knowing of at least one of the goals of the conspiracy and intended to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy."  *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983).

Nowhere do plaintiffs make any factual allegations regarding the identities of the purported conspirators, the dates or location of the formation of the conspiracy, or its terms.  *See Sinaltrainal*, 474 F. Supp. 2d at 1293-94, 1298 (finding allegations of conspiracy to be insufficient where plaintiffs failed to identify paramilitaries by name or by affiliation and failed to plead dates or locations regarding the formation of the conspiracy); *cf. Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 165 (5th Cir. 1999) (dismissing plaintiff's ATS claim where complaint was "devoid of names, dates, locations, times or any facts that would put [defendant] on notice as to what conduct supports the nature of [the] claims").  Indeed, the Complaint does not identify a single representative of Chiquita who reached agreement, or had a "meeting of the

minds," with the AUC, the FARC, or any other unspecified "paramilitary" regarding the

formation or terms of the purported "conspiracy" to commit extrajudicial killings.

Rather than providing any specific details about the conspiracy, the Complaint

simply asserts that "Chiquita" conspired with the "AUC," an allegation so generic that it would

fail pleading requirements applicable outside of the ATS. *See Cavitat Med. Tech., Inc. v. Aetna,*

*Inc.*, No. 04-CV-01849-MSK-OES, 2006 WL 218018, at *5-6 (D. Colo. Jan. 27, 2006)

(dismissing civil conspiracy claim where plaintiff failed to "identify the speakers, the statements

made, when the statements were made, or to whom they were made").

The Complaint is also devoid of any factual allegations connecting the 173

murders in this case to the particular conspiracy alleged between the AUC and Chiquita. *See*

*Sinaltrainal*, 474 F. Supp. 2d at 1295-96. By plaintiffs' own admission, Colombia was a country

where innocent civilians were, with tragic frequency, intimidated, tortured, and murdered by

various armed groups, including the AUC, FARC, and the Colombian military. (*See* Compl.

¶¶ 207-210.) Yet, plaintiffs fail to plead facts linking the *specific* murders in this case to the

formation, orchestration or goals of the conspiracy. *Sinaltrainal*, 474 F. Supp. 2d at 1296.

Indeed, as noted above, plaintiffs have not even alleged that any of the victims had any ties to

Chiquita, its banana farms, or its unions. Rather, plaintiffs rely on generic assertions that

Chiquita sought to eliminate leftist and labor opposition and otherwise "benefited" from the

various deaths alleged in the Complaint. (*See* Compl. ¶¶ 3, 211, 220, 235.) As the *Sinaltrainal*

court noted, in alleging murders occurring a country beset by violence, such attenuated, generic

assertions are simply not enough: "[I]n the context of what the Plaintiffs themselves describe as

a country torn by a long-standing civil war, *where the murder of trade unionists and civilians at*

*large is common*, some level of specificity is required to link the explicit agreement between

35

[defendant] and the [AUC] to the horrible acts that occurred." *Sinaltrainal*, 474 F. Supp. 2d at 1295-96 (quotations omitted) (emphasis added).

Plaintiffs also fail to allege any specific objective or goal of the alleged conspiracy between the AUC and Chiquita. At most, plaintiffs allege that Chiquita was "one of the financial founders of the AUC," and in return the AUC ensured that "Chiquita's business ran smoothly." (Compl. ¶¶ 220, 222.) But, this is precisely the type of generic allegation that the *Sinaltrainal* court found insufficient to satisfy the heightened pleading requirements of the ATS. *Sinaltrainal*, 474 F. Supp. 2d at 1295-96 (concluding that the "murky allegations of a vague conspiracy between Mosquera [defendant's plant manager] and unspecified paramilitaries *to use threats and violence to 'drive away' union leaders and 'destroy the union'* are not sufficient") (emphasis added). Plaintiffs cannot rely on generic allegations that Chiquita sought to suppress union and community opposition as the basis for the purported conspiracy with the AUC, as such allegations are simply inadequate as a matter of law. *Id.*[14]

Notably, plaintiffs' conspiracy allegations are far less specific and detailed than those pleaded by the plaintiffs in *Sinaltrainal*, where the court dismissed a claim for conspiracy between a U.S. corporation and the AUC. *See Sinaltrainal*, 474 F. Supp. 2d at 1293-94. In *Sinaltrainal*, plaintiffs alleged that the defendant company conspired with the AUC to intimidate and eliminate union opposition at its bottling plants in Colombia. *Id.* at 1278. The multiple complaints in *Sinaltrainal* described in great detail the specific meetings held between employees of the defendant corporation and leaders of Colombian paramilitary groups as well as

---

[14]     Plaintiffs' allegations regarding Chiquita's payments to the AUC are irrelevant to any conspiracy claim. As reflected in the Information, to the extent Chiquita "agreed" to anything with the AUC, it was to pay the AUC's extortionate demands, not to join the AUC in killing plaintiffs' relatives

the agreements reached among the alleged co-conspirators to eliminate union opposition. Notwithstanding this level of specificity, which far exceeds anything contained in the Complaint in this case, the *Sinaltrainal* court dismissed the civil conspiracy claims, finding that the plaintiffs had failed to satisfy the heightened pleading requirements of the ATS.  *Id.* at 1293-1301.

Plaintiffs' conspiracy claim amounts to no more than highly generic allegations that Chiquita provided money to the groups; that Chiquita and the AUC shared a common goal of repressing social and labor opposition in the banana-growing regions of Colombia; and that the AUC violently sought to achieve that goal.  These allegations, even if assumed to be true, lack the specificity and necessary factual support to meet the pleading requirements of the ATS.

### 4.    Plaintiffs do not allege facts to support their claim that the paramilitaries were Chiquita's "agents."

Plaintiffs alternatively allege that Chiquita is vicariously liable for the acts of the paramilitaries because they acted as the "agents" of Chiquita in Colombia.  (*See* Compl. ¶¶ 3, 230, 235.)  This allegation is frivolous.

To establish an agency relationship, plaintiffs must plead at a minimum facts demonstrating that the paramilitaries acted on Chiquita's behalf and under Chiquita's control in carrying out the murders at issue here, and that those acts were within the scope of the alleged agency relationship.  *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006) (noting that adequate pleading of an agency relationship requires showing of three elements: (1) "the manifestation by the principal that the agent shall act for him"; (2) "the agent's acceptance of the undertaking"; and (3) "the understanding of the parties that the principal is to be in control of the undertaking").  Plaintiffs' Complaint makes no attempt to plead facts establishing the requisite agency relationship.  Indeed, there is not a single specific factual allegation that demonstrates

37

that the AUC was acting on behalf of or under Chiquita's control as a general matter, let alone

any allegation that members of the AUC, or the AUC more generally, acted on Chiquita's behalf

or under Chiquita's control with respect to the 173 murders alleged here.  Plaintiffs cannot

survive a motion to dismiss based on conclusory legal assertions that the AUC acted as

Chiquita's "agent."  *See Kowal*, 16 F.3d at 1276 (on a motion to dismiss, court does not "accept

legal conclusions cast in the form of factual allegations").

> **5.    The decision of the Southern District of Florida in Sinaltrainal**
> **illustrates the weakness of plaintiffs' extrajudicial killing claims.**

The theory of liability upon which plaintiffs in this action base their extrajudicial

killing claims is substantially the same as that considered and rejected last year in *In re*

*Sinaltrainal Litigation*, 474 F. Supp. 2d. 1273 (S.D. Fla. 2006).  In *Sinaltrainal*, plaintiffs sued a

Coca-Cola bottler and others under the ATS for allegedly providing support to the AUC and for

hiring Colombian paramilitary groups to further the company's business operations in Colombia

by suppressing labor opposition.  474 F. Supp. 2d at 1273.  Plaintiffs specifically alleged that

defendants "hired or conspired with paramilitaries . . . to 'rid' four Colombian bottling plants of

the . . . union, and that the Colombian government endorse[d] or tacitly condone[d] this activity."

*Id.* at 1274.  In support of these claims, plaintiffs made numerous particularized allegations

regarding the defendant's purported complicity in the AUC's acts of violence.  *See, e.g., id.* at

1278-81 (alleged victims were employees of the defendant corporation, were murdered on the

premises of the defendant corporation, and/or were leaders of unions whose members were

employed by the defendant corporation).

In assessing the sufficiency of plaintiffs allegations, the court in *Sinaltrainal*

found that, in light of the jurisdictional nature of the ATS, it was "appropriate to require some

heightened pleading standard when determining whether the complaints in the instant cases

sufficiently plead facts showing that Defendants violated the law of nations." *Id.* at 1287.  The court accordingly rejected as "wholly conclusory" plaintiffs' allegations that the AUC acted as defendants' "agents," pointing out that "[t]he allegations remain silent as to when, where, and how the Defendants established the agency relationship." *Id.* at 1293 & n.27; *see also id.* at 1293, 1296 (finding plaintiffs' allegations "murky," "scant on the details," and "conclusory"). Similarly, the court found plaintiffs' conspiracy allegations insufficient because, *inter alia*, "there is an utter absence of specific allegations connecting the murder of [the first victim] or the kidnapping of [the second victim] to the conspiracy." *Id.* at 1295; *see also id.* at 1296 ("While the Complaint details a number of horrific acts, it is scant on the details about the formation and orchestration of the conspiracy which links these acts together.").  The court ultimately concluded that "Plaintiffs' allegations in the instant cases are too conclusory, too vague, and too attenuated to adequately plead a violation of the law of nations to support subject matter jurisdiction" under the ATS.  *Id.* at 1276.  Accordingly, the court dismissed plaintiffs' claims. *Id.* at 1302.

If the detailed allegations in *Sinaltrainal* were insufficient to survive a motion to dismiss, there is simply no basis to find that this complaint, which contains no particularized allegations connecting Chiquita to the alleged murders, is adequate.

## II.    PLAINTIFFS' TVPA CLAIM SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

Enacted by Congress in 1991, the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, provides a civil right of action against (1) an "individual" (2) acting "under actual or apparent authority, or color of law, of any foreign nation" (3) for torture or extrajudicial killing.  Claims under the TVPA may only be entertained if they fall within the jurisdiction conferred by the ATS.  *Sinaltrainal*, 474 F. Supp. 2d at 1301 (citing *Abebe-Jira v. Negewo*, 72

F.3d 844, 848 (11th Cir. 1996)); *see also Kadic*, 70 F.3d at 246. Plaintiffs' failure to plead a

violation of the international prohibition against extrajudicial killing under the ATS, as described

above, leaves the Court without jurisdiction for the TVPA claims. *See Sinaltrainal*, 474 F. Supp.

2d at 1301.

       First, "[b]y the clear language of the [TVPA], a party must act 'under actual or

apparent authority, or color of law' to be liable under the statute." *Exxon*, 393 F. Supp. 2d at 28;

*see also* 28 U.S.C. § 1350 note §2(a)(1)-(2). For the reasons set forth in Part I.A., *supra*,

plaintiffs do not adequately allege state action. On this basis alone, plaintiffs' TVPA claims

should be dismissed. *See Khulumani*, 504 F.2d at 260 (per curiam) (affirming dismissal of

TVPA claims because plaintiffs "failed to link any defendants to state aid or the conduct of state

officials"). Furthermore, plaintiffs cannot avoid the statutory mandate of state action under the

TVPA with allegations regarding "war crimes" because there is no "war crimes" exception for

TVPA claims.

       Second, as explained in Part I.A.4., *supra*, accepting plaintiffs' assertion that the

AUC acted under color of law would require an impermissible ruling on a political question —

whether the Colombian government sponsored terrorism in Colombia. The legislative history of

the TVPA confirms that a "plaintiff must establish government involvement in the torture or

killing" to state a claim under the statute and that the statute "does not attempt to deal with

torture or killing by purely private groups." *See Kadic*, 70 F.3d at 245 (citing H.R. Rep. No. 367,

102d Cong., 2d Sess, at 5 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 87). A determination of

whether the AUC acted under color of law "impermissibly requires adjudication of another

country's actions." *Exxon*, 393 F. Supp. 2d at 28.

<u>Third</u>, "the plain reading of the [TVPA] strongly suggests that it only covers human beings, and not corporations." *Exxon*, 393 F. Supp. 2d at 28 (citing *Clinton v. New York*, 524 U.S. 417, 428-29 nn. 13-14 (1998)); *see also Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1176 (C.D. Cal. 2005) ("The Court holds that corporations are not 'individuals' under the TVPA based on its reading of the plain language of the statute."); *Corrie*, 403 F. Supp. 2d at 1026 (holding that the TVPA does not apply to corporations because "the statute speaks in terms of individuals, and the rationale of *Mujica,* that 'individual' must mean the same thing with respect to both victim and perpetrators is reasonable."). For that reason, plaintiffs may not proceed with a TVPA claim against Chiquita.

## III. PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

Plaintiffs assert a variety of state common law and statutory claims based on the tortious conduct of unspecified people allegedly "employed" by Chiquita. These claims should be dismissed because (1) Chiquita is not subject to D.C. tort law for alleged conduct having no connection to that jurisdiction, (2) plaintiffs have not adequately alleged these claims under D.C. law, and (3) most of plaintiffs' claims are time-barred under the applicable statutes of limitations.

### A. D.C. Law Does Not Apply Extraterritorially.

Plaintiffs plead each of their common law tort claims under D.C. law (*see* Compl. ¶¶ 256, 266, 270, 274, 278), but federal law prohibits the extraterritorial application of D.C. tort law to conduct having no alleged connection to that jurisdiction. In *BMW of North America, Inc. v. Gore*, the Supreme Court held that Alabama courts could not calculate tort damages based on wrongdoing allegedly perpetrated in other states, because "[l]aws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extra-territorial effect only by the comity of other States." 517 U.S. 559, 572 n.16 (1996) (quotations and citation omitted);

*see also Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1881) ("No State can legislate except with reference to its own jurisdiction."); *Lauritzen v. Larsen*, 345 U.S. 571, 590 (1953) ("[It is] a denial of due process of law when a state . . . attempts to draw into control of its law otherwise foreign controversies on slight connections, because it is a forum.").  This presumption against extraterritoriality is applicable to statutory and common law claims alike.  *See Gore*, 517 U.S. at 573 n.17 ("State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute.").

The notion that D.C. tort law would govern conduct that allegedly occurred in Colombia is flatly inconsistent with the Supreme Court's holding in *Gore*.  Courts have dismissed state law claims in ATS cases for this reason.  *See, e.g.*, *Romero v. Drummond Co.*, No. CV-03-BE-0575-W, slip op. at 2 (N.D. Ala. Mar. 5, 2007) (attached as Exhibit M to Hall Decl.) (stating that court "would not apply Alabama common law to the tort claims alleged here, which occurred extraterritorially in Colombia" and dismissing claims "[b]ecause Plaintiffs pursued [these] claims . . . exclusively under Alabama law"); *Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1024 (S.D. Ind. 2007) (dismissing state law claims because "[p]laintiffs have not yet articulated a viable basis for applying California law or Indiana law to the management of [a] Plantation in Liberia.").

## B. Plaintiffs Have Not Adequately Alleged Any State Law Tort Claim.

### 1. Plaintiffs Fail to State a Claim for Any Derivative Liability Tort.

Plaintiffs allege a variety of torts under D.C. law based on Chiquita's derivative liability for alleged conduct of the paramilitaries.  (See Compl. ¶¶ 267-278 (intentional infliction of emotional distress ("IIED") (Count 7), battery (Count 8), assault (Count 9).)  But plaintiffs do not and cannot allege any facts demonstrating the required elements of respondeat superior liability – (1) a master-servant relationship and (2) tortious conduct occurring within the scope of

employment. *Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C. 1985). Plaintiffs repeatedly

refer to the paramilitaries as Chiquita's "employees" or "agents" (*see* Compl. ¶¶ 2, 3, 230, 241,

247, 252, 258, 268, 272, 276), but they have not pled a single fact demonstrating that Chiquita

controlled their activities "and the manner in which [their] work [wa]s to be done." *See Giles*,

487 A.2d at 611. Likewise, because plaintiffs have not alleged any duties that Chiquita "hired"

the paramilitaries to perform, they have utterly failed to allege facts sufficient to show that "the

incident at issue occurred while the [employee] was acting within the scope of his employment."

*Id.* Far from supporting the claim that Chiquita "controlled" the paramilitaries, the facts

imported from the criminal Information referenced in the Complaint show exactly the opposite.

### 2. *Plaintiffs Fail to State a Claim for Any Direct Liability Tort.*

Plaintiffs also allege that Chiquita directly engaged in tortious conduct under D.C.

law by negligently "hiring" and "supervising" the paramilitaries. (*See* Compl. ¶¶ 243-266

(negligence (Count 4), negligent hiring (Count 5), negligent supervision (Count 6).) Like

plaintiffs' derivative liability claims, these direct liability claims presume that Chiquita

"employed" members of the paramilitaries, an utterly absurd notion that plaintiffs do not and

could not support. *See* Part I.B.4., *supra*.

Additionally, to establish liability for negligence-based torts, plaintiffs must

allege that Chiquita: (1) had a duty to plaintiffs; (2) breached that duty; and (3) proximately

caused the alleged injuries. *Gibson-Michaels v. Securiguard, Inc.*, No. 06-1937 (RMU), 2007

WL 1322111, at *2 (D.D.C. May 4, 2007). "Inherent . . . in the concept of duty is the

relationship between the parties out of which the duty arises," *see Odemns v. District of

Columbia*, 930 A.2d 137, 143 (D.C. 2007), but plaintiffs have alleged no relationship between

their family members and Chiquita. Plaintiffs' bare-bones allegation that "Defendants had a duty

of reasonable care towards Plaintiffs to ensure that neither they nor their agents engaged in

conduct leading to or likely to lead to foreseeable harm" (Compl. ¶ 244), does not establish a relationship between Chiquita and plaintiffs' relatives.  Rather, plaintiffs have evidently alleged that Chiquita owed a legal duty to the entire population of Colombia.  Duty, however, "must be limited to avoid liability for unreasonably remote consequences."  *Odemns*, 930 A.2d at 143.

### 3.    *Plaintiffs Fail to State a Claim for Wrongful Death.*

Finally, plaintiffs also allege a cause of action for wrongful death under "the laws of the District of Columbia, the laws of the United States,[15] and the laws of Colombia."  (Compl. ¶¶ 240-42 (Count 3).)  Under D.C. law, wrongful death is a statutory cause of action that is only available to remedy "injur[ies] done or happening within the limits of the District."  D.C. Code § 16-2701(a) (2007).  Because plaintiffs allege that their relatives were injured in Colombia (Compl. ¶¶ 2, 10-183), they have failed to state a claim for wrongful death under D.C. law.  *See Estate of Grant v. Armour Pharm. Co.*, No. 04-1680 (TFH), 2007 WL 172316, at *5 (D.D.C. Jan. 23, 2007) ("As Plaintiff's injury occurred in Virginia, . . . the District of Columbia Wrongful Death statute does not provide Plaintiff a remedy.").

Moreover, under both D.C. and Colombian law, plaintiffs' wrongful death claim assumes that Chiquita is responsible for some underlying tortious conduct.  *See* D.C. Code § 16-2701(a) (2007) (providing wrongful death cause of action against person who "is liable [for a wrongful act, neglect, or default]"); attached Declaration of Eduardo A. Wiesner (describing elements of extra-contractual (*i.e.*, tort) liability under Colombian law).  Because plaintiffs fail to allege any underlying tortious conduct on behalf of Chiquita, their claim for wrongful death also fails.

---

[15]    Although plaintiffs allege wrongful death "under . . . the laws of the United States" (Compl. ¶ 241), there is no federal common law cause of action for wrongful death.

C.      **Most of Plaintiffs' State Law Claims Are Time-Barred Under The Applicable Statute of Limitations.**

In addition to plaintiffs' failure to adequately plead their state law claims on the merits, most of plaintiffs' claims are also time-barred under the applicable statute of limitations. Each plaintiff's derivative liability claims are time-barred under D.C. law.  *See* D.C. Code § 12-301(4) (2007) (1-year limitation for assault and battery); *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 87 (D.D.C. 2000) (1-year limitation for IIED claim that is "intertwined" with assault or battery claim).  All but 4 of the 144 plaintiffs' direct liability claims (*see* Compl. ¶¶ 25, 36, 54, 168), are time-barred under D.C. law.  *See* D.C. Code § 12-301(8) (2007) (3-year limitation for negligence-based actions).

Under D.C. law, each plaintiff's wrongful death claim is time-barred.  *See* D.C. Code § 16-2702 (2007) (1-year limitation under D.C. law).  If Colombian law applied to plaintiffs' wrongful death claims, only 4 of the 144 D.C. plaintiffs' claims (*see* Compl. ¶¶ 25, 36, 54, 168) would survive.  *See Higgins v. Wash. Metro. Area Transit Auth.*, 507 F. Supp. 984, 986 (D.D.C. 1981) (holding that when D.C. court applies another jurisdiction's wrongful death statute, claim is governed by 3-year limitation of D.C. Code § 12-301 covering actions "for which a limitation is not otherwise specifically prescribed").

## <u>CONCLUSION</u>

For the foregoing reasons, Chiquita respectfully requests that the Court dismiss plaintiffs' Complaint for lack of jurisdiction pursuant to Rule 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).

Respectfully submitted,

_____/s/ Eric H. Holder, Jr._____
Eric H. Holder, Jr. (D.C. Bar No. 303115)
John E. Hall (D.C. Bar No. 415364)
James M. Garland (D.C. Bar No. 475509)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-5372 (telephone)
(202) 778-5372 (facsimile)
eholder@cov.com

*Attorneys for Defendant Chiquita Brands*
Date: December 10, 2007          *International, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that true and correct copies of Defendant Chiquita Brands

International, Inc's Motion to Dismiss Complaint, Memorandum in Support, and Proposed Order

were served upon:

Terry Collingsworth
International Rights Advocates
218 D Street SE (3rd floor)
Washington, D.C. 20003
Tel: (202) 347-4100

Paul Wolf
P.O. Box 11244
Washington, D.C. 20008-1244
Tel: (202) 674-9653

*Counsel for Plaintiffs*


by electronic filing under the Rules of this Court on this 10th day of December, 2007.

_____/s/ Eric H. Holder, Jr._____
Eric H. Holder, Jr.
*Attorney for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE / JOHN DOES 1-144 <br><br> **Plaintiffs,** <br><br> v. <br><br> **CHIQUITA BRANDS INTERNATIONAL, INC.,** <br> **and DAVID DOES 1-10.** <br><br> **Defendants.** | **No. 1:07-cv-01048-PLF** |

## DECLARATION OF JOHN E. HALL

I, John E. Hall, of full age, hereby declare as follows:

1.     I am a partner at Covington & Burling LLP and counsel for Defendant Chiquita Brands International, Inc. ("Chiquita") in this action.  I make this Declaration in support of Chiquita's motion to dismiss plaintiffs' Complaint.

2.     Attached as Exhibit A is a true and correct copy of a criminal Information filed against Chiquita in the U.S. District Court for the District of Columbia on March 13, 2007.

3.     Attached as Exhibit B is a true and correct copy of the Report of the General Secretariat of the Organization of American States on the Diversion of Nicaraguan Arms to the United Defense Forces of Colombia, dated January 6, 2003.

4.     Attached as Exhibit C (with English translation and Affidavit of Accuracy) is a true and correct copy of a report of the Office of the Colombian Prosecutor General, Prosecutor's Office for Criminal Courts of the Specialized Circuits, National Anti-Terrorism Unit, dated July 23, 2004.

5.      Attached as Exhibit D (with English translation and Affidavit of Accuracy) is a true and correct copy of an excerpt of a report of the United Nations Development Programme, entitled *El conflicto, callejón con salida: Informe nacional de desarrollo humano para Colombia* [The Conflict, Alley with an Exit: National Report on Human Development for Colombia], published in 2003.

6.      Attached as Exhibit E is a true and correct copy of a press release issued by the White House and posted on the White House website entitled *President Bush, President Uribe of Colombia Discuss Terrorism and Security*, dated August 4, 2005.

7.      Attached as Exhibit F is a true and correct copy of Henry A. Crumpton's remarks at a press conference at the U.S. Embassy in Colombia on March 23, 2006, which are posted on the State Department's website.

8.      Attached as Exhibit G is a true and correct copy of R. Nicholas Burns' remarks before the Council for the Americas on October 22, 2007, which are posted on the State Department's website.

9.      Attached as Exhibit H is a true and correct copy of U.S.A.I.D.'s Data Sheet on Support for Demobilization and Reintegration in Colombia.

10.     Attached as Exhibit I is a true and correct copy of an amicus brief submitted by the United States on October 14, 2005, to the U.S. Court of Appeals for the Second Circuit in *Khulumani v. Barclay National Bank Limited*, Nos. 05-2141, 05-2326.

11.     Attached as Exhibit J is a true and correct copy of an amicus brief submitted by the United States on August 11, 2006, to the U.S. Court of Appeals for the Ninth Circuit in *Corrie et. al. v. Caterpillar, Inc.*, No. 05-36210.

12.     Attached as Exhibit K is a true and correct copy of a motion to stay the mandates pending a petition for writ of certiorari, submitted on November 1, 2007, to the U.S. Court of Appeals for the Second Circuit by the Defendants-Appellees in *Khulumani v. Barclay National Bank Limited*, Nos. 05-2141, 05-2326.

13.     Attached as Exhibit L is a true and correct copy of a slip opinion issued on July 17, 2007, by the U.S. District Court for the Southern District of Florida in *Barboza v. Drummond Co.*, No. 1:06-cv-61527.

14.     Attached as Exhibit M is a true and correct copy of a slip opinion issued on March 5, 2007, by the U.S. District Court for the Northern District of Alabama in *Romero v. Drummond Co.*, No. CV-03-BE-0575-W.

I declare under penalty of perjury that the foregoing is true and correct.


John E. Hall


Executed on:          December 10, 2007

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO.: |
| | : | |
| v. | : | |
| | : | VIOLATION: |
| CHIQUITA BRANDS | : | |
| INTERNATIONAL, INC., | : | Engaging in Transactions with a |
| | : | Specially-Designated Global Terrorist |
| Defendant. | : | (50 U.S.C. § 1705(b); |
| | : | and 31 C.F.R. § 594.204) |

## INFORMATION

The United States Attorney charges that:

### COUNT ONE
### (Engaging in Transactions with a
### Specially-Designated Global Terrorist)

At all times material to this Information:

#### A. General Allegations

#### Defendant Chiquita Brands International, Inc.

1.      Defendant **CHIQUITA BRANDS INTERNATIONAL, INC. ("CHIQUITA")**, was

a multinational corporation, incorporated in New Jersey and headquartered in Cincinnati, Ohio.

Defendant **CHIQUITA** engaged in the business of producing, marketing, and distributing bananas

and other fresh produce.  Defendant **CHIQUITA** was one of the largest banana producers in the

world and a major supplier of bananas throughout Europe and North America, including within the

District of Columbia. Defendant **CHIQUITA** reported over $2.6 billion in revenue for calendar year

2003. Defendant **CHIQUITA** had operations throughout the world, including in the Republic of

Colombia.

2.      C.I. Bananos de Exportación, S.A. (also known as and referred to hereinafter as

"Banadex"), was defendant **CHIQUITA'S** wholly-owned Colombian subsidiary. Banadex produced

bananas in the Urabá and Santa Marta regions of Colombia. By 2003, Banadex was defendant **CHIQUITA'S** most profitable banana-producing operation. In June 2004, defendant **CHIQUITA** sold Banadex.

**The AUC**

3.      The United Self-Defense Forces of Colombia – an English translation of the Spanish name of the group, "Autodefensas Unidas de Colombia" (commonly known as and referred to hereinafter as the "AUC"), was a violent, right-wing organization in the Republic of Colombia. The AUC was formed in or about April 1997 to organize loosely-affiliated illegal paramilitary groups that had emerged in Colombia to retaliate against left-wing guerillas fighting the Colombian government. The AUC's activities varied from assassinating suspected guerilla supporters to engaging guerrilla combat units. The AUC also engaged in other illegal activities, including the kidnapping and murder of civilians.

4.      Pursuant to Title 8, United States Code, Section 1189, the Secretary of State of the United States had the authority to designate a foreign organization as a Foreign Terrorist Organization ("FTO") if the organization engaged in terrorist activity threatening the national security of the United States.

5.      The Secretary of State of the United States designated the AUC as an FTO, initially on September 10, 2001, and again on September 10, 2003. As a result of the FTO designation, since September 10, 2001, it has been a crime for any United States person, among other things, knowingly to provide material support and resources, including currency and monetary instruments, to the AUC.

6.      The International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*,

conferred upon the President of the United States the authority to deal with threats to the national security, foreign policy and economy of the United States. On September 23, 2001, pursuant to this authority, President George W. Bush issued Executive Order 13224. This Executive Order prohibited, among other things, any United States person from engaging in transactions with any foreign organization or individual determined by the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, to have committed, or posed a significant risk of committing, acts of terrorism that threaten the security of United States nationals or the national security, foreign policy or economy of the United States (referred to hereinafter as a "Specially-Designated Global Terrorist" or "SDGT"). This prohibition included the making of any contribution of funds to or for the benefit of an SDGT, without having first obtained a license or other authorization from the United States government.

7.     The Secretary of the Treasury promulgated the Global Terrorism Sanctions Regulations, 31 C.F.R. § 594.201, *et seq.*, implementing the sanctions imposed by Executive Order 13224. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, was the entity empowered to authorize transactions with an SDGT. Such authorization, if granted, would have been in the form of a license.

8.     Pursuant to Executive Order 13224, the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, designated the AUC as a Specially-Designated Global Terrorist on October 31, 2001. As a result of the SDGT designation, since October 31, 2001, it has been a crime for any United States person, among other things, willfully to engage in transactions with the AUC, without having

first obtained a license or other authorization from OFAC.

## Relevant Persons

9.      Individual A was a high-ranking officer of defendant **CHIQUITA**.

10.     Individual B was a member of the Board of Directors of defendant **CHIQUITA** ("Board").

11.     Individual C was a high-ranking officer of defendant **CHIQUITA**.

12.     Individual D was a high-ranking officer of defendant **CHIQUITA**.

13.     Individual E was a high-ranking officer of defendant **CHIQUITA**.

14.     Individual F was a high-ranking officer of Banadex.

15.     Individual G was an employee of Banadex.

16.     Individual H was an employee of defendant **CHIQUITA**.

17.     Individual I was an employee of defendant **CHIQUITA**.

18.     Individual J was a high-ranking officer of defendant **CHIQUITA**.

## Defendant Chiquita's Payments to the AUC

19.     For over six years – from in or about 1997 through on or about February 4, 2004 – defendant **CHIQUITA**, through Banadex, paid money to the AUC in the two regions of Colombia where it had banana-producing operations: Urabá and Santa Marta.  Defendant **CHIQUITA** paid the AUC, directly or indirectly, nearly every month.  From in or about 1997 through on or about February 4, 2004, defendant **CHIQUITA** made over 100 payments to the AUC totaling over $1.7 million.

20.     Defendant **CHIQUITA** had previously paid money to other terrorist organizations operating in Colombia, namely to the following violent, left-wing terrorist organizations:

-4-

Revolutionary Armed Forces of Colombia – an English translation of the Spanish name of the group "Fuerzas Armadas Revolucionarias de Colombia" (commonly known as and referred to hereinafter as "the FARC"); and the National Liberation Army – an English translation of the Spanish name of the group "Ejército de Liberación Nacional" (commonly known as and referred to hereinafter as "the ELN"). Defendant **CHIQUITA** made these earlier payments from in or about 1989 through in or about 1997, when the FARC and the ELN controlled areas where defendant **CHIQUITA** had its banana-producing operations. The FARC and the ELN were designated as FTOs in October 1997.

21.     Defendant **CHIQUITA** began paying the AUC in Urabá following a meeting in or about 1997 between the then-leader of the AUC, Carlos Castaño, and Banadex's then-General Manager. At the meeting Castaño informed the General Manager that the AUC was about to drive the FARC out of Urabá. Castaño also instructed the General Manager that defendant **CHIQUITA'S** subsidiary had to make payments to an intermediary known as a "convivir." Castaño sent an unspoken but clear message that failure to make the payments could result in physical harm to Banadex personnel and property. Convivirs were private security companies licensed by the Colombian government to assist the local police and military in providing security. The AUC, however, used certain convivirs as fronts to collect money from businesses for use to support its illegal activities.

22.     Defendant **CHIQUITA'S** payments to the AUC were reviewed and approved by senior executives of the corporation, to include high-ranking officers, directors, and employees. No later than in or about September 2000, defendant **CHIQUITA'S** senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño. An in-house attorney for defendant **CHIQUITA** conducted an internal investigation

-5-

into the payments and provided Individual C with a memorandum detailing that investigation. The results of that internal investigation were discussed at a meeting of the then-Audit Committee of the then-Board of Directors in defendant **CHIQUITA'S** Cincinnati headquarters in or about September 2000. Individual C, among others, attended this meeting.

23.    For several years defendant **CHIQUITA** paid the AUC by check through various convivirs in both the Urabá and Santa Marta regions of Colombia. The checks were nearly always made out to the convivirs and were drawn from the Colombian bank accounts of defendant **CHIQUITA'S** subsidiary. No convivir ever provided defendant **CHIQUITA** or Banadex with any actual security services or actual security equipment in exchange for the payments, for example, security guards, security guard dogs, security patrols, security alarms, security fencing, or security training. Defendant **CHIQUITA** recorded these payments in its corporate books and records as "security payments" or payments for "security" or "security services."

24.    In or about April 2002, defendant **CHIQUITA** seated a new Board of Directors and Audit Committee following defendant **CHIQUITA'S** emergence from bankruptcy.

25.    Beginning in or about June 2002, defendant **CHIQUITA** began paying the AUC in the Santa Marta region of Colombia directly and in cash according to new procedures established by senior executives of defendant **CHIQUITA**. In or about March 2002, Individual C and others established new procedures regarding defendant **CHIQUITA'S** direct cash payments to the AUC. According to these new procedures:

(A) Individual F received a check that was made out to him personally and drawn from one of the Colombian bank accounts of defendant **CHIQUITA'S** subsidiary. Individual F then endorsed the check. Either Individual F or Individual G cashed the check, and Individual G hand-

-6-

delivered the cash directly to AUC personnel in Santa Marta.

(B) Banadex treated these direct cash payments to the AUC as payments to Individual F, recorded the withholding of the corresponding Colombian tax liability, reported the payments to Individual F as such to Colombian tax authorities, and paid Individual F's corresponding Colombian tax liability. This treatment of the payments made it appear that Individual F was being paid more money and thus increased the risk that Individual F would be a target for kidnapping or other physical harm if this became known.

(C) Individual F also maintained a private ledger of the payments, which did not reflect the ultimate and intended recipient of the payments. The private ledger only reflected the transfer of funds from Individual F to Individual G and not the direct cash payments to the AUC.

26.    On or about April 23, 2002, at a meeting of the Audit Committee of the Board of Directors in defendant **CHIQUITA'S** Cincinnati headquarters, Individual C described the procedures referenced in Paragraph 25. Individual A, Individual B, and Individual E, among others, attended this meeting.

## Designation of the AUC as a Foreign Terrorist Organization

27.    The United States government designated the AUC as an FTO on September 10, 2001, and that designation was well-publicized in the American public media. The AUC's designation was first reported in the national press (for example, in the Wall Street Journal and the New York Times) on September 11, 2001. It was later reported in the local press in Cincinnati where defendant **CHIQUITA'S** headquarters were located – for example, in the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001. The AUC's designation was even more widely reported in the public media in Colombia, where defendant **CHIQUITA** had its

substantial banana-producing operations.

28.     Defendant **CHIQUITA** had information about the AUC's designation as an FTO specifically and global security threats generally through an Internet-based, password-protected subscription service that defendant **CHIQUITA** paid money to receive. On or about September 30, 2002, Individual H, from a computer within defendant **CHIQUITA'S** Cincinnati headquarters, accessed this service's "Colombia – Update page," which contained the following reporting on the AUC:

> "US terrorist designation
>
> International condemnation of AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries in its annual list of foreign terrorist organizations. This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections."

**Defendant Chiquita Continued to Pay the AUC after the AUC was Designated as an FTO.**

29.     From on or about September 10, 2001, through on or about February 4, 2004, defendant **CHIQUITA** made 50 payments to the AUC totaling over $825,000.

30.     On or about September 12, 2001, Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $31,847.[1]

31.     On or about November 14, 2001, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $56,292.

---

[1]     With respect to all statements in this Information relating to payments by check, the "on or about" dates refer to the dates on which such checks cleared the bank, not the dates on which the checks were issued or delivered.

-8-

32. On or about December 12, 2001, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $26,644.

33. On or about February 4, 2002, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $30,079.

34. On or about March 7, 2002, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $25,977.

35. On or about March 31, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in two equal payments in amounts equivalent to $3,689 each.

36. On or about April 16, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $35,675.

37. On or about May 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $10,888.

38. On or about May 31, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in two equal payments in amounts equivalent to $3,595 each.

39. In or about June 2002, Individual F and Individual G began making direct cash payments to the AUC in the Santa Marta region of Colombia according to the procedures referenced in Paragraph 25.

40. On or about June 11, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in three payments in amounts equivalent to $4,764, $6,670, and $6,269, respectively.

41. On or about June 14, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $31,131.

42. On or about July 2, 2002, Individual F and Individual G paid the AUC in Urabá by

check in an amount equivalent to $11,585.

43.    On or about July 9, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,917.

44.    On or about August 6, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $4,654.

45.    On or about August 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $27,841.

46.    On or about September 2, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $4,616.

47.    On or about October 7, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $8,026.

48.    On or about October 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $40,419.

49.    On or about November 8, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,164.

50.    On or about November 29, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,685.

51.    On or about December 9, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $47,424.

52.    On or about January 21, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,954.

53.    On or about January 27, 2003, Individual F and Individual G paid the AUC in Urabá

by check in an amount equivalent to $22,336.

54.    On or about February 11, 2003, Individual F and Individual G paid the AUC in Santa
Marta in cash in an amount equivalent to $7,291.

## Defendant Chiquita Continued To Pay the AUC Against the Advice of Outside Counsel.

55.    On or about February 20, 2003, Individual I stated to Individual C that Individual I
had discovered that the AUC had been designated by the United States government as a Foreign
Terrorist Organization. Shortly thereafter, Individual C and Individual I spoke with attorneys in the
District of Columbia office of a national law firm ("outside counsel") about defendant
**CHIQUITA'S** ongoing payments to the AUC.

56.    Beginning on or about February 21, 2003, outside counsel advised defendant
**CHIQUITA**, through Individual C and Individual I, that the payments were illegal under United
States law and that defendant **CHIQUITA** should immediately stop paying the AUC directly or
indirectly. Among other things, outside counsel, in words and in substance, advised defendant
**CHIQUITA**:

- "Must stop payments."
  (notes, dated February 21, 2003)

- "Bottom Line: CANNOT MAKE THE PAYMENT"
  "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
  "General Rule: Cannot do indirectly what you cannot do directly"
  "Concluded with: CANNOT MAKE THE PAYMENT"
  (memo, dated February 26, 2003)

- "You voluntarily put yourself in this position. Duress defense can wear out through
  repetition. Buz [business] decision to stay in harm's way. Chiquita should leave
  Colombia."
  (notes, dated March 10, 2003)

- "[T]he company should not continue to make the Santa Marta payments, given the
  AUC's designation as a foreign terrorist organization[.]"

-11-

(memo, dated March 11, 2003)

● "[T]he company should not make the payment."
(memo, dated March 27, 2003)

57.    On or about February 27, 2003, Individual F and Individual G paid the AUC in Urabá

by check in an amount equivalent to $17,434.

58.    On or about March 27, 2003, Individual F and Individual G paid the AUC in Urabá

by check in an amount equivalent to $19,437.

59.    On or about April 3, 2003, Individual B and Individual C first reported to the full

Board of Directors of defendant **CHIQUITA** that defendant **CHIQUITA** was making payments to

a designated Foreign Terrorist Organization. A member of defendant **CHIQUITA'S** Board of

Directors objected to the payments and recommended that defendant **CHIQUITA** consider taking

immediate corrective action, to include withdrawing from Colombia. The Board agreed to disclose

promptly to the Department of Justice the fact that defendant **CHIQUITA** had been making

payments to the AUC.

60.    On or before April 4, 2003, according to outside counsel's notes concerning a

conversation about defendant **CHIQUITA'S** payments to the AUC, Individual C said: "His and

[Individual B's] opinion is just let them sue us, come after us. This is also [Individual A's] opinion."

61.    On or about April 8, 2003, Individual C and Individual D met at defendant

**CHIQUITA'S** headquarters in Cincinnati with Individual F, Individual G, Individual H, and

Individual I. According to the contemporaneous account of this meeting, Individual C and Individual

D instructed Individual F and Individual G to "continue making payments" to the AUC.

62.    On or about April 24, 2003, Individual B and Individual C, along with outside

counsel, met with officials of the United States Department of Justice, stated that defendant

-12-

**CHIQUITA** had been making payments to the AUC for years, and represented that the payments had been made under threat of violence. Department of Justice officials told Individual B and Individual C that defendant **CHIQUITA'S** payments to the AUC were illegal and could not continue. Department of Justice officials acknowledged that the issue of continued payments was complicated.

63.    On or about April 30, 2003, Individual B and Individual C told members of the Audit Committee of the Board of Directors and the outside auditors of defendant **CHIQUITA** about the meeting with Department of Justice officials on April 24, 2003. Individual B and Individual C said that the conclusion of the April 24th meeting was that there would be "no liability for past conduct" and that there had been "[n]o conclusion on continuing the payments."

64.    On or about May 5, 2003, according to the contemporaneous account of this conversation, Individual 1 instructed Individual F and Individual J to "continue making payments" to the AUC.

65.    On or about May 12, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,105.

66.    On or about May 21, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $47,235.

67.    On or about June 4, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,623.

68.    On or about June 6, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in two payments in amounts equivalent to $6,229 and $5,764, respectively.

69.    On or about July 14, 2003, Individual F and Individual G paid the AUC in Santa

-13-

Marta in cash in an amount equivalent to $7,139.

70.    On or about July 24, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $35,136.

71.    On or about August 8, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,822.

72.    On or about August 25, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $12,850.

73.    On or about September 1, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,963.

74.    On or about September 8, 2003, outside counsel advised defendant **CHIQUITA** in writing, through Individual C and Individual I, that: "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments."

75.    On or about October 6, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $18,249.

76.    On or about October 6, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $9,439.

77.    On or about October 24, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $30,511.

78.    On or about November 5, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,937.

-14-

79.    On or about December 1, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,337.

80.    On or about December 2, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $30,193.

81.    On or about December 4, 2003, Individual B and Individual C provided the Board of Directors additional details concerning defendant **CHIQUITA'S** payments to the AUC that had not previously been disclosed to the Board. A member of defendant **CHIQUITA'S** Board of Directors responded to this additional information by stating: "I reiterate my strong opinion – stronger now – to sell our operations in Colombia."

82.    On or before December 4, 2003, defendant **CHIQUITA** created and maintained corporate books and records that did not identify the ultimate and intended recipient of the payments to the AUC in Urabá in calendar year 2003 as follows:

| Reporting Period | Description of recipient | Description of payment |
|---|---|---|
| 1st Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security service." |
| 2nd Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security services." |
| 3rd Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security services." |

83.    On or about December 16, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $24,584.

-15-

84.     On or about December 22, 2003, Individual B sent an email to other Board members on the subject of defendant **CHIQUITA'S** ongoing payments to the AUC, stating, among other things: "This is not a management investigation. This is an audit committee investigation. It is an audit committee investigation because we appear to [be] committing a felony."

85.     On or about January 9, 2004, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $10,630.

86.     On or about January 13, 2004, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $27,958.

87.     On or about February 4, 2004, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $4,795.

88.     From on or about October 31, 2001, and continuing until on or about February 4, 2004, within the District of Columbia and elsewhere, defendant **CHIQUITA** engaged in a continuing course of conduct willfully to engage and attempt to engage in transactions with a Specially-Designated Global Terrorist, by contributing funds to and for the benefit of the AUC, without having first obtained the required authorization from the Department of the Treasury's

Office of Foreign Assets Control, located in the District of Columbia.

**(Engaging in Transactions with a Specially-Designated Global Terrorist,** in violation of Title 50, United States Code, Section 1705(b); Title 31, Code of Federal Regulations, Section 594.204.)

JEFFREY A. TAYLOR
United States Attorney
for the District of Columbia
D.C. Bar No. 498610

By: _____

Jonathan M. Malis
D.C. Bar No. 454548
Denise Cheung
D.C. Bar No. 451714
Assistant United States Attorneys
(202) 305-9665
Jonathan.M.Malis@usdoj.gov

Stephen Ponticiello
PA Bar No. 44119
Department of Justice Trial Attorney
Counterterrorism Section

Dated: March 13, 2007

-17-

# EXHIBIT B

PERMANENT COUNCIL



OEA/Ser.G
CP/doc. 3687/03
29 January 2003
Original: Spanish

REPORT OF THE GENERAL SECRETARIAT OF THE
ORGANIZATION OF AMERICAN STATES ON THE
DIVERSION OF NICARAGUAN ARMS TO THE
UNITED DEFENSE FORCES OF COLOMBIA

January 6, 2003

This document is being distributed to the permanent missions and
will be presented to the Permanent Council of the Organization.

**NOTE:**

This edition of the General Secretariat's Report on the Diversion of Nicaraguan Arms to the United Self Defense Forces of Colombia does not contain Annexes III through VII.   In all other respects this edition is identical to the complete report.



**Report of the General Secretariat of the Organization of American States on the Diversion of Nicaraguan Arms to the United Self Defense Forces of Colombia**

January 6, 2003

# <u>INDEX</u>

**1.  Executive Summary**

    1.  Summary

    2.  Recommendations


**2.  Report**

    I.      Background

    II.    Principal Actors in the Arms Diversion

    III.   The Chain of Events

    IV.   Analysis

    V.    Legal Commentary

    VI.   Application of the Inter-American Convention Against the Illicit Manufacturing of and Trafficking in Firearms, Ammunition, Explosives and Other Related Materials, (CIFTA)

    VII.  Issues Requiring Further Investigation

    VIII. Conclusions


**3.  Annexes**

    I.      Documented Chronology of the Chain of Events

    II.    List of all Actors

    III.   Sworn Statements

    IV.   Documents Related to the Supposed Purchase Order

    V.    Supporting Documents

    VI.   Application of the Inter-American Drug Abuse Control Commission's (CICAD) Model Regulations

    VII.  CICAD Model Regulations

## 1.  Executive Summary:

### I.  Summary

In October 1999, a series of events began which resulted in the illegal diversion of 3000 AK47s and 2.5 million rounds of ammunition from Nicaraguan government stocks to the *Autodefensas Unidas de Colombia* (AUC), a terrorist organization in Colombia.   The diversion was made possible by negligent actions on the part of various government officials and private companies, and the willful and criminal actions of several private arms merchants.

The original, legitimate, transaction was to be a trade between the Nicaraguan National Police and a private Guatemalan arms dealership, *Grupo de Representaciones Internacionales* (GIR S.A.).   The Nicaraguan Army introduced GIR S.A. to the police.  GIR S.A. offered the police a quantity of new Israeli manufactured pistols and mini-uzis in return for five thousand surplus AK47s and 2.5 million rounds of ammunition.   This was an attractive arrangement for the police since it was a cashless transaction and would provide the police with arms more suitable for police work.

GIR S.A.  shopped for a buyer for the police arms and settled on Shimon Yelinek, an Israeli arms merchant based in Panama.  Yelinek claimed to be representing the Panamanian National Police, and during the negotiations presented GIR S.A. and Nicaraguan officials with a Panamanian Police purchase order, which has been proven to be a forgery.  Neither GIR S.A. nor any Nicaraguan official ever questioned the purchase order or attempted to verify that Panama had in fact offered to buy the weapons.

Yelinek inspected the police weapons some months after the deal was made, and after Nicaraguan authorities had given permission for the transaction.   He declared them to be unserviceable and unsatisfactory.   This threatened the transaction.   GIR S.A. and the Nicaraguan Army solved the problem by arranging a swap of 5000 surplus police AK47s for 3117 serviceable weapons in the Nicaraguan Army inventory.   GIR S.A. delivered the Israeli arms to the police and the Nicaraguan Army took over responsibility for delivering the AK47s.  Although the parameters of the transaction changed, no new authority was requested from responsible Nicaraguan agencies.

Yelinek identified a Panamanian maritime company, Trafalgar Maritime Inc., to pick up the arms in Nicaragua and take them to Panama.  The arms were transported by the army to the port of El Rama, Nicaragua, and were loaded aboard the company's only ship, the Otterloo, which declared for Panama.  Instead, the Otterloo sailed directly to Turbo, Colombia where the arms were delivered to the AUC.  The Captain of the ship disappeared shortly thereafter, and the maritime company was dissolved several months later.  The Otterloo was sold to a Colombian citizen.

Immediately after the shipment left Nicaragua, GIR S.A. began to organize another sale to Yelinek from the Nicaraguan Army, using the same purchase order, this time for an additional five thousand AK47s and 17 million rounds of ammunition.  Prices were exchanged between the three, Yelinek made a down payment, and the deal was under way.

When the diversion of the initial shipment became known, the intelligence services of Colombia, Nicaragua and Panama agreed to organize a "sting" operation, ostensibly to track this second

shipment and identify those responsible for the first diversion. This plan fell apart fairly quickly when GIR S.A. found out that it was in play and canceled the shipment.

The OAS investigative team believes that:

1. Shimon Yelinek is likely guilty of fraud and of violating Colombian anti-terrorism laws, and possibly Panamanian anti-terrorism laws, among others. An associate Marco Shrem, appears complicit in these activities, but to an unknown degree.

2. The owner of the Otterloo, the ship which transported the arms to Colombia, is apparently guilty of conspiring with Yelinek to provide the AUC with arms and of violating Colombian, and possibly Panamanian, anti-terrorism and other laws.

3. The captain of the ship which transported the arms to Colombia, along with his first mate, may have been cognizant of, and a participant in, the arms diversion organized by Yelinek.

4. Although the Investigative Team found no evidence that Ori Zoller and Uzi Kissilevich, the owner and general manager of of GIR S.A., respectively, were co-conspirators in the arms diversion, their failure to make any attempt to verify the actual destination for the arms contributed to the diversion.

5. The Government of Nicaragua failed to comply with a number of provisions of the Inter-American Convention Against the Illicit Manufacture and Trafficking in Weapons, Munitions, Explosives and Related Materials (CIFTA), to which it is a party. Nicaraguan authorities are guilty of professional negligence with their failure to verify whether the Panamanian National Police was indeed the true end-user in the arms exchange.

6. There appears to be no involvement of Panamanian authorities in the exchange of arms, or their diversion.

7. Colombia is the victim of the arms diversion. However several Colombian customs agents were likely accomplices of, or were bribed by, the AUC in order to allow the Otterloo to land its cargo of arms and ammunition in the port of Turbo.

## II. Recommendations:

The OAS Investigative Team presents below a number of recommendations to strengthen the existing Inter-American arms control regime and prevent diversions of this type from occurring in the future.

**Recommendation 1:** The governments of Colombia, Nicaragua, and Panama should vigorously pursue investigations into possible criminal conduct on the part of any and all persons involved in this case, and should seek the collaboration of other governments including Canada, Guatemala, Israel, Mexico, and the United States of America in the investigation and prosecution of these possible crimes. These efforts should include attempts to resolve the unanswered questions presented in section VII of this report.

**Recommendation 2**:  The Inter-American Convention Against the Illicit Manufacturing of and Trafficking in Firearms, Ammunition, Explosives, and other Related Materials, (CIFTA), is, and should remain, the primary multilateral hemispheric tool to prevent the illicit manufacturing and trafficking in arms and ammunition.  All member states of the Organization who have not done so should sign and ratify the Convention.  The Consultative Committee of CIFTA should spearhead an effort to ensure full implementation of the Convention and to promote its full adoption.

**Recommendation 3:**  With regard to full implementation of the Convention, particular emphasis should be placed on the provisions of paragraph 3 of Article IX of the Convention, requiring evidence of the pre-issuance of the necessary import licenses or authorizations before any shipments of firearms are released for export.  Articles VIII, and X, should also be paid particular attention.  Member states should consider applying the CICAD Model Regulations to facilitate implementation of the CIFTA Convention.

**Recommendation 4**:  OAS member states should consider establishing surplus arms destruction programs.  OAS member and observer states should provide financial and technical assistance for such surplus arms destruction.

**Recommendation 5**:  Persons engaged in the import, export and in-transit movement of firearms, or as dealers, or carriers and/or shippers of firearms, should be registered by national governments in order to do business in each country in which they have an  office, and in each country in which a transaction takes place.  Member states should not engage in business activities with any non-registered broker.

**Recommendation 6**:  All member states should review their national legislation and administrative practices for the exportation of firearms and establish a legal regime sufficient to exert meaningful control over the inventory and export of firearms.

**Recommendation 7**:  Harmonized import certificates should be used by all member countries.  Electronic formats of the certificates should be developed so that the information can be readily shared with other countries involved in a transaction.[1]   Additionally, harmonized export and in-transit documents should be developed and used by all member states to regulate the importation, export and transit of arms and ammunition and related materials.

The OAS Investigative Team limited its work to the specific mandate it was given.  However the investigation revealed serious issues which the Team strongly recommends be investigated by governments (see page 34).

---

[1] It should be noted that this recommendation and others referring to the exchange of information among countries is subject to the confidentiality provisions set out in Article XII of the Convention.

4

2. **Report of the General Secretariat of the Organization of American States on the Diversion of Nicaraguan Arms to the United Self Defense Forces of Colombia**

I.    **Background:**

A.  Request for an Investigation:

On May 8, 2002, the Ministers of Foreign Affairs of Colombia, Nicaragua and Panama, Guillermo Fernandez de Soto, Norman Caldera C. and José Miguel Alemán, respectively, wrote to OAS Secretary General César Gaviria.   The Ministers requested that the General Secretariat of the Organization conduct an investigation into the circumstances surrounding the export of an official shipment of arms and ammunition which originated in Nicaragua in November 2001, and was subsequently diverted to the United Self Defense Forces of Colombia (*Autodefensas Unidas de Colombia*, AUC).   The letter is contained in Annex V of this report, as document No. 17, for reference.

The Ministers requested that the Secretary General investigate the events and report to their respective governments setting out the facts drawn from the investigation, together with conclusions and recommendations for suggested mechanisms and procedures designed to prevent the recurrence of similar situations in the future.

Given the importance of this joint request in the post-September 11, 2001 environment, the Secretary General responded by appointing Ambassador Morris D. Busby as his Special Representative to lead the investigation[2].

B.  Investigative Task:

The general task of the investigation was to determine how an official arms transfer between the Nicaraguan National Police (NNP) and a firearms brokerage company located in Guatemala, *Grupo de Representaciones Internacionales*, (GIR S.A.), led to the diversion of the Nicaraguan arms to the port of Turbo, Colombia, where the arms subsequently came into the hands of the United Self Defense Forces of Colombia (*Autodefensas Unidas de Colombia*, AUC), a paramilitary group considered a terrorist organization.   It had been represented to the responsible Nicaraguan authorities that the arms were being sold and shipped to the Panamanian National Police.

The Investigative Team undertook the following specific tasks:

1.  To determine the actual facts of the case and prepare a complete chronology of all events pertinent to the diversion;

---

[2] Ambassador Busby led an OAS Investigative Team composed of Christopher Hernández-Roy, Advisor to the Assistant Secretary General, serving as Ambassador Busby's Deputy; Michael Sullivan, Principal Attorney of the Department of Legal Affairs; Jimena Duque, Security Specialist, Office of the Assistant Secretary General; Sergio Caramagna, Director of the Office of the General Secretariat in Nicaragua; and Hernan Hurtado, Director of the Office of the General Secretariat in Panama.

2. To develop information on possible violations of national law and make appropriate recommendations to the governments for follow-on investigation and/or action;

3. To ascertain whether any of the governments involved failed to adhere to their relevant international obligations, and;

4. To make appropriate recommendations to avoid a recurrence of similar situations in the future.


C. Methodology:


On May 28 and 29, 2002, the three governments requesting the investigation each submitted to the General Secretariat a report on their findings related to the arms diversion. These reports contained facts of the case developed during their internal investigations, and also copies of original documentation. Based on an extensive review of this documentation, the investigating team requested additional information from the three governments on July 15, 2002, which the governments provided in late July.

Members of the Investigative Team traveled to Nicaragua, Guatemala and Panama, to obtain additional information and documentation, and to interview government officials and private individuals with direct knowledge of the case.

In Guatemala, the team met with the owner and the general manager of the firm *Grupo de Representaciones Internacionales*, (GIR S.A.), Messrs. Ori Zoller and Uzi Kissilevich. GIR S.A. was the broker that put together the deal.

In Nicaragua, the team met with the Foreign Minister, the Minister of Defense, the current and former Ministers of Government (*Ministro de Gobernación*), the current and former Chiefs of Police, the *Contralor General de la República*, the Chief of the Nicaraguan Army, the Inspector General of the army, several other civilian, police and military officials, and with representatives of the Nicaraguan shipping company, Agencia Vassali which handled the loading of the arms onto the Otterloo for ultimate transport to Colombia.

In Panama, the team met with the Foreign Minister; the Minister of Government and Justice (*Ministro de Gobierno y Justicia*); the Vice-Minister of Foreign Affairs; the Executive Secretary of the Security Council (*Secretario Ejecutivo del Consejo de Seguridad*); the Chief of the Panamanian National Police; the prosecutor (*Fiscal*) responsible for the case in Panama; Marco Shrem, one of two private individuals located in Panama who were involved in the transaction; Gustavo Padilla, a Panamanian lawyer who incorporated Trafalgar Maritime Inc.; Yariela Brown, the Secretary of Trafalgar Maritime Inc.; Carlos Aguilar, the first mate of the ship Otterloo, whose registered owner is Trafalgar Inc., and other people with knowledge of the case. The Investigative Team made several unsuccessful attempts to interview the other private individual located in Panama who was involved in the arms diversion, Shimon Yelinek. These attempts were made through Yelinek's lawyers following his arrest by Panamanian authorities in November, 2002. Table 1 (below) contains a complete list of individuals interviewed or contacted by the Investigative Team.

The Investigative Team did not travel to Colombia, rather, requests for information from the Government of Colombia were made through that country's Ambassador, Permanent Representative to the OAS, Humberto de la Calle Lombana, and through contacts with knowledgeable individuals.

The Investigative Team was able to reconstruct the facts surrounding the transfer of arms from Nicaragua to Colombia based on information provided by the countries, and other information collected during meetings with government officials and others.  The investigation also sought, and received, information from the governments of Belize, Guatemala, Israel, Mexico, and the United States of America.

## Table1:  Persons Contacted or Interviewed by the Investigative Team

Belize:

- Lisa Shoman, Ambassador, Permanent Representative of Belize to the Organization of American States.

Colombia:

- Humberto de la Calle, Ambassador, Permanent Representative of Colombia to the Organization of American States.
- Brigadier General Jose Leonardo Gallego-Castrillon, Commander, Colombian National Police, Valle de Aburra.

United States of America:

- Oliver P. Garza, Ambassador of the United States of America in Nicaragua.
- Roger Noriega, Ambassador, Permanent Representative of the United States of America to the Organization of American States.
- Christopher McMullen, Chargé, Embassy of the United States of America in Panama.

Guatemala:

- Ori Zoller, Owner of *Grupo de Representaciones Internacionales*, GIR S.A.
- Uzi Kissilevich, Director General of *Grupo de Representaciones Internacionales*, GIR S.A.
- Arturo Duarte, Ambassador, Permanent Representative of Guatemala to the Organization of American States.

Israel:

- Rafael Barak, Chargé, Embassy of Israel in the United States of America.
- Jacob Dayan, Alternate Permanent Observer of Israel to the Organization of American States.

México:

- Miguel Ruiz Cabañas, Ambassador, Permanent Representative of Mexico to the Organization of American States.

Nicaragua:

- H.E., Enrique Bolaños Geyer, President of the Republic.
- Norman Caldera, Minister of Foreign Affairs.
- Arturo Harding, Minister of *Gobernación.*
- René Herrera, former Minister of *Gobernación.*
- José Adan Guerra, Minister of Defense.
- Carlos Ulvert, Ambassador of Nicaragua to the United States of America.
- Leandro Marín Abaunza, Ambassador, Permanent Representative of Nicaragua to the Organization of American States.
- General Javier Alonso Carrión McDonough, Commander in Chief of the Nicaraguan Army.
- General Roberto Calderón, Inspector General of the Nicaraguan Army.
- Edwin Cordero, First Commissioner, NNP.
- Francisco Bautista Lara, Commissioner of Police, NNP.
- Melby Gonzalez, Commissioner of Police, NNP.
- Francisco Montealegre, former First Commissioner of Police, NNP
- Julio César Solis, General Manager, Naval Operations, *Agencia Vassali.*
- Augusto Canales Aguilar, Owner, *Agencia Canales Aguilar.*
- Members of the Superior Council of the Comptroller General of the Republic of Nicaragua (*Consejo Superior de la Contraloría General de la Republica de Nicaragua*), including the Council's former President, Guillermo Arguello Poessy, and its current President, Francisco Ramírez Torres.

Panamá:

- José Miguel Aleman, Minister of Foreign Affairs.
- Anibal Salas, Minister of Government and Justice (*Ministro de Gobierno y Justicia*).
- Harmodio Arias Cerjack, Deputy Foreign Minister.
- Ramiro Jarvice, Executive Secretary of the Security Council.
- Carlos Barés, Chief of the PNP.
- Juan Manuel Castulovich, Ambassador, Permanent Representative of Panama to the Organization of American States..
- José Isaza, Chief of the Maritime Service (*Jefe del Servicio Marítimo*).
- Gustavo Leonardo Padilla Martinez, Trafalgar Maritime Inc.'s lawyer.
- Yariela Brown, Trafalgar Maritime Inc.'s secretary.
- Fredison Carvajal, PNP
- Alexis Vergara, PNP
- Patricio Candanedo, Second Prosecutor Specializing in Crimes Related to Drugs, Public Ministry (*Fiscal Segundo Especializado en Delitos Relacionados con Drogas, Ministerio Publico).*
- Marco Shrem, owner/partner, Marksman Latin America S.A, y Marksman Panamá, commercial enterprises located in Panama.
- Carlos Aguilar, merchant marine captain, first mate aboard the Otterloo.

## II.  Principal Actors in the Arms Diversion:

The following persons had substantive roles in the arms transaction:

*In Guatemala*:

- Ori Zoller: An Israeli citizen and owner of GIR S.A., a firearms dealership and brokerage agency established in Guatemala in 1996, and a representative of Israeli Military Industries (IMI).  Zoller was formerly a member of the Israeli Army's special forces, and an intelligence officer.   He was the broker who organized and managed the transfer of the NNP firearms.

- Uzi Kissilevich:  An Israeli citizen and partner of Zoller's in GIR S.A., also  formerly a member of the Israeli military.   He serves as GIR S.A.'s general manager and was also involved in the NNP firearms transfer.

*In  Nicaragua:*

- General Roberto Calderón Meza:  Inspector General of the Nicaraguan Army and formerly its Chief of Logistics. Over the years, General Calderón allegedly had a number of business dealings with Zoller. Calderón became involved in the present case through his relationship with Zoller. He was instrumental in providing Nicaraguan Army firearms to the NNP when the firearms that the NNP was planning to transfer were found to be unsatisfactory to the ultimate buyer.

- Major Alvaro Rivas Castillo:  Major of the Nicaraguan Army, and Aide de Camp of General Calderón.  He took responsibility for logistics and the actual export of the firearms that are the subject of the investigation.

- René Herrera:  Nicaraguan Minister of Government (*Gobernación*) until September 30, 2000. Ex-Minister Herrera approved the terms of the transfer of the NNP firearms to GIR S.A.  Herrera also requested Nicaragua's Comptroller General (*Contraloría General*) to exempt this firearms transaction from Nicaragua's Law governing State Contracts (*Ley de Contrataciones del Estado*). Herrera personally briefed the then United States Ambassador to Nicaragua on the terms of the original arms deal – describing it as a sale of antiquated arms to a broker for re-sale to collectors in the United States.

- Commissioner Francisco Montealegre:  Chief of Police from September 1996 to September 6, 2001. Montealegre concluded the initial arms exchange contract with Zoller.

- Edwin Cordero Ardilla:  Present Chief of the NNP.  He became involved in the firearms transfer following Montealgre's retirement and saw it through to final completion.

*In Panama* :

- Shimon Yelinek:  Actual purchaser of the Nicaraguan firearms, through GIR S.A., purportedly for the PNP.  He is an Israeli citizen.

- Marco Shrem: A business associate of Yelinek. Shrem put Yelinek in contact with Zoller, collaborated with Yelinek in the purchase of the Nicaraguan firearms through Zoller, and attempted to buy/sell additional arms though Zoller. He is a Peruvian citizen.

- Miguel Onattopp Ferriz: General Manager and owner of Trafalgar Martime Inc., the company identified as the registered owner of the Otterloo. The Otterloo loaded the arms in El Rama, Nicaragua, and transported them to Colombia. Miguel Onattopp Ferriz is a Mexican citizen.

- Jesús Iturrios Maciel: Captain of the Otterloo at the time of the diversion, employed by Trafalgar Maritime Inc. He is a Mexican citizen.

Annex II contains a complete listing of all of the natural and legal persons and other entities involved in the case.


### III. The Chain of Events:

The chain of events of the case can be broken down into the following four phases:

- The first phase, from October 1999 to June 2000, begins when the Chief of the NNP, Commissioner Francisco Montealegre, aware that his police force has insufficient and inappropriate firearms and a lack of financial resources to acquire new ones, is introduced to Ori Zoller of GIR S.A. by the Inspector General of Nicaragua's army, General Roberto Calderón. A proposed arms transfer was conceived whereby the NNP would provide a quantity of AK47 firearms to the broker Zoller, and in exchange, Zoller would provide the NNP with more suitable firearms (pistols and mini-Uzis). During this stage, the necessary approvals within the Nicaraguan Government were sought and obtained, and a formal contract to effect the exchange was entered into between the NNP and Zoller's GIR S.A.

- The second phase occurred between July 2000 and July 2001, when Zoller identified a buyer for the Nicaraguan arms, Shimon Yelinek and his associates. A shipping company was established in Panama, Trafalgar Maritime Inc., apparently for the purpose of transporting the arms to the AUC in Colombia. It was during this stage that the arms diversion appears to have been planned.

- During the third phase, between July 4, 2001 and November 3, 2001, there was a flurry of activity, beginning when Yelinek inspected the NNP arms being offered for sale by Zoller and determined that their condition was not adequate for the transaction to proceed. In an attempt to salvage the transaction, Zoller and General Calderón entered into an agreement whereby the Nicaraguan Army offered to exchange the unacceptable NNP arms for better quality ones in the army's possession. This was also the period when the final logistical arrangements and customs and export procedures were executed, and culminated with the arms and ammunition being exported from Nicaragua and diverted to Colombia.

- The fourth and final phase took place from late November 2001 to February 2002, when preparations were made to purchase a second shipment of arms from Nicaragua, again ostensibly for the Panamanian Police. The intelligence services of Colombia, Panama, and Nicaragua, through a tri-national operation, proposed by the Nicaraguan Armny, attempted to put together a "sting", supposedly to uncover those responsible for the diversion.

Narrative Summary of the Chain of Events:

The narrative presented below was reconstructed from interviews and documents obtained by the Investigative Team.  A documented chronology of events is presented in Annex I which provides additional details regarding the events surrounding the diversion, and the persons, institutions, and businesses involved.

*Phase I:*

The Nicaraguan National Police, a force consisting of approximately 7000 police officers, has only about half the number of side-arms necessary to equip every officer.  This has forced the police to issue AK47 assault rifles to many officers, these arms being plentiful as they were left over from Nicaragua's civil war.  The Police leadership recognizes that AK47s are not appropriate for a police force.

In 1999, General Roberto Calderón, the Inspector General of the Nicaraguan Army, introduced the Chief of the NNP, Commissioner Francisco Montealegre, to Ori Zoller, the owner of GIR S.A. Zoller and Calderón had a prior business relationship, as GIR S.A. had sold arms and equipment to the Nicaraguan military in the past.  In the fall of 1999, Zoller presented Montealegre with a proposal to obtain suitable side arms which would not require the NNP to pay cash for the arms.

Zoller and Montealegre worked out an exchange, whereby GIR S.A. would provide the NNP with new side arms (465 Jericho pistols and 100 Uzi-submachineguns) in exchange for aging surplus police AK47s, ammunition and bayonets (initially, 5000 AK47s, 2.5 million rounds of ammunition, and 6000 bayonets).

Between February and the end of May, 2000, various bureaucratic procedures were undertaken within the Nicaraguan Government to obtain approval for the exchange of arms.  The exchange was approved by the Minister of *Gobernación*, who has responsibility for the NNP; it was also approved by the President of the Republic (as mentioned in a February 3, 2000 letter from the Minister of *Gobernación*, see document No. 156 in Annex V).  An exemption to the state purchases Law, to allow for a "sole source" transaction of the arms, was approved by the Comptroller General on May 22.   The Minister of *Gobernación* also informed the United States Embassy in Managua of the possible exchange, as Zoller originally indicated he would sell the AK47s as collectors items to a broker in the United States, Century International Arms.

While these internal procedures were being followed, Montealegre and Zoller formalized the agreement by jointly signing a letter of intent, outlining the terms under which the exchange was to be made.  Once the various approvals were obtained for the exchange, Zoller and Montealegre signed a formal contract on June 2, 2000.  Among other clauses in the contract was a requirement for Zoller to produce an end-user certificate for the Nicaraguan arms to be exported.

Meanwhile, in order to make the maximum cash profit on the exchange, Zoller was   searching for buyers for the military equipment.  He found three potential buyers for the arms:  1) Brian Sucher, of Century International Arms Inc., based in Miami, Florida;  2) Pedro Bello, another Miami-based arms broker; and 3)  Shimon Yelinek, an Israeli citizen residing in Panama.

Shimon Yelinek was introduced to Zoller by Marco Shrem, another resident of Panama, and an associate of Yelinek.   Zoller's business partner, Uzi Kissilevich, had been informed by Haim Geri, an advisor to Century International Arms Inc. and former representative of Israeli Military Industries in Colombia, that Marco Shrem was seeking to purchase AK47s.  Once Kissilevich contacted Shrem, and the latter introduced Yelinek, it was only a short time before Zoller and Yelinek reached a deal, as the latter apparently offered Zoller the best price for the Nicaraguan arms and ammunition.

Yelinek and Shrem purported to be acting as brokers or middlemen for the Panamanian National Police, which was allegedly the entity ultimately interested in purchasing the arms and ammunition[3].   Yelinek, Shrem, Zoller, and Yelinek's brother in law, Haviv Aviad, traveled to Nicaragua on April 28, 2000, to inspect the arms that the Nicaraguan National Police was to provide as part of the exchange.   On May 18, Zoller traveled to Panama to meet Yelinek and Shrem.   Yelinek agreed to purchase 2500 AK47s (later increased to 3000) and 2.5 million rounds of ammunition (later increased to 5 million rounds).  Zoller agreed to have the NNP arms reconditioned and crated, a task which was contracted to the NNP and associates of General Calderón.   That same day, Zoller instructed Kissilevich to fax to Panama GIR S.A.'s bank account information so Yelinek could make a down-payment for the arms purchase.  On June 16, $75,000 was deposited in GIR S.A.'s account, via wire transfer.  The total value of the Zoller-Yelinek deal was approximately $575,000.

*Phase II*

Over the next several months, Yelinek and Shrem solicited additional price quotes from GIR S.A. for firearms, missiles and other kinds of military equipment.   At the same time, GIR S.A. sent a series of reminders and instructions to Yelinek as to how to send wire-transfers to GIR S.A.'s bank account. On May 15, 2001, Yelinek met Zoller at his offices in Guatemala City, where he provided Zoller with an alleged Panamanian Police purchase order[4], which specified a much larger quantify of arms and ammunition.   The purchase order included language which could allow the order to be used simultaneously as an end-user certificate.

Yelinek inspected the NNP arms in Nicaragua a second time (this time in the presence of Uzi Kissilevich, Zoller's associate) on July 4, 2001.   As a result of this inspection, at some point in July or August of 2001, Yelinek indicated to GIR S.A. that the police arms were of poor quality and did not meet his requirements.   Zoller quickly corrected this problem by making a side deal with the army through General Calderón, whereby the army agreed to accept the NNP's 5000 old AK47s, in return for 3117 new AK47s in the possession of the army.   As a result, these new army weapons would then be the arms exchanged with GIR S.A. under the original contract signed between the NNP and GIR S.A.   In a further modification of the original deal, the Nicaraguan Army also agreed to provide an additional 2.5 million bullets and 3000 additional bayonets; GIR S.A. agreed to provide the army with a number of bullet-proof vests.  Zoller also hired Haim Geri to train the police on their new weapons.

---

[3] Yelinek, in a affidavit sworn on July 1, 2002, before a notary public in Tel Aviv, Israel, denies that he concluded any business dealings with Zoller (see document No. 1 in Annex III).  However, the Investigative Team has concrete documentation which shows this is untrue.

[4] The Investigative Team is satisfied that the alleged Panamanian Purchase Order is a forgery.  The document seems to have been created from a true blank purchase order form, but the signatures on the document have apparently been forged, and there are other irregularities as well.  See Annex IV for information and analysis on the alleged purchase order, provided by the Government of Panama.

Two side-deals were also arranged by Zoller.  One hundred fifteen of the guns supplied by the Nicaraguan Army, were to be sold to the Guatemalan Military.  Nine thousand bayonets were to be sold to Century International Arms, Inc, in Miami.  From the perspective of laws on international arms trafficking, both of these two side-deals appear to be legitimate.

Virtually at the same time, on July 11, 2001, a Mexican National, Miguel Onattopp Ferriz, reportedly a Captain in the Mexican Merchant Marine, established a new shipping company in Panama City, Trafalgar Maritime Inc., through a Panamanian lawyer, Gustavo Padilla.  The company's only ship, the Otterloo, had been purchased from Dutch owners in early July 2001, and was given a provisional Panamanian ship's license on July 24.

*Phase III*

All of the arrangements necessary to export the arms and ammunition were coordinated between the Nicaraguan Army, which undertook this role on behalf of the NNP, GIR S.A.'s shipping agent, Guatemala-based Leonel Cordon, a shipping agent in Nicaragua, Agencia Vassali S.A., and a customs broker, hired by the police, *Agencia Aduanera Canales Aguilar*.

By the end of October, 2001, GIR S.A. had virtually fulfilled its side of the bargain with the NNP, providing all but five of the side-arms stipulated in the original contract with the police.  By the middle of the month, Yelinek had wire-transferred to GIR S.A. approximately $550,000, which was only $25,000 short of the total owed.  The logistical aspects had also largely been arranged, and the arms and ammunition were ready to be exported.   On October 19, 2001, Yelinek informed Zoller that the arms and ammunition were to be transported on a Panamanian-flagged vessel, the Otterloo, owned by Panamanian-based Trafalgar Maritime Inc, whose representative was Miguel Onattopp Ferriz.  On October 22, 2001, Police Commissioner Edwin Cordero Ardilla notified the *Contraloría General* of the quantitative change in the arrangement with GIR S.A., and also the army-police arms exchange.

The Otterloo sailed from Veracruz, Mexico, on October 15.  Before sailing, the captain of the Otterloo, Iturrios Maciel,  provided Mexican authorities with a signed Bill of Lading in which he stipulated that his ship was transporting 9 containers of plastic balls to Panama.   The Otterloo arrived at the Nicaraguan port of El Rama on November 26.    After a delay of several days, on November 2, 2001, the Otterloo was loaded with 14 containers of arms and ammunition.  The Otterloo's captain signed a ship manifest and a Bill of Lading stating that the ship had been loaded with the 14 containers and that the ship's destination was the port of Colón, Panama.  The Otterloo left Nicaragua on November 3, 2001.

On November 5, 2001, the Otterloo arrived at the port of Turbo, on Colombia's Caribbean coast, without ever having stopped in Panama.  The ship was unloaded two days later by a Colombian shipping company called Banadex S.A., at the request of a shipping agent Turbana Ltd.  The Otterloo sailed for Baranquilla on November 9, where the Captain, Jesus Iturrios Maciel disembarked, stating he was ill, and disappeared.  After a series of other stops, the Otterloo returned to Panama.

In April 2002 Trafalgar Maritime, Inc. was dissolved and the Otterloo was sold to a Colombian citizen, Edgar Enrique Aaron Villalba (see document No. 11, Annex III).  The Investigative Team was informed that the new owner may have registered the ship in Belize.  However, the Government

of Belize has not been able to find the vessel in its registry, the International Merchant Marine Registry of Belize.

A final footnote to this arms diversion was provided by the leader of the United Self-Defense Forces of Colombia, Carlos Castaño, On June 30, 2002, in an interview granted to Colombia's newspaper, El Tiempo, he answered a question about the Otterloo,  and said "This is the greatest achievement by the AUC so far.  Through Central America, five shipments, 13 thousand rifles", (see document No. 14a in Annex V).

*Phase IV*

Almost immediately after the Otterloo unloaded its cargo in Turbo, a second, larger arms sale began to be organized by Zoller, at the request of Yelinek, also allegedly for the Panamanian National Police.  On November 21, Zoller sent a fax to the Nicaraguan Army, explaining that the PNP wished to purchase an additional 5000 AK47s and 17 million rounds of ammunition.  He attached a copy of the same Panamanian purchase order, dated February 10, 2000.  Zoller began making arrangements with his shipping agent to purchase 23 containers for this second shipment of arms.  A January 3, 2002, fax from Kissilevich to Leonel Cordon informed Cordon that the containers should be sent to the Nicaraguan Army in Managua, and that the contact person was General Calderon's aide, Major Rivas.   On January 11, 2002, the Nicaraguan Army issued a bill for $980,000 addressed to the PNP.  On January 16, 2002, Yelinek wire-transfered $50,000 to GIR S.A's account as a down-payment.

Towards the end of January, 2002, Colombian authorities became aware that the AUC had received the Nicaraguan arms, and informed the Panamanian Naval Intelligence Service, who in turn informed the Nicaraguan Army on January 30, 2002.   This put into motion a three-nation effort on the part of Colombian, Panamanian and Nicaraguan intelligence services[5].  Representatives of the three services met in Managua in early February, and on February 6, signed an agreement called "Operation Triangle" (O*peración Triangulo*), described as a "sting" operation to catch the arms traffickers, utilizing the second deal being organized by Zoller (See Annex V, document No. 24). The NNP was not informed by the Nicaraguan Army that the arms they had exchanged had been diverted to Colombia, nor were they included in *Operación Triangulo*.

Zoller, in an interview with the Investigative Team, said that on or about February 15, 2002, he decided to stop the second deal when General Calderón informed him of Operación Triangulo.  He notified Julio Solis of *Agencia Vassali* as well as his own agent, Leonel Cordon, that he no longer needed the containers.  General Calderón told the OAS Investigating Team that Zoller knew nothing about *Operación Triangulo*.

## IV.  Analysis:

Although it was not the purpose of this investigation to uncover wrongdoing on the part of any specific individual, governments may wish to probe further into the facts to determine if their national laws have been violated.  The following provides the Investigative Team's own perspective.

As a general comment, the Team would note that although a great deal of interest and attention to detail is evident in the movement of the firearms out of Nicaragua, Zoller, Kissilevich and the others involved readily accepted the bogus Panamanian purchase order, and displayed a complete lack of

---

[5] The army is responsible for Nicaraguan intelligence.

interest as to where the arms were ultimately going. There is no record of any communications between GIR S.A. and the Panamanian Police Force or any other Panamanian authority. Nothing in the evidence indicates that Zoller, Kissilevich, or any of the many Nicaraguan officials involved ever attempted to verify whether the purchase order provided by Yelinek was legitimate. As well, to rely on this one purchase order, unsupported by any other documentation  throughout this complex transaction, and to utilize this one document as determinative of the identity of the end-user, is unprofessional and not credible. This matter becomes even more damning considering that a second, larger, shipment was planned for the same alleged customer immediately on the heels of the first shipment. Again, no efforts were made by anyone involved to contact Panamanian authorities, even though it is difficult to understand why the Panamanian Police Force would purchase upwards of 8000 AK47s and 22 million rounds of ammunition when the entire force consists of only 13,000 officers, including administrative staff, and when the NNP leadership had recognized that AK47s were unfit for police work.

**(1) The brokers and shippers**

Messrs. Zoller and Kissilevich of GIR S.A. in Guatemala, Yelinek and Shrem in Panama, Onattopp Ferriz, the owner of the shipping company Trafalgar Maritime Inc., and Iturrios Maciel, the captain of the Otterloo, are the persons most closely linked to the diversion.

Yelinek, situated in Panama, appears consistently at the heart of the matter. He provided Zoller with the Panamanian purchase order on which the sale of the Nicaraguan firearms was based.  He inspected the NNP arms,  pronounced them unfit and with Zoller set in train the substitution of army firearms. Yelinek paid GIR S.A. for the arms and provided GIR S.A. the name of the Otterloo, communicated the particulars about the company that owned it, and the name of its legal representative. Yelinek departed Panama in April 2002, shortly after the diversion became public, and reappeared only in mid-November 2002, when he was arrested by Panamanian authorities on suspicion of arms trafficking.  His abrupt departure from Panama following the publicizing of the original diversion seems to indicate that he did not wish to be present to be investigated in any possible proceeding.   At the time this report was published, Yelinek was still in Panamanian custody.

Onatopp Ferriz established Trafalgar Maritime Inc. in early July 2001, purchased the Otterloo, registered it in Panama and obtained its provisional Certificate of Navigation from the Panamanian authorities.  Coincident with the timing of Yelinek's departure from Panama, the offices of Trafalgar closed in April 2002.  Onatopp Ferriz also disappeared from Panama around the same time.

The captain of the Otterloo, Iturrios Maciel, signed the cargo manifest and Bill of Lading, both of which falsely indicate that the final destination of the arms was the port of Colón, Panama.  Iturrios Maciel also signed the Acta de Salida form of Nicaragua's Ministerio de Gobernación, again falsely declaring his departure to Colón and stating the same destination to the Nicaraguan navy.  Two days later, confirmation of the Otterloo's arrival at Turbo, Colombia was evidenced by Iturrios' signature on a Colombian *Departamento Administrativo de Seguridad* form.  The Otterloo then proceeded to Barranquilla where Iturrios disembarked and disappeared.

Ori Zoller and Uzi Kissilevich coordinated of all the activities associated with the sale of the Nicaraguan arms.   They put all of the deals together and had on-going contacts with many Nicaraguan officials including NNP Commissioner Montealegre, his successor, Commissioner Cordero, their subordinates, with General Calderón, Major Rivas and other army officers. In addition

GIR S.A. seems to have had undue influence over internal Nicaraguan aspects of the transfer considering that they are civilians and foreigners. They were the link to Shrem, Yelinek, Haim Geri and others, and had extensive dealings involving this and other potential firearms transactions, as well as proposed arms transactions after the diversion. They accepted the fraudulent Panamanian Police purchase order from Yelinek and provided it to Nicaraguan authorities for both the original deal, as well as the potential second arms sale. For experienced arms brokers, at best, Zoller and Kissilevich exhibited negligence and perhaps willful blindness over this part of the transaction.

### (2)  The Nicaraguan Authorities

*(a)  The NNP and Nicaraguan Civilian Authorities*

The initial proposed exchange of the NNP's obsolete weapons to Zoller in exchange for new ones appears to have been conducted in a transparent fashion. NNP Commissioner Montealegre's January 2000 correspondence to Minister Herrera seeking his approval of the letter of intent to effect the exchange with GIR S.A,. and the need to obtain an end-use certificate as a part of the transaction are evidence of this. Herrera also told Commissioner Montealegre of the need to submit the proposal to the Contaloría. This was required because the acquisition of the new arms from GIR S. A. was considered a government purchase which, pursuant to Article 3 (k) of the *Ley de Contrataciones del Estado* required that an open bidding competition be held.

Subsequently Montealegre and Minister Herrera asked the *Contraloría* to grant an exemption from the usual bidding processes ordinarily required for government purchases. Initially, the *Contraloría* found deficiencies in the application which it challenged. However, these were specific technical points: failure to cite the value of the (obsolete) Nicaraguan arms being traded, failure to cite the bonafides of GIR S.A., and failure to show the Government of Israel's approval of the sale of IMI firearms (through GIR S.A). The basis of the proposal itself was not questioned, and after reviewing the NNP reply, a "Cédula de Notificación" that granted the exemption was issued in May 2000 under the general criteria of "reasons of urgency, security or others in the public interest". The *Contraloría* further stated that the exemption was granted to permit formalization of the agreement with GIR S.A. and to avoid having the firearms fall into the hands of terrorists and drug-traffickers. This process appears to be in accordance with established internal procedures.

Although the *Contraloría* requested that the Government of Israel's approval of the transaction be obtained (given that the Government of Israel is the owner of Israeli Military Industries, IMI), no effort was made by Commissioner Montealegre of Minister Herrera to comply with this request. Instead, the contract signed by Zoller and Montealegre simply included a statement explaining that the transaction was one between the Nicaraguan National Police and a commercial entity, and not a government to government transaction, and therefore, it was not possible to obtain approval from the government of Israel.

*(b) The Nicaraguan Army*

When Yelinek inspected the NNP arms for a second time, and informed GIR S.A. that the arms were unsatisfactory, General Calderón, apparently with no other authorization, made the army's firearms available as a substitute. The substitution is simply noted in  an *Acta de Entrega* documenting the transfer of the army's firearms to the NNP. In late October NNP Commissioner Francisco Bautista Lara wrote to the Nicaraguan Ministry of Finance requesting a change in the official records of the

NNP's firearms inventory. The Ministry of Finance promptly replied to Lara that the records of the firearms holdings of the NNP had been adjusted. The ministry also indicated, in a separate communication to NNP Deputy Chief Commissioner Cordero Ardilla, that the export transaction had been approved.

Through Major Rivas, Calderón's aide de camp, the army took responsibility for the logistics of the export operation, transporting the firearms to the coast and supervising loading them on the Otterloo. The army also coordinated with Leonel Cordon, GIR S.A.'s shipping agent, and Agencia Vassali, which prepared the Bill of Lading to ensure that the shipment could be exported.

Although there is no firm evidence that the army acted illegally, it is not clear under what authority General Calderón exchanged army firearms for NNP firearms, much less trading serviceable, or new, AK47s for reportedly useless ones.

Again, although the original contract was drastically changed from what the *Contraloría* approved, it appears legal since Nicaraguan law states that the NNP has the authority to approve the export of firearms, (Art. 76 (e) of Decree 26-96, the *Reglamento de la Ley de la Policia Nacional de Nicaragua*, 1996), and the army was arguably acting in this case for the NNP. Therefore, while there is a system of controls in place and an adherence to certain Nicaraguan legal regulations is required, there are significant weaknesses in Nicaraguan law.

*(c) Private Nicaraguan Entities*

In October of 2001 when the export transaction was brought to the attention of (then) Minister of *Gobernación*, Ing. Marenco Cardenal, he requested the Director of the Nicaraguan Center for Export Administration, CETREX, (*Centro de Trámites de Exportación de Nicaragua*) to take the necessary steps to have the arms exported. The CETREX Export Form was completed by Agencia Canales Aguilar documenting the shipment of the arms to the PNP at the port of Colón, Panama.

Agencia Canales Aguilar is a private enterprise not a government agency, but it appears that the government depended on it to ensure the security of an international movement of firearms. Apparently Canales Aguilar was acting under the authority of the Nicaraguan Police, by means of powers granted it by a "power of attorney" signed before a notary on October 30, 2001, by Commissioner Bautista Lara under authority granted him by Commissioner Edwin Cordero. This document contains important deviations in the specifications of where, and how many, arms and ammunition were to be exported when compared with the actual quantities exported (see document No. 60 in Annex V).

On November 2, 2001 a Nicaraguan Customs Form documenting shipment of the arms to the PNP, as well as a ship manifest and Bill of Lading were filed. These last documents are on Agencia Vassali stationery, another private company whose role and authority in the arms transaction is not fully explained. They documented that the arms and ammunition were being sent to the Panamanian Police, and were certified by the Otterloo's Captain, Iturrios Maciel.

There are a number of Nicaraguan government mechanisms applicable to arms export, which in fact were applied to the export of this shipment of firearms. These however do not meet the Government of Nicaragua's responsibilities under the CIFTA Convention. In the last analysis the existing

Nicaraguan mechanisms are clearly inadequate since their application was incapable of preventing the diversion.

**(3) The Panamanian Authorities**

The Government of Panama does not appear to have been involved in the transaction. Panama factors only because the Panamanian National Police Force is identified as the purchaser of the arms and ammunition on the purchase order provided by Yelinek. Panama has consistently denounced the purchase order as a fake. How and from what source the purchase order came into Yelinek's possession is not known.

Other than the purchase order, there is no other paper or statement that links the Panamanian Police Force to the transaction. All recorded communications coming from inside Panama flow from Yelinek to Zoller or Kissilevich, never from the Panamanian Police Force and, it might be added, never to any of the Nicaraguan authorities.

The registration of the Otterloo and the establishment of Trafalgar Maritime Inc. occur in Panama. While this reflects the country's liberal commercial and maritime practices, those events are not indicative of any role by government authorities in the diversion nor did they contribute materially to what happened.

**(4) Colombia**

What actually occurred at Turbo remains a mystery. It is clear that the Otterloo made port in Turbo based on the signing by its captain, Iturrios Maciel, of a *Departamento Administrativo de Seguridad Seccional Antioquia, Puerto Operativo Turbo* form. But beyond that, all that is known is that the guns somehow found their way to the AUC. This would have meant that someone in Colombia, associated with Yelinek, Onattopp Ferriz or possibly even the Otterloo Captain, Iturrios Maciel was ultimately responsible for the illegal importation of the arms onto Colombian soil.

**V. Legal Commentary**

A number of national laws appear to have been broken. Yelinek appears to have committed a fraud in passing off a false Panamanian Police purchase order for the firearms. This would constitute an offence under Panamanian law, and, to the extent that the fraudulent purchase order was accepted by Nicaraguan authorities, a contravention of Nicaraguan law as well. More importantly, Yelinek's actions together with those of Onattopp Ferriz and Captain Iturrios Maciel of the Otterloo constituted part of a conspiracy to fraudulently export firearms from Nicaragua and to import them into Colombia.

Likewise, Iturrios Maciel committed fraud under Nicaraguan and perhaps Panamanian law when he falsely certified the destination of the firearms on the manifest and on the Bill of Lading and then went to a different destination. If Iturrios was acting under the direction of the Otterloo's owner, Onattopp Ferriz, would also be guilty of fraud and of violating Panamanian, Nicaraguan and Colombian laws.

The importation of firearms into Panama is controlled by Article 307 of the Constitution of 1972 (as amended by legislative Acts of 1983 and 1994); by Article 1 of Decree No. 2 of 1991, and; by Article

11 of Decree No. 354 of 1948. The Constitution provides that only the government may possess military weapons and products. Executive permission is required for their manufacture, importation and export. It further provides that the government will define arms not considered to be non-military, and regulate their importation, manufacture and use.

Under Panamanian law, the Ministry of Government and Justice (*Gobierno y Justicia*) can authorize natural or legal persons to engage in the business of importing firearms and ammunition for hunting, sport and personal defense (which does not include the types of firearms that were being exported from Nicaragua). All requests to import firearms and ammunition must be made to the Minister of *Gobierno y Justicia*, and a certified copy (*copia autenticada*) of a permit approved by the Ministry of *Gobierno y Justicia* is required for the merchandise to be released from customs storage, as is evidence of the payment of duties.

Clearly, importation into Panama of the types and quantities of firearms in this case required considerably more than a purchase order. Presumably Zoller and Kissilvich, as established arms dealers in the region, would have knowledge of these requirements and could have questioned the purchase order provided by Yelinek. The same, perhaps, can also be said of the Nicaraguan authorities in this case.

Colombian law was violated because, among other reasons, under Colombia's Constitution and applicable law, only the Government may introduce or manufacture firearms, ammunition and explosives. The fact that the arms ended up in the hands of the AUC could also mean that in addition to committing a smuggling offence, Yelinek, Iturrios, Onattopp Ferriz, and possibly Zoller and his associates, may have also committed an offence against Colombia's anti-terrorism laws, as well as the laws of other countries which sanction assistance to terrorist groups.

The applicable Nicaraguan law appears to be Art. 76 (e) of Decree 26-96 which states that the NNP has responsibility for authorizing the export of firearms. This perhaps explains why other approvals to authorize export of the firearms were not sought, since the NNP has the primary authority.

Independently of whether laws were broken, the adequacy of Nicaraguan laws and the extent to which Nicaraguan national practices are effective for controlling movements of firearms is open to serious question. The fact that there is no clear evidence that laws were broken in this case by Nicaraguan authorities, and yet the diversion took place, is strong testimony that the laws and practices are seriously inadequate.

## VI.  Application of the Inter-American Convention Against the Illicit Manufacturing of and Trafficking in Firearms, Ammunition, Explosives and Other Related Materials, (CIFTA)

Two of the principal countries involved in this case, Nicaragua and Panama, have ratified the Inter-American Convention Against the Illicit Manufacturing of and  Trafficking in Firearms, Ammunition, Explosives and Other Related Materials, (CIFTA). Adherence to the Convention and application of its provisions to national practices would have made the diversion far more difficult, if not prevented it outright.

*(a) Illicit Trafficking*

The key element of illicit trafficking is the absence of authorization by any other State Party involved in the international movement of firearms. In this particular case, even though Panama was allegedly the recipient State, there was no authorization, nor were there any attempts to verify that Panama had indeed authorized any arms purchase.

*(b) Import and Export Provisions*[6]

In the case of Nicaragua, the provisions of the Convention that address exports of firearms were not applied. Articles VIII, IX, and X of the Convention call for the application of effective and secure measures to prevent illicit trafficking of firearms.

Key among these is Article IX, entitled Export, Import and In-Transit Licenses or Authorizations, which in paragraph 3. provides as follows:    *"3. States Parties before releasing shipments of firearms, ammunition, explosives and other related materials for export shall ensure that the importing and in-transit countries have issued the necessary licenses or authorizations."*

In a broader sense, Paragraph 1 of Article IX calls for the States Parties to *"establish or maintain an effective system of export, import and international transit licenses or authorizations for transfers of firearms"*, while Article VIII, Security Measures, requires the States Parties, *"in an effort to eliminate loss or diversion, [...] undertake to adopt the necessary measures to ensure the security of firearms and ammunition imported into, exported from or in transit through their respective territories."* A particular security measure is called for in Article X which calls for the *"strengthening of controls at export points."*

While the Nicaraguan authorities apparently exercised a measure of control over a number of internal steps concerning the export of the arms, the absence of any contact between officials in Nicaragua and Panama to confirm the legitimacy of the transaction is a glaring deficiency. The Convention requires that before shipments are released, the authorities responsible for the exportation must be satisfied that the receiving country has authorized the importation. A purchase order alone, even had it been legitimate, cannot serve as the sole and sufficient authority upon which Nicaraguan officials could authorize the export. Under Nicaraguan law, the responsibility to ensure compliance would appear to lie with the entity ultimately responsible for approving the export, in this case, the NNP. By failing to confirm the legitimacy of the purchase order with their Panamanian counterparts, the Nicaraguan National Police, although perhaps adhering to national practice, violated the Convention.

As with Article IX, the Nicaraguan government's adherence to Articles VIII and X, which require controls over the security of the exported firearms is questionable.

*(c ) Exchange of Relevant Information*

The exchange of relevant information between States Parties called for under Article XIII of the Convention was plainly lacking. There is no indication that Nicaraguan authorities ever attempted to verify from Panamanian authorities that there was an import license for the arms it was proposing to

---

[6] General references to legal measures applying to the terms "import" and "export" in relation to firearms throughout this report are also intended to apply, as appropriate, to in-transit movements through countries. Transit has not been referred to expressly, because the case did not have an in-transit component.

export.  The authorities involved took on faith that the firearms would go to the stated destination, based upon fraudulent information provided third-hand by Yelinek.

An exchange of information on the matters referred to in clause 1. (a) of Article XIII about *"authorized producers, dealers, importers, exporters and, wherever possible carriers, of firearms ..."* would have been helpful to authorities in determining whether business should be carried on with such individuals as Yelinek and Shrem, Zoller and Kissilevich.


## VII.  Issues Requiring Further Investigation:

The OAS Investigation Team reviewed all available documentation in this case and conducted exhaustive interviews.  However, the Organization of American States has no police powers, and although the Team requested certain information from several governments, investigators and prosecutors are understandably reluctant, and in some cases barred by national laws, to share evidentiary information.    As a result, it is the  Team's opinion that the following areas require follow-on criminal investigations by national governments:

1.  The governments of Guatemala, Nicaragua and Panama should investigate the business relationship and dealings between GIR S.A., the Nicaraguan officials involved, and Shimon Yelinek and his associates, to determine if violations of anti-corruption laws have occurred. A thorough cooperative investigation into their financial transactions must be done to determine what laws were violated.  Annex V, document No. 179, contains copies of wire transfers sent to GIR S.A.'s account.

2.  The fraudulent Panamanian Police purchase order gives rise to numerous questions.  Where did it originate?  How did the individuals preparing the false document determine the authorizing names (which are of legitimate officials) to put on the document?  What is the significance of the extensive listing and sophistication of arms on the document - a list far in excess of the reasonable needs of the Panamanian Police, a force consisting of only 13,000 officers, including many unarmed administrative staff?  Why did none of the many persons involved in the events, including Zoller, Calderón, Montealegre, Cordero and others never question the legitimacy or content of such an inappropriate and unlikely document?

3.  The governments of Panama and Mexico should cooperate to find and interview Miguel Onattopp Ferriz and Jesus Iturrios Maciel and to conduct criminal investigations into their activities in this case.

4.  The Government of Nicaragua should conduct a thorough sight check of the Nicaraguan Army's inventory of arms and ammunition.  The Investigative Team has been able to positively ascertain that the Nicaraguan Army, through General Calderón, was approached on a number of different occasions by GIR S.A. for the sale of arms and ammunition, in addition to contacts related to the exchange of arms which is the subject of this report.

One such occasion occurred on January 5, 2001, when GIR S.A. sent a fax to Calderón, listing arms and ammunition, including twin and four barrel anti-aircraft guns, surface to air missiles, rocket propelled grenades, anti-tank "launchers" and small arms, with quantities and prices (see document No. 121 in Annex V).  The document was a request from Zoller for the

sale of Nicaraguan Army equipment, at the prices and quantities listed by Zoller. The Investigative Team has been able to link this list of arms to a request from a Lebanese arms broker, Samih Osailly currently in custody in Europe and under investigation by several nations for ties to Al-Queda. He was at the time working for the Revolutionary United Front (RUF) in Sierra Leone, under an arms-for-diamonds arrangement[7]. This broker sought to purchase arms and ammunition from Shimon Yelinek, who in turn sent the list of arms and ammunition to Zoller, who forwarded the list to General Calderón.

While the Investigative Team did not uncover any evidence to suggest that the Nicaraguan Army acted on Zoller's request of January 5, 2001; this fact, plus the dealings relating to the second arms shipment allegedly to the PNP organized in the fall of 2001 and early 2002, suggest that international arms brokers repeatedly saw Nicaragua as a potential source of weapons of war for illegal purposes.

5. The Government of Colombia should ascertain whether any of the diverted arms have been recovered during operations against the AUC. The Investigative Team has been told informally that this is the case. Document 80 in Annex V, lists the serial numbers of the arms diverted to Colombia.

6. The June 30, 2002 statement by Carlos Castaño (see document No. 14a in Annex V) implying that the Otterloo had provided 13,000 rifles is inexplicable. The diversion investigated by the OAS team supposedly involved only 3000 AK47s. If at all possible, the governments involved should try and reconcile these apparent incongruities. The Government of Colombia should ascertain whether any Nicaraguan AK47s, beyond the 3000 that were shipped to Turbo aboard the Otterloo, have been recovered in Colombia.

7. Although the Team had no mandate to delve into the details of the second shipment, it presents a number of inconsistencies which require further investigation and which may also shed more light on the initial diversion: The documentation shows that the purported "sting" operation (*operación triangulo*) was conceived after Nicaraguan and Panamanian officials became aware that the original shipment had been diverted to the AUC. These officials became aware of the diversion on or about January 30, 2002 (see document No. 27, in Annex V). Yet it appears that Zoller and the Nicaraguan Army were much further along in the operational execution of the second shipment than previously reported since it had been initiated more than two months before officials in any of the countries involved knew that the initial shipment had been diverted. Only three weeks after the first shipment left Nicaragua, on November 21, 2001, Zoller sent the Nicaraguan Army a written request to purchase an additional 5000 AK47s and 17 million rounds of ammunition, using the same false Panamanian purchase order dated February 10, 2000. On January 11, 2002, the Nicaraguan army issued an invoice addressed to the PNP for $980,000 for payment for the arms and ammunition, but sent the invoice to Zoller and not the Panamanian Police. Zoller acknowledges sending his November 21 note to the army, but claims that he sent it on January 31, 2002, and that it was back-dated to November 21, 2001 at the request of the army. This series of facts leads the Investigative Team to suspect that Zoller and the Nicaraguan Army were well aware that the Panamanian purchase order was fraudulent, and

---

[7] Sierra Leone is under a United Nations arms embargo. Samih Osailly has been arrested by Belgian authorities and remained in custody at the time this report was published. In addition to alleged ties to Al-Queda, he is suspected of connections to the bombings of US Embassies in east Africa.

that the second shipment of arms was not going to the PNP. Otherwise, why send the invoice to Zoller instead of the PNP? These facts also give rise to the question as to whether the original diversion was in fact the only sale of arms to Zoller, especially when considered in light of Carlos Castaños' statement of June 30, 2002.

## VIII.  Conclusions:

1.  It appears that Shimon Yelinek committed fraud by providing a forged purchase order from the Panamanian National Police to serve as an end-user certificate for the arms exchange. As the purchaser of the arms, he also apparently planned and organized an illegal arms diversion for the United Self Defense Forces of Colombia, a group considered a terrorist organization. Yelinek is also likely guilty of violating Colombian anti-terrorism laws, and possibly Panamanian anti-terrorism laws, among others. Marco Shrem appears complicit in these activities, but to an unknown degree.

2.  Miguel Onattopp Ferriz established Trafalgar Maritime Inc. in July 2001 as a front company for the purpose of transporting arms to the AUC. It appears that he was engaged in criminal activity and was conspiring with Yelinek to provide the AUC with arms, thus violating Colombian, and possibly Panamanian anti-terrorism, and other laws.

3.  Captain Iturrios Maciel provided Mexican authorities with a signed Bill of Lading in which he deliberately and wrongly stipulated Panama as the destination of 9 containers of plastic balls. He also provided Nicaraguan authorities with a signed Bill of Lading and ship manifest in which he deliberately and wrongly stipulated Panama as the destination of his ship and its cargo of arms. Iturrios Maciel, along with his first mate, Carlos Aguilar, may have been cognizant of, and participants in the arms diversion. Iturrios Maciel is also apparently criminally complicit in providing arms and ammunition to a terrorist organization, and of violating Colombian anti-terrorism and other laws.

4.  Although the Investigative Team found no evidence that Ori Zoller and Uzi Kissilevich were co-conspirators in the arms diversion, their failure to make any attempt to verify the actual destination for the arms, not only for one, but for two shipments to the same customer, contributed to the diversion. At the least they appear guilty of serious neglect and their actions will lead to the loss of life in Colombia. As well, their association with Yelinek and his attempts to locate arms for the Revolutionary United Front of Sierra Leone should be investigated to determine if they are criminally liable.

5.  The Government of Nicaragua failed to comply with a number of provisions of the CIFTA convention. Nicaraguan authorities are guilty of professional negligence and with violating the CIFTA convention with their failure to verify whether the Panamanian National Police were indeed the true end-users in the arms exchange. One telephone call could have prevented the entire arms diversion. The involvement of the Nicaraguan Army in the first arms deal appears to be legitimate, even if negligent, not least of which because the exchange was to benefit another part of the Nicaraguan State (the Police) but because the transaction with Zoller was essentially cashless. However, the same cannot be said about the army's involvement in the second arms shipment. Here it appears that senior officers in the army acted criminally in their plan to sell state goods in return for almost one million U.S. dollars,

without the knowledge of Nicaragua's civilian authorities, using a purchase order that was unlikely to be legitimate and which was almost two years old.

6.  There appears to be no involvement of Panamanian authorities in the exchange of arms, or their diversion.  The issue of where the forged purchase order originated remains unresolved.

7.  Colombia is the victim of the arms diversion.  However several Colombian customs agents were likely accomplices of, or were bribed by, the AUC in order to allow the Otterloo to land its cargo of arms and ammunition in the port of Turbo.

ANNEX I

**Documented Chronology of the Chain of Events**

The entire chain of events has been reconstructed based on documentary and other evidence:

- On October 26, 1999, GIR S.A. sent Commissioner Montealegre a fax, stipulating the conditions and terms for an arms exchange:    Three million 7.62 x 39 caliber bullets; 6000 Kalashnikov AK47 assault rifles; 24,000 AK47 magazines; and 6000 AK47 bayonets – in exchange for – 500 9mm Jericho pistols and accessories, and 100 9mm Mini-Uzi machine pistols and accessories, both manufactured by IMI. [See doc. No. 177, Annex I].

- On November 2, 1999, another fax was sent by GIR S.A., signed by Kissilevich, the Director General of the company, outlining the same terms for the exchange, but this time assigning a monetary value to the arms to be exchanged.  The NNP arms, ammunition and accessories were valued at $261,000; and the IMI arms and accessories were valued at $264,000. [See doc. No. 176, Annex V].

- On November 4, 1999, Uzi Kissilevich sent a fax to Century International Arms, an arms company based in Fairfax, Vermont and Miami, Florida, to the attention of  Haim Geri. Kissilevich informed Geri that NNP Commissioner Montealegre agreed to sell the arms, ammunition and accessories.   He also informed Geri that they were attempting to identify arms which were not of Russian manufacture and forwarded some prices for the goods established by Montealegre (saying that Montealegre complained the original prices for the goods were too low).  Kissilevich asked Geri to keep in mind that "tanto la mercadería, como su empaque, se encuentran en perfecto estado". [See doc. No. 175, Annex V].

- On November 11, 1999 – Haim Geri sent an e-mail to  Kissilevich asking him to send a price quote for 2000 new AK47s to Marco Shrem, located in Panama, adding Shrem's fax number (507-217-6023 and 507 215-2306) and telling Kissilevich to say that he was sending the fax at the request of Geri. [See doc. No. 173, Annex V]

- On November 12, 1999 Kissilevich sent Shrem the quote for 2000 new AK47s. [See doc. No. 172, 171, Annex V].

- On December 2, 1999, Century International Arms Inc. sent Ori Zoller a fax signed by Brian Sucher, in which Century agreed to purchase the 3 million 7.62 x 39 caliber bullets; 2000 AK47 assault rifles; 24,000 AK47 magazines; and 6000 AK47 bayonets; provided such goods were in very good condition, and were importable into the United States. [See doc. No. 170, Annex V].

- On December 3, 1999, Zoller sent a fax to Commissioner Montealegre, thanking him for his courtesy during Zoller's visit to Nicaragua, and once again, outlining the goods to be exchanged: 3 million 7.62 x 39 caliber bullets; 6000 AK47s assault rifles; 24,000 AK47 magazines; and 6000 AK47 bayonets – in return for 600 9mm Jericho pistols and accessories, and 100 9mm Mini-Uzi machine pistols and accessories. [See doc. No. 168, Annex V].

On the same day, GIR S.A. sent an un-signed draft end-user certificate letter to Marco Shrem's fax number in Panama. [See doc. No. 169, Annex V].

▪ On December 20, 2000, GIR S.A. sent an "invoice", really a note offering goods at a certain price, to Pedro Bello, President of "Armamentos Inc.", with offices in West Palm Beach, FL, offering for sale the 3 million 7.62 x 39 caliber bullets; 6000 AK47s assault rifles; 24,000 AK47 magazines; and 6000 AK47 bayonets. [See doc. No. 166, Annex V]. The same day, Bello wrote back asking for clarification as to whether GIR S.A. was offering 3 million rounds of ammunition, or 300,000 thousand. [See doc. No. 167, Annex V]. Kissilevich later confirmed that it was 3 million. [See doc. No. 165, Annex V].

▪ On January 14, 2000, Zoller and Kissilevich sent a fax to Marco Shrem in Panama, regarding his travel to Nicaragua to inspect the arms – the inspection was scheduled to take place on January 18. [See doc. No. 162, Annex V].

▪ Also on January 14, 2000, GIR S.A. sent Commissioner Luis Muñoz Morales, Chief of General Administration of the NNP, a corrected draft version of the letter of intent outlining the terms of the exchange between GIR S.A. and the NNP.  The quantity of NNP equipment was changed in the revision: from 3 million rounds of ammunition to 2.5 million rounds, from 6000 AK47s to 5000 AK47s; and the AK47 magazines were dropped from the deal.   In exchange, GIR S.A. would then provide the NNP with 450 Jericho pistols and 100 Mini-Uzis [See doc. No. 163, Annex V]. These changes were confirmed in a fax from GIR S.A. to Commissioner Montealegre sent January 19, 2000. [See doc. No. 161, Annex V].

▪ On or about January 18, 2000, Zoller inspected the arms in Nicaragua, possibly along with Marco Shrem. [See doc. No. 2, Annex III].

▪ On January 21, 2000, Pedro Bello wrote to Kissilevich, asking him for the new quantity of items ready to be sold, along with the date he could go and inspect the goods.  He lamented that an earlier inspection was not possible and stated that he had buyers ready to see the goods. [See doc. No. 160, Annex V].

• On January 27, 2000 Commissioner Muñoz wrote to Commissioner Montealegre, forwarding him the draft letter of intent, explaining that GIR S.A. had accepted the NNP's last changes [presumably a change in the number of Jericho pistols the police was to receive, 465 instead of 450 [See doc. No. 159, Annex V]. [See note of March 2, 2000 below].

• The same day, Commissioner Montealegre wrote to Minister René Herrera, *Ministro de Gobernación*, who had oversight of the National Police, sending him the draft letter of intent for the exchange of arms with GIR.SA.  Montealegre said he intended to sign the letter of intent, adding that he would include a clause in the letter which would require GIR S.A. to provide an end-user certificate for the arms exchanged by the NNP. [See doc. No. 158, Annex V].

• On February 1, 2000, Montealegre wrote again to Minister Herrera, and asked that Herrera give him written permission to execute the exchange, request approval from the Contraloría General, and sign the letter of intent. [See doc. No. 157, Annex V].

27

- On February, 3, 2000, Minister Herrera replied to Montealegre and approved the exchange of arms.  Herrera mentioned that the Nicaraguan Presidency, and the US Embassy in Managua had been informed about the exchange of armament.  He further mentioned that the exchange should be submitted to the Controlaría General for approval.   [This latter point  was made because government purchases are subject to article 3 (k) of Law 323, *Ley de Contrataciones del Estado*, which requires that purchases be made by open bid competition.  In order to effect the exchange with GIR S.A., a waiver of the bidding process would have to be granted by the Controlaría.] [See doc. No. 156, Annex V].

- On March 1, 2000, Minister Herrera wrote to Guillermo Arguello Poessy, the *Contralor General* of Nicaragua, requesting his help in obtaining the waiver from the *Contraloría* for the transaction in question. [See doc. No. 155, Annex V].

- On March 2, 2000, GIR S.A. sent  a fax to Montealegre, with the final changes to the terms of the exchange, i.e. 465 Jericho pistols, instead of 450. [See doc. No. 154, Annex V].

- On March 3, 2000, Kissilevich sent Montealegre a fax which contained Ori Zoller's travel information for a visit to Managua, to take place on March 6, 2000. [See doc. No. 153, Annex V].

- On March 8, 2000, Commissioner Montealegre and Ori Zoller, signed a "*Convenio de Intención de Recambio de Armamento*" – a letter of intent establishing the terms of reference for the eventual exchange.  The terms in the notice made the exchange subject to approval by the Ministry of *Gobernación*, and by the *Contraloría General*.  Under the term, GIR S.A. was required to produce an end-user certificate for the weaponry. [See doc. No. 152, Annex V].

- On April 4, 2000, in a note to Herrera, Arguello informed him that the Contraloría could not approve the exemption to the bidding process until additional information regarding the exchange was provided.  Arguello requested information on the quantity and value of the arms to be exchanged and also mentioned that the exemption request lacked the "documentos inherentes a la legalidad de esta Empresa [GIR S.A.], su denominación, domicilio, constitución, debida autorización del Estado Israelí, y otras consideraciones pertinentes a la delicada operación propuesta." and mentioned that these should also be provided. [See doc. No. 150, Annex V].

- On the same day, Pedro Bello, wrote to Zoller and Kissilevich saying that GIR S.A. had not produced the much talked-about inventory [of arms] in Managua, and that they should call when they had something firm. [See doc. No. 151, Annex V].

- On April 28, Zoller sent Commissioner Muñoz a draft end-user certificate, which the NNP was supposed to sign and send to Amiram Maor, Director of Marketing for Latin America, of IMI, certifying the end-use for 500 Jericho pistols. [See doc. No. 148, Annex V].

- Also on April 28, 2000, Shrem and Yelineck met Zoller in Managua to inspect the NNP's inventory. [Interview with Zoller and Shrem].

- On May 2, 2000, Kissilevich sent Commissioner Muñoz another note outlining the latest terms of the change.  The number of Jericho pistols had then been increased to 500.  The rest of the terms remained unchanged:  Jerichos, plus 100 uzis, in exchange for 2.5 million rounds, 5000 AK47s

and 6000 bayonets – the transaction was valued by Kissilevich to be worth $250,000. [See doc. No. 147, Annex V].

- On May 4, 2000, Montealegre sent Arguello some documents in an attempt to address Arguello's concerns outlined in his April 4 letter to Herrera.  Montealegre did not address the question of Zoller's "*debida autorización del Estado Israelí*" – Montealegre further qualified the NNP's arms as obsolete, and hence of no monetary value. [See doc. No. 144, Annex V].

On the same day, Zoller wrote to Commissioner Muñoz, providing him with a detailed breakdown of the costs of the IMI equipment GIR S.A. was going to provide to the NNP.   The total cost was $242,000. [See doc. No. 145, Annex V].

- On May 12, 2000, Heriberto Correa Guerrero, Director of *Contrataciones Administrativas del Estado*, of the *Contraloría General*, wrote to Commissioner  Muñoz, requesting the quantity and unit value of the NNP items to be exchanged.  He also asked for an explanation as to what GIR S.A. would do with the exchanged  AK47s. [See doc. No. 143, Annex V].

- On May 15, 2000, Montealegre replied not to Correa Guerrero's letter, but directly to Contralor Arguello, giving the unit cost of the AK47s and the ammunition.  Montealegre did not say how GIR S.A. was to use the arms, but instead stated that the letter of intent established that the deal could only take place with the approval of the Minister of Gobernacion, the Contraloria, and once GIR S.A. produced an end-user certificate [See doc. No. 142, Annex V].

- On or about May 18, 2000, Zoller traveled to Panama to conclude the sale of 2500 AK47s (later 3000) and 5 million rounds of ammunition to Shimon Yelinek.  Once the deal was concluded, Kissilevich (from Guatemala) sent Zoller a fax to his hotel room in Panama, with information on how Yelinek could send a wire transfer to GIR S.A.'s bank account (Westrust Bank Ltd, account 40692-9) [Interview with Zoller].  This was so that Yelinek could send GIR S.A. a down payment. [See doc. No. 141, Annex V].

- On May 22, 2000, the *Contraloría General* issued a "Cédula de Notificación", essentially a resolution, approving the Ministry of *Gobernación* request for an exception to the bid competition requirement for government purchases.  The Cédula mentioned that this exemption was being granted so that the Contract between the NNP and GIR S.A. could be formalized. [See doc. No. 140, Annex V].

The Cédula clearly stated that the appropriate government authorities must ensure that all necessary measures were taken to ensure that the exchange of arms was done in accordance with applicable international conventions and laws.  The Cédula also recommended that any final Contract on the exchange of arms should include a provision stating the Government of Israel's agreement/approval.

On the same day, Kissilevich sent Shrem, in Panama, information on an aircraft that GIR S.A, had for sale. [See doc. No. 139, Annex V].

- On May 31, 2000, Kissilevich sent Commissioner Montealegre a fax, requesting a copy of the contract to be signed between GIR S.A. and the NNP so that Zoller could review it prior to traveling to Nicaragua on June 1, 2000 (traveling to sign the contract).  Kissilevich attached two

29

letters, one from Amiram Maor, Deputy Vice-President of marketing for of Israeli Military Industries, IMI, certifying that GIR S.A. was IMI's sole representative for any agreement with the NNP; the other from Gabriel Bernstein, Director of Marketing for Latin America of IMI, detailing the warranty that comes with the IMI arms to be supplied by GIR S.A. [See doc. No. 138, Annex V].

- On June 2, 2000, Montealegre, and Zoller, signed a Contract for the exchange of arms, "*Contrato de Permuta de Armamento y Municiones*".  In respect of the Contraloría's suggestion that certification be obtained from the Israeli Government, the Contract stated that it was not a Contract between two governments (Nicaragua and Israel) and therefore, it was not possible to obtain a certification from the Israeli Government.  The Contract was an exchange of 2.5 million 7.62 x 39 caliber bullets; 5000 AK47s assault rifles; and 6000 AK47 bayonets – in return for 465 9mm Jericho pistols and accessories, and 100 9mm mini-uzi machine pistols and accessories. [See doc. No. 137, Annex V].

- On June 6, Zoller sent Shrem in Panama, information on military trucks for sale. [See doc. No. 135, Annex V].

- On June 7, Zoller sent Shrem information on how to send a wire transfer to GIR S.A's Westrust bank account number 010063264, sub account 40692-9 - through Barclay's Bank in Miami Fl, explaining that the transfer that Shrem attempted to do one week before did not go through. [See doc. No. 136, Annex V].

- On June 16, $74,972 was deposited in GIR S.A.'s account as a down-payment for the purchase of 2500 AK47s and 5 million rounds of ammunition by Yelinek. [See doc. No. 133, Annex V].

- On September 20, 2000, Montealegre wrote to Zoller, explaining that the NNP had not received any of the 465 Jericho pistols stipulated in the contract – and he threatened to cancel the contract unless Zoller informed him when the pistols were to be delivered. [See doc. No. 129, Annex V]. On September 27, Kissilevich replied, explaining that they were doing their best to send the pistols. [See doc. No. 128, Annex V].  On September 29, Montealegre wrote back asking GIR S.A. to tell him when the pistols will be delivered – or he would cancel the contract. [See doc. No. 126, Annex V].  On October 2, 2000, Kissilevich wrote to Gabriel Bernstein, giving him the NNP address in Managua to which the Jericho pistols should be sent. [See doc. No. 125, Annex V].

- On October 2, 2000, $50,000 was deposited by Yelinek in GIR S.A.'s bank account. [Interview with Zoller].

- On January 2, 2001, Yelinek sent Zoller an e-mail, saying that "our friend in Africa" wants an urgent price quote on the following items, and whether he has them in stock: 600 AK47s; 200 rocket propelled grenade launchers (RPG7); 400 grenade launchers; 6 twin-barrel and 4 four-barrel anti-aircraft guns, 6000 hand-grenades and 50 anti-tank grenade launchers; plus attendant ammunition. [See doc. No. 123, Annex V].

- On January 3, 2001, Yelinek sent another e-mail to Zoller – saying "This is the start price list that I send to my contact.  He already told me that it expensive.  I reply that if he take it all we will make discount for him.  Please check item no 3-7-8-11-14-15 [grenade launchers, anti-tank

grenade launchers, 60 mm launchers, 2000 grenades, 200 anti-tank rockets, 800 60 mm rockets] if you have in stock and prices. Please do not travel to your man before I will receive the green light that the money is ready in my contact's hand and the end-user certificate is ready also. Send me by e-mail of fax under what name – or to whom to need the paper".  The same e-mail contains a forwarded e-mail from Yelinek to the person in Africa, identified only as Guy/Alfa, saying that  "the country in this area have (sic) everything in stock in good condition" and that "we can arrange as well the transport to your place". [See doc. No. 122, Annex V].

- On January 5, 2001, Eugenia de Leon, a secretary working at GIR S.A., sent a fax to General Calderon of the Nicaraguan Army, attaching a list of arms and ammunition, along with prices. The list of arms and ammunition corresponded to the list of equipment requested in Yelinek's e-mail of January 2, 2001. [See doc. No. 121, Annex V].

- On January 12, 2001, Ibrahim Bah, received a handwritten list of arms and ammunition, with prices. [See doc. No. 120b, Annex V].

- On January 16, 2001, GIR S.A. sent a fax to Yelinek at phone number 305-937-0806 in Miami, attaching a draft end-user certificate, addressed to Mr. Sergey Ladigin, *Director de Departamento Regional de la America Latina de la Empresa Estatal Unitar Rosoboronexport*. ("ROSOBORONEXPORT" Federal State Unitary Enterprise a specialized agency responsible for Russian arms export). [See doc. No. 120, Annex V].

- On January 16, 2001, Yelinek sent a hand-written copy of the January 16, 2001 draft end-user certificate (above) to Ibrahim Bah.  [See doc. No. 120a, Annex V].

- On February 1, 2001, Zoller sent Yelinek a fax, with the details of how to send a wire-transfer to GIR S.A.'s bank account (the Westrust Bank account). [See doc. No. 118, Annex V].

- On February 9, 2001, Kissilevich sent Yelinek a fax, with the technical specifications of AK47 assault rifles and ammunition, and the details of how they were packed. [See doc. No. 117, Annex V].

- On March 5, 2001, Zoller sent Yelinek a fax, with the details of how to send a wire-transfer to GIR S.A.'s bank account (the Westrust Bank account). [See doc. No. 114, Annex V].

- On March 6, 2001, $100,000 was deposited in GIR S.A.'s bank account via wire transfer from Discount Bank and Trust Company, Geneva, Switzerland; through Citibank, New York. [See doc. No. 113, Annex V].

- According to sworn statements given by Zoller, on May 10, 2001, [See doc. No. 2, Annex III], Yelinek met Zoller in Guatemala City, where he gave the former a purchase order from the Panamanian National Police, dated February 10, 2000. [See doc. No. 1, Annex IV].  The Order was for the purchase of 10,000 AK47s (AKM), 15 million rounds of ammunition, 1,000 machine guns (PKMS), 1,000 rocket propelled grenades (RPG7), 1000 Dragonov rifles, 10 million rounds of ammunition for PKMS, 10,000 RPG7 grenades, and 500 Jericho pistols".  A fax from Zoller to the Hotel Quinta Real (where Zoller also had his offices) sent on May 15, asked the Hotel to send him the bill for Yelinek's stay in the hotel. [See doc. No. 112, Annex V].

- According to a statement made by Gustavo Leonardo Padilla Martinez (the lawyer for Trafalgar Martime Inc.) to the Panamanian National Police [Interview with Padilla], Miguel Onattopp Ferriz purchased the ship Otterloo from Holland in early July, 2001.

- On July 2, 2001, Kissilevich sent Yelinek a fax, informing him of Zoller's trip to Manauga, scheduled for July 4, 2001. [See doc. No. 110, Annex V].

- On July 3, 2001, Kissilevich sent another fax to Yelinek, informing him that Zoller could not travel, and that he, Kissilevich, would travel to Managua on July 4, 2001, instead.  He also asked Yelinek for his arrival time in Manauga, so that he could pick him up at the airport. [See doc. No. 109, Annex V].

- On July 3, 2001, $10,450 was deposited in GIR S.A.'s bank account. [Interview with Zoller].

- On or about July 4, 2001, Kissilevich and Yelinek visited the NNP Armory, to inspect the AK47s.

- On July 6, 2001, Kissilevich sent Yelinek a fax with the name and contact information of GIR S.A.'s shipping agent, who would be responsible for shipping the containers.  The agent was Leonel Cordon, Ave. 6-26 Zona 09. oficina 702, Guatemala Ciudad, 502-334-7070. [See doc. No. 108, Annex V].

- On July 11, 2001, lawyer Gustavo Padilla filed papers to have Trafalgar Maritime Inc., established as a company in Panama.  Miguel Onattott (sic) Ferriz was stipulated as the President of the Company.  The company was legally established the same day. [See doc. No. 107a, Annex V].

- On July 24, 2001, the Panamanian *Ministerio de Hacienda y Tesoro*, granted a Provisional Certificate of Navigation to the Otterloo. [See doc. No. 106, Annex V].

- On September 6, 2001, Commissioner General Francisco Montealegre, retired as head of NNP – Francisco Bautista Lara became new Chief of Police.

- On September 18, 2001, Zoller wrote to José Antonio López Dolmuz, Deputy Administrative Chief of the NNP, informing him that he authorized "*cedo*" the Nicaraguan Army to remove from the NNP's warehouse, 2.5 M munitions, 5000 AK47s, and 6000 bayonets. [See doc. No. 103, Annex V].

- On 26 September 2001, the Chief of the army's Logistical branch, Col. Ramón Calderón Vindell, wrote to Melby González, the NNP's Chief of General Administration, to inform her that he had assigned Lt. Col. Uriel Moreno Corea, Chief of the Military's Technical Section, to receive the NNP's 5000 AK47s.  He quoted Zoller's September 18 note. [See doc. No. 102, Annex V].

Also on September 26, Zoller sent a fax to his shipping agent, Leonel Cordon, informing him that title to the containers to be used to export the NNP arms should be given to the *Ministerio de Gobierno y Justicia, Policía Nacional, Republica de Panamá.* [See doc. No. 101, Annex V].

- On September 28, 2001, Kissilevich sent Yelinek a fax, providing him the serial numbers of the containers which were to be used to export the Nicaraguan arms. [See doc. No. 98, Annex V].

- On the same day, Zoller sent Nicaraguan Army Major Alvaro Rivas, responsible for the logistical aspects of exporting the arms from Nicaragua, a fax in which he informed Major Rivas that the containers should not be loaded with more than 13 tons or 26,000 pounds. [See doc. No. 99, Annex V].

- Also on September 28, Kissilevich sent General Calderon a fax, providing an accounting of a transaction in which the army sold to GIR S.A. 2.5 million rounds of AK47 ammunition worth $112,000, agreed to exchange the 5000 old NNP AK47s, for 3117 new AK47s for a fee of $20,000, and sold 300 ammunition-carrying vests worth $15,000 – in return for 500 bullet-proof vests and accessories from GIR S.A., valued at $185,620.  Kissilevich informed Calderon that the army owed GIR S.A. $68,120 for the balance of the transaction, and attached information on how to send a wire-transfer to GIR S.A.'s account. [See doc. No. 100, Annex V].

- On October 1, 2001, (retransmitted on the 12th and 19th) – Kissilevich sent Commissioner Gonzalez a fax informing her that GIR S.A. was sending the NNP 100 Jericho pistols [See doc. No. 96, Annex V].  He added that in order to deliver the remaining 5 pistols (for a total of 465) he needed the NNP to send IMI an end-user certificate [See doc. No. 95, Annex V].  He sent the NNP a draft.

  Also on October 1, Leonel Cordon informed Kissilevich by e-mail that 4 of the containers to be used to export the arms from Nicaragua had to be replaced.  He sent Kisslevich a new list of serial numbers for the containers that were to be used.   There were 12 containers. This information was then faxed to Yelinek. [See doc. No. 94, Annex V].

- On October 2, 2001, Kissilevich sent Major Rivas the same fax that was sent to General Calderon on September 28.  He retransmitted the Fax on October 8. [See doc. No. 93, Annex V].

- On October 9, 2001, Kissilevich sent Yelinek a fax with a price list for 10,000 uniforms and boots. [See doc. No. 90, Annex V].

- On October 10, 2001, Col. Carlos Gilberto Chavarría Hernandez, Chief of Guatemala's Military Industry, certified that 115 AK47s were to be purchased from GIR S.A. for the exclusive use of Guatemala's Military Industry. [See doc. No. 89, Annex V].

- On October 12, Major Rivas sent Zoller an e-mail, explaining that they were working towards October 18, and hence, needed the 12 trucks to carry the containers on the morning of October 17.  He added that it was imperative that he received the end-user certificate by the morning of October 15. [See doc. No. 86, Annex V].

- On October 13, the Captain of the ship Otterloo, Jesus Fernando Iturrios Maciel, signed a ship manifest in the port of Veracruz, Mexico, stating that his ship was carrying 9 containers of plastic balls, and that he was sailing to Panama. [See doc. No. 85, Annex V].

- On October 15, 2001, $99,775 was deposited in GIR S.A.'s bank account via wire transfer from a certain Kolel Shomrei Aahomot by way of the Mercantile Discount Bank Ltd, Tel Aviv, Israel. [See doc. No. 84, Annex V].

- On October 16, 2001, $212,265 was deposited in GIR S.A.'s bank account via wire transfer from S.H and A. Diamonds Ltd, by way of Chase [bank] in New York. [See doc. No. 83, Annex V].

- On October 17, 2001, Colonel Ramon Calderon Vindell and Commissioner Melby Gonzalez, by way of an *Acta de Entrega* – document the army handing-over 3,117 AK47s and 2.5 million bullets to the NNP. [See doc. No. 80, Annex V].  In another document, with the same date, Col. Calderon certified that the AK47s were made before 1986. [See doc. No. 81, Annex V].

- On the same day, GIR S.A. sent a Fedex package to Major Rivas, apparently containing the end-user certificate, which took the form of an alleged Panamanian National Police Purchase Order, dated February 10, 2000. [See doc. No. 82, Annex V].

- On October 18, 2001, Kissilevich sent Yelinek an e-mail, attaching an account balance, which showed that Yelinek owed GIR S.A. approximately $25,000. [See doc. No. 79, Annex V].

- Also on October 18, 2001, the Nicaraguan Army wire transferred $68,120 to GIR S.A.'s bank account in Miami [See doc. No. 78, Annex V] – this was the amount owned on the side-deal for the bullet-proof vests and the commission for exchanging the arms with the NNP.

- On October 19, 2001, GIR S.A. forwarded a note from Yelinek to their shipping agent, Leonel Cordon.  The note from Yelinek contained the name of the ship (Otterloo), and the company name (Trafalgar Maritime Inc), also identifying the company's legal representative as a certain Captain Onattopp Ferriz. [See doc. No. 76, Annex V].

- Also on October 19, Major Rivas sent an e-mail to Kissilevich in which he asked for (1) a new end-user certificate for the AK47s which were going to the Guatemalan Army, and the end-user certificate he had was only for 115 guns, and 117 were to be shipped; (2) the name of the port of embarkation and the port where the "large package" was to be unloaded; and, (3) similar information for the bayonets. [See doc. No. 77, Annex V].

  GIR S.A. apparently replied that only 115 guns were going to Guatemala, and therefore the end-user certificate that the army had would serve; and they also provided the address for Century Arms. [See doc. No. 77, Annex V].

  In relation to the "large package"  GIR S.A. informed that the address was Captain Onatto Frizz [stet – Miguel Onattopp Ferriz] P.O. box 873276, Zona 7, Panama, Republica de Panamá. [See doc. No. 77, Annex V].

- On October 22, 2001, First Commissioner Edwin Cordero Ardilla, notified the *Contraloría General* (acting Contralor, Francisco Ramírez Torres), of a quantitative change in the arrangement with GIRSA.  He informed that 3,117 AK47s instead of 5,000 AK47s and 5 million rounds of ammunition, instead of 2.5 million rounds were to be exchanged.  He further explained that the change was necessary as the original 5,000 guns did not meet GIR S.A.'s technical requirements, and therefore an exchange with the army would solve the problem.  He further

informed that the corresponding inventories kept by *Bienes del Estado*, were to reflect the exchange. [See doc. No. 75, Annex V].

- On October 24, 2001, General Commissioner Francisco Bautista Lara, wrote to the Minister of Finance, Esteban Duque Estrada, requesting that the paper inventory of arms of the NNP be adjusted to reflect the receipt, from the army, of 3,117 AK47s, and then the exchange of those arms, under the GIR S.A. contract.  Changes were also made to stocks of munitions and bayonets. [See doc. No. 72, Annex V].

- On October 25, 2001, the Director of Government Accounting, of the *Ministerio de Hacienda y Crédito Público*, Luis Bravo Henriquez, certified that the corresponding changes in the paper inventories of the Ministry had been made. He then wrote 3 separate letters, all dated October 25, 2001, informing Commissioner Bautista Lara, of the changes to the inventories. [See doc. No. 67, Annex V].

- On October 25, 2001, the new Minister of Gobernación, Ing. José Marenco Cardenal, wrote to Jorge Molina Lacayo, the Director of the *Centro de Trámites de Exportación del Estado de Nicaragua* (CETREX), copied to new National Police Commissioner, Edwin Cordero Ardilla, and requested that he take the necessary steps to export the arms and munitions; [See doc. No. 68, Annex V].

  The Minister also wrote directly to Commissioner Cordero to inform him that he had authorized the export of the arms. [See doc. No. 69, Annex V].

- On October 26, 2001, Otterloo arrived in El Rama, Nicaragua. [See doc. No. 63, Annex V].

- On October 30, 2001, Brian Sucher, Executive VP of Century Arms, certified his company's importation of the Bayonets into the United States. [See doc. No. 61, Annex V].

- Also that day, Nicaraguan Army Major Ramiro Martinez Rivera left Managua, leading a convoy of trucks from Managua to the port of El Rama, where it arrived the next day, October 31. [See doc. No. 50, Annex V].

- On October 31, 2001, Acting Contralor, Francisco Ramírez Torres, replied to Commissioner Bautista Lara, informing the latter that the NNP could make purchases of items for exclusive police work "*sin ajustarse a los procedimientos ordinarios de la Ley*". Ramírez Torres informed the Commissioner that he must, however, send a copy of the contract to the Contraloría, within 10 days of its signature, "*para su debida fiscalización*". [See doc. No. 57, Annex V].

- On November 1, 2001, the Agencia Aduanera Canales Aguilar filled-out an export form, documenting the export of 115 AK47s from the Managua airport to the Ministry of National Defense in Guatemala. [See doc. No. 54, Annex V].

- On November 2, 2001, following a delay of two days, the 14 containers (Note: there were 14 containers: 10 containers with ammunition, 4 with AK47 assault rifles) were loaded by Agencia Vassali onto the Otterloo.  The Otterloo first had to unload 9 containers (allegedly containing plastic balls) it had on its deck, loaded the 14 arms containers into its hold, then re-loaded the 9 containers on its deck. [See doc. No. 6, Annex V].

- Also on November 2, 2001, a CETREX Export Form was filled-out by Agencia Canales Aguilar, and it documented the export of arms and ammunition to the Panamanian National Police, at the port of Colon, Panama. [See doc. No. 53, Annex V]. A Nicaraguan custom form similarly documented the shipment to the PNP. [See doc. No. 53, Annex V].

  Two other documents were also filled-out - the Otterloo's ship manifest (on Agencia Vassalli stationary) [See doc. No. 53, Annex V] and a Bill of Lading, [See doc. No. 53, Annex V], both dated November 2, 2001.  They also documented the arms and ammunition, including the serial numbers of the containers that contain the goods).  The manifest and the Bill of Lading were certified by the Otterloo's Captain (Master), Jesus Iturrios Maciel, and indicated that the final destination was the Panamanian National Police.

- On November 3, 2001, the Captain of the Otterloo, Iturrios Maciel, signed an *Acta de Salida*, a form from the Nicaraguan *Ministerio de Gobernacion*, indicating his imminent departure to the port of Colón, Panama. [See doc. No. 52, Annex V]  The Nicaraguan Navy documented the Ottlerloo sailing out of the port of El Bluff, with the declared destination being the port of Colón, Panama. [See doc. No. 52, Annex V].

- On November 5, 2001, the Otterloo arrived at the port of Turbo, as documented by a form of the *Departamento Administrativo de Seguridad, Seccional Antioquia, Puesto Operativco Turbo*, which was signed by the Captain of the Otterloo, as well as by a Colombian customs official. [See doc. No. 51, Annex V].  On November 7, the shipment of arms and ammunition was unloaded by a shipping company called Banadex S.A., at the request of a the shipping agent Turbana Ltd, and the AUC took possession of the weaponry [see doc. 14a, Annex V].  The Otterloo then sailed for Baranquilla on November 9. [See docs. Nos. 51 and 25, Annex V].

- On November 9, 2001, GIR S.A. sent Yelinek a fax outlining the entire transaction on the sale of equipment and related shipping costs, and detailing payments received from Yelinek.  The entire cost of the operation amounted to $603,805, of which GIR S.A. had received $547,642 from Yelinek - GIR S.A. was owed $ 56,343. [See doc. No. 45, Annex V].

- Also on November 9, the Agencia Aduanera Canales Aguilar completed the required export documents for exporting 9000 AK47 bayonets to Century Arms in Miami, by way of Puerto Cortes, Honduras. [See doc. No. 46, Annex V].

- On November 21, Ori Zoller sent a fax to the Nicaraguan Army (tel: 505-228-7605), explaining that the Panamanian National Police wished to purchase a second consignment of arms and ammunition:  17 million rounds of ammunition of two different types, along with 5000 AK47s.  Zoller outlined how payment was to be made for the purchase of such equipment, and he attached the February 10, 2000 purchase order which he characterized as "*debidamente firmada y sellada por el Ministerio de Gobierno y Justicia, Policia Nacional de Panamá*". [See doc. No. 42, Annex V].

- On December 4, 2001, Zoller's bank account received two wire transfers.  The first, for $6,475, from a certain Stein Svi, by way of the Mercantile Discount Bank Ltd, Tel Aviv, Israel [See doc. No. 40, Annex V]; the second, for $49,568 from a certain Chaim Mann, by way of the First International Bank of Israel, Ltd. Tel Aviv, Israel. [See doc. No. 41, Annex V].

- On December 13, 2001, the Otterloo returned to Puerto Colón, Panama, after having traveled from Baranquilla, Colombia (on November 9), to ports in Venezuela and Suriname. [See doc. No. 25, Annex V].

- On December 14, 2001, GIR S.A. sent a fax to Yelinek in which the prices were shown for a list of military hardware, which included 5000 AK47s, 10 million rounds of ammunition, 100 PKMS machine guns, 50 rocket propelled grenades RPG7, and 1000 grenades for RPG7. [See doc. No. 39, Annex V].

- On January 2, 2002, GIR S.A. sent Yelinek a fax, providing pricing for the purchase of 24 containers, and transportation and customs costs. [See doc. No. 38, Annex V]

- On January 3, 2002, Kissilevich sent a fax to his shipping agent, Leonel Cordon, giving him the address to which the containers should be sent (*Comando de Apoyo Logístico*, in Managua), and the contact person, Major Rivas of the Nicaraguan Army. [See doc. No. 34, Annex V].

- Also on January 3, 2002, Kissilevich apparently sent Major Rivas a copy of the Panamanian purchase order, describing it as the "*Certificado de Usuario Final correspondiente a la mercaderia solicitada*". [See doc. No. 37, Annex V].

- On January 8, 2002, Kissilevich sent a fax to Major Rivas, explaining that he was sending him a list of serial numbers for "ten more containers". [See doc. No. 32, Annex V].

- On January 11, 2002, the *Jefe de la Dirección de Financias del Ejercito de Nicaragua*, Coronel Miguel Guzman Bolaños, issued a bill for $980,000, addressed to the Panamanian National Police, but sent only to Zoller, for 17 million rounds of ammunition, and 5000 AK47s. [See doc. No. 31, Annex V].

- On January 16, 2002, $50,000 was wire-transferred to GIR S.A.'s Westrust Bank account from a Bank in Israel. [See doc. No. 29, Annex V].

- On January 23, Julio Solis, of Agencia Vassali in Nicaragua, sent an e-mail to GIR S.A.'s shipping agent in Guatemala, Leonel Cordon, informing him that 23 containers were available for immediate purchase. [See doc. No. 28, Annex V].

- On January 30, 2002, Ovidio Escudero, Chief of Naval Intelligence of the Panamanian Navy, sent a fax to Captain Manuel S. Mora Ortiz of the Nicaraguan Navy, asking him for any information he may have regarding the ship Otterloo. Escudero added that the Ship was suspected of transporting armament to the Fuerzas Armadas Revolucionarias de Colombia (FARC). [See doc. No. 27, Annex V].

The next day, Mora replied to Escudero, explaining that the Otterloo had sailed from Nicaragua on November 2, 2001, loaded with 3000 AK47s and 5 million bullet, which had been sent to the Panamanian National Police. [See doc. No. 26, Annex V].

- On February 6, 2002, el Teniente Coronel, Wilson Laverde, Jefe de la Unidad Antiterrorista de la Policía Nacional de Colombia; Elmer E. Acuña del Consejo de Seguridad Publica y Defensa

Nacional de Panamá; el Mayor Francisco León Rodríguez, Jefe del Departamento de Contra Inteligencia del Ejercito de Nicaragua, y el Sub-Comisionado Arnulfo Escobar, de la Policía Nacional de Panamá, signed a document called "Propuesta de Trabajo para el Desarrollo de la Operación Triangulo". [See doc. No. 24, Annex V].

- On February 15, 2002, GIR S.A. sent a fax to Julio Solis, informing him that they no longer wanted the 23 containers that were for sale.  GIR S.A. sent a copy of this fax to their shipping agent, Leonel Cordón. [See doc. No. 22, Annex V].

- On March 5, 2002 during a meeting of Chiefs of Police in Bolivia, Carlos Barés, Chief of the Panamanian National Police, asked Edwin Cordero, by then the Chief of the Nicaraguan National Police, for an explanation regarding the export of Nicaraguan arms, allegedly to Panama. Cordero later testified that up until March 5, he had no knowledge of Operacion Triangulo, nor that the Nicaraguan arms had been diverted to Colombia. [Interview with Cordero].

- On March 8, 2002, Barés and Cordero met in Panama to review the facts of the case. [Interviews with Cordero and Barés].

- On March 19, 2002, Shimon Yelinek sent Ori Zoller an e-mail, saying "I am sorry for the delay, I am doing my best to comply, I have some delay, on Friday, I will call you.  Try to hold the pressure". [See doc. No. 20, Annex V].

- On April 21, 2002, the Colombian newspaper, "El Tiempo" published a story regarding the diversion of the Nicaraguan Arms.

- April 30, 2002, Trafalgar Maritime Inc.'s Office closed permanently for business, and they gave up their office lease on May 1, 2002. [See doc. No. 13, Annex III].

- On May 8, 2002, the Ministers of Foreign Affairs of Colombia, Nicaragua and Panama, requested that the OAS conduct an investigation into the circumstances surrounding the arms diversion. [See doc. No. 17, Annex V].

- On June 14, 2002, the Otterloo was sold to Enrique Aaron Villalba, Colombian citizen, by Julio Matute, Panamanian citizen, and at this point the legal representative of Trafalgar Maritime Inc. The ship was sold for $125,000, of which only $100,000 changed hands. [See doc. No. 11, Annex III].

- On June 28, 2002, Trafalgar Maritime Inc., was formally dissolved by the lawyer Gustavo Padilla. [See doc. No. 11a, Annex V].

ANNEX II

**List of All Actors**

| NAME | TITLE |
| --- | --- |
| ACAL | Canales Aguilar Compañía Limitada (ACAL) – Customs agency in the name of Augusto Canales Meléndez. |
| Acuña, Elmer E. | Council for the Public Security and National Defense of Panama. Signatory of the document "Operación Triángulo". |
| Aguilar, Carlos | Panamanian citizen.  Second Officer of the merchant ship Otterloo. Later became its Captain. |
| Argüello Poessy, Guillermo | President of the Superior Council, Office of the Comptroller General of the Republic of Nicaragua (*Consejo Superior de la Contraloría General de la República de Nicaragua).* |
| Aviad, Haviv | Brother in law, and business associate of Shimon Yelinek. |
| Bah, Ibrahim | Principal provider of arms and diamond dealer for the United Revolutionary Front (RUF) of Sierra Leone. |
| Banadex S.A. | Colombian shipping company that unloaded the Otterloo's containers in Turbo, Colombia. |
| Bautista Lara, Francisco | Deputy Chief of the Nicaraguan National Police. |
| Barés, Carlos | Chief, National Police of Panama. |
| Bello, Pedro | President, "Armamentos Inc.," a firearms sales company in West Palm Beach, FL, USA. |
| Berenstein, Gabriel | Marketing Manager, Israeli Military Industries, Ltd. (IMI). |
| Bravo Henríquez, Luis | Director General, Government Accounting Department, Ministry of the Treasury and Public Credit. |
| Calderón Vindell, Col. Ramón | Chief, Logistics Department, Nicaraguan Army. |
| Calderón, General Roberto | Inspector General of the Nicaraguan Army. |
| Canales, Augusto | Owner of ACAL, legal representative of the Nicaraguan National Police during firearms exports customs procedures. |
| Carrión, General | Commander-in-Chief, Nicaraguan Army. |
| Cordero Ardilla, Edwin | First Commissioner, Director General, Nicaraguan National Police, as of September 2001. |
| Cordón, Leonel | Owner of Tramocaribe (Guatemala), the shipping company contracted by GIR S.A. to coordinate transportation of the arms. |
| Correa Guerrero, Heriberto | Deputy Director General, State Procurement and Tenders of Nicaragua. |
| Chavaría Hernández, Col. Carlos Gilberto | Head, Guatemalan Military Industries, which purchased 115 AK-47 from GIR S.A. |
| de León, Eugenia | Secretary, GIR S.A. |

| | |
|---|---|
| Díaz Lazo, Melba | Nicaraguan customs agent. |
| Duque Estrada, Esteban | Minister of the Treasury and Public Credit. |
| Escobar, Arnulfo | Deputy Chief of Police, National Police of Panama. Signatory of the Operación Triángulo document. |
| Escudero, Ovidio | Chief, Department of Naval Intelligence, Ministry of the Interior and Justice of Panama. |
| Ferriz, Miguel Onattopp | Manager/Owner, Trafalgar Maritime International Inc.,  the company under whose name the Otterloo was registered. |
| Gehri, Haim | Former IMI trader in Colombia.  Is now a consultant for Century International Arms in Miami. |
| GIR S.A. | Grupo Representaciones Internacionales, S.A., firearms sales Company.  Address: Prolongación Boulevard, Los Próceres, Zona 15, Kilómetro 9, Carretera a El Salvador, Área Comercial Hotel Quinta Real. |
| González, Melby | Chief, General Administration Division, Nicaraguan National Police. |
| Guzmán Bolaños, Miguel | Chief, Finance Department, Nicaraguan Army. |
| Herrera Zúñiga, René | Minister of Government of Nicaragua until September 30, 2000. |
| Iturrios Macial, Jesús | Captain/Master of the Otterloo. |
| Jiménez, Jaime | General Manager, Transportes Intermodal, a company contracted to transport the arms from Managua to Puerto El Rama. |
| Kissilevich, Uzi | General Manager of GIR S.A. |
| Ladigin, Sergey | Director, Latin American Regional Department, Federal State Unitary Enterprise "Rosoboronexport," a specialized agency handling Russian firearms exports. |
| Laverde, Wilson (Lt. Colonel) | Chief, Anti-terrorist Unit, National Police of Colombia. |
| López Dolmuz, José Antonio | Deputy Administrative Chief, Nicaraguan National Police. |
| Maor, Amiram | Deputy Vice President and Marketing Director for Latin America, Military Industries of Israel, Ltd. (IMI). |
| Marenco Cardenal, José | Minister of Government of Nicaragua from October 1, 2000 until the change of government (January 10, 2002). |
| Martínez Rivera, Ramiro | First Officer, Military Technical Office of Nicaragua, responsible for accompanying the firearms from Managua to Puerto del Rama. |
| Molina Lacayo, Jorge | Director, Exports Processing Center (CETREX). |
| Montealegre Callejas, Francisco (Franco) | First Commissioner, Chief of Nicaraguan National Police until September, 2001. |
| Mora Ortiz, Captain Manuel S. | Naval Forces of Nicaragua. |
| Moreno Corea, Lieutenant Colonel Uriel | Chief, Military Technical Office. |
| Muñoz Morales, Luis | Chief, General Administration Division, Nicaraguan National Police. |
| Osailly, Samih | Lebanese arms dealer who works for Ibrahim Bah. |
| Padilla Martínez, Gustavo Leonardo | Attorney who established the company Trafalgar Maritime International, Inc. |

| | |
|---|---|
| Ramírez Torres, Francisco | Acting President and later President of the Superior Council, Office of the Comptroller General of the Republic of Nicaragua. |
| Rivas Castillo, Álvaro (Major) | General Roberto Calderón's Assistant (Aide de Camp). |
| Rodríguez, Francisco León (Major) | Chief, Department of Counterintelligence, Nicaraguan Army. |
| Rojas Arrollo, Santiago | National Taxation and Customs Department (DIAN), Colombia. |
| Shrem, Marcos | Peruvian businessman, resident in Panama, associate of Shimon Yelinek. |
| Solís, Julio | Employee of Agencia Vassali, a Nicaraguan transportation and shipping company. |
| Sucher, Brian | Vice President, Century Arms. |
| Trafalgar Maritime Inc. | Transportation company under whose name the ship Otterloo was registered. |
| Vasalli S.A., Agencia "AVASA" | Agencia Vassalli, S.A. "AVASA" loaded the firearms onto the Otterloo in Puerto del Rama, Nicaragua. |
| Shimon Yelinek | Israeli businessman resident in Panama.  Allegedly bought Nicaraguan firearms and ammunition. |
| Zoller, Ori | Owner of GIR S.A., a firearms sales company with headquarters in Guatemala. |

# EXHIBIT C



# TRANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

AFFIDAVIT OF ACCURACY

I, Carrie Russ, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the attached Colombian Prosecutor General Report from Spanish into English.

Carrie Russ
TransPerfect Translations, Inc.
601 Thirteenth Street, NW
Suite 370 South
Washington, DC 20005

Sworn to before me this
10th day of December 2007

Signature, Notary Public

Lisa Sherfinski
Notary Public , District of Columbia
My Commission Expires 01-01-2008

Stamp, Notary Public

Washington, DC

**OFFICE OF THE COLOMBIAN PROSECUTOR GENERAL**

**PROSECUTOR'S OFFICE FOR CRIMINAL COURTS OF THE**

**SPECIALIZED CIRCUITS**

**National Anti-Terrorism Unit**

**Office 18**

*109*

File No. 59,516

Bogota, Capital District, July 23, 2004

MATTER TO BE DECIDED

Determine the propriety of the investigation being conducted by this prosecutor's office into the activities of HENRY HERNANDO RAMIREZ BAHAMON, HERMINIO MARTINEZ MERCADO, CARMELO CORDOBA CAMPO, PAOLA KATHERINE ROMERO BENAVIDES, YOVANNY HURTADO TORRES and LUIS ANIBAL CHAVERRA ARBOLEDA, who were linked to the investigation, by unsworn statement, as presumed perpetrators of the crimes as set forth in article 286, 322, amended by article 73 of Law 788 of 2002 and article 366 of the Criminal Code, concerning the issuance of false or inaccurate government documents, the fabrication, trafficking and carrying of weapons and munitions, the use of which is restricted to the armed forces, and favoritism by a civil servant, with respect to the first three individuals named, [and] the latter three individuals for the offense set forth in article 366 of the same text, once the investigational phase in these proceedings is concluded and the time allowed by law to present charges has expired.

FACTUAL SUMMARY

In response to the arguments of counsel for the civil servants employed by the DIAN [Dirección de Impuestos y Aduanas Nacionales – Colombian tax and customs authority], we affirm that there can be no doubt whatsoever as to the manner in which the arms and munitions were brought into the country, which commenced in November 2001, military material intended for paramilitary groups operating in the Departments of Córdoba and Antioquia. This occurred once the ship Otterloo weighed anchor at the shores of Uraba on November 5, 2001 and unloaded 23 containers onto *bongos* (flat-bottomed vessels) that transported them to the Banadex S.A. yards at a

*110*

Nicaraguan port, or more precisely, Puerto El Rama, where the contents of 14 of the 23 containers (plastic balls) were exchanged for the 3000 rifles (AK-47 rifles) and 5,000,000 5.62 caliber cartridges for those rifles, which arsenal had documentation not only relative to the plastic balls purchased in Mexico, but also a supposed purchase of arms from the Nicaraguan police by its counterpart in Panama, the latter to avoid any problems in case of interception on international waters.

The 23 containers having arrived at Uraba on the motorboat Otterloo, they were placed in several bongos and brought onshore to the yards of the company Banadex S.A. at Puerto Zungo (Carepa), at which location the task of inspecting the containers was carried out by Messrs. HENRY HERNANDO RAMIREZ BAHAMON, HERMINIO MARTINEZ MERCADO and CARMELO CORDOBA CAMPO, agents of the DIAN office in Turbo commissioned for this purpose, in order to "verify compliance with custom laws in force and Merchandise Monitoring." Having completed this task, the customs agents recorded in the inspection report of November 8, 2001 (folio 192 c.c. 4.), that "the merchandise inspected corresponded to the merchandise declared."

But in addition to the DIAN agents, as stated by the accused in their unsworn statements and as appears in the corresponding documentation, also present at the Banadex S.A. yard were Mr. YOVANNY HURTADO TORRES, representing Banadex S.A.; LUIS ANIBAL CHAVERRA ARBOLEDA and ERASMO DE JESUS SALDARRIAGA CUARTAS, representing the owners of the merchandise (folio 112 et seq. c.c. 3), there being a document showing that CHAVERRA ARBOLEDA was handling vis-à-vis Banadex S.A. the matter concerning importation in the name of NELSON SALDARRIAGA CUARTAS, legal representative of Banadex S.A., and was the person who coordinated the arsenal's exit in 14 trucks he had arranged for this purpose and which arrived at their final destination, the paramilitary groups operating in the Antioquia and Córdoba departments (folio 54 et seq. c.c. 4).

2

*111*

IDENTIFICATION OF THE ACCUSED

HENRY HERNANDO RAMIREZ BAHAMON, identified by national identification card no. 12,128,309, issued at Neiva (Huila), born in Garzón (Huila) on January 3, 1965, age 38 at the time of the investigation, son of HERNANDO RAMIREZ and ANA BAHAMON, living in civil union with FANY GUEVARA RODRIGUEZ, with whom he has a son, three years of age, by the name of HENRY ALEJANDRO, University studies, graduate of the faculty of Law of Funiuraba-Incca, a civil servant and revenue technician for the DIAN at Turbo (Antioquia), where he resides at Calle 102 no. 15-110.

HERMINIO MARTINEZ MERCADO, identified by national identification card no. 82,330,333 issued at Acandi (Choco), where he was born on December 10, 1965, 37 years of age at the time of the investigation, son of HERMINIO MARTINEZ and CATALINA MERCADO, married to MARITZA SAAVEDRA, with whom he has three daughters by the names of TAMMY SHIRLEY, 14 years of age, CAROLINA, nine years of age and ALEJANDRA CATALINA, 14, 9 and 3 years in order of age [sic], University studies in business administration, graduate of UNAD, a civil servant and Assistant III 1208 for the DIAN at Turbo (Antioquia), where he resides at Calle 106 No. 11-16.

CARMELO CORDOBA CAMPO, identified by national identification card no. 8,427,057, issued at Turbo (Antioquia) where he was born on November 5, 1957, 46 years of age at the time of the investigation, son of ALEJANDRO CÓRDOBA and ISABEL CAMPO, lives in civil union with LUZ MARINA TORRES, with whom he has five sons by the name of CESAR ROBERTO, 22 years of age, SIRLEY, 24 years of age, NOHORA, 18 years of age, LUIS ALEJANDRO, 20 years of age and OSCAR, 17 years of age, a public accountant by profession working for the DIAN at Turbo (Antioquia), where he resides at Calle 97 No. 16-47.

PAOLA KATHERINE ROMERO BENAVIDES, identified by national identification card no. 43,751,469, issued at Envigado (Antioquia), born in Turbo (Antioquia) on July 20, 1976, 27 years of age at the time of the investigation, daughter of MANUEL and RAQUEL, lives in civil union with NESTOR AUGUSTO MEZA, with whom she has one daughter, 20 months

3

of age by the name of MANUELA, a Business Administrative Technologist working as Secretary of Public Deposits [at] Inversiones Arizana, and resides at Carrera 13 No. 102-13 in Turbo (Antioquia).

LUIS ANIBAL CHAVERRA ARBOLEDA, identified by identification card no. 71,934,588 issued in Apartado (Antioquia), born in Yati (Antioquia) on October 20, 1963, 39 years of age at the time of the investigation, son of VICTOR and VIRGELINA (deceased), married to MARIA IDALI CANO GOMEZ, with whom he has two sons, ALEJANDRO and SEBASTIAN, 12 years and six months of age, respectively, as well as his stepdaughter by the name of EDITH YOLIMA ARIZA CANO, 22 years of age, a businessman by occupation, bachelors degree, a resident of Apartado (Antioquia) in the Manzanares neighborhood, telephone 8283074.

YOVANNY HURTADO TORRES, identified by national identification card no. 71,947,726, issued at Apartado (Antioquia), where he was born on December 16, 1977, 25 years of age at the time of the investigation, son of FABIO and ISABEL, single, employed by the Banadex S.A. as an operations assistant, education to the seventh semester of financial technology and accounting, resident of Churido, district of Apartado (Antioquia).

EVIDENCE PUT FORTH IN THE PROCEEDINGS

1. During the evidentiary phase, various exhibits were submitted to the record, consisting of intelligence reports, documents indicating the measures adopted by a private Guatemalan agency engaging in the business of buying and selling arms and munitions (GIR S.A., folio 16 et seq. c.c. 4), reports of regional institutions such as the OAS, as well as the Report of Chartering and Leasing of Ships dated October 30, 2001 (folio 52 c. o 1), from which we know that the motorboat Otterloo was chartered by the firm Inversiones Banoly Ltda. (folio 49 idem), the existence and legal representative of which is indicated at folio 35 c. o 3., to load 23 containers of plastic balls at the Port of Veracruz (Mexico), bound for Colombia, more precisely, Turbo (Antioquia), which course was changed when the vessel docked at Puerto El Rama in Nicaragua (folio 153 et seq. ss. idem), under the pretext of making repairs.

*113*

2. Similarly, the record contains the order for the vessel to set sail for Turbo, the notice of arrival, notice of arrival of carrier, report of visit of the vessel by the Captain of the Puerto de Turbo, report of incoming vessel, invoice for purchase of plastic balls, bill of lading, and cargo manifest (folio 53 et seq. idem).

3. With respect to the motorboat, according to statements, it left Puerto de Veracruz (Mexico) with 23 containers of plastic balls, arrived at El Rama, a Nicaraguan port, where it underwent repairs, which was an opportunity to load the arsenal consisting of 3000 AK-47 rifles and 5,000,000 5.62 mm cartridges for those rifles.

4. With respect to the actions taken by the Colombian customs authorities in regard to the arrival of the Otterloo in Colombia, we have in the record the *Auto Comisorio Aduanero*[1] of November 8, 2001 (folio 94 idem) appointing DIAN officials HENRY HERNANDO RAMIREZ BAHAMON and CARMELO CORDOBA CAMPO to "ensure compliance with customs regulations in force and Merchandise Monitoring"; there is also the Customs Inspection Report dated November 8, 2001 (folios 95 and 96 idem), signed by officials CARMELO CORDOBA CAMPO and HENRY HERNANDO RAMIREZ BAHAMON as agents of the DIAN and by YOVANNY HURTADO TORRES on behalf of Banadex S.A., a formality which also included Mr. HERMINIO MARTINEZ MERCADO, also an official at the DIAN, and the document demonstrates that the merchandise inspected corresponds to the merchandise declared.

5. At folio 100 idem, there appears the document entitled Simplified Import Declaration, signed by HERMINIO MARTINEZ MERCADO, and the documentation verifying that the Otterloo was anchored at El Bluff, the Nicaraguan port (folio 153 et seq. idem), the intelligence report, which provides a detailed account of the actions taken for the purchase of arms in Nicaragua by the firm GIR S.A., the ship's departure from Veracruz (Mexico), its arrival at the Port of El Bluff (Nicaragua),

---

[1] Translator's note: administrative act by the cognizant Customs official commissioning a judge or other authority to carry out formalities when the location of the goods at issue is other than location of the proceedings.

*114*

up to the unloading at the Colombian port and transport by trucks to the departments of Córdoba and Antioquia.

6. Also in the record is a report from the Interpol office of the DAS (folio 3 et seq. c.c. 3), attaching a list of rifles with serial numbers and the numbers of three containers in which they were packed, sent by Interpol Nicaragua, which list is also contained on a diskette.

7. Having carried out the judicial inspection at the decommissioned arms depot of the National Army, Fourth Brigade, headquartered in Medellin, by officials of the DAS commissioned for this purpose (folio 199 et seq. c.c. 3), there were 23 rifles in those army units, the serial numbers of which correspond to those that left Nicaragua and the list mentioned above.

8. Photographs were provided that show the portion of the Gulf of Uraba where the ships were anchored and from which the merchandise was unloaded and loaded onto the bongos which [floated] until they reached Puerto de Zungo, in this case. There is also a map of the area mentioned (folio 99 et seq. c.c. 8).

9. Pursuant to our request for international judicial assistance from authorities of the Republic of Guatemala in regard to the company GIR S.A., and for which purpose letters rogatory were issued, the items set forth at folio 166 et seq. c.c. 8 were received.

10. A sworn declaration was taken from Mr. JOSÉ ANTONIO MUÑOZ CARDOZO, a crane operator at the Banadex S.A. yards (folio 210 et seq. c.c. 4), who states that he had noted something unusual in the process of unloading the containers, since, as he states, "...everything arrives at the customs zone and never unloaded directly to the trucks from the [flat] and in this case it was done ...," adding that "...those who were there at the [flat] unloaded the trucks directly, ..." [sic] and that he was able to note that the first containers that he lifted with the crane weighed between approximately 18 and 22 tons, while the others weighed between 6 and 9 tons.

A. Documents put forth by counsel for Messrs. MARTINEZ MERCADO, RAMIREZ BAHAMON and CARMELO CORDOBA CAMPO (folio 213 et seq. c.c. 8), which are detailed below: Customs Administration Directive 0005, originating from the Special Administrative Unit, the title of which indicates that its subject was to provide instructions for officials of the various units having to do with customs operations, operations which "are all the actions undertaken to prevent, control and effectively counteract the entry of the merchandise and exit and/or movement of domestic merchandise subject to customs restrictions in the country (without complying with the standards, requirements and conditions established by customs regulations.)" (Emphasis added). Another document submitted is Administrative Order 005 of June 7, 2002, "establishing procedures to reinforce customs controls to prevent the entry of prohibited merchandise or merchandise whose importation is restricted [to] authorized locations." In addition, there is another Directive, the number of which is illegible, but dated January 23, 2002, originating from the Administrator of the DIAN office in Turbo, which identifies the customs obligations to be completed by officials of the DIAN relating to the entry of foreign merchandise by sea through the Uraba area. Circular No. 8341001-0001 of April 16, 2002, issued by the office of the DIAN Administrator in Turbo, which concerns control of unloading merchandise. Memorandum No. 8341001-001 of April 9, 2001, also referring to control of unloading merchandise, also originating from the same office. The sworn declaration of Mr. EDUARDO ANTONIO OTERO ERAZO was heard, who, at the time of the events, served as Administrator of the customs office in Turbo (Antioquia), and, among other things, makes statement in regard to the distances between the location where the ships were anchored in Uraba and the Puerto de Zungo (folio 201 et seq. c.c. 8).


PROVISIONAL LEGAL CHARACTERIZATION

The presumed illegal conduct of Messrs. HERMINIO MARTINEZ MERCADO, HENRY HERNANDO RAMIREZ BAHAMON and CARMELO CORDOBA

*116*

CAMPO is described in the abstract by the Criminal Code as follows:

1. Second Book, Title IX, Third Chapter, Article 286, which provides:

"Issuing a false or inaccurate public document. A civil servant who, in the exercise of his duties, records a falsehood or conceals all or part of the truth through the issuance of a public document that may serve as evidence, shall be subject to a term of four to eight years in prison and shall be barred from the exercise of public rights and functions for five to six years."

2. Second Book, Title X, Fourth Chapter, Article 322, amended by Article 73 of Law 788 of 2002, which provides:

"Favoritism by a civil servant. A civil servant who collaborates, participates, transports, distributes, alienates or in any other manner facilitates the theft, concealment or diversion of merchandise under the control of customs authorities, or the introduction of such merchandise through unauthorized locations, or fails to carry out the legal or regulatory controls for which he is responsible to achieve the same purposes, and the value of merchandise involved is less than 50 times the minimum legal monthly salary in effect, shall be subject to a fine of 300 to 1500 times the minimum legal monthly salary and effect, or in any event at least 200% of the customs value of the goods involved, and shall be barred from the exercise of public rights and functions for three to five years.

"If the conduct described in the preceding paragraphs involves merchandise of a value in excess of 50 times the minimum legal monthly salary, the penalty imposed shall be a sentence of five to eight years' imprisonment; a fine of between 1500 and 50,000 times the minimum legal monthly salary, or in any event at least 200% of the customs value of the goods involved; and bar on exercising public rights of functions for five to eight years.

"The amount of the fine shall not exceed the maximum fine established in this code."

3. Second Book, Title XII, Second Chapter, Article 366, which provides:

"Fabrication, trafficking and carrying weapons and munitions, the use of which is restricted to the armed forces. Anyone who imports, traffics, fabricates, repairs, stores, maintains, acquires, supplies or carries weapons or munitions, the use of which is restricted to the armed forces, shall be sentenced to three to 10 years in prison.

..."

These actions were undertaken by officials of the DIAN and served as the means to perpetrate multiple distinct crimes under the circumstances warranting the maximum penalties mentioned in article 58, numeral 10 of the Criminal Code.

THE STATEMENTS GIVEN BY THE ACCUSED

HENRY HERNANDO RAMIREZ BAHAMON states that he was commissioned on November 8, 2001, along with HERMINIO MARTINEZ MERCADO and CARMELO CORDOBA CAMPO, to inspect merchandise which had arrived at port on the motorboat Otterloo and was located at the Banadex S.A. yards in cooperation with Mr. YOVANNY HURTADO TORRES, the Banadex employee responsible for conducting the inspection process to determine that the merchandise contained in the 23 receptacles corresponded to the description on the import declaration so as to begin to nationalize it. He states that when it came time for the inspection, he and his two DIAN colleagues inspected 21 of the 23 containers, stating that what they saw were plastic balls, and he has no knowledge that the containers transported any other type of merchandise, and that his function "within the process of nationalizing the merchandise was only to inspect the cargo described in the import declaration and nothing else, and had he seen anything unusual or been alerted to [anything] equally unusual or illegal, he would have proceeded in accordance with customs regulations." He states that from the time the boat anchored in front of the port until the time of the inspection, three

days elapsed, approximately, and the distance between those locations is fairly substantial.

HERMINIO MARTINEZ MERCADO gives an unsworn account in terms very similar to those of the accused above, and states that together with MARTINEZ MERCADO and CARMELO CORDOBA CAMPO, he conducted the inspection of 21 of the 23 containers that arrived on the Otterloo and had not seen any weapons or munitions in any of those receptacles, nor even merchandise other than the plastic balls, adding that Messrs. ERASMO SALDARRIAGA, who he states was in charge of merchandise, and LUIS ANIBAL CHAVERRA were also present at the inspection, in addition to Mr. YOVANNY HURTADO TORRES, the Banadex yard supervisor. He states that he was the one who ordered the merchandise to be released, in other words, ordered it to be taken out of the yards once the inspection was completed, and that not all of the containers be reviewed, "... first, because over 90% of the homogeneous merchandise had been reviewed, and secondly, because I had to return to Turbo to authorize another release of merchandise," and that it is normal practice not to review all of the merchandise." He adds that Mr. HURTADO TORRES was at the inspection for a short time, and ERASMO SALDARRIAGA and LUIS ANIBAL CHAVERRA were also present, and that PAOLA KATHERINE ROMERO BENAVIDES was not there because she was about to have a baby, having drawn up the document for her to sign, and that HENRY HERNANDO RAMIREZ BAHAMON AND CARMELO CORDOBA CAMPO followed up with the merchandise, because it involved a boat that was arriving at the port for the first time. He also states that from the time the motorboat anchored until they reached the Banadex yards, the containers were transported on bongos, "... where something other than unloading them at Banadex could have happened during the trip ...," noting that there is a great distance between the place where the boat anchored and the port, and moreover, the review took place three days after the boat arrived.

CARMELO CORDOBA CAMPO begins his unsworn statement by indicating, like the other DIAN employees, that the inspection took place three days after the arrival of the boat, also noting the great distance between

the place where the motorboat was located and the Banadex yards, and that it was humanly impossible to review every one of the containers. He adds that at the time and before the occurrence of the facts under investigation, he, like his DIAN colleagues, had been in bad economic condition [sic] and that after reviewing 21 of the 23 containers they saw no weapons or munitions, nothing but plastic balls; he adds that he believes that Ms. PAOLA KATHERINE ROMERO BENAVIDES was not present during the formalities, as well as to have signed [sic] the customs inspection report and the *Auto Comisorio Aduanero* upon attending the task of reviewing the containers, that her actions were in accordance with customs regulations, and that when a review such as the one carried out is conducted by him and his DIAN colleagues, a detailed comparison is made between what is recorded on the documents and what can be seen and felt [by physical inspection].

PAOLA KATHERINE ROMERO BENAVIDES agrees that she was contracted to carry out the processes corresponding to importing and nationalizing the merchandise coming from Veracruz, Mexico in 23 containers, presumably plastic balls, but that because she was close to giving birth (the inspection was conducted on November 8, 2001 and she gave birth on the 20th of the same month and year) she was not present at the Banadex S.A. yards at the time the inspection was conducted by the DIAN officials, which circumstance is corroborated by Messrs. HERMINIO MARTINEZ MERCADO and HENRY HERNANDO RAMIREZ BAHAMON, who carried out that process, and by YOVANNY HURTADO TORRES, who was in charge of the Banadex S.A. yards. The accused adds that in addition to the DIAN members, the Banadex S.A. representative and Erasmo de Jesus Saldarriaga Cuartas were at the Banadex yards when the inspection of the receptacles took place, noting that the presence of the latter seemed normal, "... as he was the brother of the representative from Inversiones Banoly." She adds that from the fact of having signed the document in which it appears as though [she] was present at the Banadex S.A. yards, she thought that this might cause some type of problem, but that it was not the first time that she was not present for the review and they brought the document to her for her to sign, although this was the first time she did not attend because she was indisposed due to

her pregnancy. Regarding the importation of balls by Inversiones Banoly Ltda, she states that this appeared unusual, since that company did not usually bring that type of merchandise into the country, since what is imported was electrical appliances, dishes and umbrellas. She states that Mr. NELSON SALDARRIAGA CUARTAS, legal representative of Inversiones Banoly Ltda., knew about it when they were captured because he would do import procedures on behalf of Banoly with CARLOS MAZO, who was in charge of handling the documents.

LUIS ANIBAL CHAVERRA ARBOLEDA begins his account by stating that at the request of a man by the name of RICARDO ARANGO, who he states was recommended by his friend Mr. Gildardo Hincapie to handle the corresponding processes before the DIAN, since it would import balls and this is how he got to TURBOADUANAS [CUSTOMSTURBO], where they told him what documentation that he had to gather together. He states that after this, he went to Banadex, where they also told him what had to be done, and as Mr. RICARDO ARANGO, who had been traveling, was returning, he took him to Turboaduana where he left him speaking with the manager of that company by the name of Angel, stating that he does not recall his last name, and after Mr. RICARDO ARANGO left Turboaduana he said that everything had been arranged for the importation and nationalization of the merchandise and that once it arrived at the Banadex yards, the inspection of the merchandise was conducted and it was ordered to be released and taken out on trucks by the DIAN officials. He states that he did not go back to see Mr. RICARDO ARANGO and does not know his address or that of the gentlemen said to be his friend, Gildardo Hincapie. He affirms having been [present] at the time of the inspection of the containers at the Banadex yards and not having seen any objects other than plastic balls.

YOVANNY HURTADO TORRES states that his function as Administrator in charge of the Banadex yards, because the individual who held the job was on vacation [sic] at the time the 23 containers arrived in early November 2001, that according to the shipping documents they were plastic balls, it was the reception and coordination of his office [sic] once the nationalization process was completed. He states that in addition, he reviewed the

identification numbers of the receptacles, and did nothing else, because he says he is not authorized to review the contents of receptacles when merchandise arrives. He states that the individuals who conducted the review of the containers were the DIAN employees, HENRY HERNANDO RAMIREZ BAHAMON, HERMINIO MARTINEZ MERCADO, and CARMELO CORDOBA CAMPO, accompanied by Messrs. LUIS ANIBAL CHAVERRA ARBOLEDA and ERASMO SALDARRIAGA, who he believed represented the importer. He repeats that his function was only to receive the containers and dispatch them after the DIAN had reviewed their contents, that he was present during the opening of eight or nine of the containers, which he says contained plastic balls, because he had a need to be there, leaving the location where the review was being conducted, because he had to be there providing all the services required as an administrator of Banadex [sic]. He adds that once the review was completed, the DIAN officials ordered the merchandise to be released and gave him a copy of the declaration with the release of the merchandise and gave the containers to LUIS ANIBAL CHAVERRA ARBOLEDA, who coordinated the departure of the trucks that were loaded with the crane, one per container. He also states that Ms. PAOLA KATHERINE ROMERO BENAVIDES was not there at the time the containers were reviewed.

PLEAS AND DEFENSES PRESENTED

GUSTAVO RAMIREZ BARREIRO, ESQ., counsel for Messrs. HERMINIO MARTINEZ MERCADO, HENRY HERNANDO RAMIREZ BAHAMON and CARMELO CORDOBA CAMPO; MARIANNA SALCEDO VELOZA, Esq., counsel for Mr. LUIS ANIBAL CHAVERRA ARBOLEDA; and RUBEN DARIO TAMARA MURCIA, Esq., counsel for Mr. YOVANNY HURTADO TORRES, presented their pleas and defenses within the times provided by law.

Mr. RAMIREZ BARREIRO asked, on behalf of his client, that the investigation of his client be terminated, asserting as the basis for his request that the arrival of the arsenal at the Zungo port was not established with certainty, since, according to counsel for the civil servants employed by

the DIAN, there were credible and well-founded doubts, since he considers it true that the arms entered illegally, but not the manner in which they arrived, or when or where. Given the absence of testimonial proof, serious indications, documents or expert opinions to accuse the DIAN employees, who in his view have violated no legal provision relating to the issuance of false or inaccurate government documents, preferential treatment by a civil servant, or fabrication, trafficking and carrying weapons and munitions the use of which is restricted to the armed forces. He states that the sworn accounts of the Administrator of the DIAN office in Turbo are contradictory and that an essential, definitive fact taken into account by the undersigned was the declaration of Mr. JOSÉ ANTONIO MUÑOZ, the crane operator at the Banadex depot, who stated that there were differences in the weight of certain containers in relation to others, a situation which, according to the petitioner, should have been reported to the DIAN officials. In addition, he states that the statements of Mr. ADUARDO OTERO, Administrator of the DIAN office in Turbo, were taken into account as to the violation of customs standards on the part of the employees under his supervision. He adds that on a second occasion, José Antonio Muñoz stated that he had never said that there was a difference in the weight of certain containers, and therefore the statement by the crane operator did not disprove the statements of his clients. In summary, counsel states that no credence should be given to the statements of Messrs. EDUARDO OTERO and JOSÉ ANTONIO MUÑOZ, because neither the first nor the second told the truth, [in support of which he] transcribes a large portion of the testimony of the Administrator of the DIAN office in Turbo, arguing that his clients acted in accordance with customs regulations and that there is no evidence that they committed the actions with which they are charged, stating that the weapons and munitions entered the company, but nowhere is it proved that they were in the containers reviewed by the DIAN employees. But he also states that the weapons could have arrived concealed in the plastic balls in the containers, "... such that it was impossible to notice them," relying once again on the theory of the "switch" whereby the containers were moved at some point from the location where the Otterloo anchored to the Banadex S.A. yards, since there is a great distance between those two points, and raises a series of issues aimed at raising doubts

as to the existence of the containers, how many arrived in Colombian territory, whether the containers transported by the motor boat arrived at Zungo, whether there is any authoritative evidence establishing that there were only 23 containers on the Otterloo, that there could have been twin containers, false floors where they could have been hidden, etc. Counsel argues that the DIAN officials recorded what they saw, and accordingly, they recorded in the inspection report that the merchandise inspected was consistent with the declaration and therefore they cannot be accused of issuing false documents. He concludes his arguments by stating that his clients are persons with no criminal backgrounds, worthy of respect and trust, and outstanding civil servants, and repeating his request that the investigation of his clients pursuant to these proceedings be terminated.

Marianna Salcedo Veloza also asks that the investigation of her client, Mr. LUIS ANIBAL CHAVERRA ARBOLEDA, be terminated on the ground that he has not committed the crime with which he is charged, as provided in article 366 of the Criminal Code, stating that it is established that her client was at the Banadex S.A. yards, but not as the representative of any company, as he stated in his declaration, adding that he was waiting for the containers to be loaded onto the tracks. She also refers to the statements by codefendants HERMINIO MARTINEZ MERCADO and YOVANNY HURTADO TORRES, who identified her client as the individual who attended the review of the containers along with ERASMO SALDARRIAGA, on behalf of the owners of the merchandise, to detract from their credibility, stating that those accounts are not supported by any documents in the record, and continues this time making a lengthy presentation on the Sociedades de Intermediación Aduanera (customs brokers), their roles, responsibilities, obligations, etc., also providing citations and quotations from customs and inspection laws, and finally, dedicates a paragraph to a discussion of the presumption of innocence and teaches us, in an ironic manner, that *coautoría impropia* [the responsibility of multiple persons who cooperate in a crime by committing different elements of the crime] does not exist, citing definitions from Spanish dictionaries, stating that we were wrong to use the term "impropio," calling the use of the term absurd, for its misuse to characterize "... that particular manner of engaging in punishable conduct." She concludes by citing article 6, which concerns the principle of legality in

the Criminal Code as well as the Criminal Procedure Code, citing due process "... and not accuse one person who acted in good faith, ..."

The defense lawyer of the accused YOVANNY HURTADO TORRES, after making a statement about the functions and procedures for which his client was responsible as manager of the Banadex S.A. yards, asks for termination of the investigation that is to be carried out in respect of his client as allegedly jointly liable for an offence under Article 366 of the Criminal Code, on the grounds that HURTADO TORRES, as manager, was not authorized to undertake inspections, open containers or examine goods contained therein, since those are functions of the DIAN officials and so he could hardly have known what was in the containers but he was, however, sometimes present at the time of the inspection, since he had to deal with other aspects of deposits. He transcribes rules relating to obligations of the DIAN, such as a section of Article 469 of the Customs Regulations, amended by Decree 2685 of 1990, which states:

"The only authority with competence to verify the lawfulness of the importation of goods introduced or circulated in national Customs territory will be the Department of National Taxes and Customs ..."

He concludes his arguments by asking for termination on the basis of absence of guilt.

RECITALS

Preliminary clarification

Before we start our study of the classification of the merits of the summary proceedings, we wish to note that this decision only relates to the following persons: LUIS ANIBAL CHAVERRA ARBOLEDA, YOVANNY HURTADO TORRES, HERMINIO MARTINEZ MERCADO, HENRY HERNANDO RAMIREZ BAHAMON, PAOLA KATHERINE BENAVIDES ROMERO and CARMELO CORDOBA CAMPO because, in respect of Messrs. ERASMO and

*125*

NELSON SALDARRIAGA CUARTAS, a date and time has been fixed at their request to carry out the procedure referred to in Article 40 of the Criminal Procedure Code.

We shall now study the classification to be given to the proceedings and we note that the rule contained in Article 397 of the Criminal Procedure Code states as follows:

Substantial requirements for a decision to charge. The National Prosecutor or his delegate will issue a decision to charge when the occurrence of the event has been shown and there is a confession, evidence that offers serious grounds for belief, irrefutable presumptions, documents, expert evidence or any other evidence that indicates that the accused is liable."

This office then determines whether those substantial requirements or prerequisites, as stated in the rule transcribed above, are met in the case in question, that is, whether the investigation proceedings contain evidence sufficient to allow a decision to charge to be made or whether, on the contrary, there is an absence of those elements and therefore it would be appropriate to terminate the summary proceedings in respect of HENRY HERNANDO RAMIREZ BAHAMON, HERMINIO MARTINEZ MERCADO and CARMELO CORDOBA CAMPO, who are involved in this investigation as allegedly jointly liable for offences under Arts. 286, 322 and 366 of the Criminal Code and with regard to LUIS ANIBAL CHAVERRA ARBOLEDA, YOVANNY HURTADO TORRES and PAOLA KATHERINE BENAVIDES ROMERO, who are allegedly guilty of the conduct described in Article 366 of the Criminal Code.

CONCERNING THE OCCURRENCE OF THE EVENT

The material or objective aspect of the criminal event is properly proven in the file by means of the evidence listed in the heading concerning this evidence. This material reveals that it is a certain fact that Inversiones Banoly S.A., represented in Turbo (Antioquia) by Mr. NELSON SALDARRIAGA CUARTAS, was the firm that was entrusted with carrying out the appropriate steps to bring into the national territory, by chartering the motor vessel Otterloo, three thousand

*126*

(3,000) AK-47 guns and five million (5,000,000) 5.62 caliber cartridges. These weapons were loaded onto the aforesaid motor vessel, which departed with 23 containers carrying plastic balls from the Port of Veracruz in Mexico and arrived at the Nicaraguan port of El Bluff, where the weapons and munitions in said quantities were put into 14 of the 23 containers. The vessel left on November 3, 2001 (page 98 c.c. 1.) and anchored on November 5, 2001 opposite the coasts of Uraba. The containers were discharged onto bongos, which carried them ashore, to the Banadex S.A. yards, and their departure from these yards to their final destination, the paramilitaries, was then ordered. These events have been proven by the Receipt List available at page 68 c.c. 4., by the photocopies of the deposits made to Bancolombia on the Banadex S.A. account, settling the sums relating to the container storage service (page 79 c.c. 4.) and by the orders to dispatch the containers from the Banadex S.A. depot (page 191 c.c. 1.).

Once the containers arrived ashore, they were physically inspected by officers of the DIAN attached to the Turbo (Antioquia) Office, HERMINIO MARTINEZ MERCADO, HENRY HERNANDO RAMIREZ BAHAMON and CARMELO CORDOBA CAMPO, in order to "confirm compliance with current Customs rules and monitoring of goods." They inspected 21 of the 23 containers and stated on the Customs Inspection Certificate that the inspected goods matched the declared goods when, in fact, 14 of the 23 containers held the weapons and munitions shipped in Nicaragua (page 94 et seq. c.c. 1.). These weapons are listed in the file (page 115 et seq. c.c. 3), sent by Interpol, Nicaragua to its authorized agent of the DAS [Departamento Administrativo de Seguridad – Administrative Security Department] in Colombia. 23 of the guns that arrived in that Central American country were found with the Fourth National Army Brigade in Medellin, when the Criminal Investigation Police Officers charged with this task carried out a Criminal Investigation Inspection in the Seized Weapons Depot in this military garrison (page 207 et seq. c.c. 5).

To return to the issue of the inspection carried out at the yards of Banadex S.A., Messrs. ERASMO DE

JESUS SALDARRIAGA CUARTAS and LUIS ANIBAL CHAVERRA ARBOLEDA were present at this and they are said to have been acting on behalf of the owners of the goods. CHAVERRA ARBOLEDA is said to have arranged the movement of 14 trucks each laden with a container, to be sent to the AUC [Auto Defensas Unidas de Colombia – paramilitary organization] in the Departments of Antioquia and Córdoba. This is proved by the statement of Mr. CARLOS MAURICIO USUGA, the driver of one of the vehicles on which the weapons were carried (page 147 c.c. 4), who states that he was hired along with other drivers to carry the containers that held balls, according to him, he was told by those who hired them and said that they agreed to a price of eight hundred thousand pesos for each container carried, that the weight of the cargo was approximately six (6) tons, the single container weighing one and a half tons and the cargo four and a half tons. He stated that they reached a place called Los Manguitos and around ten (10) more people appeared with short-range weapons and they made them get out of the vehicles and they took away the motors and left the drivers at a property, watched over by two armed men, from nine in the morning until eight at night, when the people with the trucks appeared, on that day, November 8, 2001.

With regard to the carriage of the containers in national territory, a statement was also taken from Mr. HELIODINO USUGA HERRERA, the driver of one of the vehicles that were carrying the containers (page 204 et seq. c.c. 5), who states that he was actually hired for the sum of eight hundred thousand pesos to take a container to the coast. The container was loaded onto his vehicle and he set off but, a kilometer from Apartado, the truck's transmission failed and so the trip was made by another vehicle.

These actions have been subjected to the usual examination and we can conclude that, from an objective point of view, the facts are proved to the extent required by the transcribed procedural rule, which mentions the substantial requirements for a decision to charge, since it is a certain fact that, on November 5, 2001, weapons from Nicaragua arrived in the Port of Zungo in Carepa. These weapons consisted of three thousand (3,000) AK-47 guns and five million (5,000,000) cartridges for them. The firm Inversiones Banoly Ltd., domiciled in Turbo (Antioquia),

had chartered the motor ship Otterloo, of Panamanian flag. She left the Port of Veracruz (Mexico) with 23 containers containing plastic balls. This vessel stopped at the Port of El Bluff in Nicaragua, where 14 of the 23 containers, containing plastic balls, were replaced with the same number of containers where the weapons were deposited. The documentation related not only to the plastic balls but to a supposed purchase made by the National Police of Panama from their counterpart in Nicaragua, possibly so that, if they were intercepted in international waters, they could show this documentation and thus avoid any problems.

When the motor vessel Otterloo reached Colombian territorial waters in Uraba, she anchored at a certain distance from the Port of Zungo, to deposit the 23 containers onto drums that took them to the Port of Zungo and, when they reached the Banadex S.A. yards, the DIAN officials, HERMINIO MARTINEZ MERCADO, HENRY HERNANDO RAMIREZ BAHAMON and CARMELO CORDOBA CAMPO, who were charged with "confirming compliance with current Customs rules and monitoring of goods," inspected 21 of the 23 containers and stated on the Customs Inspection Certificate that the inspected goods matched the declared goods.

## CONCERNING THE GUILT OF THE ACCUSED

With regard to the matter of the guilt of HERMINIO MARTINEZ MERCADO, HENRY HERNANDO RAMIREZ BAHAMON and CARMELO CORDOBA CAMPO in the events under examination, there are also very many pieces of evidence in the proceedings that lead this Delegate Prosecution Office to state the involvement of the accused in the punishable events under investigation, since there is serious evidence of guilt against these civil servants, such as their presence in the place where the containers holding the weapons and munitions were examined in the Banadex S.A. yards, the evidence of involvement, since they were civil servants of the DIAN entrusted with checking compliance with current Customs rules and

*129*

monitoring of the goods, as required of them in the Customs Procedural Order and the evidence of no grounds, since in their unsworn statements they have declared themselves to have been uninvolved in the criminal activities proved in the proceedings, because if, of the 23 containers that arrived from Central America, 14 contained the weapons and, if they examined 21 of the total, then it is impossible to convince the courts that the weapons were not in them.

In the same way, we find in the conduct of the accused evidence of their ability to offend since, as long-standing officials of the DIAN, they had the necessary intellectual capacity for the action undertaken, which required those who committed the offence to have sufficient intellectual powers to undertake these actions which led to with the unlawful introduction of the weapons from Central America.

With regard to the accused, CARMELO CORDOBA CAMPO, against whom it is proceeded in absentia, since he has remained in hiding during these proceedings, this conduct can well be taken into account as evidence of criminal behavior.

And the documentation on the file strengthens the matter of the guilt of the DIAN officials attached to the Turbo Office.

During their appearances in the proceedings, MARTINEZ MERCADO, RAMIREZ BAHAMON and CARMELO CORDOBA CAMPO in the same way insist that there could have been a "change-over" undertaken during the journey made by the bongos carrying the twenty (23) containers from the place where the Otterloo anchored to the Banadex S.A. yards. The time taken during this journey could have been used because of the considerable distance between the two points and this theory is also stated in a document submitted by the defense lawyers of the accused. But this office's response to this is that, if the accused have maintained that the goods that arrived on the motor vessel Otterloo on November 5, 2001, which were observed by them when the containers were subjected to inspection for purposes of nationalization, were plastic balls and not the weapons

21

then, what was the "change-over" that they say could have taken place during the journey of the containers on the bongos?

When they state in their unsworn statements that there was possibly a "change-over," this seems to be more of a tacit acceptance by the accused that what they found in the containers was the weapons, since it is understood that this "change-over" would consist of replacing the plastic balls with weapons and munitions, which is what was really carried on 14 of the 21 containers carried on the Otterloo.

The DIAN officials' method of conduct in having recorded on the Customs Inspection Certificate of November 8, 2001 that the inspected goods matched the declared goods is conduct involving an offence since, as civil servants belonging to the DIAN Turbo Office, in the exercise of their functions, they recorded a falsehood in that document that would be used in evidence, when they had a duty and obligation to adhere strictly to the truth concerning the contents of the containers. We therefore state that HERMINIO MARTINEZ MERCADO, HENRY HERNANDO RAMIREZ BAHAMON and CARMELO CORDOBA CAMPO have committed conduct that is contrary to the legal authority contained in Article 286 of the Criminal Code, which concerns ideological falsehood in a public document and it is punishable conduct, accepted by the accused, when they state, contrary to the truth of the events, that what was found in the containers matched the declaration contained in the importation and nationalization documents for the goods.

The same conclusion must be reached in relation to the conduct of the officials, who failed to comply with the requirements of the Customs Procedural Order of November 8, 2001, which required them to "confirm compliance with current Customs rules and monitoring of goods." They failed to comply with this mandate since the task entrusted to them was not carried out and they recorded in the Deed of Customs Inspection of the same date as the Procedural Order that the inspected goods matched those declared, which was untrue since, as we have said above, in 14 of the 23 containers, of which 21 were examined, the

weapons loaded in Nicaragua onto the Otterloo motor vessel were to be found, which allowed the unlawful introduction into national territory of the weapons for the paramilitaries in Córdoba and Antioquia.

Furthermore, the conduct of the DIAN officials is also contrary to the prohibition contained in Article 366 of the Criminal Code, since it resulted in the commencement of unlawful trafficking of weapons and munitions for the exclusive use of the Law Enforcement Forces and they formally and materially infringed the legally protected interest of the public security. With regard to the former conduct, it is sufficient to remember that, under Article 233 of the Constitution, the distribution and handling of weapons and munitions is a State monopoly and so no private individual may trade with them without the express authorization of the competent authority.

What is penalized is the undertaking of any action for which no express authorization has been given to the person and, if this is the case, it may well be considered, as the highest court of justice has stated in the past, that this is an offence of "mere conduct," in as much as it does not require the production of a specific result.

The response of the State is to restrain the individual where there is no evidence of a presumption that he has been given the right for the use for which the weapon was created because otherwise such an activity of itself implies an attack on the security and tranquility of society, especially if, as in this case, there was a large number of AK-47 guns and 5.62 caliber munitions for them, which came into the hands of paramilitary groups that have been sowing terror in our country, that is, the AUC. This is what one of its commanders, CARLOS CASTAÑO GIL, stated in a press interview which appeared in the El Tiempo newspaper and rejoiced over the introduction of the three thousand (3,000) guns and the five million (5,000,000) cartridges for them, which came from Nicaragua, saying: "This is the best goal that I have scored."

*132*

Viewed thus, the conduct of HERMINIO MARTINEZ MERCADO, HENRY HERNANDO RAMIREZ BAHAMON and CARMELO CORDOBA CAMPO, as stated above, is typical of the conduct described in rules 286, 322 and 366 of the Criminal Code since the file shows that, on November 8, 2001, the aforesaid civil servants permitted the introduction into the country of three thousand (3,000) AK-47 guns and the five million (5,000,000) cartridges for those guns.

Well now, the unlawful nature of the punishable conduct is clear from any viewpoint since, without any justification whatsoever, the accused acted against and damaged legally protected interests, which were the law of legal authority, social economic order and public security.

In relation to the issue of their guilt, which is regarded as consciously and willfully acting in a manner that can only be regarded with censure, there can be no dispute either. As we have seen, the accused admitted that they examined 21 of the 23 containers that arrived on the motor vessel Otterloo and also that they signed the Customs Inspection Certificate, although not that they found weapons or munitions inside these containers. But this statement is not supported in any way in the proceedings and this office considers that it is untrue. The oft-mentioned civil servants are clearly guilty, since there is not the least evidence to the contrary and thus have they been dealt with.

Therefore, it is appropriate for this office to issue a Decision to Charge against HERMINIO MARTINEZ MERCADO, HENRY HERNANDO RAMIREZ BAHAMON and CARMELO CORDOBA CAMPO, as materially and jointly liable for the offences referred to in Arts. 286, 322-2 and 366 of the Criminal Code which deal with ideological falsehood in a public document, favoritism by civil servants and the fabrication, trafficking and carrying of weapons and munitions, the use of which is restricted to the armed forces, in the same way and in the circumstances requiring maximum penalty described in Article 58 (10) of the Criminal Code.

*133*

Well now, the aim of this decision is to deal with the issue of classification of the merits of the summary proceedings in respect of LUIS ANIBAL CHAVERRA ARBOLEDA, PAOLA KATHERINE BENAVIDES ROMERO and YOVANNY HURTADO TORRES, who are accused in relation to the prohibition contained in Article 366 of the Criminal Code, which deals with the fabrication, trafficking and carrying of weapons and munitions, the use of which is restricted to the armed forces, so we shall now turn to this issue and state that, with regard to the first of the aforesaid, Mr. CHAVERRA ARBOLEDA, he was the person who went to the Banadex S.A. yards with ERASMO DE JESUS SALDARRIAGA CUARTAS on behalf of the owners of the goods so that, when the containers that arrived on the motor vessel Otterloo arrived, as shown in the photocopies of pages 49 and 50 of the Persons Entering the Stores Book of this company (pages 112 and 113 c.c. 3.), a fact corroborated by YOVANNY HURTADO, HERMINIO MARTINEZ and HENRY HERNANDO RAMIREZ and we should add that, on page 67 of c.c. 3, there is a document signed by Mr. LUIS GERMAN CUARTAS C., of the Legal Department of BANADEX S.A., which states that Mr. LUIS ANIBAL CHAVERRA ARBOLEDA was involved to a large extent in the activities to unlawfully introduce into the country the containers holding three thousand (3,000) guns and five million (5,000,000) cartridges for them, and he was, as he himself states, the person who arranged the carriage in trucks of the containers holding the weapons, from the Banadex S.A. yards to the final destination of the weapons, which was the paramilitary groups that operate in the Departments of Córdoba and Antioquia.

Although CHAVERRA ARBOLEDA wishes to give the impression that he was not involved in the events, using the story of having been contacted to deal with firms charged with goods importation and nationalization tasks by a man called RICARDO ARANGO, on the recommendation of GILDARDO HINCAPIE, his friend, he does not supply any addresses or contact details for these people and this is a story that this office simply does not believe.

With regard to the occurrence of the event, the reasons set out above in the heading dedicated to this requirement of Article 397 of the Criminal Procedure Code are admissible and allow us to state that this aspect of the

investigation proceedings have been properly proven in the proceedings, as stated therein.

Well now, with regard to the alleged guilt of Mr. CHAVERRA ARBOLEDA in relation to the activities against Public Security, that is, the breach of Article 366 of the Criminal Code, the evidence in the file has been considered and we find that there is serious evidence of guilt against the aforementioned accused, such as his presence on November 8, 2001 together with ERASMO SALDARRIAGA and the three DIAN officials in the place and at the time of inspection of the containers that held, apart from plastic balls, weapons and munitions in the quantities already stated. He was also present in these yards on the 9th of the month and year stated, in order to arrange the departure of the vehicles, loading the weapons destined for paramilitaries in Córdoba and Antioquia.

Evidence of involvement is also apparent from the proceedings since CHAVERRA ARBOLEDA was in the place, as we have said, and he was also coordinating the loading and departure of the 14 trucks that were carrying the same number of containers holding the weapons, which is evidence of his involvement in the punishable conduct with which he is charged.

The intellectual capacity to offend should be added to the above evidence since, as the accused himself has clearly stated, he worked for Banadex S.A. and so he had the intellectual ability to undertake the punishable activities that involve him in these proceedings and there is also his lack of justification since, as we have said above, the statement that he acted as he did on the recommendation that his friend GILDARDO HINCAPIE made to RICARDO ARANGO to contact him to carry out the relevant actions is clearly an untruthful statement.

An analysis of the evidence convinces us that LUIS ANIBAL CHAVERRA ARBOLEDA was guilty of joint involvement in the activities against Public Security and so he should be held on remand in these proceedings, in these circumstances where the maximum penalty applies, as

*135*

stated in Article 58(10) of the Criminal Code and so it is appropriate that this office should issue a Decision to Charge against him, as allegedly jointly guilty of an offence under Article 366 of the Criminal Code, in the circumstances of maximum penalty mentioned in Article 58(10) of the Criminal Code

Well now, as regards Mrs. PAOLA KATHERINE BENAVIDES ROMERO, her conduct in the investigation, the merits of which are classified by means of this decision, has been examined. She is connected to this investigation by means of an unsworn statement and she has been remanded in custody as allegedly guilty of an offence under Article 366 of the Criminal Code and this office is of the opinion that the investigation made of her should be terminated and the same decision should be made in respect of Mr. YOVANNY HURTADO TORRES, on the basis of the reasons set out below.

It is certainly true that Mrs. BENAVIDES ROMERO worked for a Customs Brokerage Company. She was responsible for dealing with the DIAN in matters relating to the importation and nationalization of the goods carried by the motor vessel Otterloo in 23 containers, which supposedly held balls and it was her duty to attend the inspection carried out on the containers but, because she was pregnant and close to giving birth, she did not attend that examination and the accused herself states this in her unsworn statement and this is also corroborated by the same DIAN officials who carried out the examination of the containers discharged from the motor vessel Otterloo on November 5, 2001.

Well now, the accused was not present when the containers said to contain the weapons and munitions were examined but that was not her function, since it is the function of the DIAN officials and, besides, she was not responsible for any other activities that might lead us to consider that she was involved in the offence against Public Security, as alleged against her, since, by means of the procedure carried out after the precautionary measure, there was no certainty as to the guilt of Mrs. BENAVIDES ROMERO as regards the punishable conduct and this

27

*136*

requirement must be taken into consideration when deciding whether to issue a decision to charge against an accused.

We note how her non-attendance at the examination of the containers did not have any harmful effects on the legally protected interest that would have led us to the conclusion that the accused was guilty.

By her omission, the accused did not carry out any risky activity which might suggest any attempt against legally protected interests and, although it is true that the file shows that the event did occur, the same is not the case as regards the guilt of the accused.

In order "for a conduct typical of the offence to be punishable, it is a requirement that the interest protected by the criminal law should have been harmed or actually endangered, without just cause," according to Article 9 of the Criminal Code

Furthermore, although it is true that Mrs. BENAVIDES ROMERO did not attend the yards of Banadex S.A. on the eighth (8) November 2001, because she was about to give birth, which occurred on the 20th of the same month and year, she did not in fact have a duty to do so because, as the employee of a private company, her duties were restricted to carrying out the procedures prior to the importation and nationalization of the goods.

As she states in her unsworn statement, this was not the first time that Mrs. BENAVIDES ROMERO did not attend the Customs inspection carried out by the DIAN. She states that there were several such occasions and so we believe that her conduct was not guilty and so it is appropriate to apply Article 39 of the Criminal Procedure Code, which takes this fact into account when considering termination of the investigation.

We therefore repeat that the investigation against Mrs. PAOLA KATHERINE BENAVIDES ROMERO carried out by this Prosecution Office will be terminated.

With regard to Mr. YOVANNY HURTADO TORRES, we note that his conduct is also free of

*137*

any guilt since, as Manager of the Banadex S.A. yards when the 23 containers from Nicaragua arrived, he only carried out his own particular duties, which were to receive the containers and arrange their departure from the Banadex S.A. yards once the goods nationalization process had been carried out by the DIAN officials. This accused, as he states in his unsworn statement and there is no evidence to suggest the contrary, was only able to witness the examination of eight or nine containers, since his duties as manager of the establishment did not permit him to be present when the DIAN officials were inspecting the containers.

As an employee of Banadex S.A., the duties of Mr. HURTADO TORRES did not include checking the containers to ascertain their content and so he could hardly have done so.

We note that the activities of Mr. HURTADO TORRES should be regarded as not characterizing this offence, since they did not come within the punishable conduct referred to in Article 366 of the Criminal Code, punishable conduct which was imputed to him and because of which he is involved in the investigation. This fact leads us to order that the investigation against him in these proceedings is to be terminated, under Article 38 of the Criminal Procedure Code

It should be noted that, after the precautionary measure imposed on Mr. HURTADO TORRES, no evidence whatsoever was added to the file that would have disproved his unsworn statement and so, as stated above, the investigation carried out against him as allegedly jointly guilty of an offence under Article 366 of the Criminal Code will be terminated and the precautionary measure against him is to be revoked.

## RESPONSE TO THE ARGUMENTS

We respond to the arguments of the defense counsel of the civil servants attached to the DIAN by stating that there can be no doubt whatsoever as to the manner in which the arms and ammunition were brought into the country in early November 2001, [this being] military materiel

in transit to the paramilitary groups operating in the Departments of Córdoba and Antioquia. That took place once the ship was anchored off the coast of the Gulf of Uraba on November 5, 2001. Twenty-three containers were unloaded into drums that were used to transport them to the grounds of Banadex S.A. at the Port of Zungo, 14 of which contained the arsenal and 9 of which contained plastic balls, as is known from the documentation added to the record, consisting of documents pertaining to agencies that engage in the transportation of merchandise from abroad, as well as intelligence reports from the OAS, in containers that, as is known, come sealed, until the members of the DIAN tasked with inspecting the same remove the seals.

While it is true that we have not found any expert reports within the evidentiary file, we nevertheless have documents, testimony, and clear circumstantial evidence that lead us to consider Messrs. HERMINIO MARTINEZ MERCADO, HENRY HERNANDO RAMIREZ BAHAMON and CARMELO CORDOBA CAMPO to be suspected accomplices liable for violating Arts. 286, 322 and 366 of the Criminal Code and therefore to charge them as we are doing by means of this resolution. That evidence is related to the paragraph concerning the bases of judgment attached to the file.

Now, for the sake of argument, if the depositions of Messrs. EDUARDO OTERO, Managing Director of the DIAN in Turbo and JOSE ANTONIO MUÑOZ, contain contradictions that detract from their credibility, there are other bases of judgment in the trial, such as clear circumstantial evidence of liability and documents referred to in this decision, that allow us to issue an INDICTMENT against the civil servants attached to the DIAN. Furthermore, the arms entered the country in 14 containers, and the arms were confirmed as being inside the containers, because otherwise, why were they being transported in 14 trucks? It would not be the plastic balls that ended up in the hands of the paramilitary agents of CARLOS CASTAÑO, who, furthermore, in an interview with the newspaper El Tiempo, boasted about having scored a coup by bringing the arsenal into the country. Now, if it is true, as counsel for the defense says, that the arms and ammunition blended in with the plastic balls, we do not believe it because, as clearly affirmed in the record, the DIAN officers who conducted the inspection of the containers searched all the way to the bottom of the same and inspected 21

in addition to the 23. Thus, we rule out that possibility, and if this concerns the "switch" that the accused and the defense counsel have been wielding up until now, we have already stated that, if this took place, the members of the DIAN would be admitting that what arrived and was inspected by them consisted of containers holding the three thousand (3,000) guns and the five million (5,000,000) cartridges for the same.

The fact is that counsel for the defense makes speculations that are groundless and therefore lack any evidentiary support whatsoever that would detract from the charges made against his clients. Through these speculations, defense counsel, at this stage in the proceedings, would have us determine whether the motor ship has false floors that were used for purposes of transporting the arsenal, as well as whether there were doubles of those containers, etc. on the vessel.

What is clear in this case is that the accused parties who were in charge of inspecting the containers committed a falsehood on the Inspection Record made of the same when they stated on that document that what they had inspected was consistent with the declaration given.

In response to the defense counsel of the accused CHAVERRA ARBOLEDA, we shall state that our opinion that the latter committed the crime defined in Article 366 of the Criminal Code is based on: (a) the fact that he was present at the inspection as a representative of the owner of the contents of the 14 containers, at the coordination the owner carried out so that the containers would be loaded onto the same number of trucks, as admitted by both the same accused individual and by his defense counsel, in order to be taken to their final destination, the paramilitary agents, (b) the message signed by an officer of Banadex S.A., who tells us that LUIS ANIBAL CHAVERRA ARBOLEDA was making arrangements for the importation of the plastic balls, which ended up being a front for the actual situation, which was the importation of arsenal into the country, and (c) the statements made by co-defendants HERMINIO MARTINEZ MERCADO and YOVANNY HURTADO TORRES, whom ARBOLEDA assisted with the inspection at the yards of Banadex S.A. on behalf of the owners of the merchandise, these circumstances having been corroborated by the photocopies of the log used for recording entries to the yards of Banadex S.A., for the days of November 8 and 9, 2001.

Nevertheless, the transcriptions of customs laws regarding the definition of Customs Intermediary Entities (SIAs) constitute regulations that reinforce our position because they are consistent with our submissions to the effect that the DIAN officials failed to observe the provisions regulating the entry of merchandise into the country. Likewise, [there are] those regulations concerning SIAs since we know the duties of the party that represented the party to which NELSON SALDARRIAGA granted power to made arrangements with the DIAN for the importation and nationalization of the plastic balls that turned out to be the front.

Moreover, it is important to note that the presumption of innocence regarding Mr. CHAVERRA ARBOLEDA began to disappear when he opted to arrange the importation and nationalization of the plastic balls, the sole purpose of which was the illegal importation into this country of the arsenal originating in Nicaragua. Furthermore, it is most surprising to us that Ms. SALCEDO VELOZA is unfamiliar with the phenomenon of conspiracy to commit a crime, which arises in cases in which several persons undertake a criminal activity, knowingly and willingly dividing the work for purposes of achieving a characteristic result. Since all of the participants have the status of perpetrators, their conduct, taken in isolation, does not fall directly within the definition of the crime because all of the participants are united in the criminal design and act knowingly and willingly for purposes of achieving the result mutually sought or at least assumed to be likely.

Now, it is important that we explain to the defense counsel of the accused CHAVERRA ARBOLEDA that the meanings contained in regular dictionaries, whether of the Spanish language or of the Royal Academy, are one thing, and those contained in legal dictionaries [are another] because they differ in terms of their semantics. Therefore, it is advisable to consult the latter when entering into this sort of controversy.

Finally, the undersigned does not believe he has violated either the principle of legality adduced as proof by the complainant or the due process of the defendant she represents. However, as

*141*

stated previously, there is clear circumstantial evidence, as indicated earlier, that leads us to issue an indictment against the same, as a presumed accomplice liable for violating Article 366 of the Criminal Code, under the aggravating circumstances contained in section 10 of Article 58 of the Criminal Code.

With respect to the arguments presented at trial by Mr. TAMARA MURCIA with a view to having the Court terminate the investigation that has been conducted against his client, YOVANNY HURTADO TORRES, as a suspected accomplice in violating Article 366 of the Criminal Code, as noted in the body of this resolution, we have decided to proceed as requested by his defense counsel. Therefore, we shall refrain from engaging in lengthy elaborations that would agree with the petition his counsel deemed fit to make.

Therefore, the undersigned Public Prosecutor before the Penal Courts of the Circuit of Bogotá and Cundinamarca

RESOLVES as follows:

1. To ISSUE an indictment against Messrs. HERMINIO MARTINEZ MERCADO, HENRY HERNANDO RAMIREZ BAHAMON and CARMELO CORDOBA CAMPO, previously identified, as suspected accomplices liable for violating Arts. 286, 322 and 366 of the Criminal Code, through a series of related crimes, under the aggravating circumstances prescribed in section 10 of Article 58 of the Criminal Code, in accordance with the statements made in the grounds for this resolution.

2. To ISSUE an indictment against Mr. LUIS ANIBAL CHAVERRA ARBOLEDA, previously identified, as a suspected accomplice liable for violating Article 366 of the Criminal Code, under the aggravating circumstances provided in section 10 of Article 58 of the Criminal Code, in accordance with the statements made in the grounds for this resolution.

*142*

3. To TERMINATE the investigation being conducted against PAOLA KATHERINE BENAVIDES ROMERO and YOVANNY HURTADO TORRES regarding the crime referred to in Article 366 of the Criminal Code based on the grounds set forth in this decision.

4. The pre-trial detention order against the aforementioned accused individuals is REVOKED, and it is hereby ordered that they be SET FREE and that any official letters appropriate for this purpose be issued.

5. To REMAND the file containing this order to the Criminal Court Judge of the Specialized Circuit – Division [sic] – of Apartadó, Antioquia, in order to continue the trial phase and to petition the Attorney General of the Nation to appoint the appropriate official to conduct the aforementioned phase.

6. The necessary evidence shall be verified in order to continue the investigation regarding Messrs. DARIO ENRIQUE VELEZ TRUJILLO and JESUS FERNANDO ITURRIOS MACIEL.

[It is resolved that] the provisions of Article 364 of the Criminal Procedure Code BE APPLIED.

LET IT BE KNOWN; IT IS SO ORDERED.
[signed]
HERNAN DAVID QUIÑONES PABÓN
Specialized Prosecuting Attorney
Filing 59,516.

**FISCALÍA GENERAL DE LA NACIÓN**
**FISCALÍA DELEGADA ANTE LOS JUZGADOS**
**PENALES DEL CIRCUITO ESPECIALIZADOS**
Unidad Nacional contra el Terrorismo
Despacho 18

109

Rad. 59.516.

Bogotá D. C., julio veintitrés de dos mil cuatro.

ASUNTO A DECIDIR

Calificar el mérito de la averiguación que se adelantara por esta Fiscalía Delegada en contra de los señores HENRY HERNANDO RAMÍREZ BAHAMÓN, HERMINIO MARTÍNEZ MERCADO, CARMELO CÓDOBA CAMPO, PAOLA KATHERINE ROMERO BENAVIDES, YOVANNY HURTADO TORRES y LUIS ANÍBAL CHAVERRA ARBOLEDA, quienes fueron vinculados a la instructiva, mediante injurada, como presuntos coautores de los delitos contenidos en los arts. 286, 322, modificado por el art. 73 de la Ley 788 de 2002 y 366 del C.P., que tratan de la Falsedad ideológica en documento público, Fabricación, tráfico y porte de armas y municiones de uso privativo de las fuerzas armadas y Favorecimiento por servidor público, los tres primeramente nombrados, mientras que los tres últimos por el punible a que hace referencia el art. 366 de la misma obra, una vez clausurado el ciclo instructivo en estas diligencias y fenecidos los términos que para presentar alegatos concede la ley.

SINOPSIS FÁCTICA

A las argumentaciones del señor defensor de los servidores públicos adscritos a la DIAN, respondemos manifestando que no cabe duda alguna sobre la forma como fueron introducidas al país las armas y municiones aquel comienzo de noviembre de 2001, material bélico con destino a los grupos paramilitares que operan en los Departamentos de Córdoba y Antioquia. Ello ocurrió na vez fondeara el barco Otterloo frente a las costas del Urabá el 5 de noviembre de 2001 y se descargaran 23 receptáculos en bongos que los trasladaron hasta los patios de Banadex S. A., en el Puerto de

nicaraguense, más exactamente Puerto El Rama, donde el contenido de catorce (14) de los veintitrés (23) receptáculos (pelotas plásticas) fue cambiado por las tres mil (3.000) armas (fusiles AK 47) y cinco millones (5´000.000) de municiones calibre 5.62 para las mismos, arsenal que contó con la documentación no solo relativa a pelotas plásticas compradas en Méjico, sino a una supuesta compra de armas a la Policía de Nicaragua por parte de su homóloga de Panamá, esto último, para eludir cualquier inconveniente en caso de interceptaciones en aguas internacionales.

Llegados los veintitrés (23) contenedores al Urabá en la motonave Otterloo, se depositaron en unos bongos que los trasladaron a tierra, a los patios de la firma Banadex S. A., en Puerto Zungo (Carepa), sitio este donde por parte de servidores de la DIAN Delegada en Turbo, comisionados para el efecto, señores HENRY HERNANDO RAMÍREZ BAHAMÓN, HERMINIO MARTÍNEZ MERCADO y CARMELO CÓRDOBA CAMPO, se llevó a cabo la tarea de inspeccionar los contenedores a fin de "Verificar el cumplimiento de las normas aduaneras vigentes y Seguimiento Mercancías", quienes una vez llevada a cabo la tarea consignaron en el documento Auto y Acta de Inspección de noviembre 8 de 2001 (fl. 192 c. c. 4.), que "La mercancía inspeccionada, corresponde con lo declarado."

Pero además de los servidores de la DIAN, estuvieron en los patios de Banadex S. A., como así lo señalan los inculpados en sus versiones sin juramento y aparece en la documentación correspondiente, el señor YOVANNY HURTADO TORRES, en representación de Banadex S. A., LUIS ANÍBAL CHAVERRA ARBOLEDA y ERASMO DE JESÚS SALDARRIAGA CUARTAS, en representación de los dueños de la mercancía (fl. 112 y ss. c. c.3), existiendo documento en la cual se hace constar que CHAVERRA ARBOLEDA estuvo gestionando ante Banadex S. A. lo concerniente a la importación a nombre de NELSON SALDARRIAGA CUARTAS Representante Legal de Banadex S. A. y fue la persona que coordinó la salida del arsenal en catorce (14) camiones que tenía dispuestos para el efecto los que llegaron a su destino final, los grupos paramilitares que operan en los Departamentos de Antioquia y Córdoba (fl. 54 y ss. c. c. 4).

## FILIACION DE LOS INCULPADOS

**HENRY HERNANDO RAMÍREZ BAHAMÓN, identificado con cédula de ciudadanía No. 12.128.309, expedida en Neiva (Huila), nacido en Garzón (Huila) el 3 de enero de 1.965, con 38 años de edad para cuando fue indagado, hijo de HERNANDO RAMÍREZ y ANA RITA BAHAMÓN, vive en unión libre con FANY GUEVARA RODRÍGUEZ, con quien tiene un hijo de tres años de nombre HENRY ALEJANDRO, estudios universitarios, egresado de facultad de derecho de Funiuraba-Incca, servidor público como Técnico en Ingresos Públicos de la DIAN en Turbo (Ant.), donde reside en la calle 102 No. 15-110.**

**HERMINIO MARTÍNEZ MERCADO, identificado con cédula de ciudadanía No. 82.330.333 expedida en Acandí (Choco), donde nació el 10 de diciembre de 1.965, con 37 años de edad para cuando fue indagado, hijo de HERMINOIO MARTÍNEZ y CATALINA MERCADO, de estado civil, casado con MARITZA SAAVEDRA, con quien tiene tres hijas, de nombres TAMMY SHIRLEY de 14 años de edad, CAROLINA de 9 años y ALEJANDRA CATALINA, de 14, 9 y 3 años en su orden, estudios universitarios en Administración de Empresas egresado de la UNAD, servidor público como Auxiliar III 1208 de la DIAN en Turbo (Ant.), donde reside en la calle 106 No. 11-16.**

**CARMELO CORDOBA CAMPO, quien se identifica con cédula de ciudadanía No. 8.427.057 expedida en Turbo (Ant.), donde nació el 5 de noviembre de 1957, con 46 años de edad para cuando fue indagado, hijo de ALEJANDRO CÓRDOBA e ISABEL CAMPO, vive en unión libre con LUZ MARINA TORRES, con quien tiene cinco (5) hijos de nombres CESAR ROBERTO de 22 años, SIRLEY de 24, NOHORA de 18, LUIS ALEJANDR de 20 y OSCAR de 17, de profesión Contador Público, labora para la DIAN de Turbo (Ant.), donde reside en la calle 97 No. 16-47.**

**PAOLA KATHERINE ROMERO BENAVIDES, identificada con cédula de ciudadanía No. 43.751.469, expedida en Envigado (Ant.), nacida en Turbo (Ant.) el 20 de julio de 1976, con 27 aos para cuando fue indagada, hija de MANUEL y RAQUEL, vive en unión libre con NESTOR AUGUSTO MEZA, con quien tiene una hija de 20 meses**

de edad de nombre MANUELA, Técnologa en Administración de Negocios, labora como Secretaria de Depósito Público Inversiones Arizana, residente en la carrera 13 No. 102-13 en Turbo (Ant.).

LUIS ANÍBAL CHAVERRA ARBOLEDA, cedulado bajo el numero 71.934.588 expedida en Apartadó (Ant.), nacido en Yati (Ant.) el 20 de octubre de 1963, con 39 años de edad para cuando fue indagado, hijo de VÍCTOR y VIRGELINA (fallecida), de estado civil, casado con MARÍA IDALÍ CANO GÓMEZ, con quien tiene dos hijos, ALEJANDRO y SEBASTIÁN, de 12 años y 6 meses respectivamente, además una hijastra de nombre EDITH YOLIMA ARIZA CANO de 22 años de edad, de ocupación comerciante, grado de instrucción bachiller, residente en Apartadó (Ant.) en el Barrio manzanares, teléfono 8283074.

YOVANNY HURTADO TORRES, identificado con cédula de ciudadanía No. 71.947.726 expedida en Apartadó (Ant.), donde nació el 16 de diciembre de 1977, con 25 años de edad para cuando fue indagado, hijo de FABIO e ISABEL, de estado civil soltero, de ocupación empleado en Banadex S. A., como Auxiliar Operativo, grado de instrucción séptimo semestre de Tecnología Financiera y Contable, residente en Churidó, Corregimiento de Apartadó (Ant.).

## PRUEBAS ALLEGADAS A LA ACTUACIÓN

1.- Al plenario se llegaron plúrimos elementos de juicio conformados por informes de inteligencia, por documentos que demuestran las gestiones adelantadas por una agencia privada guatemalteca dedicada a compra-venta de armas y municiones (GIR S. A., fl. 16 y ss. c. c. 4), informes de organismo regional como la OEA, así como con el Informe de Fletamento y Arrendamiento de Naves de octubre 30 de 2001 (fl. 52 c. o 1), por el que sabemos que la motonave Otterloo fue fletada por la firma Inversiones Banoly Ltda. (fl. 49 ib.), de cuya existencia y representación legal se da cuenta a fl. 35 c. o 3, para cargar veintitrés (23) receptáculos con pelotas plásticas en el Puerto de Veracruz (Méjico), saliendo con destino Colombia, más exactamente Turbo (Ant.), rumbo que se cambió al atracar la motonave en el Puerto El Rama en Nicaragua (fl. 153 y ss. ib.), con el pretexto de hacerle una reparación.

5

113

2.- De igual manera se cuenta en lo actuado con la orden de zarpe de la embarcación con destino Turbo, Aviso de Arribo, Aviso de Llegada del Medio de Transporte, Acta de Visita a la embarcación por la Capitanía de Puerto de Turbo, Acta de Recepción de Buques, Factura de Compra de las Pelotas Plásticas, Documento B/L, Manifiesto de Carga (fl. 53 y ss. ib.).

3.- En cuanto a la motonave, como se señalara salió del Puerto de Veracruz (Méjico), con veintitrés (23) receptáculos conteniendo pelotas plásticas, tocó El Rama, puerto nicaragüense, donde se sometió a reparación, oportunidad para embarcar el arsenal conformado por tres mil (3000) fusiles AK47 y cinco millones (5′000.000) de cartuchos calibre 5.62 mm. para los mismos.

4.- En lo relativo a gestiones propias adelantadas por las autoridades aduaneras colombianas relacionadas con la llegada de la motonave Otterloo a Colombia, se cuenta en el paginario con el Auto Comisorio Aduanero de noviembre 8 de 2001 (fl. 94 ib.), mediante el cual se comisiona a los funcionarios de la DIAN HENRY HERNANDO RAMÍREZ BAHAMÓN y a CARMELO CÓRDOBA CAMPO, para "Verificar el cumplimiento de las normas aduaneras vigentes y Seguimiento de Mercancías", de igual manera se cuenta en la actuación con el Acta de Inspección Aduanera de noviembre 8 de 2001 (fls. 95 y 96 ib.), signada por los funcionarios CARMELO CÓRDOBA y HENRY HERNANDO RAMÍREZ BAHAMÓN, como servidores de la DIAN y por YOVANNY HURTADO TORRES en representación de Banadex S. A., diligencia esta a la que también asistió el señor HERMINIO MARTÍNEZ MERCADO, igualmente funcionario de la DIAN, documento este en que se hace constar que la mercancía inspeccionada corresponde con lo declarado.

5.- A folio 100 ib., milita el documento Declaración de Importación Simplificada que firma HERMINIO MARTÍNEZ MERCADO y la documentación que acredita que la motonave Otterloo estuvo fondeada en El Bluff, puerto nicaragüense (fl. 153 y ss. ib.), el Informe de Inteligencia, en el cual se hace un pormenorizado recuento de las gestiones para la compra de las armas a Nicaragua por parte de la firma GIR S. A., la salida de la motonave desde Veracruz (Méjico), la llegada al puerto de El Bluff (Nicaragua),

6.

164

hasta el desembarco en puerto colombiano y salida de este en camiones hacia los departamentos de Córdoba y Antioquia.

6.- De igual manera, milita en la foliatura informe originario de la Oficina de Interpol del DAS (fl. 3 y ss. c. c. 3), anexando la relación de fusiles, con su serie y número de cajas en que fueron empacados, enviada por Interpol Nicaragua, relación esta, de igual manera contenida en un diskette.

7.- Practicada Inspección Judicial en el Depósito de Armas Decomisadas de la Cuarta Brigada del Ejército Nacional con sede en Medellín por parte de funcionarios del DAS comisionados para el efecto (fl. 199 y ss. c. c. 3), se hallaron veintitrés (23) fusiles en esas dependencias castrenses, cuyo serial corresponde con los salidos de Nicaragua y a cuya relación se hizo mención en antelación.

8.- Se allegaron fotografías que recogen la parte del Golfo de Urabá donde fondean las embarcaciones y desde donde desembarcan las mercancías cargandolas a bongos que se deslizan hasta tocar el Puerto de Zungo, en este evento. También milita un mapa de la zona mencionada (fl. 99 y ss. c. c. 8).

9.- A solicitud por nuestra parte de Asistencia Judicial Internacional a las autoridades de la República de Guatemala en relación con la firma GIR S-. A., para lo cual se libró Carta Rogatoria, se recibieron los elementos de juicio que obran a folio 166 y ss. c. c. 8.

10.- Se escuchó en declaración juramentada al señor JOSÉ ANTONIO MUÑOZ CARDOZO, operador de la grúa en los patios de Banadex S. A. (fl. 210 y ss. c. c. 4), quien afirma haber notado algo anormal en el procedimiento de descargue de los contenedores, ya que como lo señala, "... todo llega a zona aduanera y de la plana nunca se descarga directamente a los camiones y este caso se hizo...", añadiendo que "..., los que se encontraban en la plana los descarguéa los camiones directamente, ..." y que pudo notar que los primeros contenedores que levantó con la grúa pesaban entre 18 y 22 toneladas aproximadamente, mientras que los demás, entre 6 y 9 toneladas.

**11.- Documentos allegados por la defensa técnica de los señores MARTÍNEZ MERCADO, RAMÍREZ BAHAMÓN y CÓRDOBA CAMPO (fl. 213 y ss. c. c.8.), que se puntualizan a continuación: Instrucción Administrativa Aduanera 0005, originaria de la Unidad Administrativa Especial, que como su título lo indica, su objetivo fue llevar instrucción a los funcionarios adscritos a las diferentes dependencias que tienen que ver con Operativos de carácter Aduanero, operativos estos que "Son todas las acciones encaminadas a prevenir, controlar y contrarrestar de manera efectiva, el ingreso de merancías y el egreso y/o movimiento de mercancías nacionales con restricciones aduaneras en el país (sin el cumplimiento de las exigencias, requisitos y condiciones establecidos por las normas aduaneras.)" (Subrayas fuera de texto). Otro documento allegado lo es la Orden Administrativa 005 de junio 7 de 2002, "Por la cual se fijan procedimientos tendientes a reforzar los controles aduaneros para prevenir el ingreso de mercancías de prohibida o restringida importación por los lugares habilitados." De igual manera se observa otro Instructivo cuyo número no es legible, pero de fecha 23 de enero de 2002, originario de la Administración de la DIAN Delegada de Turbo, que señala las obligaciones aduaneras a cumplirse por parte de funcionarios de la DIAN relacionadas con el ingreso de mercancías de procedencia extranjera por la zona de Urabá, vía marítima. Circular No. 8341001-0001 de abril 16 de 2002, expedida por la Adminstración Delegada de Turbo, que tiene que ver con el Control a descargue de mercancías. El Memorando No. 8341001-001 de abril 9 de 2001, también referente a Control descargue de mercancías, también originario de la misma delegada.    Fue escuchado en declaración jurada el señor EDUARDO ANTONIO OTERO ERAZO, quien para la época de los hechos fungía como Administrador de Aduanas Delegada de Turbo (Ant.), quien entre otras cosas hace manifestación en relación con las distancias existentes entre el lugar donde fondean los barcos en el Urabá y el Puerto de Zungo (fl. 201 y ss. c. c. 8).**

## CALIFICACIÓN JURÍDICA PROVISIONAL

**Los comportamientos presuntamente punibles atribuidos a los señores HERMINIO MARTÍNEZ MERCADO, HENRY HERNANDO RAMÍREZ BAHAMÓN y CARMELO CÓRDOBA**

CAMPO, se hallan descritos de manera abstracta en el Estatuto Represivo, así:

**1.- Libro Segundo, Título IX, Capítulo Tercero, art. 286, que es del siguiente tenor:**

"Falsedad ideológica en documento público. El servidor público que en ejercicio de sus funciones, al extender documento público que pueda servir de prueba, consigne una falsedad o calle total o parcialmente la verdad, incurrirá en prisión de cuatro (4) a ocho (8) años e inhabilitación para el ejercicio de derechos y funciones públicas de cinco (5) a seis (6) años."

**2.- Libro Segundo, Título X, Capítulo Cuarto, art. 322, modificado por el art. 73 de la Ley 788 de 2002, que a la letra dice:**

"Favorecimiento por servidor público. El servidor público que colabore, participe, transporte, distribuya, enajene o de cualquier forma facilite la sustracción, ocultamiento o disimulo de mercancías del control de la autoridades aduaneras, o la introducción de las mismas por lugares no habilitados, u omita los controles legales o reglamentarios propios de su cargo para lograr los mismos fines, cuando el valor de la mercancía involucrada sea inferior a cincuenta (50) salarios mínimos legales mensuales vigentes, incurrirá en multa de trescientos (300) a mil quinientos (1500) salarios mínimos legales mensuales vigentes, sin que en ningún caso sea inferior al 200% del valor aduanero de los bienes involucrados e inhabilitación para el ejercicio de derechos y funciones públicas de tres (3) a cinco (5) años.

"Si la conducta descrita en el inciso anterior recae sobre mercancías cuyo valor supere los cincuenta (50) salarios mínimos legales mensuales vigentes, se impondrá una pena de prisión de cinco (5) a ocho (8) años, multa de mil quinientos (1500) a cincuenta mil (50.000) salarios mínimos legales mensuales vigentes , sin que en ningún caso sea inferior al doscientos por ciento (200%) del valor aduanero de los bienes involucrados e inhabilitación para el ejercicio de derechos y funciones públicas de cinco (5) a ocho (8) años.

"El monto de la multa no podrá superar el máximo de la pena de multa establecida en este código."

3.- Libro Segundo, Título XII capítulo Segundo, art. 366, que señala:

"Fabricación, tráfico y porte de armas y municiones de uso privativo de las fuerzas armadas. El que sin permiso de autoridad competente importe, trafique, fabrique, repare, almacene, conserve, adquiera, suministre o porte armas o municiones de uso privativo de las fuerzas armadas, incurrirá en prisión de tres (3) a diez (10) años.

..."

Esos comportamientos se asumieron por parte de los servidores de la DIAN en la modalidad concursal heterogénea y en las circunstancias de mayor punibilidad a que hace mención el numeral 10 del art. 58 del C.P.

DE LAS INJURADAS

HENRY HERNANDO RAMÍREZ BAHAMÓN, señala haber sido comisionado junto con HERMINIO MARTÍNEZ MERCADO y CARMELO CÓRDOBA CAMPO, para llevar a cabo el 8 de noviembre de 2001 inspección a mercancías llegadas a puerto en la motonave Otterloo, las cuales se encontraban en los patios de Banadex, coordinando con el señor YOVANNY HURTADO TORRES, encargado de los patios de esa empresa la realización del proceso de inspección para determinar que la mercancía contenida en los veintitrés (23) receptáculos correspondiera con la descrita en la declaración de importación para así entrar a nacionalizarla. Dice que llegado el momento de la inspección se revisaron por él y sus dos compañeros de la DIAN veintiún (21) contenedores de los veintitrés (23), afirmando que lo que observó fue pelotas de plástico y que no tiene conocimiento que en los contenedores se transportara mercancía diferente a eso y que su función "...dentro del trámite de nacionalización de la mercancía fue solamente la de inspeccionar la carga descrita en la declaración de importación y no otra, de haber observado algo inusual o haber sido alertado de lago igualmente inusual o ilegal, hubiese procedido de conformidad con las normas aduaneras." Señala que desde cuando la motonave se fondeó frente al puerto, hasta el momento de la inspección, transcurrieron tres (3)

días aproximadamente y la distancia entre esos dos sitios es bastante larga.

HERMINIO MARTÍNEZ MERCADO, rinde su versión sin juramento en términos muy similares a los expuestos por el anterior inculpado, ya que manifiesta haber practicado junto MARTÍNEZ MERCADO y CÓRDOBA CAMPO inspección a veintiun (21) contenedores de los veintitrés (23) llegados en la motonave Otterloo y no haber visto en ninguno de tales receptáculos armas o municiones, ni siquiera mercancías diferentes a estas a pelotas plásticas, agregando que también estuvieron en la inspección los señores ERASMO SALDARRIAGA a quien señala como encargado de la mercancía y LUIS ANÍBAL CHAVERRA, a más del señor YOVANNY HURTADO encargado de los patios de Banadex. Señala haber sido quien ordenó el levante de la mercancía, esto es, ordenó su salida de los patios una vez se practicó la inspección y que no se revisó la totalidad de los contenedores, "...primero porque se había revisado más del 90% de una mercancía homogénea y segundo porque me tocaba devolverme hasta Turbo a autorizar otro levante de mercancía." y que es costumbre no revisar la totalidad de la mercancía. Agrega que el señor HURTADO TORRES, estuvo en la inspección por momentos, que también estuvieron presentes en la inspección ERASMO SALDARRIAGA y LUIS ANÍBAL CHAVERRA, que PAOLA KTHERINE BENAVIDES no asistió por encontrarse próxima a tener bebé, habiendo llevado el acta para que esta la firmara y que HENRY HERNANDO RAMÍREZ BAHAMÓN y CARMELO CÓRDOBA CAMPO le hicieron seguimiento a la mercancía, pues se trataba de motonave que arribaba por primera vez al puerto. También manifiesta que desde el lugar donde se fondeó la motonave hasta los patios de Banadex los contenedores se transportaron en bongos, "... donde en su recorrido ha podido pasar algo diferente a desembarcarlos en Banadex, ...", manifestando que del sitio donde se fondeó la motonave al puerto hay una gran distancia y que además la revisión se llevó a cabo tres días después del arribo del barco.

CARMELO CÓRDOBA CAMPO, inicia su versión sin juramento manifestando, al igual que los demás servidores de la DIAN, que la revisión de los contenedores se practicó tres días después del arribo del buque, señalando de igual manera la gran distancia existente

entre el sitio donde quedó la motonave y los patios de Banadex y que era humanamente imposible llevar a cabo la revisión de la totalidad de los contenedores. Añade que en el momento y antes de ocurrir los hechos que se investigaron, él, como sus compañeros de la DIAN han estado en malas condiciones económicas y que al haber revisado veintiuno (21) de los veintitrés (23) contenedores no observaron armas ni municiones, nada diferente a pelotas plásticas, agregando creer que la señora PAOLA KTHERINE BENAVIDES no asistió a dicha diligencia, así como haber firmado los documentos Acta de Inspección Aduanera y Auto Comisorio Aduanero, al asistir a las labores de revisión de los contenedores, que su actuación fue de acuerdo a las normas aduaneras y que cuando se hace una revisión como la practicada por él y sus compañeros de la DIAN, se lleva a cabo una confrontación entre lo consignado en los documentos y lo que se observa y se palpa.

PAOLA KATHERINE ROMERO BENAVIDES, acepta haber sido contratada para adelantado la tramitación correspondiente para la importación y nacionalización de la mercancía que proveniente de Veracruz Méjico en 23 contenedores, presuntamente pelotas plásticas, pero que por su estado de gestación (la inspección se efectuó el 8 de noviembre de 2001 y ella dio a luz el 20 del mismo mes y año), no asistió a los patios de Banadex S. A. para cuando se llevó a cabo la inspección a los contenedores por parte de los funcionarios de la DIAN, circunstancia es corroborada por los señores HERMINIO MARTÍNEZ MERCADO y HENRY HERNANDO RAMÍREZ BAHAMÓN, que practicaron dicha diligencia, así como por YOVANNY HURTADO TORRES encargado de los patios de Banadex S. A. Agrega la inculpada, que además de los miembros de la DIAN, asistieron a los patios de Bandex para cuando se llevó a cabo la diligencia de inspección a los receptáculos, el representante de Banadex S. A.y ERASMO de JESÚS SALDARRIAGA CUARTAS, señalando que la asistencia de este último le pareció normal, "... siendo el hermano del representante de Inversiones Banoly." Añade que por el hecho de haber firmado el acta en que aparece como si hubiera asistido a los patios de Banadex S. A., pensó que podría traerle alguna clase problemas, pero que esa no fue la primera vez que no asistió a las revisiones y le llevaron el acta para que la firmara, aunque en esta oportunidad no asistió por encontrarse indispuesta por la

proximidad del parto. Respecto de la importación de balones por parte de Inversiones Banoly Ltda., dice que le pareció raro, ya que no era normal que dicha firma trajera esa clase de mercancía al país, pues lo que importaba eran electrodomésticos, vajillas y sombrillas. Señala que al señor NELSON SALADARRIAGA CUARTAS, Representante Legal de Inversiones Banoly Ltda., lo vino a conocer cuando los capturaron, ya que los trámites de importación por parte de Banoly los hacía con CARLOS MAZO, quien se encargaba de llevar los documentos.

LUIS ANÍBAL CHAVERRA ARBOLEDA, inicia su versión manifestando que por solicitud de un señor de nombre RICARDO ARANGO, quien le manifestó venir recomendado por su amigo el señor GILDARDO HINCAPIÉ, para que le adelantara el trámite correspondiente ante la DIAN, pues importaría balones y fue así como se dirigió a TURBOADUANAS donde le señalaron la documentación que debería allegar. Dice que después de esto se dirigió a BANADEX donde de igual manera le manifestaron lo que se debía hacer y regresando el señor RICARDO ARANGO, quien había viajado, lo llevó hasta TURBOADUANA donde lo dejó hablando con el Gerente de esta empresa de nombre ANGEL, dice no recordar su apellido y que una vez salió el señor ARANGO de TURBIADUANA le manifestó que todo había quedado arreglado para la importación y nacionalización de la mercancía y que llegada esta a los patios de Banadex se llevó a cabo la inspección a la mercancía y se ordenó por los funcionarios de la DIAN el levante y se ordenó la salida de la misma en camiones. Dice no haber vuelto a ver al señor RICARDO ARANGO y no saber de su residencia, así como la de quien dice ser su amigo, GILDARDO HICAPIÉ. Afirma haber estado para el momento de la inspección a los contenedores en los patios de BANADEX y no haber visto en esos receptáculos objetos diferentes a pelotas plásticas.

YOVANNY HURTADO TORRES, manifiesta que su función como Administrador encargado de los patios de Banadex, ya que el titular se encontraba disfrutando de vacaciones, para cuando llegaron los veintitrés contenedores para comienzos de noviembre de 2001, que según los documentos de viaje se trataba de pelotas plásticas, fue la recepción y coordinación de su despacho una vez surtido el trámite de nacionalización. Afirma que además, revisó los números de

identificación de los receptáculos y solo se limita a eso, pues, señala no estar autorizado para revisar el contenido de receptáculos donde vienen las mercancías. Señala que quienes llevaron a cabo la revisión de los contenedores fueron los servidores de la DIAN, **HENRY HERNANDO RAMÍREZ BAHAMÓN, HERMINIO MARTÍNEZ MERCAD** y **CARMELO CÓRDOBA CAMPO**, acompañados de los señores **LUIS ANÍBAL CHAVERRA** y **ERASMO SALDARRIAGA**, de quienes creyó representaban al importador. Reitera que su función era únicamente la recibir los contenedores y despacharlos una vez la DIAN revisó el contenido de los receptáculos, que estuvo durante la apertura de ocho (8) o nueve (9) de esos contenedores, de los que dice contenían pelotas plásticas, ya que tuvo necesidad de estar retirándose del lugar donde se practicaba la revisión, ya que tenía que estar prestando todos los servicios propios como administrador de Banadex. Añade, que terminada la revisión, se ordenó el levante por parte de los funcionarios de la DIAN, quienes le entregaron una copia de la declaración con levante de la mercancía y procedió a entregarle los contenedores a **LUIS ANÍBAL CHAVERRA ARBOLEDA**, quien se dedicó a coordinar la salida de los camiones que eran cargados con la grúa, uno por contenedor. También manifiesta que la señora **PAOLA KATHERINE BENAVIDES** no se encontraba para cuando se llevó a cabo la revisión de los contenedores.

## ALEGATOS PRESENTADOS

Dentro del término legal presentaron sus alegaciones el doctor **GUSTAVO RAMÍREZ BARREIRO**, defensor de los señores **HERMINIO MARTÍNEZ MERCADO, HENRY HERNANDO RAMÍREZ BAHAMÓN** y **CARMELO CÓRDOBA CAMPO**; la doctora **MARIANNA SALCEDO VELOZA**, defensora del señor **LUIS ANÍBAL CHAVERRA ARBOLEDA** y el doctor **RUBÉN DARÍO TÁMARA MURCIA**, en defensa del señor **YOVANNY HURTADO TORRES**.

El doctor **RAMÍREZ BARREIRO** solicita a favor de su prohijado la preclusión de la investigación que en su contra se adelantó, centrando como fundamento de su pedimento el que no está acreditado con certeza el ingreso del arsenal por el puerto de Zungo, pues al decir del señor defensor de los servidores públicos adscritos

a la DIAN, existen serias y fundadas dudas, ya que considera un hecho cierto que entraron las armas de forma ilegal, pero no la forma en que lo hicieron, en qué momento y por qué lugar. Que no existe la prueba testimonial, indicios graves, documentos o peritazgos para acusar a los servidores de la DIAN, quienes en su sentir no han infringido la normatividad relativa a la Falsedad ideológica en documento público, el favorecimiento por servidor público y Fabricación, tráfico y porte de armas de fuego y municiones de uso privativo de las fuerzas armadas. Señala las versiones juramentadas del Administrador de la DIAN Delegado en Turbo como contradictorias y que el fundamento fáctico definitivo tenido en cuanta por el suscrito ha sido la declaración del señor JOSÉ ANTONIO MUÑOZ, operario de la grúa en el depósito de Banadex, quien manifestó existir diferencia en el peso de algunos contenedores en relación con otros, circunstancia esta que al decir del libelista ha debido poner en conocimiento de los funcionarios de la DIAN esa circunstancia. Además, dice que se tuvo en cuenta el dicho del señor ADUARDO OTERO, Administrador Delegado de la DIAN en Turbo sobre incumplimiento de la normatividad aduanera por parte de sus pupilos. Agrega, que JOSÉ ANTONIO MUÑOZ en una segunda oportunidad manifestó no haber dicho jamás que existiera diferencia en el peso de algunos contenedores y por ello el dicho del operador de la grúa no desvirtuó el dicho de sus defendidos. En resumen, el señor defensor afirma que no se debe dar crédito a los dichos de los señores EDUARDO OTERO y JOSÉ ANTONIO MUÑOZ, pues ni el primero ni el segundo de los nombrados dijeron la verdad ni el segundo dijo la verdad, transcribiendo gran parte de las deponencias del Administrador Delegado de la DIAN en Turbo, concluyendo que sus prohijados actuaron de acuerdo con la reglamentación aduanera y no existe prueba que los responsabilice de las ilicitudes que se les imputan, afirmando que las armas y municiones entraron al país, pero tampoco está probado que estas se encontraran en los contenedores que revisaran los servidores de la DIAN. Pero además señala que las armas han podido venir mimetizadas entre las pelotas plásticas en los contenedores, "…de tal manera que fuese imposible percibirlos.", trayendo una vez más a colación la tesis aquella del "cambiazo" para cuando se trasladaron los contenedores desde donde se encontraba fondeada la motonave Otterloo hasta los patios de Banadex S. A., ya que existe una gran distancia entre uno y otro puntos y plantea una serie de preguntas dirigidas a plantear dudas

123

en relación con la existencia de los contenedores, sobre cuántos llegaron a territorio colombiano, si los que transportaba la motonave llegaron a Zungo, si por alguna autoridad se estableció que en el Ottereloo se encontraban solo 23 receptáculos, que pudieron existir contenedores gemelos, pisos falsos donde pudieran venir, etc. Se arguye por el letrado que los funcionarios de la DIAN plasmaron lo que vieron y por eso plasmaron en el Acta de Inspección existir concordancia entre lo inspeccionado y lo declarado y por ello no se les puede imputar falsedad. Termina sus alegaciones manifestando que sus prohijados son personas sin antecedentes, dignas de crédito y confiabilidad y magníficos servidores públicos y reiterando su solicitud de preclusión de la investigación que se les ha seguido con estas diligencias.

Por su parte la doctora MARIANNA SALCEDO VELOZA solicita igualmente precluir la investigación adelantada en contra de su pupilo, el señor LUIS ANÍBAL CHAVERRA ARBOLEDA, al estimar que no ha cometido el delito prescrito en el art. 366 del C.P. que se le imputa, señalando que está demostrado que su pupilo estuvo en los patios de Banadex S. A., pero no como representante de empresa alguna, como lo afirmó en su injurada, añadiendo que estuvo pendiente para que los contenedores fueran subidos a los camiones. También hace referencia a los señalamientos hechos por los cosindicados HERMINIO MARTÍNEZ y YOVANNY HURTADO, quienes señalan a su prohijado como la persona que asistió a la revisión de los contenedores con ERASMO SALDARRIAGA, en representación de los dueños de la mercancía, para restarles eficacia probatoria, al señalar que esas versiones no tienen respaldo documental alguno en la actuación y continúa haciendo esta vez una larga exposición sobre lo que son las Sociedades de Intermediación Aduanera, sus funciones, su responsabilidad, sus obligaciones, etc. y de igual manera se extiende en citas y transcripciones de legislación aduanera, la inspección, y por último dedica un párrafo para tratar lo que es la Presunción de inocencia y de manera irónica enseñarnos que la coautoría impropia no existe, citando acepciones de diccionarios de la Lengua Española, señalando que no fuimos acertados al emplear el término impropio, calificando de absurda su utilización, por su mal uso para calificar "...esa particular forma de intervenir en una conducta punible." Termina citando el art. 6°, que trata del principio de legalidad tanto

en el Código Penal como en el de Procedimiento Penal, citando el debido proceso "...y que no se acuse a una persona, que ha obrado de buena fe, ..."

El señor defensor del inculpado YOVANNY HURTADO TORRES, después de hacer manifestación de cuáles eran las funciones y procedimientos a cargo de su pupilo como Administrador de los patios de Banadex S. A., solicita la preclusión de la investigación que se adelantara en contra de su defendido como presunto coautor de infracción al art. 366 del C. P., al estimar que HURTADO TORRES como administrador no estaba facultado para llevar a cabo inspecciones, abrir contenedores, revisar mercancías que estos contengan, pues esas son funciones de los funcionarios de la DIAN y por tanto mal podría haber tenido conocimiento de lo que transportaban los contenedores, que no obstante ello se hacía presente esporádicamente al momento de la inspección, pues debía atender otros frentes en el depósito. Transcribe normas relativas a obligaciones a cargo de la DIAN, como aparte del art. 469 del Estatuto Aduanero, modificado por el Decreto 2685 de 1990, que dice:

"La única autoridad competente para verificar la legalidad de la importación de las mercancías que se introduzcan o circulen en el territorio aduanero nacional, será la Dirección de Impuestos y Aduanas Nacionales..."

Concluye sus alegaciones solicitando la preclusión por ausencia de responsabilidad.

CONSIDERACIONES

Aclaración previa

Antes de entrar al estudio de la calificación del mérito sumarial de las diligencias, queremos dejar anotado que esta decisión solo comprende lo referente a los señores LUIS ANÍBAL CHAVERRA ARBOLEDA, YOVANNY HURTADO TORRES, HERMINIO MARTÍNEZ MERCADO, HENRY HERNANDO RAMÍREZ BAHAMÓN, PAOLA KATHERINE BENAVIDES ROMERO y CARMELO CÓRDOBA CAMPO, ya que respecto de los señores

ERASMO y NELSON SALDARRIAGA CUARTAS, por solicitud de los mismos se ha señalado fecha y hora para adelantar la tramitación a que hace referencia el art. 40 del C.P.P.

Entrando en el estudio de la calificación que ha de darse a la actuación, diremos, que la norma contenida e al art. 397 del C.P.P., es del siguiente tenor:

Requisitos sustanciales de la resolución de acusación. El Fiscal General de la Nación o su delegado dictará, resolución de acusación cuando esté demostrada la ocurrencia del hecho y exista confesión, testimonio que ofrezca serios motivos de credibilidad, indicios graves, documentos, peritación o cualquier otro medio probatorio que señale la responsabilidad del sindicado."

Entonces se procede por el despacho a determinar si esas exigencias o requisitos sustanciales, como lo señala la norma que viene de transcribirse, se reúnen en el caso bajo estudio, esto es, si la instructiva contiene elementos de juicio para dictar resolución acusatoria o si por el contrario, por ausencia de esos elementos lo que procede es precluir la instrucción respecto de los señores HENRY HERNANDO RAMÍREZ BAHAMÓN, HERMINIO MARTÍNEZ MERCADO y CARMELO CÓRDOBA CAMPO, vinculados a esta averiguación como presuntos coautores responsables de infringir los arts. 286, 322 y 366 del C.P. y en cuanto a los señores LUIS ANÍBAL CHAVERRA ARBOLEDA, YOVANNY HURTADO TORRES y PAOLA KATHERINE BENAVIDES ROMERO, presuntamente incursos en las conducta punible contenida en el art. 366 del Estatuto de las Penas.

DE LA OCURRENCIA DEL HECHO

El aspecto materialidad u objetivo del acontecimiento delictual se encuentra cabalmente acreditado en la foliatura con los elementos de prueba que se encuentran relacionados en el acápite relativo a tales medios, material este del cual se extrae que es un hecho cierto que Inversiones Banoly S. A., representada en Turbo (Ant.) por el señor NELSON SALDARRIAGA CUARTAS, fue la firma encargada de adelantar los trámites correspondientes para que mediante el fletamento de la motonave Otterloo se introdujeran a territorio

nacional tres mil (3.00) fusiles AK 47 y cinco millones (5´000.000) de cartuchos calibre 5.62, arsenal este embarcado en la nombrada motonave, la cual zarpó con veintitrés (23) contenedores que traían pelotas plásticas del Puerto de Veracruz en Méjico y arribó a puerto nicaraguense, El Bluff, donde en catorce (14) de los veintitrés (23) receptáculos se introdujeron las armas y las municiones en las cantidades dichas, zarpando el día tres (3) de noviembre de 2001 (fl. 98 c. c.1.), para el cinco (5) de noviembre de 2001 fondear el barco frente a las costas de Urabá, desembarcando los receptáculos en bongos y en estos llevados a tierra, los patios de Banadex S. A., para después ordenar la salida de dichos patios a su destino final, los paramilitares, circunstancias estas acreditadas con la Planilla de Recepción visible a folio 68 c. c. 4., con las fotocopias de las consignaciones hechas a Bancolombia en la cuenta de Banadex S. A. cancelando los valores correspondientes al servicio de bodegaje de los contenedores (fl. 79 c. c. 4) y con las órdenes de salida de los contenedores del depósito de Banadex S. A. (fl. 191 c. c. 1.).

Una vez llegados a tierra los contenedores, se llevó a cabo la tarea de inspección física a los mismos por parte de funcionarios de la DIAN adscritos a la Delegada de Turbo (Ant.), señores HERMINIO MARTÍNEZ MERCADO, HENRY HERNANDO RAMÍREZ BAHAMÓN y CARMELO CÓRDOBA CAMPO, para "Verificar el cumplimiento de las normas aduaneras vigentes y Seguimiento Mercancías", quienes inspeccionaron veintiuno (21) de los veintitrés (23) contenedores, consignando en el Acta de Inspección Aduanera que la mercancía inspeccionada corresponde con lo declarado, cuando lo cierto fue que en catorce (14) de los veintitrés (23) receptáculos venían depositadas las armas y municiones embarcadas en Nicaragua (fl. 94 y ss. c. c. 1), armas cuya relación milita en la foliatura (fl. 115 y ss. c. c. 3), remitida por Interpol de Nicaragua a su homóloga del DAS en Colombia, hallando veintitrés (23) fusiles de los llegados de aquella nación centroamericana en la Cuarta Brigada del Ejército Nacional en Medellín, una vez funcionarios de Policía Judicial comisionados para el efecto, llevaron a cabo Inspección Judicial al Depósito de Armas Decomisadas en dicha guarnición militar (fl. 207 y ss. c. c. 5).

Volviendo a lo de la inspección llevada a cabo en los patios de Bandex S. A., la misma contó con la asistencia de los señores

ERASMO DE JESÚS SALDARRIAGA CUARTAS y LUIS ANÍBAL CHAVERRA ARBOLEDA, de quienes se afirma lo hacían en representación de los propietarios de la mercancía, habiendo CHAVERRA ARBOLEDA coordinado el desplazamiento de catorce (14) camiones cargados cada uno con un contenedor, con destino a las AUC de los Departamentos de Antioquia y Córdoba, lo que se acredita con la deponencia del señor CARLOS MAURICIO USUGA, conductor de uno de los vehículos en que se transportó el arsenal (fl. 147 c. c. 4), quien dice haber sido contratado junto con otros conductores para transportar los contenedores que contenían balones, como dice, les afirmó quien los contrató, señalando que acordaron un precio de ochocientos mil pesos por cada contenedor transportado, que el peso de la carga era de aproximadamente seis (6) toneladas, pesando el solo contenedor tonelada y media y la carga cuatro y media toneladas, afirmando que llegando a un sitio llamado Los Manguitos aparecieron unas diez (10) personas que con armas de corto alcance los hicieron apear de los vehículos, quienes se llevaron los rodantes dejando a los conductores en un estadero custodiados por dos hombres armados, desde las nueve de la mañana hasta las ocho de la noche, hora en que regresaron las personas con los camiones, ese día 8 de noviembre de 2001.

En lo tocante con el transporte de los contenedores en territorio nacional, también se escuchó en declaración juramentada al señor HELIODINO USUGA HERRERA, conductor de uno de los vehículos que transportaron los contenedores (fl. 204 y ss. c. c.5), quien manifiesta que efectivamente fue contratado por la suma de ochocientos mil pesos para llevar hacia la costa un contenedor, que una vez cargado su vehículo con el receptáculo y habiendo salido, a un kilómetro de Apartadó, al camión se le averió la transmisión y por tanto el viaje lo hizo otro vehículo.

Ahora, sometido al estudio de rigor lo actuado, se puede concluir que desde el punto de vista objetivo los hechos se hallan demostrados en la medida que lo reclama la norma procedimental transcrita la cual hace mención a los requisitos sustanciales de la resolución de acusación, pues es un hecho cierto que el cinco (5) de noviembre de 2001, llegó hasta el Puerto de Zungo en Carepa un arsenal proveniente de Nicaragua, consistente en tres mil (3.000) fusiles AK47 y cinco millones (5'000.000) de cartuchos para los mismos,

120

habiendo la firma Inversiones Banoly Ltda., con domicilio en Turbo (Ant.) fletado la motonave Otterloo de bandera panameña la cual salió del Puerto de Veracruz (Méjico) con veintitrés (23) contenedores, conteniendo pelaotas plásticas, embarcación que tocó el Puerto El Bluff en Nicaragua donde se reemplazaron catorce (14) de los veintitrés (23) receptáculos que contenían pelotas plásticas por igual número donde se depositó el arsenal, contando con documentación relativa, no solo a las pelotas plásticas, sino a una supuesta compra realizada por la Policía Nacional Panameña a su homóloga de Nicaragua, posiblemente para en caso de ser interceptados en aguas internacionales, enseñarla y así eludir cualquier inconveniente.

Una vez llega la motonave Otterloo a aguas territoriales colombianas en el Urabá, es fondeada a cierta distancia del Puerto de Zungo, para ser depositados los veintitrés (23) contenedores en bongos que los transportaron hasta el Puerto de Zungo y ya en patios de Banadex S. A., por parte de los funcionarios de la DIAN, señores HERMINIO MARTÍNEZ MERCADO, HENRY HERNANDO RAMÍREZ BAHAMÓN y CARMELO CÓRDOBA, comisionados para "Verificar el cumplimiento de las normas aduaneras vigentes y Seguimiento de Mercancías", llevando a cabo revisión de veintiuno (21) de los veintitrés (23) contenedores, haciendo constar en el Acta de Inspección Aduanera que la mercancía inspeccionada corresponde con lo declarado.

## DE LA RESPONSABILIDAD DE LOS INCULPADOS

Respecto al elemento responsabilidad de los señores HERMINIO MARTÍNEZ MERCADO, HENRY HERNANDO RAMÍREZ BAHAMÓN y CARMELO CÓRDOBA CAMPO, en los hechos investigados, igualmente se cuenta en la actuación con plúrimos elementos de juicio que llevan a esta Fiscalía Delegada a predicar el compromiso de los inculpados en las conductas punibles objeto de investigación, pues gravitan en contra de los servidores públicos graves indicios de responsabilidad, tales como el de presencia en el lugar donde se llevó a cabo la revisión de los receptáculos contentivos de las armas y municiones en los patios de Banadex S. A., el indicio de participación, ya que fueron los servidores públicos de la DIAN comisionados para verificar el cumplimiento de la normatividad

aduanera vigente y para hacer seguimiento a las mercancías, como se les señalara en el Auto Comisorio Aduanero y el indicio de mala justificación, pues en sus injuradas se han mostrado ajenos al comportamiento delictual acreditado en la actuación, siendo que de los veintitrés (23) receptáculos llegados desde Centroamérica, catorce (14) de ellos contenían el arsenal y si revisaron veintiuno (21) del total, imposible hacer creer a la judicatura que en ellos no venía el material bélico.

De igual manera nos encontramos en el comportamiento de los inculpados el indicio de capacidad para delinquir, ya que como funcionarios de larga data en la DIAN tenían la capacidad intelectual necesaria para la acción realizada, la cual requería en los sujetos activos del delito las suficientes facultades intelectuales para ejecutar los actos que culminaron con la introducción ilegal del arsenal procedente de Centroamérica.

Respecto del inculpado CARMELO CÓRDOBA CAMPO, quien es procesado en contumacia, ya que ha permanecido oculto mientras se adelanta esta tramitación, bien puede ser tenida en cuenta esa actitud como indicio de delincuencia.

Y es que la documentación que milita en el paginario, robustece el aspecto responsabilidad que recae en los servidores de la DIAN adscritos a la Delegada de Turbo.

En sus salidas procesales los señores MARTÍNEZ NMERCADO, RAMÍREZ BAHAMÓN y CÓRDOBA CAMPO, de igual manera enfatizan al señalar que en el recorrido hecho por los bongos transportando los veintitrés (23) contenedores desde el sitio donde fondeó el Otterloo y los patios de Banadex S. A., ha podido ocurrir un "cambiazo", aprovechando el tiempo transcurrido en el recorrido por la distancia considerable entre uno y otro punto, tesis también consignada en un escrito por la defensa de los inculpados. Pero a ello el despacho responde : si los inculpados han venido sosteniendo que lo la mercancía llegada en la motonave Otterloo aquel 5 de noviembre de 2001 y que fue observada por ellos una vez sometidos a inspección los receptáculos para fines de nacionalización, fueron pelotas plásticas y jamás el arsenal, entonces, cuál fue el "cambiazo"

que dicen pudo presentarse al efectuarse el recorrido de los contenedores en los bongos?

Más parece una aceptación tácita por parte de los inculpados que lo por ellos hallado en los contenedores fue el arsenal, cuando afirman en sus versiones sin juramento un posible "cambiazo", pues se entiende que consistiría en reemplazar las pelotas plásticas por armas y municiones, que fue lo que en verdad venía en catorce (14) de los veintiún (21) contenedores transportados en el Otterloo.

La modalidad conductual consistente en haber consignado por los servidores de la DIAN en el Acta de Inspección Aduanera de noviembre 8 de 2001, que la mercancía inspeccionada corresponde con lo declarado, es comportamiento constitutivo de delito, ya que como servidores públicos adscritos a la DIAN Delegada de Turbo, en ejercicio de sus funciones, en ese documento que serviría de prueba, consignaron una falsedad, teniendo el deber y la obligación de ceñirse estrictamente a la verdad respecto del contenido de los recptáculos. Por ello es de predicarse que los señores HERMINIO MARTÍNEZ MERCADO, HENRY HERNANDO RAMÍREZ BAHAMÓN CAREMELO CÓRDOBA CAMPO se encuentran incursos en el comportamiento contra la fe pública contenido en el art. 286 del C.P. que trata de la Falsedad ideológica en documento público, conducta punibles además, aceptada por los inculpados, cuando afirman, contrariando la verdad de los hechos, que lo hallado en los contenedores corresponde con la declaración contenida en los documentos propios del trámite de importación y nacionalización de las mercancías.

Igual predicamento ha de hacerse en relación con la conducta asumida por los funcionarios, cuando con su actuar omitieron cumplir con lo mandado en el Auto Comisorio Aduanero de noviembre 8 de 2001, mediante el cual recibieron el mandato de "Verificar el cumplimiento de las normas aduaneras vigentes y Seguimiento de Mercancías", mandato que no cumplieron, por cuanto la labor encomendada no se cumplió, haciendo constar en el Acta de Inspección Aduanera de la misma fecha del auto comisorio, que la mercancía inspeccionada corresponde con lo declarado, algo alejado de la realidad, pues como se ha señalado anteladamente, en catorce (14) de los veintitrés (23) contenedores, de los que se

131.

revisaron veintiuno (21), venía el arsenal embarcado en Nicaragua en la motonave Otterloo, con lo cual se permitió la introducción ilegal a territorio nacional el material bélico con destino a los paramilitares de Córdoba y Antioquia.

De otra parte, el comportamiento asumido por los servidores de la DIAN también los hace incursos en la prohibición contenida en el art. 366 del C.P., ya que con su actuar se dio inicio a un ilegal tráfico de armas y municiones de uso privativo de la Fuerza Pública, pues vulneraron formal y materialmente el bien jurídico tutelado de la seguridad pública. En cuanto a lo primero, basta recordar que la distribución y manejo de armas y municiones, por mandato constitucional –art. 223-, es monopolio estatal y en tal virtud ningún particular puede traficar con ellos, salvo autorización expresa de autoridad competente.

Lo que se penaliza es el desarrollo de una cualesquiera de las conductas para las que no se ha autorizado expresamente a la persona y si ello es así, bien puede calificarse, como antaño lo ha considerado el máximo órgano de justicia, que se trata aquí de un delito de "mera conducta", en tanto que no requiere la producción de un específico resultado.

La respuesta del Estado, es la represión del sujeto ante la ausencia de demostración sobre la presunción que le dará el uso para el que ha sido creado el artefacto bélico, pues de contera, pos sí misma, una actividad de tal naturaleza, lleva implícita la causación de un atentado a la seguridad y tranquilidad del conglomerado social, máxime si como en el evento de la especie, se trata de gran cantidad de fusiles AK47 y municiones calibre 5.62 para los mismos, los cuales fueron a parar a manos de grupos paramilitares que han vendido sembrando el terror en nuestra país, vale decir, las Autodefensas Unidas de Colombia, como lo sostiene uno de sus comandantes, CARLOS CASTAÑO GIL en entrevista de prensa aparecida en el diario El Tiempo e elació con la introducción de los tres mil (3000) fusiles y los cinco millones (5'000.000) de cartuchos para los mismos procedentes de Nicaragua, al manifestar: "Es el mejor gol que he hecho."

Bajo esa óptica, los comportamientos asumidos por los señores HERMINIO MARTÍNEZ MERCADO. HENRY HERNANDO RAMÍREZ BAHAMÓN y CARMELO CÓRDOBA CAMPO, como se señalara anteriormente, tienen adecuación típica en las normas 286, 322 y 366 del C.P., pues se demuestra en la foliatura que los nombrados servidores públicos fueron quienes el 8 de noviembre de 2001, permitieron la introducción al país de tres mil (3000) fusiles AK47 y cinco millones (5'000.000) de cartuchos para esos fusiles.

Ahora bien, la antijuridicidad de las conductas punibles es palpable desde cualquier ángulo, como quiera que sin mediar justificación alguna, lesionaron los inculpados con su accionar contra derecho bienes jurídicos tutelados por la ley, como el de la Fe pública, el Orden económico social y la Seguridad pública,

Y desde el plano de la culpabilidad, entendida como la actitud consciente de la voluntad que de contera da paso al juicio de reproche negativo, tampoco existe discusión. Como se observa, los inculpados admitieron haber llevado a cabo la revisión de veintiuno (21) de los veintitrés (23) contenedores llegados en la motonave Otterloo, así como haber firmado al Acta de Inspección Aduanera, aunque no haber hallado armas ni municiones en el interior de esos receptáculos, afirmación que no encuentra respaldo alguno en las diligencias y que el despacho considera carente de veracidad.
La condición de imputables de los plurimencionados servidores públicos es evidente, pues no existió el mínimo de asomo de lo contrario y así han sido tratados.

Entonces, lo procedente es que por el despacho se profiera Resolución de Acusación en contra de los señores HERMINIO MARTÍNEZ MERCADO, HENRY HERNANDO RAMÍREZ BAHAMÓN y CARMELO CÓRDOBA CAMPO, como coautores materiales de los reatos a que hacen referencia los arts. 286, 322-2 y 366 del C.P., que tratan, en su orden de la Falsedad ideológica en documento público, Favorecimiento por servidor público y Fabricación, tráfico y porte de armas y municiones de uso privativo de las fuerzas armadas, en la modalidad heterogénea y en las circunstancias de mayor punibilidad a que hace mención el numeral 10 del art. 58 del C.P.

Ahora, como con esta decisión ha de resolverse lo concerniente a la calificación del mérito sumarial respecto de los señores LUIS ANÍBAL CHAVERRA ARBOLEDA, PAOLA KATHERINE BENAVIDES ROMERO y YOVANNY HURTADO TORRES, a quienes se les imputa la prohibición contenida en el art. 366 del C.P., que trata de la Fabricación, tráfico y porte de armas y municiones de uso privativo de las fuerzas armadas, a ello se procede y diremos que en cuanto al primero de los nombrados, el señor CHAVERRA ARBOLEDA, fue la persona que se hizo presente junto a ERASMO DE JESÚS SALDARRIAGA CUARTAS en los patios de Banadex S. A. en representación de los propietarios de la mercancía para cuando se efectuó la revisión de los contenedores llegados en la motonave Otterloo, como se demuestra con las fotocopias de los folios 49 y 50 del Libro de Ingresos de Personas a la bodega de dicha empresa (fls. 112 y 113 c. c. 3.), circunstancia esta corroborada por YOVANNY HURTADO, HERMINIO MARTÍNEZ y HENRY HERNANDO RAMÍREZ, a lo que hay que agregar que a folio 67 del c. c. 3 milita escrito signado por el señor LUIS GERMÁN CUARTAS C., del departamento Legal de C. I. BANADEX S. A., donde se dice que el señor LUIS ANÍBAL CHAVERRA ARBOLEDA intervino en gran medida en las gestiones de introducción ilícita al país de los receptáculos que contenían tres mil (3000) fusiles y cinco millones (5'000.000) de cartuchos para los mismos y ser, como él mismo lo afirma, la persona que coordinó el transporte en camiones de los receptáculos contentivos del arsenal, desde los patios de Banadex S. A. hasta el destino final del material bélico que lo fue los grupos paramilitares que operan en los Departamentos de Córdoba y Antioquia.

Y aunque CHAVERA ARBOLEDA quiera aparecer ajeno a los hechos con la historia de haber sido contactado para gestionar ante firmas encargadas de labores de importación y nacionalización de mercancías por un señor de nombre RICARDO ARANGO, por recomendación de GILDARDO HINCAPIÉ, su amigo, de quienes no suministra direcciones, ni datos donde se les pueda localizar, es versión que no le merece al despacho credibilidad alguna.

En cuanto a la ocurrencia del hecho, valgan los razonamientos plasmados en antelación en el acápite dedicado a ese presupuesto exigido por el art. 397 del C.P.P., para decir que este aspecto de la

28
134

instructiva se haya cabalmente demostrado en lo actuado, como allí se señalara.

Ahora, en cuanto al presupuesto responsabilidad que podría caberle al señor CHAVERRA ARBOLEDA en el comportamiento contra la Seguridad Pública, es decir, la infracción al art. 366 del C.P., se tiene que analizado el haz probatorio arrimado al paginario, emergen en contra del nombrado inculpado indicios graves de responsabilidad, como el de presencia en el lugar y momento en que se llevó a cabo la inspección a los contenedores que contenían, a más de pelotas plásticas, armas y municiones en las cantidades ya conocidas, presencia hecha junto a ERASMO SALDARIAGA y los tres funcionarios de la DIAN, aquel 8 de noviembre de 2001, asistencia a dichos patios que también lo fue para el día 9 del mes y año mencionados, a fin de coordinar la salida de los vehículos cargando el material bélico con destino los paramilitares de Córdoba y Antioquia.

También emerge de lo actuado el indicio de participación pues CAVERRA ARBOLEDA estuvo en el lugar, como se dijera y además, coordinando la embarcada y la salida de los catorce (14) camiones que transportaron igual número de receptáculos contentivos del arsenal, lo que es indicativo de su participación en la conducta punible que se le imputa.

A los anteriores indicios es de sumarse el de capacidad intelectual para delinquir, ya que como bien es señalado por el mismo inculpado laboró al servicio de Banadex S. A. y por ello poseía las capacidades intelectuales para ejecutar la conducta punible que lo mantiene vinculado a estas diligencias, a más del de mala justificación, pues como se señalara anteriormente, la manifestación de haber actuado como lo hizo por recomendación de su amigo GILDARDO HINCAPIÉ hecha a RICARDO ARANGO para que lo localizara para adelantar las gestiones del caso, son manifestaciones carentes de veracidad.

El análisis del haz probatorio nos lleva a la convicción de ser LUIS ANÍBAL CHAVERA ARBOLEDA responsable a título de coautor del comportamiento contra la Seguridad Pública por el cual soporta medida cautelar en estas diligencias, en la circunstancia de mayor

punibilidad a que hace relación el numeral 10 del art. 58 del C.P. y por ello lo procedente es que por el despacho se profiera en su contra Resolución de Acusación como presunto coautor responsable de infringir el art. 366 del C.P., en las circunstancias de mayor punibilidad a que hace mención el numeral 10 del art. 58 del C. P.

Ahora bien, en lo tocante a la señora PAOLA KATHERINE BENAVIDES ROMERO, una vez adelantado el análisis correspondiente a su actuación en la investigación cuyo mérito se califica con esta resolución, averiguación a la cual se encuentra vinculada mediante injurada soportando medida de aseguramiento de detención preventiva como presunta autora responsable de infringir el art. 366 del C.P., el despacho es del criterio de precluir la investigación seguida en su contra, decisión que de igual manera se ha de proferir respecto del señor JOVANNY HURTADO TORES, en consideración a los razonamientos que a continuación se consignan.

Es un hecho cierto que la BENAVIDES ROMERO laboraba para una Sociedad de Intermediación Aduanera, encargada de gestionar ante la DIAN lo relativo a la importación y nacionalización de la mercancía que transportaba la motonave Otterloo en veintitrés (23) contenedores, que contenían presuntamente pelotas y que siendo su deber asistir a la inspección que se llevó a cabo a los contenedores, por su estado de gestación y estar próxima a dar a luz, no asistió a esa revisión, circunstancia esta que la misma inculpado afirma en la diligencia de injurada con ella practicada y que a su vez es corroborada por los mismos funcionarios de la DIAN que practicaron la revisión a los receptáculos desembarcados de la motonave Otterloo aquel cinco (5) de noviembre de 2001.

Ahora, la inculpada no estuvo presente para cuando se adelantó la revisión de los receptáculos que se afirma contenían las armas y las municiones, pero esa no era función de ella, pues esta es propia de los funcionarios de la DIAN y además no tuvo a su cargo otra u otras actuaciones que nos lleven a estimar que hubo participación por su parte en el delito contra la Seguridad Pública que se le imputa, ya que a través de la tramitación adelantada con posterioridad a la medida cautelar no se llegó a la certeza respecto a la responsabilidad a cargo de la señora BENAVIDES ROMERO en la conducta

136

punible, presupuesto a tenerse en cuenta para proferir resolución acusatoria contra un imputable.

Observemos como su no comparecencia a la revisión de los contenedores no trajo consecuencias lesivas de naturaleza alguna para el bien jurídico tutelado por la ley para concluir en la responsabilidad penal de la inculpada.

La inculpada con su omisión no desplegó actividad riesgosa de la cual se pueda concluir afectación alguna a intereses jurídicos y si bien es cierto en este evento la ocurrencia del hecho está de presente en el paginario, no ocurre igual cosa en cuanto al aspecto responsabilidad de la inculpada.

Y es que "Para que una conducta típica sea punible se requiere que lesione o ponga efectivamente en peligro, sin justa causa, el bien jurídicamente tutelado por la ley penal", como lo señala el art. 9° del C.P.

De otra parte, si bien es cierto que la señora BENAVIDES ROMERO no asistió a los patios de Banadex S. A., para ese ocho (8) de noviembre de 2001, ya que se encontraba próxima a dar a luz, lo cual ocurrió el 20 del mismo mes y año, ello no era su obligación, por cuanto como servidora de una empresa privada su deber estuvo circunscrito a adelantar los trámites previos a la importación y nacionalización de la mercancía.

Y es que la señora BENAVIDES ROMERO, como bien lo afirma en su versión sin juramento, no fue esa la única vez que no asistió a la inspección aduanera que lleva a cabo la DIAN, manifiesta que fueron varias y por ello creemos que su actuar está exento de responsabilidad, siendo lo procedente aplicar el art. 39 del C.P.P. que contempla esta circunstancia para precluir la investigación.

Por ello, reiteramos, se precluirá la investigación que en contra de la señora PAOLA KATHERINE BENAVIDES ROMERO se adelantó por este Despacho Fiscal.

En cuanto al señor YOVANNY HURTADO TORRES, se observa que su actuar de igual manera está exento de responsabilidad alguna,

ya que como Administrador encargado de los patios de Banadex para cuando llegaron los 23 contenedores procedentes de Nicaragua, se limitó a ejercer las funciones que le eran propias, cuales fueron las de recibir los contenedores y coordinar la salida de los patios de Banadex S. A. de los mismos una vez surtido el trámite de nacionalización de la mercancía por parte de los servidores de la DIAN. Y es que como lo afirma en su injurada y no hay elemento de prueba alguna que demuestre lo contrario, solo pudo observar la revisión de ocho o nueve contenedores, ya que su tarea al frente de la administración de la bodega no le permitió estar presente para cuando inspeccionaban los de la DIAN los receptáculos.

El señor HURTADO TORRES como servidor de Banadex S. A. no tenía como una de sus funciones el revisar los receptáculos para saber su contenido y por tanto mal podría hacerlo.

Observamos como el actuar de HURTADO TORRES, es de considerarse atípico, pues su actuar no encuadra en el comportamiento punible a que hace referencia el art. 366 del C.P., punible este que se le imputó y por el cual se encuentra vinculado a la investigación. Esta circunstancia nos lleva a decretar la preclusión de la investigación que en su contra se venía adelantando con estas diligencias, de conformidad al mandato contenido en el art. 38 del C.P.P.

Es de anotar que con posterioridad a la medida cautelar que se impuso al señor HUTRTADO TORRES, no se allegó a la foliatura un solo elemento de juicio que llegara a infirmar su dicho en injurada y por tanto, como se dijera anteriadamente, se precluirá la investigación que en su contra se adelantara como presunto coautor responsable de infringir el art. 366 del C. P., revocando la medida de aseguramiento que en su contra pesa.

## RESPUESTA A LOS ALEGATOS

A las argumentaciones del señor defensor de los servidores públicos adscritos a la DIAN, respondemos manifestando que no cabe duda alguna sobre la forma como fueron introducidas al país las armas y municiones aquel comienzo de noviembre de 2001, material bélico

con destino a los grupos paramilitares que operan en los Departamentos de Córdoba y Antioquia. Ello ocurrió una vez fondeara el barco Otterloo frente a las costas del Urabá el 5 de noviembre de 2001 y se descargaran 23 receptáculos en bongos que los trasladaron hasta los patios de Banadex S. A., en el Puerto de Zungo, de los cuales 14 contenían el arsenal y 9 pelotas plásticas, como se sabe por la documentación allegada a la actuación consiste en documentos propios de agencias dedicadas al transporte de mercancías desde el extranjero, informes de inteligencia, de la OEA, en contenedores que como se sabe vienen sellados, hasta cuando los miembros de la DIAN comisionados para la revisión de los mismos levantan los sellos.

Ahora, cierto es que dentro del haz probatorio no hallamos peritazgos, pero si se cuenta con documentos, testimonios e indicios graves que nos llevan a tener a los señores HERMINIO MARTÍNEZ MERCADO, HENRY HERNANDO RAMÍREZ BAHAMÓN y a CARMELO CÓRDOBA CAMPO, como presuntos coautores responsables de las infracciones a los arts. 286, 322 y 366 del C.P. y por tanto a acusarlos como se hace con esta resolución, probanzas esas que están relacionadas en el acápite dedicado a los elementos de juicio allegados a la actuación.

Ahora, en gracia de discusión, si las deponencias de los señores EDUARDO OTERO, Administrador Delegado de la DIAN en Turbo y JOSÉ ANTONIO MUÑOZ, presentan contradicciones, que les restan credibilidad, existen en le plenario otros elementos de juicio, como indicios graves de responsabilidad y documentos señalados en esta decisión que permiten proferir Resolución Acusatoria en contra de los servidores públicos adscritos a la DIAN. Además las armas entraron al país en 14 contenedores y se acreditó que se encontraban en estos, pues si no, para qué se transportaban en catorce camiones? No serían las pelotas plásticas las que fueron a parar a manos de los paramilitares de CARLOS CASTAÑO, quien además en entrevista al diario El Tiempo hiciera gala de haber dado todo un golpe al introducir el arsenal al país. Ahora si es como dice el señor defensor que las armas y municiones han podido mimetizarse con las pelotas plásticas, no lo creemos, pues como bien se afirma en el paginario, ya que los funcionarios de la DIAN que practicaron la revisión a los contenedores penetraron hasta el fondo de estos y además de los 23

revisaron 21. Así es que se descarta esa posibilidad y si se tratara del "cambiazo" que hasta último momento vienen manejando inculpados y defensor, ya lo decíamos anteriormente, si esto ocurrió estarían aceptando los miembros de la DIAN que lo que llegó y ellos revisaron fueron receptáculos que contenían los tres miles (3000) fusiles y los cinco millones (5'000.000) de cartuchos para los mismos.

Es que por parte del letrado se hacen especulaciones sin fundamento y por tanto carentes de sustento probatorio alguno que tiendan a desvirtuar las imputaciones hechas en contra de sus pupilos, queriendo con ello que por nuestra parte y a estas alturas de la tramitación se proceda a determinar si en la motonave hay pisos falsos que sirvieron para transportar el arsenal, así como si en la embarcación existieran gemelos de esos contenedores, etc.

Aquí en este evento lo que se vislumbra es que los inculpados encargados de la revisión de los contenedores plasmaron en el Acta de Inspección llevada a cabo a los mismos una falsedad cuando consignaron en dicho documento que lo revisado concuerda con lo declarado.

Dando respuesta a la señora defensora del inculpado CHAVERRA ARBOLEDA, diremos que nuestra convicción de estar este incurso en el delito contenido en el art. 366 del C. P. se funda en el hecho de haber estado presente en la operación revisión en carácter de representante del dueño del contenido de los 14 contenedores, en la coordinación que ejerció para que estos fueran cargados en igual número de camiones, como así lo acepta el mismo inculpado, lo mismo que su defensora. para ser llevados a su destino final, los paramilitares, la comunicación signada por un funcionario de Banadex S. A., quien nos dice que LUIS ANÍBAL CHAVERRA ARBOLEDA estuvo adelantando gestiones para la importación de las pelotas plásticas que resultaron siendo fachada del verdadero asunto que era la introducción del arsenal al país, los señalamientos hechos por los cosindicados, HERMINIO MARTÍNEZ MERCADO y YOVANNY HURTADO TORRES, para quienes ARBOLEDA asistió a la revisión en los patios de Banadex en representación de los dueños de la mercancía, circunstancias estas corroboradas con las fotocopias del libro que registra la entrada a los patios de Banadex S. A., para los días 8 y 9 de noviembre de 2001.

Ahora bien, las transcripciones de normas de carácter aduanero, sobre lo que son las Sociedades de Intermediación Aduanera, es normatividad que refuerza nuestra posición, pues concuerda con lo sostenido por nuestra parte en el sentido de haber los funcionarios de la DIAN inobservado las disposiciones que regulan la entrada de mercancías al país. Así mismo, lo relativo a las SIAs cuando sabemos cuáles eran las funciones de quien representaba a la que NELSON SALDARRIAGA otorgó poder para gestionar ante la DIAN la importación y nacionalización de las pelotas plásticas que resultó ser lo de fachada.

De otra parte, es necesario dejar anotado que la presunción de inocencia respecto del señor CHAVERRA ARBOLEDA, comenzó a desaparecer cuando este optó por gestionar la importación y nacionalización de las pelotas plásticas, gestión que tuvo como único fin la ilegal entrada al país del arsenal proveniente de Nicaragua y nos extraña sobremanera que la doctora SALCEDO VELOZA no tenga conocimiento de la existencia del fenómeno delictual de la coparticipación criminal impropia, que se presenta en los casos en que varias personas proceden en una empresa criminal, con consciente y voluntaria división del trabajo para la producción e un resultado típico, todos los partícipes tienen la calidad de autores, así su conducta vista en forma aislada no permita una directa subsunción en el tipo, porque todos están unidos en el criminal designio y actúan con conocimiento y voluntad para la producción del Resultado comúnmente querido o, por lo menos, aceptado como probable.

Ahora, es necesario hacer claridad a la señora defensora del inculpado CHAVERRA ARBOLEDA en cuanto a que una cosa son las acepciones traídas por los diccionarios comunes, ya sea de la lengua española o de la Real Academia y las contenidas e los diccionarios jurídicos, pues difieren en su semántica y por ello lo aconsejable es consultar estos últimos cuando se trata de entrar en polémicas de esta naturaleza.

Por último, estima el suscrito no haber vulnerado el principio de legalidad traído a colación por la libelista, así como tampoco el debido proceso respecto de su defendido, pero en contra de este,

como se señalara anteriormente, existen indicios graves de responsabilidad, como se señala en anterioridad, que nos llevan a proferir Resolución de Acusación contra el mismo, como presunto coautor responsable de infringir el art. 366 del C.P., en las circunstancias de mayor punibilidad contenidas en el numeral 10 del art. 58 del C.P.

Respecto de los argumentos traídos al plenario por el doctor TÁMARA MURCIA, en procura de que por el despacho se precluya la investigación que en contra de su prohijado, el señor YOVANNY HURTADO TORRES, se ha vendio adelantando como presunto coautor de infringir el art. 366 del C.P., como se ha dejado anotado en el cuerpo de esta resolución, nuestra decisión es la proceder tal como lo está solicitando su defensor y por tanto estimamos no extendernos en elucubraciones que van a coincidir que el pedimento que tubo a bien hacer el letrado.

Como corolario de lo anterior ¿mente expuesto, el suscrito Fiscal Delegado ante los Juzgados Penales del Circuito de Bogotá y Cundinamrca,

**RESUELVE**

**Primero.-** PROFERIR Resolución de Acusación en contra de los señores HERMINIO MARTÍNEZ MERCADO, HENRY HERNANDO RAMÍREZ BAHAMÓN y CARMELO CÓRDOBA CAMPO, de condiciones civiles y personales conocidas, como presuntos coautores responsables de infringir los arts. 286, 322 y 366 del C. P., en concurso heterogéneo, en las circunstancias de mayor punibilidad prescritas en el numeral 10 del art. 58 del C.P., de conformidad a lo consignado en las consideraciones de esta resolución.

**Segundo.-** PROFERIR Resolución de Acusación en conra del señor LUIS ANÍBAL CHAVERRA ARBOLEDA, de condiciones civiles y personales conocidas, como presunto coautor responsable de infringir el art. 366 del C.P., en las circunstancias de mayor punibilidad contempladas en el numeral 10 del art. 58 del C.P., de conformidad a la motivación contenida en esta decisión.

Tercero.- **PRECLUIR** la investigación que se adelantara en contra de los señores **PAOLA KATHERINE BENAVIDES ROMERO** y **JOVANNY HURTADO TORRES** respecto del delito a que hace mención el art. 366 del C.P., por lo expuesto en las consideraciones de este proveído.

Cuarto.- Se **REVOCA** la medida de aseguramiento que pesa en contra de los nombrados inculpados y se orden la **LIBERTAD** de los mismos, librando los oficios a que haya lugar.

Quinto.- **REMITIR** el expediente contentivo de este diligenciamiento al Juez Penal del Circuito Especializado –Reparto - de Apartadó Antioquia , para que se continúe con la etapa del juicio y solicitar al señor Fiscal General de la Nación la designación del funcionario correspondiente para el adelantamiento de la señalada etapa.

Sexto.- Se compulsarán las piezas necesarias a fin de continuar la investigación en relación con los señores **DARÍO ENRIQUE VELEZ TRUJILLO** y **JESÚS FERNANDO ITURRIOS MACIEL**.

**DAR** aplicación a lo normado en el art. 364 del C.P.P.

**NOTIFÍQUESE Y CÚMPLASE**

HERNÁN DAVID QUIÑONES PABÓN
Fiscal Especializado

Rad. 59.516.

# EXHIBIT D



TRANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
GENEVA
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON DC

AFFIDAVIT OF ACCURACY

I, Carrie Russ, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of a portion of the attached 2003 UNDP National Report on Human Development for Colombia [page 285], from Spanish into English.

Carrie Russ
TransPerfect Translations, Inc.
601 Thirteenth Street, NW
Suite 370 South
Washington, DC 20005

Sworn to before me this
10th day of December 2007

Signature, Notary Public

Lisa Sherfinski
Notary Public, District of Columbia
My Commission Expires 01-01-2008

Stamp, Notary Public

Washington, DC

Taking away funds for the war:
Armoring  income

## A. Composition of Income

Determining the amount of income received by illegal armed groups is not an easy task. Although the figures vary significantly from one source to the next, Table 12.1 attempts to consolidate the most reliable partial estimates for the FARC and the ELN.   The national government estimates that the self-defense forces' annual income totals $286 million, 70% of which represents drug trafficking (Office of the Presidency, National Planning Department, 2003:33).

### Table 12.1.  Estimated Income of Guerrilla Forces
### (Annual Millions of Dollars)

|  | FARC | ELN | Approximate total | % |
|---|---|---|---|---|
| Drug Trafficking | 204 | (**) | 204 | 41.9 |
| Extortion | 96 | 59 | 155 | 31.8 |
| Kidnapping | 32 | 74 | 106 | 21.8 |
| Other (*) | 10 | 11 | 21 | 4.3 |
| Total | 342 | 144 | 486 | 100 |

\* "Other" includes capture of public funds, corporate attacks/robbery, and theft.

\*\* According to certain estimates, drug trafficking may represent 8% of the ELN's income.  However, this group is known to be reluctant to take part in the drug trade (Thoumi, 2002).

# El conflicto, callejón con salida

Informe Nacional de Desarrollo Humano para Colombia – 2003





# Desfinanciar la guerra: blindaje de rentas

AGRADECIMIENTOS

Colaboración: capitán Esteban Arias, Édgar Cataño, Jorge Gaviria, César González Muñoz, Alexandra Guáqueta, Juan Felipe Laverde, Astrid Martínez, Carlos Miguel Ortiz, Juan Camilo Restrepo, Andrés Soto y Rodolfo Uribe.

Página anterior: Foto 12.1 **Decomiso de una tonelada de cocaína** en La Dorada, Caldas • Foto: John W. Vizcaíno/ El Tiempo.

Los dos capítulos anteriores se ocuparon de cómo sacar gente de la guerra. Este capítulo y el próximo se refieren a cómo cerrar sus grifos financieros. En el Capítulo 3 clasificamos los ingresos de los grupos armados en función de su papel como factor de degradación del conflicto; para efectos de interrumpir ese flujo de recursos, en este capítulo usaremos una tipología diferente y donde se distinguen tres modalidades: las rentas extorsivas, los intercambios ilegales en los mercados negros paralelos y la simbiosis o infiltración en la economía legal.

• Las *rentas extorsivas* comprenden secuestro, extorsión y clientelismo armado. Frente al primero proponderemos fortalecer la prevención, desmontar las bandas y redes criminales que interactúan con los grupos armados, y ciertas reformas de orden legal para reducir el pago de rescates. Ante la extorsión se formulan medidas para inhibir los desembolsos, y sanciones de la comunidad internacional a las empresas involucradas en el pago de extorsiones en Colombia. Respecto del clientelismo armado, sugerimos establecer algunos seguros para proteger los recursos públicos, en particular las finanzas municipales y las regalías.

• Los *mercados negros paralelos* abarcan intercambios ilegales de diversos bienes legales como el oro, las esmeraldas y los hidrocarburos. Sobre estos mercados se plantea eliminar las fallas de regulación estatal a cuyo amparo ocurren los intercambios ilegales.

• La *infiltración o simbiosis con la economía legal* resulta de invertir recursos de origen ilícito en actividades legales. Esta infiltración permite que el grupo armado acceda al sistema financiero y se adueñe mediante testaferros de un sinnúmero de negocios como estaciones de gasolina, tiendas de víveres, joyerías y finca raíz. El capítulo propone bloquear estas prácticas mediante el refuerzo de los controles al lavado de activos.

## A. Composición de los ingresos

No es fácil establecer cuál es el volumen de ingresos que perciben los grupos armados ilegales. Aunque las cifras difieren bastante entre una y otra fuente, el Cuadro 12.1 intenta consolidar los estimativos parciales más confiables para el caso de las Farc y el ELN. El gobierno nacional estima que los ingresos anuales de las autodefensas alcanzan los 286 millones de dólares, de los cuales 70% corresponden al tráfico de drogas (Presidencia de la República, DNP, 2003: 33).

CUADRO 12.1 INGRESOS ESTIMADOS DE LA GUERRILLA
(MILLONES DE DÓLARES ANUALES)

|  | FARC | ELN | Total aproximado | % |
|---|---|---|---|---|
| Narcotráfico | 204 | (**) | 204 | 41,9 |
| Extorsión | 96 | 59 | 155 | 31,8 |
| Secuestro | 32 | 74 | 106 | 21,8 |
| Otros (*) | 10 | 11 | 21 | 4,3 |
| Total | 342 | 144 | 486 | 100 |

* "Otros" incluye captura de fondos públicos, asaltos a entidades, abigeato.
** Algunas estimaciones plantean que el narcotráfico puede llegar a representar 8% de los ingresos del ELN. Sin embargo, se sabe que este grupo es bastante reacio a participar en el negocio de las drogas (Thoumi, 2002).

Fuentes: Ulaf, 2002; Echandía, 1999; Rocha, 2000; Thoumi, 2002 y cálculos del INDH 2003.

En todo caso, es probable que muchas de las cifras estén subestimadas dada la infiltración de estos grupos en la eco-

# EXHIBIT E





For Immediate Release
Office of the Press Secretary
August 4, 2005

# President Bush, President Uribe of Colombia Discuss Terrorism and Security

Bush Ranch
Crawford, Texas

11:47 A.M. CDT

PRESIDENT BUSH: Thank you all. Welcome. Laura and I are very pleased to welcome President Uribe and his gracious wife, Lina, to our home here in Crawford. President Uribe is a strong and principled leader. I admire his determination; I appreciate his vision for a peaceful and prosperous Colombia.



President's Remarks
view



Our two nations are working together to fight drug trafficking and terrorism, and to promote security, democracy and the rule of law throughout the Americas. President Uribe's leadership and the courage of the Colombian people are creating a bright future for Colombia. The Colombian government implemented a comprehensive strategy, known as Plan Colombia, to reduce the illegal drug trade, revitalize Colombia's economy, strengthen its democratic institutions, and improve the security of its people. The United States provided critical assistance for Plan Colombia, and the plan is producing results.

Violent crime in Colombia is at its lowest level in 16 years. Since 2002, murders, kidnappings and terrorist acts in Colombia have all declined significantly. Colombia is also making great progress in reforming its justice system. These gains in security and the rule of law are helping the Colombian economy grow by more than 4 percent last year. And as Colombia has improved its security and economy, it has also emerged as a leader in our hemisphere.

Colombia shares our commitment to advancing economic growth, trade and democracy in the Americas. Colombia is also sharing its expertise with Afghanistan to combat terrorism and narco-trafficking in that new democracy. And America is very grateful for your support.

America will continue to stand with the people of Colombia. I will ask the Congress to sustain our commitment to follow-on programs for Plan Colombia so Colombia can build on its progress and win its war against the narco-terrorists. Our strategic partnership is vital to the security, prosperity and freedom of both our countries and the Americas. Mr. President, thank you for your leadership. Thank you for your friendship, and welcome.

PRESIDENT URIBE: (As translated.) Mr. President, thank you very much, and I also want to thank your wife, Laura, and all of your team. Thank you for welcoming Lina, my delegation and myself to your home here, and for sharing with us here in this wonderful place in Texas.

As you have well said, both of our countries have a strategic relationship that is based on mutual trust, which is aimed at deepening democracy, at combating terrorism, and on building social cohesion. Our agenda is very important for the present and the future of both of our peoples, so that Colombia can free itself from the scourge of terrorism.

The great enemy of Colombian democracy is terrorism. And our great partner in defeating terrorism has been the government and the people of the United States. Allow me to say here to the rest of the world that U.S.

cooperation has been exemplary. It has gone beyond rhetoric, and it has, in fact, been cooperation that has been put in practice. And all democratic countries need to know that, that cooperation should be realistic and put into practice.



We have made progress, and we are winning, but we have not won yet. And that is why it is important to continue with this cooperation, as you have said, that you have asked from the Congress, President Bush. We cannot leave this task half-finished. We must take it all the way to the end. We need a definitive victory for both democratic peoples of Colombia and the United States, and also, we must keep that objective in mind as we build upon our results to keep moving forward to that final goal.

We trust that we will soon be able to announce the successful completion of our free trade agreement -- an agreement built on trust; an agreement that can help bring our democratic peoples closer together and in more solidarity. The key word in Colombia today is "trust." This is the mutual trust that is the basis of the relationship with the United States. It is trust that we want to create among Colombian people, themselves.

So that Colombians can gain trust in their homeland, we are working on five elements of a modern democracy. Number one is democratic security: security for all citizens, security for pluralism, security for all ideas and for all citizens.

The second element is respect for public freedom. In Colombia we've had a dictatorship of terrorism, but the people, the government, and the nation of Colombia that are fighting terrorism will do so by respecting public freedom. They want to serve as an example, because that's the difference between what has happened in our country and in other Latin American countries, where it was government dictatorships. Here we have a democratic government that has full respect for public freedom and that fully intends to defeat terrorism.

The third element is to build social cohesion, which is necessary in order to have sustainable democracy and a sustainable security policy. The election of Ambassador Moreno, as President of the IDB represents a great opportunity for our continent. It represents a new hope for us to combat poverty, and to build social cohesion.

The fourth element is transparency. The fifth is respect for the independence of institutions. Transparency in public affairs, transparency in friendship, transparency in partnership and in agreement and in disagreement. Transparency is critical for modern democracies in order for the people to have trust in the government that guides them.



The fifth element is respect for the independence of our institutions, which is important for the rule of law. This is critical for a modern democracy. Colombia deepens its respect for its independent institutions, especially now that we're combating -- in this moment of time, when we're combating terrorism.

Thank you once again, President Bush, for your friendship, for your solidarity, and you honor us by welcoming us here to your home.

PRESIDENT BUSH: We'll answer two questions a side. Nedra.

Q Thank you, Mr. President. The Discovery Space Shuttle mission has been dominated by repairs and questions about safety. Do you think the return to space was premature? And are you worried about Discovery's return next week?

PRESIDENT BUSH: First of all, I had the honor of speaking to the -- the folks of -- that are on that mission. And it was a great experience to be talking to bold explorers. And, secondly, like a lot of Americans, I was amazed at the procedures that took place to repair the craft. It's pretty remarkable. I believe that -- I believe that the mission is

important, and I know that the mission directors will make the right decision about how to proceed.

Ours is a country that values the safety of our citizens, particularly those we ask to take risk in space. And there will be a lot of deliberation, a lot of thought that goes into the decision as to whether or not those brave souls can -- should return on that vehicle. And I know that NASA has been very closely in touch with the White House. Andy Card has been in touch with the Administrator on a regular basis. But I've got the confidence -- all the confidence that they will make the right decision.

Let me also say that it is important for our fellow citizens to understand that we're going to take the NASA mission beyond the current mission, that we'll be using -- we want -- the plan right now is to phase out the shuttle by 2010, and then begin to put a strategy in place that will use the moon as a launching spot for further exploration.

I know the -- at least the people I've talked to inside NASA are excited about the mission, the reinvigoration of the vision of exploration. And I appreciate the Administrator working on getting that strategy in place, so that when the decision is made to finally get rid of this phase of exploration, we'll be ready to take on the new phase. And that's important for the American people to understand, that, one, exploration is important; two, there will be some good coming out of exploration; and, three, that we've got a new vision embraced by NASA and its pioneers.

Go ahead and ask a question.

Q If you could answer in Spanish, that will be great. But, really, either one of you can answer. I was wondering if Venezuela came up at all, and whether or not you had a chance to discuss the advances in human rights investigations in Colombia?

PRESIDENT URIBE: (Question answered in Spanish.)

Q Did you discuss Venezuela and human rights?

PRESIDENT URIBE: (Question answered in Spanish.)

Q Mr. President --

PRESIDENT BUSH: Hold on a second. Why don't you translate that, please.

TRANSLATOR: Colombia faces a threat from terrorism from -- funded by drug trafficking. This is a threat that can affect the entire neighborhood, that can affect our entire continent, because when Colombian terrorists cannot kidnap within our borders, they're forced to kidnap outside in our neighboring countries. This terrorism -- this kind of terrorism knows no limits, it knows no ethics. And that is why it must be defeated in Colombia. And we must do this by getting cooperation from our neighboring countries. And that is what we aspire to at the highest levels.

As far as our human rights. This was discussed with great seriousness and with great respect. Our security policy must be sustainable. In order for it to be sustainable, there must be respect for human rights and there must be transparency for the -- so that it can be respected by public opinion. The respect for human rights needs transparency. This is what we work for in Colombia every day.

PRESIDENT BUSH: Steve.

Q Thanks, sir. Al Qaeda's number two, Dr. al-Zawahiri, is warning that attacks will continue until U.S. troops leave Iraq. How serious a threat is this? And after so many Marines were killed this week, what's being done to improve their safety?

PRESIDENT BUSH: First, let me say that we mourn the loss of every fallen troop. And the community outside of Cleveland, Brook Park, Ohio, suffered mightily over the last couple of days. It's -- the people of Brook Park and the family members of those who lost their life, I hope they can take comfort in the fact that millions of their fellow citizens pray for them. I hope they also take comfort in the understanding that the sacrifice was made in a noble cause.

We're laying the foundation of peace for generations to come. We're defeating the terrorists in a place like Iraq so we don't have to face them here at home. And, as well, we're spreading democracy and freedom to parts of the world that are desperate for democracy and freedom.

The comments by the number two man of al Qaeda make it clear that Iraq is a part of this war on terror, and we're at war. In other words, he's saying, leave. As I have told the American people, one, that people like Zawahiri have an ideology that is dark, dim, backwards; they don't trust -- they don't appreciate women; if you don't agree to their narrow view of a religion you'll be whipped in the public square. That's their view, and they have tactics to help spread that view. In other words, they've got goals. They want to spread that point of view throughout the world, starting in the broader Middle East. And part of their goal is to drive us out of the broader Middle East, precisely what Zawahiri said. In other words, he's threatening.

They have come up against a nation that, one, will defend itself. Zawahiri is a part of that team that attacked us on September the 11th, 2001. He was part of an al Qaeda group that said, well, we'll try to achieve our objective in attacking America. They must not have understood the nature of our country. I vowed then that we would stay on the offense against these people. We owe it to the American people, and other freedom-loving countries, to bring these killers to justice. And that's what they are: they're terrorists, and they're killers. And they will kill innocent people trying to get us to withdraw from the world, so they can impose their dark vision on the world. That's what they're trying to do. And the comments today by Mr. Zawahiri absolutely reinforce what I've just told you.

We will stay the course, we will complete the job in Iraq. And the job is this: We'll help the Iraqis develop a democracy. They're writing -- in the process of writing a constitution, which will be ratified in October, and then they will elect a permanent government. It's also important for our citizens to understand that progress has been made, particularly when eight-plus million people got to vote in the face of Zawahiri and Sarawak and these killers.

We're also training Iraqis. Our troops will come home as soon as possible. "As soon as possible" means when those Iraqis are prepared to fight. As Iraq stands up, our coalition will stand down.

The Iraqis want to live in a free society. Zawahiri doesn't want them to live in a free society. And that's the clash of ideologies -- freedom versus tyranny. We have had these kinds of clashes before, and we have prevailed. We have prevailed because we're right; we have prevailed because we adhere to a hopeful philosophy; and we have prevailed because we would not falter.

Go ahead and ask --

Q Also the question is for President Bush. Did you talk about the necessity and the importance of the creation of international community that can verify the application of the justice and peace law, and also its implementation?

PRESIDENT BUSH: We did talk about human rights. I talked about human rights. The Secretary of State Arrow -- (laughter) -- talked about human rights. The President assured us -- a couple of points that are important to understand -- one, that there is an independent judiciary, in other words, independent from government, that will adjudicate these disputes; secondly, that there is a new prosecutor reporting to the independent judiciary that will follow through on the cases; and, thirdly, that he is committed to seeing to it as best as possible that progress be made on these cases.

And we talked about specific cases. And I listened intently and believe that he is interested in following through on these cases, so that the world will hear loud and clear that Colombia is a nation of law and human rights and human dignity.

PRESIDENT URIBE: (Question answered in Spanish.)

PRESIDENT BUSH: You le compendia. Vamps a comer. (Laughter.) I told him I understood him. We're going to go eat. Thank you very much. Appreciate you. Gracias.

Q What's on the menu? What's on the menu?

PRESIDENT BUSH: Carne.

Q Carne.

PRESIDENT BUSH: Necesito preguntar a mi esposa. I've been thinking about business; she's been thinking about the food.

END 12:15 P.M. CDT

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2005/08/20050804-2.html

 CLICK HERE TO PRINT

# EXHIBIT F



You Are In: USINFO > Topics > International Security > Response to Terrorism

## Colombia, United States Allies in Fighting Terrorism

### State's Crumpton applauds nation's progress, ongoing bilateral cooperation

Colombia is an important U.S. ally in combating terrorism in the Western Hemisphere, and the United States looks forward to continued cooperation with the Andean nation, says U.S. State Department Coordinator for Counterterrorism Henry Crumpton.

Crumpton headed the U.S. delegation to the Organization of American States' (OAS) Sixth Regular Session of the Inter-American Committee Against Terrorism (CICTE), held March 22-24, in Bogota, Colombia.  At this event, he announced that the United States will commit $2.25 million to expanding regional counterterrorism coordination.   (See related article.)

In a March 23 press conference at the CICTE session, he praised Colombia as "a staunch ally" in the fight against terrorism," and added that "Colombia has made excellent progress" in its efforts to confront terrorism domestically, particularly in response to the three main narco-terrorist groups that continue to fuel civil conflict in the country.

Crumpton cited the Colombian government's progress in the demobilization of the illegal armed group known as the United Self-Defense Forces of Colombia, peace talks with another insurgent group, the National Liberation Army of Colombia and military and law-enforcement success against the rebel Revolutionary Armed Forces of Colombia (FARC).  He added that Colombia's efforts serve as "important lessons" for other nations and pledged continued U.S. support for these efforts.

"I would like to recognize the Colombian people for their stamina, determination, and courage, and to thank the government of Colombia, under the leadership of President Alvaro Uribe, for its steadfast commitment to overcome these challenges," he said.  "We stand with you."

Crumpton's comments followed a March 22 press conference

by U.S. Attorney General Alberto Gonzales, who announced the indictment of 50 FARC leaders accused of trafficking more than $25 billion of cocaine into the United States and elsewhere. (See related article.)

Crumpton said the indictments underscore the link between transnational crime and terrorism and highlight the cooperation between the United States and Colombia that produced the indictments.

Crumpton expressed confidence that the indicted FARC leaders will be brought to justice and his hope that they would be brought before a U.S. court.  He said it is not yet clear how the Colombian peace process will affect the legal proceedings.

"How this evolves in terms of U.S. indictments, in terms of the Colombian peace initiatives -- I cannot tell," he said.  "I cannot predict what the future might hold, except that I am sure that our relationship with Colombia will not only remain strong but will grow stronger."

In addition to Colombia, Crumpton said, the United States also will work with other nations in the region -- including Venezuela -- to combat the problems of narcotics and terrorism.

"We look forward to working with them and working through some of our disagreements to achieve what I hope will be common regional goals," he said.

He added that although there is no evidence that Islamic terrorist groups such as al-Qaida, Hizballah, or Hamas have operational cells in the region, the United States does have information that these groups are fund raising in the Western Hemisphere.

Crumpton indicated that the challenge facing CICTE is looking at how terrorism and transnational crime overlap, and developing a comprehensive approach to address this nexus.

Following is a transcript of Crumpton's remarks:

U. S. Embassy Press Conference
Bogotá, Colombia
March 23, 2006

Ambassador Henry A. Crumpton
Department of State's Coordinator for Counterterrorism

Ambassador John F. Maisto
U.S. Permanent Representative to the OAS

Ambassador Henry A. Crumpton Opening statement:

Thanks for the opportunity to speak with you today. We are all engaged in a global campaign against terrorism. Terrorism threatens our democratic way of life, our freedom to live and prosper peacefully. The OAS Inter-American Committee Against Terrorism (CICTE) is an outstanding, perhaps the best, example of a region pulling together to protect itself to endure the pursuit of democracy and economic freedom, all shared values among the OAS members. I am happy to be here today to discuss this with you and the U.S. Government's participation and goals for CICTE's Sixth Regular Session in Bogota.

I want to express our deepest thanks to Trinidad and Tobago for their chairmanship over the past year. CICTE, under Trinidad's leadership, has continued to build upon its impressive record of enhancing hemispheric counterterrorism capacity, information-sharing and technical expertise. Trinidad continues to play a key role in the security of the Caribbean region and it will continue its CICTE contribution through its role in the Inter-American Tourism and Recreational Security Initiative in our hemisphere.

The U.S. Government would like to express its full support to Colombia as the incoming CICTE Chair. Colombia is a staunch ally of the U.S. in the hemispheric fight against terrorism. Colombia has made excellent progress: the demobilization of the AUC; peace talks with the ELN; and military and law enforcement success against the FARC. Colombia's steadfast efforts to secure the release of all hostages, including three American citizens, are a critical part of this war.

Colombia provides many important lessons for nations and governments that are combating the menaces of drugs, terrorism, and transnational crime. Thus, I would like to recognize the Colombian people, for their stamina, determination, and courage; and to thank the government of Colombia, under the leadership of President Alvaro Uribe, for its steadfast commitment to overcome these challenges. We stand with you.

Moreover, as President Uribe stressed yesterday, counterterrorism and counternarcotics policy must focus on the long-term social, economic, and political goals, to address the needs of all of our people.

We are honored to support Colombia's leadership of CICTE in 2006.

I am pleased to lead the U.S. delegation here in CICTE VI. I am also pleased that our Permanent Representative to the

OAS Ambassador John Maisto is here with me; and I certainly appreciate his invaluable support and guidance.

It is clear that the region has demonstrated an increased determination and political will to address terrorism as demonstrated through national acts and the work of the OAS' Inter-American Committee against Terrorism, the only permanent regional multilateral organization focused exclusively on counterterrorism.

CICTE is an outstanding example of a region pulling together to protect itself, building bonds of understanding and trust, and ensuring the pursue of democracy and economic freedoms, all of which are shared values among OAS member states. The U.S. values relevant multilateralism and it is firmly committed to CICTE's long-term success, working with fellow democratic governments to defeat transnational terrorism and ensure the safety, prosperity, and well-being of all people in the hemisphere.

The Sixth session is providing the U.S. and the other 33 members an opportunity to address hemispheric cooperation in the comprehensive fight against terrorism.

In the coming decades the global war on terrorism, waged in a rapidly evolving global society, will defy our best predictions, despite our best intelligence efforts. We must therefore prepare for uncertainty by building bonds of understanding and trust through CICTE partnerships.

The U.S. strongly supports the mandate adopted in 2006 by CICTE to focus on travel document security. This will be a strong complement to the successful efforts last year to expand its mission beyond focusing on terrorism financing and enhancing border security to include addressing threats to transportation security, aviation and seaports, and also cyber-security.

The meeting will also give us an opportunity to reaffirm hemispheric recognition, as reflected in the U.N., OAS, and CICTE conventions, protocols, and resolutions, that there is interdependence between terrorism and illicit transnational activities, such as trafficking in arms, asset laundering, organized crime, and drug trafficking, they all pose serious threats to our security. The U.S. federal indictment of 50 FARC leaders for narco-trafficking underscores that point.

We also encouraged CICTE and its members to continue to enhance collaboration with other OAS entities, international organizations, such as the UN, the G-8's Roma-Lyon Group, and the Counterterrorism Action Group, and other organizations outside the hemisphere.

Voluntary contributions to CICTE are important, are its lifeblood, and we are supporting its Executive Secretariat and its capacity-building programs. We appreciate all of the voluntary contributions that member states have given to CICTE. We should strongly encourage all member states to contribute more, whether financially, seconding personnel, or with in-kind technical or other assistance.

The U.S. is committed to CICTE's long-term success, and intends to provide it with approximately $1.8 million during 2006 to support port, land border and document security activities, and training for Custom's officials. In addition to the $1.8 million, the U.S. will authorize the transfer of $454,000 to CICTE for a comprehensive airport security program. This brings the U.S. total contribution to $2.25 million, our largest contribution to CICTE. This represents an increase of $654,000 from last year.

Investment now in counterterrorism cooperation, prevention will pay significant future dividends in a secure homeland, safe trade, and expanded tourism throughout the entire hemisphere.

The U.S. is invested in CICTE's future development and has great confidence in Colombia's leadership as the next country chair.

**Joshua Goodman, Associated Press:** How much information does the U.S. government have about links between the FARC organization and international terrorist organizations such as al Qaida and Hamas, especially in light of a recent false passport ring which was disbanded here and which the Colombian authorities insist did have links to the Middle Eastern terrorist groups?

**Ambassador Henry A. Crumpton:** We do not believe that any of the Middle East terrorist groups have operational cells in the Hemisphere or more accurately we are not aware of any operational cells that al Qaida and Hezbollah or Hamas might have. However, we do have information that these organizations raise money in this Hemisphere, they are tied into international, transnational criminal networks, and that poses a great threat. If you look at terrorist mobility around the world, they rely on these transnational criminal networks to acquire documents for them to move across borders, and also increasingly they use illegal activities to raise funds that enhance their mobilization. The narco-trafficking here in Colombia is an example of that. So, to answer your question there are links, not at an operational, tactical level but certainly tied into these transnational criminals that we talk about. And, that of course is one of the key objectives of the CICTE meeting this year: looking at terrorism and looking at

transnational crime and seeing they overlap and then trying to work toward a comprehensive answer to those issues.

**Jose Luis Rodriguez, Caracol Noticias:**  Yesterday the U.S. Attorney General announced an indictment for 50 members of the FARC on charges of narco-trafficking.  Many of those members of the FARC perhaps have hundreds or even thousands indictments in Colombia on charges of narco-trafficking, murder, massacre, terrorism, and they have not been detained.  What makes the U.S. government think that with this step against 50 members they effectively will be arrested or smashed?

**Ambassador Henry A. Crumpton:**  Fist and foremost, this indictment underscores the very point that I just made about the nexus between terrorist organizations and transnational crime.  You look at what the FARC and their leadership has done, they are the major suppliers of cocaine not just for this hemisphere but really for the world.  So I think that is the first point; it underscores the important links between terrorist groups and transnational criminal networks.  Secondly, it highlights the type of cooperation required to reach this indictment.  Bear in mind this is not based on rumor or unsubstantiated intelligence; these indictments are based on hard evidence.  We are very confident that we can bring these people to justice.  Now, the last point in terms of your question, we are also confident that in time working with international partners we will be able to bring them to justice, and our preference, of course, is to bring them to a U.S. court to stand trial.  The mechanics, the operational aspects of how that happens that can vary across a multitude of options.  But the key to all of this will be international cooperation.

**Alicia Mendez, RCN Radio:**  You mentioned the FARC is the largest narco-trafficking group and also the largest terrorist organization in Colombia.  What would happen in the future if they accept to enter a peace process, if arrest warrants as well as requests for extradition are suspended as part of the peace talks, would U.S.-Colombia relations be affected?

**Ambassador Henry A. Crumpton:**  This is my first trip to Colombia.  I have only been here for a couple of days.  I have learned a lot in these two days.  I have had extensive discussions with Colombian officials.  The lesson I have learned first and foremost is the depth of our partnership, the strength of our partnership, the deep inter-dependence that we have across all aspects of statecraft looking at counterterrorism.  How this evolves in terms of U.S. indictments, in terms of the Colombian peace initiatives -- I cannot tell; I cannot predict what the future might hold except that I am sure that our relationship with Colombia will not only remain strong but will grow stronger.  Again, I think, specific

operational aspects of how this comes to the fore in terms of bringing these criminals to justice and in terms of securing a peace in Colombia, I am very confident that we can work through those specific issues. And it will have to be very specific, would be my guess, in terms of individuals, in terms of the particular groups, but I am very hopeful.

**Carlos Ibarra, Colprensa:** You mentioned that one of CICTE's goals is to seek greater cooperation in counterterrorism regarding asset laundering, trafficking in arms. The Colombian government has said in private that it is also concerned with the co-responsibility of other nations. This co-responsibility exists for counternarcotics; shouldn't it exist for counterterrorism? Do you think Colombia's neighbors support its efforts against terrorism?

**Ambassador Henry A. Crumpton:** We are encouraged by Colombia's leadership. We are also encouraged by the growing awareness and political will of other countries in the region that this is a regional problem, in terms of narcotics and terrorism. That is where the challenges we face go. This is not just about Colombia; it really is about the region. It is a transnational problem and the only way to respond to that is through regional cooperation, which is why CICTE serves such an important role. Capabilities from country-to-country vary, understanding of the problems vary but through a mutual dialogue and through joint training, through building inter-link capacity like CICTE is trying to do in terms of hindering the mobility of terrorists, helps us move in the direction that we have to go in terms of this regional cooperation. Let me also note that we have a long way to go. There are some gaps, there is uneven understanding of the problem but we are determined to move forward with this partnership -- certainly with Colombia, but also with the other countries in the region. The enemy takes advantage of our national borders. The enemy knows where the borders are. We cannot allow the enemy to do that and that is what we are addressing in this conference, and also bilaterally in conversations with some of our partners.

**Steve Dudley, Miami Herald:** Could you describe or characterize the U.S. relationship with Venezuela when it comes to fighting terrorism.

**Ambassador Henry A. Crumpton:** Again, expanding on the question I just noted, we think Venezuela has got an important role to play in the region in terms of counterterrorism. Colombia is engaging with Venezuela on some of the issues regarding the border, issues of common goals and common strategies. While we have clearly some disagreements with Venezuela, we are willing to engage with them, in fact we want to engage with them on this issue,

because terrorism is going to impact not only Colombia, not only us, but the region, and perhaps even Venezuela. The FARC and others are criminal organizations, they do not adhere to the rule of law, any legitimate government will suffer from this, and I think the Venezuelans understand this. We look forward to working with them and working through some of our disagreements to achieve what I hope will be common regional goals.

**Leonel Barreto, Cadena Melodía:** Over the past days Colombia and Ecuador have faced border conflicts as a result of guerillas crossing the frontier. Ecuador has protested Colombian Public Forces actions. What does the U.S. think about Ecuador's position on Colombia's efforts against terrorism, when once the guerrillas cross the border Colombia cannot do anything about it?

**Ambassador Henry A. Crumpton:** I do not think we can say Colombia cannot do anything about it. I think Colombia is working with the Ecuadorean Government to resolve some of these outstanding issues. From the U.S. perspective we certainly support that bilateral effort. But for us to become directly involved, neither Colombia nor Ecuador has invited us, and we really prefer the two to work through those issues, and we are very hopeful that they can. We of course support both Colombia and Ecuador, and the countries in the region and their counterterrorism efforts. We will encourage more of this bilateral discussion to resolve these issues. Again, this is a challenge. The enemy takes advantage of the borders and the borders, as you know better than I, are often mountainous, with deep foliage, and there is a lack of infrastructure that reaches the border areas, and that is again one of the key objectives of CICTE -- to look at the security of borders, to look at documents, to look at transportation. So we hope to help Colombia, Ecuador and the region to resolve that.

**Juan Carlos Giraldo, RCN Television:** You said you hope the 52 FARC leaders will be brought to a U.S. court to stand trial on drug trafficking and terrorism charges. The difficulties of arresting them in Colombia are proven. In what way can the U.S. cooperate with Colombia to effectively make those arrests: providing intelligence, technical assistance or sending experts to help in pursuing terrorists?

**Ambassador Henry A. Crumpton:** As you know we have an extensive bilateral program working with Colombia. In terms of military and just police assistance for this year it is about $400 million, including a variety of different programs: anti-kidnapping, intelligence collection, intelligence analysis. It also includes border security issues. We are looking at travel documents and how we can help each other in that regard, and a range of topics. But, also and perhaps most

importantly, we are working together and we are learning form each other. Frankly, some of the lessons that my government is learning through this cooperation with Colombia we are able to use this in other parts of the world -- the Middle East and Central Asia. The bilateral cooperation here not only helps us in Colombia --not only helps Colombia -- but it helps our efforts around the world. Frankly, the array of different things we are doing is very extensive, and some of it is fairly sensitive. It is a robust, integrated, even intimate cooperation covering intelligence, law enforcement, even economic development -- a range of things. I must note also that when we think of counterterrorism it is not just about the military, police, perhaps most importantly it is about the enduring, liberal institutions that we have to strengthen and build. This is reflected in what Colombia is doing here. The funding -- you take one piece is military and multiply times three and it goes to social-economic programs in Colombia. That is an important lesson for us also. When we talk about counterterrorism it is not just about arrests, it is not just about military strikes, it is not just about intelligence. You have to do that, you have to stop the enemy from killing us and killing our people but you also have to address those enduring social, political, economic factors the enemy exploits. You have to build civic society; you have to establish the rule of law. You look at the progress Colombia has made starting with President Pastrana and now with President Uribe, it is remarkable, and not only can we learn from it, we can also reach out for inspiration. I have learned that in the last couple of days. That is probably more than you wanted to hear in response.

**Ambassador John F. Maisto:** Todas estas preguntas que ustedes han hecho giran alrededor de la idea de que tiene haber más cooperación y CICTE, que es uno de los instrumentos de la Organización de Estados Americanos, es un ejemplo de multilateralismo que es relevante. ¿Qué significa eso? Es multilateralismo que produce algo concreto: cooperación. ¿En qué? Seguridad en puertos, aeropuertos, caber-seguridad, cómo se financia el terrorismo, la seguridad de documentos, la necesidad de tener intercambios de información, el entrenamiento. Estas son cosas de la vida cotidiana de los gobiernos. Todo lo que hacemos bilateralmente se complementa multilateralmente, y CICTE es el instrumento para una gran parte de esta cooperación multilateral. Hay vínculo entre el terrorismo y el narcotráfico. Eso lo sabemos, ustedes en Colombia lo saben, y los *indictments* en Estados Unidos dan prueban de un sistema legal de mucha honra de que hay este elemento de narcotráfico con la misma gente que hace terrorismo. La parte que quiero subrayar es la parte de multilateralismo relevante. La OEA es muchísimo más que un lugar donde se hacen discursos de retórica que no significan mucho; es un lugar donde se hacen cosas prácticas en la vida más

complicada de nuestra época: la lucha contra los narcóticos; el tráfico de personas; derechos humanos; la Comisión Interamericana de Derechos Humanos es la más respetada en el mundo; misiones que ayudan a países que tienen problemas: Nicaragua, Ecuador, Bolivia, Venezuela para la observación electoral; observación electoral en muchos países del Hemisferio. Ese es el nuevo multilateralismo de hoy y un elemento muy importante en el que Colombia juega una parte sumamente importante y liderazgo, estamos celebrando hoy aquí en Bogotá.

[Translation: All the questions you have posed have to do with having more cooperation and CICTE is just one of the instruments of the OAS, and it is an example of multilateral cooperation which is relevant. What does relevant mean? Well, multilateralism is actually something that produces something concrete: cooperation. In what? Well, port security, airport security, cyber-security, how terrorism is financed, the security of documents, the need for information exchange, and understanding these. These are the things that are the daily life of governments, and all that we do bilaterally is complemented multilaterally. CICTE is precisely the instrument for a good part of this multilateral cooperation. There is a link between terrorism and narcotics. We know it, and you know it well in Colombia, and those indictments in the U.S. are valid legal proof that the elements which engage in narco-trafficking are the same people who are terrorists. The part I would like to underscore is the multilateralism which is relevant. The OAS is more than just a place where you have rhetorical speeches that come and go. It is a place where you deal with practical issues relating to the very complex life of our time: our fight against narcotics, trafficking in persons, human rights, the Inter-American Committee on Human Rights, which is the most respected in the world; missions that help countries that have problems: Nicaragua, Ecuador, Bolivia, Venezuela for election monitoring; election monitoring in many countries in the hemisphere. That is really the new multilateralism of today and a very important element in which Colombia plays a highly important leadership role, and that is why we are pleased about our visit here in Bogota today.]

Thank you.

Created: 24 Mar 2006 Updated: 24 Mar 2006

Page Tools: ☐ Printer friendly version    ✉ E-mail this article

🔺 BACK TO TOP

USINFO delivers information about current U.S. foreign policy and about American life and culture. This site is produced and maintained by the U.S. Department of State's Bureau of International Information Programs. Links to other internet sites should not be construed as an endorsement of the views contained therein.

HOME  |  ABOUT USINFO  |  SITE INDEX  |  CONTACT US  |  PRIVACY
TOPICS  |  REGIONS  |  RESOURCE TOOLS  |  PRODUCTS



# EXHIBIT G



U.S. DEPARTMENT *of* STATE

# Promoting Peace and Prosperity in Colombia

**R. Nicholas Burns, Under Secretary for Political Affairs**
Remarks to the Council of the Americas
New York City
October 22, 2007

6 P.M.

Thank you Susan Segal for that kind introduction. I would also like to thank Eric Farnsworth of the Council's Washington, DC office for your effective advocacy on behalf of the Colombia Free Trade Agreement.

I'm very pleased to be with you all this evening. I would like to thank the Council of the Americas for hosting this event and inviting me here to speak with you about our vision for the future of Latin America and in particular about Colombia's place in that vision. In many respects, the significant progress that has taken place in Colombia in recent years is a reflection of positive trends elsewhere in the region. Indeed, in reflecting on trends in the hemisphere – and in Colombia in particular – I see considerable reason for optimism, an optimism I hope to share with you this evening.

The American view of the future of Latin America -- a vision we share with nearly all of our hemispheric neighbors -- is elegant in its simplicity. Indeed, it can be expressed in three points: First, we seek the further consolidation of democracy and democratic institutions. On this point, our hemispheric neighbors have much to be proud of: only one of 35 countries in the hemisphere has failed to achieve the democratic aspirations of its people, with Cuba still stymied by a spent dictatorship.

Second, we seek a Latin America that embraces free markets, free trade and economic integration. In embracing these goals, we understand they are not ends in themselves, but rather a means – the only time-tested means – to ensure the steady economic growth necessary to lift millions of Latin Americans out of poverty, which surely is the single greatest challenge facing the hemisphere.

And third, we seek a Latin America that defends and promotes the dignity of all its inhabitants, a region in which human rights are fully respected, the excluded are embraced, and in which age-old inequalities are at last vanquished. In short, an Americas where social justice is a paramount goal of all of us.

We have no secret strategy in pursuing this vision. We will work with any democratic government that is willing to put differences aside to meet shared objectives. We impose no ideological litmus test on potential partners in the region, and do not fear political differences. We have forged productive relationships with governments from across the political spectrum, from the Lula administration in Brazil and the Bachelet administration in Chile to the Calderon and Uribe administrations in Mexico and Colombia. Frankly, there is a great deal in common among these governments: all are committed to democracy and the rule of law, and all are seeking pragmatic solutions to age-old problems, to bring the benefits of prosperity to their people. I count as one of our great achievements that our country is now able to enjoy good relations with center-left, center, and center-right Latin American governments.

To take the case of Brazil, while Presidents Bush and Lula may have philosophical differences, their shared commitment to progress has forged a formidable personal and diplomatic partnership on issues ranging from energy to the UN Stabilization Mission in Haiti to development cooperation in Africa. Indeed, I believe my friends in Itamaraty would agree that our partnership with Brazil is broader and more productive today than ever before, and that we are better able to address our occasional differences in the spirit of cooperation.

Our most ambitious initiative with Brazil, and the cornerstone of our new strategic partnership, is a joint venture to work on the development of biofuels as an alternative energy source. I've been to Brazil twice this year to work on this initiative. With our two countries accounting for two-thirds of global biofuel production and leading the world in biofuels research, we form an ideal team to make biofuels a viable, 21st century alternative to fossil fuels. Central to this initiative is our plan to engage other regional partners, including the Dominican Republic, El Salvador, Haiti and St. Kitts, to ensure that the

economic benefits of this initiative are enjoyed broadly in the hemisphere.

Our growing strategic partnership with Brazil is but one example of our continued engagement with the region at the very highest levels and on many different fronts. Surely no area of engagement is of greater significance than our Security Cooperation Initiative for Mexico and Central America, announced just today in Washington. This initiative reflects the understanding that drug-trafficking, organized crime and endemic violence reflect perhaps the single greatest obstacle to progress in Mexico and the Central American republics, and that trans-border crime is a shared problem that requires a joint response. It also reflects the fact that in President Felipe Calderon, we have a partner who has the commitment and courage to confront this problem head-on.

The initiative envisions funding of $1.4 billion over several years. Today, President Bush submitted to Congress a supplemental budget request for $550 million to be allocated to this purpose, $500 million of it for Mexico. The overall plan, called the Merida Initiative on Regional Security Cooperation, is comprehensive, combining equipment, training, and technical support, and is focused on Counter-narcotics, Counterterrorism, and Border Security; Public Security and Law Enforcement; and Institution Building and the Rule of Law. We believe the moment is right to tackle the region's serious security challenges in a comprehensive, trans-national way and are confident that our carefully balanced package will yield results.

Having described for you our vision for Latin America and several key initiatives in pursuit of this vision, I would like to turn specifically to Colombia, to talk about the remarkable transformation it has undergone over the past decade, and what we must do to help ensure its continued progress.

In my view, the case for continued U.S. support of Colombia could not be more self-evident. As a key U.S. ally in the region, a stable Colombia is absolutely essential to the security of our hemisphere. To that end, over many years and with bipartisan support, the United States has made a substantial investment in Colombia's successful struggle against narco-terrorism, bilaterally, as well as multilaterally through the Organization of American States. This investment has begun to bear fruit, and there are important signs that Colombia has turned a corner in its effort to bring security, prosperity, and justice to its citizens. We now have a unique, even historic opportunity, to make a strategic commitment that will allow Colombia to build upon recent progress and finally emerge from a ruinous conflict. It is an opportunity we must not allow to pass.

Those of you who follow Colombia would surely agree that this is the most promising moment we have seen there in decades. In fact, a traveler to Bogota or Cali or Medellin who had not visited in a decade would not recognize the Colombia of today. Today, security is dramatically improved. Homicides have dropped 40 percent, kidnappings by 76 percent, and terrorist attacks by 61 percent.

The economy is rebounding, and people's lives are improving. Economic growth reached 6.8 percent in 2006 – the highest in eight years. Unemployment fell from 15 percent at the beginning of Plan Colombia to 11 percent in 2006. Poverty levels decreased by nearly 20 percent over the same period. These statistics aren't just impressive numbers – they represent real changes in the lives of millions of Colombians.

It is important to understand the historic challenge that Colombia has courageously and successfully confronted to produce this kind of change. Many drug cartels have been dismantled. Colombia has extradited more than 600 criminals – mostly drug traffickers – to the United States. Since 2001, cocaine production has fallen by a third, and seizures of cocaine bound for the United States have more than doubled. Huge swaths of land have been reclaimed from terrorist organizations, which are now on the run. Colombia has demobilized over 31,000 paramilitary members and is doing what no other country has attempted during a peace process: holding irregular forces accountable for their crimes. Mayors have returned to their towns. Roads are open. Displaced farmers are returning. Colombia has laid the foundation for bringing government services to newly secured areas, and investment in alternative development and social services has grown. For perhaps the first time, the central government is making a concerted effort to bring public services to long-marginalized Afro-Colombian and indigenous communities, and to integrate them into the national fabric.

There is no question that many problems remain. The U.S. has reminded Colombia that it must improve its human rights record. Colombia has committed itself to ending impunity. With the historic transformation of its criminal justice system, many cases proceed from arrest to verdict in months instead of years. Conviction rates have increased from under 3 percent to over 60 percent. Still, there is room for further improvement.

The picture of Colombia today is one where people have real hope for their future – for the first time in decades. This change is largely a product of heroic efforts by Uribe and the Colombian people and what has been a bipartisan policy of U.S. assistance through Plan Colombia. President Uribe has manifested unusual courage in making the tough decisions necessary to bring his country back from the brink.

Today the U.S. finds itself at a crucial crossroads in our relations with Colombia. Colombia has come a long way since Plan Colombia began, although there is still a ways to go. Although significant challenges remain, we must not lose sight of what is clear: the Colombian government and people are making progress toward peace, justice, and prosperity. While some of its neighbors have embraced false populism and authoritarian leaders, Colombia has embraced democratic governance and open markets. Colombia has made a strategic choice for a better future for its people, and needs our support in doing so. It is time for us to make the strategic choice to stand beside Colombia and its people.

The pending Free Trade Agreement (FTA) with Colombia is surely one of the most important means by which we can support Colombia in its success and encourage yet further progress. Over the last decade, our leaders – first President Clinton and now President Bush -- have made a commitment to the hemisphere. Now, with the three pending FTAs – with Peru, Colombia, and Panama – that commitment is being advanced further; indeed, these agreements would write that commitment into law. While our bilateral assistance has been instrumental in Colombia's hard-won security gains, the Free Trade Agreement is essential for creating new economic opportunities that will address lingering poverty and provide vital alternatives to drugs and violence.

The agreement will bring increased economic opportunity to the people of Colombia through sustained economic growth, new employment opportunities, increased investment, and by consolidating anti-corruption reforms and drawing millions into the formal economy. We estimate it will bring an estimated 270,000 Colombians legitimate jobs, weakening the draw of the illicit economic sector. Provisions in the agreement will reinforce democracy by fighting corruption, increasing transparency, and fostering accountability and rule of law. Through these changes, the Free Trade Agreement will treat the causes -- not just the symptoms -- of the social ills that provide fertile ground to narcotraffickers and insurgent groups.

Of course, the economic benefits of this agreement flow as much to Americans as to Colombians. U.S. businesses, farmers, and workers will see an estimated $1.1 billion increase in exports to Colombia, according to a December 2006 report by the International Trade Commission. Once the Free Trade Agreement is implemented, more than 80 percent of U.S. industrial and consumer exports will gain immediate duty-free access to Colombia. American agricultural products will also enjoy significant new duty-free access. As an example: the average tariff barrier in Colombia is 11.3 percent, while the U.S. average is 0.1 percent. By bringing Colombia's tariffs to zero through the Free Trade Agreement, American agricultural producers will benefit from a new duty-free market for their products.

We are not the only country to recognize the importance of Colombia as a trading partner. Canada and Colombia just held a second round of negotiations on a Free Trade Agreement, and hope to conclude an agreement by the end of this year. The EU has initiated trade negotiations with the Andean community. Meanwhile, China's economic influence in the region continues to grow: while U.S. exports to Colombia rose 13 percent between 2005 and 2006, Chinese exports climbed by 34 percent. We stand only to lose by remaining on the sidelines, while our competitors around the world hasten to explore Colombia's emerging market.

I have spoken about the direct economic benefits that would flow both to Colombia and the United States under the Free Trade Agreement. However, this agreement is about more than dollars or pesos, it is about achieving the vision I spoke of earlier of a more secure, prosperous and just hemisphere. Just as Colombia appears poised to put decades of conflict behind it, the fate of the FTA stands as a vote of confidence in Colombia's future.

Our entry into this long-term partnership with Colombia will reinforce Colombia's commitment to pro-market policies. It will bolster the country's democratic institutions by ensuring transparency and respect for workers rights, promoting strong labor and environmental standards, and giving us an important mechanism to monitor compliance so we can work with Colombia to ensure continued progress in these important areas. Most importantly, approving the Free Trade Agreement demonstrates America's enduring commitment to Latin America.

On the other hand, rejecting this agreement -- just as Colombia shows signs of emerging from its nightmare past -- would undercut its successes and send precisely the wrong signal to the region. Turning our back on our most loyal ally on the continent would cause countries around the world to question our commitment to the region, and our willingness to go the distance with our friends. The FTA's defeat would be a huge victory for those -- like Hugo Chavez -- who promote an authoritarian, populist, highly personalized model of government, drawing upon the failed economic policies of decades past. Others in the region and around the world would see the FTA's defeat not as a sign of our desire to see yet further progress in Colombia, but rather as an unwillingness to commit fully to the region.

I understand that some have reservations about the Free Trade Agreement because of concerns over labor and human rights in Colombia. We appreciate those concerns -- and we will continue to address them directly with the Government of Colombia at every opportunity -- but walking away from this agreement will not resolve these issues. Moreover, it is important to keep these problems in perspective. While significant problems certainly remain, Colombia has come a long way in addressing them and is striving to continue to improve its performance.

To cite but one key area of concern, homicides of trade unionists have shown a steep decline. Working with the International Labor Organization, Colombia has created a $1.5 million labor sub-unit to investigate priority cases of violence against trade unionists. And this unit is showing results. Cases are being resolved, and guilty parties are going to jail. Additionally, the government of Colombia is offering protection to vulnerable citizens, especially trade unionists. In fact, over a third ($9.6 million) of the Ministry of Interior and Justice's $34 million protection program goes to protect more than 1,300 trade unionists.

For many years our Congress has, with very large bipartisan majorities, approved unilateral, one-way access for Colombian goods into the United States under the Andean Trade Preference Act, even when levels of violence against trade unionists were considerably higher than they are today. Rather than condemning as insufficient the considerable progress already made by the Colombian people, we should help them consolidate that progress through expanded trade.

While there remain challenges that Colombia must address -- and while we will remain fully engaged in efforts to address them -- the United States must not retreat. We must push forward, side-by-side with Colombia. As Secretary Condoleezza Rice said, "how can we afford not to honor our agreement with Colombia?" As Secretary Rice noted, failure to approve the agreement would be, "a retreat from our responsibility of leadership and a renunciation of our influence in the Americas."

Thank you very much.


Released on October 23, 2007


 BACK TO TOP

# EXHIBIT H

**Data Sheet**

| | |
|---|---|
| **USAID Mission:** | Colombia |
| **Program Title:** | Support for Demobilization and Reintegration |
| **Pillar:** | Democracy, Conflict and Humanitarian Assistance |
| **Strategic Objective:** | 514-XXX |
| **Status:** | New in FY 2006 |
| **Planned FY 2006 Obligation:** | $8,635,000 ACI |
| **Prior Year Unobligated:** | $0 |
| **Proposed FY 2007 Obligation:** | $1,716,000 ACI |
| **Year of Initial Obligation:** | 2006 |
| **Estimated Year of Final Obligation:** | 2008 |

**Summary:** USAID supports the Government of Colombia's (GOC's) efforts to demobilize and reintegrate illegal armed groups back into Colombian civil society and facilitate reconciliation and the delivery of reparations to victims of the country's armed conflict. The program provides technical assistance, institutional strengthening, and implementation support for: reconciliation and reparations to victims; monitoring and verification of the demobilization and reintegration process; implementation of the legal framework for demobilization and reintegration; and reintegration of ex-combatants, including children.

**Inputs, Outputs, Activities:**
**FY 2006 Program:**
Mitigate Conflict and Support Peace ($635,000 ACI). USAID is providing technical assistance and administrative and logistical support to the newly created National Reconciliation and Reparations Commission (NRRC) directed by the Office of the Vice President. USAID assistance is building the capacity of the NRRC to promote reconciliation and delivery of reparations to victims through: the development of the legal and regulatory framework and implementation systems of the NRRC; the development and effective management of the Victims' Reparations Fund for collective and individual reparation; the development and effective management of a victims and reparation assets database for the administration, monitoring and reporting of reparations; and effective and efficient asset identification and recovery for use in victims' reparations. Principal grantee: to be determined.

Strengthen Public Sector Executive Function ($3,500,000 ACI). USAID is providing financial assistance to the Organization of American States for the verification of the disarmament, demobilization and reincorporation of all demobilizing members of illegal armed groups to provide credible monitoring and feedback to strengthen accountability of the GOC programs. USAID funded technical assistance is strengthening the capacity of the GOC's Office of the High Commissioner for Peace to negotiate and oversee the disarmament and demobilization of the Colombian illegal armed groups. USAID is providing the Ministry of Interior and Justice's Reintegration Program with technical assistance and training to: consolidate and expand the tracking, monitoring and evaluation system; expand the national network of Reference and Opportunities Centers where ex-combatants receive guidance, orientation and referral services that promote reintegration; strengthen the collaboration between municipal and departmental governments and the reintegration program to ensure timely responses for access to health, education, and other reintegration benefits, and to promote the development and implementation of regional reintegration programs; and develop communication and public information activities to promote program transparency and accountability as well as public support for the program. USAID provides financial and technical support to the Colombian Institute of Family Welfare for the implementation of programs to reintegrate child ex-combatants and prevent the recruitment of high-risk children and youth by illegal armed groups. During FY 2006, at least 350 children (i.e., up to 18 years) will be assisted. Principal grantee: to be determined.

Strengthen the Justice Sector ($500,000 ACI). USAID is providing technical assistance, logistical support and/or training to prosecutors, judges, public defenders, investigators and victims' advocates to ensure proper enforcement of the legal processes for ex-combatants within the legal framework for demobilization and reintegration. This support is being coordinated with the U.S. Department of Justice's

justice sector reform efforts in Colombia. Additionally, the GOC's Inspector General and Ombudsman offices are being strengthened to perform an effective oversight role in the demobilization and reintegration process. Principal grantee: to be determined.

Support Populations at Risk ($4,000,000 ACI). USAID is supporting activities aimed at the successful and sustainable reintegration of ex-combatants from the demobilized illegal armed groups. Technical assistance is being provided: to strengthen delivery of educational, vocational and social development training as well as job placement, job creation and income generation initiatives by public/private sectors and non-governmental organizations in support of the reintegration process of demobilized combatants; for effective outreach and alliance building with the private sector to open access to private sector opportunities for ex-combatants; to increase access to income generating opportunities for the demobilized and their receptor communities through the development and implementation of regional reintegration by municipal and regional governments; and for a community outreach program for both demobilized persons and the communities into which they are reintegrating that will assist community residents in better understanding the reintegration program and address concerns and questions about the process. Principal grantee: to be determined.

**FY 2007 Program:**
Strengthen Public Sector Executive Function ($1,716,000 ACI). USAID will continue to support the Colombian Institute of Family Welfare with the implementation of programs to reintegrate child ex-combatants and prevent the recruitment of high-risk children and youth by illegal armed groups. During FY 2007, at least 350 children (up to 18 years of age) will be assisted.

**Performance and Results:** This program begins in FY 2006. Successful implementation of the program should result in a strengthened demobilization and reintegration process through the proper enforcement and implementation of the legal framework; credible verification and monitoring of the demobilization and reintegration process; the delivery of multisectoral yet integrated reintegration services and support to ex-combatants; and a consolidated vehicle for promoting reconciliation and delivering reparations to conflict victims.

# US Financing in Thousands of Dollars

**Colombia**

| 514-XXX Support for Demobilization and Reintegration | ACI |
|---|---:|
| **Through September 30, 2004** | |
| Obligations | 0 |
| Expenditures | 0 |
| Unliquidated | 0 |
| **Fiscal Year 2005** | |
| Obligations | 0 |
| Expenditures | 0 |
| **Through September 30, 2005** | |
| Obligations | 0 |
| Expenditures | 0 |
| Unliquidated | 0 |
| **Prior Year Unobligated Funds** | |
| Obligations | 0 |
| **Planned Fiscal Year 2006 NOA** | |
| Obligations | 8,500 |
| **Total Planned Fiscal Year 2006** | |
| Obligations | 8,500 |
| **Proposed Fiscal Year 2007 NOA** | |
| Obligations | 1,500 |
| Future Obligations | 1,500 |
| Est. Total Cost | 11,500 |

# EXHIBIT I

# 05-2141-cv
## 05-2326-cv

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 05-2141-cv and No. 05-2326-cv

SAKWE BALINTULO KHULUMANI, as personal representative of Saba Balintulo, FANEKAYA DABULA, as personal representative of Lungile Dabula, NOKITSIKAYE VIOLET DAKUSE, as personal representative of Tozi Skweyiya, BERLINA DUDA, as personal representative of Donald Duda, MARK FRANSCH, as personal representative of Anton Fransch, SHERIF MZWANDILE GEKISO, as personal representative of James Guga, JOYCE HLOPHE, as personal

[*captions continued on inside cover*],

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA, AS *AMICUS CURIAE*

MICHAEL J. GARCIA
*United States Attorney*

DAVID S. JONES
(212) 637-2739
*Assistant U.S. Attorney*
*Southern District of New York*
*86 Chambers Street, 3rd Floor*
*New York, N.Y. 10007*

JOHN B. BELLINGER III
*Legal Adviser*
*Department of State*
*Washington D.C. 20520*

DANIEL MERON
*Acting Assistant*
*Attorney General*

DOUGLAS N. LETTER
(202) 514-3602
ROBERT M. LOEB
(202) 514-4332
*Attorneys, Appellate Staff*
*Civil Division, Room 7268*
*Department of Justice*
*950 Pennsylvania Avenue, N.W.*
*Washington, D.C. 20530-0001*

representative of Jeffrey Hlophe, NOMVULA EUNICE KAMA, as personal representative of Mncedisi Dlokova, JOYCE LEDWABA, as personal representative of Samuel Ledwaba, JOHANA LERUTLA, as personal representative of Matthews Lerutla, FRIEDA Z. LUKHULEI, as personal representative of Tokkie Lukhulei, ELIZABETH MAAKE, as personal representative of Jackson Maake, ARCHINTON MADONDO, as personal representative of Mandla Madondo, BENJAMIN MAIFADI, TSHEMI MAKEDAMA, as personal representative of Lugile Makedama, MABEL MAKUPE, as personal representative of Andrew Makupe, MABEL MALOBOLA, as personal representative of Malobola Mbuso, EVELYN MATISO, as personal representative of Pitsi Matiso, BETTY MGIDI, as personal representative of Jeffrey Mgidi, ELIZABETH MKHONWANA, as personal representative of Obed Mkhonwana, CATHERINE MLANGENI, as personal representative of Bheki Mlangeni, CECIL MLANJENI, as personal representative of Kele Mlanjeni, SAMUEL MORUDU, as personal representative of Sannah P. Leslie, TSHIDISO MOTASI, as personal representative of John and Penelope Moloke, WILLIE NELANI, as personal representative of Mongezi Nelani, CATHERINE NGQULUNGA, as personal representative of Brian Ngqulunga, CATHERINE PHIRI, as personal representative of Thomas Phiri, ELIZABETH SEFOLO, as personal representative of Harold Sefolo, MARIA SIBAYA, as personal representative of Jeffrey Sibaya, PATRICIAL M. SONGO, as personal representative of Dipulo Songo, MPOLONTSI TYOTE, as personal representative of Boyboy Tyote, NOMKHANGO SKOLWENI DYANTYI, CLIFFORD ZIXELILE FUDUKILE, WINDOVOEL GAAJE, CHARLES HLATSHWAYO, MOSES HLONGWANE, LESIBA KEKANA, SANAKI MAHLATSHI, ROBERT MAKANA, ZAKHARIA FIKILE MAMBA, ELLIOT SITHEMBISO MARENENE, ALFRED MASEMOLA, MAUREEN THANDI MAZIBUKO, MICHAEL MBELE, LAETITIA NOMBAMBO MFECANE, as personal representative of Rubin Mfecane, DENNIS MLANDELI, TEFO MOFOKENG, MOTLALETSATSI MOLATEDI, AZARIEL MOLEBELELI, SIMON MOLOTSI, LINA MOREANE, as personal representative of Albert Xaba, THABISO SAMUEL MOTSIE, SONTO NDLOVU, MANGINDIVA ROBERT RHENENE, THOBILE SIKANI, BUBELE STEFAN, NOLUTHANDO BILETILE, LESLIE MNCEDISI BOTYA, LEON DUKASCHE, ELSIE GISHI, DORTHIA GOMO-PEFILE, ZAMIKHAYA BISHOP KHALI, JAMES MAGABANA, NOSIPHO MANQUBA, NOTATHU EUGENIA MATOMELA, NOMISA THERSIA MAY, MBONGENI NELSON MBESHU, MZUHLANGENA NAMA, ELIAS NGAMANI, as personal representative of Elizabeth Nagamani, GESHIA NGOXZA, LUCAS NDUKWAYIBUZWA NGWENYANA, WELLINTON MTYUKATO NKOSIPHENDULE, VUYANI NONGCAMA, SINDISWA MIRRIAM NUNU,

THULANI NUNU, BONIWE PHALAZA, PATHISWA PRINGANE, as personal representative of Mthozama Theophilus Pringane, MTHUTUZELI SIKANI, NOLUTHANDO SILETILE, THEMBEKA VICTORIA SIPHAHO, JOHANNES TITUS, MPOLONTSI TYOTES, MTHUZIMELE MELFORD YAMILE, NTUNANI WILLIAM ZENANI, THANDIWE SHEZI, ELIAS B. BONENG, DENNIS VINCENT FREDERICK BRUTUS, MORALOKI A. KGOBE, REUBEN MPHELA, LULAMILE RALRALA,

*Plaintiffs-Appellants (05-2141)*,

—v.—

BARCLAY NATIONAL BANK LTD., BRITISH PETROLEUM, PLC., CHEVRONTEXACO CORPORATION, CHEVRONTEXACO GLOBAL ENERGY, INC., CITIGROUP, INC., COMMERZBANK, CREDIT SUISSE GROUP, DAIMLERCHRYSLER AG, DEUTSCHE BANK AG, DRESDNER BANK AG, EXXONMOBIL CORPORATION, FORD MOTOR COMPANY, FUJITSU, LTD., GENERAL MOTORS CORPORATIONS, INTERNATIONAL BUSINESS MACHINES CORP., J.P. MORGAN CHASE, SHELL OIL COMPANY and UBS AG,

*Defendants-Appellees (05-2141)*,

AEG DAIMLER-BENZ INDUSTRIE, FLUOR CORPORATION, RHEINMETALL GROUP AG, RIO TINTO GROUP, TOTAL-FINA-ELF and DOE CORPORATIONS,

*Defendants (05-2141)*.

——————

LUNGISILE NTZEBESA, HERMINA DIGWAMAJE, ANDILE MFINGWANA, F.J. DLEVU, LWAZI PUMELELA KUBUKELI, FRANK BROWN, SYLVIA BROWN, NYAMEKA GONIWE, SIGQIBO MPENDULO, DOROTY MOLEFI, THEMBA MEQUBELA, LOBISA IRENE DIGWAMAJE, KAELO DIGWAMAJE, LINDIWE PETUNIA LEINANA, MATSHIDISO SYLVIA LEINANA, KELEBOGILE PRUDENCE LEINANA, DAVID MOTSUMI, SARAH NKADIMENG, MOEKETSI THEJANE, MOSHOESHOE THEJANE, PASCALINAH BOOKIE PHOOFOLO, KHOBOTLE PHOOFOLO, GLADYS MOKGORO, JONGANI HUTCHINGSON, SEFUBA SIDZUMO, GOBUSAMANG LAURENCE LEBOTSO, EDWARD THAPELO TSHIMAKO, RAHABA MOKGOTHU, JONATHAN MAKHUDU LEDIGA, ANNA LEBESE, SIPHO STANLEY LEBESE, WILLIAM NBOBENI, JOHN LUCAS NGOBENI, CLEMENT HLONGWANE and MASEGALE MONNAPULA,

*Plaintiffs-Appellants (05-2326)*,

SAKWE BALINTULO KHULUMANI, P.J. OLAYI, WELLINGTON BANINZI GAMAGU, Violations of Pass Laws, Unlawful Detention 1981-1983, Torture Subjected to Discriminatory Labor Practices 1981 and WILLIAM H. DURHAM,

*Plaintiffs (05-2326),*

—v.—

DAIMLER CHRYSLER CORPORATION, NATIONAL WESTMINSTER BANK PLC, COLGATE PALMOLIVE, BARCLAYS BANK PLC, UBS AG, CITIGROUP INC., DEUTSCHE BANK AG, DRESDNER BANK AG, COMMERZBANK AG, FORD MOTOR COMPANY, HOLCIM, INC., EXXON MOBIL CORPORATION, SHELL OIL COMPANY, J.P. MORGAN, MINNESOTA MINING AND MANUFACTURING CO. (3M CO.), GENERAL ELECTRIC COMPANY, BRISTOL-MEYERS SQUIBB CO., E.I.DUPONT DE NEMOURS, XEROX CORPORATION, IBM, GENERAL MOTORS, HONEYWELL INTERNATIONAL INC., BANK OF AMERICA, N.A., THE DOW CHEMICAL COMPANY, COCA-COLA CO., CREDIT AGRICOLE S.A., HEWLETT-PACKARD COMPANY, EMS-CHEMIE (NORTH AMERICA) INC., CHEVRON TEXACO CORPORATION, AMERICAN ISUZU MOTORS, INC. and NESTLE USA, INC.,

*Defendants-Appellees (05-2326),*

SULZER AG, SCHINDLER HOLDING AG, ANGLO-AMERICAN CORPORATION, DEBEERS CORPORATION, NOVARTIS AG, BANQUE INDO SUEZ, CREDIT LYONNAIS, and Unknown Officers and Directors of DANU INTERNATIONAL, STANDARD CHARTERED, P.L.C., CORPORATE DOES, CREDIT SUISSE GROUP, CITIGROUP AG, SECURITIES INC., as Successor to Morgan Guaranty, MANUFACTURERS HANNOVER, CHEMICAL BANK & CHASE MANHATTAN BANK, UNISYS CORPORATION, SPERRY CORPORATION, BURROUGHS CORPORATION, ICL, LTD., AMDAHL CORP., COMPUTER COMPANIES, JOHN DOE CORPORATION, HOLCIN, LTD., HENRY BLODGET, JUSTIN BALDAUF, KRISTEN CAMPBELL, VIRGINIA SYER GENEREUX, SOFIA GHACHEM, THOMAS MAZZUCCO, EDWARD MCCABE, DEEPAK RAJ, JOHN 1-10 DOE, OERLIKON CONTRAVES AG, OERLIKON BUHRLE AG, CORPORATE DOES 1-100, ROYAL DUTCH PETROLEUM CO., SHELL TRANSPORT & TRADING COMPANY PLC and SHELL PETROLEUM, INC., MERRILL LYNCH & CO. INC., KENNETH SEYMOUR,

*Defendants (05-2326).*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ................................................................. 1

ARGUMENT ............................................................................................. 5

ALLEGATIONS OF AIDING AND ABETTING OTHERS'
MISCONDUCT ARE NOT ACTIONABLE UNDER THE ATS ......................... 5

    A.     The Court Should Be Very Hesitant To Apply Its Federal
           Common Law Powers To Resolve A Claim Centering On The
           Treatment of Foreign Nationals By Their Own Government ............ 5

    B.     The Significant Policy Decision To Impose Aiding And
           Abetting Liability For ATS Claims Should Be Made By
           Congress, Not The Courts .................................................. 9

    C.     Practical Consequences Counsel Against The Adoption Of
           Aiding And Abetting Liability Under The ATS ............................ 12

    D.     Civil Aiding And Abetting Liability Does Not Satisfy
           <u>Sosa</u>'s Threshold Requirement That An International
           Law Norm Be Both Firmly Established And Well
           Defined ...................................................................... 19

CONCLUSION ........................................................................... 27

# TABLE OF AUTHORITIES

**Cases:** **Page**

American Ins. Ass'n v. Garamendi, 123 S. Ct. 2374 (2003) ............................... 14

Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428 (1989) ..... 17

Boim v. Quranic Literacy Institute, 291 F.3d 1000 (7th Cir. 2002) .................... 10

Central Bank of Denver v. First Interstate Bank, 511 U.S. 164 (1994) ....... passim

Crosby v. National Foreign Trade Council, 530 U.S. 363 (2000) ...................... 17

EEOC v. Arabian Am. Oil Co., 499 U.S. 244 (1991) ........................................ 6

Fong Yue Ting v. United States, 149 U.S. 698 (1893) ....................................... 14

In re South African Apartheid Litigation,
      346 F. Supp. 2d 538 (S.D.N.Y. 2004) ...................................................... 4, 18

Presbyterian Church of Sudan v. Talisman Energy, Inc.,
      374 F. Supp. 2d 331 (S.D.N.Y. 2005) ................................................... 24, 26

Rose v. Himely, 8 U.S. (4 Cranch) 241 (1807) .............................................    6

Schneider v. Kissinger, 412 F.3d 190 (D.C. Cir. 2005) ..................................... 16

Sosa v. Alvarez-Machain, 124 S. Ct. 2739 (2004) ...................................... passim

Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir. 1984) ........... 2, 8, 25

The Apollon, 22 U.S. (9 Wheat.) 362 (1824) ...................................................... 6

United States v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936) ................. 14

United States v. La Eugenie, 26 F. Cas. 832 (D. Mass. 1822) ............................. 7

United States v. Palmer, 16 U.S. 610 (1818) ......................................................... 6

**Statutes:**

Alien Tort Statute:

    28 U.S.C. § 1350 ..................................................................... passim

Pub. L. 99-440 (1986) ....................................................................... 16

18 U.S.C. § 2333 ............................................................................... 10

Foreign Sovereign Immunities Act:

28 U.S.C. 1605(a)(5) ......................................................................... 17

**Rules:**

    Fed. R. App. P. Rule 29(a) ................................................................. 1

**Legislative Materials:**

144 Cong. Rec. E1440 (1998) ........................................................... 15

**Miscellaneous:**

    American Foreign Policy and the International Criminal Court, Marc
        Grossman, Under Secretary for Political Affairs, Remarks to the
        Center for Strategic and International Studies, Washington, DC,
        May 6, 2002 ............................................................................. 24

    CNN All Politics, Clinton Defends China Trip, Engagement Policy,
        (http://www.cnn.com/ALLPOLITICS/1998/06/11/clinton.china)
        (June 11, 1998) ........................................................................ 15

    Congressional Research Service, Issue Brief for Congress:  China-U.S.
        Relations (January 31, 2003) ................................................... 15

J. Crawford, THE INTERNATIONAL LAW COMMISSION'S ARTICLES ON
  STATE RESPONSIBILITY (2002) ......................................................... 22

Exec. Order No. 12532, 50 FR 36861 (September 9, 1985) ........................... 3, 16

Peter D. Feaver, The Clinton Administration's China Engagement Policy in
  Perspective, presented at Duke University "War and Peace Conference,"
  February 26, 1999 ...................................................................... 14

International Law Commission's draft articles on "Responsibility of
  States for Internationally Wrongful Acts," annexed to UN General
  Assembly Resolution 56/83, adopted January 28, 2002 .................................. 22

E. Kontorovich, Implementing Sosa v. Alvarez-Machain: What Piracy
  Reveals about the Limits of the Alien Tort Statute,
  80 Notre Dame L. Rev. 111 (2004) ................................................... 25

Military Commission Instruction No. 2,
  Art. 6(C)(1) (April 30, 2003) ...................................................... 21

National Security Decision Directive 187 (Sept. 7, 1985) .............................. 15

Nuremberg International Military Tribunal Control Council Order No. 10 ...... 21

1 Op. Att'y Gen. 29 (1792) .............................................................. 7

1 Op. Att'y Gen. 58 (1795) .............................................................. 9

Rome Statute of the International Criminal Court (1998) ........................... 21, 26

Statute of the International Criminal Tribunal for the Former Yugoslavia
  (1993, updated 2004) ............................................................. 21, 26

Statute of the International Criminal Tribunal for Rwanda (1994) ............. 21, 26

2000 UNATET Reg. No. 2000/15-14.3(1) ........................................... 26

## INTRODUCTION AND SUMMARY

Pursuant to Rule 29(a), Fed. R. App. P., the United States of America hereby submits this amicus curiae brief.

As the Supreme Court recently recognized, if improperly construed or applied, the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, could improperly impinge upon the "discretion of the Legislative and Executive Branches in managing foreign affairs." Sosa v. Alvarez-Machain, 124 S. Ct. 2739, 2763 (2004). Thus, the United States has a very substantial interest in the proper construction and application of the statute.

In Sosa, the Supreme Court held that the ATS is a jurisdictional statute that does not establish a cause of action. The Court held, however, that the ATS permits federal courts, in limited circumstances, to recognize a federal common law claim of an alien alleging a violation of the law of nations. The Court found that the claim in that case failed on the ground that it did not satisfy a necessary, but not in itself sufficient, requirement for such a federal common law cause of action under the ATS: that the claim must "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [i.e., violations of safe conducts, infringement of the rights of ambassadors, and piracy]." Sosa, 124 S.Ct. at 2761.

Significantly, the Sosa Court rejected the notion that the ATS grants federal courts unencumbered common law powers to recognize and remedy international law violations. Rather, the Court went out of its way to chronicle reasons why a court

must act cautiously and with "a restrained conception of the discretion" in both recognizing ATS claims and in extending liability.  <u>Sosa</u>, 124 S.Ct. at 2761-2764, 2766 n.20.  The Court instructed the federal courts to refrain from an "aggressive role in exercising a jurisdiction that remained largely in shadow for much of the prior two centuries."  <u>Id</u>. at 2762-2763.  The Court then discussed at length the reasons for approaching this federal common law power with "great caution," <u>id</u>. at 2764:  in general, courts must rely upon legislative guidance before exercising substantive law-making authority, and there is a heightened need for such guidance when the issues could impinge upon the "discretion of the Legislative and Executive Branches in managing foreign affairs."  <u>Id</u>. at 2763.

The Supreme Court's strongest cautionary note pertained to claims relating to a foreign government's treatment of its own citizens in its own territory:  "It is one thing for American courts to enforce constitutional limits on our own State and Federal Governments' power, but quite another to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold that a foreign government or its agent has transgressed those limits."  <u>Ibid</u>.  The Court left open whether it would ever be appropriate to project the common law of the United States to resolve such extraterritorial claims.  Citing to <u>Tel-Oren</u> v. <u>Libyan Arab Republic</u>, 726 F.2d 774, 813 (D.C. Cir. 1984) (Bork, J., concurring), where Judge Bork expressed "doubt that § 1350 should be read to require

-2-

'our courts [to] sit in judgment of the conduct of foreign officials in their own countries with respect to their own citizens'" Sosa, 124 S.Ct. at 1263, the Court concluded that recognition of such claims "should be undertaken, if at all, with great caution." Ibid.

While the Court spoke in that case to the recognition of a cause of action based upon international law norms, as we explain below, all of the Court's admonitions and cautions apply fully to the question of whether a federal court exercising its federal common law authority should recognize the right to assert an aiding and abetting liability claim under the ATS.

Plaintiffs in the present case, citizens of South Africa, seek to bring aiding and abetting claims under the ATS on behalf of millions of purported class members against various multinational corporations that did business over a 40-year period in South Africa during the apartheid regime. As then President Reagan explained, the "policy and practice of apartheid" were "repugnant to the moral and political values of democratic and free societies." Exec. Order No. 12532, 50 FR 36861 (September 9, 1985). As we detail below, the United States actively sought to end the apartheid regime through a policy of constructive engagement and tailored economic sanctions. While the regime and its treatment of the people of South Africa were indisputably abhorrent, the district court in this case correctly construed its federal common law

-3-

powers under the ATS and rejected plaintiffs' vast aiding and abetting claims.[1]  We explain below that all of the cautionary admonitions articulated by the <u>Sosa</u> Court apply with full force to the aiding and abetting claims in this case.

As the U.S. Government explained in its district court filing, adjudication of these aiding and abetting claims would interfere with South Africa's own reconciliation and redress efforts, and would cause significant tension between the United States and South Africa.  Notably, the current South African Government opposes this case being allowed to proceed and deems these actions incompatible with South Africa's own internal reconciliation process.  More generally, recognition of an aiding and abetting claim as a matter of federal common law would hamper the policy of encouraging positive change in developing countries via economic investment.

Furthermore, the Supreme Court has instructed that whether or not to permit a civil aiding and abetting claim is a legislative choice.  <u>See</u> <u>Central Bank of Denver</u> v. <u>First Interstate Bank</u>, 511 U.S. 164 (1994).  Accordingly, absent a clear direction from Congress, a federal court should not recognize such claims under the ATS.  Finally, civil aiding and abetting liability does not, in any event, satisfy <u>Sosa</u>'s threshold

---

[1]  In this brief, the United States does not address the separate question of whether appellants have demonstrated the requisite international norm to support a "state action" theory of secondary liability for the various wrongs attributed to the South African government.  The district court found that such liability had not been adequately pleaded.  <u>See</u> <u>In re: South African Apartheid Litigation</u>, 346 F. Supp. 2d 538, 548 (S.D.N.Y. 2004).

-4-

requirement that an international law norm be both firmly established and well defined.

## ARGUMENT

### ALLEGATIONS OF AIDING AND ABETTING OTHERS' MISCONDUCT ARE NOT ACTIONABLE UNDER THE ATS.

**A.     The Court Should Be Very Hesitant To Apply Its Federal Common Law Powers To Resolve A Claim Centering On The Treatment of Foreign Nationals By Their Own Government.**

Under the ATS, although the substantive norm to be applied is drawn from international law or treaty, any cause of action recognized by a federal court is one devised as a matter of federal common law -- i.e., the law of the United States. The question, thus, becomes whether the challenged conduct should be subject to a cause of action under -- and thus governed by -- U.S. law.  In this case, the aiding and abetting claim asserted against defendants turns upon the abusive treatment of the South African people by the apartheid regime previously controlling that country.  It would be extraordinary to give U.S. law an extraterritorial effect in such circumstances to regulate conduct of a foreign state over its citizens, and all the more so for a federal court to do so as a matter of common law-making power.  Yet plaintiffs would have this Court do exactly that by rendering private defendants liable for the sovereign acts of the apartheid government of South Africa.

When construing a federal statute, there is a strong presumption against projecting U.S. law to resolve disputes that arise in foreign nations, including disputes between such nations and their own citizens. See EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991). This presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." Ibid. Notably, the same strong presumption existed in the early years of this Nation, and, significantly, even the federal statute that defined and punished as a matter of U.S. law one of the principal law of nations offenses -- piracy -- was held not to apply where a foreign state had jurisdiction. See United States v. Palmer, 16 U.S. 610, 630-631 (1818) (the federal piracy statute should not be read to apply to foreign nationals on a foreign ship). See also The Apollon, 22 U.S. (9 Wheat.) 362, 370 (1824) ("The laws of no nation can justly extend beyond its own territories, except so far as its own citizens."); Rose v. Himely, 8 U.S. (4 Cranch) 241, 279 (1807) (general statutory language should not be construed to apply to the conduct of foreign citizens outside the United States). The view of that time is reflected by Justice Story:

> No one [nation] has a right to sit in judgment generally upon the actions of another; at least to the extent of compelling its adherence to all the principles of justice and humanity in its domestic concerns * * *. It would be inconsistent with the equality and sovereignty of nations, which admit no common superior. No nation has ever yet pretended to be the custos morum of the whole world; and though abstractedly a particular regulation may violate the

-6-

> law of nations, it may sometimes, in the case of nations, be
> a wrong without a remedy.

United States v. La Eugenie, 26 F. Cas. 832, 847 (D. Mass. 1822) (emphasis added).

Plaintiffs cite Attorney General Bradford's opinion from 1795. That opinion noted the availability of ATS jurisdiction for offenses on the high seas in 1795, but also explained that insofar "as the transactions complained of originated or took place in a foreign country, they are not within the cognizance of our courts." See 1 Op. Att'y Gen. 57, 58 (1795) (emphasis added).[2]

While the Sosa Court concluded that Congress, through the ATS, intended the federal courts to have a limited federal common law power to adjudicate well-established and defined international law claims, the Court expressly questioned whether this federal common law power could properly be employed "at all" in regard to disputes between a foreign nation and its own citizens. Sosa, 124 S.Ct. at 2763. Indeed, given the accepted principles of the time, it is highly unlikely that the drafters of the ATS intended to grant the newly created federal courts unchecked power to apply their federal common law powers to decide extraterritorial disputes regarding a foreign nation's treatment of its own citizens. Nothing in the ATS, or in its

---

[2] See also 1 Op. Att'y Gen. 29, 29 (1792) ("[t]he bringing away of slaves from Martinique, the property of residents there, may be piracy, and, depending upon the precise place of its commission, may only be an offence against the municipal laws") (emphasis added).

contemporary history, suggests that Congress intended it to apply to conduct in foreign lands. To the contrary, the ambassador assaults that preceded and motivated the enactment of the ATS involved conduct purely within the United States. See id. at 2756-2657.

Moreover, "those who drafted the Constitution and the Judiciary Act of 1789 wanted to open federal courts to aliens for the purpose of avoiding, not provoking, conflicts with other nations." Tel-Oren, 726 F.2d at 812 (Bork, J., concurring). The point of the ATS was to ensure that the National Government would be able to afford a forum for punishment or redress of violations for which the nation offended by conduct against it or its nationals might hold the United States accountable. A foreign government's treatment of its own nationals is a matter entirely distinct and removed from these types of concerns.

Against this backdrop, reinforced by caution recently mandated by the Supreme Court in Sosa, courts should be very hesitant ever to apply their federal common law powers to resolve claims, such as the ones here, centering on the mistreatment of foreign nationals by their own government. The fact that plaintiffs have sued corporate defendants does not alter these concerns. The fact remains that these claims turn upon the acts of the previous South African Government and would require a U.S. court to pass judgment on the acts of a foreign nation against its own citizens.

-8-

**B.**    **The Significant Policy Decision To Impose Aiding And Abetting Liability For ATS Claims Should Be Made By Congress, Not The Courts**.

As the Supreme Court has held, the creation of civil aiding and abetting liability is a legislative act that the courts should not undertake without Congressional direction, and there is no indication in either the language or history of the ATS that Congress intended such a vast expansion of suits in this sensitive foreign policy area.

1. The ATS speaks to a "civil action by an alien for a tort only, committed in violation of the law of nations." 28 U.S.C. § 1350. An aiding and abetting claim is not brought against a party charged as having "committed" a tort in violation of the law of nations. Rather, allowing aiding and abetting liability for ATS common law claims would extend liability not only to violators of international norms, but also to those who allegedly gave aid and assistance to the tortfeasor. By its very terms, the ATS simply does not suggest such third-party liability.[3]

2. Even where Congress expressly establishes domestic <u>criminal</u> aiding and abetting liability, the question whether to impose such liability for <u>civil</u> claims as well is still deemed a separate legislative judgment typically requiring legislative action.

---

[3] Plaintiffs cite to Attorney General Bradford's 1795 opinion, regarding whether U.S. Citizens who violated U.S. law by assisting a foreign nation at war, as supporting aiding and abetting liability. That opinion while suggesting possible ATS liability, does not discuss theories of civil liability or approve or address aiding and abetting liability. <u>See</u> 1 Op. Att'y Gen. at 58.

The Supreme Court's ruling in <u>Central Bank of Denver</u> v. <u>First Interstate Bank</u>, 511 U.S. 164 (1994), is key to this case; there, the Court explained that there is no "general presumption" that a federal statute should be read to extend aiding and abetting liability to the civil context.  In the criminal law context "aiding and abetting is an ancient * * * doctrine," <u>id</u>. at 181, but its extension to permit civil redress is not well established:  "the doctrine has been at best uncertain in application." <u>Ibid</u>.  While in the criminal context the government's prosecutorial judgment serves as a substantial check on the imposition of criminal aiding and abetting liability, there is no similar check on civil aiding and abetting liability claims.  <u>Cf.</u> <u>Sosa</u>, 124 S.Ct. at 2763.

Significantly, the <u>Central Bank of Denver</u> Court noted that "Congress has not enacted a general civil aiding and abetting statute – either for suits by the Government (when the Government sues for civil penalties or injunctive relief) or for suits by private parties." 511 U.S. at 182.  The Court concluded, "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, <u>there is no general presumption</u> <u>that the plaintiff may also sue aiders and abettors</u>." <u>Ibid</u>. (emphasis added).[4]  Thus,

---

[4]  This general presumption against implying aiding and abetting liability can be overcome in our domestic law.  For example, the United States successfully argued in favor of aiding and abetting liability under a statute providing a civil cause of action for those injured by an act of international terrorism, 18 U.S.C. § 2333.  <u>See</u> <u>Boim</u> v. <u>Quranic Literacy Institute</u>, 291 F.3d 1000 (7th Cir. 2002).  That argument
(continued...)

-10-

under Central Bank of Denver, a court must not presume that there is any right to assert an aiding and abetting claim under the ATS.

Moreover, in Central Bank of Denver, the Court explained that adoption of aiding and abetting liability for civil claims would be "a vast expansion of federal law." 511 U.S. at 183. Such an expansion of the law, the Court held, required legislative action, and could not be carried out through the exercise of federal common law. Ibid. So, too, under the ATS. Reading this statute to permit aiding and abetting claim would vastly increase its scope and range. That vast increase should not be undertaken without clear guidance from Congress. Notably, the Supreme Court described the ATS as an "implicit sanction to entertain the handful of international law cum common law claims." Sosa, 124 S.Ct. at 2754 (emphasis added).

In the ATS context, the Sosa Court explicitly cautioned that federal courts should be wary of "exercising innovative authority over substantive law" without "legislative guidance." Sosa, 124 S.Ct. at 2762. The Court also warned against assuming a legislative function in "crafting remedies" where resolution of the legal issue could adversely implicate foreign policy and foreign relations. Id. at 2763. The caution mandated by Sosa in deciding whether to recognize and enforce an

---

[4] (...continued)
was based, however, on the particular context, language, and purposes of that statute.

international law norm under the ATS, when coupled with the teaching of <u>Central Bank of Denver</u> that the decision whether to adopt aiding and abetting liability for a civil claim is typically a legislative policy judgment, leads to the unmistakable conclusion that aiding and abetting liability should not be recognized under the ATS, absent further Congressional action. Ultimately, the questions of whether and, if so, how to expand the reach of civil liability under international law beyond the tortfeasor would present difficult policy and foreign relations considerations that should be determined by the political branches, not the individual federal courts.

### C.    Practical Consequences Counsel Against The Adoption Of Aiding And Abetting Liability Under The ATS.

Under <u>Sosa</u>, a court deciding whether to adopt a federal common law rule extending aiding and abetting liability under the ATS must also consider the potential practical consequences, including the foreign policy effects of such a ruling. <u>See</u> 124 S.Ct. at 2766 ("the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts"); <u>id</u>. at 2766 n.21 (in discussing other possible limiting principles, the Court stated, "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"). Those

consequences strongly counsel against the judicial creation of aiding and abetting liability for ATS claims.

1.  One of the "practical consequences" of embracing "aiding and abetting" liability for ATS claims would be to create uncertainty that would in some instances interfere with the ability of the U.S. government to employ the full range of foreign policy options when interacting with regimes with oppressive human rights practices. One of these options is to promote active economic engagement as a method of encouraging reform and gaining leverage.  Individual federal judges exercising their own judgment after the fact by imposing aiding and abetting liability under the ATS for aiding oppressive regimes would generate significant uncertainty concerning private liability, which would surely deter many businesses from such economic engagement.  Even when companies are not party to or directly responsible for the abuses of an oppressive regime, they would likely become targets of ATS aiding and abetting suits, and the fact-specific nature of an aiding and abetting inquiry would expose them to protracted and uncertain proceedings in U.S. courts.  Cf. Central Bank of Denver, 511 U.S. at 188-189.

While the benefits of constructive engagement strategies have been debated for many years, such foreign policies have been employed by the United States in the past, such as with regard to the South African apartheid regime, at issue in this case,

and China.[5] The policy determination of whether to pursue a constructive engagement policy is precisely the type of foreign affairs question that is constitutionally vested in the Executive Branch and over which the courts lack institutional authority and ability to decide.  See Fong Yue Ting v. United States, 149 U.S. 698, 705 (1893); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319, 320 (1936); American Ins. Ass'n v. Garamendi, 123 S. Ct. 2374, 2386 (2003).

In the case of China, constructive engagement has been advocated as a means of advancing human rights over the long term and serving important U.S. national interests:

> Underlying th[e economic engagement] approach, for some, is a belief that trends in China are moving inexorably in the "right" direction. That is, the PRC is becoming increasingly interdependent economically with its neighbors and the developed countries of the West and therefore will be increasingly unlikely to take disruptive action that would upset these advantageous international economic relationships * * *.  Some also believe that greater wealth in the PRC will push Chinese society in directions that will develop a materially better-off, more educated, and cosmopolitan populace that will, over time, press its government for greater political pluralism and democracy.

---

[5]    See National Security Decision Directive 187 (Sept. 7, 1985) (http://www.fas.org/irp/offdocs/nsdd/nsdd-187.htm); Peter D. Feaver, The Clinton Administration's China Engagement Policy in Perspective (presented at Duke University "War and Peace Conference," February 26, 1999) (http://www.duke.edu/web/cis/pass/pdf/warpeaceconf/p-feaver.pdf).

-14-

Congressional Research Service, <u>Issue Brief for Congress: China-U.S. Relations</u>, 13 (January 31, 2003).[6]

In the case of South Africa, at issue here, the United States employed both engagement and sanctions in the effort to end apartheid. The policy of economic constructive engagement included use of "U.S. influence to promote peaceful change away from apartheid." National Security Decision Directive 187 at 1. Methods used to achieve that goal included increased funding of educational, labor, and business programs. <u>Id</u>. at 2. Also, U.S. businesses were urged to "assist black-owned companies." <u>Ibid</u>.

While employing the policy of constructive engagement, the United States also, by Executive Order, and then by statute, strongly condemned the practice of apartheid and prohibited the "making or approval of any loans by financial institutions in the United States to the Government of South Africa or to entities owned or controlled by

---

[6] <u>See</u> <u>also</u> CNN All Politics, <u>Clinton Defends China Trip, Engagement Policy</u>, http://www.cnn.com/ALLPOLITICS/1998/06/11/clinton.china (June 11, 1998) (quoting President Clinton: "Choosing isolation over engagement * * *would make it more dangerous. It would undermine, rather than strengthen, our efforts to foster stability in Asia. It will eliminate, not facilitate, cooperation on issues relating to weapons of mass destruction."); 144 Cong. Rec. E1440 (1998) (remarks of Rep. Roemer) ("I support constructive engagement with China as a method of improving our critically important bilateral relationship and pursuing our foreign policy goals to advance human rights and religious freedom * * *. Our policy of constructive engagement has also helped expand cooperation with China in critical areas important to our national security * * *.").

that Government," and "[a]ll exports of computers, computer software, or goods or technology intended to service computers to or for use by" specified entities of the South African government.[7]  This mix of engagement and limited sanctions was part of carefully crafted political and diplomatic efforts to encourage the Government of South Africa to end apartheid.  See Pub. L. 99-440, §§ 4, 101.  A court 20 years after the fact should not employ its common law powers to sit on judgment on whether this policy was in hindsight the best course of action.  See Schneider v. Kissinger, 412 F.3d 190 (D.C. Cir. 2005) (refusing to review the propriety of foreign policy decisions made by the U.S. Government in the 1970s).

Importantly, the adoption of an aiding and abetting rule in this case could prospectively restrict policy options for the United States around the world.  Adopting aiding and abetting liability under the ATS would undermine the ability of the Executive to employ an important tactic of diplomacy and available tools for the political branches in attempting to induce improvements in foreign human rights practices.  The selection of the appropriate tools, and the proper balance between rewards and sanctions, requires difficult policymaking judgments that can be rendered

---

[7] Exec. Order No. 12532, 50 FR 36861 (September 9, 1985); Pub. L. 99-440, §§ 304-305 (1986).  The Executive Order and subsequent statute extended the export ban to, inter alia, the South African military, police, prison system, and national security agencies, and any apartheid enforcing agency.

-16-

only by the federal political branches.  See Crosby v. National Foreign Trade Council, 530 U.S. 363, 375-385 (2000).

2.    Another important practical consideration is that allowing for the proliferation of ATS suits through adoption of an aiding and abetting liability standard would inevitably lead to greater diplomatic friction for the United States.  Aiding and abetting liability under the ATS would trigger a wide range of ATS suits with plaintiffs challenging the conduct of foreign nations -- conduct that would otherwise be immune from suit under the Foreign Sovereign Immunities Act ("FSIA").[8]  Aiding and abetting liability would afford plaintiffs the ability to, in effect, challenge the foreign government's conduct by asserting claims against those alleged to have aided and abetted the government.

Experience has shown that aiding and abetting ATS suits often trigger foreign government protests, both from the nations where the alleged abuses occurred, and, in cases against foreign corporations, from the nations where the corporations are based or incorporated (and therefore regulated).  This serious diplomatic friction can lead to a lack of cooperation on important foreign policy objectives.

---

[8]  Under the FSIA, foreign governments are immune from suit, subject to certain specified exceptions.  For tort claims, foreign governments generally cannot be sued unless the tort occurs within the United States.  See 28 U.S.C. 1605(a)(5); Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439-41 (1989).

In this specific case, as the district court noted, the "South African government indicated that it does not support this litigation and that it believes that allowing this action to proceed would preempt the ability of the government to handle domestic matters and would discourage needed investment in the South African economy." In re: South African Apartheid Litigation, 346 F.Supp.2d 538, 553 (S.D.N.Y. 2004). The statement of interest filed by the United States Government "expressed its belief that the adjudication of this suit would cause tension between the United States and South Africa." Id. at 553. In accord with Sosa, 124 S.Ct. at 2766 n. 21, the district court then properly gave great weight to these specific foreign policy statements, as well as to the Executive Branch's view as to broader foreign policy ramifications of recognition of aiding and abetting liability under the ATS.

3. Aiding and abetting liability can also have a deterrent effect on the free flow of trade and investment more generally, because of the uncertainty it creates for those operating in countries where abuses might occur. The United States has a general interest in promoting the free flow of trade and investment, both into and out of the United States, in order to increase jobs domestically and the standard of living overseas. Apart from this national economic interest, the U.S. has broader foreign

policy interests in using trade and investment to promote economic development in other countries as a way of promoting stability, democracy and security.[9]

Thus, serious foreign policy and other consequences relating to U.S. national interests strongly counsel against the adoption of a rule extending civil aiding and abetting liability to ATS claims.

### D. Civil Aiding And Abetting Liability Does Not Satisfy Sosa's Threshold Requirement That An International Law Norm Be Both Firmly Established And Well Defined.

Under Sosa, whatever other considerations are relevant in determining whether an international law norm should be recognized and enforced as part of an ATS federal common law cause of action, a necessary requirement is that the international law principle must be both sufficiently established and well defined. The Supreme Court did not provide any definitive methodology for assessing when international law norms meet these standards. The Court explained, however, that the principle at issue must be both "accepted by the civilized world" and "defined with a specificity," and in both respects the norms must be "comparable to the features of the 18th-century paradigms" – i.e., violation of "safe conducts, infringement of the rights of

---

[9] Adopting aiding and abetting liability for ATS claims could also have a potential deterrent effect on investments within the United States because of the concern of ATS jurisdiction based on contacts here and the exposure of such investments to attachment to satisfy adverse judgments.

ambassadors, and piracy." <u>See</u> <u>Sosa</u>, 124 S.Ct. at 2761-62.  Thus, in resolving

whether the necessary conditions are met, this Court must examine: 1) whether civil

aiding and abetting liability is broadly, if not universally, accepted by the international

community and 2) whether the principle, as accepted by the international community,

is defined with "specificity" in each regard to a degree comparable to the "18th-

century paradigms."

The common law imposition of civil aiding and abetting liability does not meet

this test.[10]

1.  First, there is no such international norm for civil aiding and abetting

liability.  Plaintiffs do <u>not</u> contend otherwise, choosing instead to base their argument

---

[10]  Plaintiffs argue that it is unnecessary to find an international norm altogether
because aiding and abetting liability is merely an "ancillary rule of decision."  But, as
we have explained, all of the cautions and admonitions of the <u>Sosa</u> Court apply in full
to the question of substantive law of whether to adopt aiding and abetting liability for
ATS claims.  It would be directly at odds with <u>Sosa</u> for the federal courts to adopt
substantive legal principles, as matter of federal common law, without proof of an
universal and specifically defined international norm. Aiding and abetting is
undoubtedly a separate cause of action and, indeed, when predicated on mistreatment
by a government of its own citizens poses the very question raised by the Supreme
Court in <u>Sosa</u>, <u>i.e.</u>, "whether international law extends the scope of liability for a
violation of a given norm to the perpetrator being sued, if the defendant is a private
actor such as a corporation or individual."  <u>Id</u>. at 2766 n.20.  Although the Supreme
Court has "recently and repeatedly said that a decision to create a private right of
action is one better left to legislative judgment," <u>Id</u>. at 2744, on plaintiffs' theory, the
courts would be free to create a wide variety of private rights of action as "ancillary
rules of decision" with no limitation based upon international law.  As we discuss
<u>supra</u>, this is directly contrary to the Supreme Court's approach in <u>Central Bank of
Denver</u>, which focused specifically on aiding and abetting.

entirely on practice of certain international criminal tribunals.[11] (No. 05-2326 at 35-39; No. 05-2141 at 34-40).  But in <u>Sosa</u>, the Court stressed that the federal courts should exercise "great caution in adapting the law of nations to private rights," 124 S.Ct. at 2764.  It is highly relevant that the law of nations generally does not recognize a specific private right to redress for civil aiding and abetting liability.

While the concept of <u>criminal</u> aiding and abetting liability is well established, the statutes of the international criminal tribunals appellants rely upon do not provide for civil aiding abetting liability.[12]  Indeed, one of the only contexts in which civil liability for aiding and abetting is addressed explicitly is in an annex to a U.N.

_____

[11]  The charters of the modern international criminal tribunals embrace the  concept of criminal aiding and abetting liability.  <u>See</u> Nuremberg International Military Tribunal Control Council Order No. 10; Statute of the International Criminal Tribunal for the Former Yugoslavia (1993, updated 2004) ("ICTY Statute"), art. 7(1); Statute of the International Criminal Tribunal for Rwanda (1994) ("ICTR Statute"), art. 6(1); Rome Statute of the International Criminal Court (1998).  Aiding and abetting liability likewise has been adopted by the United States when defining acts of international terrorism subject to prosecution before military commissions.   <u>See</u> Military Commission Instruction No. 2, Art. 6(C)(1) (April 30, 2003) (available at http://www.defenselink.mil/news/May2003/d20030430milcominstno2.pdf).

[12]  The statutes of the international criminal tribunals provide only for the possibility of restitution as a discretionary penalty.  ICTY Statute, art. 24(3); ICTR  Statute, art. 23(3).

Resolution, and that document only addresses aiding and abetting <u>between states</u> and provides a different standard from that put forward by the plaintiffs.[13]

Lacking any international consensus on civil aiding and abetting liability, plaintiffs are in essence asking our federal courts to use their federal common law powers, recognized in <u>Sosa</u>, to legislate a standard. The task of filling out its content in ATS suits would confront U.S. courts with a host of issues that do not arise with criminal aiding and abetting. The court would have to create new rules governing, among other things: how to allocate liability among multiple potential tortfeasors, including the party responsible for the primary tort; how to determine proportionality between the aider and abettor's role and the extent of its liability; what standard of causation to apply in establishing the aider and abettor's contribution to the damage; whether remedies should be allowed for "moral" as well as material damage, and if so, whether those remedies should go beyond restitution and compensation to include

---

[13]    <u>See</u> article 16 of the International Law Commission's draft articles on "Responsibility of States for Internationally Wrongful Acts," annexed to UN General Assembly Resolution 56/83, adopted January 28, 2002 ("A State which aids or assists another State in the commission of an internationally wrongful act by the latter is internationally responsible for doing so if: (a) That State does so with knowledge of the circumstances of the internationally wrongful act; and (b) The act would be internationally wrongful if committed by that State.") This formulation does not address the degree of assistance required. Moreover, the Commentary on this article indicates that the State must have intended to facilitate the wrongful conduct, a purpose element also missing from plaintiffs' proposed ATS standard. See J. Crawford, THE INTERNATIONAL LAW COMMISSION'S ARTICLES ON STATE RESPONSIBILITY, 149 (2002).

such categories as punitive damages; whether the underlying liability of the primary tortfeasor must be previously established and, if not, how to address the inability of the parties to obtain relevant information from a non-party state accused of the central wrongdoing; and, ultimately, whether it is appropriate to create a private cause of action against an alleged aider and abettor in circumstances where a foreign state actor cannot itself be sued.

Plaintiffs' bold request for judicial legislation cannot be squared with the Supreme Court's instructions. In Sosa, the Court recognized "that the general practice * * * [is] to look for legislative guidance before exercising innovative authority over substantive law." 124 S.Ct. at 2762. For this and other reasons, the Court instructed that the courts use "great caution in adapting the law of nations to private rights." Id. at 2764. Here, plaintiffs are not simply asking the court to "adapt" a well-established and well-defined civil norm of aiding and aiding liability. Rather, they are asking this Court to create such a norm and provide all of the content for the norm as well. This is far beyond the cautious and limited exercise of common law authority permitted under Sosa.

2. Plaintiffs try to remedy this fatal shortcoming by appealing to international practice regarding criminal aiding and abetting. Not only does that practice not answer the questions that would confront American courts, but it is particularly unsuited as a springboard to domestic civil aiding and abetting liability. As discussed

above, there is no "general presumption" that criminal aiding and abetting liability extends liability to the civil context.  Rather, the general presumption under our domestic law is that such an extension requires an independent legislative policy choice.  Central Bank of Denver, 511 U.S. at 182.

Moreover, the decision to charge a person for an international crime is a grave matter requiring careful exercise of prosecutorial judgment by government officials. That prosecutorial judgment serves as a substantial practical check on the application of the criminal aiding and abetting standard.[14]  Opening the doors to civil aiding and abetting claims in U.S. courts through the ATS could not be more different.  Any aggrieved aliens, anywhere in the world, could potentially bring an ATS civil suit in the United States, claiming that a private party aided or abetted abuses committed abroad against them by their own government.  Such a "vast expansion" of civil liability by adoption of an aiding and abetting rule, Central Bank of Denver, 511 U.S.

---

[14]  Notably, one stated reason why the United States refused to join the Rome Statute of the International Criminal Court, which provides for criminal aiding and abetting liability, is that it lacks sufficient checks on prosecutorial discretion.  See American Foreign Policy and the International Criminal Court, Marc Grossman, Under Secretary for Political Affairs, Remarks to the Center for Strategic and International Studies, Washington, DC, May 6, 2002 (http://www.state.gov/p/9949pf.htm).  See also Presbyterian Church of Sudan v. Talisman Energy, Inc., 374 F.Supp.2d 331, 339-340 (S.D.N.Y. 2005) ("the United States feared 'unchecked power in the hands of the prosecutor' that could lead to 'politicized prosecutions.'").

-24-

at 183, is not contemplated in any competent source of international or federal law, criminal or civil.

Under <u>Sosa</u>, before creating federal common law aiding and abetting liability for civil ATS claims, a court should examine whether there is an international consensus that criminal aiding and abetting liability should necessarily translate into a right to sue the aider/abettor for money damages. Given <u>Central Bank of Denver</u>'s statement that the extension of criminal aiding and abetting concepts to the civil context is "at best uncertain," 511 U.S. at 181, it is not possible to draw that conclusion.

3. Even on its own merits, the international criminal norms plaintiffs seek to rely upon do not satisfy <u>Sosa</u>'s requirements for incorporation into federal common law under the ATS. International criminal aiding and abetting is not one of those "handful of heinous actions - each of which violates definable, universal and obligatory norms," <u>Sosa</u> at 2766 (quoting Edwards, J., in <u>Tel-Oren</u>, <u>supra</u> at 781), nor is it all similar to the historical precedents that <u>Sosa</u> teaches should be the measure for supporting a new cause of action under the ATS. <u>See</u> E. Kontorovich, <u>Implementing Sosa v. Alvarez-Machain: What Piracy Reveals about the Limits of the Alien Tort Statute</u>, 80 <u>Notre Dame L. Rev</u>. 111, 134, 158 (2004) (describing six characteristics of piracy that made it suitable for ATS coverage and absence of those characteristics in aiding and abetting claims).

Moreover, the standard the plaintiffs propose differs materially from the most recent formulations adopted in international practice. While the plaintiffs propose a "knowledge" standard, the Rome Statute to which 99 countries are party requires a defendant to act "for the purpose of facilitating the commission" of a crime (article 25(3)). The same standard was adopted by the United Nations Administration for East Timor. See 2000 UNATET Reg. No. 2000/15-14.3(1).

Plaintiffs draw their "knowledge" standard from the ad hoc International Criminal Tribunal for the Former Yugoslavia and the International Criminal Tribunal for Rwanda. While "the ICTY and ICTR Statutes were created by resolutions of the United Nations Security Council," Presbyterian Church of Sudan v. Talisman Energy, Inc., 374 F.Supp.2d at 338, the rulings of the ICTY and the ICTR are specific to their jurisdictions,[15] and their discussions do not bind other international bodies. Accordingly, it would be inappropriate for a federal court, as a matter of federal common law, to adopt these criminal statutes and rulings as establishing a general civil aiding and abetting liability rule of "international character accepted by the civilized world." Sosa, 124 S.Ct. at 2761.

_____

[15] United Nations Security Council resolution 827 of May 25, 1993, established the ICTY to address violations of international humanitarian law committed in the territory of the former Yugoslavia since 1991. See ICTY Statute, art. 1. The ICTR's jurisdiction is likewise limited to the prosecution of persons responsible for genocide and other serious violations of international humanitarian law committed in the territory of Rwanda in 1994. See ICTR Statute, art. 1.

Particularly given the enormous practical consequences of broadening the scope of the ATS if this form of secondary civil liability were added, the courts should follow the Supreme Court's admonition in <u>Sosa</u> to exercise great caution against importing international criminal concepts of aiding and abetting into domestic tort law.

## CONCLUSION

For the foregoing reasons, this Court should affirm the dismissal of the aiding and abetting claims.

Respectfully submitted,

MICHAEL J. GARCIA
 United States Attorney

DAVID S. JONES
 (212) 637-2739
 Assistant U.S. Attorney
 Southern District of New York
 86 Chambers Street, 3rd Floor
 New York, N.Y.  10007

JOHN B. BELLINGER III
 Legal Adviser
 Department of State
 Washington, D.C. 20520

OCTOBER 14, 2005

DANIEL MERON
  Acting Assistant Attorney General

DOUGLAS N. LETTER
 (202) 514-3602
ROBERT M. LOEB
 (202) 514-4332
  Attorneys, Appellate Staff
 Civil Division, Room 7268
 Department of Justice
 950 Pennsylvania Ave., N.W.
 Washington, D.C.  20530-0001

-27-

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that this brief complies with the type-volume limitation in Rule 32(a)(7)(B). The foregoing brief is presented in Time New Roman 14 point font. The word count for the brief (as calculated by the WordPerfect 9.0 word-processing program, excluding exempt material) is 6,875, and is under the 7,000 word limitation.

_____

DAVID S. JONES
 Attorney for the United States

# EXHIBIT J

**ORIGINAL**

No. 05-36210

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

RECEIVED
CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

CYNTHIA CORRIE and CRAIG CORRIE, *et al.*
Plaintiffs-Appellants,

AUG 1 4 2006

FILED
DOCKETED

v.

CATERPILLAR INC.,
Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

BRIEF OF THE UNITED STATES AS *AMICUS CURIAE*
IN SUPPORT OF AFFIRMANCE

RONALD J. BETTAUER
Deputy Legal Adviser
Department of State

JEFFREY BUCHOLTZ
Acting Assistant Attorney General

JOHN McKAY
United States Attorney

DOUGLAS N. LETTER
(202) 514-3602
ROBERT M. LOEB
(202) 514-4332
Attorneys, Appellate Staff
Civil Division, Room 7268
Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530-0001

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

ARGUMENT ............................................................................................. 5

I.    THE DISTRICT COURT CORRECTLY HELD THAT
      ALLEGATIONS OF AIDING AND ABETTING ARE
      NOT ACTIONABLE UNDER THE ATS .......................................... 5

      A.    The Court Should Be Very Hesitant To Apply Its
            Federal Common Law Powers To Resolve A Claim
            Centering On The Treatment of Foreign Nationals
            By A Foreign Government Outside The United
            States ..................................................................................... 5

      B.    The Significant Policy Decision To Impose
            Aiding-And-Abetting Liability For ATS Claims
            Should Be Made By Congress, Not The Courts ....................... 8

      C.    Practical Consequences For U.S. Foreign Relations
            Counsel Against The Adoption Of Aiding-And-Abetting
            Liability Under The ATS ........................................................ 13

      D.    Civil Aiding-And-Abetting Liability Does Not
            Satisfy *Sosa's* Threshold Requirements ................................... 19

II.   THE DISTRICT COURT CORRECTLY DISMISSED
      THE CITIZEN PLAINTIFFS' ATS CLAIMS ................................... 24

III.  THE DISTRICT COURT CORRECTLY HELD THAT
      THE TVPA DOES NOT PROVIDE FOR AIDING-AND-
      ABETTING LIABILITY IN THIS CASE ......................................... 25

IV.   THE DISTRICT COURT CORRECTLY HELD THAT
      FOREIGN POLICY CONCERNS SUPPORT DISMISSAL
      OF THE CLAIMS ............................................................................. 27

CONCLUSION ..................................................................................................... 30

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
APPELLATE PROCEDURE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page**

*American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) ...................................... 29

*Baker v. Carr*, 369 U.S. 186 (1962) ..................................................................... 28

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) ....................... 9

*Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) ................................... 29

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) ........................... 29

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) ........................... 26

*Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164
(1994) ................................................................................................. passim

*Crosby v. NFTC*, 530 U.S. 363 (2000) ........................................................... 16, 29

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) ......................................... 5-6

*Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434 (1979) ........................ 29

*Nye & Nissen v. United States*, 336 U.S. 613 (1949) ..................................... 11-12

*Pinkerton v. United States*, 328 U.S. 640 (1946) .................................................. 12

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ......................................... 29

*Rose v. Himely*, 8 U.S. (4 Cranch) 241 (1807) ....................................................... 6

*Sarei v. Rio Tinto*, No. 02-56390, 2006 WL 2242146
(9th Cir. Aug. 7, 2006) ................................................................. 6, 8, 11, 12

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005) ........................................ 28

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ............................................ passim

*In re South African Apartheid Litigation*, 346 F. Supp. 2d 538
    (S.D.N.Y. 2004), appeal pending, No. 05-2141 (2d. Cir.) ......... 17-18, 19, 28

*State Farm Fire and Cas. Co. v. Bomke*, 849 F.2d 1218 (9th Cir. 1988) ............ 11

*Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981) .............. 24

*The Apollon*, 22 U.S. (9 Wheat.) 362 (1824) ......................................................... 6

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) ................... 16

*United States v. Palmer*, 16 U.S. 610 (1818) ........................................................ 6

**Statutes:**

Alien Tort Statute:

    28 U.S.C. § 1350 ................................................................................. 1, 4, 24

Arms Export Control Act:

    22 U.S.C. §§ 2751-2799 .................................................................... 14
    22 U.S.C. § 2763 ............................................................................... 14
    22 U.S.C. § 2799aa ............................................................................ 15
    22 U.S.C. § 2799aa-1 ........................................................................ 15

Foreign Operations, Export Financing, and Related
    Programs Appropriations Act, Pub. L. 109-102 ............................. 15

Foreign Sovereign Immunities Act:

    28 U.S.C. § 1604 ............................................................................... 18
    28 U.S.C. § 1605(a)(5) ...................................................................... 18

Torture Victim Protection Act, 106 Stat. 73 (1992) ................................................ 4

18 U.S.C. § 2333 ...................................................................................... 10

28 U.S.C. § 1331 ............................................................................... 24, 25

Pub. L. No. 99-440, §§ 4, 101; National Security Decision Directive
187 (1985) ................................................................................... 17

Pub. L. 102-256, § 2(a) ........................................................................ 25


**Legislative Materials:**

S. Rep. 102-249 at 8-9 (1991) ............................................................ 26


**Miscellaneous:**

1 Op. Att'y Gen. 57, 58 (1795) ...................................................... 7, 13

2000 UNATET Reg. No. 2000-15-14.3(1) ............................................ 23

*E. Kontorovich, Implementing Sosa v. Alvarez-Machain: What
Piracy Reveals about the Limits of the Alien Tort Statute,*
80 Notre Dame L. Rev. 111, 134, 158 (2004) ................................................ 23

Congressional Research Service, *Issue Brief for Congress:
China-U.S. Relations* 13 (Jan. 31, 2003) ........................................ 17

United Nations General Assembly Resolution 56/83 & Annex,
art. 16, adopted Jan. 28, 2002 ...................................................... 20

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

No. 05-36210

CYNTHIA CORRIE and CRAIG CORRIE, *et al.*
Plaintiffs-Appellants,

v.

CATERPILLAR INC.,
Defendant-Appellee.

BRIEF OF THE UNITED STATES AS *AMICUS CURIAE*
IN SUPPORT OF AFFIRMANCE

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Pursuant to Federal Rule of Appellate Procedure 29(a), the United States hereby submits this brief in support of affirmance of the district court's judgment of dismissal.

1. Plaintiffs here are seeking to hold defendant liable under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, for selling bulldozers to the State of Israel, and also seek to enjoin any further sales. The district court properly refused to employ its common law powers to create aiding-and-abetting liability for these ATS claims. The court recognized that, under *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), in

deciding whether to adopt a rule of aiding-and-abetting liability under the ATS, it was required to consider the potential foreign policy consequences of such a ruling.

The United States has a very substantial interest in the proper construction and application of the ATS. If improperly construed or applied, the ATS could impinge upon the "discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa*, 542 U.S. at 727. Furthermore, the United States is uniquely positioned to address the foreign policy consequences that may follow from a ruling recognizing aiding-and-abetting liability for ATS claims in general and in the present case.

Moreover, funds requested by the Executive and appropriated by Congress were used by Israel to purchase the equipment in question under the Foreign Military Financing ("FMF") Program. Nonetheless, plaintiffs would have a court limit the use of those funds, by prohibiting the sale of the equipment to Israel and holding the U.S. manufacturer liable for the past sales. The United States has a strong interest in ensuring that it speaks with one voice on matters of foreign policy and that a court not interfere unduly with the FMF program, a critical element in the conduct of U.S. foreign relations. As the district court correctly observed, for a court "to preclude sales of Caterpillar products to Israel would be to make a foreign policy decision and to impinge directly upon the prerogatives of the executive branch of government." Excerpts of Record ("ER") Doc. 62 at 16.

2

While supporting dismissal of the claims based on legal and foreign policy concerns, the United States wishes to state its deep regrets for the tragic death of Rachael Corrie as well as any other civilian deaths, injuries and losses resulting from the practice of demolitions. In addressing the legal issues in this case as amicus curiae, the United States makes no judgment on the underlying conduct and wishes to make clear that the decision not to address other legal doctrines or issues or the underlying conduct should not be understood to indicate any view regarding those matters.

2. The district court's dismissal of plaintiffs' ATS claims should be affirmed. The *Sosa* Court rejected the notion that the ATS grants federal courts unencumbered common law powers to recognize and remedy asserted international law violations. The Court went out of its way to chronicle reasons why a court must act cautiously and with "a restrained conception of the discretion" in both recognizing ATS claims and in extending liability. *Sosa*, 542 U.S. at 725-730, 732 n.20. The Court discussed at length the reasons for approaching this federal common law power with "great caution," *id.* at 727-728. As we detail below, all of the admonitions articulated by the *Sosa* Court apply with full force to the aiding-and-abetting claims in this case and, accordingly, the district court properly rejected plaintiffs' claims.

Furthermore, the Supreme Court has instructed that whether or not to permit a civil aiding-and-abetting claim is properly a legislative choice. *See Central Bank*

3

*of Denver v. First Interstate Bank*, 511 U.S. 164 (1994). Accordingly, absent a clear direction from Congress, a federal court should not recognize such claims under the ATS.

In addition, civil aiding-and-abetting liability does not, in any event, satisfy *Sosa's* threshold requirement that an international law norm be both firmly established and well defined before it can form the basis for claim brought under the ATS.

3. This Court should reject plaintiffs' contention that they can assert federal common law claims for alleged human rights violations under a court's general federal question jurisdiction. As we explain below, the limited common law authority recognized in *Sosa* flowed directly from the enactment of the ATS and is limited to claims asserted under that provision.

4. The district court correctly held that the Torture Victim Protection Act ("TVPA"), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 (note)), does not provide for aiding-and-abetting liability here. As the district court held, "an aiding and abetting claim is inconsistent with the TVPA's explicit requirement that a defendant must have acted under 'color of law.'" ER Doc. 62 at 8.

5. Finally, the district court also correctly held that foreign policy concerns support dismissal of the claims. The extent to which the use of the FMF funding to Israel or any other foreign state is to be limited or restricted based on the allegations

4

asserted by plaintiffs is a matter for the Executive Branch and Congress, not the courts.

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT ALLEGATIONS OF AIDING AND ABETTING ARE NOT ACTIONABLE UNDER THE ATS.

### A. The Court Should Be Very Hesitant To Apply Its Federal Common Law Powers To Resolve A Claim Centering On The Treatment of Foreign Nationals By A Foreign Government Outside The United States.

Under the ATS, although the substantive norm to be applied is drawn from international law or treaty, any cause of action recognized by a federal court is one devised as a matter of federal common law -- *i.e.*, the law of the United States. The question, thus, becomes whether the challenged conduct should be subject to a cause of action under -- and thus governed by -- *U.S. law*. In this case, the aiding-and-abetting claims asserted against defendant turn upon the alleged misconduct by the Israeli military against individuals living in the Gaza Strip and the West Bank. It would be extraordinary to give U.S. law an extraterritorial effect in such circumstances to regulate conduct of a foreign state in foreign territories, and all the more so for a federal court to do so as a matter of common law-making power.

When construing a federal statute, there is a strong presumption against projecting U.S. law to resolve disputes that arise in foreign territories. *See EEOC v.*

5

*Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). This presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Ibid.* Notably, the same strong presumption existed in the early years of this Nation, and, significantly, even the federal statute that defined and punished as a matter of U.S. law one of the principal law of nations offenses -- piracy -- was held not to apply where a foreign state had jurisdiction. *See United States v. Palmer*, 16 U.S. 610, 630-631 (1818) (the federal piracy statute should not be read to apply to foreign nationals on a foreign ship). *See also The Apollon*, 22 U.S. (9 Wheat.) 362, 370 (1824); *Rose v. Himely*, 8 U.S. (4 Cranch) 241, 279 (1807).

In *Sarei v. Rio Tinto*, No. 02-56390, 2006 WL 2242146  at *42 n.5 (9th Cir. Aug. 7, 2006), this Court recently cited Attorney General Bradford's opinion from 1795 regarding the ATS. That opinion noted the possibility of ATS jurisdiction for offenses on the high seas, but also explained that, insofar "as the transactions complained of originated or took place in a foreign country, *they are not within the cognizance of our courts*." *See* 1 Op. Att'y Gen. 57, 58 (1795) (emphasis added).

While the *Sosa* Court concluded that Congress, through the ATS, intended the federal courts to have a limited federal common law power to adjudicate well-established and defined international law claims, the Court went out of its way to chronicle reasons why a court must act cautiously and with "a restrained conception

6

of the discretion" in both recognizing ATS claims and in extending liability. *Sosa*, 542 U.S. at 725-730, 732 n.20. The Court instructed the federal courts to refrain from an "aggressive role in exercising a jurisdiction that remained largely in shadow for much of the prior two centuries." *Id.* at 726. Notably, the Court expressly questioned whether this federal common law power could properly be employed "at all" in regard to a foreign nation's actions taken abroad. *Sosa*, 542 U.S. at 727-728. Indeed, given the accepted principles of the time, it is highly unlikely that the drafters of the ATS intended to grant the newly created federal courts unchecked power to apply their federal common law powers to decide extraterritorial disputes regarding a foreign nation's actions taken abroad against non-U.S. citizens. Nothing in the ATS, or in its contemporary history, suggests that Congress intended it to apply to conduct in foreign lands. To the contrary, the assaults on ambassadors that preceded and motivated the enactment of the ATS involved conduct purely within the United States. *See id.* at 720, 724.

Against this backdrop, reinforced by caution recently mandated by the Supreme Court in *Sosa*, courts should be very hesitant ever to apply their federal common law powers to resolve claims, such as the ones here, centering on the asserted mistreatment of foreign residents by a foreign government outside the United States.[1]

---

[1]    While this Court recently permitted an ATS claim to proceed in a case
(continued...)

7

The fact that plaintiffs have sued a U.S. corporate defendant does not alter these concerns. The truth remains that these claims turn upon the alleged acts of the State of Israel taken in Gaza and the West Bank, and would require a U.S. court to pass judgment on the propriety of those acts.

## B.    The Significant Policy Decision To Impose Aiding-And-Abetting Liability For ATS Claims Should Be Made By Congress, Not The Courts.

As the Supreme Court has held, the creation of civil aiding-and-abetting liability is a legislative act that the courts should not undertake without Congressional direction, and there is no indication in either the language or history of the ATS that Congress intended such a vast expansion of suits in this sensitive foreign policy area.

1. The Supreme Court's ruling in *Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164 (1994), is key to this case; there, the Court explained that there is no "general presumption" that a federal statute should be read to extend aiding-and-abetting liability to the civil context. In the criminal law context "aiding and abetting

---

[1](...continued)
involving claims of residents of a foreign country regarding acts that took place in that country, *see Sarei v. Rio Tinto, supra*, the United States did not participate in the litigation before this Court, and the private parties there did *not* argue and this Court did *not* address whether, in light of the presumption against extraterritoriality, the ATS should be construed to apply to mistreatment of foreign residents by a foreign government.    Accordingly, the Court's decision should not be read as having considered or as having resolved the issue.

is an ancient * * * doctrine," *id.* at 181, but its extension to permit civil redress is not well established and has "at best uncertain in application." *Ibid.* While in the criminal context the government's prosecutorial judgment serves as a substantial check on the imposition of criminal aiding-and-abetting liability, there is no similar check on civil aiding-and-abetting liability claims. *Cf. Sosa*, 542 U.S. at 727.

Significantly, the *Central Bank* Court noted that "Congress has not enacted a general civil aiding and abetting statute – either for suits by the Government * * * or for suits by private parties." 511 U.S. at 182. The Court concluded, "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, *there is no general presumption that the plaintiff may also sue aiders and abettors*." *Ibid.* (emphasis added).[2] Thus, under *Central Bank*, a court must not presume that there is any right to assert an aiding-and-abetting claim under the ATS.

_____

[2] The presumption against implying aiding-and-abetting liability can be overcome in our domestic law. For example, the United States successfully argued in favor of aiding-and-abetting liability under a statute providing a cause of action for those injured by an act of international terrorism, 18 U.S.C. § 2333. *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002). That argument was based, however, on that statute's particular context, language, and purposes. The court made clear that a different result would attach in the absence of an express cause of action, as is true here. To adopt aiding-and-abetting liability in that context would be to improperly "pile inference upon inference." *Id.* at 1019.

9

Moreover, in *Central Bank*, the Court explained that adoption of aiding-and-abetting liability for civil claims would be "a vast expansion of federal law." 511 U.S. at 183. Such an expansion of the law, the Court held, required legislative action, and could not be carried out through the exercise of federal common law. *Ibid.* So, too, under the ATS. Reading this statute to permit aiding-and-abetting claim would vastly increase its scope and range. That vast increase should not be undertaken without clear guidance from Congress. Notably, the Supreme Court described the ATS as an "implicit sanction to entertain the *handful* of international law *cum* common law claims." *Sosa*, 542 U.S. at 712 (emphasis added).

In the ATS context, the *Sosa* Court explicitly cautioned that federal courts should be wary of "exercising innovative authority over substantive law" without "legislative guidance." *Sosa*, 542 U.S. at 712, 726. Imposing private liability not only on those persons who violate a narrow set of international-law norms, but also on any persons who aid and assist the primary wrongdoer, would constitute a vast expansion of the scope of liability.

The *Sosa* Court also warned against the courts assuming a legislative function in "craft[ing] remedies" where resolution of the legal issues could adversely implicate foreign policy and foreign relations. 542 U.S. at 727-728. The caution mandated by *Sosa* in deciding whether to recognize and enforce an international law norm under the ATS, when coupled with the teaching of *Central Bank* that the decision whether

10

to adopt aiding-and-abetting liability for a civil claim is a legislative policy judgment,

leads to the unmistakable conclusion that aiding-and-abetting liability should not be

recognized under the ATS, absent further Congressional action.

2. The issue of whether aiding-and-abetting liability should be permitted under

the ATS was not briefed to this Court in *Sarei v. Rio Tinto*, 2006 WL 2242146,

*supra*, and not decided by the Court. There, the claims were *not* ones of aiding and

abetting. Rather, plaintiffs there asserted that Papua New Guinea ("PNG") allegedly

"committed atrocious human rights abuses and war crimes at the behest of Rio Tinto,"

an international mining corporation. *Id.* 2006 WL 2242146 at \*5. Plaintiffs there

alleged that, "Rio Tinto knew that its wishes were taken as commands by the PNG

government and Rio [Tinto] intended that its comments would spur the PNG forces

into action," and that "Rio Tinto officials exercised control over the behavior of PNG

forces with regard to the conflict around the mine." *Ibid.* In this context, this Court

held that the actions of the military were "fairly attributable" to Rio Tinto, which,

accordingly, could be subject to "vicarious liability" under the ATS. *Ibid.*

As this Court has long recognized, "vicarious" liability and aiding-and-abetting

liability are not the same. *See State Farm Fire and Cas. Co. v. Bomke*, 849 F.2d

1218, 1220 (9th Cir. 1988). In the criminal context, the Supreme Court has explained

the distinction between vicarious conspiracy liability and aiding-and-abetting

liability. *See Nye & Nissen v. United States*, 336 U.S. 613, 620 (1949). Vicarious

11

conspirator liability is a "rule which holds responsible one who counsels, procures, or commands another to commit a crime." *Pinkerton v. United States*, 328 U.S. 640, 647 (1946). In contrast, "[a]iding and abetting has a broader application. It makes a defendant a principal when he consciously shares in any criminal act whether or not there is a conspiracy* * *. Aiding and abetting rests on a broader base; it states a rule of criminal responsibility for acts which one assists another in performing." *Nye*, 336 U.S. at 620.

Thus, to say there can be vicarious liability in the case of *Sarei*, where the defendant is alleged to have controlled the military and where the acts were alleged to have been taken at the defendant's behest, is not the same as saying that aiding-and-abetting liability is available under the ATS generally, or here where the claim is based on the mere sale of military equipment with alleged knowledge of how it would be used. Given the cautions mandated by *Sosa* and the analysis dictated by *Central Bank*, this Court should reject such claims.[3]

---

[3] Attorney General Bradford's 1795 opinion, cited in *Sarei*, 2006 WL 2242146 at *42 n.5, does not support the conclusion that the ATS imposes aiding-and-abetting liability. That opinion involved the question whether American citizens who breached the United States' neutrality in the war between England and France by "join[ing], conduct[ing], aid[ing], and abett[ing] a French fleet in attacking" a British settlement on the coast of Africa, and "plundering or destroying the property" of the British settlers were subject to *criminal* prosecution in a U.S. court. 1 Op. Atty. Gen. 57, 58. Although the Attorney General opined that an injured person might "have a remedy by a civil suit in the courts of the United States" under the ATS, *id.* at 58-59, (continued...)

12

**C.    Practical Consequences For U.S. Foreign Relations Counsel Against The Adoption Of Aiding-And-Abetting Liability Under The ATS.**

In *Sosa*, the Supreme Court warned that a court's limited federal common-law authority to recognize causes of action under the ATS must be exercised with "great caution" and "war[iness]," particularly where the exercise of common-law authority could impinge upon the political branches' discretion "in managing foreign affairs." *Id.* at 724-725, 727. A court deciding whether to adopt a federal common law rule extending aiding-and-abetting liability under the ATS must also consider the potential practical consequences, including the foreign policy effects of such a ruling. *See id.* at 732-733 ("the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts"); *id.* at 733 n.21 (in discussing other possible limiting principles, the Court stated, "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"). As this case amply demonstrates, adoption of a common law rule permitting aiding-and-abetting liability under the ATS would interfere with the U.S. Government's ability

---

[3](...continued)
he did not address the substantive basis for any civil claims against the defendants — who had themselves committed unlawful conduct — much less endorse aiding-and-abetting liability.

13

to employ the full range of foreign policy options when interacting with various foreign governments. Those consequences strongly counsel against the judicial creation of aiding-and-abetting liability for ATS claims in this case or as a general rule.

Adoption of a common law rule permitting aiding-and-abetting liability under the ATS would interfere with the U.S. Government's ability to employ the full range of foreign policy options when interacting with various foreign governments.

1. Adopting aiding-and-abetting ATS liability in this case and permitting the claims to proceed would be improper because it would impose liability for the purchase of equipment funded by Congress in the exercise of its foreign policy prerogatives. Here, Israel's purchase of the equipment at issue was funded by the United States Government through the Department of Defense's Foreign Military Financing ("FMF") Program. This program, authorized by the Arms Export Control Act ("AECA"), 22 U.S.C. §§ 2751-2799, allows the use of funds appropriated by Congress to finance the "procurement of defense articles, defense services, and design and construction services by friendly foreign countries and international organizations." 22 U.S.C. § 2763.[4]   The United States made a foreign policy

---

[4] Foreign military financing is provided by the President "on such terms and conditions as he may determine" 22 U.S.C. § 2763, and under the Secretary of State's supervision and general direction "to the end that the foreign policy of the United (continued...)

14

determination to extend FMF aid to Israel and to encourage equipment manufacturers like Caterpillar to sell its goods to foreign states receiving such FMF funds.

The political branches have decided that strategic interests of the United States are furthered by funding purchases of defense equipment from U.S. suppliers by Israel and other participating states. The threat of suits against those suppliers based upon the purchasing country's use of that equipment would pose a significant disincentive to suppliers' participation in FMF sales. This would undoubtedly deter future suppliers from making sales to foreign governments that the political branches have determined our Nation should support in that fashion. Adoption of aiding-and-abetting liability in circumstances such as these could be seen as imposing a legal obligation on manufacturers to conduct an independent evaluation of the buyer's intended use for the product. Not only would meeting such an obligation be largely outside the competence of most participating suppliers, but it could increase the cost to manufacturers of participating in FMF sales, or discourage participation altogether, thereby increasing the cost to the U.S. Government of the FMF program and

---

[4](...continued)

States would be best served thereby," 22 U.S.C. § 2752. Statutory provisions applicable to the provision of such foreign assistance include restrictions in the AECA and the annual Foreign Operations, Export Financing, and Related Programs Appropriations Act ("FOAA"). *See, e.g.*, 22 U.S.C. §§ 2799aa (nuclear enrichment transfers), 2799aa-1 (nuclear reprocessing transfers); 2005 FOAA (Pub. L. 109-102) §§ 508 (military coup), 542 (lethal military equipment transfer to terrorist states), 551 (gross violations of human rights), 581 and 583 (refusal to extradite).

15

jeopardizing its effectiveness. Thus, permitting an aiding-and-abetting claim for a U.S. supplier's participation in the FMF program would impermissibly undermine the foreign policy determinations of the political branches.

As noted above, the *Sosa* Court warned against exercising the common law power in a way that could impinge upon the "discretion of the Legislative and Executive Branches in managing foreign affairs." 542 U.S. at 727. Here, the district court correctly observed that, for a court "to preclude sales of Caterpillar products to Israel would be to make a foreign policy decision and to impinge directly upon the prerogatives of the executive branch of government." ER Doc. 62 at 16.

2. This case is not unique. The adoption of an aiding-and-abetting rule here would in numerous other circumstances also implicate and limit the United States' foreign policy prerogatives. One important policy option for dealing with a foreign country is to promote active economic engagement in that country as a method of encouraging reform and gaining leverage with that country. The determination whether to pursue such a policy is the type of foreign affairs question constitutionally vested in the Executive Branch. *See Crosby v. NFTC*, 530 U.S. 363, 384-386 (2000); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319, 320 (1936).

In the case of China, for example, economic engagement has been viewed as a potential means to advance human rights over the long term and to serve important U.S. interests by discouraging "disruptive action" and fostering public pressure for

16

"greater political pluralism and democracy." Congressional Research Service, *Issue Brief for Congress: China-U.S. Relations* 13 (Jan. 31, 2003). In South Africa in the 1980s, the United States employed both economic engagement and limited sanctions to encourage the South Africa government to end apartheid. *See* Pub. L. No. 99-440, §§ 4, 101; National Security Decision Directive 187 (1985).

Judicial imposition of aiding-and-abetting liability under Section 1350 would undermine the Executive's ability to employ economic engagement as an effective tool for foreign policy. Indeed, claims are currently pending before the Second Circuit seeking to impose civil liability on private companies that did business in apartheid-era South Africa during the period of the United States' policy of economic engagement. *See In re South African Apartheid Litigation*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004), appeal pending, No. 05-2141 (2d Cir.). There, the district court cogently explained, "[in] a world where many countries may fall considerably short of ideal economic, political, and social conditions, this Court must be extremely cautious in permitting suits here based upon a corporation's doing business in countries with less than stellar human rights records, especially since the consequences of such an approach could have significant, if not disastrous, effects on international commerce." *Id.* at 554. The court, recognizing that it must be "mindful of the collateral consequences and possible foreign relations repercussions that would result from allowing courts in this country to hear civil suits for the aiding-and-

17

abetting of violations of international norms across the globe," refused to create such liability under the ATS. *See id.* at 551. The court properly reasoned that to adopt such a rule "would not be consistent with the 'restrained conception' of new international law violations that the Supreme Court has mandated for the lower federal courts." *Id.* at 554.

Adopting aiding-and-abetting liability under Section 1350 would also spur more lawsuits, resulting in greater diplomatic friction. Aiding and abetting could be the basis for a wide range of claims that, although brought against third-party corporations, nonetheless sought to challenge the lawfulness of a foreign government's conduct — which is typically immune from direct challenge under the Foreign Sovereign Immunities Act, *see* 28 U.S.C. §§ 1604, 1605(a)(5). Experience has shown that such suits often trigger foreign government protests, both from the nations where the alleged abuses occurred and, in some instances, from the nations where the corporations are based. Serious diplomatic friction can lead to a lack of cooperation with the United States Government on important foreign policy objectives. "To allow for expanded liability, without congressional mandate, in an area that is so ripe for non-meritorious and blunderbuss suits would be an abdication of [a] Court's duty to engage in 'vigilant doorkeeping.'" *In re: South African Apartheid Litig.*, 346 F. Supp. 2d at 550 (quoting *Sosa*, 542 U.S. at 729).

\* \* \*

18

Thus, serious foreign policy and other consequences relating to U.S. national interests strongly counsel against the adoption of a rule extending civil aiding-and-abetting liability to ATS claims, absent express authorization by Congress.

## D.    Civil Aiding-And-Abetting Liability Does Not Satisfy *Sosa's* Threshold Requirements.

Under *Sosa*, whatever other considerations are relevant in determining whether an international law norm should be recognized and enforced as part of an ATS federal common law cause of action, a necessary requirement is that the international law principle must, at a minimum, be both sufficiently established and well defined. The Supreme Court did not provide any definitive methodology for assessing when international law norms meet these standards. The Court explained, however, that the principle at issue must be *both* "accepted by the civilized world" and defined with "specificity," and in both respects the norms must be "comparable to the features of the 18th-century paradigms," *Sosa*, 542 U.S. at 725, *i.e.*, violation of "safe conducts, infringement of the rights of ambassadors, and piracy." *Id.* at 720, 724. Thus, in resolving whether the necessary conditions are met, this Court must examine: 1) whether civil aiding-and-abetting liability is broadly, if not universally, accepted by the international community and 2) whether the principle, as accepted by the international community, is defined with "specificity" in each regard to a degree comparable to the "18th-century paradigms."

19

As we explain below, the common law imposition of civil aiding-and-abetting liability does not meet this test.

1. Plaintiffs argue (pp. 21-22) that it is unnecessary to find an international norm altogether because aiding-and-abetting liability is merely an ancillary rule of decision. But, as we have explained, all of the cautions and admonitions of the *Sosa* Court apply in full to the question of substantive law of whether to adopt aiding-and-abetting liability for ATS claims. Aiding-and-abetting is undoubtedly a separate cause of action and poses the very question raised by the *Sosa* Court, *i.e.*, "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." 542 U.S. at 732 n.20. It would be directly at odds with *Sosa* for the federal courts to adopt substantive legal principles, as a matter of federal common law, without proof of a universal and specifically defined international norm.

2. There is no such international norm for civil aiding-and-abetting liability. Virtually the only international source even to mention non-criminal aiding-and-abetting liability is a draft article by the International Law Commission. *See* United Nations General Assembly Resolution 56/83 & Annex, art. 16, adopted Jan. 28, 2002. That draft article has no relevance here because it extends liability only to States that aid and abet the wrongful act of another State. *Compare Sosa*, 542 U.S. at 732 & n.20 (court considering whether to recognize cause of action should consider

20

"whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued").

In order to adjudicate a claim for civil liability based on aiding and abetting an asserted violation of international law, a federal court would be required to confront a host of issues not addressed by international law, including allocation of liability among multiple tortfeasors, the standard of causation, and whether it is appropriate to impose liability on an alleged aider and abettor where the primary tortfeasor is immune from suit. This wholesale law-making is a far cry from the careful and narrow steps envisioned in *Sosa*. The caution mandated by *Sosa*, when coupled with the teaching of *Central Bank* that the decision whether to adopt aiding-and-abetting liability for a civil claim is typically a legislative policy judgment, leads inexorably to the conclusion that a court should not impose aiding-and-abetting liability under Section 1350 absent further Congressional action.

3. Plaintiffs try to remedy this fatal shortcoming by appealing to international practice regarding criminal aiding and abetting. As discussed above, however, there is no "general presumption" that criminal aiding-and-abetting liability extends liability to the civil context. Rather, the general presumption under our domestic law is that such an extension requires an independent legislative policy choice. *Central Bank*, 511 U.S. at 182.

21

Moreover, the decision to charge a person for an international crime is a grave matter requiring careful exercise of prosecutorial judgment by government officials. That prosecutorial judgment serves as a substantial practical check on the application of the criminal aiding-and-abetting standard. Opening the doors to civil aiding-and-abetting claims in U.S. courts through the ATS could not be more different. Any aggrieved aliens, anywhere in the world, could potentially bring an ATS civil suit in the United States, claiming that a private party aided or abetted abuses committed abroad against them by a foreign government. Such a "vast expansion" of civil liability by adoption of an aiding-and-abetting rule, *Central Bank*, 511 U.S. at 183, is not contemplated in any competent source of international or federal law, criminal or civil.

Under *Sosa*, before creating federal common law aiding-and-abetting liability for civil ATS claims, a court should examine whether there is an international consensus that criminal aiding-and-abetting liability should necessarily translate into a right to sue the aider/abettor for money damages. Given *Central Bank*'s statement that the extension of criminal aiding-and-abetting concepts to the civil context is "at best uncertain," 511 U.S. at 181, it is not possible to draw that conclusion.

4.  Even on its own merits, the international criminal norms plaintiffs seek to rely upon do not satisfy *Sosa's* requirements for incorporation into federal common law under the ATS.  International criminal aiding and abetting is not one of those

22

"handful of heinous actions - each of which violates definable, universal and obligatory norms," *Sosa* 542 U.S. at 732 (quoting Edwards, J., in *Tel-Oren, supra* at 781), nor is it at all similar to the historical precedents that *Sosa* teaches should be the measure for supporting causes of action under the ATS. *See* E. Kontorovich, *Implementing Sosa v. Alvarez-Machain: What Piracy Reveals about the Limits of the Alien Tort Statute*, 80 Notre Dame L. Rev. 111, 134, 158 (2004).

Moreover, the standard that plaintiffs propose differs materially from the most recent formulations adopted in international practice. While plaintiffs propose a "knowledge" standard (Br. 25-26), the Rome Statute to which 99 countries are party requires a defendant to act "*for the purpose* of facilitating the commission" of a crime (article 25(3)) (emphasis added). The same standard was adopted by the United Nations Administration for East Timor. *See* 2000 UNATET Reg. No. 2000/15-14.3(1). Thus, plaintiffs' asserted standard fails the second *Sosa* requirement.

Particularly given both the *Sosa* Court's admonitions and the enormous practical consequences of broadening the scope of the ATS if this form of secondary civil liability were added, the district court properly refused to recognize an aiding and abetting claim here.

23

## II.    THE DISTRICT COURT CORRECTLY DISMISSED THE CITIZEN PLAINTIFFS' ATS CLAIMS.

Plaintiffs do not dispute the district court's holding that the U.S. citizen plaintiffs cannot properly invoke jurisdiction under the ATS, which is limited to claims asserted by aliens. *See* 28 U.S.C. § 1350. Nonetheless, plaintiffs assert that the U.S. citizen plaintiffs can assert the same federal common law claims based on international law outside of the ATS, under general federal question jurisdiction, 28 U.S.C. § 1331. This Court should reject this invitation to vastly expand the federal common law authority of the courts.

The grant of subject-matter jurisdiction does not ordinarily imply the power to make federal common law. *See Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981) ("The vesting of jurisdiction in the federal courts does not in and of itself give rise to authority to formulate federal common law"). Although *Sosa* adopted a different rule for ATS cases in light of the distinctive history and context of that statute, footnote 19 of the *Sosa* ruling expressly preserved the traditional rule for other jurisdictional statutes like section 1331. *See Sosa*, 542 U.S. at 731 n.19 ("Our position does not * * * imply that every grant of jurisdiction to a federal court carries with it an opportunity to develop common law (so that the grant of federal-question jurisdiction would be equally as good for our purposes as § 1350) * * *. Section 1350 was enacted on the congressional understanding that courts

24

would exercise jurisdiction by entertaining some common law claims derived from the law of nations; and we know of no reason to think that federal-question jurisdiction was extended subject to any comparable congressional assumption"). Thus, it would be improper to extend that common law authority to adjudicate international law claims brought under Section 1331.

## III.   THE DISTRICT COURT CORRECTLY HELD THAT THE TVPA DOES NOT PROVIDE FOR AIDING-AND-ABETTING LIABILITY IN THIS CASE.

A prerequisite to liability under the TVPA is that the person sued thereunder have acted "under actual or apparent authority, or color of law, of any foreign nation." Pub. L. 102-256 § 2(a). Liability under this provision is not limited to those committing torture, and is properly read to encompass accessory liability of those who, acting under the color of foreign law, order or facilitate torture. An allegation that a U.S. company sold equipment to a foreign government does not, however, state either a claim of accessory liability or a claim that the U.S. manufacturer acted under foreign law.

Plaintiffs argue, nonetheless, that this Court should both read a claim for aiding-and-abetting liability into the TVPA, and hold defendant liable even though it did not itself act under color of foreign law. Plaintiffs, however, cannot escape the statutory text. As the district court held, recognizing an aiding-and-abetting claim here would be "inconsistent with the TVPA's explicit requirement that a defendant

25

must have acted under 'color of law.'" ER Doc. 62 at 8. Moreover, as explained above, whether or not to permit a civil aiding-and-abetting claim is a legislative choice. *See Central Bank,* 511 U.S. at 182. Accordingly, absent a clear direction from Congress here, a federal court should not recognize such claims. *Ibid.*

While the Eleventh Circuit has cited support in the legislative history supporting recognition of such liability, *Cabello v. Fernandez-Larios,* 402 F.3d 1148, 157 (11th Cir. 2005) (*citing* S. Rep. 102-249 at 8-9 (1991), which states "[t]he legislation is limited to lawsuits against persons who ordered, abetted, or assisted in the torture," that history is not, by itself, sufficient to satisfy *Central Bank*'s requirement of a clear congressional directive.    Moreover, in context, it is evident that the Senate Report did not intend "abetting" liability to obliterate the requirement that the defendant have acted under "actual or apparent authority, or color of law." Rather, all of the examples cited in the Senate Report in which the authors believed liability would attach, although the individual did not perform the act him or herself, concerned a government official "with higher authority who authorized, tolerated or knowingly ignored those acts." S. Rep. 102-249 at 8-9. As noted above, such persons, when acting under color of foreign law, are properly subject to accessory liability under the Act.

More important than the legislative history is the statutory text. As the district court held, recognizing an aiding-and-abetting claim here would be contrary to the

26

Act's color of foreign law requirement. ER Doc. 62 at 8. That ruling is correct and should be affirmed.

## IV.    THE DISTRICT COURT CORRECTLY HELD THAT FOREIGN POLICY CONCERNS SUPPORT DISMISSAL OF THE CLAIMS.

A. The *Sosa* Court warned against exercising the common law power in a way that could impinge upon the "discretion of the Legislative and Executive Branches in managing foreign affairs." 542 U.S. at 727. Here, the district court correctly observed that, for a court "to preclude sales of Caterpillar products to Israel would be to make a foreign policy decision and to impinge directly upon the prerogatives of the executive branch of government." ER Doc. 62 at 16. As discussed above, the political branches have determined that the United States has a strategic interest in promoting the sale of defense articles to select countries by U.S. manufacturers as part of the FMF program. Permitting this type of suit to proceed would directly challenge the national security determination of the political branches to fund such sales. Such suits would not only deter the sale of military equipment to Israel, but would deter sales to other allied countries, notwithstanding the determination of the political branches to support such sales under the FMF program.

Given that the claims here necessarily implicate the foreign policy of continuing to provide FMF funds to Israel, this is an appropriate case for the exercise of "case-specific deference to the political branches." *See Sosa*, 542 U.S. at 733 &

27

n.21. That deference reflects the caution demanded by the *Sosa* Court and the recognition that the limited ATS common law authority should not be exercised in a manner that interferes with the exercise of the foreign affairs function by the political branches. *See In re: South African Apartheid Litigation*, 346 F.Supp.2d at 553.

B. For the same reasons, the district court was correct in finding that the claims here present a political question. In *Baker v. Carr*, 369 U.S. 186, 217 (1962), the Supreme Court held that claims present a nonjusticiable political question when, *inter alia*, if permitting the claims to go forward would show a "lack of the respect due coordinate branches of government."

The district court correctly found that it would be impossible to adjudicate these claims on their merits without showing a "lack of the respect due coordinate branches of government," which possess the foreign policy prerogatives regarding military funding to foreign nations. Accordingly, the district court properly held that the claims should be deemed nonjusticiable under *Baker*. *See Schneider v. Kissinger*, 412 F.3d 190, 194-198 (D.C. Cir. 2005).

C. The district court held that the state law claims failed on their merits no matter which forum's law is applied. Without taking a position on that ruling by the district court, we note that the dismissal of the state law claims is also encompassed within the political question doctrine or foreign affairs deference arguments discussed above. Even beyond those doctrines, the claims should also be dismissed based on

28

constitutional principles of federal supremacy in matters of foreign affairs. *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420-425 (2003); *Crosby v. NFTC*, 530 U.S. 363, 384-386 (2000); *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 447-449 (1979). Those principles preclude a state from imposing liability on the sale of military equipment to a foreign government pursuant to a federal program where such state action interferes with that program.

The state law claims here do *not* charge the sale of a defective product or negligence in the manufacture of the product. Rather, they seek to hold defendant liable for the federally funded sale itself based upon the use of the product by a foreign government. Beyond a doubt, the policing of the propriety of federal funding of sales of military equipment to a foreign country "is hardly 'a field which the States have traditionally occupied,' such as to warrant a presumption against finding federal preemption of a state-law cause of action." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Rather, it is a matter "inherently federal in character." *Ibid.* Indeed, to permit these claims to proceed under state law would be to deter U.S. contractors from selling military equipment under the FMF program. Thus, these state law claims implicate interests that are uniquely federal in nature and the claims are properly deemed preempted by federal law. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 504-505 (1988).

29

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district

court.

Respectfully submitted,

RONALD J. BETTAUER
 Deputy Legal Adviser
 Department of State

JEFFREY BUCHOLTZ
 Acting Assistant Attorney General

JOHN McKAY
 United States Attorney

DOUGLAS N. LETTER
 (202) 514-3602

ROBERT M. LOEB
 (202) 514-4332
 Attorneys, Appellate Staff
 Civil Division, Room 7268
 Department of Justice
 950 Pennsylvania Ave., N.W.
 Washington, D.C. 20530-0001

AUGUST 2006

30

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,980 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared with Word Perfect 12 in a proportional typeface with 14 characters per inch in Times New Roman.

Robert M. Loeb
Counsel for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2006, I served the foregoing "BRIEF OF

THE UNITED STATES AS *AMICUS CURIAE* IN SUPPORT OF AFFIRMANCE"

by causing copies to be sent by Fed Ex delivery (and e-mail to lead counsel where

indicated) to the following counsel of record:

Gwynne Skinner                                          (FedEx and E-mail)
SEATTLE UNIVERSITY
RONALD A. PETERSON LAW CLINIC
1112 E. Columbia
Seattle, WA 98122-4340
Tel: (206) 398-4130

Maria C. Lahood
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6430
Fax: (212) 614-6499

Jennifer Green
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6431

Ronald C. Slye
SEATTLE UNIVERSITY SCHOOL OF LAW
901 12th Avenue
Seattle, WA 98122
Tel: (206) 398-4045

Robert G. Abrams
HOWREY LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004
Tel: (202) 383-6935

James L. Magee
GRAHAM & DUNN PC
2801 Alaskan Way, Suite 300
Seattle, WA 98121
Tel: (206) 624-8300
Fax: (206) 340-9599

Joanne E. Caruso                         (FedEx and E-mail)
Richard J. Burdge, Jr.
David G. Meyer
HOWREY LLP
550 S. Hope Street Suite 1100
Los Angeles, CA 90071

Robert M. Loeb,
Attorney

# EXHIBIT K

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
Thurgood Marshall U.S. Courthouse at Foley Square    40 Centre Street, New York, NY 10007    Telephone: 212-857-8500

### MOTION INFORMATION STATEMENT

Caption [use short title]

**Docket Number(s):** 05-2141-cv

Khulumani v. Barclays Natl. Bank

**Motion for:** Staying the Mandate Pending Petition for Certiorari

Set forth below precise, complete statement of relief sought:

Defendants-Appellees request that this Court stay its mandate until January

31, 2008, pending the filing of a petition for certiorari.

**MOVING PARTY:** Defendants-Appellees - UBS AG, et. al.

    ☐ Plaintiff        ☒ Defendant
    ☐ Appellant/Petitioner   ☒ Appellee/Respondent

**OPPOSING PARTY:** Plaintiffs-Appellants Sakwe Khulumani, et. al.

**MOVING ATTORNEY:** Francis P. Barron
[name of attorney, with firm, address, phone number and e-mail]

**OPPOSING ATTORNEY** [Name]: Michael D. Hausfeld
[name of attorney, with firm, address, phone number and e-mail]

| | |
|---|---|
| Cravath, Swaine & Moore LLP | Cohen, Milstein, Hausfeld & Toll, PLLC |
| 825 Eighth Avenue | 1100 New York Avenue, N.W. |
| New York, NY 10019 | Suite 500, West Tower |
| 212-474-1506    FBarron@cravath.com | Washington D.C., 20005   202-408-4600 |

Court-Judge/Agency appealed from: S.D.N.Y. Sprizzo, J.

**Please check appropriate boxes:**

Has consent of opposing counsel:
    A. been sought?         ☒ Yes    ☐ No
    B. been obtained?        ☐ Yes    ☒ No

Is oral argument requested?       ☐ Yes    ☒ No
(requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes    ☒ No
If yes, enter date _____

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has request for relief been made below?    ☐ Yes    ☐ No

Has this relief been previously sought in this Court?    ☐ Yes    ☐ No

Requested return date and explanation of emergency:

**Signature of Moving Attorney:**

**Date:** 12/31/07

Has service been effected?    ☒ Yes    ☐ No
[Attach proof of service]

### ORDER

**IT IS HEREBY ORDERED THAT** the motion is **GRANTED  DENIED**.

**FOR THE COURT:**
CATHERINE O'HAGAN WOLFE, Clerk of Court

Date: _____

By: _____

**Form T-1080** (Revised 10/31/02).

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

| | |
|---|---|
| KHULUMANI v. BARCLAYS NATL. BANK | No. 05-2141-CV |
| IN RE: SOUTH AFRICAN APAR. v. SULZER AG | No. 05-2326-CV |

### Defendants-Appellees' Motion to Stay the Mandates
### Pending Petition for Writ of Certiorari

Pursuant to Fed. R. App. P. 41(d)(2), defendants-appellees in Appeal No. 05-2141-cv and Appeal No. 05-2326-cv (together, "*In re S. African Apartheid Litig.*") respectfully move to stay issuance of the mandates in those appeals for a period of 90 days pending the filing in the United States Supreme Court of a petition for a writ of certiorari. In light of the entry of this Court's judgment disposing of those appeals on October 12, the mandates are presently scheduled to issue on November 2, 2007. Through this motion, defendants-appellees request that issuance of the mandates be stayed until January 31, 2008.

Defendants-appellees comprise 36 domestic and foreign corporations sued in 11 underlying actions consolidated for coordinated pretrial proceedings in the Southern District of New York. The several complaints

and amended complaints in these actions allege that defendants did business in and with South Africa during the apartheid era, and thereby aided and abetted violations of customary international law by the apartheid government. Proceedings below occurred between June 2002 and November 29, 2004, on which date the district court issued its order dismissing the complaints.

As the Court is aware, during the course of the proceedings below the district court received a Statement of Interest from the State Department's Legal Adviser setting forth the government's view that "continued adjudication of the above-referenced matters risks potentially serious adverse consequences for significant interests of the United States." (A01090) The district court also received a declaration from the Republic of South Africa's Minister of Justice and Constitutional Development, Penuell Mpapa Maduna, in which that minister, speaking on behalf of the South African government, requested that these "proceedings be dismissed" because they "interfere with a foreign sovereign's efforts to address matters in which it has the predominant interest." (A00798) In this Court, both South Africa and the United States reaffirmed in amicus briefs their views

2

that further adjudication of this case would infringe on South Africa's sovereignty and interfere with the foreign relations of the United States.

On October 12, 2007, this Court issued a 147-page decision consisting of four opinions. In its per curiam ruling, accompanied by two concurrences and one partial (albeit substantial) dissent, this Court remanded the matter to the district court for further proceedings, in light of its holding that "in this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the ATCA." *In re S. African Apartheid Litig.*, slip op. at 9 (per curiam). This Court declined to address whether principles of "case-specific deference" should be applied in light of, among other things, the views of the U.S. and South African governments, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004), to afford alternative bases for affirmance.

All defendants-appellees intend to file a petition for writ of certiorari in the Supreme Court of the United States. Accordingly, defendants-appellees request that the issuance of the mandates in these appeals be stayed pending that filing. Under Fed. R. App. P. 41(d)(2)(A), a motion to stay the mandate pending petition for certiorari "must show that the certiorari petition would present a substantial question and that there is

good cause for a stay." These two requirements have been interpreted to require showings, in turn, that there is a "reasonable probability" certiorari will be granted, a "significant possibility" of reversal, and irreparable harm from the denial of a stay. *E.g., Barnes v. E-Systems, Inc., Group Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301 (1991); *Chandler v. Cook County*, 282 F.3d 448 (7th Cir. 2002).

## A.    The Certiorari Petition Will Present Substantial Questions

The certiorari petition defendants-appellees intend to file will present substantial questions generally relating both to whether principles of "case-specific deference" as described in *Sosa* required the immediate dismissal of these actions, and to whether the complaints stated claims for aiding and abetting violations of international law cognizable under the Alien Tort Statute's limited grant of jurisdiction. In light of the growth of multinational corporate litigation under the Alien Tort Statute ("ATS"), both involve exceedingly "important question[s] of federal law," a factor highly relevant to the grant of certiorari. Sup. Ct. R. 10(c). And the arguable inconsistency between this Court's answers to those questions and the Supreme Court's decision in *Sosa* — an additional factor weighing

4

in favor of certiorari, *id.* — makes the grant of certiorari "reasonably

probable" and gives rise to a "significant possibility" of reversal.

> 1. **The Court's Failure to Afford Case-Specific Deference to the Views of the U.S. Government and the Republic of South Africa is Inconsistent With *Sosa*.**

A central argument defendants-appellees raised in support of their

motion to dismiss was that the litigation of these actions represented an

affront to the sovereignty of the Republic of South Africa, that it threatened

interference with the U.S. government's relations with that country and

others, and that it ran counter to foreign policies, such as the policies of

"constructive engagement" that the U.S. and other governments had

followed with respect to apartheid South Africa.  (7/14/2003

Memorandum of Law in Support of Defendants' Joint Motion to Dismiss,

10-13, 14-18, 23-28; 10/6/2003 Reply Memorandum of Law in Support of

Defendants' Joint Motion to Dismiss *Khulumani v. Barclays National Bank,*

*Ltd.* 2-3, 5-9.)  In an unprecedented gesture, signaling its clear appreciation

of the extent to which the mere pendency of these actions offended the

sovereignty of the Republic of South Africa and improperly interfered with

the U.S. government's conduct of foreign policy, the Supreme Court in *Sosa*

noted that there is a "strong argument" that "serious weight" should be

given to the Executive Branch's expressed views in these very cases. 542

U.S. at 733 n.21.

Defendants-appellees will argue to the Supreme Court that this Court

failed to give "serious weight" to the U.S. government's views or to those

of the Republic of South Africa. Specifically, though the issues of case-

specific deference had been fully litigated below and though the district

court, following the admonition of *Sosa*, gave "great weight" in its opinion

to the views of the U.S. and South African governments, this Court

declined to reach the issues the Supreme Court had flagged and that the

district court had expressly considered.[1]  Instead, it invited the district

court on remand to "solicit anew the views" of the U.S. and South African

governments. *In re S. African Apartheid Litig.*, slip op. at 14 n.13 (per

curiam).  The latter suggestion, if followed, would enmesh the district court

---

[1] *In re South African Apartheid Litig.*, 346 F. Supp. 2d 538, 553-54
(S.D.N.Y. 2004) ("Indeed, the South African government has indicated that
it does not support this litigation and that it believes that allowing this
action to proceed would preempt the ability of the government to handle
domestic matters and would discourage needed investment in the South
African economy.  Similarly, the United States government has expressed
its belief that the adjudication of this suit would cause tension between the
United States and South Africa and would serve to hamper the policy of
encouraging positive change in developing countries via economic
investment.  As the *Sosa* Court made clear, these opinions as to the foreign
relations consequences of this action certainly deserve great weight."
(citations omitted)).

in the conduct of relations with a foreign state and might irritate the South African government by suggesting that its original, unsolicited view was not duly considered or fully formed.  As set forth in an October 19, 2007 statement released by Minister Maduna's successor, Brigitte Mabandla, immediately following the release of this Court's decision, South Africa's objection to the affront to its sovereignty that these cases present has not abated during the pendency of these appeals:

> "Minister Mabandla wants to reiterate the government's consistent position on the matter, as captured in the Maduna Declaration of July 2003, is essentially of a political nature.  The government is of the view that the case is directly related to the sovereignty of the South African state and should be resolved through South Africa's own democratic processes.  'We submit that another country's courts should not determine how ongoing political processes in South Africa should be resolved...'"

October 19, 2007 Media Statement of the Ministry of Justice and Constitutional Development, attached as Exhibit A, quoting the 10/13/2005 Statement of Brigitte Sylvia Mabandla, Minister of Justice and Constitutional Development, on Behalf of the Republic of South Africa, Concerning the Apartheid-Related Litigations in the United States Courts, annexed to the 10/13/2005 Brief of *Amicus Curiae* Republic of South Africa in Support of Affirmance.

7

In light of these threatened practical consequences and the Supreme Court's comments regarding these cases in *Sosa*, there is substantial reason to believe that the Supreme Court will regard as troubling the prospect of a further cycle of (re)briefing and (re)solicitation of government views in these cases, which have already been pending at the pleading stage for more than five years. By instead directing these actions to continue to proceed below through still more rounds of motions for leave to file amended complaints, motions to dismiss, and associated briefing, this Court permitted to fester the very irritant to South African-U.S. relations — *i.e.*, "permitting this litigation to go forward" (A00805 (Maduna Declaration)) — and disincentive to investment in developing economies (A01091 (Statement of Interest)), that the governments' statements were intended to dispel.[2]

---

[2]  As Minister Maduna stated in his declaration:

"*Permitting this litigation to go forward* will, in the [South African] government's view, discourage much-needed direct foreign investment in South Africa and thus delay the achievement of our central goals. . . . *If this litigation proceeds,* far from promoting economic growth and employment and thus advantaging the previously disadvantaged, the litigation . . . will do exactly the opposite of what it ostensibly sets out to do." (A00805-06 (emphasis added)).

8

This Court's declination to address the justiciability doctrines urged as alternative bases for affirmance is also in tension with decisions of other courts of appeals that have addressed claims of accessorial liability under the ATS. Those courts have affirmed the dismissal of claims for accessorial liability under the ATS, because they would require the adjudication of questions firmly committed to the political branches.[3] This consideration likewise supports the prospect of Supreme Court review.

## 2. The Court's Recognition of Claims for Aiding and Abetting Violations of International Law is Inconsistent with *Sosa*.

There also is a substantial argument that this Court's ruling is inconsistent with the core holding of *Sosa*. In *Sosa*, addressing the ATS for

---

[3] *See, e.g., Corrie v. Caterpillar, Inc.*, No. 05-36210, 2007 WL 2694701, at *7 (9th Cir. Sept. 17, 2007) ("Plaintiffs' claims can succeed only if a court ultimately decides that Caterpillar should not have sold its bulldozers to the [Israeli Defense Forces]. Because that foreign policy decision is committed under the Constitution to the legislative and executive branches, we hold that plaintiffs' claims are nonjusticiable under the first *Baker* test."); *Hereros v. Deutsche Afrika-Linien GMBLT & Co.*, 232 Fed. Appx. 90, 96 (3d Cir. 2007) ("This case . . . implicates delicate foreign policy decisions made long ago — decisions which our courts have long considered inappropriate for judicial review."); *Joo v. Japan*, 413 F.3d 45, 48 (D.C. Cir. 2005) ("[W]e defer to the judgment of the Executive Branch of the United States Government, which represents, in a thorough and persuasive Statement of Interest, that judicial intrusion into the relations between Japan and other foreign governments would impinge upon the ability of the President to conduct the foreign relations of the United States."); *Alperin v. Vatican Bank*, 410 F.3d 532, 562 (9th Cir. 2005) ("In this case, the Holocaust Survivors must look to the political branches for resolution of the War Objectives Claims which, at base, are political questions.").

9

the first time in the modern era, the Supreme Court held that any claim

brought under the jurisdictional grant of the ATS must "rest on a norm of

[i] international character [ii] accepted by the civilized world and [iii]

defined with a specificity comparable to the features of the 18th-century

paradigms we have recognized." 542 U.S. at 725. A corollary is that courts

must not recognize "new and debatable violations of the law of nations."

*Id.* at 728. The claims, however, that this Court permitted to proceed to a

new round of amended pleadings are "new" and highly "debatable." The

several opinions in this case alone attest to the intensity of the debate, and

the analysis set forth in the dissenting opinion demonstrates that there is a

significant basis for the argument that this Court's holding recognizing

civil aiding and abetting liability in this case cannot be reconciled with

*Sosa's* principles. Further evidencing this debate and the reasonable basis

for the positions advanced by defendants-appellees is the mushrooming

body of case law and commentary examining whether cases like these, in

which corporations doing business in countries ruled by repressive

governments are accused of complicity in those governments' wrongs,

represent appropriate exercises of the federal judiciary's jurisdiction under

10

the ATS.[4] For this reason as well, there is a reasonable probability that the Supreme Court will review this case.

## B.    There is Good Cause for a Stay

There is "good cause" for a stay of the mandates pending review by the Supreme Court, separate and apart from the consideration of the reasonable probability that review will be granted. As noted above and as the most recent, October 19 statement of the South African government further attests, it is the maintenance of these actions alone — not merely their ultimate potential result — that is an affront to South Africa's sovereignty, an irritant to U.S. foreign relations with that country and others, and a disincentive to future multinational corporate investment in

---

[4] *E.g., Stutts v. De Dietrich Group,* No. 03-CV-4058, 2006 WL 1867060, at *12 (E.D.N.Y. June 30, 2006) ("Courts have declined to impose liability on defendants for participation in a commercial enterprise that allegedly assists in another's violations of international law."); *Corrie v. Caterpillar Inc.,* 403 F.Supp.2d 1019, 1027 (W.D. Wash. 2005) ("One who merely sells goods to a buyer is not an aider and abettor of crimes that the buyer might commit . . . because the seller does not share the specific intent to further the buyer's venture."), *aff'd,* No. 05-36210, 2007 WL 2694701 (9th Cir. Sept. 17, 2007); *Doe v. Exxon Mobil Corp.,* 393 F. Supp. 2d 20, 24 (D.D.C. 2005) (declining to impose aiding and abetting liability under the ATS), *appeal denied, Doe v. Exxon Mobil Corp.,* 473 F.3d 345 (D.C. Cir. 2007); Curtis A. Bradley, Jack L. Goldsmith, David H. Moore, *Sosa, Customary Int'l Law, and the Continuing Relevance of Erie,* 120 Harv. L. Rev. 869, 924 (2007) ("[W]e believe that the best reading of *Sosa* is that ATS liability cannot be extended to corporations based on an aiding and abetting theory absent further action by Congress.").

11

developing economies. A stay of the mandates pending disposition in the Supreme Court will prevent the intensification of these irreparable harms, and abate judicial interference with the several foreign policies the State Department identified in its Statement of Interest as compromised by the "continued adjudication" of these actions. (A01090-91) It will also prevent the potentially unnecessary expenditure of private legal and judicial resources in what is, by any measure, an extraordinarily complex set of cases that present profound challenges to case management.

Nor can plaintiffs-appellants plausibly contend that the passage of 90 days during which a certiorari petition is prepared will meaningfully prejudice the prosecution of these actions. These cases concerned decades-old events even when they were first filed more than five years ago. Even under the most aggressive schedule and assuming *arguendo* no further dismissals, trial dates in these actions are years away, not months. A brief stay of the mandates, during which defendants-appellees will pursue the opportunity for Supreme Court review, is far more consistent with the practical adjudication of these actions than the mandates' immediate issuance.

12

November 1, 2007

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP

by _____
Francis P. Barron
A member of the Firm

*Liaison Counsel for all Appellees*
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

13



**MINISTRY**
**JUSTICE AND CONSTITUTIONAL DEVELOPMENT**
**REPUBLIC OF SOUTH AFRICA**



**19 October 2007**

The Minister for Justice and Constitutional Development, Ms Brigitte Mabandla, MP, has noted the decision of the New York Circuit Court of Appeal to reverse the finding of the district court on the Alien Tort Act Claim. The Alien Tort Claims Act allows foreign victims of serious human rights abuse by multi-nationals to sue the perpetrators in U.S. courts.

Minister Mabandla wants to reiterate that the government's consistent position on the matter, as captured in the Maduna Declaration of July 2003, is essentially of a political nature. The government is of the view that the case is directly related to the sovereignty of the South African state and should be resolved through South Africa's own democratic processes. "We submit that another country's courts should not determine how ongoing political processes in South Africa should be resolved," Minister Mabandla said in her declaration filed in the New York court.

Like her predecessor, Dr Penuell Maduna, the Minister maintains that "the responsibility to address the country's apartheid past, the development of policies addressing this past and the rehabilitation and improvement of the lives of the people of South Africa lies with the South African government and not foreign courts."

**Contact:**
**Mr Zolile Nqayi**
**Spokesperson: Ministry of Justice and Constitutional Development**
**Tel: (021) 467 1714**
**Cell: 082 898 6483**
**Fax: (021) 467 1732**
**E-mail: znqayi@justice.gov.za**

**Issued by: Ministry: Justice and Constitutional Development**
**19 October 2007**

# EXHIBIT L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-61527-CIV-DIMITROULEAS

MARINA BARBOZA, on behalf of herself
and as heir of the deceased, Candido Jose Mendez,
MAIRA MARLENE MENDEZ BARBOZA,
on behalf of herself and as heir of the deceased,
Candido Jose Mendez, and RAFAEL MENDEZ
BARBOZA,on behalf of himself and as heir of
the deceased, Candido Jose Mendez,

      Plaintiffs,

vs.

DRUMMOND COMPANY, INC., and
DRUMMOND LTD.,

      Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

THIS CAUSE is before the Court upon Defendants, Drummond Company, Inc., and

Drummond Ltd.'s ("Defendants") Motion to Dismiss [DE 28]. The Court has carefully

considered the Motion [DE 28], Plaintiffs' Response in Opposition [DE 34], Defendants' Reply

[DE 38], and is otherwise fully advised in the premises.

## I. BACKGROUND

On October 10, 2006, Plaintiffs, family members of deceased trade unionist and former

employee of Drummond Ltd., Candido Jose Mendez ("Mendez"), filed suit against Defendants

pursuant to the Alien Tort Claims Act for damages suffered stemming from the February 19,

2001 murder of Mendez. Plaintiffs allege that Defendants openly associated and conspired with

known members of the paramilitary group, the United Self-Defense Forces of Colombia

(hereinafter the "AUC") to silence union members, an act which directly led to the murder of Mendez, a member of the Union of Workers of the Mining and Energy Industry of Colombia ("SINTRAMIENERGETICA"). A substantial portion of the events giving rise to the present action occurred in Colombia, implicating the involvement of paramilitaries as well as Defendants.

The following facts are gleaned from the Amended Complaint and accepted as true for the purposes of Defendants' motions to dismiss. Drummond Company, Inc. ("DCI") is an Alabama corporation in the business of mining and shipping coal. Drummond Ltd. is a wholly-owned subsidiary of DCI that manages the daily operations of coal mining in Colombia (collectively "Defendants"). In Colombia, armed conflicts between the government and terrorist organizations have continued yearly with certain consistency. The "terrorist organization" called the AUC, although demobilized by the Colombian government, still "remains the object of military action" due in part to its involvement in practices such as "unlawful and extrajudicial killings, political killings and kidnappings" among other things. See Pl.s' Resp. at 13, n.10 (citing U.S. Department of State, 2006 Country Reports on Human Rights Practices). A common target of the paramilitary is the union. Under the belief that union members are affiliated with left-wing insurgents, the AUC has targeted and made attacks on all union members. Id. It is with full knowledge of the political ideals and practices of the paramilitary that Defendants hired known AUC members to protect its "mining facilities, railway lines and U.S. workers." (Am. Compl. ¶ 28.) In addition to maintaining facilities for the use of AUC members, Defendants coordinated the activities of members under the supervision of Alfredo Araujo, a community relations manager of Drummond Ltd. (Am. Compl. ¶ 29.)

2

The SINTRAMIENERGETICA union was formed in July of 1996 by Drummond employees. Consequently, the union was able to commence negotiations with Defendants in an attempt to resolve work related issues such as the protection of employees from the paramilitary. It is based on these negotiations that Defendants allegedly began veiled threats towards the union and its members. (Am. Compl. ¶ 33.)

On February 18, 2001, Mendez, while on his way to work, noticed a suspicious truck parked next to the company bus. The truck resembled trucks typically used by paramilitary forces. On his way home he was followed by what seemed to be the same truck from earlier that day. On February 19, 2001, in the early morning, Mendez and his family awoke to men shouting outside their home. The men shouted that "they would throw a bomb inside" Mendez's home if he did not exit the house. Mendez exited his home and was immediately restrained by approximately thirty men where he was killed in front of his family. Of the thirty men that came to the Mendez's home, "some were wearing paramilitary uniforms, some police uniforms, and others were wearing civilian clothing." (Am. Compl. ¶ 34.)

On October 10, 2006, Plaintiffs filed the Complaint in the above-styled action. On March 23, 2007, Plaintiffs filed a First Amended Complaint (hereinafter "Amended Complaint") alleging a single count against Defendants under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1340, for providing material support to a foreign terrorist organization resulting in death. On April 5, 2007, Defendants filed the instant motions to dismiss the Amended Complaint.

## II. DISCUSSION

In its motion to dismiss, Defendant Drummond Ltd. moves to dismiss Plaintiffs'

Amended Complaint pursuant to the doctrine of *forum non conveniens*. Additionally, Drummond Ltd. moves to dismiss the claims against it based on lack of personal jurisdiction, improper venue, and insufficient service of process. Defendant Drummond Company, Inc. also moves to dismiss the Amended Complaint, arguing that Plaintiffs have failed to plead a violation of the law of nations, and therefore this Court does not have subject matter jurisdiction under the ATCA.

### A. *Forum non conveniens*

Defendants have petitioned the Court to dismiss the present action pursuant to the doctrine of *forum non conveniens* for "the convenience of the parties and the court, and the interests of justice." Ford v. Brown, 319 F.3d 1302, 1307 (11th Cir. 2003). The central issue before the Court is whether the merits of the case should be resolved before this Court, in the Southern District of Florida, or alternatively be dismissed in order to have "localized controversies decided at home." Ford, 319 F.3d at 1302 (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947).[1]

The doctrine of *forum non conveniens* permits a "trial court to decline to exercise its jurisdiction . . . where it appears that the convenience of the parties and the court, and the interests of justice indicate that the action should be tried in another forum." Ford v. Brown, 319 F.3d 1302, 1307 (11th Cir. 2003) (quoting Sibaja v. Dow Chem. Co., 757 F.2d 1215, 1218 (11th

---

[1]Although a court generally must first determine that it has jurisdiction over the category of claim in suit, the Supreme Court has recently held that a court may respond to a defendant's motion for dismissal based on *forum non conveniens* before addressing other threshold questions, particularly where inquiry into subject matter jurisdiction is difficult to determine. Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., --- U.S. ----, 127 S. Ct. 1184, 167 L. Ed. 15 (2007)

Cir. 1985)).  In determining whether dismissal is appropriate based on *forum non conveniens*, the Court will look to whether "(1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice." Leon v. Millon Air, Inc., 251 F.3d 1305, 1311 (11th Cir. 2001).  Although the doctrine is discretional in nature, the Court must "balance the relevant factors" that exist in order to determine whether dismissal would be appropriate.  Ford, 319 F.3d at 1308.  As this dispute may be characterized as primarily a Colombian dispute, Plaintiffs' choice of forum is afforded "less deference" as a foreign plaintiff. However, the mere fact that plaintiffs are domiciliaries of Colombia is not an absolute bar to adjudication in this Court as they are afforded some deference. Ravelo Monegro v. Rosa, 211 F.3d 509, 514 (9th Cir, 2000). A defendant is charged with proving "all elements of a *forum non conveniens* motion, including the burden of demonstrating that an adequate, alternative forum is available." Leon, 251 F.3d at 1310 (quoting Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 951 (11th Cir. 1997)).

*1. Adequacy of the Forum*

In the instant case, Defendants argue that dismissal is warranted because the case is purely

a Colombian dispute.  As such, the doctrine of *forum non conveniens* is invoked as a means to bar further adjudication within the present forum.  The 'adequacy of the forum' requirement is a threshold criterion that must be overcome before any balancing of the interest analysis may be entertained.  Therefore, Defendants contend that the forum of Colombia is adequate as evidenced by remedies that are available to Plaintiffs within Colombia.  In support of its

5

position, Defendants argue that Plaintiffs "could participate as civil parties in any criminal proceeding against the alleged perpetrators" of the murder of Mendez or, alternatively, file suit against the perpetrators or any private third-party accomplices within the Colombian Civil Court under a civil action. See Ex.1, Decl. of Carlos Gustavo Arrieta ¶ 9. Through these "judicial avenues of redress," Plaintiffs are afforded relief based on their cause of action.

In addition to fulfilling the 'adequacy' criterion, Defendants contend that a forum is deemed 'available' if "all parties are amenable to process and are within the forum's jurisdiction." In Re Bridgestone/Firestone, Inc., Tires Prod. Liability Litig., 190 F. Supp. 2d 1125, 1129 (D. Ind. 2002) (citing Kamel v. Hill-Rom Co., Inc., 108 F.3d 799, 803 (7th Cir. 1997)). As such the jurisdiction of Colombian courts is deemed 'available' because of Defendants' voluntary submission to that court's jurisdiction conditioned on the granting of the present motion by this Court.

Plaintiffs counter by qualifying Defendants' definition of "adequate forum," adding that "an alternative forum is 'adequate' when 'the parties will not be deprived of all remedies or treated unfairly.'" Kamel, 108 F.3d at 803 (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 (1981)). Plaintiffs contend that if forced to litigate within the Colombian forum they would be open to great risk of harm stemming from this suit due to its implication of paramilitary members and local law enforcement. Plaintiffs allege that Defendants, while maintaining facilities for the local military, knowingly permitted AUC members to operate "in and around the Drummond facilities" due to the "cooperative and symbiotic relationship" that exist between the "regular military soldiers" and the AUC. (Am. Compl. ¶ 29.)

Ordinarily, Plaintiffs' fears, if justified and reasonable would be weighed along with

private interests factors in order to determine the applicability of *forum non conveniens* analysis.
See Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142, 147 (2d Cir. 2000) (In balancing the
interests involved "justice is best served in this case by acknowledging the unique and heavy
burden placed on Plaintiffs if they are required to litigate in Egypt").  However, what
distinguishes the present case from cases such as Guidi is the fact that Plaintiffs' suit directly
implicates terrorist organizations, paramilitary members as well as police and military officers in
collaboration with the paramilitary.  (Am. Compl. ¶ 34.)  Therefore, the reality of retaliation
against Plaintiffs from the paramilitary or possibly rogue police or military officials is plausible.
See Mujica v. Occidental Petroleum Corp., 381 F. Supp.  2d 1134, 1143 (C.D. Cal. 2005)
(reasoning that there does not need to be "an absolute certainty that Plaintiffs would be harmed
if they returned: a significant possibility would be sufficient.")  With the 2006 U.S. Department
of State Country Report indicating that the environment in Colombia is still prone to instances of
"forced disappearances; insubordinate military collaboration with criminal groups; torture and
mistreatment of detainees; overcrowded and insecure prisons" as well as "an inefficient
judiciary subject to intimidation," Plaintiffs' fears seem to be reasonably justified.

Plaintiffs fears against possible retaliation from the paramilitary and parties in collusion
with the organization are reasonably justified.  However, this Court rejects Plaintiffs' allegations
pertaining to the indirect involvement of the Colombian government.  Plaintiffs have alleged
that there exists a principal/agent relationship between the Colombian government and the
paramilitary.  Plaintiffs further contend that based on this relationship an atmosphere of
corruption and violence exists that have marred the Colombian judicial system thereby making it
inadequate as an alternative forum.  In citing corruption as a basis for the inadequacy of a forum,

7

Plaintiffs have undertaken a course of argument that has not enjoyed "a particularly impressive track record." Leon, 251 F.3d at 1312 (quoting Eastman Kodak Co. v. Kavlin, 978 F. Supp. 1078, 1084 (S.D. Fla. 1997)). However, while under other circumstances courts have been reluctant to criticize the judicial systems of other countries, we need not pass judgment on the entire Colombian judicial system to find that there is a legitimate fear of retaliation, making the forum inadequate.

Ultimately, the Court believes that Defendants have not fulfilled their burden of persuasion in establishing the adequacy of the Colombian forum. Although Defendants provided evidence as to the availability of remedies in Colombia, Defendants have failed to overcome the issue of possible harm to Plaintiffs in the Colombian forum. Defendants reliance on personal injury cases that have found Colombia to be an adequate forum does not satisfy this threshold criterion as those cases differ materially in substance and form from the present case.

Having concluded that Defendants have not met the burden of demonstrating the availability of an adequate, alternative forum, the Court could end its analysis here. However, the Court will nevertheless address the private and public interest facts below.

### 2. Private Interest Factors

In balancing the relevant private interest factors, the Court will look to the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of the premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." Piper Aircraft Co., 454 U.S. at 241 (citing Gulf Corp Oil, 330 U.S. at 508).

Defendants argue that all witnesses and evidence are located in Colombia and it would be of considerable expense to the Court to transport witnesses and evidence to the United States. In addition, Defendants contend that with all witnesses situated in Colombia, the Court would have no ability to subpoena anyone who witnessed or was involved in the murder. Defendants also point to the expense that will be incurred in the translation of documents which will primarily be in Spanish. Plaintiffs respond by arguing that this case is not document intensive and that there is no evidence which cannot be easily transported to this forum. In addition, Plaintiffs contends that most documents pertaining to the case as well as several of Defendants' key officials with knowledge of the events are located in Alabama. Plaintiffs have also secured two material witnesses from Colombia willing to voluntarily testify.

Because the Defendants' executive officers are located in the United States, this Court is convinced by Plaintiffs' contention that much of the evidence required for trial is located in the United States and the evidence located in Colombia can easily be transported to this forum. As both Drummond Company, Inc. and Drummond Ltd. are located in the state of Alabama, key decision makers directly linked to the allegations made against Defendants would be located in Alabama. As alleged in the Amended Complaint, it is at Defendants' headquarters in Birmingham, Alabama, on July 22, 1996, that Drummond executive officers discussed the union, SINTRAMIENERGETICA as well as the AUC's involvement in "getting rid of the union." (Am. Compl. ¶ 30.) Therefore, individuals present at this meeting could be possible witnesses.

Pertaining to the question of accessibility to foreign witnesses, a court of the United States is empowered to subpoena U.S. nationals and residents located in a foreign country if the

9

court finds that testimony or production of documents is "necessary in the interest of justice." 28 U.S.C. § 1783 (2006). Foreign nationals however, are outside the reach of this Court's jurisdiction. Therefore, in the interest of justice, courts within the United States may, at its discretion, secure relevant evidence from foreign nationals in a foreign country through letters rogatory, pursuant to 28 U.S.C. § 1781. As such, this Court is able to acquire material testimony from Colombian citizens by use of this tool. Underlying the issuance of a letter rogatory are principles of international comity where one nation allows the recognition of the legislative, executive or judicial acts of another nation within its territory, "having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." Hilton v. Guyot, 159 U.S. 113, 164 (1895). Therefore, it is the doctrine of comity between the United States and Colombia which allows for the ability to transport evidence with ease. Evidence transported to this forum from Colombia, may require translation from Spanish to English; however, the cost associated with translating important documents would not be so excessive as to burden the Court. See In Re Bridgestone/Firestone, 190 F. Supp. 2d at 1152.

Ultimately, this Court agrees with the reasoning expressed in the case of In Re Bridgestone/Firestone that "in the absence of a clear picture of how many witnesses important to each case are in the United States as compared to the number in Colombia, this factor does not tilt in either direction." In Re Bridgestone/Firestone, 190 F. Supp. 2d at 1141. Therefore, Defendants have failed to establish that dismissal is warranted. As such, the deference given to a foreign plaintiff, although less than his or her counterpart who has chosen to file suit at home, will not be disturbed.

10

### 3. Public Interest Factors

Along with private interest factors, the Court will also look to whether public interest factors favor dismissal. Public interest factors include considerations for "administrative difficulties stemming from court congestion, the interest in having local controversies decided in their home forum and the interest in having laws determined by their home tribunal." Gulf Oil Corp., 330 U.S. at 509 (1947).

In the present action, Defendants contend that Colombia's interest in this dispute is far greater than the United States' interest due to the implication of Colombian military and police officers as well as the paramilitary in Plaintiffs' Amended Complaint. Also implicated by Plaintiffs' Amended Complaint is the Colombian government itself, including its past and present conduct with the paramilitary, as well as key industries within the country. Defendants contend that based on Plaintiffs' allegations, Colombia is better suited to address issues pertaining to its judicial competence as well as the mining industry and Colombian law enforcement officials. Defendants also contend that the United States' interest in the present dispute is minimal or non-existent and therefore should not entertain this Colombian dispute. See Defs.' Mot to Dismiss at p.10.

Plaintiffs contend that public interest factors favor adjudication of this suit within Florida. In support of their position, Plaintiffs argue that entertaining the present dispute before this forum would not be a burden due to the Southern District of Florida's ability to efficiently dispose of disputes in a timely manner. See Pls.' Resp., at p.18, (quoting 2003 Annual Report, Southern District of Florida, pg. 22.). In addition, because Defendants are United States corporations with substantial contacts with the State of Florida, the United States would have an

11

interest in monitoring and deterring the unethical conduct of American corporations in hiring paramilitary members for company use.

Arising from the present action are issues which will directly impact the forum of Colombia. Therefore, this Court agrees with Defendants' arguments presented in support of public interest factors weighing in favor of Colombia. However, Defendants' notion that the United States has no interest in entertaining this suit is rejected. As Defendants are United States corporations, the United States does have an interest in monitoring the activities of its corporations in foreign countries as well as any illegal conduct of its corporations at home as well as abroad. See Reid-Walen v. Hansen, 933 F.2d 1390, 1400 (8th Cir. 1991). Although public interest factors show a strong Colombian interest, it does not show such a strong showing that Plaintiffs' choice of forum should be disturbed.

In conclusion, Defendants have failed to satisfy its burden of proving that dismissal is warranted based on *forum non conveniens*. Each of the factors of the *forum non conveniens* analysis except for the public interest factors favor Florida as the forum for the present suit. Although public interest factors weigh slightly in Defendants favor, Plaintiffs' chosen forum should not be disturbed.

### B. Personal Jurisdiction

Defendant Drummond Ltd. also moves to dismiss Plaintiffs' claims against it based on a lack of personal jurisdiction. Defendants contend that there is no personal jurisdiction over Drummond Ltd. because it lacks sufficient minimum contacts with the forum state. The determination of personal jurisdiction over a nonresident defendant under Florida law requires a two-part analysis. Abramson v. Walt Disney Co., 132 Fed. Appx. 273, 275 (11th Cir. 2005).

First the court must determine whether the Florida long-arm statute provides a basis for personal jurisdiction.  Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 626 (11th Cir.1996).  If so, the court must then go on to determine "whether sufficient minimum contacts exists between the defendants and the forum state so as to satisfy 'traditional notions of fair play and substantial justice' under the Due Process Clause of the Fourteenth Amendment." Id. (quoting Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 256 (11th Cir. 1996)).

Drummond Ltd., as a nonresident defendant, would be amenable to this forum's specific jurisdiction if it possesses sufficient minimum contacts with the State of Florida in order to satisfy due process requirements. Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1552 (11th Cir. 1993).  A "federal court may exercise personal jurisdiction over non-resident defendants only to the extent permitted by the forum state's long-arm statute." Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V., 701 F.2d 889, 890 (11th Cir. 1983).  Therefore, if there are sufficient minimum contacts with Florida, this Court would be allowed to exercise jurisdiction over Drummond Ltd. to the extent permitted by Florida's Long Arm Statute § 48.193. Vermeulen, 985 F.2d at 1552. In addition, "when a defendant raises through affidavits, documents or testimony a meritorious challenge to personal jurisdiction, the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents." Jet Charter Serv., Inc. v. Koeck, 907 F.2d 1110, 1112 (quoting Sims v. Sutton, 451 So. 2d 931(Fla. DCA 1986)).

Defendant argues that Drummond Ltd. lacks the requisite minimum contacts with the State of Florida to support a finding of personal jurisdiction.  To support its position, Defendant contends that Drummond Ltd. "conducts substantially all of its business operations in the Republic of Colombia" and does not conduct, solicit or maintain "any office, agency or agents in

13

the State of Florida." See Ex. 1, Jones Decl. at ¶¶ 7, 8. In addition, Defendant contends that

"Drummond Ltd. is not registered with the Florida Secretary of State to transact business in the

State of Florida" and does not share assets or its funds with Drummond Company, Inc. (Jones

Decl. at ¶¶ 6, 12.)

Plaintiffs have requested jurisdictional discovery in order to ascertain the relevant facts

pertaining to Defendant Drummond Ltd.'s contacts with the State of Florida. Plaintiffs contend

that jurisdictional discovery is necessary in order for Plaintiffs to adequately respond to

Defendant's motion. However, "[t]here is no absolute right to conduct jurisdictional discovery"

and as such, this procedural tool is discretional. Utsey v. New Eng. Mut. Life Ins. Co., No. 07-

0199-WS-M, 2007 WL 1076703, *2 (S.D. Ala. Apr. 9, 2007). This is especially so when

Plaintiffs have "failed to specify what they thought could or should be discovered." Posner v.

Essex Ins. Co, 178 F.3d 1209, 1214 (11th Cir. 1999); see also Instabook Corp. v.

Instantupublisher.com, 469 F. Supp. 2d 1120, 1127 (M.D. Fla. 2006)(request for jurisdictional

discovery was denied where party "only generally requested such discovery, without explaining

how such discovery would bolster its contentions"). A significant period of time has passed in

this case during which Plaintiffs could have previously sought permission to conduct

jurisdictional discovery and in which relevant information could have been acquired by

Plaintiffs. Absent a specific showing by Plaintiffs as to its need for such discovery now, the

Court will exercise its discretion by denying Plaintiffs' request for jurisdictional discovery

Plaintiffs have not responded to Defendants' allegations challenging personal

jurisdiction. The burden of proving facts justifying the exercise of jurisdiction pursuant to the

State's long arm statute is placed with the person invoking jurisdiction (i.e. Plaintiffs). Jet

Charter Serv., 907 F.2d at 1112. Integral to a personal jurisdiction analysis is a defendant's ability to foresee that his "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297(1980). Therefore, with no evidentiary response to Defendant's challenge there are no grounds to satisfy due process requirements as Drummond Ltd. has no contacts with the State of Florida.

Moreover, reviewing the merits of Defendant's jurisdictional argument the Court agrees that Plaintiffs have failed to satisfy their burden of proving Drummond Ltd. is subject to this Court's jurisdiction. In Plaintiffs' Amended Complaint, Plaintiffs only attempt of establishing Drummond Ltd.'s 'contacts' with this forum is through its business relationship with Drummond Company, Inc. However, Plaintiffs' attempt to show a connection between this forum and defendant Drummond Ltd., through its characterization of Drummond Ltd. as "wholly-owned" by Drummond Company, Inc. is misplaced. (Am. Compl. at ¶ 17.) "In order to establish an agency relationship in Florida, a party must show: (1) acknowledgment by the principal that the agent will act for it; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the actions of the agent." Meterlogic, Inc. v. Copier Solutions, Inc., 126 F. Supp. 2d 1346, 1354 (S.D. Fla. 2000).

Here, Plaintiffs have failed to establish these elements in order to show that there is an agency relationship between the two defendants. Plaintiffs have also failed to show that the principal has exercised such control of the agent that it "manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." Florida v. American Tobacco Co., 707 So. 2d 851, 855 (Fla. 4th DCA 1998). Moreover, even

assuming that Plaintiffs could establish an agency relationship here, it is the principal that would be subject to liability from the actions of the agent, and thus the Court agrees that DCI's contacts should not be imputed to Drummond Ltd. See <u>Meterlogic</u>, 126 F. Supp. 2d at 1357. Therefore, this Court agrees that it lacks personal jurisdiction over Drummond Ltd. and will grant Defendant's motion on this ground.[2]

### C. Subject Matter Jurisdiction

Defendant DCI moves to dismiss the Amended Complaint arguing that the Court lacks subject matter jurisdiction under the ATCA because Plaintiffs have failed to plead a violation of the law of nations.[3] Defendant argues that Plaintiffs have failed to establish jurisdiction under the ATCA because 1) a violation of international law must be gleaned from international law, not merely United States law, 2) allegations of terrorism in general are not sufficient to establish a violation of the law of nations under the ATCA, and 3) finding a violation of the law of nations based on any law passed pursuant to Congress's Article I, Section 8, Clause 10 powers would impermissibly expand federal court jurisdiction under the ATCA.

Plaintiffs respond that the Court does have jurisdiction over Plaintiffs' claim under the ATCA because specific acts of terrorism have been held to be a violation of the law of nations. Plaintiffs contend that the factual allegations in the Amended Complaint go beyond mere

---

[2] Having found that Drummond Ltd. is not subject to the exercise of personal jurisdiction by this Court, the Court need not address Drummond Ltd.'s venue and service of process arguments.

[3] In its motion to dismiss, DCI also argued that 1) Plaintiffs have failed to adequately plead state action or an exception thereto and 2) resolution of this case involves a nonjusticiable political question. Defendant has withdrawn these arguments, however, given Plaintiffs' response that the conduct of the Colombian government is not pertinent to this litigation regarding their state action allegations. See Defs.' Reply at 3 n.6.

allegations of terrorism in general and are sufficiently specific to establish a violation of the law of nations.

The Alien Tort Claims Act provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350 (2005).  Conduct constitutes a violation the law of nations "if it contravenes 'well-established, universally recognized norms of international law.'" Kadic v. Karadzic, 70 F.3d 232, 239 (2d Cir.1995), cert. denied, 518 U.S. 1005 (1996).  Therefore, to obtain relief under the ATCA, "plaintiffs must be (1) an alien, (2) suing for a tort, which was (3) committed in violation of international law." Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1246 (11th Cir. 2005).

The Supreme Court recently clarified that the ATCA provides both a basis for federal court jurisdiction and a cause of action "for the modest number of international law violations with a potential for personal liability at the time" the ATCA was enacted.  Sosa v. Alvarez-Machain, 542 U.S. 692, 724 (2004).  New causes of action may be recognized if the claim is based on an international norm "accepted by the civilized world and defined with a specificity comparable to the features of the 18th century paradigms we have recognized." Id.  A cause of action constituting a violation of the law of nations within the meaning of the ATCA must be sufficiently specific, well-defined, and universally abided by out of a sense of legal obligation and mutual concern.  Almog v. Arab Bank, 471 F. Supp. 2d 257, 270-271 (E.D.N.Y. 2007) (citing Flores v. So. Peru Copper Corp., 414 F.3d 233, 248 (2d Cir. 2003)).  The Supreme Court directed federal courts to exercise great caution in considering new causes of action, however, stating that the door to recognizing new causes of action is "still ajar subject to vigilant

17

doorkeeping, thus open to a narrow class of international norms today." Sosa, 542 U.S. at 729.

Here, Plaintiffs urge the Court to recognize jurisdiction over the instant claim based on the Plaintiffs' allegations that Defendants violated international law by providing financial support to a terrorist organization resulting in the death of Candido Jose Mendez. In the Amended complaint, Plaintiffs identify several U.S. statutes in support of their claim that Defendants violated the law of nations and that the Court has jurisdiction under the ATCA. Specifically, Plaintiffs cite the Anti-Terror Act, 18 U.S.C. § 133B, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996); and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 272 (2001). However, reliance on the laws of one nation alone is insufficient to state a violation of the law of nations. See Flores, 414 F.3d at 257, n.33 ("[I]t is not possible to claim that the practice or policies of any one country, including the United States, has such authority that the contours of customary international law may be determined by reference only to that country . . . ."); Banco Nacional de Cuba v. Sabbatino, 307 F.2d 845, 861 (2d Cir. 1962), rev'd on other grounds 376 U.S. 398 (1964) ("One pitfall into which we could stumble would be the identification as a fundamental principle of international law of some principle which in truth is only an aspect of the public policy of our own nation and not a principle so cherished by other civilized peoples."). Thus, the Court must look to sources of international law including the "myriad of decisions made in numerous and varied international and domestic areas." Saperstein v. Palestinian Authority, 2006 WL 3804718, at *4 (S.D. Fla. 2006) (quoting Flores, 343 F.3d at 154).

Plaintiffs contend that Defendants violated a norm of customary international law by providing material support to a known terrorist organization. Plaintiffs assert that two cases are decisive on the issue of whether aiding and abetting a terrorist organization is a violation of the law of nations–Saperstein, 2006 WL 3804718, and Almog, 471 F. Supp. 2d 257–and that this case is more akin to Almog in which the court found that the conduct alleged was sufficient to establish a violation of the law of nations. For the reasons set forth below, the Court disagrees and finds that it lacks subject matter jurisdiction over the instant Complaint.

 In Almog, the court concluded that it had jursidiction under the ATCA, finding the allegations sufficient to state a violation of the law of nations for a) genocide and crimes against humanity and b) for financing suicide bombings and other  attacks on innocent civilians intended to intimidate or coerce a civilian population. Almog, 471 F. Supp. 3d at 276. Here, Plaintiffs do not argue that the facts alleged here state a violation of international law based on the first type of violation, genocide and crimes against humanity. Rather, Plaintiffs argue that the Amended Complaint adequately alleges a violation of international law similar to that in Almog based on Defendants' alleged financial support of a terrorist organization.

In Almog, the plaintiffs alleged that the defendant, Arab Bank, PLC, provided financial support to the Islamic Resistance Movement in Palestine ("HAMAS") and other Palestinian paramilitary who engaged in systematic murder of Jews and other civilians in Israel. Specifically, the plaintiffs alleged that Arab Bank provided support which led to suicide bombings and shootings by HAMAS and other paramilitary on eight specific occasions resulting in the death and injury of the family members of the plaintiffs. In reaching the conclusion that the court had subject matter jurisdiction over the plaintiffs' claims in Almog, the court identified

19

specific international treaties and conventions establishing norms of international law which were violated by the defendants alleged conduct. In particular, the court relied on the International Convention for the Suppression of Terrorist Bombing, ("the Bombing Convention"), the International Convention for the Suppression of the Financing of Terrorism ("the Financing Convention"), and Common Article 3 of the Geneva Conventions of 1949 ("the Geneva Conventions") as support for its jurisdiction under ATCA.

Plaintiffs contend that these international treaties and conventions relied upon in Almog likewise demonstrate a violation of the law of nations based on the facts alleged in this action. See Pls.' Resp. at 8 n.4. However, the Court disagrees. First, the Bombing Convention which prohibits the discharge or detonation of an explosive or other lethal device is clearly inapplicable here. Bombing Convention, G.A. Res. 52/164, 1 U.N. Doc. A/RES52/164 (Dec. 15, 1997). There are no allegations that the paramilitary used explosives or other lethal devices to facilitate their attacks on union leaders. Additionally, Article 3 of Geneva Convention does not apply here because Plaintiffs have not alleged that the alleged tort occurred during the course of an armed conflict. See Common Article 3 of the Geneva Conventions of 1949; see also Almog, 471 F. Supp. 2d at 279 (". . . the Geneva Conventions apply expressly only in situations of armed conflict . . .").

The Court also identified the Financing Convention, adopted by the General Assembly of the United Nations, see G.A. Res. 54/109, 1, U.N. Doc A/RES/54/109 (Dec. 9, 1999) and ratified by over 130 countries, as supporting its finding of jurisdiction over the plaintiffs' ATCA claims. Id. The Financing Convention, which Plaintiffs assert is applicable here, provides in Article 2(1) that

Any person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out:

a) An act which constitutes an offence within the scope of and as defined in one of the treaties listed in the annex;[4] or

b) Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a Government or an international organization to do or to abstain from doing any

---

[4]The treaties listed in the annex to the Financing Convention are:
1.      Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague on 16 December 1970.
2.      Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, done at Montreal on 23 September 1971.
3.      Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents, adopted by the General Assembly of the United Nations on 14 December 1973.
4.      International Convention against the Taking of Hostages, adopted by the General Assembly of the United Nations on 17 December 1979.
5.      Convention on the Physical Protection of Nuclear Material, adopted at Vienna on 3 March 1980.
6.      Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation, supplementary to the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation, done at Montreal on 24 February 1988.
7.      Convention for the Suppression of Unlawful Acts against the Safety of Maritime Navigation, done at Rome on 10 March 1988.
8.       Protocol for the Suppression of Unlawful Acts against the Safety of Fixed Platforms located on the Continental Shelf, done at Rome on 10 March 1988.
9.      International Convention for the Suppression of Terrorist Bombings, adopted by the General Assembly of the United Nations on 15 December 1997.

act.

Dec. 9, 1999, S. Treaty Doc. No. 106-49 (2000). Here, the facts as alleged do not fall within any

of the enumerated prohibited acts specifically set forth in the Financing Convention. Plaintiffs

do not argue that the conduct alleged violates any of the treaties listed in the annex to the

Financing Convention nor does the Court find those treaties to be relevant here. Additionally, as

noted above, Plaintiffs do not allege that the alleged tort occurred during an armed conflict as

required under Art. 2(1)(b). Moreover, the conduct underlying the alleged violation of

international law is not so widespread and systematic as to support a conclusion that the purpose

of the Defendants' conduct was "to intimidate a population, or to compel a Government or an

international organization to do or to abstain from doing any act." See Aldana v. Del Monte

Fresh Produce, N.A., Inc., 416 F.3d 1242, 1247 (11th Cir. 2005) (stating under similar facts that

allegations of systematic and widespread efforts against organized labor were too tenuous to

establish a prima facie case under the ATCA based on crimes against humanity).

Unlike the plaintiffs in Almog, Plaintiffs here have asserted only claims of terrorism in

general, not acts of terrorism as specifically defined in a recognized norm of customary

international law. Plaintiffs have not identified any particular international convention or other

recognized source of determining international law to establish a violation of the law of nations

here. Allegations of support for terrorism not based on specific conduct which violates

international law "has not reached the status of violation of the law of nations." Saperstein,

2006 WL 3804718, at *7; see also Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 795 (D.C.

Cir. 1984) ("[T]he nations of the world are so divisively split on the legitimacy of such

aggression as to make it impossible to pinpoint an area of harmony or consensus . . . Given this

division, I do not believe that under current law terrorist attacks amount to law of nations

violations.").

Although some acts of financial support of terrorism have been held to be sufficient to

support jurisdiction under the ATCA, this Court finds that it lacks subject matter jurisdiction

over Plaintiffs' claim as pleaded.  However, the Court will grant Plaintiffs leave to file a Second

Amended Complaint that identifies specific and established international law of which the facts

as alleged state a violation.

### III.  CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1.      Defendant Drummond Ltd.'s Motion to Dismiss [DE-29] is hereby **GRANTED**

**IN PART AND DENIED IN PART**.  This action is dismissed as to Defendant

Drummond Ltd. based on a lack of personal jurisdiction.

2.      Defendant Drummond Company, Inc.'s Motion to Dismiss [DE-28] is hereby

**GRANTED**.  Plaintiff's Amended Complaint is hereby **DISMISSED** without

prejudice to Plaintiffs filing a Second Amended Complaint on or before July 30,

2007.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida this

16th   day of July, 2007.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

William Wichman, Esq.
Brett Barfield, Esq.

# EXHIBIT M

FILED

2007 Mar-05  PM 01:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | | |
|---|---|---|
| IN RE: JUAN AGUAS ROMERO, *et al.*, | } | |
| | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | **CASE NO. CV-03-BE-0575-W** |
| v. | } | |
| | } | |
| **DRUMMOND COMPANY, INC.,** *et al.*, | } | |
| | } | |
| | } | |
| **Defendants.** | } | |

## ORDER

This case is before the court on the Defendants' joint motion for summary judgment

(Doc. 293).  Following briefing by both sides, the court held a hearing on the motion on February

27, 2007.  For the reasons explicitly stated on the record at that hearing, the court hereby

GRANTS in part and DENIES in part Defendants' motion for summary judgment.

## I.    CLAIMS OF TORTURE PLAINTIFFS[1]

The First and Second Causes of Action in the complaints brought by each of the "Torture

Plaintiffs" state claims for torture under the Alien Tort Claims ("ATCA") and the Torture

Victims Protection Act ("TVPA").  The court finds that the Torture Plaintiffs have failed to put

forward evidence sufficient to establish the elements of a claim for torture under either statute.

Specifically, the court finds that a claim for torture under either act requires a showing of custody

---

[1]  Juan Aquas Romero (Case No. 03-CV-575-KOB), Jimmy Jose Rubio Suarez (Case No. 03-CV-1788-KOB), Francisco Ruiz (Case No. 04-CV-241-KOB), John Doe II (Case No. 04-CV-242-KOB), and the union SINTRAMIENERGETICA (named plaintiff in each of the foregoing cases).

1

or physical control by the offender over the alleged torture victim. Because plaintiffs have not

put forward evidence establishing custody or control over them, no genuine issue of material fact

exists as to this element of their torture claims, and Defendants are entitled to summary judgment

as a matter of law as to all claims for torture under the ATCA and the TVPA. As such, the First

and Second Causes of Action are hereby DISMISSED with prejudice from each of the member

cases named above.

The Torture Plaintiffs have also alleged various causes of action under state common

law.[2] The court determined that, in view of Alabama's traditional refusal to apply its common

law to torts where the injury occurred outside of the state, it would not apply Alabama common

law to the tort claims alleged here, which occurred extraterritorially in Colombia. Because

Plaintiffs pursued their claims for assault, intentional infliction of emotional distress, false

imprisonment, and negligent supervision exclusively under Alabama law, the court hereby

GRANTS Defendants' motion for summary judgment as to those claims. The state common law

claims asserted by the Torture Plaintiffs, therefore, are hereby DISMISSED with prejudice.

The court notes that Plaintiffs have agreed to forego their claims for Denial of

Fundamental Rights to Associate and Organize under the ATCA and the TVPA (Third Cause of

Action in each of the cases brought by the Torture Plaintiffs, as well as in the case brought by the

Wrongful Death Plaintiffs, discussed below). Thus, finding that no causes of action remain in

any of the complaints brought by the Torture Plaintiffs, the court hereby DISMISSES with

---

[2] The state law tort claims are: (1) assault (Fourth Cause of Action in Romero, Suarez, Ruiz, and Doe II complaints); (2) intentional infliction of emotional distress (Fifth Cause of Action in Romero, Suarez, Ruiz, and Doe II); (3) negligent supervision (Sixth Cause of Action in Ruiz and Doe II complaints; Seventh Cause of Action in Romero and Suarez complaints); (4) false imprisonment (Sixth Cause of Action in Suarez complaint); and (5) negligent infliction of emotional distress (Sixth Cause of Action in Romero complaint, which this court has already dismissed on October 22, 2003).

2

prejudice the member cases *Romero v. Drummond* (03-575), *Suarez v. Drummond* (03-1788),

*Ruiz v. Drummond* (04-241), and *Doe II v. Drummond* (04-242) in their entireties.

## II.     CLAIMS OF WRONGFUL DEATH PLAINTIFFS[3]

The Wrongful Death Plaintiffs in member case *Rodriquez v. Drummond* (02-665) have

alleged in the Fourth Cause of Action a claim for wrongful death under the laws of Colombia,

and have submitted an affidavit informing the court of what they contend are the relevant legal

principles in Colombia.  The court *reserves ruling* on Defendants' motion for summary judgment

as to the wrongful death claims, until after Defendants have had an opportunity to brief

Colombian law in response to the affidavit Plaintiffs submitted.  A separate scheduling order will

be entered as to Defendants' brief and Plaintiffs' reply on the issue of wrongful death under

Colombian law.

The Wrongful Death Plaintiffs have alleged a claim for extrajudicial killing under both

the ATCA and the TVPA (First and Second Causes of action in the *Rodriquez v. Drummond*

complaint).  The court finds that Plaintiffs have failed to put forward sufficient evidence to

satisfy the state action requirement of the TVPA, and that Defendants are entitled to judgment on

these claims.  Accordingly, Defendants' motion for summary judgment is GRANTED as to all

claims for extrajudicial killing under the TVPA.  The Second Cause of Action in member case

No. 02-CV-0665-KOB is hereby DISMISSED with prejudice.

On the other hand, the court finds that the Wrongful Death Plaintiffs have produced

---

[3] Several anonymously-identified Plaintiffs have filed a complaint alleging, among other things, a claim for wrongful death under the ATCA, the TVPA, and common law.  That case is identified as Rodriquez, et al. v. Drummond et al. (02-CV-665-KOB).  The anonymous Plaintiffs are the legal heirs and successors to Valmore Locarno Rodriquez ("Locarno"), Victor Hugo Orcasita Amaya ("Orcasita"), and Gustavo Soler Mora ("Soler"), all of whom were union leaders allegedly murdered by paramilitary forces at the orders of the Defendants.

enough evidence to create a genuine issue of material fact as to whether Defendants' alleged participation in the murders of the union leaders might fall within the war crimes exception to the state action requirement of the ATCA. *See Kadic v. Karadz*, 70 F.3d 232, 243 (2d Cir. 1996). Plaintiffs have put forward sufficient evidence to create a genuine issue of material fact as to Defendants' liability for violation of the Alien Tort Claims Act, under a theory of aiding and abetting liability, but *not* under either a conspiracy or an agency theory.[4] As such, Defendants have not established that no genuine issues of fact exist and that they are therefore entitled to judgment as a matter of law. The court, therefore, DENIES Defendants Drummond Ltd. and Augusto Jiménez's motion for summary judgment as to the ATCA claims of the deceased union leaders' anonymous heirs and successors for extrajudicial killing, under a theory of aiding and abetting liability. The Wrongful Death Plaintiffs' First Cause of Action, in member case No. 02-CV-0665-KOB, shall proceed.

The court found that Plaintiffs had failed to put forward sufficient evidence to establish direct liability of Defendant Drummond Company, Inc. on the claims for extrajudicial killing under the ATCA. Plaintiffs also have not convinced the court that it should pierce the corporate veil, or that any other theory of corporate liability exists for asserting these claims against Drummond Company, Inc. Therefore, the court GRANTS summary judgment as to all claims against Drummond Company, Inc.. Drummond Company, Inc., therefore, is hereby DISMISSED with prejudice from the remaining member case No. 02-CV-0665-KOB.

Finally, the court determined that the union, SINTRAMIENERGETICA, has put forward

---

[4] As stated on the record, however, should the court determine that Mr. Garcia may testify at trial, Plaintiffs are given leave to petition the court to reconsider whether Defendants may be held liable under either a conspiracy or an agency theory.

4

sufficient evidence of injury, causation, and redressability to establish that it has standing to assert claims for extrajudicial killing of its leaders under the ATCA.  Defendants' motion for summary judgment as to the union's extrajudicial killing claims under the ATCA is therefore DENIED.

This case shall proceed only as to the claims of the Wrongful Death Plaintiffs (including the union, SINTRAMIENERGETICA) (1) for extrajudicial killing under the ATCA under a theory of aiding an abetting liability, and (2) for wrongful death under Colombian law (following briefing by both sides on Colombian wrongful death law, as set forth in the contemporaneously-filed scheduling order).  All other claims and causes of action, including all claims against Drummond Company, Inc., have been dismissed with prejudice.

DONE and ORDERED this 5th day of March, 2007.


KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

## WIESNER & ASOCIADOS LTDA.

### ABOGADOS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE / JOHN DOES 1-144,<br><br>                        **Plaintiffs,**<br><br>        v.<br><br>CHIQUITA BRANDS INTERNATIONAL, INC.,<br>and DAVID DOES 1-10,<br><br>                       **Defendants.** | No. 1:07-cv-01048-PLF |

## DECLARATION OF EDUARDO A. WIESNER

1. I am a lawyer at Wiesner & Asociados Ltda. Abogados in Bogotá, Colombia. I have been practicing law in Colombia for 17 years, and I am a lawyer in good standing in Colombia. I have reviewed plaintiffs' complaint, and I make this declaration on personal knowledge, in support of Chiquita Brands International, Inc.'s motion to dismiss plaintiffs' complaint.

2. Colombian civil law provides for both direct and indirect (vicarious) extra-contractual (tort) liability actions. Direct extra-contractual liability actions are governed by article 2341 of the Colombian Civil Code; indirect extra-contractual liability actions are governed by article 2347 of the Colombian Civil Code.

3.    Under article 2341, a person who commits an illicit act (negligence, willful misconduct, or fraud) and causes damage (any bodily, moral, or material injury) is obligated to indemnify such damage.[1]

4.    Under article 2347, a principal is liable for injury caused by the fault of a person under his supervision, and who is acting within the scope of his powers.[2]

5.    Both direct and indirect (vicarious) extra-contractual liability actions are based on personal fault, that is, they are grounded on the negligent or willful act of the liable party. In the case of direct liability actions, the liable party must have caused damage in a negligent or willful manner. In the case of indirect (vicarious) extra-contractual liability actions,

---

[1]    Article 2341 provides: "A person who has committed a crime or fault which caused harm to another person is under the obligation to indemnify him or her, without prejudice to the main penalty imposed by the law for the said offense or crime committed."

[2]    Article 2347 provides:

Every person is liable, not only for their own actions, for the purposes of indemnifying damages, but also for the deeds of those who are under their care.

As such, the father and, in absence thereof the mother, is liable for the conduct of the sons and daughters who, being minors, inhabit the same home.

As such, the tutor is liable for the conduct of the pupil that lives under his or her care.

As such, the husband is liable for the conduct of his wife.

As such, the directors of schools are liable for the conduct of their disciples while they are under their care and artists and merchants for the conduct of their apprentices or subordinates, in the same event.

But the liability of such persons will cease, if the authority and care which their capacity confers upon them would not have sufficed to avoid the fact.

the liable party must have been negligent in the care it was due to exercise over the person who

caused the injury or damage.

      6.  In both direct and indirect (vicarious) extra-contractual liability actions, the

injured party bears the burden of proof and must demonstrate three elements: fault, damage, and

a causal relation between them.  The Colombian Supreme Court has stated:

> Based on Article 2341 of the Civil Code, this Corporation has
> historically concluded that, in order to engage the responsibility of
> an individual or a corporation, on an extra-contractual basis,
> coexistence of the three elements that traditional doctrine has
> identified as "fault, damage and causal relation between them" is
> required. These conditions are the axiological scenery of the claim
> under study and define the evidentiary burden of the plaintiff, since
> he has the burden of demonstrating the patrimonial or moral
> (damage) detriment and that such damage is a consequence of the
> fault of the plaintiff, because the responsibility is the result of the
> legal relationship of two individuals: the author of the damage and
> the person that suffered such damage.[3]

      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.  Executed on the 7th day of December, 2007, in Bogotá,

Colombia.

*Eduardo A. Wag*

————————————————
Eduardo A. Wiesner

---

[3]     Corte Suprema de Justicia. Sala de Casación Civil y Agraria. Magistrado Ponente: Dr.
José Fernando Ramírez Gómez. Bogotá, 25 de octubre 1999. Referencia: Expediente No. 5012.
Original Spanish Text: "*Como desde antaño lo viene predicando la Corporación con apoyo en el
tenor del artículo 2341 del C. Civil, para que resulte comprometida la responsabilidad de una
persona natural o jurídica, a título extracontractual, se precisa de la concurrencia de tres
elementos que la doctrina más tradicional identifica como "culpa, daño y relación de causalidad
entre aquélla y éste". Condiciones estas que además de configurar el cuadro axiológico de la
pretensión en comentario, definen el esquema de la carga probatoria del demandante, pues es a
éste a quien le corresponde demostrar el menoscabo patrimonial o moral (daño) y que éste se
originó en la conducta culpable de quien demanda, porque al fin y al cabo la responsabilidad se
engasta en una relación jurídica entre dos sujetos: el autor del daño y quien lo padeció.*"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**JANE / JOHN DOES 1-144,**

                                        **Plaintiffs,**

        **v.**

                                                        **No. 1:07-cv-01048-PLF**

**CHIQUITA BRANDS INTERNATIONAL, INC.,**
**and DAVID DOES 1-10,**

                                        **Defendants.**

---

[PROPOSED] ORDER

        Upon consideration of Defendant Chiquita Brands International, Inc.'s motion to

dismiss plaintiffs' Complaint, it is this ___ day of _____ 200__, hereby ORDERED

that Defendant's motion is GRANTED.  Plaintiffs' Complaint is DISMISSED.


                                        _____
                                        PAUL L. FRIEDMAN
                                        United States District Judge