**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JANE / JOHN DOES 1-144**<br><br>                              **Plaintiffs,**<br><br>**v.**<br><br>**CHIQUITA BRANDS INTERNATIONAL, INC. and DAVID DOES 1-10**<br><br>                              **Defendants.** | **Case No.: 1:07-cv-01048-PLF** |

**PLAINTIFFS' MEMORANDUM IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Terry Collingsworth (D.C. Bar No.471830)
Natacha Thys (D.C. Bar No. 458143)
International Rights Advocates
218 D Street S.E. (Third Floor)
Washington, D.C. 20003
Telephone: 202-543-5811
Email: tc@iradvocates.org

*Attorneys for Plaintiffs Jane/John
Does 1-144*

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND FACTS .....................................................................................4

III.    STANDARD OF REVIEW...................................................................................6

IV.     ARGUMENT.........................................................................................................6

     A.     Plaintiffs' Claims for Extrajudicial Killing are Unquestionably
        the Type of Claims Actionable Under the ATS and TVPA....................................6

     B.     Chiquita Is Liable for the AUC's Acts as "War Crimes" and as
        "State Action."........................................................................................................7

          1.     The murders of Plaintiffs' relatives were  war crimes, which obviates
             the need to show state action..........................................................................9

          2.     The AUC Paramilitaries that Chiquita made substantial payments to
             from 1997-2004 were acting under color of law.........................................11

               a. The AUC's "*convivirs*" that Chiquita made substantial
                  payments to acted under explicit authority of law......................11

               b. Military officers were members of the AUC
                  and military units openly collaborated with the AUC................13

          3.     Chiquita's novel "foreign relations" defense would
             prevent any case from ever being brought under the
             ATS or TVPA...............................................................................................15

     C.     Defendants Are Liable for the Acts of the AUC Terrorists Who Murdered
        the Decedents........................................................................................................17

          1.     Chiquita is liable for knowingly aiding and abetting the AUC's
             terrorist acts that included murdering the decedents...................................18

               a. The ATS permits claims based on aiding and abetting...............18

               b. Under both federal common law and international law,
                 aiding and abetting requires knowing substantial assistance........20

c. Plaintiffs have properly alleged that Chiquita provided knowing substantial assistance to the AUC, which murdered the decedents................................................................22

2. Chiquita is liable for conspiring with the AUC to drive leftists and communists out of the banana belt, which resulted in the murder of the decedents................................................................................26

3. Chiquita is vicariously liable for the acts of the AUC committed while the AUC was being paid to depopulate the banana region of leftists...........................................................................29

D. Plaintiffs Injured by Chiquita's Payments to FARC Should Be Permitted to Have Discovery on the Nature and Scope of that Relationship.........................32

E. Plaintiffs Injured by the AUC State A Claim Under the TVPA for Extrajudicial Killing.................................................................................34

F. Plaintiffs Have Properly Alleged Pendant State Law Claims................................37

1. District of Columbia law governs Plaintiffs' state tort claims except for their wrongful death claims, which are governed by New Jersey law................................................................................39

2. Plaintiffs' state law claims are not barred by any statute of limitations...................................................................................43

a. Plaintiffs' causes of action did not accrue until they knew they could sue Chiquita ........................................................43

b. Principles of equitable tolling toll the limitations period..........44

V. CONCLUSION.......................................................................................................45

## TABLE OF AUTHORITIES

### CASES

*Aldana v. Del Monte Fresh Produce, N.A., Inc.,*
    416 F.3d 1242 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 18, 35

*Almog v. Arab Bank, PLC,*
    471 F. Supp. 2d 257 (E.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Arias v. Dyncorp,*
    2007 WestLaw 1521044 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Beanal v. Freeport-McMoran, Inc.,*
    197 F.3d 161 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Biscoe v. Arlington Co.,*
    738 F.2d 1352 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Bodner v. Banque Paribas,*
    114 F. Supp. 2d 117 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bowoto v. Chevron Texaco Corp.,*
    312 F. Supp. 2d 1229 (N.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Breach of Neutrality,* 1 Op. Att'y Gen. 57 (1795) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Brentwood Academy v. Tennessee Secondary School Athletic Association,*
    531 U.S. 288 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

*Bridgeway Corp. v. Citibank,*
    201 F.3d 134 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Burnett v. Al Barka Investment,*
    274 F. Supp. 2d 86 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Burns v. Bell,*
    409 A.2d 614 (D.C. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Burton v. Wilmington Parking Authority,*
    365 U.S. 715 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*Byers v. Burleson*,
713 F.2d 856 (D.C. Cir 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43,44

*Cabello v. Fernandez-Larios*,
402 F.3d 1148 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 27

*Caribbean Broad. Sys., v. Cable & Wireless PLC*,
148 F.3d 1080 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Central Bank, N.A. v. First Interstate Bank*,
511 U.S. 164 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Cervantez v. J.C. Penney Company, Inc.*,
595 P.2d 975 (Cal. Sup. Ct. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Clinton v. New York*,
524 U.S. 417 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Conley v. Gibson*,
355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Cox v. Administrator United States Steel & Carnegie*,
17 F.3d 1386 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Collett v. Socialist Peoples' Libyan Arab Jamahiriya*,
362 F. Supp. 2d 230 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Currier v. Radio Free Europe/Radio Liberty*,
159 F.3d 1363 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*DAG Enters., Inc. v. Exxon Mobil Corp.*,
Civ. A. 00-0182 (CKK), 2001 WL 34778782 (D.D.C. Sept. 30, 2001) . . . . . . . . . 40, 42

*Daskalea v. D.C.*,
227 F.3d 433 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*DeLong Equipment Co. v. Washington Mills Abrasive Co.*,
887 F.2d 1499 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*District of Columbia v. Coleman*,
667 A.2d 811 (App. D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Doe v. Islamic Salvation Front*,
    993 F. Supp. 3d (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,9

*Doe v. Rafael Saravia*,
    348 F. Supp. 2d 1112 (E.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Doe v. Qi*,
    349 F. Supp. 2d 1258 (N.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Doe I v. Exxon Mobil Corp.*,
    393 F. Supp. 2d 20 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19, 35

*Doe I v. Unocal Corp*,
    395 F. 3d 932 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19, 21

*Droysen v. Hansen*,
    59 F.R.D. 483 (E.D. Wis.  1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Duncan v. GEW, Inc.*,
    526 A.2d 1358 (App. D.C. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Eastman Kodak Co. v. Kavlin*,
    978 F. Supp. 1078 (S.D. Fla. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Edwards v. Okie Dokie, Inc.*,
    473 F. Supp. 2d 31 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Eli Lilly & Co. v. Home Ins. Co.*,
    764 F.2d 876 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Estate of Rodriguez v. Drummond Co.*,
    256 F. Supp. 2d 1250 (N.D. Ala. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 35

*Faison v. Nationwide Mortg.Corp*,
    839 F.2d 680 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Fitts v. Minnesota Mining & Mfg. Co.*,
    581 So.2d 819 (Ala. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 25-27, 31

*Hercules & Co. v. Shama Restaurant Corp.*,
566 A.2d 31 (App. D.C. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Hilao v. Estate of Marcos*,
103 F.3d 767 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hobson v. Wilson*,
737 F.2d 1 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*In re Agent Orange Product Litigation*,
373 F. Supp. 2d 7 (E.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 35

*In re Air Crash Disaster*,
559 F. Supp. 333 n.10 (D.D.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*In re Sinaltrainal Litigation*,
474 F. Supp. 2d 1273 (S.D. Fla. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re South African Apartheid Litigation*,
346 F. Supp. 2d 548 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*In re Terrorist Attacks on September 11, 2001*,
349 F. Supp. 2d 765 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*International Action Center* v. U.S.,
2002 WL 31696682, *1-2 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Jaffe v. Pallotta Teamworks*,
374 F.3d 1223 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41,42

*Kadic v. Karadzic*,
70 F.3d 232 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *In Passim*

*Khulumani v. Barclay National Bank Ltd.*,
504 F. 3d 254 (2d Cir 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 19, 20

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Lewis v. Washington Metropolitan Area Transit Authority*,
463 A.2d 666 (D.C. Ct. App. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Linde v. Arab Bank, PLC*,
    384 F. Supp. 2d 571 (E.D.N.Y 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Long v. Sears Roebuck & Co.*,
    877 F. Supp. 8 (D.D.C. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Lony v. E.I. Du Pont DeNemours & Co.*,
    886 F.2d 628 (3rd Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

*McChristian v. Popkin*,
    75 Cal. App. 2d 249 (Cal. Dist. Ct. App. 1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*McLennan v. Am. Eurocopter Corp.*,
    245 F.3d 403 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Mehinovic v. Vuckovic*,
    198 F. Supp. 2d 1322 (N.D.Ga. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Metropolitan Life Ins. Co. v. Ward*,
    470 U.S. 869 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Monroe v. Williams*,
    705 F. Supp. 621 (D. D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Mujica v. Occidental Petroleum*,
    381 F. Supp. 2d 1164 (C.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*NCGUB v. Unocal, Inc.*,
    176 F.R.D. 329 (C.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 30, 45

*Oparaugo v. Watts*,
    884 A.2d 63 (App. D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Palm v. Marr*,
    174 F. Supp. 2d 484 (N.D. Texas 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Parker v. District of Columbia*,
    850 F.2d 708 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Penn Cent. Transp. Co. v. Reddick*,
    398 A.2d 27 (D.C. Ct. App. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Phillips v. Heine,*
    984 F.2d 489 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
    374 F. Supp. 2d 331 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Reese v. Geneva Enters.,*
    1997 U.S. Dist. LEXIS 5727 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Rymer v. Pool,*
    574 A.2d 283 (App. D.C. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Safeway Stores Inc. v. Kelly,*
    448 A.2d 856 (D.C. Ct. App. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Sarei v. Rio Tinto,*
    456 F.3d 1069 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Shear v. National Rifle Ass'n of America,*
    606 F.2d 1251 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Sinaltrainal v. Coca-Cola,*
    256 F. Supp. 2d 1345 (S.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7,15, 20

*Sparrow v. United Air Lines, Inc.,*
    216 F.3d 1111 (DC Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Sprint Communications Company, L.P. v. FCC,*
    76 F.3d 1221 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Stutsman v. Kaiser Found. Health Plan,*
    546 A.2d 367 (App. D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Tel-Oren v. Libyan Arab Republic,*
    726 F.2d 774 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15, 21

*The State of Ohio v. Bell Telephone Co.*,
    36 Ohio St. 296 (1880) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Tomera v. Galt*,
    511 F.2d 504 (7th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*U.S. v. Aimone*,
    715 F.2d 822 (3rd Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*U.S. v. Baker*,
    432 F.3d 1189 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*U.S. v. Blinder*,
    10 F.3d 1468 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*U.S. v. Cooper*,
    91 F. Supp. 2d 60 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*U.S. v. Michel*,
    588 F.2d 986 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*U.S. v. Middleton*,
    231 F.3d 1207 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-37

*U.S. v. Thevis*,
    665 F.2d 616 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*U.S. v. Turkette*,
    452 U.S. 576 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Weinberg v. Johnson*,
    518 A.2d 985 (D.C. Ct. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Weisberg v. Williams, Connolly & Califano*,
    390 A.2d 992 (D.C. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Wright v. Sony Pictures*,
    Civ. A. No. 03-2083 (JDB), 2005 WL 2692487 (D.D.C. Feb. 24, 2005) . . . . . . . . 40, 41

*Y.W.C.A. v. Allstate Ins. Co.*,
    275 F.3d 1145 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

## INTERNATIONAL CASES

*Prosecutor v. Delalic*,
    ICTY-96-21, Appeals Judgment (Feb. 20, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Prosecutor v. Furundzija*,
    ICTY-95-17/1, Trial Judgment (Dec. 10, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Prosecutor v. Georges Anderson Nderubumwe Rutaganda,*
    ICTR-96-3 (December 6, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*U. S. v. Friedrich Flick*,
    6 Trials of War Criminals Before the Nuremberg Military Tribunals
    Under Control Council Law No. 10 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## STATUTES

Alien Tort Statute,
    28 U.S.C. § 1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *In Passim*

Torture Victim Protection Act,
    28 U.S.C. § 1350, *note* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *In Passim*

D.C. Code § 16-2701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

N.J. Stat. Ann. § 2A:31-1 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Ohio Rev. Code Ann. § 2125.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## RULES

66 Fed. Reg. 47,054 (September 5, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fed. R. Civ. P. 12(b) (2), (6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Evid. 803(8)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## OTHER AUTHORITIES

Black's Law Dictionary, 4th & 6th Editions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

S. Rep. No. 102-249 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36, 38

137 Cong. Rec. S1369-01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

Restatement (Second) of Agency § 228, 245 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

Restatement (Second) of Conflicts § 136 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

Restatement (Second) of Conflict of Laws § 146 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

Restatement (Second) of Torts § 416 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

W. Prosser, *Law of Torts,* at 292 (4th ed. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

The 144 Doe Plaintiffs, on behalf of 173 decedents, filed claims against the Chiquita Defendants for extrajudicial killing under the Alien Tort Statute (ATS) and the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350, and included pendant state claims as well. The Chiquita Defendants make the effort, but there is just no way to downplay that this case is substantially different from others because Chiquita has already pled guilty to the crime of making substantial payments to the terrorist organizations that murdered the family members of the Doe Plaintiffs. Most of the murders were carried out by the notoriously brutal United Self Defense Forces of Colombia ("AUC"), which was officially named a terrorist organization by the U.S. Department of State during the time that Chiquita was making the payments.[1] Chiquita continued making substantial payments to the AUC for nearly three years after the AUC earned the "terrorist" moniker, and paying them became a felony.

Chiquita's "explanation," it's sole "defense" to providing substantial support to a brutal terrorist organization from 1997-2004, when it was forced to stop by the Justice Department, is that the AUC's leader, Carlos Castaño, "sent an unspoken but clear message that failure to make payments could result in physical harm to Banadex personnel and property."[2]  However, at this procedural juncture, Defendants clearly cannot be afforded the benefit of the very generous factual inference that they were somehow coerced into making monthly payments to the AUC for seven long years. More important, as will be detailed below, Plaintiffs' Complaint provides a much more plausible

---

[1] 66 Fed. Reg. 47,054 (September 5, 2001).

[2] *See* Defendants' Memorandum in Support of Motion to Dismiss (Defs. Mem.) at 3, quoting the Information filed in the criminal case against Chiquita, which is filed by Defendants as Exhibit A to the Hall Declaration. Plaintiffs will refer to it as the "Information." Banadex was Chiquita's wholly-owned subsidiary. *See* Information at 1-2, ¶ 2.

explanation for the Chiquita payments – that Chiquita was one of the "financial founders" of the AUC, which Chiquita helped establish to drive leftist, communist-leaning groups out of the banana region of Colombia, and keep them out. The AUC and Chiquita had a shared mission, and the AUC even got rid of Chiquita's pesky leftist trade union and replaced it with an AUC-controlled union. As a result of the Chiquita-AUC collaboration, by 2003, Banadex was Chiquita's most profitable banana operation in the world. If Chiquita was truly being extorted, it could have sold Banadex and left Colombia. Instead, it sold Banadex in 2004 when forced to by the Justice Department prosecution, and even then, addicted to Colombian profits, some board members advocated maintaining the symbiotic relationship with the terrorist AUC and letting the government "come after us."

Defendants' assertions of remoteness and lack of clarity, based on selective omissions, are unfounded in light of the actual allegations of the Complaint. As an initial matter, there is no question that Plaintiffs' claims for extrajudicial killing are squarely within the "law of nations" scope of the ATS. No case has ever held otherwise. Further, extrajudicial killing is expressly covered by the TVPA. There is simply no issue as to whether Plaintiffs' claims based on extrajudicial killing are cognizable under the ATS and TVPA.

Defendants assert that Plaintiffs cannot show state action, a requirement of some ATS claims and all TVPA claims. First, if the executions were in furtherance of "war crimes," state action is not required for the ATS claims. The region where the murders occurred in Colombia is ground zero for the ongoing civil conflict, making the killings of civilians by the combatants war crimes. Second, while there may be some cases where state action is an issue, this is not one of them. Chiquita admits that its payments to the AUC were run through "*convivirs*," which were established by the Colombian government to work with local police and military to provide "security." *See* Chiquita Factual Proffer

("Proffer"), attached as Exhibit ("Ex") 1 to the Declaration of Terry Collingsworth, filed concurrently herewith, at 5 ¶ 21.[3] These groups were by law operating under "color of authority." Further, in the Colombian context, authorities like the U.S. State Department report that during the years at issue in this case, sympathetic officers from the Colombian military joined the AUC in their mission to defeat the guerilla groups. This alone would establish that the AUC was a state actor.

As to Defendants' liability for acts of the AUC terrorists, based on the actual allegations of the Complaint, all three of the identified grounds for holding Chiquita legally-responsible are solidly supported. Chiquita's substantial payments to the local AUC leaders in the banana region to clear out the leftist groups certainly aided and abetted those operations, which predictably resulted in the deaths of thousands of innocent people, including Plaintiffs' relatives. Further, if, as Plaintiffs allege, Chiquita met with and then engaged the AUC for the purpose of clearing the leftist groups out of the banana region, this was a conspiracy, and all of its participants, including Chiquita, are responsible for the violent outcome. Finally, Chiquita's payments to the AUC made the AUC Chiquita's agent and/or co-venturer, and Chiquita is responsible for the mayhem that occurred in the course of the specific engagement – driving out the leftist groups from the banana zone.

In addition to repeating the state action issues raised with respect to the ATS, Chiquita asserts that the TVPA claims must be dismissed because it prohibits conduct of "individuals," not corporations. The better-reasoned cases around the country agree that a corporation can be an individual within the TVPA's statutory scheme. Further, Plaintiffs have named as Defendants the ten

_____

[3] To distinguish from Defendants' use of letters A-L, Plaintiffs number their exhibits 1-10. All exhibits are attached to the Collingsworth Declaration.

Chiquita directors responsible for the payments to terrorists. At a minimum, the TVPA claims must go forward against them.

Finally, Defendants are simply wrong on the state law claims. The issue is not extraterritorial application, but choice of law. The law of the forum, the District of Colombia, applies to all state law claims unless a party demonstrates that there is a material conflict with another state's law that has a stronger basis for application. Here, because all states that have an arguable interest in holding Chiquita accountable have nearly identical laws on intentional infliction of emotional distress, battery, assault and negligence, there is no conflict and DC law applies to these claims. With respect to wrongful death, there is a material conflict, and the law of New Jersey, the place of Chiquita's incorporation, should be applied because of a stronger interest in having its law applied to Chiquita than DC.

Chiquita also raises the statute of limitations as to the state law claims. However, these claims did not accrue until Plaintiffs learned of Chiquita's direct support of the terrorist groups that murdered their relatives. The applicable date is March 13, 2007, when the Information was filed. Further, equitable tolling must be applied because Chiquita concealed its illegal payments to the terrorists, preventing Plaintiffs from learning of their claims. Another tolling issue is that Plaintiffs still live in an area under the control of the AUC, and they had no access to courts until June, 2007, when they met counsel and learned they could file in the U.S. using pseudonyms to prevent violent retaliation by the AUC.

## II. BACKGROUND FACTS

The details of Plaintiffs' allegations as they relate to the legal issues are provided in the Argument below. All of the key facts of this case are admitted by Chiquita in the Proffer (Ex. 1).

Additional facts are supplied by the Information (Defs. Ex. A) and the Government's Sentencing

Memorandum ("Sentencing Memo")(Ex. 2).[4]   There is no question that Chiquita made regular

payments to the FARC and ELN, two leftist terrorist groups, from 1989 to 1997. Proffer (Ex. 1) at

4-5, ¶ 20. There are 45 Plaintiffs whose claims are based on the executions of their relatives by the

FARC during the period that Chiquita supported that terrorist organization. Ex 3 provides a complete

list of these Plaintiffs. Because the Justice Department did not focus on the FARC-related payments,

and Chiquita did not disclose any details in the Proffer, Plaintiffs do not know how much money

Chiquita paid to FARC, or for what purpose. However, in making payments across eight years, there

must have been meetings, and there must have been some understanding between FARC and

Chiquita. These details can only be learned through discovery.  We do know that in paying FARC for

eight years, Chiquita knowingly provided substantial resources to a terrorist organization. Complaint

¶ 3. FARC executed the relatives of 45 of the Doe Plaintiffs during the time it received substantial

support from Chiquita. *Id*. ¶¶ 230-33, and the specific paragraphs referenced in Ex 3.

As Chiquita admits, its General Manager met in 1997 with Carlos Castaño, the leader of the

AUC. Castaño told Chiquita he was going to clear the FARC out of the banana belt, and he wanted

Chiquita's support. Proffer at 5 ¶ 21. From that moment in 1997, until 2004 when forced to stop by

the Justice Department, as Chiquita admits, it made substantial monthly payments to the AUC. *Id*.

¶¶ 22, 23, 25, 29-54, 57-58, 64-80, 83-87. Chiquita concealed these payments by calling them

"security services," and it made the payments to a government-created organization called a

"*convivir*," which was a front group for the AUC. *Id*. ¶ 21. Chiquita was a "financial founder" of the

---

[4] Plaintiffs agree with Defendants that the Court should take judicial notice of these
public records. *See* Defs. *Mem*. at 2, n.1.

AUC and even made a profit-sharing arrangement with the terrorist group. Complaint ¶¶ 220, 222. All of the remaining Plaintiffs (excluding those killed by FARC, discussed above) were executed in furtherance of the AUC-Chiquita plan to drive all leftist groups out of the banana belt, and murder those who were suspected to be sympathizers with those groups. Complaint ¶¶ 2, 3, 229-33. Thousands of innocent civilians were murdered by the AUC. *See* Sentencing Memo (Ex. 2) at 13. The Doe Plaintiffs were among them.

### III.   STANDARD OF REVIEW

Defendants filed their Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2) and (6). In opposing a dismissal motion, Plaintiffs' allegations of fact must be taken as true, and construed in the light most favorable to them. *See, e.g.,  Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Moreover, "[a] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim . . ." *Id.*  Accordingly, Defendants' attempt to argue for competing factual inferences in the context of their own dismissal motion is highly improper.  *See, e.g.*, *Shear v. National Rifle Ass'n of America*, 606 F.2d 1251, 1253 (D.C. Cir. 1979). Plaintiffs address several instances of this below, which reinforces this case should not be dismissed.

### III.   ARGUMENT

**A.    Plaintiffs' Claims for Extrajudicial Killing Are Unquestionably the Type of Claims Actionable Under the ATS and TVPA.**

Defendants refer frequently to the Supreme Court's holding in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), and reference the Court's admonition that courts should be cautious in "recognizing a cause of action under the [ATS] statute." *See* Defs. Mem. at 8; 22-24, 26. Defendants try to create the impression that there is an issue of whether Plaintiffs' claims for extrajudicial killing can be

recognized under the ATS or TVPA. While *Sosa* did urge restraint and vigilance in recognizing **new** causes of action, 542 U.S. at 725, there has never been a question that extrajudicial killing is one of those universally-recognized international norms that is actionable under the ATS. The early cases of the modern ATS era, such as *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), demonstrated the universal acceptance of the prohibition of extrajudicial killing, and the Supreme Court cited the case, and the test it applied, with approval. *Sosa,* 542 U.S. at 763-64. Further, the Supreme Court specifically included extrajudicial killing in the list of examples of the kinds of claims that were sufficiently, "universal, specific, and obligatory" to be actionable under the ATS. *Id.* at 732. As to the TVPA, it expressly establishes a cause of action for "extrajudicial killing." 28 U.S.C. § 1350, *note* § 2 (a)(2). Thus, the need for caution, vigilance and gate-keeping have been resolved with respect to claims for extrajudicial killing. Defendants' effort to sow doubt along these lines is completely misplaced. Once the question of whether there is an actionable claim is resolved, as it is here, then this is just like any other case brought under a federal statute.

**B.    Chiquita Is Liable for The AUC's Acts as "War Crimes" and as "State Action."**

To pursue their claim, Plaintiffs must show that the ***AUC*** could be held liable under international law for extrajudicial killing. If so, then as established in section C, below, Chiquita can be liable for aiding and abetting, conspiring with, or establishing an agency and/or joint venture relationship with the AUC. There is no question that Plaintiffs must show that the AUC was acting under "color of law" to state a claim for extrajudicial killing under the TVPA. This is an express requirement.  28 U.S.C. § 1350, *note*, § 2(a). Plaintiffs make this showing in subsection 2, below. With respect to the ATS claims, a showing of state action is also  required unless Plaintiffs show that the murders at issue were in furtherance of the AUC's "war crimes." *See Kadic,* 70 F.3d at 240, 243

7

(quoting *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 795 (D.C. Cir. 1984)(Edwards, J., concurring)); *Doe v. Islamic Salvation Front*, 993 F. Supp. 3, 8 (D.D.C. 1998). Defendants do not dispute that a showing of war crimes obviates the need to show state action for ATS claims. *See* Defs. Mem. 15-16. However, as with the TVPA claims, Plaintiffs' ATS allegations with respect to the AUC murders also establish state action.[5]

In *Estate of Rodriguez v. Drummond Co.*, 256 F. Supp. 2d 1250, 1261, 1264-65 (N.D. Ala. 2003), the court found plaintiffs' allegations that Drummond had provided material support to the AUC, which murdered three leaders of the union representing Drummond workers, to be sufficient to state claims for war crimes, and declined to address the state action issue on a dismissal motion. Here, Plaintiffs make very similar allegations of both war crimes and state action, except that Drummond had not pled guilty to actually funding first the FARC and then the AUC in the ongoing civil conflict. Drummond also lacked allegations present here that Chiquita was a "financial founder" of the AUC and embarked on a joint mission to drive leftist groups out of the banana area, killing Plaintiffs' relatives in the process. Complaint ¶¶ 2, 3, 220, 222, 229-33. Further, the state action analysis is made much simpler here because Chiquita admitted that it paid the AUC funds through "*convivirs*," which are government-licenced organizations charged by law with assisting local police and military. These *convivirs* were functioning as front groups for the AUC, and Chiquita knew this. Sentencing Memo (Ex. 2) at 4, n. 4. This is an unassailable indication of state action.

---

[5] Plaintiffs concede that they cannot show that FARC acted under color of state law because they are engaged in an armed conflict with the state. However, there is no question that the FARC murders were war crimes, and Plaintiffs assert in section D, below, that Chiquita aided and abetted those war crimes by providing knowing, substantial assistance to the FARC.

1.    **The murders of Plaintiffs' relatives were war crimes, which obviates the need to show state action.**

*Kadic* is the seminal case in explaining how paramilitaries and rebel groups are within the war crimes prohibition of Article 3 of the Geneva Convention, and therefore are responsible under international law regardless of whether they are state actors. It holds that Article 3 applies to an **"armed conflict not of an international character**," and noncombatants are protected from human rights violations committed by "**all parties** to internal conflicts regardless of whether they are recognized nations or **roving hordes of insurgents**." *Kadic*, 70 F.3d at 243 (emphasis added). *See also Islamic Salvation Front*, 993 F. Supp. at 8.

Defendants concede that *Kadic* is correct on the law, *see* Defs. Mem. 15-16, and instead purport to challenge whether Plaintiffs allege that the murders at issue were ***"committed in the course of hostilities." Id*. at 16 (quoting *Kadic*). Given Plaintiffs' allegations of being innocent victims of the armed conflict, and Chiquita's admission to making substantial payments to both sides in the ongoing armed conflict, it is difficult to take Chiquita's position seriously.

Plaintiffs allege that while Chiquita was providing substantial assistance to both the FARC, and then to the AUC, Colombia was in the midst of a bloody civil conflict. *See, e.g.,* Complaint ¶¶ 3, 207-209. The conflict was particularly volatile in the areas where Plaintiffs lived and worked. *Id*. ¶¶ 207, 209-10, 212. Indeed, Chiquita began paying the AUC in 1997 to drive the FARC and other leftist groups out of the banana region, and this was itself a major escalation of the armed conflict. *Id*. ¶¶ 209,220,222. Further, at least in 1997, when Chiquita switched sides and began funding the AUC, the FARC, it is reasonable to infer, was still using arms and other materials bought with Chiquita's pre-1997 funds. Chiquita's role in supporting the conflict was significant. As the Justice

9

Department noted, "**Defendant Chiquita's financial support to the AUC was prolonged, steady, and substantial. . . .  Chiquita's money helped to buy weapons and ammunition used to kill innocent victims of terrorism.**"[6] Sentencing Memo (Ex 2) at 13. Plaintiffs, all noncombatants, were among the victims. Complaint ¶¶ 235

Again, in assessing the war crimes issue, the question is whether there was an "armed conflict"; whether the FARC and the AUC were parties to the conflict; and whether Plaintiffs were noncombatants killed in the "course of hostilities." *See Kadic*, 70 F.3d at 242-43.[7] There is just no question Plaintiffs have alleged all of these elements. Indeed, in assessing the allegations in *Drummond*, unaided, as here, by the defendants' guilty plea to funding both sides of the conflict, the court stated:

> At this stage in the proceedings, the court *assumes* the trade union's allegations are true. Thus, the court finds that the union sufficiently alleged that defendants acted in conjunction with the paramilitaries to violate the laws of war. The trade union leaders who were killed by the paramilitaries were not active participants in the civil war raging in Columbia. Thus, again assuming plaintiff's allegations to be true, defendants and their alleged agents violated the law of war by allegedly murdering the union leaders. *See* Geneva Convention I art. 3(1). *Estate of Rodriguez,* 256 F. Supp. 2d at 1261.

To emphasize how beyond-debate the war crimes issue is in this case, Plaintiffs note that each year the U.S. State Department issues annual human rights reports on all countries, including Colombia. Ex. 4 is the 1997 report for Colombia.[8] This was the year Chiquita started funding the

[6] This finding renders frivolous Chiquita's factual assertion that its support to the AUC was not "substantial." *See* Defs. Mem. at 29-30.

[7] The issue of **Chiquita's liability** is assessed based on its relationship to both the AUC and the FARC in sections C and D, *infra*, using well-established standards of aiding and abetting, conspiracy, and agency/joint venture liability.

[8] It is well-settled that the Court can take judicial notice of the State Department's Country Reports, which also constitute admissible evidence under Fed. R. Evid. 803(8)(c), and

AUC. The State Department reported that Colombian government's control of national territory "has been increasingly challenged by longstanding and widespread internal armed conflict and rampant violence. . ." *Id.* at 1. "The many paramilitary groups took the offensive against the guerillas, often perpetrating targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base . . . ***An active policy of depopulation, pursued by some paramilitary groups against communities suspected of guerilla support***, was the primary cause of the growing internal displacement problem." *Id.* at 2 (emphasis added). This is just one example. Every year since then the State Department has similarly described the violent civil conflict, with effects on innocent people exactly as Plaintiffs allege happened to their relatives. There is simply no basis for Defendants to challenge Plaintiffs' war crimes allegations on a dismissal motion.

> **2.    The AUC paramilitaries that Chiquita made substantial payments to from 1997-2004 were acting under color of law.**

While Plaintiffs' allegations solidly support the inference that the AUC was acting under "color of law" during the time Chiquita was providing it with substantial support, this issue is "intensely fact-specific" and generally not resolvable upon a motion to dismiss. *See, e.g., Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722 (1961); *NCGUB v. Unocal, Inc.,* 176 F.R.D. 329, 346 (C.D. Cal. 1997).

> **a.    The AUC's "*convivirs*" that Chiquita made substantial payments to acted under explicit authority of law.**

The actual allegations of the Complaint (not discussed by Defendants), with the added details revealed in Chiquita's criminal plea agreement, do not even leave Defendants with an arguable denial

---

may be relied on "not merely . . . [for] factual determinations in the narrow sense, but also . . . conclusions and opinions that are based upon a factual investigation." *Bridgeway Corp. v. Citibank,* 201 F.3d 134, 143-144 (2d Cir. 2000).

that the AUC was a state actor. First, Plaintiffs allege that the AUC was acting under "color of law" in carrying out the violations of law alleged. Complaint ¶¶ 235,238. Further, Plaintiffs allege that the "paramilitary security forces openly operate under the laws of Colombia, and are assisted by government military officials." *Id*. ¶ 235. Plaintiffs also allege that Chiquita made the illegal payments to the AUC through the "Papagayo Association, a paramilitary group licensed by the Colombian government." *Id*. ¶ 221. The Justice Department confirms that Chiquita made its payments through these licensed groups called "*convivirs*." Sentencing Memo (Ex 2) at 4. The Justice Department explains that:

> [*c]onvivirs* were private security companies licensed by the Colombian government to assist the local police and military in providing security. Notwithstanding their intended purpose and ***apparent legal authority under Colombian law***, the AUC used certain *convivirs* as fronts to collect money from businesses to support its illegal activities.

*Id*. at 4, n. 4 (emphasis added). The Justice Department added that Chiquita was instructed by the leader of the AUC to make its payments through the convivirs, *id*. at 4, and that "[f]rom the outset [Chiquita] recognized that the payments to the AUC were illicit, even though they were being made through a *convivir*." *Id*.

That Chiquita was making its illegal AUC payments through government-licensed *convivirs,* created to assist local police and military and that operated under the authority of the Colombian government, is dispositive on the issue of state action. As the Supreme Court recognized in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 296 (2001), "[a] nominally private entity (is treated) as a state actor… when it has been delegated a public function by the state." This is certainly the law in this Court. *See, e.g, Arias v. Dyncorp*, 2007 WL 1521044 (D.D.C. 2007)("a nominally private entity is treated as a state actor when it has been

12

delegated a public function by the State"); *Edwards v. Okie Dokie, Inc.*, 473 F. Supp.2d 31, 41 (D.D.C. 2007)(citing *International Action Center* v. U.S., 2002 WL 31696682, *1-2 (D.D.C. 2002)(holding that "private entities, such as PIC [a private security firm to whom the DC police had delegated authority] may act under color of law where there is a transfer of state authority"). *See also Palm v. Marr*, 174 F. Supp.2d 484, 487 (N.D. Texas 2001)(found Wackenhut subsidiary to be a state actor under color of law when it maintained a state prison). The fact that Chiquita did not even mention in its lengthy presentation the *convivirs* and their status as state actors speaks volumes.

      **b.**     <u>Military officers were members of the AUC and military units openly collaborated with the AUC.</u>

Plaintiffs also assert that the AUC is operated with "the complicity of state actors" and was "assisted by government military officials." Complaint, ¶ 235. As Defendants concede (Defs. Mem. at 14-15), in *Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242, 1248-49 (11th Cir. 2005), *cert. denied,* No. 06-426, 2006 WL 2783671, at *1 (Nov. 13, 2006), the Court found that the mere presence of the Mayor of the local town when private thugs, employed by Del Monte, tortured union leaders was sufficient to allege state action because it could be inferred that the Mayor was an active participant. Here, Plaintiffs allege that there was widespread participation in the AUC by military officers, and high levels of cooperation. This would certainly allow the inference that some officers were members of the AUC units supported by Chiquita. All reliable observers of AUC-military relations confirm that this was not only possible, but common. For example, every U.S. State Department Human Rights Report from 1997 to the present includes findings of systematic cooperation between the AUC and the military. For example the 2001 Report (Ex. 5) observes at p. 2 (emphasis added):

Credible allegations of cooperation with paramilitary groups, including instances of both silent support and direct collaboration by members of the public security forces, in particular the army, continued. Evidence suggests that there were tacit arrangements between local military commanders and paramilitary groups in some regions, and paramilitary forces operated freely in some areas that were under military control or despite a significant military presence. ***Individual members of the security forces actively collaborated with members of paramilitary groups – passing them through roadblocks, sharing intelligence, providing them with ammunition, and allegedly even joining their ranks while off-duty***.

Further, according to a report by Human Rights Watch, ***The Ties That Bind: Colombia and Military-Paramilitary Links*** (at p. 1), there is "detailed, abundant, and compelling evidence of continuing close ties between the Colombian Army and paramilitary groups responsible for gross human rights violations." The Report, referenced in the Complaint at ¶ 4 and attached as Ex. 6, is replete with examples of military-AUC collaboration.[9] Thus, Plaintiffs' allegations of systematic military collaboration with the AUC, as well as the participation of military officers in the AUC, which must be taken as true on a dismissal motion, are very likely going to be proven at trial.

As a matter of law, military officers who themselves participate in AUC activities are state actors. *Aldana,* 416 F.3d at 1248-49. The overall cooperation either shows a "symbiotic relationship" or that the AUC and military were sufficiently "entwined" to make the AUC effectively state actors. *See, e.g., Burton*, 365 U.S. at 715, 723-25 (1961); *Brentwood Academy,* 531 U.S. at 298-299 (private athletic association was sufficiently "entwined" with the public school system as evidenced by the fact that the association, which provided "an integral element of secondary public schooling," was composed of public officials and financially supported by the public schools).

---

[9] The investigative work of Human Rights Watch in Colombia is cited favorably by the State Department. *See, e.g.*, 2001 Report (Ex. 5) at 3.

14

**3**.     **Chiquita's novel "foreign relations" defense would prevent any case from ever being brought under the ATS or TVPA.**

Defendants make a novel and sweeping assertion that this case must be dismissed because it could require that the record of the Colombian government on dealing with AUC terrorist acts be scrutinized, and this might offend our Colombian allies. Defs. Mem. 18-21. As a threshold matter, this argument can have no application to Plaintiffs' ATS claims based on war crimes, which do not require a showing of state action. Regardless, given that every TVPA claim, and most ATS claims, require a showing of "state action," Defendants' assertion would mean that few cases could ever be brought because virtually every case would somehow implicate a government and thereby cause tensions. Judge Edwards addressed this frivolous position succinctly: "[i]f Congress determined that aliens should be permitted to bring actions in federal courts, only Congress is authorized to decide that those actions 'exacerbate tensions' and should not be heard." *Tel-Oren*, 726 F.2d at 774.

In *Sosa*, the Supreme Court, in a footnote, stated that "[a]nother possible limitation [to bringing ATS cases] that we need not apply here is a policy of case-specific deference to the political branches." 542 U.S. at 733, n. 21. The Court went on to discuss the South Africa cases, where both the State Department and the South African government had filed strong objections to the litigation challenging corporate participation in apartheid, and cited the negative impact on foreign relations. *Id*. The Court concluded, "[i]n such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the cases's impact on foreign policy." *Id*.  In the South Africa case, the District Court took the Supreme Court's footnote to be law and dismissed the case. *In re South African Apartheid Litigation*, 346 F. Supp. 2d 548, 553-54 (S.D.N.Y. 2004).[10]

---

[10] Relying on the South Africa case, Judge Oberdorfer in *Doe I v. Exxon Mobil Corp*., 393 F. Supp.2d 20, 26-28 (D.D.C. 2005), dismissed Plaintiffs' federal claims citing foreign policy

Stating that it viewed "summary dismissal at the behest of a footnote as premature," the Second Circuit reversed. *Khulumani v. Barclay National Bank Ltd.*, 504 F. 3d 254, 261, n. 9 (2d Cir 2007). The Court found that even though the concerned governments objected, it was inappropriate on a dismissal motion to find there was a ***legal*** effect of the foreign relations concerns. *Id*. at 261-64. The Court stated "'not every case touching foreign relations is nonjusticiable and judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights." *Id*. at 263 (quoting *Kadic,*70 F. 3d at 250).

Given this context, Defendants' assertion of an overarching "foreign relations defense" is an invitation to legal error. The Colombia situation is entirely different from the circumstances found ***insufficient*** for dismissal in *Khulumani.* First, the U.S. State Department has not intervened in this case to assert that it would interfere with U.S. foreign relations. We do know, however, that the State Department has been extremely critical of the Colombian government's failure to reign in the AUC violence. Each of the annual human rights reports from 1997-2004 includes lengthy and detailed criticism of the Colombian government's failure to bring the AUC to justice. *See, e.g.*, 2001 Human Rights Report (Ex. 5) at 1,3. Second, again a unique aspect of this case, relations with Colombia appear to have survived the very public criminal prosecution of Chiquita, where the issue of Chiquita paying government-licenced *convivirs* as front groups for the AUC was first exposed. Third, according to press reports, high-level officials of the Colombian government were unhappy that the criminal case against Chiquita did not result in reparations for the victims, and that none of the

---

concerns. In that case, as in the South Africa case, both the U.S. State Department and the Government of Indonesia filed formal objections to the impact of the litigation on foreign relations. Plaintiffs expect that based on the *Khulumani* reversal of the South Africa case, the *Exxon* dismissal would be reversed. However, plaintiffs cannot appeal until there is a final judgment, and the case is slated for a June 21, 2008 jury trial on plaintiffs' state law claims.

16

Chiquita officers received any punishment at all. *See, e.g*, Ex. 7. Fourth, as the State Department itself recognizes, military "actions in the field were not always consistent with the leadership's positions, and members of the security forces sometimes illegally collaborated with paramilitary forces." Ex. 5 at 3. Thus, Plaintiffs can put Chiquita and its AUC allies on trial without needing to assert that the entire Colombian government supports the AUC terrorists. Indeed, earlier this year, the Colombian government stepped up its own efforts to investigate the "para-business" scandal and prosecute AUC leaders. *See* March 20, 2007 ***Washington Post***, attached as Ex. 8.

**C.    Defendants Are Liable for the Acts of the AUC Terrorists Who Murdered the Decedents.**

All three of Plaintiffs' theories of liability with respect to Chiquita's relationship to the AUC are supported by allegations in the Complaint, and are based on settled principles of law. As Plaintiffs demonstrate below, Chiquita's role in creating the AUC and supporting it for seven years with substantial monthly payments for the purpose of driving leftist groups and their sympathizers out of the banana zone, would allow a finding that Chiquita aided and abetted the AUC, conspired with the AUC, and also establish a joint venture and/or principal-agent relationship with the AUC. Defendants seek to minimize the significance of the dispositive factual allegations of a shared mission between Chiquita and the AUC. However, this direct relationship, supported by Chiquita's guilty plea to providing substantial support to the AUC, makes this a unique case. Defendants are plainly on notice that Plaintiffs assert that the decedents were murdered as part of a plan that brought the AUC to Colombia's banana belt to benefit Chiquita.

None of the cases cited by Defendants requiring more specific facts had the damning admission of a guilty plea on the ultimate question of liability for the acts of a terrorist group that was

created and supported by the Defendant, and let loose on a population of simple farmers in the service of the Defendants. Indeed, Defendants' effort to compare this case to *In Re Sinaltrainal Litigation*, 474 F. Supp. 2d 1273 (S.D. Fl. 2006), *see* Defs. Mem.at 38-39, is particularly disingenuous. There is no question that the Defendant company, Coca-Cola, asserted as a factual matter that it had no relations with the AUC and that the parent company had no control over its Colombian bottlers.[11] Here, Chiquita has admitted both that it paid the AUC for seven years, and these payments originated with the parent company. As stated in the Sentencing Memo (Ex. 2) at 13, "**Defendant Chiquita's financial support to the AUC was prolonged, steady, and substantial. . . . Chiquita's money helped to buy weapons and ammunition used to kill innocent victims of terrorism.**" The Doe Plaintiffs are among those innocent victims. There is no other case like this.

1.      Chiquita is liable for knowingly aiding and abetting the AUC's terrorist acts that included murdering the decedents.

a.      The ATS permits claims based on aiding and abetting.

Defendants misstate the law as to the availability of aiding and abetting under the ATS.  As an initial matter, ***every  federal appellate court that has considered the issue has held that a valid substantive ATS claim can be based upon aiding and abetting liability***.  *See Khulumani*,  504 F. 3d at 260 ("We hold that in this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the [ATS]"); *Aldana*, 416 F.3d at 1247-48; *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157-58 (11th Cir. 2005); *Sarei v. Rio Tinto*, 456 F.3d 1069, 1078 n.5 (9th Cir. 2006); *Doe I v. Unocal*

---

[11] That case is currently on appeal in the Eleventh Circuit (No. 06-15851-HH) because Coca-Cola's factual assertions were accepted on a dismissal motion despite the fact that they conflicted with Plaintiffs' allegations.

*Corp*, 395 F. 3d 932, 947-54 (9th Cir. 2002);[12] *Hilao v. Estate of Marcos*, 103 F.3d 767, 776 (9th Cir. 1996).

Further, most federal District Courts have agreed that ATS claims can be brought under an aiding and abetting theory. In *Burnett v. Al Barka Investment,* 274 F. Supp.2d 86, 100 (D.D.C. 2003), a case from this District not cited by Defendants, Judge Robertson found ATS liability exists for "accomplices, aiders and abetters, or co-conspirators." *See also Almog v. Arab Bank, PLC*, 471 F. Supp.2d 257, 286-93 (E.D.N.Y. 2007)*; Mujica v. Occidental Petroleum*, 381 F. Supp.2d 1164, 1172-74 & n. 6 (C.D. Cal. 2005); *Doe v. Rafael Saravia*, 348 F. Supp.2d 1112, 1148-49 (E.D. Cal. 2004); *In re Agent Orange Product Litigation*, 373 F. Supp.2d 7, 37 (E.D.N.Y. 2005); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 374 F. Supp.2d 331, 338-40 (S.D.N.Y. 2005); *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765, 826 (S.D.N.Y. 2005); *Doe v. Qi*, 349 F. Supp.2d 1258, 1332 (N.D. Cal. 2004); *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp.2d 1229, 1242, 1247 (N.D. Cal. 2004); *Mehinovic v. Vuckovic,* 198 F. Supp.2d 1322, 1355-56 (N.D.Ga. 2002); *Bodner v. Banque Paribas,* 114 F. Supp.2d 117, 128 (E.D.N.Y. 2000); *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1091-92 (S.D. Fla. 1997).

The two cases Defendants rely upon in arguing that aiding and abetting is not available in ATS cases, *In re South African Apartheid Litigation*, 346 F. Supp. 2d 548 (S.D.N.Y. 2004), and *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005), which relied exclusively on the South Africa case, *id.* at 24, are both negated on this point by the recent reversal of the South Africa case. *See Khulumani,* 504 F. 3d at 260-64.

---

[12] Both *Sarei* and *Unocal* were vacated when the Ninth Circuit granted *en banc* review. Unocal settled while the appeal was pending, and an *en banc* decision in *Sarei* is imminent.

It is thus an understatement to say that the great weight of authority agrees that aiding and abetting creates a viable ATS claim. Indeed, from the very inception of the ATS, aiding and abetting liability was available. *See Breach of Neutrality*, 1 Op. Att'y Gen. 57, 58-59 (1795). There, Attorney General Bradford issued an official Opinion that plainly states that ATS liability is available against aiders and abettors. Defendants' speculation about what the Supreme Court might do on this issue notwithstanding, Defs. Mem. 24, it is significant that the Supreme Court cited the Bradford Opinion as important evidence of the Founders' intent.  *See Sosa*, 542 U.S. at 721.

> **b.    Under both federal common law and international law, aiding and abetting requires knowing, substantial assistance.**

The great debate on the subject is not ***whether*** aiding and abetting is available, but on an issue of significant intellectual interest, though with no practical effect in this case, whether the ***source of law*** is federal common law or the "law of nations." The Second Circuit's decision in *Khulumani* is illustrative. All three judges agreed that aiding and abetting liability is available, but had a lengthy debate about the source of law. Judge Katzman found that international law norms should apply, 504 F. 3d at 264-65, 270, while Judge Hall found that federal common law should apply.  *Id.* at 284-87. District Judge Korman, sitting by designation, found, apparently, that at the time of most of the apartheid crimes alleged there was not a sufficiently specific aiding and abetting norm under international law, but the 2002 Rome Statute provides a sufficiently specific aiding and abetting norm today. *Id.* at 331-33.  Much of this debate on the source of law was informed by an *amici curiae* brief filed by a group of international law scholars ("Scholars' Brief")(Ex. 9). The scholars assert that federal common law should govern the aiding and abetting standard. *Id.* at 5-9.

A similar debate was held by the Ninth Circuit in *Unocal*, with Judges Pregerson and Tashima finding that aiding and abetting under ATS is derived from international law, 395 F.3d at 947-54, and Judge Reinhardt taking the federal common law view. *Id.* at 963-71.

In this Circuit, Judge Edwards weighed in on the specific form of civil actions to advance the "law of nations" by stating, "the law of nations never has been perceived to create or define the civil actions to be made available by each member of the community of nations; by consensus, the states leave that determination to their respective municipal laws." *Tel-Oren,* 726 F.2d at 778 (Edwards, J., concurring). *See also Doe*, 257 F. Supp.2d at 120, n.12 ("tort principles from federal common law may be more useful" than international law in determining secondary liability).

Despite the vigorous disagreement on principle, all sides appear to agree that the standard for aiding and abetting is substantially similar under federal common law and international law.  Thus, while it is Plaintiffs' position that, as Judge Edwards intimated, federal common law should apply in assessing the standard for ancillary issues, such as aiding and abetting, resolution of the debate does not matter in this case as both sources of law reach a similar standard of "knowing substantial assistance." Plaintiffs easily meet this standard.

Looking first at the federal common law standard for aiding and abetting, the Supreme Court has described this Circuit's opinion in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as "a comprehensive opinion on the subject." *Central Bank, N.A. v. First Interstate Bank*, 511 U.S. 164, 181 (1994). The *Halberstam* Court, 705 F.2d at 477, applied the RESTATEMENT (SECOND) OF TORTS, § 876(b) and held that aiding and abetting has three essential elements:

> (1) the party whom the defendant aids must perform a wrongful act that causes and injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious

21

activity at the time he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.

Under international law, a similar aiding and abetting standard of knowing, substantial assistance has been applied since at least the Nuremberg cases.[13] Building on the Nuremberg Tribunals, the jurisprudence of the Ad Hoc Tribunals for the Former Yugoslavia ("ICTY") and Rwanda ("ICTR"), also recognize a standard of knowing, substantial assistance for aiding and abetting liability.[14] These decisions emphasize that the requisite "participation" for aiding and abetting is lending "practical assistance, encouragement, or moral support which has a substantial effect upon the perpetration of the crime."[15] Defendants do not appear to dispute that knowing, substantial assistance is the correct standard for aiding and abetting. *See* Defs. Mem. at 27-28.

> ### c.      **Plaintiffs have properly alleged that Chiquita provided knowing substantial assistance to the AUC, which murdered the decedents.**

In challenging the sufficiency of Plaintiffs' allegations, Chiquita distorts the record by failing to represent fairly what those allegations are. It is highly improper for Defendants to ignore key allegations and to argue for factual inferences that favor their defense. The actual allegations of the Complaint show, not only that Chiquita provided knowing substantial assistance to the AUC, but in the criminal case, was forced to admit doing so:

---

[13] *See, e.g., U. S. v. Friedrich Flick*, 6 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10 (1952).

[14] For a complete discussion of the aiding and abetting standard under international law, *see* Scholar's Brief (Ex. 9) at 14-23.

[15] *Prosecutor v. Furundzija*, ICTY-95-17/1, Trial Judgment (Dec. 10, 1998) at ¶ 235. *See also, Prosecutor v. Delalic*, ICTY-96-21, Appeals Judgment (Feb. 20, 2001) at ¶ 345; *Prosecutor v. Georges Anderson Nderubumwe Rutaganda,* ICTR-96-3 (December 6, 1999).These cases are available at www.ictr.org.

- ¶¶ 206-07; 219: Chiquita grew bananas in Colombia in Uraba and Santa Marta. Left-wing guerrilla groups held these areas when Chiquita was first operating there, and the governments were taken over by leftists and communists. While Chiquita made regular payments to the main guerilla group, the FARC,[16] a reasonable inference is that Chiquita was not happy investing in region under the control of guerillas and communists, and did not like the influence these groups had on the workers on the banana plantations.

- ¶¶ 219, 221-22: From 1997-2004, Chiquita made payments to the AUC, sometimes directly to Carlos Castaño, the head of the AUC. Chiquita's general manger met with Castaño in 1997. Castaño said he was going to drive the FARC out of the banana region, and asked Chiquita for financial support. Information at 5, ¶ 21. Chiquita was a "financial founder" of the AUC, and joined the AUC's mission from its inception. Complaint ¶ 222. "The AUC was paid to ensure that Chiquita's business ran smoothly." *Id*. ¶ 220.

- ¶¶ 209, 215: The AUC's mission for Chiquita was to drive the FARC and leftist sympathizers out of the banana region; this would ensure Chiquita's business "ran smoothly." ¶ 220.

- ¶ 213: The AUC also directly helped Chiquita's operations by getting rid of the leftist trade union that had organized the banana workers. The AUC then took control of the union representing the Chiquita workers.

- ¶¶ 219-22: Chiquita made payments to the AUC for seven years. According to the Information at 6, ¶¶19, 23, the payments were made to the two local units of the AUC in Uraba and Santa Marta, the regions where Chiquita operated.

- In what was likely a second payment stream to the AUC, Salvatore Mancuso, another AUC commander now in prison, testified in Colombia that the AUC was paid a monthly "commission" based on the number of boxes of bananas shipped. *Id.* ¶ 220.

- According to the Sentencing Memo (Ex. 2) at 13, "***Chiquita's financial support to the AUC was prolonged, steady, and substantial***" (emphasis added).

- ¶ 224: In addition to cash payments, Chiquita also helped to supply arms to their AUC allies.[17]

---

[16] Liability for these payments is discussed in section D, *infra*.

[17] Defendants' assertion that they did not supply arms to the AUC has no place in a motion to dismiss. "Defendants' affidavits which dispute the factual allegations have no bearing on such a motion [to dismiss]." *Droysen v. Hansen*, 59 F.R.D. 483, 484 (E.D. Wis. 1973).

- ¶¶ 2,3, 209-12, 215, 229, 231,143-44:  Defendants provided substantial assistance to the AUC knowing that in order to drive the FARC and other leftist groups out of the banana region, the AUC would use brutal methods and that thousands of innocent civilians would be slaughtered in the process. As the U.S. Justice Department concluded, "Chiquita's money helped to buy weapons and ammunition used to kill innocent victims of terrorism." Sentencing Memo (Ex 2) at 13.

- ¶ 185: Chiquita's pact with the AUC was successful. By 2003, Banadex was Chiquita's most profitable banana operation in the world. Indeed, several of its directors wanted to keep making the payments even after the U.S. government was informed of the criminal activity. One director said of the Justice Department, "just let them sue us, come after us." *Id.* ¶ 226.

These allegations are more than sufficient to establish that Chiquita provided substantial assistance to the AUC terrorists[18] to drive the leftists and communists out of the banana belt, knowing that the brutal methods employed by the AUC would result in the deaths of many innocent people who resided in the area. Indeed, given that this is a finding already made in the Sentencing Memo (Ex. 2) at p. 3, it is likely that Plaintiffs will have evidence to support these claims, making it particularly frivolous for Defendants to argue that Plaintiffs' allegations would not be sufficient to even raise an inference that Defendants knowingly provided substantial assistance to the AUC.

That Chiquita made the payments to the AUC ***across seven long years***, after the initial and obvious AUC brutality was visible for all, absolutely forecloses any assertion that Chiquita was not fully aware of the campaign of violence it was knowingly financing that resulted in the deaths of Plaintiffs' relatives and many other innocent civilians. *See* Defs. Mem. 31-33. The facts of

---

[18] Defendants appear to argue that Plaintiffs can't sue them because they were supporting a terrorist group, and "terrorism" is not a cause of action. Defs. Mem. 25. While there certainly is a potential claim for violating U.S. law and the "law of nations" by providing material assistance to a terrorist group, *see, e.g., Almog*, 471 F. Supp.2d at 267-269, in the context of Plaintiffs' actual claim for extrajudicial killing, it surely is no defense that Chiquita used a terrorist group, rather than a less prominent gang of thugs.

24

*Halberstam* are dispositive on this. There, the D.C. Circuit upheld the finding of aiding and abetting liability against Hamilton, the live-in companion of a burglar, Welch, for a murder that occurred during a burglary. Hamilton's assistance was primarily doing the secretarial work of Welch's "business." 705 F.2d at 487. Hamilton did not directly aid the commission of the burglaries or the subsequent murder. The Court stated, "[a]lthough her own acts were neutral standing alone, they must be evaluated in the context of the enterprise they aided, *i.e*, a five year long burglary campaign against private homes." *Id*. at 488. The court further noted that "[i]f . . . ***Hamilton's assistance was knowing, then it evidences a deliberate long-term intention to participate in an ongoing illicit enterprise*. . . . *it was no passing fancy or impetuous act*.**" *Id.* (emphasis added). Further, the Court held Hamilton liable for the murder, which was incidental to a burglary, because "it was a natural and foreseeable consequence of the activity Hamilton [undertook]." *Id.*

Similarly, in *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 584 (E.D.N.Y 2005), the court held that a bank's financial assistance to a terrorist group that sponsored suicide bombers made the bank an aider and abetter of the murders of the bombing victims. Rejecting the bank's argument that it did not specifically intend any of the murders, the Court held that "[t]hese allegations are well within the mainstream of aiding and abetting liability. They describe the wrongful acts performed by the terrorists, the defendant's general awareness of its role as part of an overall illegal activity, and the defendant's knowing and substantial assistance to the principal violation." *Id*. Thus, Chiquita need not have intended the specific murders alleged in the Complaint. It had knowledge, across the ***seven years*** of direct funding of the local AUC operations in Uraba and Santa Marta, that its terrorist partner was murdering innocent people in those areas, which included Plaintiffs' relatives.

25

As a final measure, Defendants present a fictional parade of horribles that would occur if they are held accountable for the murders alleged in Plaintiffs' Complaint. The main allegation is that there would be a rush on the ATS courthouse. Defs. Mem. 26. Applying a standard in this case that virtually every other court has applied will have no floodgates effect. Further, Plaintiffs, whose counsel are involved in most of the current ATS cases in litigation around the country, can assure the Court that Chiquita's case is unique. There are no other cases in which a company has pled guilty to making record profits from providing substantial assistance to a terrorist organization that committed atrocities across an entire banana-growing region.[19]

### 2.     Chiquita is liable for conspiring with the AUC to drive leftists and communists out of the banana belt, which resulted in the murder of the decedents.

Plaintiffs also allege that Chiquita and the AUC had a conspiracy that resulted in the deaths of the Plaintiffs' relatives. Complaint ¶¶ 235, 238. When Chiquita met with the head of the AUC, Carlos Castaño, to agree that Chiquita would pay the AUC to drive the leftist groups out of the banana zone, this was a conspiracy. *See* Information at 5, ¶ 21. *Halberstam,* 705 F.2d at 477, provides the elements of conspiracy:

> (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.
> The element of agreement is the key factor distinguishing conspiracy from aiding and abetting.

*Id.* "Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Id.* (citing W. Prosser, *Law of Torts,* at 292 (4th ed. 1971)).

---

[19] Defendants' assertion that there would be an impact on foreign relations is addressed in the discussion of state action, section B (3), *supra*.

In *Cabello,* one of the few ATS cases that has gone to jury verdict on a conspiracy claim, the Court applied a nearly identical standard for conspiracy as *Halberstam*. *See* 402 F.3d at 1159. The facts found to support a finding of conspiracy in *Cabello* were far less than Plaintiffs allege here. Essentially, Defendant Fernandez was found to be a member of a military squad that supported Pinochet's coup in Chile, and they had a record of violence against persons who opposed Pinochet. This was the common plan. Fernandez was found to have made statements that he was the "right hand man" of the squad's violent leader, and he stated that his "spiked weapon" would be used to "caress the little pigeons," which was inferred to mean the opponents of Pinochet. *Id.* The Eleventh Circuit affirmed liability of Defendant Fernandez based on evidence that he was a member of the military squad that was likely responsible for killing the victim, Cabello. The Court reasoned that "it is not disputed that Fernandez's military colleagues, if not Fernandez himself, were responsible for Cabello's death. Because killing civilians presumably opposed to the [Pinochet] *junta* is an act in furtherance of the conspiracy, the jury reasonably could have found [Fernandez knew his actions would assist in the illegal or wrongful activity]". *Id.* at 1158-59. The Court imputed to Defendant Fernandez the acts of the violent group to which he belonged.

Here, if Plaintiffs' allegations are taken as true that the AUC and Chiquita were in agreement for Chiquita to pay the AUC to use violence to drive leftists out of the banana sector, this was the common plan. Killing innocent people, such as the decedents herein, because they were suspected sympathizers with leftists, is an act in furtherance of the conspiracy. Chiquita is liable for these murders, regardless of specific knowledge, because they were:

> the reasonably foreseeable acts of another co-conspirator taken in the course of and in furtherance of the unlawful agreement, regardless of whether they had actual knowledge of those acts, so long as they played more than a minor role in the conspiracy or had actual

27

> knowledge of at least some of the circumstances and events culminating in the reasonably foreseeable event.

*U.S. v. Baker*, 432 F.3d 1189, 1235 (11th Cir. 2005). *See also U.S. v. Michel*, 588 F.2d 986, 999 (5th Cir. 1979)("a party to a continuing conspiracy may be responsible for a substantive offense committed by a co-conspirator in furtherance of the conspiracy, even though that party does not participate in the substantive offense or have any knowledge of it.").

Defendants complain that Plaintiffs do not reveal the name of the Chiquita manager who made the deal with the AUC. Defs. Mem. at 34. This is particularly disingenuous because the Justice Department inexplicably shielded from public disclosure the names of the specific Chiquita executives who made the decision to pay the AUC to go on the murderous rampage that resulted in the deaths of Plaintiffs' relatives. *See* Complaint ¶¶ 187-205. The Information reveals only that Banadex's "General Manager" met with the AUC leader Castaño. Information at 5, ¶ 21. After brief discovery, Plaintiffs will have the real names of the currently faceless corporate supporters of the AUC, but there is no question that ***Chiquita*** knows who these people are and that ***Chiquita*** knows the dates of the meetings.

Plaintiffs acknowledge that it may be difficult, with AUC leader Castaño dead, to get from Chiquita an accurate report on what was said at the meeting described in the Information. In fact, in *DeLong Equipment Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989), the court noted that "[c]onspiracies are rarely evidenced by explicit agreements, and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators." In this case, the fact that there ***was*** a meeting between Chiquita's General Manager and the founder of the AUC, and following the meeting Chiquita began making payments to the AUC, which upheld its part of the deal by clearing the banana region of leftists, would allow the inference of an agreement. "The

28

existence of the conspiracy agreement does not have to be proven by direct evidence. Instead, it can be inferred from "'the **conduct** of the alleged participants or from circumstantial evidence of the scheme.'" *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1410-11 (11th Cir. 1994)(citation omitted). This is particularly applicable here since the AUC is a terrorist organization and Chiquita had no legitimate reason for having contact with them, let alone provide them with substantial support.

### 3. Chiquita is vicariously liable for the acts of the AUC committed while the AUC was being paid to eliminate the leftists in the banana region.

With respect to Plaintiffs' claims based on vicarious liability, Defendants, once again, present a skewed version of the allegations and then attack their sufficiency. Defs. Mem. 37-38. Here, Plaintiffs allege that Chiquita hired the AUC as "agents" and directed the general mission of the AUC, which was to clear the banana region of "persons suspected of sympathizing with leftist guerillas . . . Union leaders, and others voicing opposition to the paramilitaries' strict control over these regions." Complaint ¶¶ 2, 3. Plaintiffs specifically allege that Chiquita and the AUC were engaged in "joint action." *Id.* ¶¶ 143-44. Plaintiffs also allege that "the terrorist groups accepting material assistance from Defendants were acting under the supervision of Defendants and/or as Defendants' agents, and/or were acting within the course and scope of the security duties for which they were retained with the advance knowledge, acquiescence or subsequent ratification of Defendants." *Id.* ¶ 230. Further, the "AUC was paid to ensure that Chiquita's business ran smoothly." *Id.* ¶ 220. The payments made were substantial, and were made on a monthly basis from 1997-2004. *Id.* ¶ 219.

While Plaintiffs have not yet had discovery of Chiquita's financial records to determine amounts, there was a second payment stream to the AUC. Salvatore Mancuso, another AUC commander now in prison, testified in Colombia that the AUC was paid a monthly "commission" based

on the number of boxes of bananas shipped. *Id.* ¶ 220. Thus, the AUC was Chiquita's partner with a direct incentive to help Chiquita maximize its shipments of bananas. The relationship was a business success. By 2003, Banadex was Chiquita's most profitable banana operation in the world. *Id.* ¶ 185.

The close, explicit business relationship between Chiquita and the AUC, with some of the payments to the AUC, a form of profit-sharing, certainly allows the inference that the AUC and Chiquita were engaged in a joint venture. *See, e.g., Faison v. Nationwide Mortg.Corp*, 839 F.2d 680, 685 (D.C. Cir. 1987)("In the District of Columbia, the general rule is that joint tortfeasors are jointly and severally liable for compensatory damages. If any of the defendants in this case is found to be a party to a joint venture that caused tortious injury to plaintiffs, those joint venturers are also joint tortfeasors. . . . What is a joint venture? Where two, or more persons are engaged in an activity in which they are acting in pursuit of a common purpose and in which they have a mutual interest in the joint right of control, they are engaged in what is known as a joint venture . . . ."). *See also NCGUB,* 176 F.R.D. at 348.

Due to the pre-discovery details provided by the Information and Sentencing Memo, Plaintiffs' allegations here are more specific than required and certainly would allow an inference of joint a venture. Indeed, once Chiquita began making monthly ***cash*** payments to the AUC through a Chiquita executive, it is reasonable to infer that there were discussions of what had been done and what still needed to be done. *See* Information at 6-7, ¶ 25.

Likewise, these facts could establish an agency relationship, and a principal is liable for the intentional torts of his agent committed within the scope of employment. *Weinberg v. Johnson*, 518 A.2d 985 (D.C. Ct. App. 1986)(Laundromat owner liable for shooting by employee where employee is motivated at least in part by desire to serve his employer's interest.); *Safeway Stores Inc. v. Kelly,* 448

A.2d 856 (D.C. Ct. App. 1982)(Safeway was liable for assault and battery by security guard from a guard service company); *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 31 (D.C. Ct. App. 1979); Restatement (Second) of Agency § 228, § 245 (Master is responsible for the use of force where force is not unexpected in view of the duties of the servant, even where the act was unauthorized). *See also* Restatement (Second) of Torts § 416 (The employer of an independent contractor is liable to third parties for the failure to take reasonable precautions where the work creates a risk of physical harm to others.). This includes acts committed by state police officers hired to provide security. *Cervantez v. J.C. Penney Company, Inc.*, 595 P.2d 975, 979-80 (Cal. Sup. Ct. 1979); *McChristian v. Popkin*, 75 Cal. App. 2d 249, 255-56 (Cal. Dist. Ct. App. 1946). Here, as noted, the scope of the relationship was to use violence to clear out leftists from the banana region, and Plaintiffs injuries were caused by the implementation of this plan. Complaint ¶¶ 3, 230-33.

Moreover, ratification of the unauthorized acts of another may be established by the principal's knowing acceptance or retention of the benefits of the act. *Lewis v. Washington Metropolitan Area Transit Authority*, 463 A.2d 666, 671 (D.C. Ct. App. 1983). Plaintiffs' allegations in this case raise the inference that Chiquita knowingly hired and accepted the benefits of the AUC's cleansing operation in the banana region. That some Chiquita executives, after seven years of a business relationship with the AUC, wanted to keep making the payments despite warnings from the Justice Department, indicates that Chiquita was benefitting from and wanted to continue the business relationship. *See* Complaint ¶ 226.

31

**D.    Plaintiffs Injured by Chiquita's Payments to FARC Should Be Permitted to Have Discovery on the Nature and Scope of that Relationship**.

Most of the facts in the Information detail Chiquita's seven-year business relationship with the AUC. However, the Information makes a brief reference that, prior to establishing its relationship with AUC, Chiquita made payments to two other terrorist organizations, the leftist guerilla groups, FARC and ELN. Information at 4-5, ¶ 20. Payments were made from 1989-1997. *Id.* Both groups were designated terrorist organizations in 1997. *Id.* The Information does not include any facts regarding the amount or purpose of these payments. The payments stopped in 1997 because Chiquita established a relationship with the AUC to drive the leftist groups out of the banana region. *See id.* at 5, ¶ 21.

There are 45 Plaintiffs, listed in Ex. 3,  whose claims are based on injuries suffered when the FARC murdered their relatives during the time Chiquita was making payments to that terrorist group. Plaintiffs acknowledge that their claims based on the FARC payments are different than the AUC-related claims. First, as noted in section B, s*upra*, these claims can only go forward under the ATS, not the TVPA, because Plaintiffs will not be able to make a showing that the FARC was acting "under color of state law," a requirement of all TVPA claims. However, the claims can go forward under the ATS if the murders were in furtherance of "war crimes," which they certainly were as the FARC was engaged in a civil conflict with the government of Colombia and the AUC, and Plaintiffs' relatives were murdered in the course of that conflict.

The FARC claims are also different because it is unlikely that Chiquita conspired with the FARC. Plaintiffs do not allege a specific meeting or meetings between Chiquita and FARC leaders, although they must have occurred across the eight years that Chiquita was making payments.

Plaintiffs do allege that Chiquita provided knowing substantial assistance to the FARC, and thus aided and abetted the violence that injured the Plaintiffs. Aiding and abetting does not require specific intent; it requires knowledge. *See Halberstam,* 705 F.2d at 487-88 (imposed liability due to years of general assistance to a burglar, and liability for murder that occurred in the course of a burglary because "it was a natural and foreseeable consequence of the activity Hamilton [undertook]"). Further, Chiquita and the FARC were in a joint venture or created an agency relationship based on eight years of continuous payments.

Plaintiffs have no idea why the Justice Department did not pursue the details of the FARC payments made by Chiquita. They only source of that information now will be the discovery process. Plaintiffs request that they be permitted to conduct discovery on the nature and scope of the relationship between FARC and Chiquita that resulted in eight years of payments made to FARC. Even if "it may appear on the face of the pleadings that a recovery is very remote and unlikely . . . but that is not the test." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1118 (DC Cir. 2000). "After all, the issue presented by a motion to dismiss is 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Caribbean Broad. Sys., v. Cable & Wireless PLC*, 148 F.3d 1080, 1086 (DC Cir. 1998)(citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).[20]

---

[20] Plaintiffs note that if they are permitted to go forward with their state law claims, a topic discussed in section F, *infra*, their claims for negligence based on payments to FARC should go forward regardless of any ruling on the ATS claims.

**E.     Plaintiffs Injured by the AUC State A Claim Under the TVPA for Extrajudicial Killing.**

The TVPA is an explicit grant of a claim to persons who are injured by extrajudicial killing or torture. 28 U.S.C. § 1350, *note*. Plaintiffs have already established in section B (2), *supra*, the key element of a TVPA claim, that the wrongful action was done under color of state law. *Id*. § 2(a)(1)-(2). Further, while Defendants do not mention it one way or the other, the legislative history of the TVPA makes crystal clear that aiding and abetting liability is available for TVPA claims. For example, the Senate Report states that the Act will permit "lawsuits against persons who ordered, ***abetted or assisted*** in the torture" or extrajudicial killing. *See* S. Rep. No. 102-249, at 8-9 (1991)(emphasis added). Plaintiffs are not aware of any court that has disagreed with this clear statement of legislative history.

*The sole issue unique to the TVPA that Defendants raise in their dismissal motion is whether corporations can be sued under the statute, because the operative word for its coverage is "individuals."* *See* Defs. Mem. at 41. Before getting into that debate, Plaintiffs note that they have named in the Complaint the ten individual Chiquita executives who approved, authorized or permitted the illegal payments to the AUC, and Chiquita makes no argument that these individuals cannot be sued under the TVPA. Complaint ¶¶ 187-205.

The issue of whether a corporation is within the term "individual" as used in the TVPA is not definitively resolved, and there are decisions going both ways. The sole appellate court to face this issue squarely to date, the Fifth Circuit, declined to decide the question. In *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 169 (5th Cir. 1999), the court pointedly did not affirm the lower court's holding that the term "individual" as used in the TVPA does not include corporations. *See* 969 F. Supp. at 382. Even the district court in *Beanal* acknowledged that the legislative history of the TVPA stated only that "Congress purposefully chose the term ["individual"] so as to circumscribe foreign state liability under

34

the Act," and that "Congress does not appear to have had the intent to exclude private corporations from liability under the TVPA." *Id.* at 382. The Court's conclusion that corporations cannot be sued under the TVPA was therefore contrary to its own conclusion regarding the legislative history. *See also Aldana,* 416 F.3d 1242 (court allowed a TVPA claim to go forward against Del Monte, but the specific issue of whether a corporation was an individual was not raised).

The lower courts are split on whether the term "individual" in the TVPA applies to corporations. Two courts agreed that the TVPA includes corporations within the scope of individuals. *See Drummond*, 256 F. Supp. 2d at 1266-1267; *Sinaltrainal v. Coca-Cola*, 256 F. Supp. 2d 1345, 1358-1359 (S.D. Fl. 2003). Other courts, with no definitive authority, and often with reluctance, find the opposite. *See, e.g., Exxon Mobil Corp*, 393 F.Supp.2d at 28; *In re Agent Orange Product Liability Litig.*, 373 F. Supp.2d at 55-56; *Mujica,* 381 F.Supp.2d at 1176 (appeal pending).

Plaintiffs submit that this open question can be resolved to allow for corporations to be covered by the TVPA if traditional methods of statutory interpretation are employed. First, there is nothing in the structure or history of the TVPA that suggests that Congress *intended* to exclude corporations from liability. To the contrary, Congress expressed a clear intent for the TVPA to be construed as broadly as possible to allow for the vindication of a broad range of human rights violations committed by a broad range of potential wrongdoers. Senator Specter, the sponsor of the Senate bill, stated that "[t]he bill is limited to suits against *persons* who specifically ordered, abetted, or assisted in the torture."[21] Moreover, the Senate Report's only reference to the term "individual" states that "the legislation uses the term to make crystal clear that foreign states or their entities cannot be sued under this bill under any

---

[21] 137 Cong. Rec. S1369-01, 1991 WL 9635, at *1378(emphasis added).

35

circumstances."[22]  This clearly shows that the Senate was concerned with sovereign immunity issues, rather than shielding corporations from liability.  And, as Senator Kennedy stated in the TVPA legislative history, "we have an obligation to make our courts accessible to . . . victims to the maximum extent that the Constitution allows to assure that torturers feel the full weight of international law."  *See* 137 Cong. Rec. S1369-01, 1991 Westlaw 9635, at *1379.  In other words, the TVPA and its terms should be read in the broadest, rather than more restrictive sense.

In addition, a number of courts have interpreted the term "individual" to encompass a "corporation" in other, similar circumstances. For example, in *Clinton v. New York*, 524 U.S. 417 (1998), the Supreme Court examined the meaning of "individual," and found it synonymous with "person."  There, the question was whether the term "individual" in the Line Item Veto Act allowed a corporation to challenge the President's authority to cancel provisions in federal statutes.  The Supreme Court held that "Congress undoubtedly intended the word 'individual' to be construed as synonymous with the word 'person'" although the Line Item Veto Act allows "any ***individua*l** adversely affected by [the Act] to bring an action." *Id.* at 428 (emphasis added).

Other courts' interpretations of the term "individual" also support the position that the term includes corporations.  *See, e.g., Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 881 (1985); *U.S. v. Turkette*, 452 U.S. 576, 583 (1981) (using the term "individual" and "persons" interchangeably), *accord*, *U.S. v. Cooper*, 91 F. Supp. 2d 60 (D.D.C. 2000); *U.S. v. Aimone,* 715 F.2d 822 (3d Cir. 1983); *U.S. v. Thevis,* 665 F.2d 616 (5th Cir. 1982); *U.S. v. Blinder*, 10 F.3d 1468, 1473 (9th Cir. 1993)(under RICO, the term "group of individuals" encompassed "a group of corporations," and thus, that a group of corporations could constitute a criminal "enterprise" under RICO);  *U.S. v. Middleton*, 231 F.3d

---

[22] S. Rep 102-249, 1991 WL 258662, at *7.

1207, 1210 (9th Cir. 2000)(rejecting ordinary dictionary definition of "individual" and relying, in part, upon Black's Law Dictionary definition, to find that a corporation was an "individual" within the meaning of statute criminalizing computer crimes that damage "individuals").

The term "individual" has, for decades, been used to refer both to natural as well as artificial persons, such as corporations. As Black's Law Dictionary explains, while this term "commonly" denotes "a private or natural person," "it is said that this restrictive signification is not necessarily inherent in the word, and that it may, in proper cases, include artificial persons." Black's Law Dictionary, 4th & 6th Editions.[23]

The weight of authority, combined with the relevant statutory history, indicates that under most statutory schemes, including the TVPA, "individual" is equivalent to "person," which includes private corporations. Given the absolutely clear intent of Congress to have the TVPA applied as broadly as possible to reach a broad range of human rights abusers, this Court should construe "individual" in its broader sense to include corporations.

**F.    Plaintiffs Have Properly Alleged Pendant State Law Claims.**

Plaintiffs have alleged that Chiquita's payments to and relationships with the terrorist groups also create liability under state tort law, and have filed claims based on wrongful death, negligence, intentional infliction of emotional distress, battery, and assault. Complaint ¶¶ 240-78. These claims are

---

[23]The 4th Edition of Black's Law Dictionary (at p. 913) refers the reader to *The State of Ohio v. Bell Telephone Co.*, 36 Ohio St. 296, 310 (1880), in which the Supreme Court of Ohio interpreted the word "individual" in a statute to be synonymous with "person" and thus to "embrace[] artificial or corporate persons as well as natural." The 6th Edition (at p.773), which is the last edition to contain the definition of the noun "individual" (as contrasted with the adjective) simply refers the reader to "person," a term which, under the law, normally refers to corporations as well as natural persons.

based on the same conduct as the federal claims, giving this Court jurisdiction of these pendant claims under 28 U.S.C. § 1367. As an initial matter, Plaintiffs have established the basis for holding Chiquita liable for the acts of the terrorist groups in sections C and D, *supra*, where Plaintiffs demonstrate that they have properly alleged aiding and abetting, conspiracy, and joint action and/or agency. Any of these theories of liability would support Plaintiffs' state law claims for intentional torts.[24]

Defendants raise two other arguments for dismissal of Plaintiffs' state law claims. Defs. Mem. 41-45. First, Defendants assert that the law of the District of Colombia cannot be applied extraterritorially. On this, Defendants confuse choice of law principles with extraterritorial application of state law. Second, Defendants assert that the statute of limitations has expired on most of the state law claims. In raising this affirmative defense, Defendants ignore principles of accrual and equitable tolling, both factually-intensive issues not appropriate for resolution on a motion to dismiss. Both of these doctrines apply to Plaintiffs' claims here.

Defendants ignore Judge Oberdorfer's opinion in *Exxon* in which he permitted Plaintiffs' to pursue their state law claims against Exxon for wrongful death, assault, battery, false imprisonment, and negligent hiring for injuries that occurred in Aceh, Indonesia. In ruling that the law of the forum, the District of Colombia, applied to all of the state law claims except wrongful death, Judge Orberdorfer stated that "***the United States, the leader of the free world, has an overarching, vital interest in the***

---

[24] With respect to lower standard applicable to negligence, there is no question that Chiquita was reckless and negligent in hiring terrorist groups knowing of their violent histories. *See Doe I v. Exxon Mobil Corporation*, Slip Opp at 3 (D.D.C. March 2, 2006)(Ex 10) at 5-6 (hiring Indonesian military to provide security, knowing of past human rights abuses, sufficient for claims on negligent supervision). Further, failing to take appropriate measures once the violations became clear is itself a basis for liability. *See, e.g.*, *Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C. Cir. 1988); *Daskalea v. D.C.*, 227 F.3d 433, 441 (D.C. Cir. 2000).

*safety, prosperity, and consequences of the behavior of its citizens, particularly its super-corporations conducting business in one or more foreign countries*." *Exxon Mobil,* Slip Opp at 3 (Ex. 10)(emphasis added). That decision was correct in its application of DC choice of law rules, which permit Plaintiffs to pursue their state law claims against Chiquita.

### 1.   DC law governs Plaintiffs' state tort claims except for their wrongful death claims, which are governed by New Jersey law.

Defendants confuse extraterritoriality with choice of law. Surely they are not arguing that there is ***no*** law that can be applied to them for the state law torts. In each case involving state law violations that occurred in a place other than the forum, the issue is, based on the choice of law rule of the forum, what state law should be applied. In this case, and consistent with Judge Oberdorfer's opinion in *Exxon Mobil*, under DC choice of law rules, DC law, as the law of the forum, applies to all Plaintiffs' claims except wrongful death.[25]  With respect to Plaintiffs' wrongful death claim, District of Columbia law conflicts with the law of New Jersey, the state of Chiquita's incorporation, and under the choice of law rules, New Jersey law applies to that claim.

When a federal district court is applying state law, it looks to the forum state's choice of law provision to determine the substantive law to apply.  *See Y.W.C.A. v. Allstate Ins. Co*., 275 F.3d 1145, 1150 (D.C. Cir. 2002) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  Thus, the DC's choice of law provisions determine which state's laws should apply to Plaintiffs' claims.

---

[25] In sharp contrast, Alabama, the example from the *Drummond* case cited by Defendants for the erroneouss proposition that state law ***never*** applies extraterritorially, Defs. Mem. at 42, does not apply its law to injuries that occur outside the state. Alabama, as per its own Supreme Court's description, is one of the few jurisdictions that continues to recognize the *lex loci delicti* rule and applies the law of where the injury occurred. *Fitts v. Minnesota Mining & Mfg. Co.*, 581 So.2d 819, 823-24 (Ala. 1991).

Under DC choice of law rules, a court must first determine whether there is a conflict in the potentially applicable legal standards of the forum state and other possibly relevant jurisdictions. *Y.W.C.A.*, 275 F.3d at 1150; *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985); *Wright v. Sony Pictures*, Civ. A. No. 03-2083 (JDB), 2005 WL 2692487, at *3 (D.D.C. Feb. 24, 2005). "*Only if such a conflict exists* must the court then determine, pursuant to District of Columbia choice of law rules, which jurisdiction has the more substantial interest in the resolution of the issues." *Y.W.C.A.*, 275 F.3d at 1150 (emphasis added). *See also Wright*, 2005 WL 2692487, at *3; *Duncan v. GEW, Inc.,* 526 A.2d 1358, 1363 (App. D.C. 1987). If there is no conflict, the court applies the law of the forum state. *Y.W.C.A.*, 275 F.3d at 1150*; DAG Enters., Inc. v. Exxon Mobil Corp.*, No. Civ. A. 00-0182 (CKK), 2001 WL 34778782, at *6 (D.D.C. Sept. 30, 2001) (applying District of Columbia law to two common law claims because laws of relevant states "are virtually the same"); *In re Air Crash Disaster,* 559 F. Supp. 333, 343 n.10 (D.D.C. 1983) ("When the laws of the various jurisdictions are not in conflict, for reasons of judicial efficiency the law of the forum may be applied.").

The Court may apply different jurisdictions' laws to different claims, depending on whether a conflict with the forum state exists and, if it does, whether the state with the conflicting law has a more substantial interest than the forum state in the resolution of the particular claim at issue. *See Exxon*, Slip Opp (Ex. 10) at 2; *DAG Enters.*, 2001 WL 34778782, at *5-6 (applying D.C. law to two claims, but holding another state's law would apply to third); *In re Air Crash Disaster*, 559 F. Supp. at 341; *Hercules & Co. v. Shama Restaurant Corp.*, 566 A.2d 31, 40 (App. D.C. 1989) *Stutsman v. Kaiser Found. Health Plan*, 546 A.2d 367, 373 (App. D.C. 1988).

The other U.S. state that has an interest in this litigation is New Jersey. With respect to Plaintiffs' state law claims other than their wrongful death claims, including negligence, intentional

40

infliction of emotional distress, battery, and assault, there is no material conflict between DC law and New Jersey law. Accordingly, DC law applies to Plaintiffs' state law claims other than wrongful death. *See In re Air Crash Disaster*, 559 F. Supp. at 343 n.10. Defendants did not address this, and it is their burden, if challenging the application of the law of the forum, to demonstrate the conflict. *See Rymer v. Pool*, 574 A.2d 283, 285 (App. D.C. 1990).

With respect to Plaintiffs' wrongful death claims, DC law conflicts with New Jersey law. DC's wrongful death statute provides a cause of action only for injuries that occurred within the District and resulted in death. D.C. Code § 16-2701. Because the injuries for which Plaintiffs claim wrongful death did not occur in the District, these claims are not cognizable under DC law. In contrast, the wrongful death statute in New Jersey does not restrict claims to injuries that occurred in that state. N.J. Stat. Ann. § 2A:31-1 (2005).

To determine which jurisdiction's law applies to Plaintiffs' wrongful death claim, the Court must determine which jurisdiction, New Jersey or DC,[26] has a more substantial interest. *Jaffe v. Pallotta Teamworks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004). *See also Wright*, 2005 WL 2692487; *District of Columbia v. Coleman*, 667 A.2d 811, 816 (App. D.C. 1995). In assessing a state's relative interest in

---

[26] The Court is under no obligation to apply Colombian law to Plaintiffs' claims, particularly because, if Chiquita seeks to do so, it has the burden of proving a material conflict with the law of the forum, and that Colombia has a greater interest than New Jersey, something it has not even attempted. *See Rymer,* 574 A.2d at 285. *See also Oparaugo v. Watts*, 884 A.2d 63, 69-70 (App. D.C. 2005); Restatement (Second) of Conflicts § 136, comment h, at 378-379 (1971)) ("Where either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own law except when to do so would not meet the needs of the case, or would not be in the interests of justice."). Thus, wholly apart from other considerations, the absence of a conflict precludes the application of Colombian law, and the Court applies the law of the forum, DC. *See Rymer*, 574 A.2d at 285. Further, as Judge Oberdorfer found in *Exxon*, the "United States has an overriding interest applying its own laws to defendants, all of whom are U.S. companies." Slip Opp (Ex. 10), at 3.

having its tort laws applied to the claims in question, courts further look to the Restatement of Conflicts of Law's four part contact test, which considers "(1) 'the place where the injury occurred,' (2) 'the place where the conduct causing the injury occurred,' (3) 'the domicile, residence, nationality, place of incorporation and place of business of the parties,' and (4) 'the place where the relationship is centered.'" *Jaffe*, 374 F.3d at 1227. This approach "guides the Court in choosing the jurisdiction whose policy 'would be most advanced by having its law applied to the facts of the case under review.'" *DAG Enters.*, 2001 WL 34778782, at *4 (citation omitted). *See also Biscoe v. Arlington Co.*, 738 F.2d 1352, 1361 (D.C. Cir. 1984) (quoting Restatement (Second) of Conflict of Laws § 146)); *Long v. Sears Roebuck & Co.,* 877 F. Supp. 8, 10 (D.D.C. 1995).

Courts have repeatedly held that a jurisdiction has a strong interest in enforcing tort laws against businesses incorporated in that state or doing business in that state. *See McLennan v. Am. Eurocopter Corp.,* 245 F.3d 403, 426 (5th Cir. 2001). *See also Lony v. E.I. Du Pont DeNemours & Co.*, 886 F.2d 628, 641 (3d Cir. 1989). Because Chiquita was incorporated in New Jersey at all times relevant to this suit, and is still incorporated in New Jersey, Complaint ¶ 8, New Jersey has a substantial interest in seeing that its wrongful death statute is enforced with respect to Chiquita. *Lony,* 886 F.2d at 641. This interest outweighs that of D.C., in which Chiquita operates, but is not incorporated. *Id.*

Because there is no conflict between DC and New Jersey law with respect to Plaintiffs' claims other than their wrongful death claims, the law of the forum, DC, applies to these claims. New Jersey law applies to Plaintiffs' wrongful death claims because its interest in enforcing its wrongful death statute against Chiquita is more substantial than D.C.'s interest.[27] *See Exxon*, Slip Opp (Ex.10), at 4

---

[27] In the alternative, Ohio law may also apply to Plaintiffs' wrongful death claims. The Ohio wrongful death statute is similar to New Jersey's and thus also conflicts with DC's wrongful death statute. *See* Ohio Rev. Code Ann. § 2125.01. Chiquita's principal place of

42

(finding that DC law applies to all of the state law claims except wrongful death, and for that applying the law of Delaware, the state of Exxon's incorporation).

### 2.     Plaintiffs' state law claims are not barred by any statute of limitations.

As a last resort to dismiss the state law claims, Defendants hang their hat on the statute of limitations. Defs. Mem. 45. Once again, Defendants make their argument without disclosing the actual facts. Plaintiffs can raise both the factual issues of accrual and equitable tolling because there is no question that Chiquita concealed its illegal payments to the terrorist groups and Plaintiffs had no way to know that Chiquita had a major role in their injuries until the criminal prosecution was made public with the Information filed on March 13, 2007. These issues of fact are particularly inappropriate to resolve on a dismissal motion. Dismissal "is not appropriate in a case applying the discovery rule if there is a genuine issue of material fact as to when, through the exercise of due diligence, the plaintiff knew or should have known of her injury." *Byers v. Burleson*, 713 F.2d 856, 861 (D.C. Cir 1983); *Burns v. Bell*, 409 A.2d 614 (D.C. 1979).

### a.     Plaintiffs' causes of action did not accrue until they knew they could sue Chiquita.

Chiquita admitted in its March 19, 2007 Proffer that it concealed its payments to AUC from public review by calling the payments "security services" and listing the as the payee various "*convivirs*," which, Chiquita admits, were front groups for the AUC. Ex. 1 at 5-6, ¶¶ 21-23. Plaintiffs therefore did not have the possibility of notice of Chiquita's role in supporting the terrorist groups until March 13, 2007, when the Information was filed. This is the date of accrual for their claims. *Reese v. Geneva Enters.*, 1997 U.S. Dist. LEXIS 5727, *23-25 (criminal indictment places plaintiff on notice

---

business is in Ohio. Complaint  ¶ 8, and thus Ohio also has a substantial interest in the resolution of Plaintiffs' wrongful death claims.  *Lony,* 886 F.2d at 641.

and begins the limitations period within which plaintiff must file his cause of action). *See also Sprint Communications Company, L.P. v. FCC*, 76 F.3d 1221, 1226 (D.C. Cir. 1996)(statute of limitations does not begin to run on a cause of action when "the defendant took 'some misleading, deceptive or otherwise contrived action' to conceal information material to the plaintiff's claim.")(citing *Hobson v. Wilson*, 737 F.2d 1, 34 (D.C. Cir. 1984)). *Tomera v. Galt*, 511 F.2d 504, 510 (7th Cir. 1975)(finding fraudulent concealment where mining companies' records concealed illegal disbursement of funds.).

The discovery rule "tolls the running of the statute of limitations until the plaintiff knows or should know all the material facts essential to show the elements of his cause of action." *Byers*, 713 F.2d at 861. Plaintiffs, living in rural Colombia, had no ability to investigate Chiquita's role in their injuries, and did not learn of it until the Information was filed March 13, 2007 and the story became an international news item.  It is Defendants' burden to demonstrate that Plaintiffs knew or should have known before the public disclosure. *Sprint Communications Company,* 76 F.3d at 1226.

### b.    Principles of equitable tolling toll the limitations period.

Chiquita's concealment of the payments to the AUC, discussed above, also provides grounds for equitable tolling. "If a court determines that a party has fraudulently concealed the existence of a cause of action, the limitations period shall be tolled until plaintiff knows, or by exercise of due diligence should know, that he may have a cause of action. *Monroe v. Williams*, 705 F. Supp. 621, 626-27 (D. D.C. 1998)(citing *Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992, 995 (D.C. 1978)). "Equitable estoppel in the statute of limitations context prevents a defendant from asserting untimeliness where the defendant has taken active steps to prevent the plaintiff from litigating in time." *Currier v. Radio Free Europe/Radio Liberty*, 159 F.3d 1363, 1367 (D.C. Cir. 1998).

44

In addition, Chiquita's substantial payments to the AUC allowed the AUC to maintain control of the area where Plaintiffs resided, exposing them to violent retaliation if they had even attempted to complain about the AUC. The lack of safe access to justice is an additional basis for equitable tolling. *See* NCGUB, 176 F.R.D. at 360 (equitable tolling applied for the period during which plaintiffs were "unable to obtain access to judicial review in Burma."). *See also Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F. Supp.2d 230, 242 (2005)(applying equitable tolling principles); *Phillips v. Heine*, 984 F.2d 489, 491 (D.C. Cir. 1993). Here, Plaintiffs first had access to justice in June, 2007, when they first met counsel in this action and learned that they could file a case in U.S. federal court using pseudonyms to protect them from violent retaliation.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' dismissal motion in its entirety.

Respectfully submitted this 15th day of January, 2008,


By: /Terry Collingsworth/
/Terry Collingsworth
International Rights Advocates
218 D Street S.E. (Third Floor)
Washington, D.C. 20003
Telephone: 202-543-5811
Email: tc@iradvocates.org
**ATTORNEYS FOR PLAINTIFFS**

**Certificate of Service**

I hereby certify that true and correct copies of Plaintiffs' Memorandum in Opposition to

Defendants' Motion to Dismiss were served upon:

James McMackin Garland
John E. Hall
Eric H. Holder
COVINGTON & BURLING
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
jgarland@cov.com

jhall@cov.com

eholder@cov.com

Date: January 15, 2008

Rebecca Pendleton

46