**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JANE / JOHN DOES 1-144**<br><br>                            **Plaintiffs,**<br><br>                **v.**<br><br>**CHIQUITA BRANDS INTERNATIONAL,<br>INC. and DAVID DOES 1-10**<br><br><br>                            **Defendants.** | **Case No.: 1:07-cv-01048-PLF** |

**DECLARATION OF TERRY COLLINGSWORTH IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

I, Terry Collingsworth, declare under penalty of perjury of the laws of the United States as follows:

1. I am an attorney with International Rights Advocates, counsel of record in this litigation for the Plaintiffs. I am submitting the following materials, attached hereto, to support Plaintiffs' Opposition to Defendants' Motion to Dismiss.

2. Attached hereto as **Exhibit 1** is a true and correct copy of the Chiquita Factual Proffer ("Proffer"), which Chiquita stipulated to on March 13, 2007, and that was filed with the criminal court (No. 07-055) on March 19, 2007.

3. Attached hereto as **Exhibit 2** is a true and correct copy of the Government's Sentencing Memorandum ("Sentencing Memo"), which was filed in the criminal court (No. 07-055) on September 17, 2007.

4. Attached hereto as **Exhibit 3** is a true and correct copy of a list, generated by my review of the Complaint, of the 45 Doe Plaintiffs who allege that their family members were murdered by FARC.

5. Attached hereto as **Exhibit 4** is a true and correct copy of the U.S. Department of State's Colombia Country Report on Human Rights Practices for 1997.

6. Attached hereto as **Exhibit 5** is a true and correct copy of the U.S. Department of State's Colombia Country Report on Human Rights Practices for 2001.

7. Attached hereto as **Exhibit 6** is a true and correct copy of the Human Rights Watch report from 2000, ***The Ties That Bind: Colombia and Military-Paramilitary Links.*** The Report is referenced in the Complaint at ¶ 4.

8. Attached hereto as **Exhibit 7** is a true and correct copy, as well as a certified translation of, a September 20, 2007 news release by the Colombian government reported by *Agenpress*.

9. Attached hereto as **Exhibit 8** is a true and correct copy of a March 20, 2007 article in the ***Washington Post*** by Juan Forero and titled, *Colombia Unravels Government-Paramilitary Ties*.

10. Attached hereto as **Exhibit 9** is a true and correct copy of an *amici curiae* brief filed by a group of international law scholars ("Scholars' Brief"), in the appeal of *Khulumani v. Barclay National Bank Ltd.*, 504 F. 3d 254 (2d Cir, 2007).

11. Attached hereto as **Exhibit 10** is a true and correct copy of Judge Oberdorfer's opinion on state law claims in *Doe I v. Exxon Mobil Corporation*, Slip Opp at 3 (D.D.C. March 2, 2006).

Executed in Washington, D.C. on the 15th day of January, 2008

Terry Collingsworth

**Certificate of Service**

I hereby certify that a true and correct copy of Plaintiffs' Declaration by Terry Collingsworth in

Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss was served upon:

James McMackin Garland
John E. Hall
Eric H. Holder
COVINGTON & BURLING
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
jgarland@cov.com

jhall@cov.com

eholder@cov.com

Date: January 15, 2008

Rebecca Pendleton

# EXHIBIT 1

**FILED**

MAR 19 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO.: *07-055* |
| | : | |
| v. | : | |
| | : | |
| CHIQUITA BRANDS | : | |
| INTERNATIONAL, INC., | : | |
| | : | *Let this be filed.* |
| Defendant. | : | *Royce C. Lamberth* |
| | | *U.S.D.J. 3/19/07* |

## FACTUAL PROFFER

Had this case gone to trial, the government would have proven beyond a reasonable doubt that:

### Defendant Chiquita Brands International, Inc.

1.    Defendant **CHIQUITA BRANDS INTERNATIONAL, INC. ("CHIQUITA")**, was a multinational corporation, incorporated in New Jersey and headquartered in Cincinnati, Ohio. Defendant **CHIQUITA** engaged in the business of producing, marketing, and distributing bananas and other fresh produce. Defendant **CHIQUITA** was one of the largest banana producers in the world and a major supplier of bananas throughout Europe and North America, including within the District of Columbia. Defendant **CHIQUITA** reported over $2.6 billion in revenue for calendar year 2003. Defendant **CHIQUITA** had operations throughout the world, including in the Republic of Colombia.

2.    C.I. Bananos de Exportación, S.A. (also known as and referred to hereinafter as "Banadex"), was defendant **CHIQUITA'S** wholly-owned Colombian subsidiary. Banadex produced bananas in the Urabá and Santa Marta regions of Colombia. By 2003, Banadex was defendant **CHIQUITA'S** most profitable banana-producing operation. In June 2004, defendant **CHIQUITA** sold Banadex.

**EXHIBIT**

A

## The AUC

3.     The United Self-Defense Forces of Colombia – an English translation of the Spanish name of the group, "Autodefensas Unidas de Colombia" (commonly known as and referred to hereinafter as the "AUC"), was a violent, right-wing organization in the Republic of Colombia. The AUC was formed in or about April 1997 to organize loosely-affiliated illegal paramilitary groups that had emerged in Colombia to retaliate against left-wing guerillas fighting the Colombian government. The AUC's activities varied from assassinating suspected guerilla supporters to engaging guerrilla combat units. The AUC also engaged in other illegal activities, including the kidnapping and murder of civilians.

4.     Pursuant to Title 8, United States Code, Section 1189, the Secretary of State of the United States had the authority to designate a foreign organization as a Foreign Terrorist Organization ("FTO") if the organization engaged in terrorist activity threatening the national security of the United States.

5.     The Secretary of State of the United States designated the AUC as an FTO, initially on September 10, 2001, and again on September 10, 2003. As a result of the FTO designation, since September 10, 2001, it has been a crime for any United States person, among other things, knowingly to provide material support and resources, including currency and monetary instruments, to the AUC.

6.     The International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*, conferred upon the President of the United States the authority to deal with threats to the national security, foreign policy and economy of the United States. On September 23, 2001, pursuant to this authority, President George W. Bush issued Executive Order 13224. This Executive Order

prohibited, among other things, any United States person from engaging in transactions with any foreign organization or individual determined by the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, to have committed, or posed a significant risk of committing, acts of terrorism that threaten the security of United States nationals or the national security, foreign policy or economy of the United States (referred to hereinafter as a "Specially-Designated Global Terrorist" or "SDGT"). This prohibition included the making of any contribution of funds to or for the benefit of an SDGT, without having first obtained a license or other authorization from the United States government.

7.    The Secretary of the Treasury promulgated the Global Terrorism Sanctions Regulations, 31 C.F.R. § 594.201, *et seq.*, implementing the sanctions imposed by Executive Order 13224. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, was the entity empowered to authorize transactions with an SDGT. Such authorization, if granted, would have been in the form of a license.

8.    Pursuant to Executive Order 13224, the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, designated the AUC as a Specially-Designated Global Terrorist on October 31, 2001. As a result of the SDGT designation, since October 31, 2001, it has been a crime for any United States person, among other things, willfully to engage in transactions with the AUC, without having first obtained a license or other authorization from OFAC.

### Relevant Persons

9.    Individual A was a high-ranking officer of defendant **CHIQUITA**.

-3-

10.    Individual B was a member of the Board of Directors of defendant **CHIQUITA** ("Board").

11.    Individual C was a high-ranking officer of defendant **CHIQUITA**.

12.    Individual D was a high-ranking officer of defendant **CHIQUITA**.

13.    Individual E was a high-ranking officer of defendant **CHIQUITA**.

14.    Individual F was a high-ranking officer of Banadex.

15.    Individual G was an employee of Banadex.

16.    Individual H was an employee of defendant **CHIQUITA**.

17.    Individual I was an employee of defendant **CHIQUITA**.

18.    Individual J was a high-ranking officer of defendant **CHIQUITA**.

**Defendant Chiquita's Payments to the AUC**

19.    For over six years – from in or about 1997 through on or about February 4, 2004 – defendant **CHIQUITA**, through Banadex, paid money to the AUC in the two regions of Colombia where it had banana-producing operations: Urabá and Santa Marta. Defendant **CHIQUITA** paid the AUC, directly or indirectly, nearly every month. From in or about 1997 through on or about February 4, 2004, defendant **CHIQUITA** made over 100 payments to the AUC totaling over $1.7 million.

20.    Defendant **CHIQUITA** had previously paid money to other terrorist organizations operating in Colombia, namely to the following violent, left-wing terrorist organizations: Revolutionary Armed Forces of Colombia – an English translation of the Spanish name of the group "Fuerzas Armadas Revolucionarias de Colombia" (commonly known as and referred to hereinafter as "the FARC"); and the National Liberation Army – an English translation of the Spanish name of

-4-

the group "Ejército de Liberación Nacional" (commonly known as and referred to hereinafter as "the ELN"). Defendant **CHIQUITA** made these earlier payments from in or about 1989 through in or about 1997, when the FARC and the ELN controlled areas where defendant **CHIQUITA** had its banana-producing operations. The FARC and the ELN were designated as FTOs in October 1997.

21.    Defendant **CHIQUITA** began paying the AUC in Urabá following a meeting in or about 1997 between the then-leader of the AUC, Carlos Castaño, and Banadex's then-General Manager. At the meeting Castaño informed the General Manager that the AUC was about to drive the FARC out of Urabá. Castaño also instructed the General Manager that defendant **CHIQUITA'S** subsidiary had to make payments to an intermediary known as a "convivir." Castaño sent an unspoken but clear message that failure to make the payments could result in physical harm to Banadex personnel and property. Convivirs were private security companies licensed by the Colombian government to assist the local police and military in providing security. The AUC, however, used certain convivirs as fronts to collect money from businesses for use to support its illegal activities.

22.    Defendant **CHIQUITA'S** payments to the AUC were reviewed and approved by senior executives of the corporation, to include high-ranking officers, directors, and employees. No later than in or about September 2000, defendant **CHIQUITA'S** senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño. An in-house attorney for defendant **CHIQUITA** conducted an internal investigation into the payments and provided Individual C with a memorandum detailing that investigation. The results of that internal investigation were discussed at a meeting of the then-Audit Committee of the then-Board of Directors in defendant **CHIQUITA'S** Cincinnati headquarters in or about September

-5-

2000. Individual C, among others, attended this meeting.

23.    For several years defendant **CHIQUITA** paid the AUC by check through various convivirs in both the Urabá and Santa Marta regions of Colombia. The checks were nearly always made out to the convivirs and were drawn from the Colombian bank accounts of defendant **CHIQUITA'S** subsidiary. No convivir ever provided defendant **CHIQUITA** or Banadex with any actual security services or actual security equipment in exchange for the payments, for example, security guards, security guard dogs, security patrols, security alarms, security fencing, or security training. Defendant **CHIQUITA** recorded these payments in its corporate books and records as "security payments" or payments for "security" or "security services."

24.    In or about April 2002, defendant **CHIQUITA** seated a new Board of Directors and Audit Committee following defendant **CHIQUITA'S** emergence from bankruptcy.

25.    Beginning in or about June 2002, defendant **CHIQUITA** began paying the AUC in the Santa Marta region of Colombia directly and in cash according to new procedures established by senior executives of defendant **CHIQUITA**. In or about March 2002, Individual C and others established new procedures regarding defendant **CHIQUITA'S** direct cash payments to the AUC. According to these new procedures:

(A) Individual F received a check that was made out to him personally and drawn from one of the Colombian bank accounts of defendant **CHIQUITA'S** subsidiary. Individual F then endorsed the check. Either Individual F or Individual G cashed the check, and Individual G hand-delivered the cash directly to AUC personnel in Santa Marta.

(B) Banadex treated these direct cash payments to the AUC as payments to Individual F, recorded the withholding of the corresponding Colombian tax liability, reported the payments to

-6-

Individual F as such to Colombian tax authorities, and paid Individual F's corresponding Colombian tax liability. This treatment of the payments made it appear that Individual F was being paid more money and thus increased the risk that Individual F would be a target for kidnapping or other physical harm if this became known.

(C) Individual F also maintained a private ledger of the payments, which did not reflect the ultimate and intended recipient of the payments. The private ledger only reflected the transfer of funds from Individual F to Individual G and not the direct cash payments to the AUC.

26.    On or about April 23, 2002, at a meeting of the Audit Committee of the Board of Directors in defendant **CHIQUITA'S** Cincinnati headquarters, Individual C described the procedures referenced in Paragraph 25. Individual A, Individual B, and Individual E, among others, attended this meeting.

## Designation of the AUC as a Foreign Terrorist Organization

27.    The United States government designated the AUC as an FTO on September 10, 2001, and that designation was well-publicized in the American public media. The AUC's designation was first reported in the national press (for example, in the Wall Street Journal and the New York Times) on September 11, 2001. It was later reported in the local press in Cincinnati where defendant **CHIQUITA'S** headquarters were located – for example, in the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001. The AUC's designation was even more widely reported in the public media in Colombia, where defendant **CHIQUITA** had its substantial banana-producing operations.

28.    Defendant **CHIQUITA** had information about the AUC's designation as an FTO specifically and global security threats generally through an Internet-based, password-protected

-7-

subscription service that defendant **CHIQUITA** paid money to receive. On or about September 30, 2002, Individual H, from a computer within defendant **CHIQUITA'S** Cincinnati headquarters, accessed this service's "Colombia – Update page," which contained the following reporting on the AUC:

> "US terrorist designation
>
> International condemnation of AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries in its annual list of foreign terrorist organizations. This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections."

**Defendant Chiquita Continued to Pay the AUC after the AUC was Designated as an FTO.**

29.    From on or about September 10, 2001, through on or about February 4, 2004, defendant **CHIQUITA** made 50 payments to the AUC totaling over $825,000. Defendant **CHIQUITA** never applied for nor obtained any license from the Department of the Treasury's Office of Foreign Assets Control with respect to any of its payments to the AUC.

30.    On or about September 12, 2001, Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $31,847.[1]

31.    On or about November 14, 2001, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $56,292.

32.    On or about December 12, 2001, Individual F and Individual G paid the AUC in

---

[1]    With respect to all statements in this Factual Proffer relating to payments by check, the "on or about" dates refer to the dates on which such checks cleared the bank, not the dates on which the checks were issued or delivered.

Urabá and Santa Marta by check in an amount equivalent to $26,644.

33.    On or about February 4, 2002, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $30,079.

34.    On or about March 7, 2002, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $25,977.

35.    On or about March 31, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in two equal payments in amounts equivalent to $3,689 each.

36.    On or about April 16, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $35,675.

37.    On or about May 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $10,888.

38.    On or about May 31, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in two equal payments in amounts equivalent to $3,595 each.

39.    In or about June 2002, Individual F and Individual G began making direct cash payments to the AUC in the Santa Marta region of Colombia according to the procedures referenced in Paragraph 25.

40.    On or about June 11, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in three payments in amounts equivalent to $4,764, $6,670, and $6,269, respectively.

41.    On or about June 14, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $31,131.

42.    On or about July 2, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $11,585.

43.     On or about July 9, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,917.

44.     On or about August 6, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $4,654.

45.     On or about August 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $27,841.

46.     On or about September 2, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $4,616.

47.     On or about October 7, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $8,026.

48.     On or about October 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $40,419.

49.     On or about November 8, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,164.

50.     On or about November 29, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,685.

51.     On or about December 9, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $47,424.

52.     On or about January 21, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,954.

53.     On or about January 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $22,336.

-10-

54.    On or about February 11, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,291.

**Defendant Chiquita Continued To Pay the AUC Against the Advice of Outside Counsel.**

55.    On or about February 20, 2003, Individual I stated to Individual C that Individual I had discovered that the AUC had been designated by the United States government as a Foreign Terrorist Organization. Shortly thereafter, Individual C and Individual I spoke with attorneys in the District of Columbia office of a national law firm ("outside counsel") about defendant **CHIQUITA'S** ongoing payments to the AUC.

56.    Beginning on or about February 21, 2003, outside counsel advised defendant **CHIQUITA**, through Individual C and Individual I, that the payments were illegal under United States law and that defendant **CHIQUITA** should immediately stop paying the AUC directly or indirectly. Among other things, outside counsel, in words and in substance, advised defendant **CHIQUITA**:

- "Must stop payments."
  (notes, dated February 21, 2003)

- "Bottom Line: CANNOT MAKE THE PAYMENT"
  "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
  "General Rule: Cannot do indirectly what you cannot do directly"
  "Concluded with: CANNOT MAKE THE PAYMENT"
  (memo, dated February 26, 2003)

- "You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia."
  (notes, dated March 10, 2003)

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
  (memo, dated March 11, 2003)

- "[T]he company should not make the payment."
  (memo, dated March 27, 2003)

57.    On or about February 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $17,434.

58.    On or about March 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $19,437.

59.    On or about April 3, 2003, Individual B and Individual C first reported to the full Board of Directors of defendant **CHIQUITA** that defendant **CHIQUITA** was making payments to a designated Foreign Terrorist Organization. A member of defendant **CHIQUITA'S** Board of Directors objected to the payments and recommended that defendant **CHIQUITA** consider taking immediate corrective action, to include withdrawing from Colombia. The Board agreed to disclose promptly to the Department of Justice the fact that defendant **CHIQUITA** had been making payments to the AUC.

60.    On or before April 4, 2003, according to outside counsel's notes concerning a conversation about defendant **CHIQUITA'S** payments to the AUC, Individual C said: "His and [Individual B's] opinion is just let them sue us, come after us. This is also [Individual A's] opinion."

61.    On or about April 8, 2003, Individual C and Individual D met at defendant **CHIQUITA'S** headquarters in Cincinnati with Individual F, Individual G, Individual H, and Individual I. According to the contemporaneous account of this meeting, Individual C and Individual D instructed Individual F and Individual G to "continue making payments" to the AUC.

62.    On or about April 24, 2003, Individual B and Individual C, along with outside counsel, met with officials of the United States Department of Justice, stated that defendant **CHIQUITA** had been making payments to the AUC for years, and represented that the payments

-12-

had been made under threat of violence. Department of Justice officials told Individual B and Individual C that defendant **CHIQUITA'S** payments to the AUC were illegal and could not continue. Department of Justice officials acknowledged that the issue of continued payments was complicated.

63.     On or about April 30, 2003, Individual B and Individual C told members of the Audit Committee of the Board of Directors and the outside auditors of defendant **CHIQUITA** about the meeting with Department of Justice officials on April 24, 2003. Individual B and Individual C said that the conclusion of the April 24th meeting was that there would be "no liability for past conduct" and that there had been "[n]o conclusion on continuing the payments."

64.     On or about May 5, 2003, according to the contemporaneous account of this conversation, Individual I instructed Individual F and Individual J to "continue making payments" to the AUC.

65.     On or about May 12, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,105.

66.     On or about May 21, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $47,235.

67.     On or about June 4, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,623.

68.     On or about June 6, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in two payments in amounts equivalent to $6,229 and $5,764, respectively.

69.     On or about July 14, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,139.

-13-

70.     On or about July 24, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $35,136.

71.     On or about August 8, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,822.

72.     On or about August 25, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $12,850.

73.     On or about September 1, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,963.

74.     On or about September 8, 2003, outside counsel advised defendant **CHIQUITA** in writing, through Individual C and Individual I, that: "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments."

75.     On or about October 6, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $18,249.

76.     On or about October 6, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $9,439.

77.     On or about October 24, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $30,511.

78.     On or about November 5, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,937.

79.     On or about December 1, 2003, Individual F and Individual G paid the AUC in Santa

Marta in cash in an amount equivalent to $6,337.

80.     On or about December 2, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $30,193.

81.     On or about December 4, 2003, Individual B and Individual C provided the Board of Directors additional details concerning defendant **CHIQUITA'S** payments to the AUC that had not previously been disclosed to the Board.  A member of defendant **CHIQUITA'S** Board of Directors responded to this additional information by stating: "I reiterate my strong opinion – stronger now – to sell our operations in Colombia."

82.     On or before December 4, 2003, defendant **CHIQUITA** created and maintained corporate books and records that did not identify the ultimate and intended recipient of the payments to the AUC in Urabá in calendar year 2003 as follows:

| Reporting Period | Description of recipient | Description of payment |
| --- | --- | --- |
| 1st Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security service." |
| 2nd Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security services." |
| 3rd Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security services." |

83.     On or about December 16, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $24,584.

84.     On or about December 22, 2003, Individual B sent an email to other Board members

on the subject of defendant **CHIQUITA'S** ongoing payments to the AUC, stating, among other things: "This is not a management investigation. This is an audit committee investigation. It is an audit committee investigation because we appear to [be] committing a felony."

85.     On or about January 9, 2004, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $10,630.

86.     On or about January 13, 2004, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $27,958.

87.     On or about February 4, 2004, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $4,795.

**Defendant Chiquita's Profits from its Colombian Banana-Producing Operations**

88.     According to defendant **CHIQUITA'S** records, from September 10, 2001, through in or about January 2004, defendant **CHIQUITA** earned no more than $49.4 million in profits from its Colombian banana-producing operations.

JEFFREY A. TAYLOR
United States Attorney
for the District of Columbia
D.C. Bar No. 498610

By:

Jonathan M. Malis
D.C. Bar No. 454548
Denise Cheung
D.C. Bar No. 451714
Assistant United States Attorneys
(202) 305-9665
Jonathan.M.Malis@usdoj.gov

-16-

Stephen Ponticiello
PA Bar No. 44119
Department of Justice Trial Attorney
Counterterrorism Section

Dated: March 13, 2007

## Defendant's Stipulation and Signature

I am the Chairman of the Board of Directors, President, and Chief Executive Officer of Chiquita Brands International, Inc. I am authorized by Chiquita Brands International, Inc., to act on its behalf in this matter.

On behalf of Chiquita Brands International, Inc., after consulting with its attorneys and pursuant to the plea agreement entered into this day with the United States, I hereby stipulate that the above statement of facts is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Chiquita Brands International, Inc.

_3/12/2007_
Date

By: _Fernando Aguirre_
Chairman of the Board of Directors, President, and Chief Executive Officer of Chiquita Brands International, Inc.

## Attorney's Acknowledgment

I am counsel for Chiquita Brands International, Inc. I have carefully reviewed the above statement of facts with my client. To my knowledge, the decision to stipulate to these facts is an informed and voluntary one.

_3-13-07_
Date

Eric H. Holder, Jr., Esq.
Counsel for Chiquita Brands International, Inc.

-17-

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CRIMINAL NO.: 07-055 (RCL) |
| v. | : | |
| | : | |
| CHIQUITA BRANDS | : | Sentencing: September 17, 2007 |
| INTERNATIONAL, INC., | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S SENTENCING MEMORANDUM

I.      INTRODUCTION

In March of this year, Chiquita Brands International, Inc. ("Chiquita" or "Company"),

entered into a written plea agreement with the United States of America as part of an ongoing

criminal investigation into payments that defendant Chiquita made to a federally-designated

terrorist organization known as the AUC. Defendant Chiquita agreed to plead guilty to a one-

count criminal Information that charged the Company with the felony of Engaging in

Transactions with a Specially-Designated Global Terrorist. As a basis for its guilty plea,

defendant Chiquita admitted as true the facts set forth in the Factual Proffer submitted in support

of the guilty plea. Defendant Chiquita also agreed to cooperate in the ongoing investigation.

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the United States and defendant

Chiquita agreed that, with the Court's approval, the Company should be sentenced to a criminal

fine of $25 million and corporate probation of five years.

At a hearing on March 19, 2007, the United States and defendant Chiquita presented the

plea agreement to the Court for its approval. Through its General Counsel, James E. Thompson,

Esq.,[1] defendant Chiquita admitted its guilt and pled guilty. The Court provisionally accepted the

---

[1]      Mr. Thompson appeared at the plea hearing on behalf of defendant Chiquita. The
plea agreement and the Factual Proffer were executed by Fernando Aguirre, Chairman of the

plea agreement at that time. The Court deferred final acceptance of the plea agreement until the date of the sentencing hearing, which is now scheduled for Monday, September 17, 2007, at 10 a.m.

The United States respectfully recommends that the Court accept the parties' written plea agreement pursuant to Rule 11(c)(1)(C) and sentence defendant Chiquita to a criminal fine of $25 million and corporate probation of five years.

## II.    THE OFFENSE CONDUCT

### A.    Summary

For over six years – from sometime in 1997 through February 4, 2004 – defendant Chiquita, through its wholly-owned Colombian subsidiary, paid money to a violent, right-wing terrorist organization in the Republic of Colombia, known as the "Autodefensas Unidas de Colombia" or "AUC." The AUC was formed around April 1997 to organize loosely-affiliated illegal paramilitary groups that had emerged in Colombia to retaliate against left-wing guerillas fighting the Colombian government. Defendant Chiquita paid the AUC, directly or indirectly, nearly every month. From 1997 through February 4, 2004, defendant Chiquita made over 100 payments to the AUC totaling over $1.7 million.

From around 1989 through 1997, defendant Chiquita paid money to two violent, left-wing terrorist organizations in Colombia, namely the FARC and the ELN.[2] Thus, defendant Chiquita paid money to Colombian terrorist organizations for approximately fifteen years.

_____

Board of Directors, President, and Chief Executive Officer of defendant Chiquita.

[2]    The FARC and the ELN were federally-designated as Foreign Terrorist Organizations in October 1997. There is no evidence that defendant Chiquita made any payments to the FARC or the ELN after those terrorist groups were designated as FTOs.

Defendant Chiquita continued to pay the AUC even after the payments were brought directly to the attention of its senior executives during a Board meeting held in September 2000. Defendant Chiquita continued to pay the AUC after the United States designated the AUC as Foreign Terrorist Organization on September 10, 2001, and as a Specially-Designated Global Terrorist on October 30, 2001. Defendant Chiquita continued to pay the AUC after gaining direct knowledge of the AUC's designation as a Foreign Terrorist Organization in September 2002.

Defendant Chiquita continued to pay the AUC even after its outside counsel emphatically and repeatedly advised the Company, beginning in late February 2003, to stop the payments. Defendant Chiquita continued to pay the AUC after Department of Justice officials admonished the Company, on April 24, 2003, that the payments were illegal and could not continue. Defendant Chiquita continued to pay the AUC after the same outside counsel advised the Company, on September 8, 2003, that the Department of Justice had given no assurances that the Company would not be prosecuted for making the payments. Defendant Chiquita continued to pay the AUC even after one of its directors acknowledged in an internal email, on December 22, 2003, that "we appear [to] be committing a felony."

Not all of defendant Chiquita's executives agreed with the Company's course of action. For example, upon first learning of the payments at a Board meeting on April 3, 2003, one director objected to the payments and recommended that defendant Chiquita consider taking immediate corrective action, to include withdrawing from Colombia. Moreover, within one month of his arrival as defendant Chiquita's new Chief Executive Officer in January 2004, Fernando Aguirre decided that the payments had to stop. According to an internal document, Mr.

Aguirre stated: "At the end of the day, if extortion is the modus operandi in Colombia or any other country, we will withdraw from doing business in such a country."

### B.    Inception of the Payments to the AUC

Starting sometime in 1997, defendant Chiquita made payments to two different components of the AUC in the Urabá and Santa Marta regions, where defendant Chiquita had its Colombian operations. Defendant Chiquita made these payments through its wholly-owned Colombian subsidiary, C.I. Bananos de Exportación, S.A. ("Banadex").[3]

Defendant Chiquita began paying the AUC in Urabá following a meeting sometime in 1997 between Carlos Castaño, the leader of the AUC, and the general manager of Banadex. Castaño advised that the AUC was about to drive the FARC out of the Urabá region and instructed defendant Chiquita's subsidiary to make payments to the AUC through an intermediary known as a "*convivir*."[4] Castaño sent an unspoken but clear message that failure to make the payments could result in physical harm to Banadex personnel and property. Within a few months after the AUC drove the FARC out of Urabá, and following a demand made by an AUC intermediary, defendant Chiquita began paying the AUC in Urabá by check through a *convivir*. The AUC demanded payment based on a formula tied to the production of bananas. Defendant Chiquita quickly routinized the payments. Sometime in 1998 or 1999, following a similar instruction, defendant Chiquita began making payments to the AUC in the Santa Marta region.

---

[3]    Defendant Chiquita's payments to the FARC and the ELN had been in those same regions.

[4]    "*Convivirs*" were private security companies licensed by the Colombian government to assist the local police and military in providing security. Notwithstanding their intended purpose and apparent legal authority under Colombian law, the AUC used certain *convivirs* as fronts to collect money from businesses for use to support its illegal activities.

For several years defendant Chiquita paid the AUC by check through various *convivirs* in both the Urabá and Santa Marta regions. The checks were nearly always made out to the *convivirs* and were drawn from the Colombian bank accounts of defendant Chiquita's subsidiary. No *convivir* ever provided defendant Chiquita or Banadex with any actual security services or actual security equipment in exchange for the payments, such as, security guards, security guard dogs, security patrols, security alarms, security fencing, or security training. Defendant Chiquita recorded these payments in its corporate books and records as "security payments," payments for "security," or "security services."

From the outset, officers of defendant Chiquita and Banadex recognized that the payments to the AUC were illicit, even though they were being made through a *convivir*. These officers also assumed that the payments were a necessary and acceptable cost of doing business in Colombia. For example, in early 1997, according to a contemporaneous, written account, one officer of defendant Chiquita remarked about the payments: "Cost of doing business in Colombia – maybe the question is not why are we [Chiquita] doing this but rather we [Chiquita] are in Colombia and do we [Chiquita] want to ship bananas from Colombia." In June 1997, a senior officer of Banadex approved a *convivir* payment with the written comment: "No alternative. But next year needs to be less."

**C.    Knowledge of Defendant Chiquita's Senior Officers and Directors**

Defendant Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including high-ranking officers, directors, and employees. No later than September 2000, defendant Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño. An in-house attorney for defendant Chiquita conducted an internal investigation into

5

the payments in August 2000 and prepared a memorandum detailing that investigation. The memorandum made clear that the *convivir* was merely a front for the AUC and described the AUC as a "widely-known, illegal vigilante organization."

The in-house attorney presented the results of his investigation to the Audit Committee of the Board of Directors during a meeting in defendant Chiquita's Cincinnati headquarters in September 2000. According to contemporaneous notes of the meeting, defendant Chiquita's ongoing payments to the AUC were described as "not a voluntary decision (extortion)" and Carlos Castaño was named as the "*convivir* leader." According to the notes, one director responded to the presentation by asking: "Can we reduce [the] amount per box?" There was no recorded discussion about whether to stop the payments or whether to report the payments to any United States or Colombian authorities.[5] Notwithstanding the knowledge of senior officers and directors that the Company was making regular payments to a violent, paramilitary organization, defendant Chiquita continued to make payments to the AUC for another three and a half years.

### D.    Defendant Chiquita's Knowledge of U.S. Law Designations Criminalizing the AUC Payments

On September 10, 2001, the AUC was designated as a Foreign Terrorist Organization ("FTO") by the United States Department of State, making defendant Chiquita's payments to the AUC illegal under the material support statute, 18 U.S.C. § 2339B. On October 31, 2001, the AUC was designated as a Specially-Designated Global Terrorist by the United States Department of the Treasury's Office of Foreign Assets Control, making the payments illegal under the

---

[5]    Prior to the meeting with Department of Justice officials on April 24, 2003, defendant Chiquita had never reported any AUC demands to any department or component of the United States government or the Colombian government. As of the date of that meeting, defendant Chiquita had made over 90 payments to the AUC totaling close to $1.4 million.

International Emergency Economic Powers Act, 50 U.S.C. § 1705(b), and the underlying Global

Terrorism Sanctions Regulations, 31 C.F.R. § 594.204.

Defendant Chiquita had information about the AUC's designation as an FTO from the

public media. The AUC's designation was first reported in the national press, for example, in the

Wall Street Journal and the New York Times on September 11, 2001. It was later reported in the

local press in Cincinnati where defendant Chiquita's headquarters are located – for example, in

the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001. The

AUC's designation was even more widely reported in the public media in Colombia, where

defendant Chiquita had its substantial banana-producing operations.

In addition to these widely-circulated reports, defendant Chiquita had knowledge of the

AUC's designation as an FTO specifically, and global security threats generally, through an

Internet-based, password-protected security information service to which defendant Chiquita

subscribed. The security service's website reported on the AUC's designation as an FTO when

that designation first occurred. The security service was able to provide data establishing that an

employee of defendant Chiquita – using defendant Chiquita's password – accessed the service's

"Colombia – Update page" from the Company's Cincinnati headquarters on September 20,

2002.[6] At that time, the web page displayed the following reporting on the AUC:

> "US terrorist designation
> International condemnation of AUC human rights abuses culminated in 2001 with
> the US State Department's decision to include the paramilitaries in its annual list of
> foreign terrorist organizations. This designation permits the US authorities to
> implement a range of measures against the AUC, including denying AUC members
> US entry visas; freezing AUC bank accounts in the US; and barring US companies
> from contact with the personnel accused of AUC connections."

---

[6]     The security service does not maintain subscriber access data prior to the summer
of 2002.

**E.     Continuing Payments to the AUC and Misuse of General Manager's Fund**

Defendant Chiquita's payments to the AUC were reported to the Audit Committee of the Board of Directors on a quarterly basis. Throughout the duration of the payments to the AUC in Urabá, defendant Chiquita reported them in its books and records as "security payments" or payments for "security services" to a specifically-named *convivir*, even after it was clear to senior officers and directors that no *convivir* was providing defendant Chiquita or Banadex with any security services in Colombia and the *convivirs* were simply fronts for a terrorist organization.

In late March 2002, in response to a new AUC demand,[7] senior officers of defendant Chiquita established new procedures for paying the AUC in Santa Marta directly and in cash and keeping a private ledger of these cash payments. The procedures involved paying a senior officer of Banadex additional "income" from the Banadex general manager's fund. That money, in turn, was provided to an employee of Banadex, who delivered the cash directly to AUC personnel in Santa Marta. The senior Banadex officer reported this additional "income" on his Colombian tax return, and Banadex increased the payments to him to cover this additional personal tax liability. This made it appear that the senior Banadex officer was more highly paid and thus increased the risk that he would be a target for kidnapping or other physical harm.

On April 23, 2002, these new procedures were reviewed at a meeting of the Audit Committee of the Board of Directors in defendant Chiquita's Cincinnati headquarters. The procedures were implemented beginning in June 2002.

---

[7]     Defendant Chiquita changed its method of payment to the AUC in Santa Marta several times. Initially, defendant Chiquita paid the AUC through a *convivir* located in Santa Marta. Later, defendant Chiquita made combined payments to a *convivir* in Urabá, with the payments shared between the AUC components in Urabá and Santa Marta. Eventually, the AUC in Santa Marta demanded direct cash payments.

Defendant Chiquita's corporate books and records never reflected that the ultimate and intended recipient of these funds was the AUC. With respect to the payments to the AUC in Urabá, the books and records only identified payments to various *convivirs*. With respect to the payments to the AUC in Santa Marta, the private ledger only identified the transfer of funds from the senior Banadex officer to the Banadex employee.

### F.    Outside Counsel's Advice: Must Stop the Payments

On February 20, 2003, a senior officer of defendant Chiquita was told that the AUC had been designated as an FTO. Within days, other senior executives of defendant Chiquita were told of the FTO designation. Beginning on February 21, 2003, defendant Chiquita's outside counsel repeatedly advised the Company to stop making the payments because they were illegal under U.S. law, principally the material support statute, 18 U.S.C. § 2339B.

Outside counsel's advice was memorialized in a series of contemporaneous memoranda and notes. Among other things, outside counsel advised defendant Chiquita:

- "<u>Must</u> stop payments."
  (notes, dated February 21, 2003)

- "<u>Bottom Line: CANNOT MAKE THE PAYMENT</u>"
  "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
  "General Rule: Cannot do indirectly what you cannot do directly"
  "Concluded with: CANNOT MAKE THE PAYMENT"
  (memo, dated February 26, 2003)

- "You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia."
  (notes, dated March 10, 2003)

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
  (memo, dated March 11, 2003)

- "[T]he company should not make the payment."
  (memo, dated March 27, 2003)

9

Notwithstanding outside counsel's advice, defendant Chiquita made payments to the AUC in late February and late March 2003.

On April 3, 2003, the full Board of Directors was advised for the first time that defendant Chiquita was making payments to a designated Foreign Terrorist Organization. One director objected to the payments and recommended that defendant Chiquita consider taking immediate corrective action, to include withdrawing from Colombia. That recommendation was not followed.[8] Instead, the Board agreed to disclose promptly to the Department of Justice the fact that defendant Chiquita had been making payments to the AUC.

The following day, on April 4, 2003, according to outside counsel's contemporaneous notes concerning a conversation about defendant Chiquita's payments to the AUC, a senior officer of defendant Chiquita said: "His and [a director's] opinion is just let them sue us, come after us. This is also [a senior officer's] opinion." Four days later, senior officers of defendant Chiquita instructed their subordinates to "continue making payments" to the AUC.

**G.      The Department of Justice's Admonition: The Payments are Illegal**

On April 24, 2003, senior executives of defendant Chiquita, along with outside counsel, met with officials of the United States Department of Justice, stated that defendant Chiquita had been making payments to the AUC for years, and represented that the payments had been made under threat of violence. Department of Justice officials told the senior executives that defendant Chiquita's payments to the AUC were illegal and could not continue. Department of Justice officials also cautioned the senior executives, as its outside counsel had warned earlier, that "the

---

[8]      Upon learning additional details about defendant Chiquita's payments to the AUC at a Board meeting on December 4, 2003, this director told his fellow Board members: "I reiterate my strong opinion – stronger now – to sell our operations in Colombia."

situation that Chiquita described [was] not a case of true duress because Banadex has a legal option – to withdraw from Colombia."

The Department of Justice never authorized defendant Chiquita to continue under any circumstances the Company's payments to the AUC – not at the meeting on April 24, 2003, nor at any other point. To be sure, when first presented with this issue at the meeting on April 24th, Department of Justice officials acknowledged that the issue of continued payments was complicated. But this acknowledgment did not constitute an approval or authorization for defendant Chiquita to continue to break the law by paying a federally-designated Foreign Terrorist Organization. Indeed, as its outside counsel later stated in writing, the Department of Justice never gave defendant Chiquita any assurance that the Company would not be prosecuted for making the payments.

Nevertheless, about two weeks later, on May 5, 2003, an employee of defendant Chiquita instructed others to "continue making payments" to the AUC. Within a week, defendant Chiquita made another cash payment to the AUC. Defendant Chiquita thereafter continued its regular payments to the AUC.

Representatives of defendant Chiquita had other contacts with Department of Justice officials through September 2003. In a memorandum dated September 8, 2003, outside counsel summarized defendant Chiquita's various contacts with the Department of Justice from April 2003 through September 2003. Outside counsel noted that: "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments." Senior officers of defendant Chiquita received copies of this memorandum.

Senior officers and directors of defendant Chiquita were well aware that the Company was continuing to pay a federally-designated Foreign Terrorist Organization and that the Company was subject to criminal prosecution for its continuing conduct. On December 22, 2003, a director of defendant Chiquita sent an email to other directors regarding the Company's ongoing payments to the AUC, in which he said, among other things: "we appear to [be] committing a felony." A week later, according to a contemporaneous account of the conversation, that same director told outside counsel for the Audit Committee that "Chiquita is knowingly violating the law."

### H.    Defendant Chiquita's New CEO: Decision To Stop the Payments

Fernando Aguirre joined defendant Chiquita as its new CEO in January 2004. Within one month of assuming his new position, Mr. Aguirre decided that the payments had to stop. On January 29, 2004, defendant Chiquita issued its last check for a payment to the AUC. The check cleared on February 4, 2004.

In an email to senior officers of defendant Chiquita, dated January 31, 2004, Mr. Aguirre said: "At the end of the day, if extortion is the modus operandi in Colombia or any other country, we will withdraw from doing business in such a country." In June 2004, defendant Chiquita sold Banadex to a Colombian company.

## III.    DISCUSSION OF THE OFFENSE CONDUCT

### A.    The Gravity of the Core Conduct

This is a very serious matter. Defendant Chiquita has admitted to paying terrorist organizations in Colombia for about fifteen years – from 1989 through February 2004. Defendant Chiquita paid all three major terrorist organizations in Colombia: the AUC, the

FARC, and the ELN. Those terrorist organizations are responsible for a staggering loss of life in that country.

Defendant Chiquita's financial support to the AUC was prolonged, steady, and substantial. Defendant Chiquita paid the AUC on roughly a monthly basis for over six years. Defendant Chiquita's payments to the AUC were typically in amounts equivalent to tens of thousands of U.S. dollars, and in the end totaled in excess of $1.7 million.

The money that defendant Chiquita paid to the AUC (and to the FARC and the ELN before that) was put to whatever use the terrorists saw fit. Money is fungible. Regardless of the Company's motivations, defendant Chiquita's money helped buy weapons and ammunition used to kill innocent victims of terrorism. Simply put, defendant Chiquita funded terrorism.

### B.    Defendant Chiquita's Motivations

Defendant Chiquita's motivations for paying the AUC are irrelevant to the illegality of its conduct or to the harm that the Company's conduct has caused to victims of AUC violence. As one federal appeals court has noted, "Terrorist organizations use funds for illegal activities regardless of the intent of the donor[.]" Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief and Dev., 291 F.3d 1000, 1027 (7th Cir. 2002) (discussing breadth of criminal liability under the material support statute, 18 U.S.C. § 2339B). Nevertheless, defendant Chiquita's motivations for paying the AUC are relevant to an understanding of the felony charge against the Company.

Preliminarily, it is important to note what defendant Chiquita is not accused of. Defendant Chiquita is not accused of supporting the goals or ideologies of the terrorist organizations that the Company funded. The record reflects that defendant Chiquita did not seek out the AUC to start making these payments. Rather, the AUC, through its leader Carlos

13

Castaño, instructed that defendant Chiquita's subsidiary would have to start making the payments once the AUC moved into the Company's banana-producing region.

Defendant Chiquita, however, did not make one or two payments while deciding on a course of action to take in the face of the AUC's demand (and implied threat) in 1997. Defendant Chiquita decided to accede to the AUC's demand and make routine payments for fully six years. Although defendant Chiquita would later claim that it was the victim of AUC extortion, the Company did not report the "extortion" to any United States or Colombian authorities for several years.

Defendant Chiquita, as a large multinational corporation, had choices to make about where in the world to operate and under what conditions. The Company chose to enter and exit markets and to buy and sell farms based on its business judgment. Defendant Chiquita chose to remain in Colombia and make payments to the AUC that it deemed necessary to operate in the Urabá and Santa Marta regions of Colombia.

Defendant Chiquita's reason for being in Colombia was, of course, to produce bananas profitably. And there is no question that defendant Chiquita profited from its Colombian operations during the period that the Company paid the AUC. According to defendant Chiquita's records, from September 10, 2001 (the date of the AUC's designation as a Foreign Terrorist Organization), through January 2004, the Company earned approximately $49.4 million in profits from its Colombian banana-producing operations. Indeed, by 2003 the Company's Colombian operations were its most profitable.

Whatever motivated defendant Chiquita at the start, the Company made a business decision to remain in Colombia and pay the AUC for over six years. Officers of defendant Chiquita and Banadex referred to the payments as an unsavory "cost of doing business" at their

inception in 1997.  When the internal investigation into the payments was presented to the Board

in September 2000, the Board treated them as a routine business matter – a tolerable expense to

be kept low.  When the AUC in Santa Marta demanded direct, cash payments in 2002, senior

officers of defendant Chiquita obliged.  These senior executives also came up with a procedure to

record these monthly payments in the Company's books and records that failed to reflect the

ultimate and intended recipient of the payments.

By late February 2003, when defendant Chiquita's outside counsel advised the Company

to stop the payments immediately in light of the AUC's designation as an FTO and the attendant

risk of criminal liability, the payments had already been reviewed and approved at the highest

levels of the Company for years.  The fact of the AUC demand in 1997 and any perceived risk to

the Company's employees from doing business in Colombia were not new topics.  The payments

had been discussed repeatedly in defendant Chiquita's Cincinnati headquarters.  The Company

had long since made the business judgment to remain in Colombia, to keep paying the AUC, to

record the payments in the Company's books and records without identifying the AUC, and not

to report the payments to the pertinent United States and Colombian authorities.

The new information in late February 2003 was not the claimed extortion, but rather

outside counsel's advice about the risk of criminal liability to the Company for making the

payments.  Defendant Chiquita chose to reject that advice and to continue to pay the AUC.  The

Company chose to continue the payments even after being advised by the Department of Justice

that the payments were illegal and could not continue.

Defendant Chiquita has claimed that it made the payments to protect its employees.

Undoubtedly some officers, directors, and employees of defendant Chiquita with knowledge of

the payments firmly believed (and still believe) that the Company's sole motivation for making

the payments was to protect its Colombian employees. As mentioned, the Company's motivation

is legally irrelevant and of no comfort to the victims of the AUC's violence. But even this

purported rationale for the payments begs serious questions. If defendant Chiquita was solely

motivated to protect its Colombian employees from the AUC,

- How did the payments protect the Company's employees during those times when the employees were not working on the Company's farms?

- How did the payments protect the communities in which those employees lived?

- How did the payments protect the families, friends, and associates of the Company's employees?

- What concrete steps did the Company take starting in 1997 to protect its employees from AUC violence, in lieu of making payments to the AUC?

- Why did the Company establish a procedure for paying the AUC in Santa Marta directly and in cash that put a senior officer of Banadex at greater personal risk of physical harm?

- Why did the Company fail to report the AUC's demands to the pertinent United States authorities for years?

- Would the Company have remained in Colombia indefinitely without regard to the profitability of its Colombian operations, just to be able to pay the AUC?

## C.    Defendant Chiquita's Alternatives

The Department of Justice is not in the business of providing outside parties with advice

about how best to comply with the law. Defendant Chiquita is a sophisticated multinational

corporation with access to the highest quality business and legal advice. There were a number of

points at which the Company could have conformed its conduct to the requirements of the law.

Its failure to do so until late in the evolution of this matter is one of the reasons that the Company

appears before the Court having pled guilty to a very serious criminal charge.

Defendant Chiquita was not without any alternative to paying the AUC. While there may

have been alternatives short of withdrawing from Colombia, withdrawal was plainly an option

that the Company could have considered when faced with the AUC's demand in 1997. As one of its officers noted in 1997, the Company had a choice about whether to remain in Colombia and make these payments. The officer stated, "[M]aybe the question is not why are we doing this but rather we are in Colombia and do we want to ship bananas from Colombia." In late February and March 2003, defendant Chiquita's outside counsel advised it to stop the payments immediately and recommended that defendant Chiquita withdraw from Colombia. When the full Board was first advised of the designation of the AUC as a Foreign Terrorist Organization on April 3, 2003, there was discussion in the Board room about defendant Chiquita's withdrawing from Colombia. Department of Justice officials cautioned defendant Chiquita's senior executives on April 24, 2003, that "the situation that Chiquita described [was] not a case of true duress because Banadex has a legal option – to withdraw from Colombia." Indeed, within one month of joining defendant Chiquita as its new CEO, Fernando Aguirre told senior officers that "if extortion is the modus operandi in Colombia or any other country, we will withdraw from doing business in such a country."

Defendant Chiquita may well have had other alternatives – other than the course that it pursued. In the end, the issue is not what defendant Chiquita could have done, but rather what it chose to do – and that was to continue paying terrorists for over six years.

## IV.    THE PLEA AGREEMENT

### A.    Terms of the Agreement

Pursuant to Rule 11(c)(1)(C), defendant Chiquita signed a written plea and cooperation agreement with the United States. Defendant Chiquita and the United States presented the plea agreement to the Court for its approval at a plea hearing on March 19, 2007. Pursuant to the plea agreement, defendant Chiquita, through its organizational representative James E. Thompson,

17

Esq., pled guilty to one felony count of a criminal Information, charging defendant Chiquita with

Engaging in Transactions with a Specially Designated Global Terrorist, namely the AUC, in

violation of 50 U.S.C. § 1705(b) and 31 C.F.R. § 594.204. Defendant Chiquita, through Mr.

Thompson, admitted its guilt to the offense conduct described in the Factual Proffer that has been

filed with the Court. Pursuant to Rule 11(c)(1)(C), the plea agreement provides for an agreed-

upon sentence of a criminal fine of $25 million and corporate probation of five years. The plea

agreement provides that defendant Chiquita must pay the criminal fine in five annual

installments. Defendant Chiquita must make the first payment of $5 million upon entry of

judgment. Defendant Chiquita is required to pay an additional $5 million, plus post-judgment

interest, each year for the next four years.

The plea agreement provides for a five-year term of corporate probation. In addition to

the general conditions of probation, the plea agreement provides for the following specific

additional conditions of probation: (1) defendant Chiquita shall pay the sums set forth in the

agreement; (2) defendant Chiquita shall implement and maintain an effective compliance and

ethics program that fully comports with the criteria set forth in Section 8B2.1 of the United States

Sentencing Guidelines, including, but not limited to, (a) maintaining a permanent compliance

and ethics office and a permanent educational and training program relating to federal laws

governing payments to, transactions involving, and other dealings with individuals, entities, or

countries designated by the United States as Foreign Terrorist Organizations, Specially-

Designated Global Terrorists, Specially-Designated Narcotics Traffickers, and/or Countries

Supporting International Terrorism, and/or any other such federally-designated individuals,

entities, or countries, (b) ensuring that a specific individual remains assigned with overall

responsibility for the compliance and ethics program, and (c) ensuring that that specific

18

individual reports directly to the Chief Executive Officer and to the Board of Directors of

defendant Chiquita, at least annually on the effectiveness of the compliance and ethics program;

and (3) pursuant to 18 U.S.C. § 3563(a)(1), defendant Chiquita shall not commit any federal,

state or local crimes during the term of probation.

The plea agreement also contains a cooperation provision that has required defendant

Chiquita to provide assistance to the United States in this ongoing investigation.  As described

below, defendant Chiquita has provided significant assistance to the United States pursuant to

that cooperation provision.

### B.     Maximum Statutory Penalties and the Sentencing Guidelines

On the felony charge to which defendant Chiquita has pled guilty, Engaging in

Transactions with a Specially-Designated Global Terrorist (in violation of 50 U.S.C. § 1705(b)

and 31 C.F.R. § 594.204), the Company faces a statutory maximum criminal fine of twice the

defendant's pecuniary gain from the offense, pursuant to 18 U.S.C. §§ 3571(c)(2) and (d).  The

United States and defendant Chiquita have agreed that, based on documents that defendant

Chiquita provided to the United States, the Company earned no more than $49.4 million in

profits from its Colombian banana-producing operations from September 10, 2001, through

January 2004.  The United States and defendant Chiquita have further agreed that, based on this

estimate of $49.4 million in relevant pecuniary gain, the maximum criminal fine is $98.8 million.

Defendant Chiquita is also subject to a term of corporate probation of five years pursuant

to 18 U.S.C. § 3561.  In addition, pursuant to 18 U.S.C. § 3013(a)(2)(B), defendant Chiquita is

obligated to pay the mandatory special assessment of $400 to the Clerk of the United States

District Court prior to the date of sentencing.

## V.    PLEA AND SENTENCING RECOMMENDATION

The Court should accept the parties' written plea agreement pursuant to Rule 11(c)(1)(C) and sentence defendant Chiquita to a criminal fine of $25 million and five-years of corporate probation, with the specific additional conditions of probations described above.  The plea agreement is a fair resolution of the Company's criminal culpability.  The agreement gives defendant Chiquita the benefit of its acceptance of responsibility and cooperation, by providing it with a lesser criminal fine than the Court might otherwise impose after a trial and conviction.  The agreement also benefits the United States, because it avoids the expense, time, and risk associated with trial by jury.  The agreement has already benefitted the United States, in that defendant Chiquita has provided significant cooperation to the United States in the ongoing investigation of this matter.

### A.    Acceptance of Responsibility

Defendant Chiquita has pled guilty to a very serious charge.  In support of its guilty plea, the Company has admitted the truth of the facts sets forth in the Factual Proffer.  In so doing, defendant Chiquita has accepted responsibility for its criminal conduct and deserves the benefit of that acceptance of responsibility.

### B.    Cooperation

This investigation arose from defendant Chiquita's voluntary self-disclosure of its illegal payments.  It was a lengthy investigation into conduct that spanned years and that occurred in both the United States and in Colombia.  Defendant Chiquita provided voluminous records and made numerous company witnesses available over the course of this investigation.  Defendant Chiquita deserves credit for its pre-plea efforts to assist the United States in this investigation.

20

Defendant Chiquita also deserves credit for its significant post-plea assistance pursuant to the cooperation provision of the plea agreement. The United States gave serious consideration to bringing additional charges in this matter. In the exercise of its prosecutorial discretion, the United States has decided not to do so. Defendant Chiquita, through its post-plea cooperation, provided critical evidence and information that the United States considered in making this determination.[9]

### C.    Voluntary Disclosure

Defendant Chiquita's voluntary disclosure – standing alone – merits comment. As a matter of good policy and common sense, the Department of Justice encourages self-reporting. The Company deserves and has received some credit for having done so in this case. It is important to point out, however, that defendant Chiquita also admitted as part of its guilty plea that it continued to engage in the same criminal conduct after its voluntary disclosure.

Self-reporting alone does not automatically protect a company from prosecution, any more than a confession would protect an individual from prosecution. The decision whether to prosecute a voluntary disclosure case depends on a myriad of factors, including the nature and scope of the criminal conduct that has been disclosed. Moreover, a voluntary self-disclosure certainly does not authorize the continuation of the underlying criminal conduct.

---

[9]    The Information and Factual Proffer filed in connection with defendant Chiquita's guilty plea each contain a section captioned "Relevant Persons," who are identified by letter and a cursory description of their respective positions in the Company. Because corporations can only act through individuals, a description of the conduct of certain individuals was necessary to set forth the facts in this case. It was particularly important to make clear that the conduct that led to the Company's guilty plea was not the act of a rogue employee or mid-level manager. However, absent unusual circumstances, Department of Justice policy prohibits the naming of uncharged third-parties. See United States Attorneys' Manual, § 9-27-760.

21

**D.    The Criminal Fine**

Defendant Chiquita has agreed to pay a $25 million criminal fine. This fine is a substantial criminal penalty. If accepted by the Court, it would be the largest criminal penalty ever imposed under the Global Terrorism Sanctions Regulations.

As in any criminal case, a plea agreement represents a compromise. The maximum criminal fine that defendant Chiquita could have faced was dependent on the Company's profits derived from its illegal payments. The United States and defendant Chiquita had differing perspectives as to the appropriate methodology and estimate of such profits. By agreeing on the appropriate estimate of profits, based on documents provided by defendant Chiquita to the United States, the parties have avoided the expense, time, and risk associated with litigating the relevant profits.

**E.    The Specific Conditions of Probation**

Pursuant to the plea agreement, defendant Chiquita has agreed to implement and maintain an effective compliance and ethics program as described above. The purpose of this program is to ensure that this criminal conduct never occurs again.

**VI.    CONCLUSION**

The United States respectfully requests that the Court accept the parties' plea agreement pursuant to Rule 11(c)(1)(C) and sentence the defendant Chiquita Brands International, Inc., to a criminal fine of $25 million and five years of probation, with the specific additional conditions of

probation provided in the plea agreement.

Respectfully submitted,

By: _____

Jonathan M. Malis
D.C. Bar No. 454548
Denise Cheung
D.C. Bar No. 451714
Assistant United States Attorneys
(202) 305-9665
Jonathan.M.Malis@usdoj.gov

_____

Stephen Ponticiello
PA Bar No. 44119
Department of Justice Trial Attorney
Counterterrorism Section

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was caused to be served on counsel of record through the Court's Electronic Case Filing system, on this 11th day of September, 2007.

_____

Jonathan M. Malis
Assistant United States Attorney

23

# EXHIBIT 3

## DOE PLAINTIFFS ALLEGING INJURY FROM FARC VIOLENCE

| NUMBER | PARAGRAPH | DECEDENT | PLAINTIFF |
|--------|-----------|----------|-----------|
| No. 1 | ¶52 | Peter Doe 32 | Jane Doe 32 |
| No. 2 | ¶57 | Peter Doe 37 | Jane Doe 37 |
| No. 3 | ¶80 | Peter Doe 58 | John Doe 58 |
| No. 4 | ¶85 | Peter Doe 62 | John Doe 62 |
| No. 5 | ¶96 | Peter Doe 72 | Jane Doe 72 |
| No. 6 | ¶97 | Peter Doe 73 | Jane Doe 73 |
| No. 7 | ¶98 | Peter Doe 74 | Jane Doe 74 |
| No. 8 | ¶99 | Peter Doe 75 | Jane Doe 75 |
| No. 9 | ¶100 | Pam Doe 75-a | Jane Doe 75 |
| No. 10 | ¶102 | Peter Doe 77 | Jane Doe 77 |
| No. 11 | ¶104 | Peter Doe 79 | Jane Doe 79 |
| No. 12 | ¶105 | Peter Doe 80 | Jane Doe 80 |
| No. 13 | ¶106 | Peter Doe 80-a | Jane Doe 80 |
| No. 14 | ¶107 | Peter Doe 80-b | Jane Doe 80 |
| No. 15 | ¶108 | Peter Doe 81 | Jane Doe 81 |
| No. 16 | ¶109 | Peter Doe 82 | Jane Doe 82 |
| No. 17 | ¶111 | Peter Doe 84 | Jane Doe 84 |
| No. 18 | ¶112 | Peter Doe 85 | Jane Doe 85 |
| No. 19 | ¶114 | Peter Doe 87 | Jane Doe 87 |
| No. 20 | ¶115 | Peter Doe 88 | John Doe 88 |
| No. 21 | ¶116 | Peter Doe 88-a | John Doe 88 |
| No. 22 | ¶117 | Peter Doe 89 | Jane Doe 89 |
| No. 23 | ¶118 | Peter Doe 89-a | Jane Doe 89 |
| No. 24 | ¶119 | Peter Doe 89-b | Jane Doe 89 |
| No. 25 | ¶124 | Peter Doe 94 | Jane Doe 94 |
| No. 26 | ¶126 | Peter Doe 96 | Jane Doe 96 |
| No. 27 | ¶128 | Peter Doe 98 | Jane Doe 98 |
| No. 28 | ¶130 | Peter Doe 98-b | Jane Doe 98 |
| No. 29 | ¶134 | Peter Doe 102 | Jane Doe 102 |
| No. 30 | ¶135 | Peter Doe 103 | Jane Doe 103 |
| No. 31 | ¶136 | Peter Doe 104 | Jane Doe 104 |
| No. 32 | ¶138 | Peter Doe 106 | Jane Doe 106 |
| No. 33 | ¶139 | Peter Doe 107 | Jane Doe 107 |
| No. 34 | ¶140 | Peter Doe 108 | Jane Doe 108 |
| No. 35 | ¶141 | Peter Doe 108-a | Jane Doe 108 |
| No. 36 | ¶145 | Peter Doe 112 | John Doe 112 |
| No. 37 | ¶148 | Peter Doe 115 | Jane Doe 115 |
| No. 38 | ¶155 | Peter Doe 121 | Jane Doe 121 |
| No. 39 | ¶157 | Peter Doe 123 | John Doe 123 |
| No. 40 | ¶160 | Peter Doe 125 | John Doe 125 |
| No. 41 | ¶164 | Peter Doe 128-a | Jane Doe 128 |
| No. 42 | ¶166 | Peter Doe 129 | Jane Doe 129 |
| No. 43 | ¶169 | Peter Doe 132 | Jane Doe 132 |
| No. 44 | ¶170 | Peter Doe 133 | Jane Doe 133 |
| No. 45 | ¶177 | Peter Doe 140 | Jane Doe 140 |

# EXHIBIT 4



The State Department web site below is a permanent electronic archive of information released prior to January 20, 2001.  Please see www.state.gov for material released since President George W. Bush took office on that date. This site is not updated so external links may no longer function.  Contact us with any questions about finding information.

NOTE: External links to other Internet sites should not be construed as an endorsement of the views contained therein.



# U.S. Department of State

## Colombia Country Report on Human Rights Practices for 1997

Released by the Bureau of Democracy, Human Rights, and Labor, January 30, 1998.

---

### COLOMBIA

Colombia is a constitutional, multiparty democracy, in which the Liberal and Conservative parties have long dominated politics. The presidency was weakened throughout the year by continued controversy arising from substantial, credible public evidence that President Ernesto Samper personally sought and accepted an illegal $6 million contribution from the Cali-based narcotics trafficking cartel during his 1994 electoral campaign. This enduring controversy significantly diminished the President's moral authority and political ability to govern. The civil judiciary is largely independent of government influence, although the suborning or intimidation of judges, witnesses, and prosecutors by those indicted is common. The separate military judicial system has been long accountable only to the uniformed military leadership, but in August the Constitutional Court directed it to relinquish to the civilian judiciary the investigation and prosecution of allegations of human rights abuses committed by police and military personnel.

The control of the central Government over the national territory has been increasingly challenged by longstanding and widespread internal armed conflict and rampant violence--both criminal and political. An estimated 10,000 to 15,000 full-time guerrillas, belonging to three distinct communist rebel armies operating in more than 100 separate guerrilla fronts spread across the nation, represented a growing threat to government security forces. The Government has been forced into an essentially defensive posture and its forces rarely initiate military action. The guerrillas exercised a significant degree of influence in about 57 percent of the country's 1,071 municipalities. Some guerrilla groups, especially in rural regions in the southern and eastern parts of the country, continued to collaborate with narcotic traffickers. Such criminal activities produced revenues estimated in the hundreds of millions of dollars annually for the guerrilla groups. A diverse collection of regional-based paramilitary forces assumed a dominant role in the internal conflict, greatly expanding their political and military influence into a number of geographic areas previously dominated by the guerrillas.

The civilian-led Ministry of Defense is responsible for internal security and oversees both the armed forces and the national police, although civilian management of the security forces is limited. The Department of Administrative Security (DAS), with broad intelligence gathering, law enforcement, and investigative authority, reports directly to the President. The armed forces and the police committed numerous, serious violations of human rights, although significantly fewer than in 1996.

Colombia has a mixed private and public sector economy. The Government continued to privatize institutions, although at a slower rate than the peak in 1995. Crude petroleum replaced coffee as the nation's principal legitimate export in 1996. Narcotics traffickers continued to control large tracts of land and other assets and exerted undue influence throughout society and political life. The country suffers from a highly skewed distribution of income, with a per capita gross domestic product of $2,225.

The Government's human rights record continued to be poor, although there were some improvements in certain areas. Government forces continued to commit numerous serious abuses, including extrajudicial killings; however, they were responsible for fewer such killings than in the previous year. During the first 9 months of the year, government forces committed 7.5 percent of all politically motivated extrajudicial killings. There were targeted killings by elements of the Army, notably the 20th Intelligence Brigade. Security forces were responsible for several instances of forced disappearance, and police and soldiers continued to torture and beat some detainees. At times the security forces collaborated with paramilitary groups that committed abuses. Conditions in the overcrowded prisons are generally harsh; however, some inmates use bribes or intimidation to obtain more favorable conditions. Arbitrary arrest and detention, as well as prolonged pretrial detention, are fundamental problems. The judiciary is severely overburdened and has a case backlog estimated at greater than 1 million cases. Less than 3 percent of all crimes committed nationwide are successfully prosecuted. The use of "faceless" prosecutors, judges, and witnesses, under cover of anonymity for security reasons, continued in cases involving kidnaping, extortion, narcotics trafficking, terrorism, and in several hundred high-profile cases involving human rights violations.

Although the number of human rights violations by government forces declined somewhat from the previous year, the executive branch and Congress continued to be unable to eliminate those abuses. At year's end, the military exercised jurisdiction over many cases of military personnel accused of abuses, a system that has established an almost unbroken record of impunity.

Inefficiency, intimidation, and impunity in both the civilian and military courts remain at the core of the country's human rights problems. The Prosecutor General's office, however, increased efforts to prosecute high-profile human rights cases involving serious violations such as killings, massacres, and kidnapings committed by government forces, paramilitary groups, and guerrillas. The Government permitted the continued existence of special "public order zones" in some locations, in which military commanders in areas of high conflict directed all government security efforts--including the imposition of curfews, check-points, and requirements for safe conduct passes.

The Government and its backers in Congress increased pressure on the media to influence reporting. Although the Constitutional Court struck down portions of a 1996 government-backed media law, which permitted censorship, it left intact other key aspects of the law. This action left the Government in a position to reward its political backers, punish its opponents, and fundamentally influence the electronic media. Journalists practiced self-censorship. Violence against women and children is a serious problem, as is child prostitution. Extensive societal discrimination against women, minorities, and the indigenous continued. Child labor is a widespread problem. Vigilante and paramilitary groups that engaged in "social cleansing"--the killing of street children, prostitutes, homosexuals, and others deemed socially undesirable--continued to be a serious problem.

The many paramilitary groups increasingly took the offensive against the guerrillas, often by perpetrating targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base. During the first 9 months of the year, members of paramilitary groups committed 69 percent of all politically motivated extrajudicial killings. The Government took no significant action to restrain these powerful paramilitary groups. The public security forces' relations with paramilitary groups varied considerably, ranging from noncooperation, to turning a blind eye to paramilitary activities, to some instances of active collaboration. There was no credible evidence of any sustained military action to constrain the paramilitary groups. While the President announced on December 1 a series of measures to combat paramilitary forces, including a task force to hunt down their leaders, these measures had not been implemented by year's end.

The Government's National Human Rights Ombudsman argued that the government-sponsored, rural self-defense groups known as "Convivir" directly involved citizens in the armed conflict, converting them into targets of guerrilla attack. It became increasingly clear that paramilitary groups and their leaders were largely beyond the control of the State, which had initially promoted the development of such groups in response to rising guerrilla actions. Many paramilitary groups have far stronger ties to regional or local political and economic elites--including narcotics traffickers--than they do to the military. This development significantly heightened the risks to a society in which fragile national institutions were already reeling from rebel attacks, narcotics-related corruption, a judicial system crippled by impunity and inefficiency, a disgraced administration and a disconnected, self-absorbed political class.

An active policy of depopulation, pursued by some paramilitary groups against communities suspected of guerrilla support, was the primary cause of the growing internal displacement problem. The breakdown of public order in many rural areas, sparked by the continuing conflicts among paramilitary, guerrilla, and narcotics trafficking organizations; economic interests; and the police and the armed forces, has prompted the internal displacement of more than 525,000 citizens during the years 1995 to 1997. It remained unclear, however, how many of these were temporary rather than permanent displacements.

Guerrilla forces continued to be responsible for numerous killings; during the first 9 months of the year, they committed 23.5 percent of all politically motivated extrajudicial killings. Guerrilla forces also were responsible for disappearances, as well as more than 50 percent (867) of all formally reported kidnapings. As the October 26 gubernatorial and local elections

approached, guerrillas targeted political officeholders, candidates, and election workers as "military objectives"--part of their declared campaigns to destabilize the country and delegitimize the Government. They killed or kidnaped more than 200 candidates and elected officials during the year and forced more than 2,000 political candidates to withdraw from electoral campaigns. Despite the widespread violence generated by guerrilla forces, the Government carried out elections in the vast majority of municipalities and citizens turned out in sizable numbers and voted overwhelmingly in favor of national peace talks in a nonbinding plebescite.

## RESPECT FOR HUMAN RIGHTS

**Section 1 Respect for the Integrity of the Person, Including Freedom From:**

a. Political and Other Extrajudicial Killing

Political and extrajudicial killings continued to be a serious problem. More than 3,500 citizens died in such acts, committed by both state and nonstate agents. Members of the security forces continued to commit extrajudicial killings, albeit at a reduced rate. According to multiple, credible reports, the security forces were responsible for approximately 7.5 percent of political killings during the first 9 months of the year in which the perpetrators could be identified. This represented a continuation of the steady and substantial decline since 1993, when the military was deemed responsible for 54 percent of such killings. The total number of extrajudicial killings directly attributable to the security forces continued to decline, from 126 in 1996 to 80 in the first 9 months of 1997. The police reportedly committed some social cleansing killings. Government and military officials give credence to reports of isolated killings during the year conducted by members of at least one army unit, the 20th Intelligence Brigade.

The Government's independent National Human Rights Ombudsman (Defensoria del Pueblo) received 253 complaints in 1996 against the army alleging murder, forced disappearances, and threats (compared with 219 in 1995). The same report cited 226 complaints against the police for murder, disappearances, and threats (compared with 169 in 1995). The Attorney General's office (Procuraduria) reported that of the 3,000 complaints against public officials received between June 1995 and October 1996, it opened administrative proceedings in 1,338 cases, including 28 massacres and 202 homicides. Some of the other cases did not involve public officials and were passed on to other government investigative bodies. It is unclear how many of the cases have since resulted in convictions or have otherwise been closed.

The Institute for Legal Medicine reported a 1997 homicide rate of 66 deaths per 100,000 inhabitants. The police and the judiciary have insufficient resources to investigate most killings adequately. In 1996 the Superior Council of the Judiciary reported that 74 percent of all crimes go unreported, and between 97 and 98 percent of all crimes go unpunished. The Government Commission on Public Spending similarly placed the impunity rate for all crimes at 99.5 percent.

Two intelligence agents, an army private, and several civilians--all associated with the 20th Intelligence Brigade--were arrested in May and placed in preventive detention for their presumed involvement in the November 2, 1995, assassination of opposition Conservative Senator Alvaro Gomez Hurtado and his assistant. A regional court judge ruled in November that there was insufficient evidence to warrant the continued detention without bail of two of the detainees, who nonetheless remain under active investigation. By year's end, civilian prosecutions against four of the others were complete, awaiting only the judge's ruling and sentencing. Four field-grade intelligence officers with ties to the brigade were passed over for promotion in November, effectively ending their careers. The authorities were investigating one of them, the brigade commander, for the murder of several of the brigade's own informants. The Government also forcibly retired a former commander of the brigade.

On April 4, the Superior Military Tribunal ordered the arrest in Cartagena of five members of the National Police for the September 3, 1995, death of Italian tourist Giacomo Turra from beatings while in detention. The military trial of police Sergeant Raymundo Llanos Vasquez and four subordinates on the charge of premeditated homicide began in October.

Army Captain Rodrigo Canas Flores was arrested on May 19, along with a paramilitary leader, for the April 22, 1996, massacre of 15 persons in the town of Segovia, Antioquia department. The Supreme Court upheld in December the convictions of 6 former police officers for conspiracy and aggravated homicide in the 1991 killings of 18 persons in Villas del Rosario, Santander del Norte department. The court, which sentenced the six former policemen to between 14 and 26 years in prison, determined that they were members of an illegal paramilitary group operating in that department.

In November 1996, the Superior Council of the Judiciary transferred to the military justice system the case of General Farouk Yanine Diaz and three other senior military codefendants on trial for the 1987 massacre of 19 local merchants. This transfer directly contravened constitutional requirements that such trials be conducted exclusively by civilian courts. On June 18, then-Commanding General of the Army Manuel Jose Bonett (who had initially attempted to recuse himself from the case) personally cleared General Yanine Diaz and his military codefendants of homicide and kidnaping charges. Meanwhile, a

civilian regional court tried three civilian codefendants on the basis of the same evidence, convicted them on June 25, and sentenced them to 30 years in prison for their roles in the massacre of the 19 merchants. Several human rights groups submitted a complaint against Yanine Diaz to the Inter-American Commission on Human Rights (IACHR), which has it under review. General Yanine Diaz and four other retired army generals remain under investigation by the Prosecutor General's office for their roles in the development of paramilitary death squads in the Middle Magdalena region.

In October the Prosecuting Attorney's Human Rights Unit formally charged two army Sergeants, Hernando Medina Camacho and Gusto Gil Zuniga Labrador, and paramilitary leader Carlos Castano with the 1994 killing of the leader of Patriotic Union (UP) Senator Manuel Vargas Cepeda. The two sergeants remained in preventive detention, while Castano was tried in absentia. UP leader Senator Hernan Motta, Cepeda's successor, left the country with his family in October, following increasing threats to their safety.

In late June, the Government approved compensation for the relatives of members of the April 19th Movement (M-19) guerrilla group who died during an army operation in the southeast area of Bogota on September 30, 1985. This decision followed a recommendation by the Inter-American Commission on Human Rights (IACHR).

In May a regional judge in Medellin sentenced in absentia accused narcotics trafficker Fidel Castano, cofounder of the largest paramilitary coalition, to 30 years in prison for the January 1990 massacre of 43 peasants in Pueblo Viejo, Antioquia, and for the 1988 kidnaping and killing of Conservative Senator Alfaro Ospina. In January Castano's codefendant and fellow paramilitary leader Jose Anibal Rodriguez Urquijo was sentenced to 40 years in prison for his role in the two crimes.

There continued to be incidents of social cleansing--including attacks and killings--directed against individuals deemed socially undesirable, such as drug addicts, prostitutes, transvestites, beggars, and street children. Most of these incidents were attributed to paramilitary groups and criminal gangs; elements of the police, however, were believed responsible for a number of such incidents, as well. Criminal or "antisocial" elements were sometimes similarly "cleansed" from communities under the sway of the guerrillas.

Killings by paramilitary groups (also known as "self-defense groups") increased significantly, many times with the complicity of individual soldiers or military units, or with the knowledge and tacit approval of senior military officials. The number of such killings attributed to paramilitary forces increased significantly (from 751 in 1996 to 752 during the first 9 months of 1997). The Ombudsman, the Prosecutor General's office, and the Presidential Exploratory Peace Commission all agreed that some cases indicated that members of the armed forces actively collaborated with paramilitary groups. The September 9 report by the Exploratory Peace Commission declared that, given the nation's historically ambivalent policy towards such groups, "the State in its entirety bears an important degree of responsibility for the creation and expansion of the self-defense groups." The report also noted that there was a clear relationship between local political and economic elites in some regions of the country and the self-defense groups, both in the financing of such groups and in the direction of their activities.

Credible allegations of cooperation with paramilitary groups, including instances of both silent support and direct collaboration by members of the armed forces, in particular the army, continued to generate controversy. Military commander General Bonett categorically denied that such cooperation existed, but tacit arrangements between local military commanders and paramilitary groups did occur in some regions. Government authorities and academic analysts asserted that paramilitary groups freely operated in some areas that were under military control. For example, army commander Major General Mario Hugo Galan denied to the press in October that the army had institutional or operational contact with paramilitary groups, but admitted that there had been "individual cases" of army personnel cooperating with members of such groups. General Yanine Diaz, former commander of the army's Second Division based in Bucaramanga, was accused of establishing and expanding paramilitary death squads in the Middle Magdalena region, as well as ordering dozens of disappearances, multiple large-scale massacres, and the killing of judges and court personnel sent to investigate previous crimes. Army Colonel Carlos Alfonso Velasquez, then serving as Deputy Commander and Chief of Staff of the Army's 17th Brigade operating in the Cordoba and Uraba region, was forced to retire in January after he privately criticized the Brigade's refusal to confront the paramilitary forces headquartered there.

The statutes of the Self-defense Groups of Cordoba and Uraba (ACCU), the nation's most powerful paramilitary group, explicitly condoned extrajudicial executions, stating "we respect all persons who are outside the conflict, but we do not so consider guerrillas camouflaged as peasants engaged in espionage." This attitude encouraged the widespread and arbitrary use of extrajudicial killing by paramilitary forces. According to credible sources, during the first 9 months of the year, members of paramilitary groups committed 69 percent of all politically motivated extrajudicial killings.

The largest illegal paramilitary groups (centered in Cordoba, Uraba, and the Middle Magdalena regions, plus the eastern plains) announced on April 19 the establishment of a national umbrella organization, the AUC (United Self-defense Groups of Colombia). The growing participation in the conflict by civilians has been prompted in part by the guerrillas' increasing strength and presence in a growing number of municipalities (173 in 1985 compared with 622 in 1995) and in part by the

Government's failure to ensure security throughout the country.

Overall, paramilitary killings escalated not only in those areas that have long suffered the greatest concentration of violence, such as Meta, Uraba, Cordoba, and Cesar, but in other regions as well, including parts of Antioquia beyond Uraba, the Magdalena Medio region, and the departments of Sucre, Guaviare, Caqueta, and Putumayo. Such killings reflect the intensified competition between paramilitary and guerrilla organizations for control across a broad sweep of territory (see Section 1.g.).

Paramilitary groups extended their influence into the historically guerrilla-dominated coca-growing areas of Meta department with their July 15-20 takeover of the town of Mapiripan. They singled out at least seven townspeople and executed them, reportedly for supporting the guerrillas. Thousands of townspeople subsequently fled, claiming that the paramilitary forces had killed as many as two dozen others and had thrown their bodies into the Guaviare River. In a September interview in El Tiempo newspaper, paramilitary leader Carlos Castano admitted responsibility for the Mapiripan massacre. The army and the Attorney General opened separate, partial administrative investigations into the possible role of four Army officers, including the Commander of the 7th Brigade, Brigadier General Jaime Humberto Uscategui, and five civilian officials, including the mayor of Mapiripan, in the takeover. The Prosecutor General's office also opened a criminal investigation into the incident. A similar paramilitary incursion into Miraflores, Guaviare, on October 18-20, which left at least five persons dead, also prompted the Prosecutor General to open a criminal investigation into the role of the security forces in supporting the attacks.

With few notable exceptions, known paramilitary leaders remained beyond the reach of the law. The regional court of Medellin sentenced Gerardo Antonio Palacio to 8-1/3 years in prison for forming an illegal paramilitary group. The authorities were also investigating Palacio and others for the group's role in the August 15, 1995, massacre of 18 persons in Chigorodo, Antioquia. On April 26, the police recaptured Luis Alfredo Rubio Rojas, former mayor of Puerto Boyaca and leader of a paramilitary group initially founded by Medellin cartel narcotics trafficker Gonzalo Rodriguez Gacha, after 7 years in hiding. Rubio had previously been sentenced to 12 years in prison for his role in the 1986-87 Honduras and La Negra massacres; he is also under investigation in the murder of 19 local merchants, the murder of 12 Fiscalia employees sent to investigate those killings, as well as for hiring British and Israeli mercenaries to train members of paramilitary groups to fight the Colombian Revolutionary Armed Forces (FARC) and defend narcotics interests.

For the first time since the December 1994 establishment of the government-sponsored civilian rural defense cooperatives known as Convivir, a Convivir leader was found guilty of forming an illegally armed group. A Medellin judge on October 23 sentenced Jose Alirio Arcila Vasquez, director of the "Los Sables" Convivir, and other Los Sables members to 7 years in prison for the April 1996 murder of three men in Ciudad Bolivar, Medellin. The case against former army Captain Ciro Alfonso Vargas Lancheros for his possible role in the incident remained ongoing.

Former guerrillas who have laid down their weapons following previous peace agreements with the Government were also the targets of attacks--from both paramilitary groups and their former comrades-in-arms. Of the 5,897 guerrillas formally demobilized during 1990-94 from at least 6 rebel armies, 258 had been killed by the end of 1996. An additional 82 "reinserted" guerrillas had been killed as of August 15, 70 percent of them in Antioquia and Sucre departments. At least 19 members of the Socialist Renovation Current (CRS), which broke with the National Liberation Army (ELN) and demobilized in 1994, were killed during the year. The July murders of William Jaraba and Fredy Fuentes Paternidad, Cordoba regional leaders of the CRS, prompted a rare joint statement by the Ministers of Defense and Interior. They criticized the attacks by illegal armed groups, noted that the CRS was a legally constituted political movement committed to the democratic legal order, and ordered the police and military to provide the CRS "with maximum collaboration and protection of its social and political activities."

The leftist coalition party known as the UP continued to be the target of political killings. Unknown assailants shot and killed a policeman early on July 26 as he successfully prevented the detonation of a 110-pound bomb aimed at the UP's Bogota headquarters. The UP has lost more than 3,000 members in a campaign of targeted killings waged against its leadership--a campaign initially precipitated by Rodriguez Gacha and the Medellin Cartel after the UP was formed as part of a 1985 peace accord that permitted several thousand guerrillas to turn in their weapons in exchange for participation in a legal political party. There have been 600 reported murders of UP party members in Meta department alone since the campaign began, including the head of the Meta Committee for Human Rights, Josue Giraldo, who was killed in October 1996.

In 1996 the UP brought a complaint before the IACHR that charged the Government with "action or omission" in what the UP termed "political genocide" against the UP and the Communist Party. In its October submission to the IACHR, the Reinsertion Foundation human rights organization charged that 13 regional UP political leaders had been killed and 3 tortured during the first 9 months of the year. The Government and the UP continued without success in their efforts to reach an amicable solution under the auspices of the IACHR.

The guerrillas of the FARC, the ELN, and the People's Liberation Army (EPL) continued to commit extrajudicial executions,

often targeting noncombatants in a manner not unlike the paramilitary groups. Local elected officials or candidates for public office, teachers, civic leaders, business owners, and peasants opposed to their political or military activities were common targets. Police and military personnel were also targeted for killings, both in and out of combat, but to a lesser degree (see Section 1.g.).

On April 21, a FARC guerrilla squad raided the town of Liborina, Antioquia, held a public "revolutionary trial" of a local municipal official and four peasants accused of collaborating with the military, and executed them. In September FARC guerrillas killed more than a dozen persons in the San Luis indigenous reserve. In December FARC forces killed a Catholic priest (see Section 1.g.).

b. Disappearance

"Forced disappearance", while explicitly prohibited by the 1991 Constitution, remained an act not explicitly outlawed under the Penal Code, although the law codifies kidnaping for extortion and "simple kidnaping" as crimes. An estimated 3,000 cases of forced disappearance have been formally reported to the authorities since 1977; very few have ever been resolved. The U.N. Working Group on Enforced or Involuntary Disappearances reported that it received 133 complaints of forced disappearance in Colombia during the past 4 years.

According to data collected jointly by the Intercongregational Commission for Justice and Peace and the Center for Investigations and Popular Research (CINEP), 136 persons disappeared during the first 9 months of 1997. The army was deemed responsible for 6 of the disappearances and 130 were attributed to paramilitary groups.

On January 29, the Inter-American Human Rights Court found that the Government should pay $89,500 to the families of Isidro Caballero Delgado and Maria del Carmen Santiago, following an earlier Court ruling that the State was responsible for their forced disappearances.

The Judicial Council of State determined in September that the Government should compensate the families of M-19 guerrilla Irma Franco Pineda and 11 civilian cafeteria workers, whose disappearance was attributed to the army's 20th Intelligence Brigade after the army retook Bogota's Palace of Justice following the M-19's November 6, 1985 siege. The Council ordered the Government to pay the equivalent of 2,000 grams of gold to Franco's family.

There has been no progress since the December 1996 decision of the Superior Judicial Council to transfer the criminal investigation of General Alvaro Velandia Hurtado, the former commander of the 20th Intelligence Brigade, who was accused of the 1987 forced disappearance, torture, and murder of M-19 member Nydia Erika Bautista, to the military judicial system. The Prosecutor General's human rights unit was forced to terminate its investigation after it lost jurisdiction over the case. Like many similar cases, this case remained in the military justice system at year's end, despite the August 5 Constitutional Court decision that all such human rights cases be conducted by the civilian courts.

The U.N. Committee on Human Rights found that the Government was directly responsible for the 1990 disappearance and murder of Torres Crespo, Torres Arroyo, and Chaparo Torres, three indigenous leaders.

On April 23, antikidnap czar Alberto Villamizar called for investigation into allegations of cooperation between the Government's elite antikidnap squads (GAULA) and illegal paramilitary groups following the April 22 rescue by paramilitary forces of an oil company employee kidnaped in Bolivar department by the ELN.

Police Major Manuel de Jesus Lozada Plazas, the deputy GAULA commander in Bogota, was arrested on March 10 and charged with the May 19, 1995 kidnaping of three former EPL guerrillas in Cali, where he had previously served as head of the GAULA. In its first such decision following the August 5 Constitutional Court ruling regarding alleged human rights violations by security forces personnel, the Superior Judicial Council determined on August 14 that Lozada would be tried in a civilian court.

On April 18 in Bucaramanga, presumed members of a paramilitary group kidnaped the sister and brother-in-law of Nicolas Rodriguez, the reputed deputy commander of the ELN. This kidnaping was part of a campaign begun in 1996 by paramilitary groups to give guerrillas "a taste of their own medicine." Military courts opened an investigation into military complicity, however, after army Sergeant Jesus Antonio Sanchez Morales testified that General Rafael Hernandez, Second Division commander, ordered him to take part in the kidnaping. Sanchez was placed in preventive detention; the kidnap victims never reappeared.

Guerrillas were deemed responsible for over 50 percent (involving 867 victims) of the 1,693 kidnaping cases formally reported to the National Police during 1997, according to the Pais Libre foundation. Arrests or prosecutions in any of these cases were rare. Foreigners accounted for approximately 5 percent of those kidnaped, and represented attractive targets for

both the FARC and the ELN, which generally demanded exorbitant ransom payments for their release.

The body of Vassily Lojkin, a Russian cyclist endeavoring to circumnavigate the globe, was found on March 7 in Apartado; he had been kidnaped, then executed, by the FARC.

From August to October, FARC and ELN guerrillas waged a massive kidnaping campaign against candidates for the October 26 departmental and local elections. Hundreds of persons were kidnaped, held for several days or weeks, lectured, and subsequently released, typically after promising to withdraw their candidacies. Some 2,000 candidates nationwide withdrew (see also Section 3). Two Catholic bishops were kidnaped in October and November, one by the FARC and the other by the ELN (see Section 1.g.).

There has been no confirmation for nearly 4 years that three American missionaries kidnaped by FARC guerrillas in Panama on January 31, 1993, and immediately moved to Colombia, were still alive. The FARC and other guerrilla groups regularly kidnaped foreign citizens; some were released after months of captivity, while others remained in captivity at year's end. The tortured body of American geologist Frank Thomas Pescatore, kidnaped on December 10, 1996, by FARC guerrillas, was found on February 23.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Constitution explicitly prohibits torture, as well as cruel, inhuman, or degrading treatment or punishment. Reports of incidents of police and military torture or mistreatment of detainees nevertheless continued. The Office of the Attorney General for Human Rights reported investigating 462 cases of torture committed by the police, DAS, army, prison officials, and other agents of the State during the period from June 1995 to October 1996. There has been no appreciable subsequent decrease in cases of torture committed by various government security agencies. These abuses often occurred in connection with illegal detentions in the context of counter-insurgency or counter-narcotics operations.

Paramilitary and guerrilla groups were also responsible for many instances of torture; the bodies of a great many persons detained and subsequently killed by these illegal groups showed signs of torture and disfigurement.

Prison conditions are generally harsh, especially for those prisoners without significant outside support. Severe overcrowding, and dangerous sanitary and health conditions remained serious problems. In December a visiting IACHR mission declared that the living conditions in Bogota's La Picota prison constituted "cruel, inhuman, and degrading treatment of the inmates." The nation's 168 prisons and jails held 43,221 inmates in December, 52 percent more than planned capacity. In a number of the nation's largest prisons, the overcrowding reached even higher levels. Medellin's Bellavista prison, the nation's largest, was built to house 1,700 inmates; in December, it housed some 5,050 inmates--triple its designed capacity. Bogota's La Modelo and the Palmira prison outside Cali were both at 250 percent of designed capacity.

Forty-six percent of all prison inmates are pretrial detainees. The remaining 54 percent are roughly split between those appealing their convictions and those who have exhausted their appeals and are serving out their terms.

Prison conditions prompted an unprecedented total of 50 uprisings and hostage-takings by inmates in the first 6 months of the year. Three guards and a prisoner were killed at Valledupar prison in April after common prisoners and detained ELN members took more than 15 hostages. Guards, who typically have no riot control equipment, training, or capability, also went on strike at several facilities. Instances of abuse by and corruption among prison staff, as well as ongoing criminal activities by inmates, were so serious that judicial authorities announced on April 1 the transfer of control of the maximum security wings of La Picota, La Modelo, Palmira, and Medellin's Itagui prisons from the civilian National Prisons Institute to the National Police.

Political detainees and prisoners are typically housed with common prisoners. There are no separate facilities for pretrial detainees and convicted prisoners. Key narcotics traffickers and some guerrilla leaders, however, get special cells with many comforts, some of which--such as access to two-way radios, cellular telephones, and computers--allowed them to continue their illegal activities from inside jail.

Local or regional military and jail commanders did not always prepare mandatory detention registers or follow notification procedures; as a result, precise accounting for every detainee was not always possible.

The International Committee of the Red Cross (ICRC) continued to have routine access to most prisons and police and military detention centers.

The ICRC began to obtain more frequent access, although still on an ad hoc basis, to prisoners privately held by paramilitary groups or guerrilla forces.

d. Arbitrary Arrest, Detention, or Exile

The Constitution includes several provisions designed to prevent illegal detention; however, there continued to be instances in which the authorities arrested or detained citizens arbitrarily.

The law prohibits incommunicado detention. Anyone held in preventive detention must be brought before a judge within 36 hours to determine the legality of the detention. The judge must then act upon that petition within 36 hours of its application. Despite these legal protections, instances of arbitrary detention continued; the Human Rights Ombudsman reported 509 formal complaints of arbitrary or illegal detention in 1996, far more than the 374 cases reported in 1995. The CINEP and Justice and Peace, using different reporting criteria, received 51 reports of arbitrary detention during the first 9 months of 1997.

An estimated 46 percent of the nation's prison inmates were being held in various forms of pretrial detention. At the time of the April Valledupar prison uprising, the facility's population approached five times its official capacity; 341 of the 578 inmates were being held in pretrial detention.

Conditional pretrial release is available under certain circumstances, for example, in connection with minor offenses or after unduly lengthy amounts of time in preventive detention. It is not available in cases of serious crimes, such as homicide or terrorism.

Forced exile is not formally practiced, although there were repeated instances of individuals pressured into self-exile for their personal safety. Such cases included persons from all walks of life, including politicians, human rights workers, slum-dwellers, business executives, and rural farmers. The threats came from various quarters: Elements of the military, paramilitary groups, guerrilla groups, narcotics traffickers, and other criminal elements.

In more than 150 cases, the Office of the Presidency actively assisted the international relocation of threatened persons, including the provision of financial support, when it was decided that the Government was unable to ensure their security anywhere within the country. Richard Velez, a television cameraman who was beaten severely by several army troops while filming a 1996 peasant protest by coca-leaf pickers in Caqueta department, fled the country along with his family in October. Velez had received a number of threats, culminating in an early October armed assault (see also Section 2.a.).

e. Denial of Fair Public Trial

The civilian judicial system, reorganized under the 1991 Constitution, is largely independent of the executive and legislative branches, both in theory and in practice, although the suborning or intimidation of judges, witnesses, and prosecutors by those indicted or involved is common.

The judiciary includes the Constitutional Court, Supreme Court of Justice, the Council of State, the Superior Judicial Council, tribunals, and courts. The Prosecutor General's office is an independent prosecutorial body.

The judiciary has long been subject to threats and intimidation when dealing with cases involving members of the armed forces or of paramilitary, guerrilla, and narcotics organizations. Although the number of instances of violent attacks against prosecutors and judges declined with the abatement of drug-related terrorism in the late 1980's--and as extradition of citizens was halted in 1991--prosecutors, judges, and defense attorneys continued to be subjected to threats and acts of violence. Prosecutors reported, moreover, that potential witnesses in major cases often lacked faith in the Government's ability to protect their anonymity and were thus unwilling to testify, ruining chances for successful prosecutions.

Corruption and intimidation are believed responsible for the relatively light prison terms that Gilberto and Miguel Rodriguez Orejuela, longtime leaders of the multi-billion dollar Cali-based narcotics trafficking cartel, received in January (10-1/2 and 9 years, respectively). A court subsequently sentenced Miguel Rodriguez to 23 years in prison for other crimes. The Rodriguez Orejuelas are credibly believed to continue to operate their business from Bogota's La Picota prison.

The Constitutional Court struck several blows against impunity during the year. In August it directed the separate military judicial system, long accountable only to the uniformed military leadership, to relinquish to the civilian judiciary investigation and prosecution of human rights violations and other alleged crimes not directly related to acts of service. On September 23, the Constitutional Court declared null and void a statute of the Penal Code (dating from the 1930's) that prohibited punishment of politically motivated rebels for any criminal acts committed in combat, except those that constituted acts of savagery or barbarism.

Prior to the August Constitutional Court decision, most cases involving high-level military personnel were transferred to the military courts, where convictions in human rights-related cases were the rare exception (see also Section 1.a.). One

significant exception to the military's routine exertion of exclusive jurisdiction was the June 12 decision by the Superior Judicial Council to deny the military's request and remand to the civilian courts the criminal case against army Colonel Hernando Navas Rubio. Navas Rubio, one-time Deputy Commander of the 14th Brigade at Puerto Berrio, Antioquia, in the Magdalena Medio region, was charged in connection with the November 11, 1988, massacre at Segovia, Antioquia, which left 50 persons dead and 49 wounded. Most significantly, the military courts had already obtained jurisdiction for the trials of three of Navas Rubio's own subordinates, who had been charged earlier in connection with the same crimes.

The Attorney General's office is part of the Public Ministry. It investigates misconduct by public officials and orders administrative sanctions as applicable. The Attorney General for Human Rights investigates some allegations of human rights abuses by members of the state security apparatus, drawing upon a nationwide network of hundreds of government human rights investigators covering the nation's 1,071 municipalities.

The Public Ministry's National Ombudsman for Human Rights is elected by the House of Representatives to a 4-year term and has the constitutional duty to ensure the promotion and exercise of human rights. In addition to providing public defense attorneys in criminal cases, the Ombudsman's offices throughout the country provide a legal channel for thousands of complaints and allegations of human rights violations. In practice, however, the Ombudsman's operations are severely underfunded and continued to labor under significant staffing shortages in an effort to develop a credible public defender system. The 1996 budget, for example, was sufficient to employ 558 public defenders (compared with the official goal of 2,000), providing only minimal coverage for just 70 percent of the nation's municipalities. None of the public defenders were permanent members of the civil service; all were contract employees.

The Prosecutor General is elected by the Supreme Court of Justice from a list of three candidates chosen by the President and is tasked with investigating criminal offenses and presenting evidence against the accused before the various judges and tribunals.

The October strike by 41,000 judicial branch employees interrupted the prosecution of hundreds of cases, and led to the release of some criminal detainees whose habeas corpus rights were violated because they were not brought before a judge for arraignment during the required period after their initial detention.

The Constitution specifically provides for the right to due process. The outcome of all trials is determined by judges; there are no jury trials. The accused is presumed innocent until proven guilty and has the right to representation by counsel, although representation for the indigenous and the indigent historically has been inadequate. As in past years, the judiciary remained overburdened and often in a state of chaos, staggering under a backlog estimated at over 1 million cases. The new Prosecutor General announced in May the establishment of a commission to analyze the backlog and make recommendations as to how to reduce the case load and streamline procedures.

Trials conducted by the regular courts are public. Defendants have the right to be present and the right to timely consultation with an attorney. Defendants and their attorneys have the right to question or contradict (although not directly confront) witnesses against them, to present witnesses on their own behalf, and to have access to government evidence relevant to the case. Defendants also have the right to appeal a conviction to a higher court.

The civilian justice system continued to incorporate regional or public order jurisdictions to prosecute cases involving the crimes of narcotics trafficking, terrorism, kidnaping, subversion, extortion, and some cases of human rights violations. In these courts, prosecutors, judges, witnesses, and attorneys act under cover of anonymity for security reasons. Given security concerns, and since testimony and evidence is typically provided to the judge in written form, regional court trials are not public. While a 1993 reform of the Criminal Procedures Code addressed certain procedural shortcomings within the system, significant problems remained. It was still difficult for defense attorneys to impeach or cross-examine anonymous witnesses, and often the defense attorneys did not have unimpeded access to the State's evidence. As a result of such concerns, judges may no longer base a conviction solely on the testimony of an anonymous witness.

Prosecutors, judges, and witnesses generally maintained that the protection of anonymity provided by the faceless system is essential to the successful investigation and prosecution of cases in a country where violence is endemic and acts of revenge against those prosecuting violent crime may be expected. Domestic and international human rights groups, President Samper, the Prosecutor General, and military forces Commanding General Bonett, however, all publicly stated during the year that the anonymous court system violates basic legal norms and procedural rights and requires stricter controls and limits. Some of the most vocal congressional critics of the regional courts, however, have themselves been implicated in those courts' investigations into the purchase of political protection by the Cali narcotics cartel.

The U.N. Committee on Human Rights and the IACHR urged the Government to abolish the regional judicial system and ensure that all trials adhere to due process norms. The Legal Statute of Justice sets a June 1999 deadline to disband the regional court system.

In an attempt to deal with impunity, the Prosecutor General in October 1995 created a special Human Rights Unit as part of the regional courts system. The unit achieved significant results; its group of 25 anonymous prosecutors addressed several hundred cases involving massacres, extrajudicial killings, kidnapings, and terrorism. They issued arrest warrants against members of the public security forces, paramilitary, guerrilla, and drug trafficking organizations and successfully arrested dozens of those suspects by year's end, including those charged with the May 19 CINEP murders (see Sections 1.a. and 4).

Paramilitary groups and guerrillas continued to target and kill judicial and criminal investigative employees for their efforts to enforce the rule of law. In August the Bogota regional court indicted in absentia 24 national and regional leaders of the FARC on charges of rebellion, terrorism, and kidnaping. Although top military leaders hailed the cases brought against guerrilla leaders, they strongly objected, and in some cases tried to obstruct, prosecution of cases against members of the armed forces and of paramilitary organizations.

The Government states that it does not hold political prisoners. The ICRC reported that it monitored approximately 3,000 cases of imprisoned citizens accused of terrorism, rebellion, or aiding and abetting the insurgency, which are crimes punishable under law. It is likely, however, that a number of those persons were convicted by regional courts without the full due process benefits of a fair public trial.

f. Arbitrary Interference With Privacy, Family, Home, or Correspondence

The law generally requires a judicial order for authorities to enter a private home, except in cases of hot pursuit. The Ministry of Defense continued training public security forces in legal search procedures that comply with constitutional and human rights. Defense Ministry officials complained, however, that in the absence of evidentiary proof collected directly by prosecutors, guerrilla suspects the security forces capture in or out of battle and turn over to judicial authorities are routinely freed due to a lack of juridically acceptable evidence.

A judicial order or the approval of a prosecuting attorney is required to authorize the interception of mail or monitoring of either landline or cellular telephones. This protection extends to prisoners held in jails. However, various state authorities sometimes monitor telephones without obtaining prior authorization.

g. Use of Excessive Force and Violations of Humanitarian Law In Internal Conflicts

The internal armed conflict and narcotics trafficking are the central causes of violations of human rights and humanitarian law. Government security forces violated international humanitarian law, and paramilitary and guerrilla groups, in particular, committed numerous abuses. The ICRC reported that the Government, including military authorities, followed an open-door policy toward the ICRC and readily incorporated Red Cross curriculums on international humanitarian law in standard military training. A persistent emphasis by the army on body counts as a means of assessing field performance is a main contributing cause of government violations of international humanitarian law. With rare exceptions, according to military sources, local commanders typically preferred to transfer or discharge soldiers accused of serious human rights violations, rather than initiate court martial proceedings.

The U.N. Committee on Human Rights noted in May that, although the decree authorizing "public order zones" had expired in November 1996, the public security forces in some cases continued to exercise special powers over the civilian population and authorities, including judicial authorities. The Committee expressed particular concern for "the fact that the military exercise the functions of investigation, arrest, detention and interrogation."

In zones where the guerrillas were active, such as the Sierra Nevada and Valle de Cauca, the public security forces often suspected the indigenous population of complicity with narcotics traffickers and guerrillas. In September and October, the military conducted a sustained joint air-land operation against the FARC, primarily in the Yari region of Meta, Guaviare, and Caqueta departments. On September 5, Escolastico Ducuara, the indigenous governor of the Pijao ethnic community, criticized the aerial bombardment of an indigenous community near San Vicente del Chagran, Caqueta department. Although General Gabriel Eduardo Contreras publicly rejected the reports as rumors, a subsequent field investigation by the National Human Rights Ombudsman confirmed that there had been indiscriminate bombings by the military in the indigenous communities of Pijao, Piratapuyo, and Tucano.

Data compiled by the System of Information on Households Displaced by Violence (SISDES) showed that in 1996 the public security forces were responsible for 16 percent of forced displacements.

The Government initiated a program in December 1994 to organize and register civilian rural defense cooperatives, known collectively as Convivir, which were to provide counter-insurgency intelligence to local police and military commanders. The Government acknowledged approximately 440 such groups in 21 of the nation's 32 departments by mid-year. Credible outside observers, however, placed the number at more than 700. Although the authorities originally intended these groups to be

unarmed, they subsequently authorized an undetermined number to carry small arms in self-defense. Other Convivir groups were clearly operating outside the terms of the law, as they were armed with rifles, shotguns, machine guns, and other weaponry, much of it authorized, sold, or otherwise provided to them by the military.

Antioquia's governor testified before the U.N. Human Rights Commission in July in support of the Convivir groups as a legal manifestation of the civilian population's legitimate right to self-defense in the face of rising guerrilla violence. A number of observers and officials also argued that the Government's efforts to combat the guerrillas would inevitably be less discriminate, and result in greater human rights abuses, without the active participation of members of the public, especially in providing intelligence information to the police and military.

The Ombudsman's 1997 report to Congress, however, reiterated his office's opposition to the Convivir program, on the grounds that it involved citizens in the armed conflict, stripped them of their protected status, and converted them into legitimate targets of attack. Both President Samper and the official in charge of registering and overseeing the Convivir conceded in August that state oversight of the Convivir was both necessary and lacking. In a 4-to-5 ruling on November 7, the Constitutional Court determined that the Convivir were a constitutional means for combating guerrillas, but that the Convivir must relinquish rifles, machine guns, and other restricted weaponry in their possession.

The many paramilitary groups are diverse in their motivations, structure, leadership, and ideology, although the April establishment of the United Self-defense Groups of Colombia (AUC) as a national umbrella organization was clearly designed both to provide a national structure and to develop a more coherent political culture for the nation's local and regional paramilitary groups. The victims of paramilitary killings were typically unarmed, noncombatant civilians. Paramilitary groups sought the death or displacement of civilians as punishment for perceived ties to the guerrillas. The paramilitary groups centered their actions in selective killings, intimidation, and the forced displacement of persons not directly involved in the hostilities. They targeted teachers, labor leaders, community activists, mayors of towns and villages, town council members, and, above all, peasants whom they accused of supporting the leftist guerrillas. A number of these victims included members of indigenous communities, and paramilitary forces were responsible for the July massacre of 15 indigenous persons. Despite the continuing, alarming rise in paramilitary activity since 1992, the military has failed to give priority to confronting these illegal groups.

According to the independent Advisory Committee for Human Rights and Displacements, some 257,000 persons were forcibly displaced from their homes by violence during 1997; the total number of internally displaced citizens during 1995-97 exceeds 525,000. It remains unclear, however, how many displacements become permanent. Some people return home within a few days or weeks, while an undetermined number are permanently displaced and forced to resettle in other regions of the country. Forced displacement of civilian populations has become an integral part of the strategy employed by some paramilitary forces. They employed terror campaigns in some cases to depopulate communities believed to be loyal to leftist guerrillas; in other cases, the paramilitary groups loyal to large economic interests (often including narcotics traffickers) displaced populations so that valuable land and economic assets could then be purchased very cheaply.

Data compiled by the SISDES showed that in 1996 paramilitary organizations were responsible for 32 percent of forced displacements. According to the Colombian Red Cross, some 75 percent of the urban population of Riosucio, Choco department, and various nearby hamlets--some 15,000 persons in all--were forcibly displaced during March and April. The Uraba region of Antioquia and Choco departments suffered the greatest displacements on a per capita basis. According to the Advisory Committee for Human Rights and Displacement, mass displacements occurred in 208 municipalities in 27 departments, with residents of Antioquia constituting 31 percent of all displaced persons. More than 120,000 citizens were internally displaced during the first 7 months of 1997. On July 2, the Archbishop of Santa Fe de Antioquia criticized the paramilitary order not to sell foodstuffs to the residents of Frontino, Dabeiba, and Canas Gordas, declaring that 12,000 persons were being put at risk of having to relocate in order to obtain food--the clear intent of the paramilitary edict.

Paramilitary groups and guerrilla organizations continued to pursue strategies that routinely violated citizens' rights. Their tactics consistently included extrajudicial killings, kidnaping, torture, targeting of civilian populations and installations, and the forced recruitment of children under the age of 15. Once recruited, child guerrillas are virtual prisoners of their commanders and subject to various forms of abuse. Sexual abuse of young girls is a particular problem. Guerrillas also were responsible for the continuing indiscriminate deployment of landmines, often resulting in the killing or maiming of civilian noncombatants.

SISDES data showed that in 1996 guerrilla organizations were responsible for 26 percent of forced displacement of civilians. Three main communist guerrilla armies--the FARC, the ELN, and EPL--commanded an estimated total of 10,000 to 15,000 full-time guerrillas operating in more than 100 fronts in an estimated 30 of the nation's 32 departments. Tied loosely into the Simon Bolivar Coordinating Group, these groups exercised a degree of influence in 57 percent of the nation's 1,071 municipalities.

On September 3, FARC forces attacked the Guatape hydroelectric facility, one of the nation's largest power plants. The attackers included a large number of child guerrillas; according to plant employees and other witnesses, some were as young as 8 years of age. As part of their attempts to disrupt the October 26 elections, ELN guerrillas attempted to use a 9-year-old child to deliver a 33-pound bomb to a polling place in Cucuta on election day (see also Section 3).

A FARC car bomb placed in front of the El Pescador Hotel in Apartado, Antioquia, on February 27 killed 11 persons and wounded 53. Two ELN car bombs on March 16 in Cucuta killed an 18-month-old child and injured four other persons. Another ELN car bomb the same day in Saravena, Arauca, killed four persons and wounded five.

A FARC letter bomb sent on April 14 to former EPL leader Mario Agudelo Vasquez in Antioquia killed his son when the youth opened the package. A second letter bomb, sent the next day to a former EPL member since elected to the Apartado city council, was defused by police. The bombings were part of the FARC's continuing revenge campaign against former guerrillas who had signed peace accords with the Government.

The Caqueta departmental ombudsman announced on September 12 that the FARC had killed nine members of the Koreguaje tribe from the San Jose del Cuerazo indigenous reserve, including Alejandro Piranga, governor of the reserve. The southern bloc of the FARC had previously threatened 64 Koreguaje with death for their supposed support for the army. In August the FARC killed 13 Koreguaje leaders from the nearby San Luis and Aguas Negras reserves. Ombudsman Jose Fernando Castro, who noted that the remaining survivors of the San Luis reserve consisted only of 2 adult men, 19 women, and some 100 children, reiterated his appeal to the guerrillas that they respect the neutrality of the indigenous communities and not involve them in the armed conflict.

Both paramilitary and guerrilla groups were responsible for multiple violations of the protected status of religious and medical personnel, of the wounded, and of the emblem of the Red Cross. On several occasions during the year, paramilitary forces in Putumayo forcibly entered ambulances and hospitals in order to kill wounded persons receiving medical care. Several ambulances were fired upon, stolen, and subsequently used to transport armed paramilitary members or guerrillas. On October 30, the police deactivated an ambulance filled with 220 pounds of explosives. The FARC, which had stolen the vehicle earlier in Colon, Putumayo, had rigged the explosives to detonate when the ignition key was turned. On October 25, Catholic priest Antonio Bedoya was killed in the doorway to his church in San Francisco, Antioquia, after ELN guerrillas opened fire on the departing helicopter of the department's governor. That same day, FARC guerrillas in Meta department announced the kidnaping of Hector Julio Lopez, the Catholic Bishop of Ariari.

ELN guerrillas kidnaped the Bishop of Tibu, Norte de Santander (along with the mayor and mayor-elect) in November, releasing all three in December. On December 9, the FARC killed Catholic priest Damuel Calderon in El Calvario, Meta.

According to statistics compiled by CINEP and Justice and Peace, guerrillas were responsible for killing at least 256 civilians outside of combat during the first 9 months of the year. In the continuing struggle for control of the narcotics and arms smuggling Uraba corridor, the guerrillas' retaliation for paramilitary successes in driving them from a longtime position of unrivaled dominance involved the regular victimization of innocent civilians, although some direct clashes with paramilitary units did occur. To justify summary executions of civilians, guerrillas typically claimed that their victims either were military informants or that they simply refused to support the guerrillas' operations.

The FARC released 70 soldiers and marines on June 15 through the good offices of the ICRC and the Catholic Church-backed National Conciliation Commission. The 60 soldiers had been held since August 31, 1996, when the guerrillas overran the military base at Las Delicias, Putumayo department. The 10 marines were captured on January 17 in Choco department. The release of the military personnel came about only after the President yielded to the guerrillas' demand to "demilitarize" for 1 month an estimated 5,000 square miles of Putumayo and Caqueta departments dominated by the guerrillas and the production of coca.

After months of being in the crossfire between the army, paramilitary forces, and FARC, ELN, and EPL guerrillas, the inhabitants of San Jose de Apartado, Uraba, and 22 outlying hamlets, with the support of the Catholic Church, declared themselves on March 23 to be a neutral "peace community"--off-limits to all participants in the armed conflict. The threats from the army, paramilitary groups, and guerrillas came almost immediately; by March 31, 10 inhabitants had been killed. On July 4, citizens identified several persons debarking from army helicopters as frequent watchstanders at the paramilitary roadblock on the edge of town, including the man responsible for the May 17 detention (and subsequent execution) of Francisco Tabarquino, a member of the peace community's organizing committee.

On October 6, armed members of the FARC's 58th front confronted some 20 residents of San Jose de Apartado and verbally abused them for refusing to provide the FARC with food, lodging, equipment, or intelligence. The guerrillas then ordered the group to depart, but detained Ramiro Correa, a member of the community council, as well as Luis Fernando Espinoza and Fernando Aguirre. The ICRC recovered the bodies of the three local leaders the next morning, bringing the total number

killed in San Jose de Apartado to 41 since March 23.

The FARC continued its campaign of killings against the legal Hope, Peace, and Freedom Movement, whose members had left the EPL following the 1991 peace accord signed with the Government.

Guerrillas killed more than 24 mayors or mayoral candidates during the year, compared with 14 in 1996, according to the Colombian Federation of Municipalities. More than 200 incumbents or candidates for public office, of all political orientations, were killed in political violence during the year, as the FARC, ELN, and EPL guerrilla groups all publicly declared their armed opposition to electioneering in areas they controlled--or attempted to control. Guerrillas kidnaped at least 60 mayors or mayoral candidates; many scores of candidates for lesser local offices were also abducted. The FARC, in particular, orchestrated a massive military and terrorist campaign against political candidates and the electoral process. In addition to its traditional objective to undermine the State's presence and authority in contested areas, the FARC in some cases also sought to win control of a number of mayoralties (and municipal coffers) by eliminating competition to candidates who were actually members of the FARC's clandestine political party, the Bolivarian Movement for a New Colombia, which was formed in 1993.

The guerrilla groups launched armed strikes, burned public transport vehicles, and targeted political candidates, incumbents, party headquarters, electoral workers, and institutions. On September 8, guerrillas bombed various party headquarters in the cities of Bogota, Medellin, Cucuta, and Puerto Lleras. Guerrillas also attacked or bombed more than 25 offices of the National Electoral Council during August, September, and October, and targeted civilians who had been assigned to serve as officials at voting stations.

Guerrilla threats forced more than 2,000 of the 42,500 candidates nationwide to withdraw, including all 4 candidates for the governorship of Putumayo. The Government refused to accept most of the resignations, however, saying that they came after the August 24 deadline for withdrawing candidacies. According to the Federation of Municipalities, at least 75 municipalities were left without any candidates for mayor. At least 20 municipalities were left without candidates for town council; 18 of these were also without mayoral candidates.

On August 15, the ELN kidnaped the mayor of San Pablo, Bolivar department, along with three mayoral candidates and eight city council members. The same day in Simiti, Bolivar, the FARC and ELN jointly kidnaped eight of nine city council members, a mayoral candidate, a candidate for city council, and the town's treasurer. The Simiti council members plus 23 candidates were freed on August 26 after being offered a choice: withdraw from politics or die. They withdrew.

The mayor of Simiti, Ubaldo de Jesus Lopez, had fled the town in July, following the June 30 joint assault on the town by FARC and ELN guerrillas, which resulted in the deaths of three policemen and the abandonment of the town by the police and the army. Lopez, as well as the mayors of Tiquisito, Rio Viejo, and Morales, all relocated to Cartagena, following threats from paramilitary groups and from guerrillas. Paramilitary representatives threatened to depopulate the towns, which they considered guerrilla support bases. At least 10 mayoral candidates and 68 council candidates withdrew in Bolivar, primarily in the southern part of the department.

Following similar FARC kidnapings and threats, candidates for mayor and councils in 10 of Caqueta's 16 municipalities withdrew on August 29, and appealed for the national Government to postpone the elections until security could be ensured. A total of 298 council members in Cesar department withdrew their candidacies the same week.

In a move opposed by military commander General Bonett, Antioquia's governor temporarily appointed four military officers as mayors on September 2, following the FARC kidnaping of the elected mayors, who were released several days later. Eastern Antioquia was particularly affected. The Roman Catholic Diocese of Sonson-Rio Negro announced in September that of the 21 municipalities in the diocese, guerrilla threats forced all the candidates to withdraw in 13 municipalities.

ELN guerrillas killed Liberal Party Senator Jorge Cristo and his bodyguard in Cucuta, Norte de Santander, on August 8. Following the paramilitary takeover of Mapiripan, Meta department, in July, all candidates for local elections withdrew their names.

## Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of the press; although the Government generally respected this right in practice, there were significant exceptions. Journalists practiced self-censorship. However, the privately owned print media published a wide spectrum of political viewpoints and often voiced harsh antigovernment opinions without administrative reprisals. The media continued to operate under a government ban against publication of the text of guerrilla communiques.

The Samper administration was quick to apply pressure on the media when its core interests were threatened. Self-censorship was common, either to curry favor with the Government or to avoid political or economic retaliation. The Ministers of Communications and Mining were forced to resign on August 19, after a leaked tape recording revealed that they had conspired to reward 40 of 80 FM radio licenses to political supporters of the President. In October the Directorate of Prisons (a direct dependency of the Office of the Presidency) forcibly obstructed a television interview with a recently released prisoner, Santiago Medina, President Samper's former campaign treasurer, who accused Samper of having sought and accepted $6 million from the Cali drug cartel. (The interview was subsequently conducted from the open window of an apartment building adjacent to Medina's apartment.)

In a 5-to-4 decision on July 29, the Constitutional Court gave its approval to most of the December 1996 law that granted the Government and Congress unprecedented powers over national television programming. Although the Court struck down the most restrictive provision of the law--which directed the Government's National Television Commission (CNTV) to evaluate the license holders of television news programs on the three national (government-owned) channels and sanction those that did not meet the Government's vaguely defined standards of "objectivity"--it upheld the rest of the law. Senator Martha Catalina Daniels, leader of Samper's supporters in Congress, publicly boasted that "the newscasts and other television contractors are not free... Thus the intervention of the State in this field ensures truthful and impartial news reporting."

The 1996 television law includes a number of elements clearly designed to eliminate troubling news coverage of a scandal-ridden administration, to reward the administration's powerful backers for remaining loyal, and to influence news coverage during the 1997-98 electoral season. The law also terminated the contracts for 10 private news programs before the end of 1997 and required them to bid again for the right to continue broadcasting. It opened the door to the creation of two new private television channels, which are expected to fall under the ownership of economic conglomerates that have historically paid for a privileged relationship with whatever government is in power.

The dissenting judges noted that the abrupt termination of the existing contracts for news programs, which had been established with the assumption of their eventual extension for up to 12 years, would discourage private investment in television and punish those who had already made substantial investments on the basis of their renewable--now abrogated--contract. This sudden change of rules, they argued, violated the fundamental principle of good faith between the State and the citizenry.

The new television law--originally launched by Samper supporters in Congress widely believed to be in the pay of the Cali Cartel-- is regarded as political retaliation for media investigations into narcotics corruption in the Samper administration, particularly President Samper's ties to the Cali Cartel. The co-owner of QAP News, Nobel laureate Gabriel Garcia Marquez, called the television law fundamentally a smokescreen to destroy or expropriate QAP. In the wake of the FM radio licensing scandal, QAP News announced its intention to refuse to pursue its proposal to renew its television broadcast license, convinced that the Samper administration would never authorize it.

On October 27, the CNTV fined QAP $80,000 (100 million pesos) for having withdrawn its application. That same day CNTV not only awarded 5 of the 10 news licenses--including the most lucrative slots--to families of former presidents, but also gave 3 of the licenses to close personal friends of President Samper.

Other government efforts to influence the media included occasional calls on patriotic grounds to limit negative reporting that might hurt the country's image in the world. The Government imposed some restrictions on electronic media coverage of incidents of public disorder and of drug-related or terrorist activity and reserved the right to prohibit coverage of certain news events that could affect state security.

All citizens have the right to seek a judicial injunction or motion ("tutela") in cases involving violations of constitutional rights. This provides all persons and organizations, including the media, with a mechanism to denounce both governmental or private violations of fundamental rights.

Both Colombian and international journalists typically work in an atmosphere of threats and intimidation. The body of Freddy Elles, a photographer for Bogota's El Espectador newspaper, was found on March 19 in Cartagena; he had been handcuffed, tortured, and stabbed to death. Gerardo Bedoya Borrero, editorial director of Cali's El Pais newspaper, was shot and killed on March 20. Bedoya, a former congressman and the cousin of General Harold Bedoya, then Acting Defense Minister, had criticized President Samper for accepting Cali drug cartel money and was a vocal critic of the corrosive influence of the drug trade on all facets of Colombian life. That same day, an anonymous caller threatened to kill Francisco Santos, an editor of Bogota's El Tiempo newspaper, and blow up the newspaper's office. Santos, who had been kidnaped and held for several months in 1990 by the Medellin drug cartel, attributed the threats to drug traffickers angry with the paper's coverage. A car bomb containing approximately 550 pounds of dynamite was deactivated on September 3 in front of the offices of Medellin's El Mundo newspaper. The narcotics traffickers collectively known as "The Extraditables" claimed responsibility and threatened to conduct more such attacks if extradition--then under consideration by the Congress--were reinstated. Seven

journalists were killed in separate attacks during the year.

The Jaime Bateman Cayon movement, a small splinter group of the long-demobilized M-19 movement, claimed responsibility for the kidnaping on December 4 in Bogota of William Parra, the President's press spokesman, and Luis Eduardo Maldonado, a prominent radio journalist. The FARC kidnaped four other journalists on December 13, the same day that the Jaime Bateman Cayon group released Parra and Maldonado.

The Government generally respected academic freedom, and there exists a wide spectrum of political activity throughout the country's universities. Paramilitary groups and guerrillas, however, often targeted teachers at the elementary and secondary levels in areas of conflict. The National Federation of Educators reported that 23 teachers had been killed and another 6 disappeared in the first half of 1997, primarily in Antioquia and Cordoba departments. University-level academics engaged in study of either the internal conflict or human rights were also similarly targeted.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of peaceful assembly, and the Government respects these rights in practice. The authorities do not normally interfere with public meetings and demonstrations and usually grant the required permission except when they determine that there is imminent danger to public order.

The Constitution provides for freedom of association, and the Government respects this right in practice. Any legal organization is free to associate with international groups in its field. Membership in proscribed organizations, such as the FARC, ELN, and EPL, is a crime.

c. Freedom of Religion

The Constitution provides for complete religious freedom, and the Government respects this right in practice. There is little religious discrimination. Roman Catholic religious instruction is no longer mandatory in state schools, and a 1994 Constitutional Court decision declared unconstitutional any official government reference to religious characterizations of the country. The Government permits proselytizing among the indigenous population, provided that it is welcome and does not induce members of indigenous communities to adopt changes that endanger their survival on traditional lands. The law on the freedom of cults provides a mechanism for religions to obtain the status of recognized legal entities.

Both Jehovah's Witnesses and the Mennonite Church encountered problems because of the pacifist nature of their churches. Jehovah's Witnesses complained of inability to perform alternative service to military conscription, despite the military's own legal procedures providing for it. In April the Ministry of Education temporarily suspended a December 1996 order to close the Mennonite biblical seminary and Justapaz, a church-sponsored human rights group. By year's end, however, Mennonite seminarians still were being forced into military conscription.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The Constitution provides citizens with the right to travel domestically and abroad. Outsiders who wish to enter Indian tribes' reserves must be invited. In areas where counter- insurgency operations were underway, police or military officials occasionally required civilians to obtain safe-conduct passes; guerrillas and paramilitary forces often used similar means to restrict travel in areas under their control. Guerrilla incursions, military counter-insurgency operations, forced conscription by paramilitary and guerrilla organizations, and land seizures instigated by wealthy individuals or narcotics traffickers often forced peasants to flee their homes and farms.

Colombia has had a tradition of providing asylum since the 1920's. During the 1970's, Colombia granted asylum to Argentine, Chilean, Uruguayan, and Paraguayan citizens seeking refuge from dictatorial regimes in their own countries. The right to asylum, under terms established by law, is provided for in the 1991 Constitution.

The Government cooperates with the Office of the United Nations High Commissioner for Refugees and other humanitarian organizations in assisting refugees and internally displaced persons. In June the Government formally invited the UNHCR to establish an ongoing presence in the country. The Government reserves the right to determine eligibility for asylum, based upon its own assessment of the nature of the persecution an applicant may have suffered. Some 58 individuals from 13 nations applied for refugee status during the first half of the year. The issue of the provision of first asylum did not arise. There were no reports of the forced expulsion of persons having a valid claim to refugee status to a country where they feared persecution.

With the assistance of the Colombian Government, some 325 Colombians were forcibly returned in April from Panama, where they had fled to escape paramilitary and guerrilla activities in the neighboring Colombian departments of Choco and

Antioquia.

**Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government**

The Constitution provides for the right of citizens to change their government, and citizens exercise this right in regularly scheduled elections by secret ballot. However, critics question if elections have been fair, point out that vote buying has been a regular feature of elections in some regions, and that President Samper's 1994 election campaign solicited and received contributions from drug traffickers.

Presidential elections are held every 4 years, with the incumbent barred for life from reelection. The Liberal and Conservative parties have long monopolized the formal political process with one or the other customarily winning the presidency. Public employees are not permitted to participate in partisan campaigns. Officially, all political parties operate freely without government interference. Those that fail to garner 50,000 votes in a general election lose the right to present candidates and may not receive funds from the Government. They may reincorporate at any time, however, by presenting 50,000 signatures to the National Electoral Board. Voting is voluntary and universal for citizens aged 18 and older, except for active-duty members of the police and armed forces.

Two of the Senate's 102 seats are reserved for representatives of the nation's indigenous communities, while the 100 other senators are elected on the basis of national "at large" balloting. Two seats in the 165-member House of Representatives are reserved for each department and the capital district; additional representation is apportioned through the use of a complex population-based formula.

On October 26, citizens voted for departmental governors and deputies, municipal mayors, and members of town councils and local administrative boards. Due to security constraints, however, elections could not be held in at least 33 of the nation's 1,071 municipalities, including the rural Sumapaz zone of the capital district, Santa Fe de Bogota. Electoral results were distorted in at least 15 percent of the nation's municipalities, as the guerrillas' campaign of threats, kidnapings, and murders forced the withdrawal of some 2,000 candidates for public office (see Section 1.g.).

The campaign period was marred by a high level of paramilitary violence, and an even higher level of guerrilla violence, designed to intimidate both voters and candidates, despite the Government's efforts to provide electoral security. Vote-buying and ballot-box stuffing, common features of elections in some regions, continued. On October 1, National Elections Registrar Orlando Abello publicly criticized the fact that vote "manipulation," in and of itself, was not punishable as a crime. The AUC paramilitary movement declared a ban on electioneering by those candidates it determined were in league with the guerrillas, but urged the citizenry to vote. The AUC said that it interpreted abstention as a vote for the guerrillas and threatened reprisals.

The demobilized guerrillas of the Revolutionary Workers Party were unable to file a formal list of candidates in Sucre department, as seven of the party's candidates had been killed. Despite a revenge campaign waged by the FARC against their former revolutionary allies, demobilized EPL guerrillas won the mayoralties of Apartado, Carepa, and Turbo--the three key municipalities of Uraba's banana-growing region, an area considered forcibly "cleaned" of the FARC's long-time presence by a sustained offensive by paramilitary forces.

The Government invited the Organization of American States (OAS) and the European Union to send international observers to monitor the elections. ELN guerrillas, however, kidnaped two of the OAS observers and a Colombian colleague on October 23 in Antioquia, only releasing them on November 1. Despite the security limitations, the results were widely accepted by most citizens and international observers. The electorate also voted overwhelmingly in favor of a "mandate for peace," a nonbinding plebescite calling for national peace talks and strict adherence to human rights norms in the nation's armed conflict. The relatively high voter participation (about 55 percent) was, given the violence and intimidation from both right and left, seen as a manifestation of the public's ability and willingness to exercise their political rights.

There are no legal restrictions, and few practical ones, on the participation of women or minorities in the political process, although they are underrepresented in official and party positions. Seven female senators and 19 female representatives served among the 267 members of the 2 chambers of Congress, including the second vice president of the Senate. Women served in a number of key cabinet posts during the year, including Ministers of Foreign Affairs, Justice, Agriculture, Education, and Health. The President's advisers for human rights, for juridical affairs, for Bogota, for Antioquia department, and for public administration affairs were also women, as was the director of the National Prisons Institute.

Indigenous people are underrepresented in government and politics; 2 of 102 Senate seats are reserved for indigenous representatives. Blacks also are underrepresented in government and politics. A 1993 law that set aside two House seats for citizens of African heritage was declared unconstitutional in September 1996 by the Constitutional Court, which nonetheless allowed the incumbents to complete their term in office.

**Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights**

A large and varied nongovernmental human rights community is active, providing a wide range of views. Among the many groups are: the Catholic Bishops Conference, the Colombian Commission of Jurists; the Intercongregational Commission for Justice and Peace; the Permanent Committee for the Defense of Human Rights; the Center for Investigations and Popular Research; the Advisory Committee for Human Rights and Displacements; the Latin American Institute for Alternative Legal Services; the Committee in Solidarity with Political Prisoners; the Association of Families of Detained and Disappeared Persons; the Reinsercion Foundation (focused on demobilized guerrillas); the Pais Libre Foundation (focused on the rights of kidnap victims); and the VIDA Foundation (focused on the rights of victims of guerrilla violence). International human rights organizations in the country include the Peace Brigades International and the U.N. High Commissioner for Human Rights.

Nongovernmental organizations (NGO's) investigated and reported on human rights abuses committed by government forces, various paramilitary groups, and the guerrilla armies. Many NGO's expressed serious concern over the growing paramilitary and guerrilla violence--and the Government's increasingly apparent inability to stop either of them. In particular, a number of NGO, as well as governmental, human rights officials were alarmed by the rapid growth of paramilitary groups, both in terms of their responsibility for a significant proportion of human rights violations and their growing political and military power.

The United Nations High Commissioner for Human Rights opened a field office in Bogota in April to operate through April 1998. The office is tasked with monitoring and analyzing the human rights situation throughout the country and with the provision of assistance to the Government, civil society, and NGO's in the field of human rights protection. It submitted private reports to the Government and to the U.N. and occasionally spoke out publicly on particularly egregious abuses committed by government, paramilitary, or guerrilla forces.

The human rights community came under intense pressure during the year. Although the Samper administration generally did not interfere directly with the work of human rights NGO's, many prominent human rights monitors worked under constant fear for their physical safety. Human rights groups were subjected to surveillance, harassing phone calls, graffiti campaigns, and threats by military, intelligence, police, paramilitary, and guerrilla forces. Senior military officials, including General Harold Bedoya, then-Commanding General of the military forces, sometimes publicly voiced feelings of frustration and outright hostility toward the NGO community, or publicly accused particular groups or individuals of working on behalf of the guerrillas.

At least 10 governmental and NGO human rights workers were killed during the year; over a dozen others were forced to relocate within the country, or flee abroad, following threats. Many others were forced to restrict their travel sharply, particularly in the countryside. The Bogota-based representative of the U.N. High Commissioner for Human Rights requested special protection for nongovernmental human rights workers and organizations.

Two CINEP workers, Mario Calderon and Elsa Alvarado, along with Elsa's father Carlos Alvarado, were killed in their Bogota home during the predawn hours of May 19. Five armed individuals, dressed in uniforms of the Fiscalia's Criminal Investigative Team, stormed their apartment and shot them. Elsa's mother, who was seriously wounded, survived the attack, as did the couple's 18-month-old child. No group claimed responsibility for the killings. Army commander General Bonett strenuously denied public suggestions that the army might have been involved. The Prosecutor General's Human Rights Unit arrested five Medellin-based hired killers and charged them with the crimes. The authorities dropped charges against one of the detainees in October and held the other four for trial. The investigation into who ordered the killings continued.

There was no progress in investigating the October 1996 murder of the head of the Meta Committee for Human Rights, Josue Giraldo, who was then under the "protection" of the Inter-American Court of Human Rights. The Court asked the Government in February to prosecute anyone targeting human rights advocates for murder and emphasized the special importance of effectively investigating Giraldo's murder as a means of protection for others so targeted.

Paramilitary groups stormed or otherwise attacked the offices of some human rights groups. Two presumed paramilitary members killed Victor Julio Garzon, founder of the Meta Department Civic Committee for Human Rights, and an active defender of Meta coca-growing peasants, on March 7 in the Bogota offices of the Federation of Agricultural Workers. A small bomb exploded on June 4 at the Medellin office of the Colombian Red Cross when the ICRC was in the final stages of coordinating the June 15 release of 70 government troops held by the FARC. The Medellin offices of the ASFADDES were the target of a June 24 dynamite attack. Following increasing threats, Yanette Bautista, judicial coordinator of ASFADDES, fled the country with her family on September 9. Bautista is the sister of missing M-19 guerrilla Nydia Erika Bautista; the prosecution of those responsible for her 1987 disappearance, torture, and murder has been stymied by the military courts (see Section 1.b.). At least one human rights group was forced to close its Bogota office after receiving direct threats from presumed paramilitary groups.

The Government made a strong formal response to the September Amnesty International report on the crisis caused by the forced internal displacement of civilian populations. The Government claimed the AI report "lacked complete and current information", lamented the presentation of what it termed "inexact information," invited AI to visit, and recounted steps it said had been taken to deal with the situation, including a national fund for populations at risk and a national information network.

The Government has an extensive human rights apparatus, which includes the office of the President's Adviser for Human Rights, the National Human Rights Ombudsman and its regional representatives, the Attorney General's office for human rights and its regional representatives, and a human rights unit within the Prosecutor General's office. Nevertheless, the corps of government human rights advisers and monitors was often unsuccessful in getting its recommendations adopted on government policy issues.

According to September congressional testimony by the Minister of Defense, during the first 8 months of the year, the Attorney General's Office of Human Rights filed only one human rights case against a member of the military services, down from 34 cases in all of 1996, and the 1993 peak of 138 cases. Of the 15 cases closed by the military justice system or the Attorney General's office between January and August, 8 of the accused were absolved, 4 received temporary suspensions, 2 were fined, and 1 case was closed due to the death of the accused. None were permanently separated from service, compared with 12 in 1996. The director of the Attorney General's human rights office reported in mid-November that the office had received only 463 formal human rights complaints against members of the military forces, compared with 2,000 such complaints in 1996. The Attorney General has jurisdiction to carry out disciplinary investigations and administratively punish military officials who improperly conduct criminal proceedings; it is not known, however, if this power has ever been successfully employed.

As part of the Defense Ministry's efforts to protect the rights of citizens, the military services and police have established 225 human rights offices throughout the nation since 1994. These offices accept and investigate public complaints of abuse and coordinate human rights training programs for public security personnel.

An IACHR delegation visited in February to study the status of friendly settlement proceedings in a number of other cases brought before the Commission. On September 9, President Samper announced that the Government had compensated the families of 89 victims of human rights violations, under the terms of the compensation law approved in 1996. The IACHR acknowledged such steps but called on the Government to "create effective mechanisms for ensuring compliance with all the recommendations of the Commission and other international human rights bodies, not only those which recommend financial compensation."

Several international human rights organizations conducted official trips to Colombia in December. For the second time in 5 years, the IACHR commissioners carried out an intensive on-site analysis of the human rights situation. Both Amnesty International and Human Rights Watch/Americas also visited, conducting investigations and meeting with government, military, and NGO representatives, as well as with other independent observers.

The ICRC continued to expand operations, with an office in Bogota plus 11 offices in various conflict zones. The ICRC, working with the presidential human rights adviser and the public security forces, helped provide training programs in international humanitarian law. These programs were directed not only at affected civilian populations but were also integrated into the military training curriculum. Many observers credited these programs with having done much to foster a climate of increased respect for human rights and international humanitarian law within the military forces in recent years.

**Section 5 Discrimination Based on Race, Sex, Religion, Disability, Language, or Social Status**

The Constitution specifically prohibits discrimination based on race, sex, religion, disability, language, or social status. In practice, however, many of these provisions are not enforced. In May the U.N. Committee on Human Rights criticized the continuing practice of social cleansing, directed against street children, homosexuals, prostitutes, and criminals, noting that the Government had "still not instituted adequate and effective measures to guarantee the full protection of the rights of these groups, above all the right to life."

Women

Rape and other acts of violence against women are pervasive in society, and like other crimes, are seldom prosecuted successfully. The quasi-governmental Institute for Family Welfare (ICBF) and the Presidential Adviser's Office for Youth, Women, and Family Affairs continued to report high levels of spouse and partner abuse throughout the country. The ICBF conducted programs and provided refuge and counseling for victims of spousal abuse, but the level and amount of these services were dwarfed by the magnitude of the problem.

The Institute for Legal Medicine estimated that 239,400 persons are victims of sexual abuse annually, 88 percent of them

women. The Institute also estimated that 95 percent of all abuse cases are never reported to authorities.

The 1996 Law on Family Violence criminalized violent acts committed within families, including spousal rape. The law also provides legal recourse for victims of family violence, immediate protection from physical or psychological abuse, and judicial authority to remove the abuser from the household. It allows a judge to oblige an abuser to seek therapy or reeducation. For acts of spousal sexual violence, the law mandates sentences of 6 months to 2 years and denies probation or bail to offenders who disobey court restraining orders. A 1997 law also made additional, substantial modifications to the Penal Code and introduced sentences of between 4 and 40 years for crimes against sexual freedom or human dignity, including: rape, sex with a minor, sexual abuse, induction into prostitution, and child pornography. The law also repealed an old law that fully exonerated a rapist if he subsequently offered to marry the victim and she accepted.

The Constitution prohibits any form of discrimination against women and specifically requires the authorities to ensure "adequate and effective participation by women at decisionmaking levels of public administration." Even prior to implementation of the 1991 Constitution, the law had provided women with extensive civil rights. Despite these constitutional provisions, however, discrimination against women persists. According to figures published by the United Nations, women's earnings for formal sector, nonagricultural work correspond to approximately 85 percent of men's earnings for comparable work, and women must demonstrate higher qualifications than men when applying for jobs. Moreover, women constitute a disproportionately high percentage of the subsistence labor work force, especially in rural areas.

ICBF data indicated that although working women suffered from a higher rate of unemployment than men, the economically active female population had a higher level of education than did men. Some 39 percent of working women were employed in minimum wage jobs, however, compared with 31 percent of men.

Despite an explicit constitutional provision promising additional resources for single mothers and government efforts to provide them with training in parenting skills, women's groups reported that the social and economic problems of single mothers remained great. The Constitutional Court ruled on September 25 that pregnant women and mothers of new-born children under 3 months of age could not be fired from their jobs without "just cause." Bearing children, the Court ruled, was not just cause.

Children

The Constitution formally provides for free public education, which is compulsory between the ages of 6 and 14, inclusive. Nevertheless, an estimated 25 percent of children in this age group do not attend school, due to lax enforcement of truancy laws, inadequate classroom space, and economic pressures to provide income for the family.

Despite significant constitutional and legislative commitments to the protection of children's rights, these were implemented only to a minimal degree. The Constitution imposes the obligation on family, society, and the State to assist and protect children, to foster their development, and to assure the full exercise of these rights. A special Children's Code sets forth many of these rights and establishes services and programs designed to enforce the protection of minors. Children's advocates reported the need to educate citizens with regard to the code as well as the 1996 and 1997 laws on Family Violence, which had been drafted particularly to increase legal protection for women and children.

According to the Institute for Legal Medicine, 82 percent of sexual abuse victims were minors. An estimated 25,000 boys and girls under age 18 work in the sex trade. In 1996 legislators passed a law prohibiting sex with minors or the employment of minors for prostitution, and in 1997 that law was amended to provide that conviction for nonviolent sexual abuse of a child under 14 carries a prison sentence of 4 to 10 years. Conviction for rape of anyone under the age of 12 carries a mandatory sentence of 20 to 40 years in prison. Although enforcement of such laws is lax, crimes against children are being dealt with more severely than in the past. The ICBF oversees all government child protection and welfare programs and funds nongovernmental and church programs for children. In conflict zones, children were also often caught in the crossfire between the public security forces, paramilitary groups, and guerrilla organizations.

People With Disabilities

The Constitution enumerates the fundamental social, economic, and cultural rights of the physically disabled, but serious practical impediments exist that prevent disabled persons' full participation in society. There is no legislation that specifically mandates access for people with disabilities. According to the Constitutional Court, physically disabled individuals must have access to, or if they so request, receive assistance at, voting stations. The Court has also ruled that the social security fund for public employees cannot refuse to provide services for the disabled children of its members, regardless of the cost involved.

Indigenous People

There are approximately 82 distinct ethnic groups among the 800,000 indigenous inhabitants. The Constitution gives special recognition to the fundamental rights of indigenous people. It provides for a special criminal and civil jurisdiction, based upon traditional community laws, within Indian territories. The Ministry of Interior, through the Office of Indigenous Affairs, is responsible for protecting the territorial, cultural, and self-determination rights of Indians. Ministry representatives are located in all regions of the country with indigenous populations and work with other governmental human rights organizations, as well as with NGO human rights groups and civil rights organizations, to promote Indian interests and investigate violations of indigenous rights. Nonetheless, members of indigenous groups suffer discrimination in the sense that they have traditionally been relegated to the margins of society. Few opportunities exist for those who might wish to participate more fully in modern life. In addition, indigenous communities suffer disproportionately from the internal armed conflict (see Section 1.g.).

Traditional Indian authority boards operate some 334 designated Indian reserves; the boards handle national or local funds and are subject to fiscal oversight by the national Comptroller General. These boards administer their territories as municipal entities, with officials elected or otherwise chosen according to Indian tradition. Indigenous communities are free to educate their children in traditional dialects and in the observance of cultural and religious customs. Indigenous men are not subject to the national military draft.

Most threats or attacks on members of indigenous communities stemmed from land ownership disputes concerning the designated Indian reserves. The National Land Reform Institute estimated that some 40 indigenous communities had no legal title to land they claimed as their own, and that an estimated 100 additional groups had title claims that were not recognized or reconciled.

In October the National Public Order Tribunal overruled the October 1995 decision of an Antioquia regional judge and found William Alberto Tulena Tulena guilty of ordering the May 27, 1994, killing of three Zenu Indian leaders and their driver, after they had filed a lawsuit regarding a land dispute in San Andres de Sotavento, Cordoba. The Tribunal found that Tulena had the men killed to prevent the valid pursuit of Zenu claims to the lands, which dated back more than two centuries in favor of the Zenus. The Tribunal ordered Tulena to serve 55 years in prison and pay 2,000 grams of gold to the family of each of his victims. Tulena owns extensive land holdings in Cordoba, was implicated in the activities of some local paramilitary forces, and is the nephew of a former president of the Senate.

A contract that Ecopetrol, the national oil company, awarded to Occidental Petroleum in 1995 continued to cause conflict with the 5,000-member U'wa indigenous community. After a Bogota superior court issued an injunction against further exploration by Occidental and Ecopetrol on lands claimed by the U'wa, the Supreme Court and the Council of State issued separate, contradictory decrees in the matter. In May the U'wa filed a complaint before the IACHR. The community claimed that there was insufficient prior consultation, and that the person, cultural, economic, and environmental rights of the community's members had not been respected. That same month, the Government requested that the OAS sponsor a joint investigation with a university of the dispute. That study subsequently recommended the immediate and unconditional suspension of oil exploration or exploitation activities; clarification of the status of U'wa territories and protected reserves; and the development of a formal process of consultation under auspices of the Government.

National/Racial/Ethnic Minorities

Approximately 2 million citizens of African heritage live primarily in the Pacific departments of Choco, Valle del Cauca, and Narino, and along the Caribbean coast. They represent roughly 5 percent of the total population, while the figures of the National Administrative Department of Statistics place the national black population at 16 percent of the total, or 6.4 million.

Blacks are entitled to all constitutional rights and protections but have traditionally suffered from economic discrimination. Despite the passage of the African-Colombian Law in 1993, little concrete progress was made in expanding public services and private investment in the Choco or other predominantly black regions. Unemployment, for instance, among African-Colombians ran as high as 76 percent in some communities. Choco department remains the department with the lowest per capita level of social investment and is last in terms of education, health, and infrastructure. It also has been the scene of some of the nation's most unremitting political violence, as guerrillas and paramilitary forces struggled for control of the Uraba region.

Allegations of discrimination and hazing by the military against African-Colombians continued. The navy makes little effort to recruit African-Colombians, despite their traditional ties to the sea and maritime commerce. The U.N. Special Rapporteur on Racial Discrimination noted in a 1996 report that "The responses received were confused or an uncomfortable silence when one asked questions regarding the number or percentage of African-Colombians who serve in the army, the navy, the diplomatic corps, or in the Catholic Church hierarchy, as if these were unusual or inappropriate questions."

**Section 6 Worker Rights**

a. The Right of Association

The 1991 Constitution recognizes the rights of workers to organize unions and strike, except for members of the armed forces and police, and those "essential public services" as defined by law. However, legislation that prohibits public employees from striking is still in effect, even if often overlooked. The Labor Code provides for automatic recognition of unions that obtain at least 25 signatures from potential members and comply with a simple registration process at the Labor Ministry. The law penalizes interference with freedom of association. It allows unions to determine freely internal rules, elect officials, and manage activities, and forbids the dissolution of trade unions by administrative fiat. According to Labor Ministry estimates, approximately 7 percent of the work force is organized in about 4,900 labor organizations.

Before staging a legal strike, unions must negotiate directly with management and, if no agreement results, accept mediation. By law, public employees must accept binding arbitration if mediation fails; in practice, public service unions decide by membership vote whether or not to seek arbitration.

In 1993 the International Labor Organization (ILO) criticized 10 provisions of the law, including: The supervision of the internal management and meetings of unions by government officials; the presence of officials at assemblies convened to vote on a strike call; the legality of firing union organizers from jobs in their trades once 6 months have passed following a strike or dispute; the requirement that contenders for trade union office must belong to the occupation their union represents; the prohibition of strikes in a wide range of public services that are not necessarily essential; various restrictions on the right to strike; the power of the Minister of Labor and the President to intervene in disputes through compulsory arbitration when a strike is declared illegal; and the power to dismiss trade union officers involved in an unlawful strike.

Labor leaders throughout the country continued to be the target of attacks by the military, police, paramilitary groups, guerrillas, narcotics traffickers, and their own union rivals. In June the International Confederation of Free Trade Unions announced in Geneva that 98 union members had been killed because of their union activities in 1996, many of them employed in the banana industry of the Uraba region. Members of paramilitary groups and the FARC guerrillas both carried out a number of massacres in Uraba during the year, often targeting the same groups of organized workers. Many of the victims of the FARC massacres were former EPL guerrillas, targeted for their participation in, or sympathy with, the National Syndicate of Agro-Industry Workers, a labor union closely associated with the Hope, Peace, and Freedom Movement made up of demobilized EPL guerrillas.

A collective work convention signed in 1995 between Ecopetrol and the Union of Syndicated Labor (USO) remained in effect. That accord was the result of the Government's restructuring, rather than privatizing, Ecopetrol to avoid massive layoffs. The USO leadership remained in open conflict with the Government on many issues. USO leaders reported further that its members in the oil-producing Magdalena Medio region continued to receive death threats from presumed paramilitary groups, who have accused USO officials of working with the ELN guerrillas waging a sabotage campaign against the nation's oil pipelines. In November the Prosecutor General charged 20 USO members--including the union's former president--with conspiracy to perpetrate dynamite attacks on the Cano Limon oil pipeline.

Unions are free to join international confederations without government restrictions.

b. The Right to Organize and Bargain Collectively

The Constitution protects the right of workers to organize and engage in collective bargaining. Workers in larger firms and public services have been most successful in organizing, but these unionized workers represent only a small portion of the economically active population. High unemployment (about 14 percent), traditional antiunion attitudes, and weak union organization and leadership limit workers' bargaining power in all sectors.

The law forbids antiunion discrimination and the obstruction of free association. Government labor inspectors theoretically enforce these provisions, but because of the small number of inspectors and workers' fears of losing their jobs, the inspection apparatus is weak. The Labor Code calls for fines to be levied for restricting freedom of association and prohibits the use of strike breakers.

Collective pacts--agreements between individual workers and their employers--are not subject to collective bargaining and are typically used by employers to obstruct labor organization. Although employers must register collective pacts with the Ministry of Labor, the Ministry does not exercise any oversight or control over them.

The Labor Code also eliminates mandatory mediation in private labor-management disputes and extends the grace period before the Government can intervene in a conflict. Federations and confederations may assist affiliate unions in collective bargaining.

Labor law applies to the country's seven free trade zones (FTZ's), but its standards are difficult to enforce. Public employee unions have won collective bargaining agreements in the FTZ's of Barranquilla, Buenaventura, Cartagena, and Santa Marta, but the garment manufacturing enterprises in Medellin and Risaralda, which have the largest number of employees, are not organized. National labor leaders claim that in these FTZ's the provisions of the Labor Code dealing with wages, hours, health, and safety are not honored.

c. Prohibition of Forced or Compulsory Labor

The Constitution forbids slavery and any form of forced or compulsory labor, and this prohibition is generally respected in practice. The law prohibits forced or bonded labor by children but the Government does not have the resources to effectively enforce this prohibition (see Section 6.d.)

d. Status of Child Labor Practices and Minimum Age for Employment

The Government prohibits forced and bonded labor by children but is unable to enforce this prohibition effectively (see Section 6.c.).

The Constitution bans the employment of children under the age of 14 in most jobs, and the Labor Code prohibits the granting of work permits to youths under the age of 18. A 1989 decree establishing the Minors Code prohibits the employment of children under age 12 and demands exceptional conditions and the express authorization of Labor Ministry inspectors for the employment of children between the ages of 12 and 17 (inclusive). These requirements are largely ignored in practice, however, and only 5 percent of those working have filed for the required work permits.

A 1996 Labor Ministry study determined that 28 percent of all children between the ages of 12 and 17 worked. Some 15 percent of urban 12- to 17-year-olds worked, as did fully one-third of those in rural areas. More than 50 percent of all child workers did not attend school at all. The study also determined that child workers averaged 50 hours of work per week, double the legal limit of 26 hours per week. In rural areas, the study determined that 75 percent of child workers received, on average, one-fourth of the minimum wage, while 25 percent received no pay at all. Only 10 percent of child laborers were found to be covered by the health services of the social security system. A 1996 study by the National Human Rights Ombudsman of child labor in Putumayo department found that 22 percent of the children between the ages of 5 and 18 were full-time coca-pickers. In the municipality of Orito, the figure reached 70 percent.

Child workers are exposed to the same risks that affect adult workers, including exposure to toxic substances and accidental injuries, all of which contribute to impaired physical development. The ICBF continued its outreach campaign to inform child laborers of their rights and where to turn for help. No statistics were available to measure the impact of this effort.

e. Acceptable Conditions of Work

The Government sets a uniform minimum wage for workers every January to serve as a benchmark for wage bargaining. The monthly minimum wage was $139.25 (172,682 pesos) throughout 1997. The minimum wage does not provide a decent standard of living for a worker and family. Because the minimum wage is based on the Government's target inflation rate, the minimum wage has not kept up with inflation in recent years. By government estimates, the price of the family shopping basket is 2.4 times the minimum wage. However, 77 percent of all workers earn no more than, and often much less than, twice the minimum wage.

The law provides for a standard workday of 8 hours and a 48-hour workweek, but it does not specifically require a weekly rest period of at least 24 hours, a failing criticized by the ILO. Legislation provides comprehensive protection for workers' occupational safety and health, but these standards are difficult to enforce, in part due to the small number of Labor Ministry inspectors. In addition, unorganized workers in the informal sector fear the loss of their jobs if they exercise their right to denounce abuses, particularly in the agricultural sector. According to the Labor Code, workers have the right to withdraw from a hazardous work situation without jeopardizing continued employment. In general, a lack of public safety awareness, inadequate attention by unions, and lax enforcement by the Labor Ministry result in a very high level of industrial accidents and unhealthy working conditions. Over 80 percent of industries lack industrial security plans. The Social Security Institute reported 115,000 work-related accidents for 1995, 17,000 of which resulted in deaths. Informed observers reported that the level of work-related accidents was expected to remain at comparably high levels in 1997.

[end of document]



Return to 1997 Human Rights Practices report home page.
Return to DOSFAN home page.
This is an official U.S. Government source for information on the WWW. Inclusion of non-U.S. Government links does not imply endorsement of contents.

# EXHIBIT 5



**U.S. DEPARTMENT of STATE**

## Colombia

Country Reports on Human Rights Practices  - 2001
Released by the Bureau of Democracy, Human Rights, and Labor
March 4, 2002

Colombia is a constitutional, multiparty democracy in which the Liberal and Conservative parties have long dominated politics. In 1998 citizens elected President Andres Pastrana of the Conservative Party and a bicameral legislature controlled by the Liberal Party in generally free, fair, and transparent elections, despite attempts at intimidation and fraud by paramilitary groups, guerrillas, and narcotics traffickers. The Government continued to face serious challenges to its control over the national territory, as longstanding and widespread internal armed conflict and rampant violence--both political and criminal--persisted. The principal participants in the conflict were government security forces, paramilitary groups, guerrillas, and narcotics traffickers. The country's internal conflict caused the deaths of between 3,000 and 3,500 civilians during the year, including combat casualties, political murders, and forced disappearances. The civilian judiciary is largely independent of government influence; however, the suborning or intimidation of judges, witnesses, and prosecutors is common.

The civilian-led Ministry of Defense (MOD) is responsible for internal security and oversees both the armed forces (including the army, air force, navy, marines, and coast guard) and the National Police. In the past, civilian management of the armed forces has been limited; however, over the past few years, the professionalism of the armed forces has improved, and respect for civilian authority on the part of the military has increased. In addition to the armed forces and the National Police, the public security forces include armed state law enforcement and investigative authorities, including the Administrative Department of Security (DAS) and the Prosecutor General's Technical Corps of Investigators (CTI). The DAS, which has broad intelligence gathering, law enforcement, and investigative authority, reports directly to the President but is directed by a law enforcement professional. The police are charged formally with maintaining internal order and security but in practice often share law enforcement responsibilities with the army in both rural and urban areas. There are approximately 192 municipalities that lack a state security presence. Many observers maintain that government action to combat paramilitarism has been inadequate, and in the past security forces regularly failed to confront paramilitary groups. However, the security forces confronted and detained significantly more members of paramilitary groups during the year compared with the previous year. Nevertheless, members of the security forces sometimes illegally collaborated with paramilitary forces. Members of the armed forces and the police committed serious violations of human rights.

The country's population is estimated at 41,713,000. Despite years of drug- and politically related violence, the economy is diverse and relatively advanced. Crude oil, coal, coffee, and cut flowers are the principal legal exports. In 1999 the country suffered its first recession in over 60 years, with a decrease in gross domestic product (GDP) of 4.3 percent and record unemployment of over 18 percent. The economy grew approximately 2 percent during the year, and unemployment stood at 16.8 percent at year's end. The inflation rate at year's end was 7.65 percent. Since 1999 the Government has adopted fiscally austere budgets and floated the peso. High levels of violence greatly inhibit business confidence. Narcotics traffickers continued to control large tracts of land and other assets and exerted influence throughout society, the economy, and political life. Income distribution is highly skewed; much of the population lives in poverty. Per capita GDP was approximately $2,087.

The Government's human rights record remained poor; there were continued efforts to improve the legal framework and institutional mechanisms, but implementation lagged, and serious problems remained in many areas. A small percentage of total human right abuses reported are attributed to state security forces; however, government security forces continued to commit serious abuses, including extrajudicial killings. Impunity remained a problem. Despite some prosecutions and convictions, the authorities rarely brought higher-ranking officers of the security forces and the police charged with human rights offenses to justice. Members of the security forces collaborated with paramilitary groups that committed abuses, in some instances allowing such groups to pass through roadblocks, sharing information, or providing them with supplies or ammunition. Despite increased government efforts to combat and capture members of paramilitary groups, security forces also often failed to take action to prevent paramilitary attacks. Paramilitary forces still find support among the military and police, as well as among local civilian populations in many areas.

The revised Military Penal Code, which took effect in August 2000, provides for an independent military judicial corps and for legal protection for troops if they refuse to carry out illegal orders to commit human rights abuses; the code also precludes unit commanders from judging subordinates. A series of military reform decrees, signed by the President in September 2000, provided greater facility for the military to remove human rights abusers or paramilitary collaborators from its ranks and provided for the further professionalization of the public security forces. The military judiciary continued to demonstrate an increased willingness to turn cases involving security force officers accused of serious human rights violations over to the civilian judiciary, as required by a 1997 Constitutional Court ruling, the new Military Penal Code, and an August 2000 presidential directive.

Police, prison guards, and military forces tortured and mistreated detainees. Conditions in the overcrowded and underfunded prisons are harsh; however, some inmates use bribes or intimidation to obtain more favorable treatment. Arbitrary arrest and detention, as well as prolonged pretrial detention, are fundamental problems. The civilian judiciary is inefficient, severely overburdened by a large case backlog, and undermined by intimidation and the prevailing climate of impunity. This situation remains at the core of the country's human rights problems. At year's end, the Superior Judicial Council (CSJ) reported that the judicial system was extremely overburdened; it received a total of 8.6 million suits in 1994-2000, of which 226,783 were criminal cases filed during 2000.

The authorities sometimes infringed on citizens' privacy rights. A number of journalists were killed, and journalists continued to work in an atmosphere of threats and intimidation, in some instances from local officials, but primarily from paramilitary groups and guerrillas. Journalists practice self-censorship to avoid reprisals. The paramilitaries and guerrillas targeted religious leaders. There were some restrictions on freedom of movement, generally because of security concerns. Violence and instability in rural areas displaced between 275,000 and 347,000 civilians from their homes in during the year. Almost one-fourth of these movements occurred in massive displacements. Exact numbers of displaced persons are difficult to obtain because some persons were displaced more than once, and many displaced persons do not register with the Government or other entities. However, while no consensus exists regarding the exact number of internally displaced persons (IDP's), observers agreed that there has been a significant increase in displacements over the past 3 years. The total number of internally displaced citizens during the last 6 years may exceed 1 million. There were reports that security force members, paramilitaries, and guerrillas killed, threatened, and harassed members of human rights groups. Violence and extensive societal discrimination against women, abuse of children, and child prostitution are serious problems. Extensive societal discrimination against indigenous people and minorities continued. Labor leaders and activists continued to be targets of high levels of violence. Child labor is a widespread problem. Trafficking in women and girls for the purpose of sexual exploitation is a problem. "Social cleansing" killings of street children, prostitutes, homosexuals, and others deemed socially undesirable by paramilitary groups, guerrillas, and vigilante groups continued to be serious problems.

NGO's attributed a large majority of political killings, social cleansing killings, and forced disappearances to paramilitary groups. According to military estimates, the United Self-Defense Forces of Colombia (AUC) paramilitary umbrella organization has a membership of between 8,000 and 11,000 combatants. The AUC exercised increasing influence during the year and fought to extend its presence through violence and intimidation into areas previously under guerrilla control while conducting selective killings of civilians whom it alleged collaborated with guerrillas. Throughout the country, paramilitary groups killed, tortured, and threatened civilians suspected of sympathizing with guerrillas in an orchestrated campaign to terrorize them into fleeing their homes, to deprive guerrillas of civilian support and allow paramilitary forces to challenge the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN) for control of narcotics cultivations and strategically important territories. They also fought guerrillas for control of some lucrative coca-growing regions and engaged directly in narcotics production and trafficking. The AUC increasingly tried to depict itself as an autonomous organization with a political agenda, although in practice it remained a mercenary vigilante force, financed by criminal activities and sectors of society that are targeted by guerrillas. Although some paramilitary groups reflect rural residents' desire to organize solely for self-defense, most are vigilante organizations, and still others are actually the paid private armies of narcotics traffickers or large landowners. Popular support for these organizations grew as guerrilla violence increased in the face of a slowly evolving peace process.

The Government continued to insist that paramilitary groups, like guerrillas, were an illegal force and significantly increased efforts to apprehend paramilitary members. State security forces captured three times as many paramilitaries during the year as during the same period in 2000; however, the public security forces' record in dealing with paramilitary groups remained mixed, and in some locations elements of state security forces tolerated or even collaborated with paramilitary groups.

In April the U.N. Human Rights Commissioner, Mary Robinson, presented a report that strongly criticized the rising number of massacres and disappearances, and the growth of paramilitary forces in the country. In her annual report to the U.N. Commission on Human Rights, Ms. Robinson criticized the Government for failing to fight the paramilitaries. In addition, she expressed alarm at apparent links between paramilitary groups and members of the armed forces.

The FARC and the ELN regularly attacked civilian populations, committed massacres and summary executions, and killed medical and religious personnel. The FARC continued its practice of using gas canisters as mortars to destroy small towns, indiscriminately wounding government officials and civilians in the process. Guerrillas were responsible for the majority of cases of forcible recruitment of indigenous people and of hundreds of children. Guerrillas also were responsible for the majority of kidnapings. Guerrillas were responsible for forced disappearances of soldiers and police and continued a policy of killing, attacking, and threatening off-duty police and military personnel, their relatives, and citizens who cooperated with them. In many places, guerrillas collected "war taxes," forced members of the citizenry into their ranks, forced small farmers to grow illicit crops, and regulated travel, commerce, and other activities. Business owners have been kidnaped or threatened for refusing to comply with the FARC's "Law 002," announced in March 2000, which demanded that anyone with assets of $1 million pay taxes to the FARC or risk kidnaping. The FARC routinely committed abuses against citizens who resided in the demilitarized ("despeje") zone consisting of 5 southern municipalities, with a total population of approximately 120,000 persons. Numerous credible sources reported cases of murder, rape, kidnaping, extortion, robbery, threats, detention, and the forced recruitment of adults and children, as well as impediments to free speech and fair trial, and interference with religious practices.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary and Unlawful Deprivation of Life

Political and extrajudicial killings continued to be a serious problem. During the year, NGO's estimated that over 3,700 citizens died in such acts, committed principally by nonstate agents. Members of the security forces continued to commit extrajudicial killings. An analysis of data from the Center for Investigations and Popular Research (CINEP), published by the Colombian Commission of Jurists (CCJ), a nongovernmental organization (NGO), claimed that from June 2000 to June 2001, state forces committed 100 reported extrajudicial killings, including deaths that resulted from police abuse of authority. CINEP reported that, from January through September, state security force members committed 92 "intentional homicides of protected persons," and caused the deaths of 25 civilians during combat. CINEP reported that security forces were responsible for 119 intentional homicides of protected persons during the same period in 2000. Most of the incidents cited by the CCJ and CINEP were under investigation by military and civilian authorities at year's end. Civilian courts tried an increasing number of cases of military personnel accused of human rights violations (see Section 1.e.). Members of the security forces sometimes illegally collaborated with paramilitary forces, and the authorities continued to investigate past cases of collaboration with or failure to prevent massacres by paramilitaries. There were some reports that police and former security force members committed social cleansing killings. Investigations of past killings and massacres proceeded slowly.

On December 31, 2000, a soldier tossed a grenade at a group of civilians, killing three and injuring three more. On January 29, the authorities dismissed him from the army, and he then pled guilty to aggravated homicide and illegal weapons possession.

The authorities continue to investigate the murder on April 4 of policeman Carlos Ceballos Gomez, who testified in the investigation of illegal wiretapping by the Medellin GAULA kidnaping force (see Section 1.f.).

There continued to be reports that an undetermined number of off-duty policemen committed "social cleansing" killings, or that the police deliberately failed to prevent such killings.

The CCJ reported 161 massacres (defined as the simultaneous or nearly simultaneous killing of 3 or more persons outside of combat at a single location or at several nearby locations), in which 1,021 victims died, during the period from January through September, and claimed that the total number of massacres during the year exceeded 200. The CCJ attributes four massacres to acts of negligence or deliberate omission by state security forces. According to the MOD, during the year, 493 persons were killed in massacres (defined as 4 or more persons killed in 1 incident). The MOD figure does not include persons killed in prison riots; NGO's include such incidents in their statistics. The CCJ analyzed CINEP data from June 2000 to June 2001 and attributed 3 percent of civilian victims and persons killed outside of combat to state security forces.

A court of the first-instance ruling exonerated the soldiers involved in the August 2000 killing of six children by an army unit; however, the Superior Military Tribunal returned the case for reconsideration (see Section 1.g.).

The Procuraduria General (Inspector General), which conducts disciplinary investigations of all public sector employees, received 228 complaints against members of state security forces during the year, compared with 201 during 2000. The Inspector General's office investigated 183 members of state security forces on disciplinary charges related to massacres and forced disappearances. Of this number, the Inspector General sanctioned 20 members of the army, 14 members of the police, and 1 marine. The office exonerated 20 accused persons. As in the previous year, the office continued to refer all cases involving human rights violations to the Prosecutor General for criminal investigation. Five generals remained under investigation by the Inspector General during the year for failure to prevent paramilitary massacres in 1998 and 1999; one was convicted.

As of December, the human rights unit of the Prosecutor General's office reported that it had approximately 788 open investigations of human rights violations by 1,342 individuals, including 234 members of the military and police, 770 presumed members of paramilitary groups, 240 presumed guerrillas, and 98 other civilians. As of December, the unit had arrested 1,293 persons, and another 891 arrest warrants for persons remained outstanding, of which 39 are for members of the military, the police, and the DAS. Prosecutors placed under arrest 132 members of the army, 97 police, 9 members of the DAS, and 7 members of the CTI during the year.

The Institute for Forensic Medicine reported 25,351 homicides for the year, 792 fewer cases than in 2000. The police and the Prosecutor General's office have insufficient resources to investigate most killings adequately. The Superior Judicial Council estimated based on a 1997 survey that 63 percent of crimes go unreported, and that 40 percent of all reported crimes go unpunished.

According to a March 2000 report by the MOD, during the first half of 1999, the most recent year for which information was available, the military judiciary convicted and sentenced 206 members of the National Police, army, and navy for serious offenses that the Ministry identified as violations of human rights: Homicide, bodily injuries, rape, attempted murder, illegal detention, and abuse of authority. Of the total number of convictions, 66 were for homicide and 113 were for bodily injuries. The average sentences issued in 1998 were 58 months' imprisonment for homicide and 15 months' imprisonment for bodily injuries, although sentences ranged from 2 years to 64 years for homicide, and 2 months to 2 years for bodily injuries. The civilian Criminal Procedure Code authorizes restriction to a military base as an acceptable substitute for imprisonment when military jails or prisons are unavailable.

In 1997 the Constitutional Court more narrowly defined the constitutional provision that crimes by state agents unrelated to "acts of service" must be tried in civilian courts (see Section 1.e.). As of November, the military judiciary had turned 1,373 cases, of which an estimated 41 percent were possible human rights violations, over to the civilian judiciary for investigation and possible prosecution, including cases involving high-ranking officers. The new Military Penal Code reiterates that the crimes of genocide, forced disappearance, and torture must be tried in civilian courts. In August 2000, the President reaffirmed these new legal norms through a directive sent to the military high command and the commander of the National Police (see Section 1.e.).

During the year, the military judiciary turned 66 cases over to the civilian judiciary, compared with 496 cases during 2000. The decrease does not reflect a reduced willingness to transfer such cases; a large backlog of cases from previous years were transferred during 2000. The Supreme Council of the Judiciary ruled on 31 conflicts of jurisdiction involving cases against the military during the year. Of these, 11 cases were assigned to the military judiciary and 20 were assigned to civilian courts.

The CCJ in its analysis of data from CINEP and other sources attributed four massacres during the year to state security forces. In none of these cases were killings attributed directly to members of the state security services; CCJ and CINEP attributed three of these massacres to state negligence, while the fourth was attributed to deliberate failure to prevent paramilitary violence. Of these four incidents, three involved prison riots, in which guerrilla and paramilitary inmates killed one another (see Section 1.c.). CCJ and CINEP concluded that prison guards were at fault in failing to prevent these deaths.

The fourth incident was a March 17 paramilitary massacre in San Carlos, Antioquia, which resulted in the deaths of 13 persons. CCJ and CINEP charged that army and police troops deliberately withdrew from the area of the attack 3 days prior to the killings. At year's end, the office of the Inspector General was conducting a disciplinary investigation of 10 members of the military and police, regarding allegations that they permitted a truck that was carrying 15 hostages being held by paramilitaries to pass unchallenged. A separate investigation by the Prosecutor General's office was in progress at year's end.

In May the authorities detained two army Fourth Brigade corporals on suspicion of having participated in the January 2000 murder of Uberney Giraldo and Jose Evelio Gallo, both long-demobilized guerrillas of the Socialist Renewal Current (CRS) and two others, after abducting them from the village of San Antonio, Antioquia department. Although two other army officers and four other soldiers were not detained, they remained under investigation. The Inspector General's office and the Prosecutor General's office continue to investigate the case at year's end.

In June a Rionegro, Antioquia department, court convicted in absentia army major David Hernandez Rojas and army captain Diego Fino Rodriguez of aggravated homicide in the 1999 murder of Antioquia peace commissioner (and former Vice Minister for Youth) Alex Lopera and two other persons, and sentenced them to 50 years in prison. A former member of the army's Fourth Brigade, Raul Gallego, was absolved. Two other soldiers were convicted of committing the killings and were serving prison sentences at year's end. Captain Fino and Major Hernandez remained at large at year's end following their escapes from military detention in March 2000 and June 1999 respectively. Another soldier and a civilian were convicted and sentenced in absentia for obstruction of justice and for assisting in Fino's escape.

In November retired army Lieutenant Colonel Jorge Plazas Acevedo, former chief of intelligence of the army's 13th Brigade, stood trial for the 1998 kidnaping and 1999 murder of Jewish business leader Benjamin Khoudari. At year's end, the court had not yet issued a final ruling. Civilian Jhon Alexis Clarite Briceno and army sergeant Guillermo Lozano Guerrero also remained on trial at year's end. Two other suspects were appealing their convictions for aggravated kidnaping and homicide to the Bogota Supreme Court.

Prosecutors continued to investigate the May 1998 Barrancabermeja massacre, as well as the July 2000 murder of Elizabeth Canas Cano, a key eyewitness. The Inspector General's office also was conducting an inquiry into the death of Canas. In August 2000, the Inspector General had sanctioned eight service members in connection with the massacre, including members of the army, the police, and the DAS, of which three--army Captain Oswaldo Prada Escobar, Lieutenant Enrique Daza and Second Lieutenant Hector Guzman Santos--were discharged. A police lieutenant colonel, captain, and lieutenant, as well as two DAS agents were suspended.

At year's end, the civilian trial continued of retired Colonel Bernardo Ruiz Silva, former commander of the army's now disbanded 20th Brigade (military intelligence) for allegedly organizing the 1995 Bogota killing of Conservative Party opposition leader Alvaro Gomez Hurtado. In March the judge reported a death threat against her (see Section 1.e.). The trial continued at year's end. Also on trial are army intelligence agents Henry Berrio Loaiza and Carlos Gaona Ovalle, retired army warrant officers Omar Berrio Loaiza and Franklin Gaona Ovalle, and civilian accused killers Hector Paul Florez Martinez, Manuel Mariano Montero Perez, Gustavo Adolfo Jaramillo Giraldo, and Hermes Ortiz Duran.

At year's end, marine Colonel Jose Ancizar Molano Padilla (then-commander of the 2nd Marine Infantry Battalion) as well as marine Corporals Javier Fernando Guerrero, Eduardo Aristides Alvarez, and Jose Milton Caicedo were standing trial in a civilian court in Pasto for the 1995 social cleansing killings of alleged thieves Sifredy and Fredy Arboleda. The authorities continued to seek the capture of marine Sergeant Francisco Duarte Zuniga. A disciplinary investigation by the Inspector General continued at year's end.

The Supreme Court is expected to rule on the appeal of 5 army officers and 4 paramilitaries of their 1998 convictions in the case of the 1988 Nuevo Segovia paramilitary massacre, in which 43 persons were killed and 45 injured, and their sentence of 18 to 30 years' imprisonment for terrorism.

The Prosecutor General's office continued to investigate the 1987 kidnaping, torture, and death of Nydia Erika Bautista de Arellano, a member of the M-19 guerrilla group. The case was reassigned to civilian justice in July 2000. In 1994 the Inspector General had removed Brigadier General Alvaro Velandia Hurtado from the armed forces and sanctioned a sergeant in the case. In 1996 the Government had complied with a court order to pay compensation to Bautista's family for the involvement of MOD officials.

Credible allegations of cooperation with paramilitary groups, including instances of both passive support and direct collaboration by members of the public security forces, in particular the army, continued. Evidence suggests that there were tacit arrangements between local military commanders and paramilitary groups in some regions, and paramilitary forces operated freely in some areas despite a significant military presence. Members of the security forces actively collaborated with members of paramilitary groups--passing them through roadblocks, sharing intelligence, providing them with ammunition, and allegedly even joining their ranks while off duty.

The military high command, under the leadership of Minister of Defense Gustavo Bell and General Fernando Tapias, stated repeatedly that it would not tolerate collaboration between military personnel and paramilitary groups, and that the army would combat paramilitary groups. Although state security forces doubled operations against paramilitaries during the year and tripled the number of paramilitaries captured since 2000 (see Section 1.g.), security force actions in the field were not always consistent with the leadership's positions, and members of the security forces sometimes illegally collaborated with paramilitary forces. Credible reports persisted of paramilitary installations and roadblocks near military bases; of contacts between paramilitary and military members; of paramilitary roadblocks unchallenged by military forces; and of military failure to respond to warnings of impending paramilitary massacres or selective killings. Military entities often cited lack of information, manpower, and mobility to explain this situation. Impunity for military personnel who collaborated with members of paramilitary groups remained common.

In October Human Rights Watch issued "The Sixth Division," a report that stated that the army maintains close operational ties to paramilitary groups. The report highlighted reports from 1999-2001 of collaboration with paramilitary forces or acts of omission in preventing paramilitary crimes by officers of the army's 3rd, 5th, and 24th Brigades. Human Rights Watch sharply criticized the Government for failing to address effectively the problem of continued military-paramilitary cooperation and general impunity for human rights violators and also charged that the Government exaggerated the effectiveness of its actions against paramilitarism with "a sophisticated public relations campaign." Presidential Human Rights Program Director Reinaldo Botero vigorously denied that his office published distorted information and criticized the "immoderate tone" of the report. However, Botero welcomed the NGO's statement that high level Government officials clearly and publicly stated their policy to combat paramilitarism. Brigadier General Martin Orlando Carreno, commander of the Fifth Brigade, said that Human Rights Watch's allegations were based on erroneous information and noted that the Fifth Brigade had captured 147 members of paramilitary groups and killed 18 others in combat during the year.

In September 2000, the President signed military decrees that allowed for the dismissal of members of the public security forces who were complicit in paramilitary or other illegal activities; government agencies actively investigated allegations of collaboration or complicity with paramilitary groups by members of the security forces. From October 2000 through the end of 2001, the military dismissed approximately 600 members; however, it was not known how many discharges were for collaborating with paramilitary groups (see Section 1.e.).

On January 17, approximately 80 paramilitaries killed 27 civilians in Chengue, Sucre department. Early in the investigation, paramilitary Elkin Antonio Valdiris Tirado was captured and confessed to a role in the massacre. Valdiris also implicated two active duty marine sergeants; one was charged and was awaiting trial at year's end, while the other was detained pending formal charges. A civilian suspect also was awaiting trial at year's end. On August 29, in Sincelejo, Sucre department, presumed paramilitaries killed Yolanda Paternina, a prosecutor working on the case. Two CTI investigators on the case disappeared in mid-April near Berrugas, Sucre department

and are presumed dead. The Inspector General's office opened a disciplinary investigation of then-Marine First Brigade commander Rodrigo Quinones, five other marine officers, the marine sergeants, and a police officer for possible acts of omission in failing to prevent the massacre.

The Government is investigating a March 5 paramilitary incursion in the "peace community" of San Jose de Apartado, in Uraba region, Antioquia department, in which both residents and international observers were threatened, and a number of buildings were burned. Community members alleged that members of the army's 17th Brigade were involved in the raid. On July 30, 15 armed paramilitaries killed 1 man and displaced 64 families from the peace community of La Union, Uraba region, and announced a paramilitary takeover of the community, although they did not maintain control. Both FARC and paramilitaries are present in the mountains above this community. At the request of the peace community, 17th Brigade troops did not enter San Jose. Witnesses reported that the paramilitaries who entered San Jose in July 2001 identified themselves as the same persons who had committed the July 2000 massacre in the same community. The murder is under investigation. The authorities also are investigating the December 15 murder of a resident of San Jose de Apartado by three armed men in civilian clothing; the victim was not a member of the peace community. An NGO attributed the killing to paramilitaries; however, it remains unclear who was responsible.

Prosecutors also continue to investigate two paramilitary massacres in February 2000 in San Jose de Apartado and in July 2000 in neighboring La Union, in which 11 persons were killed. Members of the San Jose de Apartado peace community, as well as NGO's, accused the 17th Brigade of complicity in the attacks. On February 19, 2000, unidentified presumed ACCU paramilitaries killed five persons in San Jose de Apartado, and wounded three others; there were reports that the men wore the insignia of the 17th Brigade on their uniforms. On July 8, 2000, approximately 20 paramilitary assailants murdered 6 peasants in La Union, part of San Jose de Apartado. The attackers reportedly gave the citizens 20 days to leave the town. NGO's alleged that the 17th Brigade was complicit in both attacks, that army members were near La Union prior to the July 8 attack, and that a military helicopter hovered over La Union during the massacre. Government investigators continued to investigate complaints of military-paramilitary collusion in these massacres at year's end.

On February 19-20, 2000, a large group of AUC paramilitary attackers killed 42 persons, whom they accused of being guerrillas or guerrilla sympathizers at El Salado, Bolivar department. A military investigation did not find any substantiation for complaints that the military purposely failed to prevent the attack, or that the navy blocked relief groups from entering. An investigation by the Prosecutor General's office continued, and by year's end, 16 paramilitary suspects were detained and standing trial. (An arrest warrant remained outstanding for AUC leader Carlos Castano.) The Inspector General's office continued a disciplinary investigation of navy Rear Admiral Humberto Cubos Padilla and navy Rear Admiral Rodrigo Quinones, five other navy officers, and two police officers, but at year's end, had not yet charged any service member in the case.

In March 2000, the human rights unit of the Prosecutor General's office ordered the detention of army Captain Luis Fernando Campusano Vasquez and sought the capture of 15 other civilians, including Carlos Castano, who remained at large. They are suspected of being affiliated with area units that collaborated with a 300-person paramilitary group based at Vetas, Norte de Santander department, which committed 15 massacres in and around the towns of La Gabarra and Tibu between May and September, 1999. More than 145 persons whom the attackers claimed were guerrillas or guerrilla supporters were killed. Nearby elements of the army's 46th counterguerrilla battalion (Tibu) and 5th mechanized group (Cucuta), as well as police, did not intervene. In December the authorities arrested army Colonel Victor Matamoros and Captain Juan Carlos Fernandez, the former commander and the former intelligence director of the Fifth Mechanized Group, respectively. The two are charged with collaboration with and the formation of illegal paramilitary groups between 1997 and 1999.

The Prosecutor General's office has charged one army captain and two civilians for failing to prevent a paramilitary massacre of 22 persons in August 1999 in La Gabarra, Norte de Santander department. However, it did not file charges against retired army Brigadier General Alberto Bravo Silva, Colonel Roque Sanchez, and two other army officers. (Bravo retired in 1999 on orders from the President.) The Prosecutor General's office is trying in absentia AUC leader Carlos Castano and 14 others for homicide and subversion related to this massacre.

The May 29, 1999, paramilitary massacre in which six persons in Los Cuervos (near La Gabarra) were killed also remains under investigation; two former members of the military, two prison guards, and five civilians are under arrest and in detention. The Inspector General's office continued its investigation of (but had not charged) Bravo, Roque, army Colonel Victor Hugo Matamoros, army major Mauricio Llorente Chavez, and army lieutenant Luis Fernando Campuzano.

In March the Prosecutor General charged former Tibu military base commander Mauricio Llorente Chavez, former Tibu police commander Major Harbey Fernando Ortega Ruales, and 13 police agents with homicide and complicity in a July 17, 1999, paramilitary massacre in Tibu. The suspects remained under arrest at year's end.

In April the Prosecutor General's office ordered the detention of Colonel Rafael Alfonso Hani Jimeno, who was arrested later and charged with collusion with paramilitaries. Hani was the commander of the army's Palace de Buga Battalion, located in Tulua, Valle del Cauca department, during a period in 1999 when paramilitaries conducted a series of killings and displaced hundreds of peasant farmers. He also was alleged to have permitted a known paramilitary (whom Hani claimed was an informant) to live at battalion headquarters for months. At year's end, the charges against Hani had been overturned on appeal, but Hani remained under investigation. There were reports of threats against investigators and witnesses in this case. In February the Inspector General's office opened a separate disciplinary investigation of Hani.

On July 27, 2000, the Inspector General's office formally charged 5 army officers, including 4 generals, for failing to prevent the massacre of 19 persons in May 1998 in Puerto Alvira, Meta department. The five charged are former commanders of the army's Fourth Division, retired Major General Augustin Ardila Uribe and General Jaime Humberto Cortes Parada (the army's Inspector General); former commander of the 7th Brigade, retired Brigadier General Jaime Humberto Uscategui; commander of the 2nd Brigade, General Fredy Padilla de Leon (also the former head of the 7th Brigade); and the commander of the "Joaquin Paris" battalion, Colonel Gustavo Sanchez Gutierrez. Those involved denied the charges. The Inspector General's investigation was still in progress at year's end. In March the Superior Military Tribunal confirmed the June 2000 first instance military court's ruling to close the case. At year's end, the human rights unit of the Prosecutor General's office had under arrest one paramilitary, had released another suspect for lack of evidence, and had outstanding arrest warrants for AUC leader Carlos Castano and seven others.

In December 2000, the Inspector General's office charged 17 police and 9 army officials with collusion with paramilitary groups in approximately 160 social cleansing murders by members of paramilitary groups in northeastern Antioquia (including the communities of La Ceja, Guarne, and El Penon) during 1995-98. The Inspector General also charged two municipal officials with omission. The Prosecutor General's office also charged 21 of the 26 officials who faced disciplinary charges, as well as a suspected paramilitary. All of the individuals charged either were standing trial or awaiting court dates at year's end.

In April a military tribunal convicted Brigadier General Jaime Uscategui and sentenced him to 40 months' imprisonment for failing to prevent the July 1997 AUC paramilitary massacre of dozens of persons in Mapiripan, Meta department. The court also convicted Lieutenant Colonel Hernan Orozco (a primary witness against Uscategui) and sentenced him to 38 months in prison. Orozco was released in September, having served his entire sentence. Uscategui's sentence subsequently was reduced for time served and work performed, and he was released in July. In the view of many human rights groups, the term of Uscategui's sentence and early release, although legal, severely undercut the message sent by his conviction. In addition, human rights organizations criticized the sentence given to Colonel Orozco as punishment for his having come forward with the facts and the General's involvement in the massacre. A civilian judge hearing the case against other military and civilian defendants was threatened during the year (see Section 1.e.). In November the Constitutional Court announced that it would rule that Uscategui's case should be assigned to civilian jurisdiction. The court had not issued or implemented the ruling at year's end. The ruling is expected to nullify the military tribunal's conviction. The ruling is also an implied exoneration of Orozco because the Prosecutor General's office had decided in March 1999 not to press charges against Orozco.

In 1999 the CSJ had sent the cases of all other defendants in the Mapiripan case to the civilian courts for action, including charges against Lieutenant Colonel Lino Hernando Sanchez Prada for facilitating the massacre, which was determined not to be an act of service. At year's end, Lieutenant Colonel Sanchez and the five other defendants (two noncommissioned officers and three commercial pilots) remained on trial in the civilian judiciary. Two other civilian paramilitary defendants were indicted in December 2000 and remained on trial and in detention at year's end. In November 2000, the Prosecutor General indicted in a separate process Lieutenant Colonel Sanchez, two army sergeants, and eight members of paramilitary groups (including two civilian pilots).

The military judiciary announced no new developments during the year in its ongoing investigation of retired Brigadier General Fernando Millan Perez regarding allegations that he armed and equipped a paramilitary group in Lebrija, Santander department in 1997, which was believed to be responsible for at least 11 killings. In October 1998, the Superior Judicial Council had determined that Millan's alleged actions constituted an act of service and turned the case over to the military judiciary for

Colombia

prosecution. In July the Inspector General's office charged army General Fernando Millan Perez, army Colonel Hernando Sanchez Salamanca, and army lieutenant Oscar Esteban Hernandez Barragan.

In late July, the CTI detained General Rito Alejo del Rio, former commander of the 17th Brigade, on suspicion of illegal collaboration with paramilitaries in Uraba in 1995-97. Newly named Prosecutor General Luis Camilo Osorio publicly criticized the decision to arrest del Rio and complained that he had not been consulted. The Human Rights Unit coordinator Pedro Diaz insisted that the Human Rights Unit prosecutor on the case had legal authority to issue the warrant. In early August, a Bogota judge freed del Rio under a habeas corpus ruling that claimed irregularities in the processing of the arrest warrant. The judge also ruled (under a highly controversial interpretation of Article 235 of the Constitution) that jurisdiction for the case rested exclusively with Osorio, not the Human Rights Unit prosecutor. Both Diaz and Deputy Prosecutor General Pablo Elias Gonzalez resigned shortly afterward. General Del Rio remained free; however, in November the office of the Prosecutor General summoned General del Rio to inquest. The investigation was still in progress at year's end. The office of the Inspector General continued a separate disciplinary investigation of del Rio.

An appeals court confirmed charges of collusion with paramilitaries in the 1996-97 social cleansing killings in La Ceja, Antioquia department, against army Lieutenant Colonel Jesus Maria Clavijo Clavijo, soldier Carlos Mario Escudero, and police agent William Mora; all three were awaiting trial in a civilian court at year's end. Clavijo remained detained at 5th Brigade headquarters. In two separate cases related to the same series of crimes in Antioquia, prosecutors also charged police agents Luis Alfredo Castillo Suarez, Juan Carlos Valencia Arbalaez, Carlos Maria Tejada, and Olimpo Rivera; and soldiers Javier Antonio Gomez Herran, and Osvaldo Leon Beltran, all of whom were awaiting trial at year's end. Prosecutors also arrested army Major Alvaro Cortes Murillo and army Lieutenant Colonel Alfonso Zapata Gaviria. Paramilitary Ricardo Lopez Lora was sentenced to 16 years in the La Ceja killings, another paramilitary is being tried in absentia, and a third has been absolved.

The case of retired army Colonel Jose Ancizar Hincapie Betancurt for collaboration in 1993-94 with a paramilitary group that killed 11 persons remained pending before civilian courts at year's end.

Paramilitary groups committed numerous extrajudicial killings, primarily in areas where they competed with guerrilla forces for control, and often in the absence of a strong government security force presence. Several major paramilitary campaigns during the year included massacres in Sucre, Norte de Santander, Magdalena, and Valle del Cauca departments. The office of the Human Rights Ombudsman received complaints regarding 125 massacres during the year. The MOD reported that paramilitary forces were responsible for the deaths of 1,015 civilians in the period from January to November. According to the MOD, during the year, the paramilitaries killed 281 persons during massacres. The CCJ reported 161 massacres during January-September, of which 102 massacres (representing 671 victims) are attributed to paramilitaries. The CCJ attributes a total of 1,929 political killings and 319 social cleansing killings to paramilitary groups in the period from June 2000 to June 2001. Paramilitary activities also included kidnaping, intimidation, and the forced displacement of persons not directly involved in hostilities (see Sections 1.b., 1.g., and 2.d.). Paramilitary groups targeted journalists and teachers (see Section 2.a.), human rights activists (see Section 4), labor leaders (see Section 6.a.), community activists, national and local politicians (including the President), peasants, and other persons whom they accused of supporting or failing to confront guerrillas. Paramilitary forces killed indigenous people (see Section 5).

AUC paramilitary groups were suspected of hundreds of selective killings throughout the country, especially in Valle del Cauca, Antioquia, Norte de Santander, Bolivar, and Sucre departments. The FARC, the ELN, or both had a strong presence in these areas as paramilitary forces vied with them for control of territory or resources, including coca cultivation. Paramilitary groups continued to kill political leaders and peace activists, including Ismael Valencia, the former mayor of Calima Darien, Valle del Cauca department; and nun and human rights activist Yolanda Ceron in Tumaco, Narino department. Six members of the CTI were killed during the year in various parts of the country; paramilitary forces were suspected of responsibility in two of these killings; in the others the responsible group had not been identified at year's end.

Paramilitary massacres and incursions continued in Antioquia, Sucre, and Bolivar departments as part of an ongoing paramilitary effort to wrest territorial control from the guerrillas. A similarly fierce struggle for control continued in Norte de Santander, Cauca, and Valle del Cauca departments.

On January 5, presumed paramilitaries killed 14 persons in the villages of Chiquinquira and Mesetas, Penol municipality, Antioquia department.

On February 13, gunmen shot and killed Ivan Villamizar, a former regional ombudsman, in Cucuta, Santander department. One presumed paramilitary was captured and charged with the murder.

On March 21, a suspected paramilitary gunman shot and killed business owner and farmer Gonzalo Rodrigez, brother of ELN leader Nicolas Rodriguez, in Socorro. The victim reportedly had no involvement with guerrillas.

On March 24, paramilitaries reportedly kidnaped between 24 and 30 persons in La Llorente, Narino department. Three persons, not among those reported kidnaped, were killed in separate incidents and confirmed dead after this incursion. The identity and fate of the other persons reportedly kidnaped has never been confirmed.

From January through April, the AUC mounted a successful offensive to displace the ELN from the northeastern neighborhoods of Barrancabermeja, Santander department. By April, more than 180 civilians had been killed and another 4,000 displaced. The human rights NGO CREDHOS reported at year's end that 360 persons were killed in political violence in the period from January to November in Barrancebermeja and surrounding areas. The Prosecutor General's office and Inspector General's office are investigating numerous complaints of military and police collusion with paramilitaries in Barrancabermeja.

On April 14, in the Alto Naya region (on the border of Cauca and Valle del Cauca departments), paramilitaries murdered 20 persons with machetes and guns (reportedly raping at least 1 victim first), and displaced hundreds more. Responding to the massacre, the army and navy captured 70 paramilitaries, including a paramilitary bloc commander, in a joint operation. All of the suspects were under arrest and awaiting trial at year's end. The Prosecutor General's office and the Inspector General's office also are investigating allegations that army troops may have been guilty of failing to prevent the massacre. No charges have been filed against any service member.

On July 4, a large group of AUC paramilitaries kidnaped 43 young men in Peque, Antioquia department and forced them to herd stolen cattle. Seven of the men later were found dead and severely mutilated. As some of these victims were taken into an area where there was AUC-FARC combat, it remains unclear whether the paramilitaries or the FARC killed them. FARC guerrilla troops arrived in Peque following the incident and offered security to its residents. The guerrillas departed later on July 11, after which the army and police arrived. Vice President and Minister of Defense Bell also visited Peque on July 12. Most of the 3,500 persons displaced by this incident returned by late July. The army reported that limited manpower and mobility, as well as other demands on army resources at the time, prevented rapid reaction to the crisis in Peque. The Inspector General was investigating complaints of military omission or collusion, but had not identified individual suspects in the case.

On September 5, presumed AUC paramilitary gunmen killed Congressman and Lower House Peace Committee Acting Chairman Jairo Hernando Rojas. The Prosecutor General's Human Rights Unit was investigating the case.

On September 15, approximately 20 AUC paramilitaries killed 9 persons in Frias, Magadalena department, accusing them of being guerrilla informants. Contrary to some press reports alleging slow military reaction, international organizations verified that the army arrived promptly at the scene. There had been no previous threats or warnings reported for that location.

In October presumed paramilitaries kidnaped 13 fishermen in Cienaga de Santa Marta, Magdalena department; the bodies of 6 were found (see Section 1.b.).

On October 10, AUC paramilitaries shot and killed 24 persons in the communities of La Habana and Alaska, near the city of Buga in Valle del Cauca department. Human Rights Ombudsman Eduardo Cifuentes publicly accused the army's Palace de Buga battalion of omission in failing to reach the area until the following morning. According to the army, this area, contested between the FARC and paramilitaries, was difficult to reach quickly in combat conditions. In late October, army troops captured 10 civilian paramilitary suspects, and the case remained under investigation by the Prosecutor General's office at year's end.

On December 1, AUC paramilitaries shot and killed 15 persons on a remote country road in Boyaca department. According to press reports, local officials said that the

mass slaying signals a possible push by the AUC into the mineral rich region that had been a bastion of guerrillas.

The Prosecutor General's office continues to investigate a series of attacks in November 2000, when paramilitary forces killed 15 fishermen in Nueva Venecia (La Cienaga de Santa Marta), Magdalena department, and kidnaped another 22 persons, whose bodies later were discovered.

Prosecutors continue to investigate an April 2000 massacre of 21 men by approximately 50 paramilitary attackers at Tibu, Catatumbo region, Norte de Santander department.

Prosecutors continued to investigate the February 2000 ACCU massacres in five neighborhoods of Las Ovejas.

In May 2000, a paramilitary group that identified itself as the "Calima Front" claimed responsibility for the killings of 12 civilians in the village of Sabaletas, Valle del Cauca department. The group also claimed to have killed 14 other persons it suspected of being guerrillas in the same area. According to Human Rights Watch, the army's 3rd Brigade created and supports the Calima Front, which Human Rights Watch believes was responsible for at least 200 killings between July 1999 and July 2000, as well as the displacement of over 10,000 persons. The Prosecutor General's office and the Inspector General's office continue investigating claims of continued military collusion with the Calima Front.

At year's end, paramilitary and "La Terraza" gangster Juan Pablo Ortiz Agudelo (alias "Bochas"), already convicted and imprisoned for another murder, was appealing charges filed against him for the 1999 murder in Bogota of journalist, comedian, and human rights activist Jaime Garzon Forero. Under the law, a defendant has the right to appeal charges; if the charges are confirmed, the case proceeds to trial. AUC leader Carlos Castano has been charged with ordering the killing, but remains at large.

Paramilitary leader Mario James Mejia ("el Panadero") was convicted of eight murders and sentenced to 40 years' imprisonment for the February 1999 "Barrancabermeja II" massacre, which left nine persons dead. Pedro Mateo Hurtado Moreno and three other paramilitary suspects in the massacre remained at large at year's end.

In July a Bogota judge, citing lack of evidence, acquitted five suspects in the 1998 killing of Eduardo Umana Mendoza, perhaps the country's best-known and most controversial human rights lawyer. The five were released, after 3 years in detention.

In March a Medellin court sentenced two paramilitaries to 35 years' imprisonment for the 1998 killing of human rights activist Jesus Maria Valle, the president of the Antioquia Permanent Committee for the Defense of Human Rights. Seven other suspects were exonerated, and AUC leader Carlos Castano was convicted in absentia of the formation of paramilitary groups but absolved of the murder.

Accused paramilitary Ivan Urdinola Grajales remained in detention in connection with the 1989-90 "Trujillo I" massacres in Valle del Cauca department, and also is implicated in the 1994 "Trujillo II" massacre. Prosecutors also have an outstanding warrant for the detention of one other paramilitary member in the Trujillo I case. In May 2000, a court upheld charges against paramilitary Norberto Morales Ledesma for involvement in the Trujillo II massacre. Two other members of paramilitary groups implicated in both Trujillo I and Trujillo II remain at large.

In November Carlos Castano admitted in his published memoirs that he was responsible for the 1990 murder of presidential candidate Carlos Pizarro, among other crimes.

Although authorities have captured several regional commanders, top paramilitary leaders largely remained beyond the reach of the law. MOD figures published in July indicated that 954 paramilitaries were captured between January and November (a 3-fold increase over the same period in 2000) and 109 were killed. The Ministry of Defense also reported in mid-October that 24 soldiers were killed and 31 wounded in clashes with the AUC.

In January police in Barrancabermeja arrested Franklin Eugenio Aguilar Rengifo in connection with a kidnaping. On January 12, police captured Danilo Cordoba Moya, presumed regional AUC commander for the northern part of the country, in Zambrano, Bolivar department. On January 28, the CNP arrested paramilitary leader Gustavo Adolfo Soto Garcia in San Carlos de Guaroa, Meta department. On March 22, Roberto Carlos Delgado, leader of the AUC's Southern Liberators bloc, was captured along with five others including retired army colonel Jesu Uruena Paz. In May the police captured Dumar de Jesus Gerrero, commander of the AUC's forces in the central regions of the country. On May 19, military units captured Francisco Javier Correa Gonzalez, leader of AUC forces in the northeastern neighborhoods of Barrancabermeja.

The guerrillas of the FARC, the ELN, and the People's Liberation Army (EPL) continued to commit killings, often targeting noncombatants in a manner similar to that of paramilitary groups. The MOD attributed a total of 1,075 civilian deaths to guerrillas between January and November. According to the MOD, during the year, guerrillas killed 158 persons during massacres. The CCJ reported that guerrillas were responsible for 458 political killings in the period from June 2000 to June 2001, the most recent period for which figures are available, compared with 236 political killings in the period from October 1999 through March 2000. The Ministry of Defense attributed 880 civilian deaths in massacres to guerrillas during 2000. The Human Rights Ombudsman attributed 22 massacres to the FARC during the first 6 months of 2000 and 9 massacres to the ELN. The Ombudsman also attributed 89 killings to the FARC and 31 killings to the ELN during the first 6 months of 2000.

Common guerrilla targets included local elected officials and candidates for public office, teachers (see Section 2.a.), civic leaders, business owners, and peasants opposed to the guerrillas' political or military activities. Guerrilla groups also killed religious leaders (see Section 2.c.), members of indigenous groups (see Section 5), and labor leaders (see Section 6.a.). Some communities controlled by guerrillas also experienced social cleansing killings of criminal or other "undesirable" elements. The CCJ reported 10 such killings for the period of June 2000 to June 2001. Guerrilla campaigns around the demilitarized area, in the Norte de Santander, Antioquia, and southern departments often involved significant civilian casualties and prompted significant displacements (see Section 1.g. and 2.d.).

On January 18, guerrillas of the FARC's 57th front shot and killed Henry Perea Torres, the mayor of Jurado, Choco department. Perea, who had taken office on January 1, represented the Indigenous Social Alliance and had criticized the murder several days earlier of fellow indigenous leader Armando Achita.

On February 6, presumed ELN guerrillas killed nine farmers who actively opposed the creation of an ELN encounter zone, in La Cristalina community near Puerto Wilches, Santander department.

On February 13, FARC guerrillas killed nine young hikers in the Purace National Park in Huila department. The FARC stated that they had mistaken the hikers for paramilitaries and promised the victims' relatives that the culprits would stand revolutionary trial. The killers remained at large at year's end.

From May 22-29, FARC guerrillas kidnaped and killed approximately 23 peasants in Alto Sinu, Cordoba department. An estimated 110 families were displaced following these attacks. The attacks appeared to have been part of an AUC-FARC struggle to control territory and coca cultivation, and to terrorize the local population.

In August presumed ELN guerrillas set off a series of bombing attacks in Medellin, Marinilla, and San Francisco, Antioquia department. Two persons were killed and approximately 81 persons were injured.

On September 6-7, FARC guerrillas killed 10 coca leaf pickers. As many as 40 other persons were reported dead, but the FARC prevented government authorities and the International Committee of the Red Cross (ICRC) from recovering the bodies. The attacks appeared to be an effort by the FARC to take back the area around La Gabarra, which had been seized by paramilitaries in a series of attacks in 1999 that included three large massacres. This area remains hotly contested between illegal armed groups, both for coca cultivation and for access to the Venezuelan border.

On September 24, the FARC kidnaped and later killed Consuelo Araujo, a former Minister of Culture and the wife of the Inspector General (see Section 1.b.). Other kidnap victims were released or rescued.

In October ELN guerrillas destroyed a building in El Penol, Antioquia department, killing a policeman, his wife and child, and two other civilians.

On November 16, FARC units at an illegal checkpoint at Santuario, Putumayo department executed an unarmed soldier from the 12th Brigade and a taxi driver.

The authorities blamed FARC guerrillas for the December massacre of 15 farmers in Samana, Caldas department.

The human rights unit of the Prosecutor General's office continues to investigate deaths, disappearances, and kidnapings of off-duty army and police personnel (see Section 1.b.). For example, in late July, the authorities discovered the bodies of army Sergeant Eliud Sarmiento Ruiz and soldiers Eduardo Barreto, Moise Murcia Robayo, and Carlos Coronado Lopez in a common grave in Cundinamarca department. The four men, whose hands were bound and whose bodies showed signs of torture, had been kidnaped by the FARC on July 1 while they were off-duty, out of uniform, and unarmed.

Investigations into reported killings by FARC members within and on the periphery of the despeje continued. The investigation continued of the December 2000 killing of congressional peace commission chairman Diego Turbay Cote, his mother councilwoman Ines Cote, and five other persons in Caqueta department (near the FARC demilitarized zone). In November three suspects in the Turbay killings were released for lack of evidence.

In early October 2000, the FARC attacked the remote village of Ortega and killed eight persons, including two women and two children. The guerrillas also burned 20 homes, a school, and a church. In June 2000, the FARC massacred at least 11 civilians at Nutibara, Antioquia department, and injured 15 other persons.

The ELN is suspected of involvement in the February 6 killing of nine farmers in the La Cristalina community, in Santander department (Magdalena Medio region). Some of the victims were members of a civil society organization opposed to a proposed demilitarized zone for the ELN in southern Bolivar and Antioquia departments. One of the victims was a young pregnant woman.

The authorities charged in absentia FARC 34th front member Fernando Zapata Hinestroza for the killing of 21 police officers and 8 civilians, including 2 children, during the March 2000 attack on the twin towns of Vigia del Fuerte, Antioquia department, and Bellavista, Choco department. The authorities also are seeking the arrest of three other FARC members in this case. Seven police officers captured in the assault were released individually during the year.

Guerrillas killed citizens using bombs, artillery and antipersonnel land mines, and continued their practice of using gas canisters to attack small towns, thereby killing civilians indiscriminately (see Section 1.g.).

The authorities still have not captured FARC eastern bloc commander German Briceno Suarez ("Grannobles") and U'wa tribe member Gustavo Bocota, who have been indicted for involvement in the March 1999 killings of kidnaped foreign activists for indigenous rights Terence Freitas, Lahe'ena'e Gay, and Ingrid Washinawatok near Saravena, Arauca department. The investigation of the case continued at year's end.

At year's end, the authorities had not yet captured Arley Leal and Milton de Jesus Tonal Redondo ("Joaquin Gomez" or "Usurriaga") of the FARC's 32nd Front in connection with the 1998 murder of Father Alcides Jimenez in Putumayo. The Inspector General's office continued to investigate possible government negligence in failing to prevent the killing.

In July the MOD reported that, from January through November, security forces killed 979 and captured 1,623 guerrillas. The Prosecutor General's office reported that as of December it had 98 open investigations against 240 guerrillas, had 227 guerrillas in custody, and had 262 warrants outstanding for the capture of guerrillas.

Approximately 80 cases regarding the country were before the Inter-American Commission on Human Rights (IACHR) at year's end. The great majority involved violations of the right to life. At year's end, the IACHR was expected to make a decision about whether to move a case involving paramilitary and military involvement in the 1996 killing of 19 merchants to the Inter-American Court of Human Rights.

In response to the killings of thousands of members of the Patriotic Union (UP) leftist coalition (see Section 1.g.), a May 2000 law classified "political genocide" as a crime; however, it provided that political genocide could be committed only against members of legally constituted (i.e., nonguerrilla) groups.

The IACHR continued the process of trying to reach an amicable settlement of the UP's 1996 complaint charging the Government with "action or omission" in what the UP termed "political genocide" of the UP and the Communist Party. As part of the process, since June 2000, the Government has provided protection through the Interior Ministry to surviving UP and Communist Party members. Despite these efforts, NGO's reported to the IACHR that at least 20 persons associated with the UP were killed during the year.

There continued to be incidents of social cleansing--including attacks and killings--directed against individuals deemed socially undesirable, such as drug addicts, prostitutes, transvestites, homosexuals, beggars, and street children. The CCJ attributed one social cleansing killing to security forces during the period from June 2000 to June 2001; it attributed 319 killings to paramilitary groups, and 10 to the guerrillas. AUC social cleansing killings of homosexuals, prostitutes, drug users, and mentally ill persons were reported in Barrancabermeja, Cucuta, and numerous other municipalities. Barrancabermeja residents also have reported AUC attempts to impose "social controls" (such as curfews or dress codes) and the exercise of vigilante justice (see Section 1.e.).

b. Disappearance

The 1991 Constitution and the Criminal Code explicitly prohibit forced disappearance; however, it continued to be a problem. In May 2000, Congress passed legislation that criminalized forced disappearance, genocide, torture, and forced displacement by putting them into the Criminal Code. The law entered into effect in July 2000, allowing these crimes to be tried in civilian courts. Human rights activists noted that the final law did not require that military defendants be tried in civilian, rather than military, courts; however, the reformed Military Penal Code, which entered into effect in August 2000, did include such a requirement (see Section 1.e.). More than 3,700 cases of forced disappearance have been reported formally to the authorities since 1977. Very few have been resolved. Many of the victims disappeared in the course of confrontations between illegal armed groups and the State, or between paramilitaries and guerrillas. The great majority of victims of forced disappearance have never been seen or heard from again. The human rights NGO CREDHOS reported at year's end that 71 persons disappeared between January and November in Barrancabermeja and surrounding areas.

The CCJ attributed five forced disappearances to state security forces in the period from June 2000 to June 2001. The Inspector General's office investigated 183 members of state security forces on disciplinary charges related to massacres and forced disappearances (see Section 1.a.).

The CCJ attributed 296 forced disappearances to paramilitaries in the period from June 2000 to June 2001. In many instances persons kidnaped by paramilitary groups later were found dead (see Section 1.a.).

In mid-April two investigators working on the January massacre in Chengue, Sucre department, disappeared (see Section 1.a.).

The law prohibits kidnaping; however, it remained an extremely serious problem. According to the Free Country Foundation (Fundacion Pais Libre), 3,041 persons, or 8 persons per day, were kidnaped during the year, compared with 3,706 in 2000. Paramilitary groups kidnaped 9 percent of these persons. Guerrilla groups were

responsible for 63 percent of the kidnapings. Criminals kidnaped 10 percent. An estimated 205 minors were in captivity as of October. Members of the Government's elite antikidnaping squads known as GAULA (a combined police and military unit) and other units of the security forces freed 697 persons during the year. The Free Country Foundation reported that 98 persons died in captivity during the year. Arrests or prosecutions in kidnaping cases were rare.

According to the MOD, 22 police hostages remain in captivity, and the FARC and ELN were responsible for the forced disappearances of 40 others. The army reports that the FARC kidnaped 24 soldiers and was responsible for the forced disappearances of 51 other soldiers outside combat; the ELN was responsible for the forced disappearances of 8 soldiers. During the year, the FARC released 189 captured soldiers and police (see Section 1.d.). However, the FARC captured 20 soldiers and police in combat. FARC and ELN guerrillas kidnaped 22 police officers and were responsible for the forced disappearances of 40 others. At year's end, the FARC and ELN reportedly held 22 police and 44 soldiers captive.

On March 24, paramilitaries reportedly killed or kidnaped between 24 and 30 persons in La Llorente, Narino department; however, the identities of these persons, their number, and their fate was never confirmed (see Section 1.a.).

On May 16, AUC paramilitaries kidnaped 190 farm workers in southern Casanare department and stated they would begin forcible recruitment in the area. Under pressure from army troops, the AUC released the hostages unharmed after 36 hours.

On June 2, six unidentified assailants kidnaped Embera-Katio indigenous leader Kimi Domico Pernia in Tierralta, Cordoba department. Local Embera-Katio members believe that local paramilitary groups kidnaped Pernia as retaliation for Embera-Katio participation in FARC attacks (see Section 5). In December AUC military commander Salvatore Mancuso told the press that Pernia had been killed.

In October presumed paramilitaries kidnaped 13 fishermen in Cienaga de Santa Marta, Magdalena department. By October 10, the bodies of 6 of the kidnap victims had been found (see Section 1.a.), while another 3 hostages had escaped.

On November 19, the AUC in a letter to the Governor of Antioquia department reported that on November 18, it had abducted six mayors from eastern Antioquia, as well as their human rights adviser. The kidnaping apparently was in retaliation for meetings that the mayors had held with representatives of the ELN to seek respect for the lives of the civilian population in their municipalities. The ELN unilaterally had committed to a truce until April 2002, demanding in turn that the Government withdraw police from their towns. The paramilitaries released the hostages on November 20.

In March 2000, a paramilitary group led by Jhon Jairo Esquivel Cuadrado kidnaped seven members of the CTI at Minguillo, Cesar department. Esquivel was captured in July 2000 and was awaiting trial at year's end. There were no indications that the abducted investigators were still alive.

Kidnaping continued to be an unambiguous, standing policy and major source of revenue for both the FARC and ELN. According to the Free Country Foundation, politicians, cattlemen, children, and businessmen were the guerrillas' preferred victims. The Foundation reported that guerrillas committed 63 percent of the 3,041 kidnapings reported during the year; ransom payments continued to serve as an important source of revenue for the FARC and the ELN. The FARC often purchased victims kidnaped by common criminals and then negotiated ransom payments with the family. In March 2000, the FARC announced "Law 002," which required persons with more than $1 million in assets to volunteer payment to the FARC or risk detention. There were many reports that guerrillas tortured kidnap victims (see Sections 1.c. and 1.g.) Several released kidnap victims claim that the FARC are holding more than 200 persons in the despeje zone.

On March 14, ELN guerrillas attacked a wellhead belonging to Occidental Petroleum Colombia and kidnaped an unarmed guard, who was released uninjured a week later.

On April 16, the ELN kidnaped 130 employees of Occidental Petroleum. They released all hostages by April 19.

On July 15, the FARC kidnaped former Meta governor Alan Jara, as he was riding in a U.N. vehicle with the U.N. Development Program (UNDP) Director and government officials. In response to strong and widespread criticism, the FARC alleged falsely that Jara was collaborating with paramilitaries and said that he would be subjected to a "revolutionary trial." At year's end, Jara still was held by the FARC, reportedly in the despeje.

On July 28, the FARC kidnaped 15 persons, including the wife and two sons of a congressman, from a residential building in Neiva, the capital of Huila department (near the border of the despeje). The FARC released six of the captives; however, it reportedly took nine remaining hostages to the despeje.

On September 20, the FARC kidnaped 11-year-old Laura Ulloa from her school bus in Cali. She remained in captivity at year's end.

The FARC also kidnaped Consuelo Araujo, former Minister of Culture and wife of the Inspector General and at least 10 others on September 24 near Valledupar, Cesar department. The other victims were quickly released or rescued by the army, but a guerrilla killed Araujo on September 29 (see Section 1.a.). Within a few days of the Araujo kidnaping, the FARC also took another 65 hostages near Valledupar, who were released quickly due to heavy pressure on the FARC by the army.

On July 26, approximately 70 guerrillas from the FARC's Teofilo Forero Front stormed an apartment complex in Neiva, Huila department and kidnaped 15 persons. Six hostages quickly were released, but the remaining nine reportedly were taken to the despeje.

On November 7, FARC guerrillas kidnaped Mireya Mejia Araujo, a peace counselor in Cesar department. The guerrillas released her on November 29 with a message to the governor that the FARC was concerned over the growth of paramilitary forces and about the need for more social spending.

Andres Felipe Navas, kidnaped at 21/2 years of age by the FARC in April 2000, was released in November. (The FARC continued to hold an adult member of the same family at year's end.)

Early in the year, the FARC released Juliana Villegas, daughter of the head of the National Association of Industrialists, whom they had kidnaped in November 2000.

The FARC refused repeated calls from relatives, humanitarian groups, and the public to release police Corporal Norberto Perez, whose 12-year-old son Andres Felipe Perez died of cancer in December.

Guerrillas kidnaped journalists (see Section 2.a.).

Guerrillas continued to kidnap political leaders (see Section 3). During the year, the FARC kidnaped Liberal Congressman Orlando Bernal Cuellar in August, Liberal Congressman Luis Eladio Perez in June, and Huila department Congressman Consuelo Gonzalez in September. At year's end, all three remained in captivity, along with Conservative Party Congressman Oscar Lizcano, who was kidnaped in June 2000. In May the FARC kidnaped Jairo Antonio Correa, the mayor of Dabeiba. The Federation of Colombian Municipalities reported the kidnaping of at least 10 mayors, (3 by guerrilla groups, the rest by unidentified groups) during the year (see Section 3).

The FARC, the ELN, and other guerrilla groups regularly kidnaped foreign citizens throughout the year; some were released after weeks or months of captivity. On July 18, the FARC kidnaped three German nationals (a German government development official, his brother, and a friend). On September 23, the official's brother escaped and reported that the development official was in poor health due to long forced marches and lack of medical attention for a heart condition. The two remaining German hostages were released on October 12. A Slovak priest was kidnaped in September but quickly released. In July 2000, a representative of the NGO Doctors without

Borders was kidnaped by a fringe guerrilla group. The victim was released in January and reportedly left the country.

Despite government search efforts and continued pressure by the Government on the FARC to account for three American missionaries kidnaped by FARC guerrillas in January 1993, their whereabouts and condition remained unknown.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Constitution and criminal law explicitly prohibit torture, as well as cruel, inhuman, or degrading treatment or punishment; however, there were reports of police and military torture and mistreatment of detainees. In May 2000, Congress criminalized torture (see Section 1.b.), and the reformed Military Penal Code directed that trials of members of the military and police accused of torture be held in civilian, rather than military, courts (see Section 1.e.). The Inspector General's office received 29 complaints of torture by state agents during the year, compared with 101 during 2000. CINEP reported that between January and September state security forces tortured six persons; five cases were attributed to the police, and one case was attributed to the army.

Colonel Jose Ancizar Molano Padilla (then-commander of the 2nd Marine infantry battalion), Captain Alvaro Hernando Moreno, Captain Rafael Garcia, Lieutenant Carlos Eduardo Jaramillo, and four noncommissioned officers were on trial at year's end for torturing 12 marines with asphyxiation and electric shocks in December 1995.

CINEP reported 158 cases of torture by paramilitaries in the period from January through September.

Paramilitary groups increasingly used threats both to intimidate opponents and to raise money. Letters demanding payment of a war tax and a threat to mark victims as a military target if they failed to pay were typical. In 1999 CINEP reported that nearly half of those threatened were public school teachers and that approximately half of all threat recipients were residents of Antioquia department.

Guerrilla groups also tortured and abused persons. The bodies of many persons kidnaped and subsequently killed by guerrillas showed signs of torture and disfigurement. CINEP reported 40 cases of torture by guerrillas during the period from January through September. Numerous former kidnap victims and hostages taken by the guerrillas during combat reported severe deprivation, denial of medical attention, and physical and psychological torture during captivity (see Section 1.b.). The MOD also reported numerous cases of soldiers and policemen tortured or mutilated and killed after surrendering (see Section 1.g.).

Prison conditions are harsh, especially for those prisoners without significant outside support. Severe overcrowding and dangerous sanitary and health conditions remained serious problems. In early June, the Supreme Court of Valledupar, Cesar department, ruled in favor of Valledupar prison inmates who had filed a writ of appeal complaining of lack of water, sanitation, natural light, and prolonged isolation from contact with relatives. The court ordered the Prison and Penitentiary Institute (INPEC) to resolve these problems. There are approximately 7,000 prison guards from the INPEC who report to the Ministry of Justice. Guards and prison staff frequently are untrained or corrupt.

Only three prisons--Valledupar, Bogota's La Picota prison, and Acacias--appear to meet international standards for treatment of prisoners. In the country's other prisons, inmates pay to eat, drink, sleep on a mattress, wash clothes, or make telephone calls, and also pay protection fees to fellow inmates or to corrupt prison guards. According to the Committee for Solidarity with Political Prisoners, outside, private sources continued to provide the majority of prisoners' food in most prisons. In 1999 INPEC reported that the daily food allowance for each prisoner was $1.44 (2,700 pesos). In late November, the director of the office of the U.N. High Commissioner for Human Rights in the country, Anders Kompass, described the country's overcrowded prisons to a news conference as terrible.

According to INPEC, in September the country's prisons and jails held approximately 51,251 inmates, 24 percent over their capacity of 41,191; the occupancy rate was 37 percent over capacity at the end of 2000. According to INPEC figures, overcrowding has improved, but remains severe. Medellin's Bellavista prison, the country's largest, housed 6,219 inmates at year's end although it originally was built to house 1,800 inmates (a 245 percent occupancy rate). Bogota's La Modelo prison had a 160 percent occupancy rate, compared with 169 percent in 2000, and the Palmira prison outside Cali held 14 percent above its planned capacity, compared with a 192 percent occupancy rate in 2000.

An estimated 17.8 percent of the country's prisons were between 40 and 80 years old, 3.5 percent between 80 and 201 years old, and 2.4 percent more than 201 years old. The Justice Ministry made significant progress in implementing its plan, announced in February 2000, to renovate prisons and build 11 new prisons and expand prison capacity by 18,000 persons by 2003. During the year, the Government renovated prisons in Valledupar, Acacias, Popayan, Barne, and the high security pavilion in Bogota's La Picota penitentiary. The Government already had completed, had under construction, or had contracted to add 10,600 beds at the end of the year.

An estimated 42 percent of all prison inmates (21,364 persons) are pretrial detainees. The remaining 58 percent (29,887 persons) are split roughly between those appealing their convictions, and those who have exhausted their appeals and are serving out their terms. There are no separate facilities for pretrial detainees and convicted prisoners. According to the MOD, in 2000 a total of 4,145 persons (8 percent of inmates) were in pretrial detention in police stations. Despite a 1999 Constitutional Court ruling that ordered the transfer of detainees from overcrowded police station holding cells to prisons, Bogota's 21 police stations still held 1,657 prisoners awaiting transfer to prisons at the end of 2000, the most recent available estimate.

Local or regional military and jail commanders did not always prepare mandatory detention registers or follow notification procedures; as a result, precise accounting for every detainee was not always possible.

The Government frequently failed to prevent deadly violence among inmates. In the period from January through September, INPEC reported 19 disturbances and 62 violent deaths in the penitentiary system. For example, in January two inmates were killed and one wounded during paramilitary-guerrilla fights at the prison in Bucaramanga, Santander department. In June the ELN kidnaped five paramilitaries from municipal prisons in El Bagre, Antioquia department. Also in June, three inmates died and four more were injured in fighting at the Palmira prison, Valle del Cauca department. On July 2-3, 10 persons were killed and 23 injured in an armed battle between paramilitary and guerrilla convicts in Bogota's La Modelo prison. State security forces were unable to reestablish control for 17 hours. Sixteen inmates reportedly remain unaccounted for following April 2000 fighting between paramilitaries and organized crime groups, which left 27 dead and 43 wounded in Bogota's La Modelo prison.

Escapes from prison continued to be a very serious problem; from January through September, INPEC reported 168 escapes. A total of 781 inmates escaped during 2000, most when granted 72-hour passes to leave the prisons. The Prosecutor General's office and the Inspector General's office continued to investigate abuse of these passes. Some of those who escaped during the year were highly dangerous criminals. On February 19, 20 prisoners escaped from the prison in Neiva, Huila department, when the FARC blew a hole in the wall with a rocket. In early May, Omar Yesud Lopez Alarcon, the head of the northern branch of the paramilitaries who is accused of masterminding a number of massacres, escaped from the Modelo de Cucuta prison. On May 7, the FARC released 65 prisoners from a prison in Caloto, Cauca department, during a FARC attack. On June 23, 98 inmates (including 19 guerrillas) escaped from La Picota prison by blowing a hole in a wall with a gas cylinder. FARC inmates said that FARC commanders had orchestrated the escape. The La Picota incident prompted the resignation of the director of INPEC. On July 22, 73 prisoners escaped from prison when 300 FARC troops attacked the town of Bolivar, Cauca department.

Key narcotics traffickers and some guerrilla leaders obtain cells with many comforts, some of which--such as access to two-way radios, cellular telephones, and computers--allowed them to continue their illegal activities from inside jail. However, the high security wing of La Picota prison in Bogota has undergone renovations that have altered considerably this comfortable lifestyle.

There are separate prison facilities for women, and in some parts of the country, separate women's prisons exist. Conditions at women's prisons are similar to those at men's prisons but are far less violent. According to the Criminal Procedures Code, no one under the age of 18 may be held in a prison. Juveniles are held in separate facilities operated by the Colombian Institute for Family Welfare (ICBF).

The ICRC continued to have routine access to most prisons and police and military detention centers. The ICRC continues to have ad hoc access to civilians held by paramilitary groups and guerrilla forces. However, the FARC and ELN continue to deny the ICRC access to police or military hostages (see Sections 1.b. and 1.g.).

d. Arbitrary Arrest, Detention, or Exile

The Constitution includes several provisions designed to prevent illegal detention; however, there continued to be instances in which the authorities arrested or detained citizens arbitrarily.

The law prohibits incommunicado detention. Anyone held in preventive detention must be brought before a prosecutor within 36 hours to determine the legality of the detention. The prosecutor must then act upon that petition within 36 hours of its submission. Despite these legal protections, instances of arbitrary detention continued.

In August the office of the Human Rights Ombudsman, a group of NGO's, and two private individuals filed four Constitutional Court challenges to the 2001 Law on Security and National Defense on the grounds that, among other things, it would infringe on the right to due process of persons detained or investigated by the military (See Section 1.e.). The law does not specify the maximum period detainees may be held before being turned over to civilian authorities.

Conditional pretrial release is available under certain circumstances, for example, in connection with minor offenses or after unduly lengthy amounts of time in preventive detention. It is not available in cases of serious crimes, such as homicide or terrorism.

AUC paramilitaries in the northeastern neighborhoods of Barrancabermeja, Magdalena department illegally exercised "social controls," such as curfews for young persons and punishing domestic violence. In May police had to rescue a man who was kidnaped by the militias and beaten for fighting with his wife in the street.

Guerrillas, particularly the FARC, pressed the Government and Congress to adopt a permanent prisoner exchange law. Initiating regular prisoner exchanges remained a top guerrilla priority and featured prominently in the FARC's negotiating points at the peace talks. Neither the Congress nor the Government attempted to pass such legislation, and there was minimal popular support for it during much of the year. In June the FARC released 42 captured soldiers and police in exchange for 15 imprisoned FARC members, then unilaterally released an additional 247 soldiers and policemen (see Section 1.d.). During the year, 145 soldiers and police either were captured in combat or kidnaped while off-duty are presumed to be held by the FARC or the ELN. The ICRC was not permitted access to them.

The Constitution prohibits exile, and forced exile is not practiced by the State. However, there were numerous instances of individuals pressured into self-exile for their personal safety. Such cases included persons from all walks of life, including politicians, journalists, human rights workers, slum-dwellers, business executives, farmers, and others (see Sections 2.a. and 4). The threats came from various quarters: Some individual members of the security forces, paramilitary groups, guerrilla groups, narcotics traffickers, other criminal elements, or combinations of the above.

e. Denial of Fair Public Trial

The civilian judicial system, reorganized under the 1991 Constitution, is independent of the executive and legislative branches both in theory and in practice; however, the suborning or intimidation of judges, witnesses, and prosecutors by those indicted or involved is common. The Human Rights Ombudsman's office reported receipt of 568 complaints of denial of the right to due process during 2000, the most recent year for which statistics were available. The office received 773 such complaints in 1999. Judges, prosecutors, and defense attorneys continued to be subjected to threats and acts of violence.

The judiciary includes the Constitutional Court, the Supreme Court of Justice, the Council of State (the appellate court for civil cases), the Superior Judicial Council, and lower courts. The CSJ, which oversees the administration of the judiciary, also has responsibility for determining whether cases involving members of the security forces are to be tried in civilian or military courts. The Prosecutor General's office is an independent prosecutorial body that brings criminal cases before the courts.

The Constitutional Court adjudicates cases of constitutionality, reviews all decisions regarding writs of protection of fundamental rights ("tutelas"), and reviews all decisions regarding motions for cessation of judicial proceedings. Jurisdictional clashes among the Constitutional Court, the Supreme Court of Justice, the Council of State, and the CSJ were common, due to the lack of a single supreme judicial authority capable of deciding issues of jurisdiction or constitutional interpretation.

In April 2000, the Constitutional Court overturned much of the 1999 law creating a specialized jurisdiction (which had replaced the anonymous ("faceless") regional courts system in July 1999). Arguing that defendants have the right to know the identity of their accusers, the Constitutional Court overturned elements of the law that permitted some prosecutors and witnesses to remain anonymous under exceptionally dangerous circumstances. The Court also ruled that specialized jurisdiction judges and prosecutors no longer could transfer cases to other colleagues when they believed their own security to be at risk.

The Constitutional Court's decision preserved first instance specialized jurisdiction courts created by the 1999 law, which try certain crimes, including kidnaping, hijacking, paramilitarism, guerrilla subversion, narcotics trafficking, money laundering, and human rights abuses. Specialized jurisdiction prosecutors still are permitted 12 months to investigate and develop cases, rather than the 6 months afforded to regular civilian judiciary prosecutors.

The Constitution specifically provides for the right to due process. Judges determine the outcome of all trials; jury trials are rare. The accused is presumed innocent until proven guilty and has the right to representation by counsel, although representation for indigenous people and the indigent historically has been inadequate. In mid-1999, the CSJ's administrative chamber reported that the civilian judiciary suffered from a backlog of approximately 3,069,000 cases (including approximately 604,000 criminal cases) and that there were approximately 338,000 outstanding arrest warrants. Approximately 223,000 writs for protection of fundamental rights ("tutelas") were before the Constitutional Court for its legally mandated review. At year's end, the CSJ reported that the judicial system was extremely overburdened; it received a total of 8.6 million suits in 1994-2000, of which 226,783 were criminal cases filed during 2000. These backlogs have created large numbers of pretrial detainees (see Section 1.c.).

Defendants in trials conducted by the regular courts have the right to be present and the right to timely consultation with an attorney. Regular court defendants and their attorneys have the right to question, contradict, and confront witnesses against them, to present witnesses on their own behalf, and to have access to government evidence relevant to the case. The country's judiciaries, including regular civilian, specialized jurisdiction, and military, continue to be overwhelmingly Napoleonic in character; everything is processed in writing. Public trials are still rare, and there are juries only in rare instances; however, cross-examination of witnesses does occur. Defendants also have the right to appeal a conviction to a higher court.

The Constitution provides for a special criminal and civil jurisdiction within indigenous territories based upon traditional community laws (see Section 5).

As part of the Ministry of Defense, the military judiciary falls under the executive branch, rather than under the judicial branch. The lack of transparency and accountability in the workings of the military judiciary contribute to a general lack of confidence in the system's ability to bring human rights abusers to justice. The new Military Penal Code, which entered into effect in August 2000, denied unit commanders the power to judge subordinates; called for the creation of an independent military judicial corps; and provided legal protection for service members who refuse to obey illegal orders to commit human rights abuses. The reformed code does not allow torture, genocide, and forced disappearance to be related to acts of service—the constitutional standard for trying crimes in the military judiciary. Therefore, these crimes must be tried in the civilian judiciary (see Sections 1.a. and 1.b.). In August 2000, the President issued a directive to the armed forces and the police that excluded from military criminal jurisdiction the crimes of genocide, torture, forced disappearance, and acts against humanity.

The new military justice system is composed of magistrates of the Military Court of Appeals, lower military court judges, investigating judges, prosecutors, and judge advocates (auditor de guerra) at the General Inspector, division, and brigade levels. The Executive Director of the Military Penal Justice, Corps Brigadier General Jairo Pineda, reports directly to the Minister of Defense, a civilian. Military prosecutors report to Brigadier General Pineda, not to unit commanders as under the previous

system. The new Military Penal Code provides for the right of representatives of the civilian judiciary to be present at military trials of military personnel.

A 1997 Constitutional Court decision transferred jurisdiction for the investigation and prosecution of serious human rights violations and other alleged crimes not related directly to acts of service from the military judicial system to the civilian judiciary. (Previously the CSJ assigned most cases involving high-level military personnel to the military courts, where convictions in human rights-related cases were rare.) The Constitutional Court ruled that, in the case of doubt, jurisdiction should be assigned to the civilian system. However, in 1998 the CSJ determined that it was not bound by the Constitutional Court's 1997 decision. In that instance the CSJ's decision ended a civilian investigation of the relationship between Brigadier General Fernando Millan and paramilitary groups in Santander department (see Section 1.a.).

The 1991 Constitution provides that general-rank officers be tried by the Supreme Court. The new Military Penal Code provides that the Supreme Court (not the Superior Military Tribunal) has first instance jurisdiction in cases that date from August 12, 1999, involving criminal acts by generals, admirals, major generals, vice-admirals, brigadier generals, rear admirals, and magistrates and prosecutors of the Superior Military Tribunal. Cases that already were in their trial phase before this date must continue under the old military penal code. The new code also makes the Supreme Court the court of second instance review of rulings by the Superior Military Tribunal, thereby giving the Supreme Court--a body composed entirely of civilian magistrates--effective authority over the military judiciary. An August 2000 presidential directive also "raises to the category of law" the 1997 Constitutional Court decision that serious human rights violations and other crimes not directly related to acts of service must be tried by civilian courts.

CSJ figures quoted at the end of 2000 by the Ministry of Defense indicated that when conflicts of jurisdiction arose, the total number of cases assigned to military courts dropped from 50 percent in 1992 to approximately 15 percent in 2000, while cases assigned to civilian jurisdiction rose from 40 percent in 1992 to 60 percent over the same period. During the year, the CSJ assigned 11 cases out of 31 conflicts of jurisdiction involving military or police suspects to the military penal system and 20 cases to civilian jurisdiction.

The military judiciary demonstrated an increased willingness during the year to turn cases of military officers accused of human rights violations or criminal activities over to the civilian judiciary; however, such officers generally were of lower rank. In November the Ministry of Defense released figures that indicated that since the 1997 Constitutional Court decision, the military judiciary has transferred 1,372 cases to the civilian judicial system; there was no information available as to how many of these cases dealt specifically with human rights abuses or violations of international humanitarian law, nor how many remained in the military judicial system. However, a March 2000 report by the Ministry of Defense stated that 41 percent of the cases transferred involved serious crimes such as homicide, torture, illegal detentions, and infliction of bodily injuries; the rest were common crimes. Out of the total of 1,314 police and military cases transferred, 58 cases were transferred during the year, 496 cases were transferred in 2000, 79 in 1999, 266 in 1998, 295 in 1997, and 171 cases were transferred on an unknown date.

During 2000 the military judiciary found 122 members guilty of violating "human or fundamental rights." The average prison sentence was 58 months for homicide and 15 months for inflicting bodily injury.

In a key ruling, the military judiciary convicted General Jaime Humberto Uscategui Ramirez of failing to stop the 1997 massacre in Mapiripan, Meta department (see Section 1.a.). Uscategui was sentenced to 40 months in prison and loss of salary. Uscategui served a reduced sentence, however, and many human rights activists claimed that the message sent by his conviction was undercut by his early release. Furthermore, the key witness against Uscategui, Lt. Col. Hernan Orozco, was sentenced to 38 months imprisonment. Orozco served the entire sentence and was released in November. However, the Constitutional Court announced in November its ruling that the CSJ should transfer Uscategui's case to the civilian judiciary, arguing that Uscategui's alleged crimes were not service-related acts. This ruling, which had not yet been issued formally and implemented by year's end, in essence nullified the military judiciary's conviction, and means that Uscategui's case will fall to the Prosecutor General's office for investigation and prosecution. (Orozco is not expected to face investigation, as the Prosecutor General's office had declined in 1998 to press charges against him.)

In September 2000, the President signed 12 decrees to reform and strengthen the military. One decree provides for the separation from service of all uniformed members of the military regardless of their time in service, at the discretion of the top military commanders. Previously, the Minister of Defense could at his discretion separate from service only those who had served at least 15 years in the military. Other decrees establish three levels of misconduct and the crimes classified at each level. A total of 27 crimes are punishable with immediate dismissal; these include: torture, forced disappearance, genocide, facilitating by any means the knowledge of protected information or access to classified documents without authorization, failure to enter into combat or to pursue the enemy having the capacity to do so, and retreating before the enemy or abandoning post without having used elements of defense that might be available. A higher-ranking officer such as a unit commander is granted initial authority to issue disciplinary sanctions. Those under investigation may be suspended for up to 90 days with half pay; those suspended may perform administrative duties. The decrees also state that in the event that another authority should learn of crimes, the military must inform that authority and provide all relevant information to it. Another decree states that, with limited exceptions, any officer sentenced to prison by the military or the civilian justice system is to be separated from service.

From October 2000 through the end of 2001, the military dismissed a total of approximately 600 members; however, it was not known how many discharges were for collaborating with paramilitary groups. No information was available from the MOD regarding the specific reasons for any of the dismissals, nor were their names announced. It was not known how many were dismissed due to allegations that they were responsible for human rights abuses or collaborating with paramilitary groups in such abuses. The MOD has confirmed the claims of many human rights NGO's that a large number of those dismissed have entered the ranks of illegal paramilitary groups.

When military officers were tried, convicted, and sentenced for human rights violations, they generally did not serve prison terms but were confined to their bases or military police detention centers, as permitted by law. The Ministry of Defense reports, and the Prosecutor General's office concurs, that military and police prisoners charged by civilian prosecutors routinely are suspended from their duties and placed on half-pay. Officers and noncommissioned officers are removed from any command duties. Some perform administrative functions while in detention. Armed Forces Commander General Tapias has cited a lack of adequate military prison facilities as a primary cause for escapes from military detention areas. To address these concerns, in September Minister of Defense Bell announced that a new high security prison would be opened at Tolemaida military base in October. Although the military is responsible for operating the facility, the civilian INPEC will provide oversight.

On August 13, the President signed the Law on Security and National Defense (Law 684 of 2001), which among other things, expanded the authority of the armed forces to detain suspects in the absence of civilian authorities. Various human rights groups protested the law's final version. Four different lawsuits (one by the Human Rights Ombudsman's office, one by a group of NGO's, and two by individuals) challenging the law have been filed before the Constitutional Court (see Section 1.d.). They contend that various aspects of the law violate the right to due process as provided for in the Constitution and the Criminal Code. Article 58 of the law does not limit specifically the time the military can detain a suspect before turning that person over to civilian law enforcement, although Article 70 mandates that suspects be turned over to civilian authorities as soon as time and distance permit, and that any delay must be justified appropriately. Article 60 gives civilian authorities up to 60 days from the receipt of a complaint of a human rights violation to decide whether to investigate formally alleged crimes by military or police during operations, significantly less than the year allowed for investigations of civilian authorities. Some legal experts also have complained that the provisions that allow the Government to declare a zone a military theater of operations, in effect, give military commanders authority over regional civilian authorities. While the law does not grant explicitly military commanders authority over regional civilian authorities, it permits the President to delegate to the military the authority to enforce presidential decrees and orders.

Judges have long been subject to threats and intimidation, particularly when handling cases involving members of the public security forces or of paramilitary, narcotics, and guerrilla organizations. Violent attacks against prosecutors and judges continued, and prosecutors, judges, and defense attorneys continued to be subjected to threats and acts of violence. Prosecutors reported that potential witnesses in major cases often lacked faith in the Government's ability to protect their anonymity and were thus unwilling to testify, ruining chances for successful prosecutions.

For example, in March Bogota judge Lesther Gonzalez Romero received threats which appeared to be related to important cases she had tried or is trying, such as the three 1997 CINEP murders, the 1997 Mapiripan massacre, and the 1995 assassination of Alvaro Gomez. Also in March, Medellin judge Adalgisa Lopera Aristizabal and her family left the city following a death threat. Judge Lopera was trying terrorism, narcotics, and paramilitarism cases.

The investigation continues of the April 2000 murder of specialized jurisdiction prosecutor Margarita Maria Pulgarin Trujillo in Medellin; AUC members were the prime suspects in her killing. One suspect has been charged in absentia; no one has been detained in the case.

On August 29, presumed paramilitaries killed Yolanda Paternina, a prosecutor investigating the January Chengue massacre, in Sincelejo, Sucre department. Two other investigators working undercover on the case disappeared in mid-April near Berrugas, Sucre department. There have been no arrests in these cases.

In July the reformed Criminal Code and Criminal Procedure Code went into effect. The revised code created a number of new crimes such as genocide (see Section 1.a.), but reduced the sentences for a number of serious crimes, including kidnaping and extortion, and the amount of time served necessary for parole.

The Inspector General's office investigates misconduct by public officials, including members of the military and police. The Inspector General's office can draw upon a nationwide network of hundreds of government human rights investigators covering the country's 1,097 municipalities. The office received 228 complaints related to massacres and forced disappearances during the year, compared with 201 in 2000. Of complaints received during the year, 146 are under preliminary investigation, 23 resulted in formal disciplinary investigations, and 14 resulted in formal charges being filed. Of the 101 persons under investigation at year's end for complaints related to massacres and forced disappearances, 45 were army, 28 were police, 5 were air force, 22 were marines, and 1 was from the INPEC. The Inspector General's office can only impose administrative sanctions; it has no authority to bring criminal prosecutions or impose criminal sanctions but can refer all cases to the Prosecutor General's office for investigation. The Inspector General's office referred all cases of human rights violations received during the year to the Prosecutor General for investigation, and reported that that the majority of these cases are investigated by the Inspector General's office.

The Supreme Court elects the Prosecutor General for a 4-year term, which does not coincide with that of the President, from a list of three candidates chosen by the President. The Prosecutor General is tasked with investigating criminal offenses and presenting evidence against the accused before the various judges and tribunals. However, this office retains significant judicial functions and, like other elements of the civilian judiciary, it is struggling to make the transition from a Napoleonic to a mixed legal system that incorporates an adversarial aspect.

In an attempt to address impunity, the Prosecutor General in 1995 created a special human rights unit as part of the regional courts system. As of December, the group of 30 prosecutors had 788 open cases involving massacres, extrajudicial killings, kidnapings, and terrorism during the year, with 1,342 suspects under investigation, of which 234 were members of state security forces. The unit's prosecutors have issued arrest warrants against members of the security forces and of paramilitary, guerrilla, and drug trafficking organizations. As of December, the human rights unit had under arrest 275 members of state security forces, had charges filed against 214, and had 56 members of the state security services on trial for a variety of charges including homicide, torture, kidnaping, and sponsorship of paramilitary groups. The security forces demonstrated a greater willingness to follow up with instructions that those ordered arrested be removed from their duties, denied the right to wear a uniform, or turned over to civilian judicial authorities. The Ministry of Defense and the Fiscalia reported that all military and police charged with a human rights crimes are suspended from their duties and placed on half-pay. At year's end, 107 military and 74 police were suspended. However, for various reasons including lack of resources for investigation, lack of protection for witnesses and investigators, lack of coordination between government organs, and in some cases, obstruction of justice by individuals, impunity continued to be very widespread.

In addition to providing public defense attorneys in criminal cases, the Human Rights Ombudsman's 34 departmental and regional offices throughout the country provide a legal channel for thousands of complaints and allegations of human rights violations. However, in practice the Ombudsman's operations are underfunded and understaffed, slowing its development of a credible public defender system. Human Rights Ombudsman Eduardo Cifuentes was active during the year in criticizing and reporting human rights violations and in visiting the sites of massacres. His office has worked to improve training and support of its personnel and has begun to build a nationwide Early Warning System, now operational, to help prevent massacres.

Within the FARC-controlled despeje zone, local FARC leaders effectively supplanted judicial authorities and declared the establishment of an alternative, FARC-run "justice system." In the face of FARC intimidation, all elements of the civilian judiciary fled the zone. Residents of the zone regularly were denied the right to a fair trial. Continuing concern about arbitrary FARC justice in the zone led the authorities to stress that governmental justice must be present.

The Government states that it does not hold political prisoners.

The Government granted the ICRC access to monitor approximately 3,900 cases of imprisoned citizens accused of terrorism, rebellion, or aiding and abetting the insurgency, which are crimes punishable under law.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law provides for the protection of these rights; however, at times the authorities infringed upon them. The law generally requires a judicial order signed by a prosecutor for the authorities to enter a private home, except in cases of hot pursuit. The MOD continued training public security forces in legal search procedures that comply with constitutional and human rights. Due to intimidation, corruption, or the absence of evidentiary proof collected directly by prosecutors, judicial authorities routinely set free paramilitary and guerrilla suspects captured by the security forces in or out of combat.

The authorities may intercept mail or monitor telephones only with a judicial order. This protection extends to prisoners held in jails. However, various state authorities sometimes monitored telephones without obtaining prior authorization. There were unconfirmed reports by some human rights groups that members of the security forces subjected them to surveillance, harassment, or threats (see Section 4).

In April then-Prosecutor General Alfonso Gomez Mendez announced a formal investigation of extensive illegal wiretapping by the Medellin GAULA (a combined police and army antikidnapping unit)(see Section 1.b.). Investigators working on the October 2000 disappearance of ASFADDES workers Angel Quintero and Claudia Patricia Monsalve uncovered evidence that the GAULA tapped 2,500 telephone lines without proper authorization, including those of ASFADDES and other human rights organizations (see Section 4). Police captain Harvey Gerardo Grijalba Suarez was arrested but subsequently released for lack of evidence. Nine other persons, including two other police officers, were investigated but not charged in the case. Prosecutors are investigating the April 4 murder of police officer Carlos Ceballos Gomez, who testified in the case (see Section 1.a.). The Inspector General's office is conducting a separate disciplinary investigation.

In August the Prosecutor General's anticorruption unit cleared six members of the DAS who were suspected of illegal wiretapping in Bogota over the course of several years.

Guerrillas used wiretaps and accessed bank accounts of citizens at roadblocks to select kidnap victims.

In 1999 the Government announced that no one under the age of 18 could enter military service, even with the consent of a parent; previously, individuals over 16 years of age but below age 18 could volunteer to join the military with parental permission but were barred from serving in combat.

The Ministry of the Interior reported increased recruitment of minors by illegal armed groups during the year. The MOD reported that an increased number of minors deserted from illegal armed groups; 93 children under the age of 18 surrendered to state security forces during the year, compared with 72 in 2000 and 29 in 1999.

In August the Human Rights Ombudsman reported increased recruitment of minors by paramilitary groups. In late July, a previously unknown armed group kidnaped 10 youths, whom they first attempted to recruit, from a government youth center in Villavicencio, Meta department. It is suspected, but not established, that this group was paramilitary. In August paramilitary groups forcibly recruited 20 young men between the ages of 16 and 25 from 3 villages in Casanare department.

The use of child soldiers by guerrillas was common. NGO's and the Government strongly and repeatedly criticized guerrilla recruitment of children. The Government estimates that both paramilitary groups and guerrillas engage approximately 6,000 children as combatants. In 1999 the FARC promised visiting Special Representative of the U.N. Secretary General on Children in Armed Conflict Olara Otunnu that it would stop forcing children into its ranks; however, it continued the practice, and during the year, the number of children recruited appeared to increase. Once recruited, child guerrillas are virtual prisoners of their commanders and subject to various forms of abuse. Sexual abuse of girls is a particular problem. Former child guerrillas have testified to rape, mandatory use of intrauterine devices, and forced abortions. Child

soldiers, including girls, were seen in guerrilla ranks in the despeje, and reports from various sources indicate that the guerrillas recruited at least 120 minors, but possibly many more, in the despeje. According to press reports, at least one third of the guerrillas were under the age of 18. The Roman Catholic Church and teachers reported that the FARC lured or forced hundreds of children from the despeje zone into its ranks. According to press reports, families from the demilitarized zone, as well as from Arauca, Valle del Cauca, and Antioquia departments have fled their homes because guerrilla groups have tried to impress their children. In February the FARC handed over 62 child guerrillas, ranging from 12 to 16 years of age, to the Government. The children had been serving in the FARC for up to 3 years. According to press reports, in August 2000, members of the FARC killed a school rector in Meta department for criticizing the recruitment of his students.

Although the ELN agreed to halt recruitment of children under the terms of the June 1998 Mainz "Heaven's Gate" agreement, it also regularly impressed children into its ranks.

Paramilitary groups and guerrilla forces also regularly forcibly recruited indigenous persons to serve as soldiers.

Children were also among the preferred kidnaping targets of guerrillas (see Section 1.b.).

Guerrillas continued a policy of killing, attacking, and threatening off-duty police and military personnel, their relatives, and citizens who cooperated with them.

Former female guerrillas have reported forced abortions and forced implantation of intrauterine devices (see Section 1.g.).

g. Use of Excessive Force and Violations of Humanitarian Law in Internal Conflicts

The internal armed conflict and narcotics trafficking are the central causes of violations of human rights and international humanitarian law. Government security forces at times violated international humanitarian law and continued to commit serious human rights abuses; however, paramilitary groups and guerrillas committed the great majority of serious abuses. The CCJ analyzed CINEP data from June 2000 to June 2001 and attributed 3 percent of civilian victims and persons killed outside of combat to state security forces, compared with 3.5 percent in 1999-2000.

May 2000 legislation classified forced displacement as a crime; however, military counterinsurgency operations, forced conscription by paramilitary and guerrilla organizations, and guerrilla incursions often forced peasants to flee their homes and farms, and there was a very large population of IDP's (see Section 2.d.). Between 275,000 and 347,000 displacements of persons occurred during the year; the vast majority of IDP's are peasants who have been displaced to cities.

In response to the killings of thousands of members of the Patriotic Union leftist coalition, the May 2000 law classified "political genocide" as a crime (see Section 1.a.). However, it provided that political genocide could be committed only against members of legally constituted (i.e., nonguerrilla) groups.

In March the ICRC again suspended evacuations of wounded combatants following an incident near Aguachica, Cesar department, in which paramilitaries kidnaped a wounded ELN guerrilla who was being moved in a Colombian Red Cross vehicle. The wounded man later was found dead. The ICRC had resumed evacuations in December 2000, after a previous suspension occasioned by two similar murders (one by paramilitaries and another by FARC guerrillas) during October 2000. Evacuations of combatants remained suspended at year's end.

The ICRC reported that the Government, including military authorities, followed an open-door policy toward the ICRC and readily incorporated Red Cross curriculums on international humanitarian law in standard military training. However, impunity remains a problem. According to military sources, local commanders often transferred or discharged soldiers accused of serious human rights violations, rather than initiate legal proceedings. It remained unclear how many suspected human rights violators were investigated or prosecuted after being dismissed (see Section 1.e.).

A court ruling exonerated the soldiers involved in the August 2000 killing of six children by an army unit; however, the Superior Military Tribunal returned the case for reconsideration.

In June a military judge ordered the arrest of air force Captain Cesar Romero Pradilla, air force Lieutenant Johan Jimenez Valencia, and air force flight technician Hector Mario Hernandez for the December 1998 bombing of civilians in Santo Domingo, Arauca department by an air force helicopter; however, the three were freed on bail. In January the Inspector General's office charged Romero, Jimenez, Hernandez, and army major Juan Manuel Gonzalez with indiscriminate use of force.

Both the paramilitaries and the guerrillas continued blockades or illegal checkpoints in several areas around the country, in many cases causing severe shortages of food and medicine, straining local economies, and increasing forced displacement, particularly in Choco, Antioquia, Cauca, Magdalena Medio, Bolivar, Cesar, and La Guajira departments (see Section 2.d.). For example, by midyear the ELN had destroyed a bridge near Tibu three times, causing sharp increases in local food prices.

According to the army and independent monitors, there are an estimated 130,000 antipersonnel landmines in the country, with minefields in an estimated 140 municipalities around the country, and covering approximately 90,000 square miles of the country's territory. At year's end, the military maintained approximately 18,000 mines to defend static positions; the remaining mines were placed by illegal armed groups. According to the Ministry, antipersonnel mines killed 16 and wounded 75 military personnel during the year, and 14 civilians (9 of them children) were injured in minefields during the year.

The Human Rights Ombudsman's office stated in its 2000 report that women, who by and large remain socially and economically disadvantaged, continued to be affected disproportionately by violence, especially in war zones (see Section 5). The Ombudsman's office also noted a lack of government programs to address their problems. Female leaders of political and peasant organizations in various regions are the targets of persecution, threats, torture, and executions. Intrafamilial violence, sexual assault, and murder of women remained serious problems throughout the country (see Section 5). More than 30 percent of FARC members are female. Several observers have criticized the use of female combatants in guerrilla organizations as sex slaves (see Sections 1.f. and 5).

U.N. High Commissioner for Human Rights Mary Robinson in her report noted that all sides in the conflict failed to respect the principles of humanitarian law. She said that "the conflict has deteriorated to such an extent that combatants are disregarding the most basic humanitarian precept...the defenseless civilian population and children continue to be the principal victims of these actions." In November the World Food Program reported that armed groups had been hijacking trucks carrying deliveries intended for displaced children.

There were no reports during the year that the Government militarized public hospitals in conflict areas, which had increased the risk that the hospitals would become targets of guerrilla attack. In March 2000, the Constitutional Court ruled that state security forces could not maintain installations (such as police stations) next to schools, to avoid endangering the lives of students in case of guerrilla attacks; however, this continued to be the case in some communities. There were no reports that the State refused medical treatment to guerrillas.

The 1997 establishment of the AUC as a national paramilitary umbrella organization was designed both to provide a national structure, to coordinate logistics and offensive operations, and to develop a more coherent political movement. Although illegal, some early paramilitary groups reflected rural citizens' legitimate desire to defend themselves from the guerrilla threat. Other groups were actually the paid, private armies of drug traffickers or large landowners. Many members of paramilitary groups are former security force members or former guerrillas. The AUC umbrella group, according to military estimates, comprises between 8,000 and 11,000 combatants, who are members of 7 major blocs. (The AUC has claimed there are 15,000 paramilitary combatants.) The largest of these organizations is the ACCU, which is based in Cordoba department and the Uraba region of Antioquia department. On May 26, Carlos Castano formally stepped down as the military head of both the AUC and the ACCU and was replaced by a 9-member "military command"; however, he retained control of the AUC's political wing. Castano admitted publicly in 2000 that his group receives funding from legitimate businesses and from narcotics trafficking, and that the group is financed by "dominant businesses" in the regions in which it operates. In November Castano announced at an AUC convention that the AUC would no longer commit massacres; however, it remained unclear at year's end what the

effect of this announcement would be.

On May 24, units of the CTI and the army launched raids on homes and offices of suspected paramilitary financiers in the cities of Monteria, Cordoba department; Medellin, Antioquia department; and in Santander department. The seizure of financial documents revealed that legitimate businesses finance the right wing groups.

Some local army and police commanders tacitly tolerated--and sometimes aided and abetted--the activities of paramilitary groups, despite the public pronouncements of the Government and the public security forces' high command that they intended to combat paramilitary violence (see Sections 1.a. and 1.c.). The President, other government officials, the UNHCHR, and various NGO's noted increasing popular support for paramilitary groups during the year, spurred in part by continued human rights violations by the guerrillas.

Paramilitary groups used selective killings and systematic massacres to force displacements and punish civilians for perceived ties to the guerrillas (see Section 1.a.). During the year, paramilitary groups continued to commit numerous massacres but also appeared to rely increasingly on selective killings and forced disappearances of civilians to establish territorial control and to advance their political goals. By the year's end, the CCJ attributed 2,545 deaths to paramilitaries from June 2000 to June 2001, compared with 2,199 in 1999-2000.

The Government increased its efforts to combat paramilitary groups. State security forces captured 992 paramilitaries during the year, compared with 312 in 2000, and killed in combat 116 paramilitaries during the year, compared with 92 in 2000. Law enforcement officials also have begun to investigate and prosecute more aggressively persons who finance the paramilitaries.

Paramilitary groups on occasion used landmines. In August the Human Rights Ombudsman reported increased recruitment of minors by the paramilitaries (see Section 1.f.). Paramilitary forces failed to respect the injured and medical personnel. On numerous occasions, medical personnel and hospitals were declared "military objectives."

The 2 main guerrilla armies, the FARC and the ELN, as well as the much smaller EPL and other groups, commanded an estimated total of 21,645 full-time guerrillas operating in more than 100 semiautonomous groups throughout the country. These groups undertook armed actions in nearly 1,000 of the country's 1,097 municipalities. Both the FARC and the ELN systematically attacked noncombatants and violated citizens' rights through the use of tactics such as killings, forced disappearances, the mutilation of bodies, attacks on churches, attacks on hospitals, attacks on ambulances, and executions of patients in hospitals (see Sections 1.a., 1.b., and 1.c.). Guerrilla groups also were responsible for multiple abuses of religious and medical personnel. For example, on January 10, the FARC stopped an ambulance carrying a woman in labor to a hospital in Antioquia. Despite the pleas of the attendants, the guerrillas burned the vehicle, and the woman endured a difficult breech delivery in a nearby house (although she and the baby reportedly survived). Indiscriminate attacks on police stations resulted in high numbers of civilian casualties. Guerrillas also killed religious leaders (see Section 2.c.) and indigenous people (see Section 5).

Guerrilla organizations continued to pursue strategies that routinely led them to commit abuses against citizens. Their tactics consistently included killings, kidnaping, torture, targeting of civilian populations and installations (including medical facilities), and the forced recruitment of children as young as 10 years old (see Sections 1.a., 1.b., 1.c., and 5). In July Human Rights Watch directed an open letter to FARC commander-in-chief Manuel Marulanda that cited various abuses and called on the FARC to respect human rights and international humanitarian law. The FARC failed to respond substantively to any of the letter's points; instead, it accused Human Rights Watch of being a tool of a foreign government.

Guerrillas also massacred civilians, and continued to be responsible for a significant percentage of massacre victims and other civilian deaths related to the conflict. According to CCJ, the guerrillas were responsible for 101 massacre victims (10 percent of the total number) during the year. CCJ estimates that the guerrillas are responsible 22 percent of total civilian deaths related to the conflict since 1995. The Ministry of Defense reported that 1,060 civilian deaths were attributed to guerrilla groups during the year (out of a total of 2,088 civilian deaths related to the conflict) (see Section 1.a.).

Guerrillas used landmines both to defend static positions (such as base camps, cocaine laboratories, and sites at which kidnap victims were held) and as indiscriminate weapons of terror. The Vice President's office reported in 2000 that the FARC and ELN have laid indiscriminately 50,000 mines in rural areas. Landmines planted by guerrillas or disguised as everyday items such as soccer balls or paint cans often resulted in the killing or maiming of civilian noncombatants; thousands of IDP's were unable to return to their homes due to the presence of antipersonnel mines (see Section 2.d.). According to press reports, landmines surround guerrilla bases in the despeje zone. The FARC used sulfuric acid in the gas canisters that it employed as artillery and continued its practice of using these canisters to attack small towns. Scores of soldiers, police, and civilians were burned indiscriminately as a result.

In April FARC rebels raided the village of Caucana, Antioquia department. Using guns and gas canisters packed with explosives to attack a gas station and other buildings, they killed an estimated 25 persons, including 7 children.

Although the ELN agreed to halt recruitment of children under the terms of the June 1998 Mainz "Heaven's Gate" agreement, both the ELN and the larger FARC regularly forced children into their ranks (see Section 5). According to various witnesses and to former child guerrillas, once recruited, child guerrillas are virtual prisoners of their commanders and subject to various forms of abuse. Sexual abuse of girls is a particular problem, and former child guerrillas have testified to rape, mandatory use of intrauterine devices, and forced abortions. Child soldiers, including girls, were seen in guerrilla ranks in the despeje, and reports from various sources indicate that the guerrillas recruited at least 120 minors, but possibly many more, in the despeje. In addition, many families reportedly left the despeje (or have been displaced from other regions) to escape forcible recruitment of their children. According to press reports, in April 2000, FARC military commander Jorge Briceno Suarez ("Mono Jojoy") admitted that the FARC often had committed serious abuses against civilians, and that the FARC regularly used child combatants.

Paramilitary-guerrilla violence resulted in a number of civilian casualties in the wake of ongoing targeted or massive killings by both sides. According to Ministry of Defense figures, 2,088 civilians were killed in violence related to the internal conflict during the year. Of these, 1,028 were killed by paramilitaries, and 1,060 by guerrillas.

The FARC staged many attacks against municipalities outside of the despeje, possibly in an effort to expand its area of control beyond the demilitarized zone. For example, on February 24, the FARC's 21st front attacked San Antonio, Tolima department with gas cylinders loaded with grapeshot, killing two persons, injuring two more, and kidnaping one policeman. They destroyed the police station, the city hall, the bank, and 10 houses. On March 20, the FARC's 29th front killed 5 civilians and destroyed 35 houses in Bocas de Satinga. On April 1, the FARC's 13th front destroyed the police station, several public buildings, and houses in Almaguer, Cauca department and left several mines planted in the area.

On November 16, combined FARC and ELN columns attacked the town of Bolivar, Cauca department. The guerrilla forces ransacked and destroyed the local bank, mayor's office, police station, and most of the town plaza. Eventually they surrounded the town's 24 police officers. The unarmed townspeople organized themselves, marched toward the guerrillas, created a human shield to protect the policemen, and demanded that the guerrillas leave town, which they did. Earlier on November 13, the FARC had attacked the town of Caldono in the same department. The population also had organized itself, confronted the FARC unarmed, and forced the guerrillas to leave the town. On December 31, FARC guerrillas shot to death indigenous law student Jimmy Boanerge Guainga Chicangana, as he and fellow citizens in Purace, Cauca department, participated in unarmed civil resistance in the town square.

The FARC continued to kidnap, torture, and kill off-duty soldiers and policemen, as part of its openly announced "Plan Pistola" strategy (see Sections 1.a., 1.b., and 1.c.). For example, on July 1, in Cundinamarca department the FARC kidnaped an off-duty and unarmed army sergeant and three soldiers who later were found dead and whose bodies showed signs of torture (see Section 1.a.).

The FARC committed numerous abuses against civilians in the despeje. The FARC was responsible for killings; alleged cases of forced disappearance; rape; arbitrary detention infringement of the rights to free speech, freedom of religion (see Section 2.c.), and fair trial (see Section 1.e.); forced political indoctrination; and the forced recruitment of hundreds of children (see Section 1.f.). According to press reports, the FARC stated publicly in 2000 that all persons between the ages of 13 and 60 in the despeje zone are liable for military service with the guerrillas; families fleeing the zone reported that they were asked to surrender children to the FARC as of their 14th

birthday.

Guerrillas, usually the ELN, caused massive damage to the country's power industry and increases in electricity rates for consumers. ELN sabotage in December 2000 and FARC attacks in March left several towns in the Uraba region without electricity for weeks at a time, causing economic and health problems. In October FARC and ELN attacks caused power outages in the departments of Cesar, Bolivar, and Cordoba. Guerrilla attacks on oil pipelines also caused considerable environmental damage. Press reports indicated that as of July, there had been more than 100 guerrilla attacks on the Occidental Petroleum Corporation pipeline in Arauca department.

In November prosecutors charged 1 suspected ELN guerrilla who was detained, and continued to seek the arrest of 7 others, for terrorism, homicide, and injury in connection with the 1998 pipeline explosion in Machuca, Antioquia department, which killed 73 persons (including 36 children), injured 32 more, left over 1,000 persons homeless, and caused extensive environmental damage. Prosecutors charged in absentia ELN commanders Nicolas Rodriguez (alias "Gabino") and Herlington Chamorro (alias "Antonio Garcia") and four others. In September 2000, the ELN reportedly held an internal trial. The ELN claimed to have expelled guerrillas from its ranks for involvement in the crime.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of the press; and the Government generally respected this right in practice; however, journalists regularly practiced self-censorship to avoid retaliation and harassment by various groups. The privately owned print media published a wide spectrum of political viewpoints and often voiced harsh antigovernment opinions without fear of reprisals. A ban on the publication of evidence pertaining to criminal investigations, based on the secrecy provisions of the Penal Code and an anticorruption statute, remained in effect. During the year, journalists were intimidated, threatened, kidnaped, and in some cases killed, primarily by paramilitary groups and guerrillas. There were also reports of a significant number of threats from local officials accused of corruption. Fearing for their safety, journalists often refrain from publishing or broadcasting stories counter to the interests of paramilitary groups, guerrillas, or narcotics traffickers.

The NGO Reporters Without Frontiers reported that 12 journalists were killed during the year. Of these, 3 cases appeared related to the victim's work as a journalist, 4 victims were murdered for other reasons, and the motive for the other 5 cases was undetermined. The Colombian Press Freedom Foundation reported that 7 journalists were killed during the year, and that there were 51 cases in which journalists reported receiving threats. NGO's and international organizations reported obvious self-censorship by the press due to threats from illegal armed groups. In July Organization of American States (OAS) Rapporteur for Freedom of Expression Santiago Canton called for the effective investigation of continuing murders of journalists, and said that violence against journalists places at serious risk the right to freedom of expression and information of all citizens. In October Reporters without Frontiers noted that the paramilitaries were the main threat to press freedom, and in May the Committee to Protect Journalists released a list of the 10 worst enemies of press freedom that included Carlos Castano of the AUC. At least 19 journalists reported being threatened, and 6 had left the country at midyear. These figures are thought to be low, since many victims do not report threats to the authorities or to NGO's.

In June state police officers struck media workers from RCN and Caracol radio stations and destroyed a camera, as the journalists were recording the detainment of a student protester. Charges were filed against the two police officers.

In May AUC leader Carlos Castano reportedly acknowledged in an interview with Le Monde that the AUC had killed journalists Luis Fernando Velez Castano and Hector Dario Velez Castano, whom the AUC accused of being guerrillas. The two victims were the brothers of the deputy manager of television channel TeleMedellin.

On April 27, journalist Flavio Bedoya, who worked for the Communist Party weekly Voz, was killed in Tumaco, Narino department. According to the Inter-American Press Society, Bedoya had received threats from paramilitaries. On May 21, police bomb disposal experts defused a bomb packed into a pick-up truck outside of the offices of Voz.

Authorities are investigating the April 30 murder of Carlos Trespalacios, communications director for the municipal sports and recreations institute in Medellin, Antioquia department.

On May 3, Cali-based Telepacifico TV sports reporter Yesid Marulanda Romero was killed. On May 18, the FARC murdered Edgar Tavera Gaona, a local radio reporter in Santander department.

On June 27, the FARC kidnaped Pablo Emilio Parra Castaneda, a radio station owner, reporter, and Colombian Red Cross local official. The FARC had accused him of collaborating with paramilitaries. Parra later was found dead.

On July 4, unidentified men shot and killed radio station director Arquimedes Arias Henao in Fresno, Tolima department. Arias deliberately had focused his broadcasts on music and culture due to the dangers of reporting on more politically sensitive events.

On July 6, two unidentified men on a motorcycle shot and killed radio reporter Jose Duviel Vasquez in Florencia, Caqueta department. Vazquez had replaced Alfredo Abad Lopez, who was killed in a similar manner in December 2000, as the director of Voice of the Jungle radio station, a Caracol affiliate. In November 2000, unidentified assailants also had killed reporter Guillermo Leon Agudelo in Florencia. In December 2000, the authorities formed a special unit to investigate the murders of both Abad and Agudelo, and the Florencia mayor's office offered a $10,000 reward for information leading to arrests in these cases. The murders remained under investigation at year's end.

On July 8, unidentified men shot and killed Jorge Enrique Urbano in the port city of Buenaventura, Valle del Cauca department. Urbano had been the director of Radio Buenaventura, had served as the press secretary of the Buenaventura mayor's office, and directed a NGO dedicated to building public parks. It was unclear whether Urbano's murder was related to his work as a journalist.

On July 16, unidentified gunmen shot and killed Eduardo Estrada Gutierrez in San Pablo, Bolivar department. Estrada was president of the Association for the Development of Communications and Culture in San Pablo and was working on the implementation of a community radio station in the municipality. Estrada was the second person involved with a community radio program to have been killed during the year.

In November hooded gunmen killed Heriberto Cardenas in Buenaventura. Cardenas worked as a radio reporter as well as a correspondent for El Tiempo and El Espectador; however, he had withdrawn from journalism in 2000 and only occasionally made any contributions.

The investigation continued into the November 2000 murder of local radio reporter Gustavo Rafael Ruiz Cantillo in Pivijay, Magdalena department.

The investigation continued into the September 2000 murder by paramilitary members of Carlos Jose Restrepo Rocha, the publisher of TanGente newspaper in Tolima, a municipal council candidate, and a former member of the now-inactive M-19 guerrilla group.

Two suspected paramilitaries were on trial for the 1999 murders of journalists Alberto Sanchez and Luis Alberto Rincon. A third suspect was charged but died before the trial.

Prosecutors are appealing the decision of a Valledupar judges to absolve suspected paramilitaries Rodolfo Nelson Rosado Hernandez (alias "El Pichi") and Jorge Eliecer Espinal Velasquez ("El Parce") for the 1999 murder of newspaper editor Guzman Quintero Torres in Valledupar, Cesar department.

At year's end, paramilitary and La Terraza gangster Juan Pablo Ortiz Agudelo (alias "Bochas") was appealing charges filed against him for the 1999 murder in Bogota of journalist, comedian, and human rights activist Jaime Garzon Forero (see Section 1.a.).

The Supreme Court upheld a Neiva judge's decision to exonerate three men charged with the 1998 murder of journalist Nelson Carvajal Carvajal. There were no other suspects detained in the case.

According to the Free Country Foundation, five journalists were kidnaped during the year.

On March 16, the FARC kidnaped journalist and international affairs commentator Guillermo Angulo and two other persons in Choachi, Cundinamarca department. Angulo was held for 5 months.

In June journalist Carlos Reina was kidnaped in Yopal, Casanare department. In July Telecaribe journalist Ramon Campo Gonzalez was kidnaped in Santa Marta, Magdalena department.

On June 23, armed men kidnaped journalist Carlos Alberto Reina Camargo, as he traveled with his family in Boyaca department. Reina was released on July 6.

On June 30, four armed men kidnaped cable television executive and journalist Ramon Ocampo Gonzalez in Magdalena department as he was driving to his family farm. Ocampo is a member of a politically influential family and was also a member of the regional coffee growers association. The authorities suspect that the FARC was responsible. Ocampo was released on July 4.

An investigation continued of the May 2000 kidnaping and rape of Jineth Bedoya Lima, a reporter for the El Espectador newspaper. Bedoya was kidnaped while on her way to interview a convicted paramilitary leader at the Modelo prison in Bogota, raped, and subsequently released in Meta. El Espectador had received threatening letters against her and other journalists. AUC leader Carlos Castano denied that the AUC was involved. There have been no arrests in this case.

On February 26, two bombs went off at the home of radio reporter Zoraida Ariza in Saravena, Arauca department. In August the ELN detonated a bomb targeting Caracol Radio's Medellin offices. No one was injured in the blast.

At least five journalists left the country during the year, and several well-known journalists remain in exile. In late January, RCN prime time journalist and host of RCN top-ranking opinion show La Noche Claudia Gurisatti left the country for 3 months, following an alert from the authorities of a plot to kill her. Three men were arrested for conspiracy to kill Gurisatti, which appears to have been organized by the same FARC front also thought to be responsible for the December 2000 murder of congressional peace commission president Diego Turbay (see Section 1.a.). Gurisatti continued to host La Noche from abroad.

Journalist Hatem Dusaki, Cali television reporter Willy Maldonado Penaranda, television producer Jorge Rangel Rengifo, and Cali journalist Ricardo Varela all left the country during the year due to death threats or extortion attempts.

Francisco "Pancho" Santos, editor of the family-run El Tiempo, the country's largest newspaper, and founder of the Pais Libre antikidnapping organization and the national "No More" antiviolence civic campaign, remained in exile at year's end. Santos fled the country in March 2000 after announcing that he was the target of a FARC guerrilla group plot to kill him. In May four journalists of El Tiempo were threatened, declared to be military targets, and warned that they must leave the county within 1 month.

In February seven broadcast journalists in Popayan announced that they had received threats from paramilitaries. In May an AUC press release declared five broadcast journalists in Cali to be military targets. On November 9, the AUC threatened three journalists and a cameraman and advised them to abandon their profession in less than 48 hours or face execution.

On September 28, FARC guerrillas manning a roadblock harassed and threatened seven journalists who were going to cover a rally by presidential candidate Horacio Serpa, whom the guerrillas also prevented from entering the demilitarized zone.

The FARC restricted the movement of journalists in the despeje through blockades and random identity checks.

In 2000 the Inter-American Press Society opened a rapid action unit office in Bogota to help the Prosecutor General's office investigate crimes against journalists. The Ministry of Interior operates a program for the protection of journalists, established by an August 2000 presidential decree. During the year, the Government continued to consult with journalism organizations to identify journalists at special risk but has not had sufficient resources to provide protection. The Ministry of the Interior also supported an alerts network organized for journalists by providing a small number of radios and an emergency telephone hot line, which began to function in February.

Media ownership remains highly concentrated. Wealthy families or groups associated with one of the two dominant political parties have consolidated their holdings of news media, and regional firms continued to purchase local news media outlets. As a result of the general economic downturn, large press conglomerates closed radio stations and newspaper offices in certain provinces and reduced staff. In September El Espectador, one of the two leading Bogota dailies, became a weekly newspaper due to financial difficulties. The press remained generally free; however, economic problems and the concentration of media ownership limited the media's resources, causing the media to rely heavily on a smaller pool of advertisers, including the Government, which the media often chose not to criticize.

The National Television Commission continued to oversee television programming throughout the year.

Domestic organizations which promote freedom of the press include the Foundation for Freedom of the Press, Media for Peace (which provides training for journalists), and the Free Country Foundation (an antikidnapping NGO). However, on June 15, Free Press announced that it had shut down operations due to threats.

The Government does not restrict academic freedom, and there was a wide spectrum of political activity throughout the country's universities. However, paramilitary groups and guerrillas maintain a presence on many university campuses, aimed at generating political support for their respective campaigns. They use both violent and nonviolent means toward political ends. Both paramilitary groups and guerrillas also regularly targeted public school teachers at the elementary and secondary levels for politically motivated killings.

Investigations continued into four 1999 attacks against prominent academics. Jesus Antonio Bejarano, a former government peace commissioner; Doctor Dario Betancur, head of the social sciences faculty of Bogota's Universidad Pedagogica; and Doctor Hernando Henao, an anthropologist who published on the subject of displaced persons were killed in 1999.

As a result of these incidents, academic leaders have chosen to assume a lower profile; many have taken up residence outside the country.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of peaceful assembly, and the Government generally respects this right in practice. The authorities normally do not interfere with public meetings and demonstrations and usually grant the required permission except when they determine that there is imminent danger to public order.

In June two police officers struck journalists who were recording the detainment of a student protester (see Section 2.a.).

There were large demonstrations on several occasions by citizens throughout the country; the authorities generally did not interfere. In February approximately 12,000 persons demonstrated peacefully in San Pablo, Bolivar department, to protest the creation of a paramilitary enclave for the ELN. Later in the same month, about 20,000 persons blocked major highways in Magdalena Medio in an attempt to stop the creation of the zone. They lifted their blockade after the army threatened to intervene. In August agricultural workers blockaded 15 major highways throughout the country, and state security forces reportedly used tear gas to disperse the crowd. Also in August, 20 persons were injured in demonstrations by striking Bogota cab and bus drivers (see Section 6.a.). The Presidential Human Rights Program and state security forces cooperated with civil society organizations to provide security for major events in July in Antioquia and in September in the Barrancabermeja area. NGO's in Barrancabermeja reported harassment by paramilitaries during a September summit of women's and peace organizations.

The Constitution provides for freedom of association, and the Government generally respects this right in practice. Any legal organization is free to associate with international groups in its field. However, membership in proscribed organizations, such as the FARC, the ELN, the EPL, and the AUC is a crime. In practice, freedom of association is restricted by killings of and threats against labor union leaders and members of NGO's by illegal armed groups (see Sections 4 and 6.a.).

c. Freedom of Religion

The Constitution provides for freedom of religion, and the Government generally respects this right in practice. Although the 1991 Constitution separated the Catholic Church from the State, the Church retains a de facto privileged status.

A 1994 Constitutional Court decision declared unconstitutional any official government reference to religious characterizations of the country. The law on freedom of religion provides a mechanism for religions to obtain status as recognized legal entities. Accession to the 1997 public law agreement between the State and non-Roman Catholic religious entities is required currently for any religion that wishes to minister to its adherents via any public institution. A total of 12 non-Roman Catholic churches have received this special status; however, these churches report that some local authorities have failed to comply with the accord. No non-Christian religion is a signatory to the 1997 public law agreement. Some prominent non-Christian religious groups, such as the Jewish community, have not requested state religious recognition. All legally recognized churches, seminaries, monasteries, and convents are exempt from national and local taxes. Local governments may exempt religiously affiliated organizations such as schools and libraries from taxes; however, in practice, local governments often exempt only organizations that are affiliated with the Roman Catholic Church. According to military regulations, only Roman Catholic priests may serve as chaplains. The Government permits proselytizing among the indigenous population, provided that it is welcome and does not induce members of indigenous communities to adopt changes that endanger their survival on traditional lands.

In August the human rights unit of the Prosecutor General's office reported that it had 37 open cases of religiously motivated crimes.

The AUC sometimes targeted representatives and members of the Roman Catholic Church and evangelical Christian churches, generally for political reasons.

In May 2000, the authorities charged one suspect with the 1999 killings of Roman Catholic priest Jorge Luis Maza and Spanish aid worker Inigo Eguiluz in Choco department. The suspect was on trial in Quibdo at year's end. Security forces had arrested nine suspected members of a paramilitary group in connection with this crime but were obliged to release them due to lack of evidence.

The FARC and ELN guerrilla movements regularly target representatives and members of the Roman Catholic Church and evangelical Christian churches, generally for political reasons, and committed acts of murder, kidnaping, and extortion, as well as inhibited the right to free religious expression. The FARC has placed religious restrictions on persons within the despeje zone. The FARC also levied "war taxes" on Roman Catholic and evangelical churches and schools in the despeje and elsewhere.

The Christian Union Movement (MUC) reported the December 29 killing of an evangelical pastor and the December 30 kidnaping of another in Caqueta department. A total of 61 pastors have been killed in the last 8 years. As of June 2000, the FARC had forced the closure of over 300 evangelical churches in Meta, Guajira, Tolima, Vaupes, Guainia, Guaviare, Vichada, Casanare, and Arauca departments, and as of May, 120 more churches had been closed in the southwestern part of the country. Additionally, the MUC claimed that the FARC extorted and, in many cases, forced the closure of rural evangelical schools. Threats by guerrillas or paramilitary forces forced many evangelical preachers to refrain from publicly addressing the country's internal conflict. The MUC also reported an overall increase in the number of kidnapings and extortions but said that these crimes tend to be for economic rather than religious reasons. For example, in February the FARC kidnaped evangelical pastor and radio network president Enrique Gomez in a small town southwest of Bogota and released him in August.

The Bishops' Conference of the Catholic Church reported in 2000 that paramilitary forces, the ELN, and the FARC sometimes threatened rural priests with death for speaking out against them. It also reported that the indiscriminate use of force during guerrilla attacks on towns and police stations destroyed Roman Catholic churches in Huila, Tolima, Cauca, and Antioquia departments (see Section 1.g.).

Jewish community leaders estimated that as many as one-third of the country's Jewish community had fled the country as of July 1999. Among the principal causes was a string of kidnapings, assaults, and murders affecting Jewish business leaders.

In January representatives of various evangelical Christian churches reported that the FARC harassed congregation members for refusing to participate in coca cultivation in Meta and Cauca departments.

On March 11, unknown persons killed Protestant pastor Onofre Hernandez Benitez as he came out of the Pan-American Church of Arauca. It remains unclear to what extent, if any, the killing was related to religion.

In March 2000, unidentified perpetrators killed Roman Catholic priest Hugo Duque Hernandez at Supia, Caldas department. The case remained under investigation at year's end.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The Constitution provides citizens with the right to travel domestically and abroad, and the Government generally respects this right in practice, with some exceptions. Outsiders who wish to enter Indian tribes' reserves must be invited. In areas where counterinsurgency operations were underway, police or military officials occasionally required civilians to obtain safe-conduct passes; paramilitary forces and guerrillas often used similar means to restrict travel in areas under their control. At times the Government implemented curfews.

Throughout the year, frequent road blockades erected by paramilitary groups, the FARC, ELN, and peasant farmers inhibited transportation, communication, and commerce throughout the country (see Sections 1.g. and 2.a.). Social organizations also resorted to road blockages, some of them prolonged, to protest government actions or policies (see Section 2.b.). Almost every major artery in the country was closed at some point during the year. There were numerous reports of members of indigenous communities, particularly in Putumayo, being forbidden to leave their community without either paramilitary or FARC permission, and in which paramilitaries have blockaded communities.

According to the U.N. High Commission for Refugees (UNHCR), in the first three-quarters of the year, 9,412 Colombians requested asylum. UNHCR also reported that Colombians represent the 12th most numerous nationality requesting asylum, up from 21st during the first half of 2000.

A May 2000 law prohibits forced displacement; however, military counterinsurgency operations, forced conscription by paramilitary and guerrilla organizations, and guerrilla incursions often forced peasants to flee their homes and farms, resulting in a very large population of IDP's.

Both paramilitary groups and guerrillas used forced displacements to gain control over disputed territories and to weaken their opponents' base of support. An estimated 42 towns were abandoned after paramilitary or guerrilla attacks. The authorities sometimes encouraged civilian populations to move back to their homes before security situations had normalized, or civilians returned before it was advisable.

According to CODHES, 347,000 displacements of civilians from their homes occurred during the year, compared with 317,340 during 2000. Government sources estimated that 275,000 persons were displaced, compared with 125,000 in 2000. Exact numbers of IDP's are difficult to obtain because some persons are displaced more than once, and many IDP's do not register with the Government or other entities. As many as 1.3 million citizens may have been displaced since 1996. An alliance of human rights, religious, and aid organizations stated in 2000 than an estimated 2 million persons had been displaced by political violence since 1985. CODHES states that some persons have been displaced for as long as 10 years, but it is unable to identify a typical timeframe for displacement. Some persons return to their homes within days or weeks, others within months, and some never return. Some displaced persons move several times after fleeing their original home, making tracking difficult. CODHES estimated that perhaps 65 percent of displacements became permanent, while the ICRC estimates that 50 percent of the displaced return home, although they may be displaced again. The Social Solidarity Network is working with the ICRC, CODHES, the UNHCR, and the Bishop's Conference of the Catholic Church on a system for providing better estimates of the number of IDP's, which they hope may yield more reliable figures by the middle of 2002. An estimated 525,000 persons are believed to be in need of assistance, including newly and longer term displaced. The U.N. Technical Group, an intersectoral group composed of U.N. agencies, government agencies, and NGO's, reported that state agents are responsible for less than 1 percent of displacements, the paramilitaries are responsible for 46 to 63 percent, and guerrilla groups are responsible for 12 to 13 percent.

The vast majority of displaced persons are peasants who have been displaced to cities, which have had difficulty integrating large numbers of persons into their infrastructure. Many displaced persons settle on the outskirts of Bogota, Medellin, and Cartagena, where conditions are overcrowded and unsanitary, and smaller municipalities have been overwhelmed by the need for services. According to CODHES, between 1985 and the first quarter of the year, 66 percent of displaced persons came from rural areas, 22 percent of IDP's are female heads of household, 57 percent of the total number are female, and 70 percent of IDP's are under the age of 19. There are reports that some families flee to avoid forcible recruitment of their children by guerrillas (see Sections 1.f. and 5). Thousands of IDP's were unable to return to their homes due to the presence of antipersonnel mines (see Section 1.g.). Several observers noted that displaced women and girls are especially vulnerable to domestic violence, sexual abuse, and sexual exploitation (see Section 5). Many displaced persons lost access to health care, employment, and education (see Section 5). CODHES estimates that only 34 percent of displaced households have access to health services. The Human Rights Ombudsman's office reported in 2000 that only 15 percent of displaced children have access to schools. Malnutrition among displaced children is a problem, and displaced children are increasingly vulnerable to sexual exploitation and recruitment by criminal gangs. According to the UNHCR, approximately one-third of IDP's are indigenous or Afro-Colombian. (Afro-Colombian and indigenous groups make up approximately 16 percent and 2 percent of the population, respectively.) Numerous threats were made during the year against individuals and groups working with the displaced.

The Government does not make adequate provisions for humanitarian assistance to the displaced, although the law and court decisions require it to do so. Although conditions for IDP communities varied in different regions, conditions for displaced persons in many locations were poor and unhygienic, with little access to health care, and few educational or employment opportunities. The Government provides assistance through the Solidarity Network, the ICBF, the Health Ministry, and other state entities. Government officials continued to estimate that 70 to 80 percent of humanitarian assistance received by displaced persons is provided by the ICRC and NGO's. Most displaced citizens received emergency humanitarian assistance from the ICRC, Social Solidarity network, or NGO's for only 90 days, although some IDP's have received it for longer, and others never receive any aid at all. The ICRC provided emergency assistance to 125,000 displaced persons during the year, compared with 135,000 in 2000.

On August 31, Kofi Asomani, the U.N. Special Coordinator on Internal Displacement, stated that the country is facing an acute problem of displacement. He noted that in the first 8 months of the year there was a progressive increase in the numbers, geographical extension, and political complexities of the displacement phenomenon. He urged the Government and the international community to devote greater attention to addressing the longer-term needs of the displaced.

The UNHCR office in Bogota works to strengthen the Government's capacity to address the IDP problem and to work on regional refugee issues. The UNHCR office also has field offices in Barrancabermeja; Apartado, Uraba department; and in Puerto Asis, Putumayo department. The UNHCR plans to open an office in Sincelejo, Sucre department, in 2002.

Hundreds of displaced persons also fled to Panama, Ecuador, and Venezuela. There have been few or no reports of the forced return of refugees from Panama or Ecuador, although most refugees received little assistance. Colombians leaving the country to Ecuador used that country as a temporary escape from violence in Putumayo and returned to Colombia through another border crossing, such as Ipiales, Narino department. There continued to be reports of the forced return of refugees from Venezuela. In February church officials in Venezuela stated that they provided food and shelter to about 3,000 refugees who fled the country to escape paramilitary attacks. There were two reported group refugee incidents in Venezuela during the year. On January 25, an estimated 400 to 500 persons received food aid and medical assistance from local NGO's and the Venezuelan military and returned to La Cooperativa in Northeast Colombia. The UNHCR and NGO's were denied access, and it is unclear whether the group return was voluntary. On October 7, a group of 164 persons, including 90 children, fled from Vichada into Venezuela's Amazonas province. They were given aid, and the UNHCR reported that their return was voluntary.

An organized group of IDP's continues to occupy the former headquarters of the ICRC in Bogota, despite a December 2000 Constitutional Court ruling that the Government was to assist and resettle the group. However, a number of persons both inside and outside of the Government have argued that it is not possible for the Government to comply with the ruling due to lack of resources, and because the law on displacement does not define a limit to reintegration assistance.

The Constitution provides for the right to asylum, under terms established by law in accordance with the 1951 U.N. Convention Relating to the Status of Refugees and its 1967 Protocol. The country has had a tradition of providing asylum since the 1920's. During the year, 3 refugees had been granted legal asylum status, and 17 applications for asylum were pending at year's end.

The Government cooperates with the offices of the UNHCR and other humanitarian organizations in assisting refugees and IDP's. The Government reserves the right to determine eligibility for asylum, based upon its own assessment of the nature of the applicant's case. The issue of the provision of first asylum did not arise during the year. There were no reports of the forced return of persons to a country where they feared persecution.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The Constitution provides for the right of citizens to change their government peacefully, and citizens exercise this right in practice through periodic, free, and fair elections held on the basis of universal suffrage. In 1998 voters elected Conservative Party candidate Andres Pastrana President in elections that were free, fair, and transparent, despite some threats to the electoral process by paramilitary groups, narcotics traffickers, and guerrillas. The Liberal Party controls the legislature. In the Senate, the Liberal Party holds 19 of 72 seats, the Conservative Party holds 15, and small independent movements hold the remaining 38 seats. In the House of Representatives, Liberals holds 86 seats, Conservatives have 32, and independent movements hold the remaining 43 seats.

Presidential elections are held every 4 years, with the incumbent barred for life from reelection. The next election is scheduled for May 26, 2002. The Liberal and Conservative parties long have dominated the formal political process with one or the other winning the presidency. Public employees are not permitted to participate in partisan campaigns. Elections to renew the entire Senate and House of Representatives are scheduled for March 10, 2002. Congresspersons are elected to 4-year terms. Governors, mayors, assemblymen, and other local officials are elected to 3-year terms. The next elections for local officials are scheduled for October 2003.

Officially, all political parties operate freely without government interference. Those that fail to garner 50,000 votes in a general election lose the right to present candidates and may not receive funds from the Government. However, they may reincorporate at any time by presenting 50,000 signatures to the National Electoral Board. Voting is voluntary and universal for citizens age 18 and older, except for active-duty members of the police and armed forces, who may not vote.

Both paramilitary and guerrilla organizations sought to dissuade some potential candidates from running for office, restrict their ability to campaign, and threatened,

kidnaped, and killed incumbent elected officials at various levels (see Sections 1.a, 1.b., and 1.c.).

In September FARC guerrillas prevented presidential candidate Horacio Serpa from leading a large campaign delegation into the demilitarized zone. Guerrillas are suspected in at least three plots to kill right wing, independent presidential candidate Alvaro Uribe. In December members of Congress held a candlelight vigil to remember their peers who had been kidnaped and killed. The FARC kidnaped Liberal Congressman Orlando Bernal Cuellar in August and Liberal Congressman Luis Eladio Perez in June. On September 10, Huila department Congressman Consuelo Gonzalez was kidnaped, presumably by the FARC. The FARC also are holding hostage Conservative Party congressman Oscar Lizcano, kidnaped in June 2000.

In September AUC leader Carlos Castano launched the National and Democratic Movement, a quasi-political party affiliated with the AUC that plans to run or support candidates in the March 2002 congressional elections. The group is expected to remain largely clandestine, as Castano continues to seek political recognition. There also are credible reports that the AUC plans to run congressional candidates in March 2002 under the Liberal and Conservative Party banners. There are credible reports that the paramilitaries are trying to coerce congressional candidates they do not support from running for office, especially in the Middle Magdalena region. Numerous members of Congress have expressed concern about threats and violence against candidates and voters; in May Liberal Party presidential candidate Horacio Serpa said that there were candidates at all levels who could be elected by guns.

In April 2000, the FARC announced the formation of a political party--the Bolivarian Movement for a New Colombia--before a gathering of thousands of persons. FARC leader Manuel Marulanda announced that the party would operate secretly.

In the 192 municipalities which lack state security presence, and in urban neighborhoods, both guerrilla and paramilitary groups sought to impose control and garner political support with measures ranging from social cleansing killings to punishments for domestic violence (see Sections 1.a., 1.d., and 5) and by donating materials or labor to community projects. In May Governor Jorge Gomez Villamizar of Santander department strongly criticized numerous threats against mayors and councilmen in 26 Santander municipalities that lack permanent state security forces.

The Colombian Federation of Municipalities reported to the press in 2000 that armed groups threatened candidates in the October 2000 municipal elections in more than half of the country's 1,097 municipalities. By year's end, the Federation reported that 6 mayors had been killed, that displacements of mayors from their municipalities had increased, and that 10 mayors were kidnaped (see Section 1.b.). For example, on November 19, the AUC abducted six mayors from eastern Antioquia, as well as their human rights adviser, apparently in retaliation for meetings that the mayors had held with representatives of the ELN to seek respect for the lives of the civilian population in their municipalities. In response to these attacks and threats, some rural mayors fled to major cities, where they continued to conduct municipal business via telephone and facsimile. The Federation reported in 2000 that 19 municipal candidates were killed, 20 were kidnaped, 12 reported threats, and as many as 53 candidates for mayoral and municipal council posts withdrew their candidacies. However, the October 2000 municipal elections were generally peaceful.

There are no legal restrictions, and few practical ones, on the participation of women or minorities in the political process; however, the percentage of women or minorities in government and politics does not correspond to their percentage of the population. In March 2000, a quota law to increase the number of women in high-level public positions went into effect. The quota law requires that a minimum goal of 30 percent of nominated positions, including seats on the high courts and ministerial positions, be allotted to women. The quota law does not apply to publicly elected positions, such as seats in Congress. In March the Constitutional Court decided that the statutory quota cannot be applied to candidates for local election or public enterprises. Before the end of each year, the Government must report to Congress the percentage of women in high-level governmental positions. The Government's year end report indicated that there are 13 female senators (out of 102 seats) and 19 female representatives (out of 161) in the Congress. There were 4 women in the 16-member cabinet (the Ministers of Health, Culture, Communications, and Foreign Trade) and 7 vice ministers. There is 1 female among the 23 Supreme Court justices, 1 woman among 9 Constitutional Court magistrates, and 2 among the 13 magistrates of the Superior Judicial Council. The report also stated that there is 1 female governor and 75 female mayors.

The percentage of indigenous people in government and politics does not correspond to their percentage of the population. Two Senate seats are reserved for indigenous representatives. In October 2000, voters in Cauca elected Floro Tunubala, the country's first indigenous governor. Paramilitaries repeatedly have threatened him since he took office in January. The percentage of Afro-Colombians also does not correspond to their percentage of the population. In 1996 the Constitutional Court declared unconstitutional a 1993 law that set aside two house seats for citizens of African heritage, although the ruling allowed the incumbents to complete their terms in office. There is one Afro-Colombian senator, but there are no Afro-Colombian members of the House of Representatives. Afro-Colombian organizations say that Afro-Colombians have almost no representation in the executive branch, judicial branch, and civil service positions, and in military hierarchies.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A large and varied nongovernmental human rights community is active and provides a wide range of views; however, many prominent human rights monitors worked under constant fear for their physical safety. Among the many groups are: The Colombian Catholic Bishops Conference; the CCJ; the Intercongregational Commission for Justice and Peace; CINEP; the Advisory Committee for Human Rights and Displacement; the Committee in Solidarity with Political Prisoners (dedicated to defending accused guerrillas); the Association of Families of Detained and Disappeared Persons; the Reinsertion Foundation (focused on demobilized guerrillas); the Free Country Foundation (focused on the rights of kidnap victims); several associations which promote the rights of guerrilla violence; groups which provide legal assistance to victims of human rights violations; and groups which provide humanitarian assistance to the displaced. Other international humanitarian and human rights organizations include the office of the U.N. High Commissioner for Human Rights in Colombia, several other U.N. agencies, the ICRC (with 16 offices across the country), and Peace Brigades International. NGO's investigated and reported on human rights abuses committed by government forces, various paramilitary groups, and the guerrillas.

Although the Government generally did not interfere with the work of human rights NGO's, there were unconfirmed reports that security forces harassed or threatened human rights groups. Citing changes in the revised Criminal Code, in August the Prosecutor General's office revoked charges filed against retired Brigadier Generals Millan and Del Rio for bribing witnesses to testify falsely against a leading NGO organizer and a labor leader, although the two men remain under investigation (see Section 1.a.).

Paramilitary, guerrilla, and other unidentified groups subjected human rights groups to intense pressure during the year, in the form of surveillance, harassing telephone calls, graffiti campaigns, and death threats. Paramilitary and guerrilla groups also have been implicated in the deaths of human rights and development workers. According to the CCJ, nine human rights advocates were killed during the year; four human rights workers disappeared. A total of 48 human rights workers have been killed or have disappeared in the past 5 years.

For example, paramilitaries are thought to be responsible for the June torture and murder of Alma Rosa Jaramillo Lafourie, a lawyer and development worker for the Program for Peace and Development in Magdalena Medio, in Morales, Bolivar department. In July another employee of the program, Eduardo Estrada, was murdered in San Pablo, Bolivar department.

On September 9, armed men shot and killed Sister Yolanda Ceron, a human rights worker for the Catholic Church, in Tumaco, Narino department.

Leading domestic NGO's and international organizations strongly and unanimously condemned the December 27 and 28 killings by FARC guerrillas of peace community activists Petrona Sanchez and Edwin Ortega in Choco department. Sanchez and Ortega were coordinating an education project in the self-declared neutral peace community of San Francisco de Asis (Uraba region, Choco department), which is accompanied by the Catholic Church and by CINEP.

There is no information on the whereabouts of Angel Quintero and Claudia Patricia Monsalve, members of ASFADDES (an association for relatives of the disappeared) who were kidnaped in October 2000. No arrests had been made in the kidnaping at year's end, but investigators in this case subsequently uncovered evidence of extensive illegal wiretapping by the Medellin GAULA (see Section 1.f.). The authorities continued to investigate the kidnaping. In June Astrid Manrique Varvajal of ASFADDES and her family were threatened.

On numerous occasions during the year, paramilitary groups in several municipalities circulated lists of the names of persons they considered "military targets," which included the names of local human rights activists, labor organizers, and politicians (see Sections 3 and 6.a.).

On January 3, AUC paramilitaries threatened Jose Guillermo Larios and Ivan Madero Vergel, members of CREDHOS. On numerous occasions during the year, AUC members threatened members of the Popular Women's Organization in Barrancabermeja.

In addition, approximately 60 human rights workers left the country, either temporarily or permanently, for their own safety. Many more activists leave without coming to the Ministry of Interior or leading NGO's for assistance. CINEP reported at year's end that requests for protection received by the Ministry of Interior and the Ad Hoc Commmittee of Human Rights Defenders rose 130 percent.

The Government, through the Ministry of the Interior and the DAS, allocated approximately $11.3 million (25 billion pesos) to its 3-year-old program to protect human rights advocates and labor activists associated with 88 different human rights NGO's and unions. The funds were designated for security measures for individuals as well as for the headquarters of the NGO's, an emergency radio network, and funding for travel abroad for individuals who faced a particular threat; however, human rights groups continued to state that the protection programs are inadequate to address the crisis, and called for increased efforts to combat impunity. During the year, the Ministry of Interior fought successfully to quadruple its budget and extended protection measures to 2,344 union leaders, NGO members, witnesses, community leaders, members of the Patriotic Union, and journalists; 880 persons were provided with protection in 2000. This protection included bulletproofing for 65 residences and offices.

On February 16, Hina Jilani, the Special Representative of the Secretary General of the U.N. on Human Rights Defenders, expressed deep concern over the violation of the rights of human rights workers. She stated that she had received information that human rights defenders had been subject to numerous forced disappearances, internal and external displacement, and death threats. She revisited the country in October. At a press conference at the conclusion of her visit, she again expressed concern over the attacks upon human rights defenders. In November the U.N. Special Rapporteur on violence against women, Radhika Coomaraswamy, investigated violence against women in the country's armed conflict (see Sections 1.g. and 5).

Armed groups also targeted regional human rights ombudsmen. A paramilitary was charged in the January murder of regional human rights ombudsman Ivan Villamizar in Cucuta, Norte de Santander department. He remained in detention at year's end. In July 2000, the FARC reportedly kidnaped and killed Jose Manuel Bello, the municipal human rights ombudsman in Vigia del Fuerte, Atrato, Antioquia department. In July 2000, unidentified armed men killed Yemil Fernando Hurtado Castano, the human rights ombudsman in Narino municipality, southeastern Antioquia department. The murders of Bello and Hurtado remained under investigation at year's end. There was no reported progress in the investigation of the 1999 killing of the Human Rights Ombudsman's representative for San Juan Nepomuceno, Carlos Arturo Pareja, and his assistant.

NGO's linked suspected paramilitary leader Libardo Humberto Prada Bayona to the August 2000 murder of peace activist and former mayor Luis Fernando Rincon Lopez in Aguachica, Cesar department; however, prosecutors have not linked Prada to the Rincon murder, which remains unsolved. The case remained under investigation at year's end. Prada was absolved by a Valledupar court for the 1998 killing of local Redepaz coordinator Amparo Leonor Jimenez Pallares; prosecutors were appealing the decision at year's end.

Prosecutors continued to investigate the 1999 AUC killings of southern Bolivar department peasant leaders Edgar Quiroga and Gildardo Fuentes.

Arrest warrants remained outstanding for Carlos Castano and four other members of paramilitary groups for the 1997 murders of two CINEP workers and one other person (see Section 1.a.).

In 1997 the UNHCHR opened a field office in Bogota to observe human rights practices and advise the Government; in April its mandate was extended through April 2002. The office is tasked with monitoring and analyzing the human rights situation throughout the country and with the provision of assistance to the Government, civil society, and NGO's in the field of human rights protection. It submitted reports to the Government and to the U.N. during the year. In March the UNHCHR report, which covered 2000, criticized a lack of state effort to prevent and prosecute crimes by paramilitary groups, and broadly criticized the continuing systemic problems of impunity, lack of due process, and growing violence against women and children (see Sections 1.e. and 5). UNHCHR's report also criticized guerrilla abuses such as killings, kidnaping, child recruitment, forced displacement, and interference with medical missions (see Sections 1.a., 1.b., 1.g., 2.d., and 5). The Government publicly criticized the UNHCHR's report for failing to acknowledge government efforts.

The Government has an extensive human rights apparatus, which includes the office of the President's Adviser for Human Rights, headed by Vice President Gustavo Bell. In September 2000, human rights expert Reinaldo Botero was named director of the presidential program for human rights and international humanitarian law. The executive branch's efforts on human rights are supported by the Ministry of Interior, the human rights office of the MOD, and dependent offices for each of the public security forces. The office of the National Human Rights Ombudsman, its regional representatives and corps of public defenders, the Inspector General's office and its delegate for human rights and regional representatives, and the Prosecutor General's office and its human rights unit are all independent institutions, not subject to executive branch direction.

The House of Representatives elects the Public Ministry's National Ombudsman for Human Rights for a 4-year term, which does not coincide with that of the President. The office has the constitutional duty to ensure the promotion and exercise of human rights. The Ombudsman provides public defense attorneys and a channel for complaints of human rights violations (see Section 1.e.). However, the Ombudsman lacks sufficient funding and staff. In August 2000, the House of Representatives confirmed former Constitutional Court Judge Eduardo Cifuentes Munoz as Human Rights Ombudsman. Cifuentes has been active in his role, visiting massacre sites, and pressing for increased security and humanitarian assistance for affected communities. His office, with international assistance, is providing training for its regional ombudsmen and conducting public education on human rights. The Ombudsman's office also is developing an early warning system, which would allow the Ombudsman's office to track threat information and subsequent government action to investigate threats and protect the civilian population.

The Human Rights Ombudsman's office processed 14,149 complaints in 2000 (the latest year for which figures were available). Of these, 300 complaints concerned extrajudicial killings, 125 concerned massacres, and 699 concerned threats. The office also provided 32,295 free legal consultations through its corps of more than 1,000 public defenders, many of whom work only part-time.

In 1999 the Vice President enunciated the Government's human rights policy; however, despite improvements, some aspects of implementation have been slow to materialize, and there has been an overall increase in human rights violations by illegal armed groups since 1999. The Government's national human rights plan called for the respect, promotion, and assurance of human rights. It promised increased government attention to the consequences of human rights abuses and called on all armed factions to respect international humanitarian law. The plan asserted that security forces would combat both guerrilla and paramilitary forces. One of the plan's most important provisions permitted the armed forces commander to remove from service summarily any military member whose performance in combating paramilitary forces he deemed "unsatisfactory or insufficient." In September 2000, the President signed 12 decrees to reform and strengthen the military (see Section 1.e.).

The Presidential Program for Human Rights established six regional intersectoral commissions, which include NGO's, government officials, and state security forces, to address human rights, development, and security concerns in vulnerable areas. During the year, presidential staff and leading NGO's met to discuss how best to structure cooperation on the national human rights plan. The Presidential Program for Human Rights, the Ministry of the Interior, and state security forces also coordinated to provide security for several large civil society events such as the Plenary of the National Assembly for Peace in Rionegro, the Caravan of Peace in Medio Magdalena, and a major women's march to Barrancabermeja.

The MOD reported in September that in the past 5 years, 119,349 security force members received human rights training, including 2,269 human rights trainers. The ICRC, the Colombian Red Cross, the Roman Catholic Church, elements of the Government and security forces, and foreign governments provide such training. Many observers credited these programs with having done much to foster a climate of increased respect for human rights and international humanitarian law within the military forces in recent years. In September the MOD signed an agreement with two national universities and the Inter-American Institute for Human Rights to conduct research

and training on human rights and organized several seminars intended to foster dialog with NGO's and academics on human rights.

Section 5 Discrimination Based on Race, Sex, Religion, Disability, Language, or Social Status

The Constitution specifically prohibits discrimination based on race, sex, religion, disability, language, or social status; however, in practice, many of these provisions are not enforced. The killing of homosexuals as part of the practice of social cleansing continued, especially by the AUC (see Section 1.a.).

Women

Rape and other acts of violence against women are pervasive in society, and like other crimes, seldom are prosecuted successfully. According to the Ombudsman's 2000 report, intrafamilial violence, sexual assault, and the murder of women were increasing problems. The governmental Institute for Family Welfare and the Presidential Adviser's Office for Youth, Women, and Family Affairs continued to report high levels of spousal and partner abuse throughout the country. Between January and August, the Institute for Forensic Medicine reported 19,066 cases of spousal abuse. There were 8,757 cases of domestic violence by other family members. The Institute reported 2,834 cases of sex crimes (excluding figures for Bogota) including rape, the rape of minors, and other forms of sexual abuse. The Institute commented that the crimes of domestic violence and rape are grossly underreported, citing its 1995 survey that indicated that as few as 5 percent of these crimes are reported, and that only 2 percent of victims receive a medical evaluation. The ICBF conducted programs and provided refuge and counseling for victims of spousal abuse; however, the level and amount of these services were dwarfed by the magnitude of the problem. For example, each of the ICBF's 530 family ombudsmen handle approximately 1,160 cases per year.

The 1996 Law on Family Violence criminalizes violent acts committed within families, including spousal rape. The law also provides legal recourse for victims of family violence, immediate protection from physical or psychological abuse, and judicial authority to remove the abuser from the household. It allows a judge to oblige an abuser to seek therapy or reeducation. For acts of repeated sexual violence, the law mandates sentences of 6 months to 2 years and denies probation or bail to offenders who disobey restraining orders issued by the courts.

A 1997 law also made additional, substantial modifications to the Penal Code and introduced sentences of between 4 and 40 years for crimes against sexual freedom or human dignity, including rape, sex with a minor, sexual abuse, induction into prostitution, and child pornography. The June 2000 reforms to the Penal Code approved reduced the maximum sentence for violent sexual assault from 20 to 15 years; the minimum sentence is 8 years. The Institute of Forensic Medicine reported 13,703 cases of probable rape during 2000. First Lady Nohra Puyana de Pastrana is on the board of directors of the ICBF and works with the "Make Peace" program, which provides support to women and children who were victims of domestic violence. Under the auspices of the same program, the Human Rights Ombudsman's office conducted regional training workshops in various cities to promote application of domestic violence statutes.

Women also faced an increased threat of torture and sexual assault due to the internal conflict (see Section 1.g.). In November the U.N. Special Rapporteur on violence against women, Radhika Coomaraswamy, investigated violence against women in the country's armed conflict. The UNHCR, CODHES, and the Human Rights Ombudsman all noted that internally displaced women and girls are especially vulnerable to domestic violence, sexual abuse, and sexual exploitation (see Section 2.d.). In August the Colombian Pro-Family Institute published a Study of Sexual Health and Reproduction in Displaced Women and Adolescents. One of the greatest problems facing displaced women is adolescent pregnancy; 3 out of 10 girls between the ages of 13 and 19 have a child or are pregnant. According to the study, one out of five displaced women have been raped, a significant percentage by their husbands or companions. International organizations and NGO's have noted with deep concern that sexual violence is largely unreported and that no long-term assistance is available to female IDP's. In addition, they criticized the use of female combatants in guerrilla organizations as sex slaves. Former female guerrillas also have reported forced abortions and forced implantation of intrauterine devices (see Section 1.g.).

Prostitution, which is not legal, is a problem, which has been aggravated by a poor economy and internal displacement. Sex tourism exists to a limited extent, especially in coastal cities like Cartagena and Barranquilla. It is likely that some number of marriage and dating services are covers for sex tourism activities.

Trafficking in women for sexual exploitation is a problem (see Section 6.f.).

The law prohibits sexual harassment; however, it is a problem.

The Constitution prohibits any form of discrimination against women and specifically requires the authorities to ensure "adequate and effective participation by women at decision making levels of public administration." Even prior to implementation of the 1991 Constitution, the law had provided women with extensive civil rights. However, despite these constitutional provisions, discrimination against women persists. A 2000 study by the University of Rosario concluded that women faced hiring discrimination, and that women's salaries were generally incompatible with their education and experience. The salary gap between men and women widened from 1990 through 2000, reaching a high point in 1999 as the country's economy declined. The study also noted that women were affected disproportionately by unemployment. Government unemployment statistics for 2000 indicated that the unemployment rate for men was 16.9 percent, while the rate for women was 24.5 percent. According to the March 2000 report of the UNHCR, women earn 28 percent less than men do. The National Statistics Institute reported that a higher percentage of women were employed in minimum wage jobs. According to U.N. statistics, women's earnings for formal sector, nonagricultural work corresponded to approximately 85 percent of men's earnings for comparable work, and women must demonstrate higher qualifications than men when applying for jobs. Moreover, women constitute a disproportionately high percentage of the subsistence labor work force, especially in rural areas. Female rural workers are affected most by wage discrimination and unemployment.

Despite an explicit constitutional provision promising additional resources for single mothers and government efforts to provide them with training in parenting skills, women's groups reported that the social and economic problems of single mothers remained great. According to a 1997 Constitutional Court decision, pregnant women and mothers of newborn children less than 3 months of age may not be fired from their jobs without "just cause." The court ruled that bearing children was not just cause.

Children

Constitutional and legislative commitments to the protection of children's rights were implemented only to a minimal degree. The Constitution imposes an obligation on the family, society, and the State to assist and protect children, to foster their development, and to ensure the full exercise of these rights. The Children's Code describes many of these rights and establishes services and programs designed to enforce the protection of minors. Children's advocates reported the need to educate citizens regarding the code as well as the 1996 and 1997 laws on family violence, which increase legal protection for women and children. The ICBF oversees all government child protection and welfare programs and funds nongovernmental and church programs for children.

The Constitution formally provides for free public education, which is compulsory between the ages of 6 and 15. An estimated 25 percent of children in this age group do not attend school, due to lax enforcement of truancy laws, inadequate classroom space, and economic pressures to provide income for the family. The Government provides for the cost of primary education, but many families face additional expenses such as matriculation fees, books, school items, and transportation costs (which are significant in rural areas where children may live far from school). These costs can be prohibitive, especially for the rural poor.

The law obliges the Government to provide medical care for children; however, medical facilities are not universally available, especially in rural areas.

Child abuse is a problem. The National Institute for Forensic Medicine reported 5,471 cases of child abuse between January and August; there were 9,896 reported cases in 2000. According to the March 2000 report of the UNHCR, sexual abuse is prevalent, particularly of children between the ages of 5 and 14 years of age. In 70 to 80 percent of cases, children know their abusers.

According to UNICEF, an estimated 35,000 boys and girls under age 18 work as prostitutes. A 1996 law prohibits sex with minors or the employment of minors for prostitution. In August 2000, the Prosecutor General's Specialized Sex Crimes and Human Dignity Unit reported that from August 1999 to August 2000 it opened 41 cases in which a child under 14 was induced or lured into prostitution.

Children are trafficked for sexual exploitation (see Section 6.f.).

Child labor is a significant problem (see Section 6.d.).

In conflict zones, children often were caught in the crossfire between public security forces, paramilitary groups, and guerrilla organizations. For example, on March 9, seven children were injured near Popayan, Cauca department, by a grenade left behind by the ELN. MOD figures indicated that approximately 200 children were killed due to the conflict during 2000. Children suffered disproportionately from the internal conflict, often forfeiting opportunities to study as they were displaced by conflict and suffered psychological traumas. According to UNICEF, over 1 million children have been displaced from their homes over the past decade (see Section 2.d.). The Human Rights Ombudsman's office estimated that only 15 percent of displaced children attend school. Both female and male children who have been displaced are especially vulnerable to abuse, sexual exploitation, or recruitment by criminals.

Paramilitaries and guerrillas forcibly recruited children, and the use of child soldiers was common (see Section 1.f.) Sexual abuse of girls is a particular problem (see Sections 1.f. and 1.g.).

In 2000 UNICEF reported that various armed groups had killed 460 children over the previous 4 years and kidnaped another 789 children (see Section 1.b.). Children were among the preferred kidnaping targets of guerrillas (see Section 1.b.). Pais Libre reported that the number of children kidnaped annually increased from 206 in 1999, to 265 in 2000, and to 205 as of October. According to the MOD, 213 minors were kidnaped between January and August. Among the 213 were 29 babies less than 2 years of age, and 57 of these children still were in captivity as of August. For example, the FARC kidnaped 3-year-old Andres Felipe Navas in April 2000 and did not release him until November 2001. In April 2000, the FARC also kidnaped 9-year-old Dagoberto Ospina Ospina from his school bus in southern Cali and did not release him until early in the year (see Section 1.f.).

Persons with Disabilities

The Constitution enumerates the fundamental social, economic, and cultural rights of the persons with physical disabilities; however, serious practical impediments exist that prevent the full participation of persons with disabilities in society. There is no legislation that specifically mandates access for persons with disabilities. (Most public buildings and public transport are not accessible to persons with disabilities.) According to the Constitutional Court, persons with physical disabilities must have access to, or if they so request, receive assistance at, voting stations. The Court also has ruled that the social security fund for public employees cannot refuse to provide services for the children of its members who have disabilities, regardless of the cost involved.

Indigenous People

There are 82 distinct ethnic groups among the country's 716,400 indigenous inhabitants, who constitute about 2 percent of the country's population. These groups are concentrated in the Andes mountains, Pacific Coast lowlands, the Guajira Peninsula, and Amazonas department. According to the National Organization of Colombia's Indigenous (ONIC), 93 percent of indigenous people live in rural areas; and approximately 115,000 indigenous people are without land.

The Constitution gives special recognition to the fundamental rights of indigenous people. The Ministry of Interior, through the office of indigenous affairs, is responsible for protecting the territorial, cultural, and self-determination rights of indigenous people. Ministry representatives are located in all regions of the country with indigenous populations and work with other governmental human rights organizations, as well as with NGO human rights groups and civil rights organizations, to promote indigenous interests and investigate violations of indigenous rights. Nonetheless, members of indigenous groups suffer discrimination because they traditionally have been relegated to the margins of society. Few opportunities exist for those who might wish to participate more fully in modern life. The March 2000 report of the UNHCHR noted that an estimated 80 percent of the indigenous population live in conditions of extreme poverty, that 74 percent receive wages below the legal minimum, and that many municipalities have the highest rates of poverty. In addition, indigenous communities suffer disproportionately from the internal armed conflict (see Section 1.g.). Members of indigenous communities often flee together in mass displacements, relocating to other indigenous communities (see Section 2.d.).

According to the National Agrarian Reform Institute (INCORA), 70,049 indigenous families (377,085 persons, or 60 percent of the country's total indigenous population) live on designated reserves. Indigenous groups' rights to their ancestral lands are by law permanent. INCORA reports that approximately 80 percent of these lands have been demarcated. However, armed groups often violently contested indigenous land ownership. According to ONIC, roughly 95 percent of the country's natural resources are found on indigenous reservations and claimed territories. Traditional Indian authority boards operate some 545 reserves; the boards handle national or local funds and are subject to fiscal oversight by the national Comptroller General. These boards administer their territories as municipal entities, with officials elected or otherwise chosen according to tradition.

INCORA estimated that some 200 indigenous communities had no legal title to land that they claimed as their own. According to INCORA, more than 12,603,496 acres (approximately 28 percent of the national territory) have been recognized legally as indigenous lands. It is buying back much of this land, which was settled by mestizo peasants, and returning it to indigenous groups.

The Constitution provides for a special criminal and civil jurisdiction within indigenous territories based upon traditional community laws. However, some observers asserted that these special jurisdictions were subject to manipulation, and that punishments rendered by such community courts were often much more lenient than those imposed by regular civilian courts.

Indigenous communities are free to educate their children in traditional dialects and in the observance of cultural and religious customs. Indigenous men are not subject to the national military draft.

Members of indigenous communities continued to be victims of all sides in the internal conflict, and a number of them were killed. The UNHCHR's office reported that 10 indigenous leaders were killed between January and August. The UNHCHR strongly criticized both paramilitary and FARC threats against indigenous communities and characterized government investigations of human rights violations against indigenous groups as insufficient. ONIC reported in July that 35 members of indigenous groups were killed between January and July. ONIC reported widespread cases in which members of indigenous communities, particularly in Putumayo, are forbidden to leave their community without either paramilitary or FARC permission, in which paramilitaries have blockaded communities, or in which indigenous people returning from urban areas are accused by guerrillas of being paramilitary collaborators.

For example, in May leaders of the Arhuacos people told the press that they fear that the civil war could destroy their tribe as they become caught in the crossfire between the FARC and the AUC. On November 24, AUC gunmen attacked an indigenous reservation near Rio Sucio Cauca department; they killed five persons and threatened others. In December attacks by the AUC killed seven persons, while a subsequent attack by the FARC killed a 14-year-old girl in the village of San Lorenzo. The attacks wounded 3 other persons and destroyed 35 homes.

In June in Cordoba department, presumed paramilitaries kidnaped and reportedly killed Embera leader Kimy Pernia Domico, well-known for his opposition to the Urra reservoir project (see Section 1.b.).

Paez leader Cristobal Secue Tombe was killed in June. The Regional Indigenous Council of Cauca (CRIC) attributed Secue's murder to the FARC and said the killing may have been retribution for Secue's investigations of crimes by the FARC. Also in June, unknown persons shot and killed Alberto Sabugara Velasquez, spokesman for the Tascicogucho community of Alto Baudo, in Quibdo, Choco department. Following these crimes, in July ONIC announced that it would suspend its participation in working groups with the Government for at least 30 days and demanded that the Administration clarify its policy toward indigenous people. ONIC maintained its suspension of dialog with the Government at year's end.

In August unidentified men killed Masael Cheta Cety, the indigenous governor of the Cristal Paez reservation in Florida municipality, Valle del Cauca department, and his

wife.

In July the Special Representative of the U.N. Secretary General on human rights defenders, Hina Jilani, and the Special Rapporteur of the Commission on Human Rights on extrajudical, summary, or arbitrary execution, Asma Jahangir, expressed their deep concern over the murder and disappearance of indigenous leaders in the country. They drew the attention of the Government in particular to the paramilitary killing in June of Embera-Katio leader Pedro Alirio Domico, governor of Esmeralda River Indigenous Reserve, Cordoba department, and Alberto Sabugara Velasquez, leader of the Gengaro Indigenous Reserve, Choco department.

The authorities are seeking the detention of two suspects in the December 2000 murder of Embera leader Armando Achito in Jurado municipality, Choco department. The authorities continued to investigate the June 2000 murder of Joselito Bailarin, the Embera-Katio governor of the community of Canaverales, in Murri de Frontino in Antioquia department, by presumed paramilitaries. The authorities also continued to investigate the March 2000 disappearance of indigenous leader Jairo Bedoya Hoyos. The Indigenous Organization of Antioquia (OIA) held the AUC responsible. In an open letter, the AUC stated that it did not have Bedoya in its custody.

Paramilitary and guerrilla groups have forced indigenous people, including children, into their ranks (see Section 1.f.).

U'wa objection to initial drilling by Occidental Petroleum in an area near, but not on, their reserve continued. There was little exploration activity during the year due to security problems unrelated to the dispute with the U'wa, and no large demonstrations against the project were reported. The U'wa had filed several court challenges to drilling, and succeeded in winning brief delays before appeal courts ruled in favor of the Government's arrangement with Occidental. The U'wa reserve measures 1.25 million acres and has estimated oil reserves of up to 1 billion barrels. In August 2000, a technical working group including the Ministries of Interior and Environment, as well as an advisor to the U'wa, had reported that the Government and Occidental Petroleum were complying with all applicable regulations. The U'wa broke off talks with the Government in September 2000, in response to a ruling by the Government's agrarian reform agency authorizing the state oil company to purchase lands to create a buffer zone around the drilling area, and talks remained suspended during the year.

National/Racial/Ethnic Minorities

According to the National Planning Department, the country has approximately 10.6 million citizens of African heritage. The departments with the largest number of Afro-Colombians are Valle, Antioquia, Bolivar, Atlantico, Magdalena, and Cordoba. However, the Pacific department of Choco has the highest percentage of Afro-Colombian residents, at 85 percent. There are also significant numbers of Afro-Colombians along the Caribbean coast. Although estimates vary, government figures indicate that Afro-Colombians represent approximately 26 percent of the total population.

Afro-Colombians are entitled to all constitutional rights and protections; however, they traditionally have suffered from discrimination. Afro-Colombian organizations report that Afro-Colombians have almost no representation in the executive branch, judicial branch, and civil service positions, and in military hierarchies (see Section 3). In addition, Afro-Colombian communities report that they have been disproportionately affected by violence related to the conflict. For example, according to the UNHCHR, approximately one-third of IDP's are indigenous or Afro-Colombian (see Section 2.d.).

Despite the passage of the Afro-Colombian law in 1993, little concrete progress has been made in expanding public services and private investment in Choco department or other predominantly Afro-Colombian regions. The same law also authorized Afro-Colombian communities to receive collective titles to some Pacific coastlands; however, Afro-Colombian leaders complained that the Government was slow to issue titles, and that their access to such lands often was inhibited by the presence of armed groups or individuals. Unemployment among Afro-Colombians ran as high as 76 percent in some communities. The March 2000 report of the UNHCHR noted that an estimated 80 percent of Afro-Colombians live in conditions of extreme poverty, that 74 percent receive wages below the legal minimum, and that their municipalities have the highest rates of poverty. Choco remains the department with the lowest per capita level of social investment and is last in terms of education, health, and infrastructure. It also has been the scene of some of the country's most enduring political violence, as paramilitary forces and guerrillas struggled for control of the Uraba region.

Section 6 Worker Rights

a. The Right of Association

The Constitution provides for the right to organize unions, except for members of the armed forces, police, and persons executing "essential public services" as defined by law. In practice, violence against union members and antiunion discrimination are obstacles to joining unions and engaging in trade union activities. Labor leaders around the country continue to be targets of attacks by paramilitary groups, guerrillas, and narcotics traffickers. Union leaders contend that perpetrators of violence against workers, particularly members of paramilitary groups, operate with virtual impunity.

The heavily amended 1948 Labor Code provides for automatic recognition of unions that obtain 25 signatures from potential members and comply with a simple registration process. However, the International Labor Organization (ILO) has received reports that this process is slow and sometimes takes years. The law penalizes interference with freedom of association and allows unions to determine freely their internal rules, elect officials, and manage activities. The law also forbids the dissolution of trade unions by administrative fiat. Law 584, which the President approved in 1999, limits government interference in a union's right to free association in accordance with recommendations made by the ILO Direct Contacts Mission. However, the law includes a provision authorizing Ministry of Labor officials to compel trade unions to provide interested third parties with relevant information on their work, including books, registers, plans, and other documents. The ILO Committee of Experts considers this amendment to be inconsistent with freedom of association, since it believes an administrative authority only should conduct investigations when there are reasonable grounds to believe that an offense has been committed.

According to the National Labor College ("Escuela Nacional Sindical", or ENS), a Medellin-based NGO which collects, studies, and consolidates information on organized labor in the country, as of October, there were 2,482 registered unions with 860,281 affiliates. These figures are significantly lower than its 5,470 unions and 1,054,400 affiliates reported by the Ministry of Labor in 1997. Although specific statistics for the year are not available, a continuing downward trend is discernable. Only 4.5 percent of the work force of approximately 19 million is unionized. According to the CCJ, 89 percent of these workers are in the public sector. Government and labor sources estimate that between 87 and 95 percent of unions are affiliated with 1 of 3 confederations: The center-left United Workers' Central (CUT), with which 45 to 50 percent of unions are affiliated; the Social Christian Colombian Democratic Workers' Confederation (CGTD), with which approximately 30 percent of unions are affiliated; and the Liberal Party-affiliated Confederation of Colombian Workers (CTC), with which 12 to 15 percent of unions are affiliated.

The Constitution provides for the right to strike, except for members of the armed forces, police, and persons executing essential public services as defined by law.

Labor leaders nationwide continue to be targeted for attacks by paramilitaries, guerrillas, and narcotics traffickers. According to the U.N., the ILO, and trade union leaders, the vast majority of killings and attacks on labor leaders are committed by paramilitaries. According to the ENS, a total of 184 union activists were killed during the year. The ENS also reported that 23 unionists survived attempts on their lives, 203 were threatened with death, 37 were kidnaped, 12 disappeared, and 16 were forcibly displaced. Nearly 1,600 union members have been murdered since 1991, and unions face widespread societal hostility because some observers see them as "subversive."

On January 22, an alleged paramilitary murdered Jose Luis Guete Montero, president of the National Union of Industrial and Agricultural Workers (SINALTRAINAGRO). An investigation was opened but had not made any significant progress by year's end. In March Valmore Locarno Rodriguez and Victor Hugo Orcasita, local president and vice president of miners' union SINTRAMINERGETICA at Drummond Corporation's La Loma coal mine in the northeastern department of Cesar, were abducted from their company bus and killed. In October presumed paramilitaries abducted Locarno's replacement as union president, Gustavo Soler, and then tortured and killed him.

In April Ricardo Orozco, vice president of the Hospital Workers Union was shot and killed near Barranquilla. Orozco's name had appeared on a list of union activists targeted by paramilitaries.

On June 21, Oscar Dario Soto Polo, chairman of the National Beverage Workers Union (SINALTRAINBEC) and a member of the CUT national committee, was killed in broad daylight while walking his 8-year-old daughter home from school. Soto's death and other murders, kidnapings, and incidents of harassment of beverage industry workers led the United Steelworkers of America and the International Labor Rights Fund to file suit in July in a U.S. district court on behalf of SINALTRAINAL, the Colombian National Food Industry Workers Union, against Coca-Coca and two affiliated Colombian bottlers. The suit alleges that the company has colluded with paramilitaries to harass, intimidate, kidnap, and kill union leaders over the past 10 years. Coca-Cola and its affiliated bottlers strongly deny the accusations.

On July 6, Hernando Hernandez Pardo, president of the Oil Workers Trade Union (USO), was reported barely to have escaped an attempt on his life by alleged paramilitaries in Barrancabermeja.

On November 30, the AUC kidnaped Aury Sara Marrugo, president of the Cartagena chapter of the USO, and his bodyguard. On December 5, their bodies were found near Cartagena. AUC political head Carlos Castano acknowledged kidnaping and executing Sara, who, Castano claimed, had confessed to being the commander of a local ELN front.

As of March, the Government had detained eight persons in connection with the December 2000 attempt to kill public employee union president Wilson Borja, an outspoken critic of paramilitary leader Carlos Castano and prominent advocate of the Government's negotiations with the ELN. In February the authorities arrested active duty police captain Carlos Gomez. The Inspector General's office alleged that Gomez had links to paramilitaries. Other detainees include an active duty army major, two retired members of the military, and four suspected paramilitaries. In December in response to new, credible death threats, Borja left the country.

Prosecutors have outstanding warrants for the arrest of paramilitary members Temilda Rosa Martinez and Eduardo Manrique Morales for the 1999 killing of Julio Alfonso Poveda, a CUT founder. In December 2000, the Prosecutor General's office arraigned three hired killers alleged to have killed CUT vice president Jorge Ortega in 1998.

There is still no information in the 1999 bombings of both the Association of Rural Land Users in Sincelejo, Sucre Department, and the Medellin office of the USO, where a bomb was defused. According to the ENS, there have been 14 bombing attempts against union offices in the last 4 years.

One of the 25 special human rights investigative subunits of the Prosecutor General's office is responsible for investigating cases of human rights violations against trade unionists, and there was a significant increase in the legal budget for judicial employees in 2000 that was maintained during the year. On the whole, government identification of perpetrators of crimes against trade union members has been slow, a situation which the ILO Special Representative's June report noted is aggravated by the difficulties faced by the office of the Inspector General and the judiciary in carrying out their inquiries and offering adequate assurances of protection so that witnesses are willing to come forward.

In February 2000, an ILO Direct Contacts Mission visited the country to examine alleged abuses of workers' rights to life, free association, and collective bargaining. In June 2000, the Mission presented a report to the Governing Body's Committee on Freedom of Association (CFA) which noted that the Government was "making sincere efforts" to address these problems. However, the report expressed concern over the number of murders, kidnapings, death threats, and other violent assaults on trade union leaders and unionized workers and stated that murders of trade union leaders and unionized workers were a "regular" occurrence. In response, the ILO committee on free association recommended an urgent inquiry into the participation of public officials in the creation of self-defense or paramilitary groups, an increase in government budgetary allocations to protect trade union officials, and an increase in efforts to combat impunity.

To monitor compliance with its recommendations, the ILO appointed Rafael Albuquerque, former Minster of Labor of the Dominican Republic, as ILO Special Representative to the country. Albuquerque began his work in October 2000 and presented a report to the ILO Administrative Committee in June. His report noted apparent government progress in combating paramilitarism; however, he also noted that the Government had been unable to stem effectively the violence affecting the trade union movement. Albuquerque also commented that in many departments of the country where there was little or no presence of the security forces, paramilitary groups continue to dismantle trade unions by threatening the members of their executive committees.

In 1999 the Government developed the Program for the Protection of Human Rights Defenders and Trade Union Leaders to protect trade unionists from violence. As of December, the program had provided protection for 158 trade union premises and 1,033 leaders and activists. These individuals are provided with bulletproof vests, bodyguards, and in some cases vehicles. To pay for these expanded measures, the Government increased its budget for protective measures by over 400 percent. In May Claudia Caceres, director of the protection program, stated that her office was overwhelmed by the increase in its caseload. The number of cases has grown from 300 in 1999 to over 2,300 cases in December. Trade unionists complain that even these increased measures are insufficient to protect adequately the large number of trade unionists who are threatened, and they continued to press for more efforts to break the impunity with which most of these acts are committed.

Based on government commitments to combat paramilitarism, protect union members, and overcome impunity, the ILO decided in June not to send a formal Commission of Inquiry to the country. Instead, the ILO decided that its satellite office in the country should remain open and that a technical commission should be formed to assist the country in complying with recommendations made in the Special Representative's June report. The recommendations found in the June report focus on improving protective measures for union members, combating impunity, and encouraging freedom of association.

Before staging a legal strike, unions first must negotiate directly with management and, if no agreement results, accept mediation. The Labor Code prohibits the use of strike breakers. Legislation that prohibits all public employees from striking is still in effect, although it often is overlooked. By law, public employees must accept binding arbitration if mediation fails; however, in practice, public service unions decide by membership vote whether or not to seek arbitration.

In March state workers from the national, departmental, and municipal governments staged a 24-hour general strike to protest state sector layoffs and proposed reforms to the national pension system. In May teachers and health care workers, fearing reductions in their respective budgets, went on strike to protest proposed legislation that would have changed how public money is distributed to departments and municipalities. In June public sector workers staged a 48-hour strike to protest the Government's program of structural reforms. Workers at the Red Cross and the Social Security Institute also went on strike to protest proposed changes in their respective institutions. On November 1, members of the CUT, the CGTD, and the CTC staged a 24-hour strike to protest the Government's economic and social policies, high unemployment, and violence against labor leaders and human rights activists. Strike organizers stated that some 500,000 government workers took part in the action. The longest strike of the year took place from December 18, 2000, to February 28, at the factories of beverage manufacturer Bavaria, where over 6,300 employees walked out to protest stalled contract negotiations.

In August thousands of Bogota cab and bus drivers went on strike to protest restrictions on the circulation of public transportation vehicles; 20 persons were injured in the demonstrations. The strike paralyzed the capital for several days before the mayor and transportation unions negotiated a solution.

The Government still has not addressed a number of ILO criticisms of the Labor Code. The ILO had complained about the following provisions of the law: The requirement that government officials be present at assemblies convened to vote on a strike call; the legality of firing union organizers from jobs in their trades once 6 months have passed following a strike or dispute; the requirement that contenders for trade union offices must belong to the occupation that their union represents; the prohibition of strikes in a wide range of public services that are not necessarily essential; various restrictions on the right to strike; the power of the Minister of Labor and the President to intervene in disputes through compulsory arbitration when a strike is declared illegal; and the power to dismiss trade union officers involved in an unlawful strike. The ILO's June report noted the Government's continuing failure to address these criticisms.

Unions are free to join international confederations without government restrictions and do so in practice.

b. The Right to Organize and Bargain Collectively

The Constitution protects the right of workers to organize and engage in collective bargaining. Workers in large firms and public services have been most successful in organizing, but these employees represent only a small percentage of the workforce. High unemployment, a large informal economic sector, traditional antiunion

attitudes, and weak union organization and leadership limit workers' bargaining power in all sectors. A requirement that trade unions must represent a majority of workers in each company as a condition for representing them in sectoral agreements further weakens workers' bargaining power.

The law forbids antiunion discrimination and the obstruction of free association. However, according to union leaders, both discrimination and obstruction of free association occur frequently. Government labor inspectors theoretically enforce these provisions; however, there are only 271 labor inspectors to cover 1,097 municipalities and more than 300,000 companies. The inspection apparatus is therefore weak. Furthermore, labor inspectors often lack basic equipment, including vehicles. Guerrillas sometimes deter labor inspectors from performing their duties by declaring them military targets. In some cases paramilitaries have threatened unionists with killing if they do not renounce their collective bargaining agreements and carried out those threats.

The Labor Code calls for fines to be levied for restricting freedom of association.

Collective pacts--agreements between individual workers and their employers--are not subject to collective bargaining and typically are used by employers to obstruct labor organization. Although employers must register collective pacts with the Ministry of Labor, the Ministry does not exercise any oversight or control over them.

The Labor Code also eliminates mandatory mediation in private labor-management disputes and extends the grace period before the Government can intervene in a conflict. Federations and confederations may assist affiliate unions in collective bargaining.

Labor law applies in the country's 15 free trade zones (FTZ's), but its standards often are not enforced in these zones. Public employee unions have won collective bargaining agreements in the FTZ's of Barranquilla, Buenaventura, Cartagena, and Santa Marta, but the garment manufacturing enterprises in Medellin and Risaralda, which have the largest number of employees, are not organized.

c. Prohibition of Forced or Compulsory Labor

The Constitution forbids slavery and any form of forced or compulsory labor, and this prohibition generally is respected in practice in the formal sector; however, women and girls are trafficked for the purpose of sexual exploitation (see Section 6.f.).

Paramilitaries and guerrillas forcibly conscripted indigenous people (see Section 5). There were some reports that guerrillas use forced labor.

The law prohibits forced or bonded labor by children; however, the Government does not have the resources to enforce this prohibition effectively (see Section 6.d.). Although there were no known instances of forced child labor in the formal economy, several thousand children were forced to serve as paramilitary or guerrilla combatants (see Sections 1.f. and 5) or to work as prostitutes (see Section 5) or coca pickers, and trafficking in girls is a problem (see Section 6.f.). According to Save the Children, nearly 325,000 children working as domestic servants are fed poorly, are paid little or nothing, and are not free to seek other employment.

d. Status of Child Labor Practices and Minimum Age for Employment

The Constitution prohibits the employment of children under the age of 14 in most jobs, and the Labor Code prohibits the granting of work permits to children under 18; however, child labor remains a significant problem, particularly in the informal sector. A 1989 decree established the Minors Code and prohibited the employment of children under age 12. It also required exceptional conditions and the express authorization of the Labor Ministry to employ children between the ages of 12 and 17. Children under age 14 are prohibited from working, with the exception that those ages 12 and 13 may perform light work with the permission of their parents and appropriate labor authorities. Children ages 12 and 13 may work a maximum of 4 hours a day, children ages 14 and 15 may work a maximum of 6 hours a day, and children ages 16 and 17 may work a maximum of 8 hours a day. All child workers are prohibited from working at night, or performing work where there is a risk of bodily harm or exposure to excessive heat, cold, or noise. Children are prohibited from working in a number of specific occupations, including mining and construction; however, these requirements largely are ignored in practice, and only 5 percent of working children possess the required work permits. By allowing children ages 12 and 13 to work, even under restricted conditions, the law contravenes international standards on child labor, which set the minimum legal age for employment in developing countries at 14 years.

In the formal sector, child labor laws are enforced through periodic review by the Ministry of Labor and the military, which ensure compliance with mandatory service requirements. However, in the informal labor sector and rural areas, child labor continues to be a problem, particularly in agriculture and mining. Children as young as 11 work full-time in almost every aspect of the cut flower industry. Even children enrolled in school or, in some cases, those too young for school, accompany their parents to work at flower plantations at night and on weekends. In the mining sector, coal mining presents the most difficult child labor problem. Many marginal, usually family-run, mining operations employ young children as a way to boost production and income. It is estimated that between 1,200 and 2,000 children are involved. The work is dangerous and the hours are long. Younger children cart water and package coal, while those age 14 and up engage in more physically demanding labor such as carrying bags of coal. These informal mining operations are illegal. The Ministry of Labor reported that by the end of 1999 an interagency governmental committee had removed approximately 80 percent of child laborers from the informal mines and returned them to school.

The law prohibits the employment of minors for prostitution; however, child prostitution is a problem (see Section 5).

A Catholic Church study conducted in 1999 reported that approximately 2.7 million children work, including approximately 700,000 children who work as coca pickers. Observers note that the economic downturn might increase the number of children working, especially in rural areas. Child participation in agricultural work soars at harvest time. All child workers must receive the national minimum wage for the hours that they work. However, according to the Ministry of Labor, working children between the ages of 7 and 15 earned between 13 and 47 percent of the minimum wage. An estimated 26 percent of working children have regular access to health care; the health services of the social security system cover only 10 percent of child laborers. Approximately 25 percent are employed in potentially dangerous activities. School attendance by working children is significantly lower than for nonworking children, especially in rural areas. A 1996 study by the national Human Rights Ombudsman of child labor in Putumayo department found that 22 percent of children between the ages of 5 and 18 were full-time coca pickers. In the municipality of Orito, the figure reached 70 percent.

The Labor Ministry has an inspector in each of the country's 32 departments and the national capital district, responsible for certifying and conducting repeat inspections of workplaces that employ children; however, the system lacks resources and covers only 20 percent of the child labor force employed in the formal sector of the economy. The National Committee for the Eradication of Child Labor includes representatives from the Ministries of Labor, Health, Education, and Communications, as well as officials from various other government offices, unions, employer associations, and NGO's. The Government also has obtained commitments from the country's leading trade associations and unions to implement child labor eradication programs, some of which were underway at year's end. In 2000 the Government formulated a 2000-02 Action Plan which gives priority to direct intervention on behalf of domestic child workers, child miners, sexually exploited children, children in trade activities, and children in the agricultural sector. Under the Action Plan, the Government distributes funds to member organizations for child labor eradication projects. It has also designed a project to collect more reliable national data on child labor; results are expected in Spring 2002.

The law prohibits forced and bonded labor by children; however, the Government is unable to enforce this prohibition effectively. The ICBF estimates that paramilitary and guerrilla groups employ 6,000 children as combatants (see Section 1.f.). Trafficking in girls for the purpose of sexual exploitation and child prostitution are problems (see Sections 5 and 6.f.).

e. Acceptable Conditions of Work

The Government sets a uniform minimum wage for workers every January to serve as a benchmark for wage bargaining. The monthly minimum wage, set by tripartite negotiations among representatives of business, organized labor, and the Government was about $125 (286,000 pesos). The minimum wage does not provide a decent standard of living for a worker and family. Because the minimum wage is based on the Government's target inflation rate, the minimum wage has not kept up with real

inflation in the past several years. An estimated 70 percent of all workers earn wages that are insufficient to cover the costs of the Government's estimated low-income family shopping basket. An estimated 76 percent of all workers earn no more than twice the minimum wage.

The law provides for a standard workday of 8 hours and a 48-hour workweek, but it does not require a weekly rest period of at least 24 hours, a failing criticized by the ILO.

Legislation provides comprehensive protection for workers' occupational safety and health; however, these standards are poorly enforced, in part because of the small number of Labor Ministry inspectors. In general, a lack of public safety awareness, inadequate attention by unions, and lax enforcement by the Labor Ministry result in a high level of industrial accidents and unhealthy working conditions. Over 80 percent of industrial companies lack safety plans. The Social Security Institute reported over 220,000 work-related accidents during the year, resulting in 1,277 deaths. The industries most prone to worker accidents were mining, construction, and transportation. According to private professional risk management company SURATEP, work-related accidents in the country cost $3.3 billion (7.25 trillion pesos) each year, or approximately 3.7 percent of GNP. According to government statistics, over 5 million persons--many of them children--work in the informal sector and have no insurance against work-related injuries.

According to the Labor Code, workers have the right to withdraw from a hazardous work situation without jeopardizing continued employment. However, unorganized workers, particularly those in the agricultural sector, fear losing their jobs if they exercise their right to criticize abuses.

f. Trafficking in Persons

In July a new Criminal Code went into effect which defines trafficking in persons as a crime; however, trafficking in persons, primarily women and girls, remains a problem. Colombia is a source country for trafficking in women and girls to Europe, the United States, Asia, and other Latin American countries. The DAS reported in 2000 that the country is one of the three most common countries of origin of trafficking victims in the Western Hemisphere; in 2000 an estimated 35,000 to 50,000 Colombian trafficking victims were overseas. The majority of women trafficked for prostitution reportedly go to the Netherlands, Spain, Japan, Singapore, and Hong Kong. A study carried out in Spain in 1999 by the Roman Catholic religious order the "Adoratrices" found that Colombian women constituted nearly half of all trafficking victims in that country. The Organization for Security and Cooperation in Europe issued a report on trafficking in persons in 1999 that stated that women and girls from Colombia also are trafficked to North America. According to press reports, more than 50 percent of women from Colombia who enter Japan are trafficking victims forced to work as prostitutes. Law enforcement authorities report that most trafficked persons come from the departments of Valle de Cauca, Antioquia, Santander, Cundinamarca, and the coffee-growing regions of Risaralda, Caldas, Quindio, and Tolima.

Police report that most traffickers are linked to narcotics or other criminal organizations. Traffickers disguise their intent by running media ads offering jobs, portraying themselves as modeling agents, offering marriage brokerage services, or operating lottery or bingo scams with free trips as prizes. Recruiters reportedly loiter outside high schools, shopping malls, and parks to lure adolescents into accepting phantom jobs abroad.

The country's overall situation of economic downturn, high unemployment, internal conflict between three major illegal armed groups, and social exclusion contributes to the availability of victims. While young women are the primary targets of traffickers, children and men also are affected. According to officials at the ICBF, a high rate of unwanted pregnancy in unwed teenage girls contributes to trafficking in children.

Law 599 of 2000, which became effective in July, made penalties for trafficking for purposes of prostitution equivalent to those for rape and sexual assault, carrying penalties of 6 to 8 years in prison and fines of up to 100 times the monthly minimum wage, currently equivalent to $14,000 (39 million pesos). Trafficking of children under the age of 14 carries a more severe sentence of 5 to 9 years in prison. Additional charges of illegal detention, violation of the right to work in dignified conditions, and violation of personal freedom also may be brought against traffickers. The Minister of Justice is lobbying for passage of even stricter antitrafficking legislation that would increase the penalty for trafficking for purposes of prostitution to 10 to 15 years, with heavier penalties for aggravating factors. The Prosecutor General's office reported investigating 110 cases of trafficking between 1998-2001, resulting in 18 convictions to date.

According to the DAS, Interpol rescued 140 Colombian trafficking victims abroad during 1998-2001, and the National Police rescued an additional 147 victims during 1999-2001.

In May authorities captured four members of a criminal gang that kidnaped children and sold them abroad.

Additional efforts have addressed the problem of trafficking within the country's own borders. According to UNICEF, approximately 25,000 children--16,000 of them between 8 and 12 years of age--are victims of sexual exploitation (see Section 5). The ICBF estimates that in Bogota alone there are over 10,000 girls and nearly 1,000 boys exploited as child prostitutes. In 2000 the Prosecutor General's office created the Center for Attention to Victims of Sexual Crimes, which as of December had provided legal assistance in 2,200 cases of sexual aggression against women and children. During the year, the ICBF provided assistance, either directly or through other specialized agencies, to over 14,000 sexually exploited children.

A government advisory committee composed of representatives of the Ministry of Foreign Affairs, Interpol, the DAS, the Ministry of Justice, the Inspector General's office, the Prosecutor General's office, and the Presidency meets every 2 months to discuss trafficking in persons. Since 1997 the committee has prepared information campaigns, promoted information exchange between government entities, created trafficking hot lines for citizens, and encouraged closer cooperation between the Government and Interpol. Mayoral and gubernatorial staffs taking office following the October 2000 elections were given training by the Ministry of Justice and "Fundacion Esperanza" or the Hope Foundation (a Colombian NGO) on the problems of trafficking and the importance of expanding social services to populations vulnerable to trafficking. In November 2000, the Ministry of Justice, the Ministry of Foreign Affairs, the International Organization for Migration (IOM), and the Hope Foundation held the first national conference on trafficking in persons. A second conference sponsored by the IOM, the Catholic Church, several local NGO's, and the city of Medellin took place in Medellin in November.

Victims do have access to generally limited government social services. In addition, the Government has instructed its consulates in foreign countries to provide legal and social assistance to victims of trafficking and has contracted 46 legal advisors and 16 social workers to help victims abroad. Government officials work with NGO representatives to arrange to meet returning victims at the airport.

The Hope Foundation, which assisted 57 trafficking victims in 2000, provides educational information, social support, and counseling to victims of trafficking who return to the country. It does not receive money from, but cooperates with the Government. Services provided by the Hope Foundation in coordination with government social service agencies include psychological counseling, social assistance, placement, and follow-up care.

 BACK TO TOP

EXHIBIT 6



February 2000                                                    Vol. 12, No. 1 (B)

# COLOMBIA

### The Ties That Bind: Colombia and Military-Paramilitary Links

## TABLE OF CONTENTS

SUMMARY AND RECOMMENDATIONS

COLOMBIA AND MILITARY-PARAMILITARY LINKS

THIRD BRIGADE

FOURTH BRIGADE

THIRTEENTH BRIGADE

## SUMMARY AND RECOMMENDATIONS

Human Rights Watch here presents detailed, abundant, and compelling evidence of continuing close ties between the Colombian Army and paramilitary groups responsible for gross human rights violations.

This information was compiled by Colombian government investigators and Human Rights Watch. Several of our sources, including eyewitnesses, requested anonymity because their lives have been under threat as a result of their testimony.

Far from moving decisively to sever ties to paramilitaries, Human Rights Watch's evidence strongly suggests that Colombia's military high command has yet to take the necessary steps to accomplish this goal. Human Rights Watch's information implicates Colombian Army brigades operating in the country's three largest cities, including the capital, Bogotá. If Colombia's leaders cannot or will not halt these units' support for paramilitary groups, the government's resolve to end human rights abuse in units that receive U.S. security assistance must be seriously questioned.

Previous Human Rights Watch reports and documents have detailed credible and compelling evidence contained in government and other investigations of continuing ties between the military and paramilitary groups in the Fifth, Seventh, Ninth, Fourteenth, and Seventeenth Brigades.

Together, evidence collected so far by Human Rights Watch links half of Colombia's eighteen brigade-level army units (excluding military schools) to paramilitary activity. These units operate in all of Colombia's five divisions. In other words, military support for paramilitary activity remains national in scope and includes areas where units receiving or scheduled to receive U.S. military aid operate.

Human Rights Watch has drawn this information to the attention of the appropriate Colombian government ministers and officials, and has urged them to take immediate action to address these continuing problems in accordance with existing Colombian law.

Based on the enclosed evidence, Human Rights Watch found that:

- As recently as 1999, Colombian government investigators gathered compelling evidence that Army officers set up a "paramilitary" group using active duty, retired, and reserve duty military officers along with hired paramilitaries who effectively operated alongside Army soldiers and in collaboration with them;

- In 1997, 1998, and 1999, a thorough Colombian government investigation collected compelling evidence that Army officers worked intimately with paramilitaries under the command of Carlos Castaño. They shared intelligence, planned and carried out joint operations, provided weapons and munitions, supported with helicopters and medical aid, and coordinated on a day to day basis. Some of the officers involved remain on active duty and in command of troops;

- There is credible evidence, obtained through Colombian government investigations and Human Rights Watch interviews, that in 1998 and 1999, Army intelligence agents gathered information on Colombians associated with human rights protection, government investigative agencies, and peace talks, who were then subjected to threats, harassment, and attacks by the army, at times with the assistance of paramilitary groups and hired killers;

- There is credible evidence that this alliance between military intelligence, paramilitary groups, and hired killers is national in scope and is able to threaten key investigators in the Attorney General's office and the Procuraduría;

- The brigades discussed here -- the Third, Fourth, and Thirteenth -- operate in Colombia's largest cities, including the capital. Their commanders are considered among the most capable and intelligent, and are leading candidates for promotion to positions of overall command of divisions, the Army, and Colombia's joint forces. If Colombia's leaders cannot or will not halt support

for paramilitary groups in these units, it is highly questionable to assume that they will be more successful in units that are less scrutinized or operate in rural areas, including units that receive U.S. security assistance in southern Colombia;

- As these cases underline, Colombia's civilian investigative agencies, in particular the Attorney General's office, are capable of sophisticated and hard-hitting investigations. However, many investigators assigned to cases that implicate the Army and paramilitaries have been forced to resign or to flee Colombia;

- At least seven officers mentioned in the attached report are School of the Americas graduates. Training alone, even when it includes human rights instruction, does not prevent human rights abuses. It must be accompanied by by clear and determined action on the part of the Colombian government to bring to justice those in the military who have committed human rights abuses, to force the military to break longstanding ties to paramilitary groups, and to ensure that the Colombian Armed Forces are subject to the rule of law, including the August 1997 Constitutional Court decision that mandates that security force personnel accused of committing crimes against humanity are tried in civilian courts.

All international security assistance should be conditioned on explicit actions by the Colombian Government to sever links, at all levels, between the Colombian military and paramilitary groups. Abuses directly attributed to members of the Colombian military have decreased in recent years, but over the same period the number and scale of abuses attributed to paramilitary groups operating with the military's acquiescence or open support have skyrocketed. International assistance should not be provided either to those who directly commit human rights abuses or to those who effectively contract others to carry out abuses on their behalf.

**The actions that the Colombian government should be required to take include**:

- devising and implementing a comprehensive and public plan to investigate, pursue, capture, and bring to justice paramilitary leaders, one that provides sufficient resources and guarantees the necessary political support to accomplish these goals;

- providing a significant increase of funding for the Attorney General's Human Rights Unit, including increased support for the Witness Protection program, travel, communications equipment, increased security, and improved evidence-gathering capability. The work of Colombia's Attorney General's office has contributed significantly to the protection of human rights and accountability for serious crimes, including crimes committed by Colombia's guerrillas. Yet prosecutors and investigators continue to run deadly risks. Many have been forced to leave the country because of threats against their lives, leaving the fate of crucial cases in jeopardy;

- establishing the ability at the regional and local level to respond to threats of massacres and targeted violence, including the creation of a rapid reaction

force to investigate threats and killings, and to take steps to pursue and apprehend alleged perpetrators in order to bring them to justice;

**With regard to U.S. training of Colombian military and police, Human Rights Watch urges the international community to ensure that:**

- all U.S. advice and training includes detailed instruction regarding the obligation of all members of the military and security forces to uphold Common Article 3 of the Geneva Conventions and Protocol II. Training should include hypothetical situations that reflect Colombian reality, and students should be closely evaluated on their understanding and application of international humanitarian law. Specialists from the International Committee of the Red Cross should be invited to contribute to such training;

- all existing training materials are reviewed in coordination with representatives of the International Committee of the Red Cross, the Defensora del Pueblo, the office of the U.N. High Commissioner for Human Rights, the Colombian Attorney General, and a representative of independent human rights groups, to ensure that they reflect the highest standards of protection for human rights and international humanitarian law;

- all trainees, whether of officer rank or below, receive appropriate instruction in human rights and international humanitarian law.

The information submitted by Human Rights Watch shows clearly that intelligence-sharing remains the most pervasive and common method of collaboration between the Colombian military and paramilitary groups, with grave consequences for human rights. Intelligence is by definition a central function of any army, and is clearly so in the case of the Colombian military. Addressing the problems such information-sharing poses defies a unit-by-unit approach. Therefore:

- observing the aim of the Leahy Amendment, the United States should apply human rights conditions to all intelligence-sharing, to ensure that information is neither shared with human rights abusers nor with those who will pass it to paramilitary groups that violate human rights;

- for the purposes of compliance with the Leahy Amendment, the United States should make it clear that aiding and abetting any paramilitary group would result in a unit being disqualified for receipt of further U.S. aid or training effective measures are taken to investigate and punish violations;

- any increase in security assistance should mean a proportionate increase in civilian staff assigned to the U.S. Embassy and State Department to oversee compliance with human rights conditions. Staff should be required to meet frequently with not only military and government sources of information, but also independent human rights groups, the church, and aid organizations. The goal must be to gather as much information as possible about reported human rights violations;

- a report on monitoring activities in countries where the Leahy Amendment

applies should be a regular part of the State Department's annual report on human rights and should be available for independent review.

The "effective measures" set out in the Leahy Amendment should be interpreted to include, among other measures, the rigorous application of the August 1997 ruling of Colombia's Constitutional Court, which requires that crimes against humanity allegedly committed by military personnel be investigated and tried in civilian courts. Neither the military nor the Superior Judicial Council charged with resolving jurisdictional disputes have abided by this ruling to date.

- as a condition of U.S. security assistance, the Government of Colombia should first require the military to respect civilian jurisdiction in cases involving credible allegations of human rights abuse by military personnel, including cases where officers are accused of conspiring to commit or facilitate murders and massacres by paramilitary groups. In this way, President Pastrana can ensure that such cases are sent to civilian courts, best equipped to investigate them impartially and guarantee due process;

- the United States should require that the Colombian military set up an independent review committee, composed of high level representatives from the Attorney General's office and the office of the Procuraduría, to assess whether there is credible evidence of human rights abuse against individual officers and soldiers. If such credible evidence is found, the individual should be immediately suspended and the case sent to the civilian courts for prosecution. If found guilty, the individual should be permanently dismissed from the security forces;

- to reinforce sanctions on abusive security force members, the United States should conduct a review of all visas granted to military personnel and ensure that individuals against whom there is credible evidence of human rights abuse or support for paramilitary groups have their visas revoked or are denied visas to enter the United States;

- to strengthen accountability, the United States must urge Colombia to reform the rules governing investigations and disciplinary proceedings carried out by the Procuraduría. The Procuraduría is the government agency that oversees the conduct of government employees, including members of the military and police, and can order them sanctioned or dismissed. Currently, however, delays in investigation mean that many investigations into serious human rights crimes must be shelved due to excessively short statutes of limitations. Also, the crime of murder is not included as a reason for dismissal. Even when the Procuraduría finds that a member of the security forces has committed murder, it can recommend no more stringent punishment than a "severe reprimand," simply a letter in the individual's employment file;

- the United States must require that Colombia void the statute of limitations for investigations into crimes against humanity and other, related human rights violations.

Further, the international community should urge Colombia to pass and rigorously

enforce laws that protect human rights including laws penalizing forced disappearance, unlawful detention, and torture. Legislation that officially recognizes and supports the work of the Attorney General's Human Rights Unit should also be supported by the foreign embassies in Bogotá.

Human rights defenders are among the most at-risk groups in Colombia. The international community should support their work by increasing funding for non-governmental groups that apply for international assistance. Funds should help strengthen their ability to investigate and report on human rights violations.

The international community should provide increased funding for Colombia's forcibly displaced, not only those who may be forced to abandon their homes because of future coca eradication efforts. Currently Colombia ranks third in the world in terms of the number of forcibly displaced people. Aid should be channeled through the church and independent aid and human rights groups rather than the government, in view of the latter's previous failure to follow through with promised assistance.

BACK TO THE TOP

---

## COLOMBIA AND MILITARY-PARAMILITARY LINKS

***Half of Colombia's eighteen brigade-level army units (excluding military schools) have documented links to paramilitary activity***

**THIRD BRIGADE** (headquarters in Cali, Valle);

***"The Calima Front and the Third Brigade are the same thing."***

**Colombian government investigator**

Colombian government investigators and Human Rights Watch interviews include compelling, detailed information that in 1999, the Colombian Army's Third Brigade set up a "paramilitary" group in the department of Valle del Cauca, in southern Colombia. The investigators identify this group by its self-imposed name, the Calima Front (Frente Calima), and told Human Rights Watch that they were able to link the group to active duty, retired, and reserve military officers attached to the Third Brigade along with hired paramilitaries taken from the ranks of the Peasant Self-Defense Group of Córdoba and Urabá (Autodefensas Campesinas de Córdoba y Urabá, ACCU), commanded by Carlos Castaño. According to these government investigators as well as eyewitness testimony obtained by Human Rights Watch, the Third Brigade provided the Calima Front with weapons and intelligence.

At the time these events took place, the Third Brigade was under the command of Brig. Gen. Jaime Ernesto Canal Albán, where he remains to this day.[1]

Our information is based on interviews with Attorney General investigators who

prepared documents for an on-going government investigation that is currently under seal (*bajo reserva*); an investigator from an independent organization; other investigators; and "Elias," a former Army intelligence agent who also served as a cartel gunman. "Elias" also testified under oath to Attorney General investigators. "Elias" told Human Rights Watch and government investigators that he worked for the army's "Coronel Agustín Codazzi" Battalion in Palmira, part of the Third Brigade.[2]

The Third Brigade is part of the Colombian Army's Third Division, which includes a region where military units receiving a large amount of U.S. security assistance are concentrated.[3]

According to the government investigator Human Rights Watch interviewed who helped prepare the official investigation, the Calima Front was formed in response to a mass kidnaping carried out by guerrillas belonging to the José María Becerra Front of the National Liberation Army (Ejército de Liberación Nacional, ELN). On May 30, 1999, guerrillas seized about 140 worshipers from Cali's La María Church. Among those taken were suspected drug traffickers believed to run part of the business established by the jailed Cali Cartel leaders.[4] Guerrillas demanded ransoms for some of the hostages, a serious violation of the laws of war.[5]

In response, "Elias" told Human Rights Watch, Third Brigade active duty and reserve officers formed the Calima Front, with the assistance of Carlos Castaño. Active duty officers provided intelligence and logistical support. Former military officers were among those called in to assume positions of command. The troops were made up primarily of paramilitaries brought in from Colombia's north. The men were initially lodged on ranches belonging to suspected drug traffickers, who also contributed resources to equip and feed the men.[6]

The connection between drug traffickers and paramilitary groups is not new and has been well documented in reporting by the U.S. Embassy in Bogotáá since at least 1990.[7]

"Elias" told Human Rights Watch that during his employment as an intelligence agent, he witnessed close links between drug traffickers, paramilitaries, and the Army. Among other illegal practices, "Elias" said that Codazzi Battalion soldiers routinely sold weapons and munitions captured from guerrillas on the black market. The money raised, he said, went to soldiers and to fund illegal activities. "Elias" said that he was paid according to operations generated by his information, in part supplemented by the battalion's illegal weapons sales.[8]

"Elias" said he also worked for local drug traffickers, and served as a body guard on the ranch of one drug trafficker who frequently hosted Third Brigade troops and paramilitaries. In his interview, he described the distinction between drug traffickers, paramilitaries, and the Colombian Army as virtually non-existent. His services were valuable, he told Human Rights Watch, since he maintained close ties to the Army and could serve as a shared intelligence agent for all three groups. "The salary was $800 a month if I worked with [the paramilitaries] without going on

maneuvers and $1,300 if I went into the field," "Elias" told Human Rights Watch.[9]

In July, local officials and the regional ombudsman (Defensora) began receiving reports from local residents of the appearance of the "Calima Front." Over the August 1 weekend, armed men reportedly killed four peasants near Tulu.[10] According to press reports, the group, estimated to include at least 150 men wearing army-style uniforms, carried AK-47s, M-60s, grenades, and the latest communications equipment. Despite abundant reports of their presence, their movements went virtually unimpeded for weeks.[11]

In August, "Elias" testified to Attorney General investigators in Bogotá about his contact with the Calima Front. Investigators told Human Rights Watch that they corroborated his testimony over the following weeks, as the killings and massacres he warned had been planned by the Calima Front in conjunction with Third Brigade officers progressed.[12]

Subsequently, allegations of a connection between the Calima Front and Third Brigade surfaced publicly, when the ELN charged Army complicity in a statement released with a group of La María hostages.[13] Human Rights Watch interviewed an independent investigator who was able to confirm the Calima Front's existence and give additional information in October 1999.[14]

By August 5, the first of hundreds of displaced people began to arrive in towns like Tulu, San Pedro, and Buga. Many told stories similar to the one Abelardo Trejos gave to a reporter from the Cali-based *El País*. Armed men had blocked the roads, so Trejos, his wife, and two children fled on a foot path. "[The armed men] told me that we had to leave, because there was going to be a tremendous war and that I should return when it was all over."[15]

On August 7, armed men seized Noralba Gaviria Piedrahíta, a community leader, bound her, then led her to the outskirts of Ceylán, near Bugalagrande, and executed her.[16] On September 22, authorities discovered the mutilated and dismembered bodies of seven men near Tulu, apparently executed by the Calima Front for suspected ties to guerrillas.[17]

Despite abundant evidence of illegal activity, throughout the summer the Army claimed that the murders and forced displacement were "unconfirmed." Maj. Gen. Jaime Humberto Cortés Parada, commander of the Cali-based Third Division, blamed deaths on the Revolutionary Armed Forces of Colombia (Fuerzas Armadas Revolucionarias de Colombia, FARC), which in his words was seeking to "generate chaos and disinformation."[18]

In Tulu, where a community stadium was providing emergency shelter, the number of displaced families fast outgrew available resources. The press reported that at night, men on motorbikes fired shots into the air and shouted threats at the displaced civilians, whom they accused of being guerrilla sympathizers.[19] By September, local officials estimated that at least 40 people had been killed and over 2,000 were

forcibly displaced.[20]

Meanwhile, both "Elias" and the government investigators handling the case told Human Rights Watch that they began to receive death threats.[21] Although government investigators told Human Rights Watch that they put "Elias" under protective custody, the threats continued. "Elias" told us there were two attempts on his life.[22] The government investigators handling the case and one other observer contacted by authorities to assist in the investigation told Human Rights Watch that they were also threatened. [23] "Elias" and several Attorney General investigators later fled Colombia.[24]

All agree, in the words of one investigator, that "the Calima Front and the Third Brigade are the same thing."[25]

This pattern of activity differs little from previous cases documented in Colombian court proceedings, where the Third Brigade, paramilitaries, and drug traffickers allied to attack suspected guerrillas and civilians and commit atrocities. Between 1988 and 1990, for example, traffickers allied with police and Third Brigade officers perpetrated the over 100 killings known collectively as the Trujillo massacre. President Ernesto Samper subsequently acknowledged the government's role in carrying out these killings and covering up its responsibility on January 31, 1995. [26]

Another atrocity linked to the Third Brigade was the 1993 Riofrío massacre. On October 5, thirteen members of the Ladino family living in Riofrío, Valle del Cauca, were murdered by a combined force of Third Brigade soldiers and paramilitaries.[27]

More recently, the Third Brigade has been implicated in the Monteloro massacre of five people on November 8, 1998. According to an independent investigation, troops from the "Palacé" Battalion, based in Buga, and the "Numancia" Counterguerrilla Battalion killed five civilians as they celebrated the fifteenth birthday party of the daughter of the owner of the house they were in. Several of the witnesses have since been killed in circumstances that suggest an attempt to cover up the crime.[28]

BACK TO THE TOP

---

## FOURTH BRIGADE (headquarters in Medellín, Antioquia)

*"When we would deliver a guerrilla to the Girardot Battalion, they would give us in exchange grenades and R-15 munitions . . . And after the Army received (the corpse), they would dress it in a military uniform."*

**Francisco Enrique Villalba Hernández, a former paramilitary**

The Attorney General's office has collected extensive evidence of pervasive ties in 1997, 1998, and 1999 between the Fourth Brigade and paramilitaries under the

command of Carlos Castaño. These documents name the Girardot, Granaderos, Héroes de Barbacoas, Juan del Corral Battalions, and Pedro Nel Ospina Battalions as well as Fourth Brigade headquarters.

The investigation describes activities that occurred while the Fourth Brigade was under the command of Gen. Alfonso Manosalva (since deceased) and subsequently, Gen. Carlos Ospina Ovalle, since promoted and now head of Colombia's Fourth Division.[29] In his current post, General Ospina is the divisional commander of at least one of the units proposed to receive U.S. security assistance, the Twelfth Brigade, based in Florencia, Caquetá.[30]

In 1998, the Attorney General opened an investigation of alleged atrocities committed the previous year by paramilitaries around the town of Girardota, Tarazá, and Caucasia, in the department of Antioquia. Investigators concluded that a group of so-called "paramilitaries" included six active-duty soldiers assigned to the Batallón de Infantera No. 10 "Girardot" and the Batallón de Ingenieros No. 4 "Pedro Nel Ospina." In the official investigation, the group was linked to a series of killings and robberies committed while they were dressed in Army uniforms and carrying their Army-issue weapons, including machine guns and grenades. In so-called "social cleansing" operations, the group attacked and killed individuals believed to be drug addicts or thieves.[31]

Among the alleged paramilitaries Attorney General investigators told Human Rights Watch enjoyed free access to Fourth Brigade headquarters in 1997 and 1998 was Jacinto Alberto Soto, known as "Lucas" and believed to act as the ACCU's accountant. In 1998, the Attorney General issued an arrest warrant for Soto and seized him in possession of ACCU documents and ledgers. Nevertheless, authorities told Human Rights Watch that Soto apparently bribed his way out of the front door of Medellín's maximum security prison weeks later.[32]

In a separate series of investigations, Attorney General prosecutors collected abundant evidence linking the Fourth Brigade to the paramilitaries under Castaño's command who carried out the El Aro massacre, which took place in October 1997. At the time, General Ospina commanded the Fourth Brigade. These documents show that on October 25, a joint army-paramilitary force surrounded the village of El Aro and the 2,000 people who live in and around it. The operation was part of a region-wide offensive launched against the FARC and designed to force residents to abandon villages identified as providing FARC guerrillas with supplies and "conquer" the region, in the words of Castaño.[33]

Survivors told Human Rights Watch that while soldiers maintained a perimeter around El Aro, an estimated twenty-five ACCU members entered the village, rounded up residents, and executed four people in the plaza. One witness told Human Rights Watch that the ACCU leaders were men who called themselves "Cobra" and "Junior." Witnesses said that paramilitaries told store owner Aurelio Areiza and his family to slaughter a steer and prepare food from their shelves to feed the ACCU fighters on October 25 and 26, while the rest of Colombia voted in municipal elections. The next day, witnesses told Human Rights Watch, paramilitaries took Areiza to a nearby house, tied him to a tree, then tortured and

killed him. They added that the ACCU gouged out Arieza's eyes and cut off his tongue and testicles.[(34)]

One witness told journalists who visited El Aro soon afterwards that families who attempted to flee were turned back by soldiers camped on the outskirts of town. Over the five days they remained in El Aro, ACCU members were believed to have executed at least eleven people, including three children, burned forty-seven of the sixty-eight houses, including a pharmacy, a church, and the telephone exchange, looted stores, destroyed the pipes that fed the homes potable water, and forced most of the residents to flee. When they left on October 30, the ACCU took with them over 1,000 head of cattle along with goods looted from homes and stores.[(35)] Afterwards, thirty people were reported to be forcibly disappeared.[(36)]

By year's end, hundreds of displaced families were divided between shelters in Ituango, Puerto Valdivia, and Medellín.[(37)] Jesús Valle, an Ituango town councilman, lawyer, and president of the "Héctor Abad Gómez" Permanent Human Rights Committee, helped document the massacre and represented some families of victims. He was assassinated in his Medellín office on February 27, 1998. Carlos Castaño, the Army, and local drug traffickers are currently under investigation for planning his murder.[(38)] Government investigators have linked the hired killers to La Terraza, a group of professional assassins that works on contract for Castaño.[(39)]

In sworn testimony to Attorney General investigators taken on April 30, 1998, Francisco Enrique Villalba Hernández, a former paramilitary who took part in the El Aro massacre, confirmed the testimony by survivors taken by Human Rights Watch that the operation had been carefully planned and carried out by a joint paramilitary-Army force. Villalba said he belonged to the Toledo Group within the ACCU's Metro Front. He told authorities that "Junior" and Salvatore Mancuso, known as "El Mono Mancuso" and the commander of ACCU fighters present, took him and approximately 100 other paramilitaries to Puerto Valdivia to prepare to enter El Aro. [(40)]

There, Villalba told authorities that he witnessed the meeting between Mancuso, an Army lieutenant, and two Army subordinates, there with troops. This region is covered by both the Girardot and Granaderos Battalions. Throughout the encounter, Villalba testified, Army soldiers and paramilitaries addressed each other as "cousin" (*primo*), as a sign of shared goals and purpose.[(41)] Villalba was also able to testify about radio exchanges he overheard between Mancuso and the colonel in charge of the battalion that was taking part in the combined operation. According to Villalba, "They were planning the entry into El Aro and how the operation would go lower down (the mountain), so that the Army would prevent people or commissions or journalists from entering."[(42)]

During the operation, Villalba said that the combined Army-paramilitary force was attacked by the FARC. "Right when we had contact with guerrillas, which lasted three hours, an Army helicopter arrived, and gave us medical supplies and munitions."[(43)]

Villalba admitted taking direct part in killings and the mutilations of victims, including a beheading. Once the paramilitaries had rounded up the cattle belonging to El Aro residents, Villalba said, paramilitaries left the area protected by the Army, which advised them to take a route that would avoid members of the Attorney General's office and Procuradura they believed had been sent to investigate reports of the massacre. While the paramilitaries traveled in several public busses commandeered on the highway, another car preceded them, according to Villalba, ensuring that the busses would pass army roadblocks unhampered.[44]

In statements to the press, Carlos Castaño took responsibility for the massacre.[45]

Villalba also testified about numerous other operations carried out jointly by paramilitaries and the Granaderos and Girardot Battalions. A common practice, he told government investigators, was "legalization" (*legalización*), when paramilitaries would give the corpses of suspected guerrillas or murdered civilians to the Army in exchange for weapons and munitions. Villalba testified that soldiers then clothed the corpses in military uniforms and claimed them publicly as guerrillas killed in combat. "When we would deliver a guerrilla to the Girardot Battalion, they would give us in exchange grenades and R-15 munitions... And after the Army received (the corpse), they would dress it in a military uniform."[46]

Prosecutors told Human Rights Watch that they confirmed this detail by reviewing Fourth Brigade records on weapons, which revealed that many weapons issued to troops had vanished. Although the prosecutor told Human Rights Watch that Fourth Brigade military officers had confirmed that Granaderos Battalion stores had gone to paramilitaries, he claimed that the Army never followed up on the investigation or punished anyone.[47]

As Human Rights Watch explained in *War Without Quarter: Colombia and International Humanitarian Law*, fueling human rights abuses by soldiers is the army's continuing emphasis on body counts as a means of measuring performance. [48] Officers who fail to amass lists of enemy casualties risk seeing their careers stalled and ended.[49]

As Villalba's testimony demonstrates, "legalization" is one way officers can better their chances of receiving medals and promotions. "The commander would give the order, and says that he wanted results, casualties (*bajas*)," one former army officer told Human Rights Watch. "So anyone who came near our patrol would be killed."[50]

Less than a month after former Armed Forces Commander General Manuel Bonett told Human Rights Watch that the army had revised the way it measured success, Gen. Iván Ramírez summarized the work of his First Division by releasing to the press long lists of people claimed killed in action by his troops.[51]

This is the same officer whose visa to enter the United States was reportedly revoked the grounds of "terrorist activity," in this case support for paramilitary groups. According to a *Washington Post* investigation, Ramírez was a key

intelligence source for the United States and served as a liaison and paid informant for the Central Intelligence Agency, supposedly to help the fight against drug traffickers and Marxist guerrillas. At the same time, according to the report, he maintained close ties to right-wing paramilitary groups who finance much of their activities through drug trafficking.[52]

Far from subsiding, Attorney General investigations gathered in compelling detail evidence on how illegal activity in the Fourth Brigade continued in 1998 and 1999. Perhaps most notorious was the March 1999 murder of Alex Lopera, a former peace adviser to the Antioquia governor's office. Lopera was assisting a family negotiate the release of a family member kidnaped by guerrillas when he was stopped at an Army roadblock near Sonsn, Antioquia.[53]

According to sworn testimony by "Valentín," a former Fourth Brigade soldier and radio operator present at the scene, soldiers from the Granaderos and Juan del Corral Battalions searched the car and discovered the ransom money hidden in a spare tire. At the time, "Valentín" told prosecutors, the commander of the Granaderos Battalion, Major David Hernández Rojas, was present.[54]

Since there were no arrest warrants for any of the car's occupants, "Valentín" testified, procedure dictated that soldiers had to let the car proceed. However, according to "Valentín," Major Hernández first sent several soldiers ahead to ambush the car and steal the money.[55]

The soldiers, "Valentín" explained, had little choice. "Hernández told all of us there to have a care, that whoever informed on him would die, with every person in his family. He said that he had people working for him that did that sort of work."[56]

Under the command of Capt. Diego Fernando Fino, "Valentín" said that he and two soldiers set up the ambush.[57] "Valentín" testified to prosecutors that private Carlos Mario Escudero fired the fatal shots, killing all three passengers at point blank range. The ransom was divided up between the soldiers.[58] The case came to light, however, when Escudero's wife reported his share of the money stolen several weeks later according to Escudero's testimony to government investigators.[59]

An internal investigation initiated by the Fourth Brigade was easily deflected, according to "Valentín." "(Hernández) told all of the Granaderos soldiers how they should testify, and each one was given a set thing to say."[60]

"Valentín" also testified about Major Hernández's close ties with paramilitaries operating in eastern Antioquia.[61] In one deposition, "Valentín" told investigators that Major Hernández told him and other subordinates that he had begun to organize a death squad called "La Muerte" (Death) within the Fourth Brigade in coordination with an army officer attached to the rural Gaula, a combined military-police unit. The group was to be equipped and armed with camouflage uniforms, guns, and munitions seized by soldiers from guerrillas.[62]

"Valentín" also told Attorney General investigators that Major Jesús María Clavijo Clavijo, then commander of the "Héroes de Barbacoas" Battalion, worked with paramilitary groups.[63] Among the killings "Valentín" attributed to Major Clavijo working with paramilitaries were ones carried out near El Carmen de Atrato, Choc, in February 1999. "Normally, everywhere that Major Clavijo went, there were disappearances, murders, and wherever he was there was always a flood of reports of abuses," he told investigators in a sworn statement.[64]

According to "Valentín," Major Clavijo also "legalized" corpses delivered by paramilitaries. However, this system didn't work if a reward for a missing person was offered by family members. In one case, "Valentín" testified that Major Clavijo ordered soldiers under his command to dismember several corpses with chainsaws in order to foil identification.[65]

"Valentín," who was a radio operator, said he often heard paramilitaries communicating with the Army in the field. "As I was monitoring the communications, I heard people that were not part of the Army talking about combat and requesting assistance, using other channels than the ones we used, and I realized that these were the paramilitaries by the way that they spoke... Major Abondano [of the Fourth Brigade] gave orders to the troops using the radio, to advance, to follow the flank they were on, because our 'cousins' were in combat and needed help."[66]

This witness also linked other Fourth Brigade officers, including Major Clavijo, Col. Rivillas, Major Abondano and others to paramilitaries through regular meetings held on military bases, He said that officers attached to the "Pedro Nel Ospina" Battalion also took part in support for paramilitaries.[67]

A parallel investigation by the Internal Affairs agency (Procuraduría) listed hundreds of cellular telephone and beeper communications between known paramilitaries and Fourth Brigade officers, among them Lieutenant Colonel Carlos Ospina Pardo, Lieutenant Colonel Alfonso Zapata Gaviria, Major Álvaro Cortés Morillo,[68] a "Major Ardila," Major Jesús María Clavijo, Lieutenant Felipe Rodríguez, Private Iván Darío Jaramillo, Private Javier Gómez Herrán, and Private Carlos Mario Escudero.[69]

Clavijo's name also surfaced in Attorney General investigations of alleged Army coordination with CONVIVIRs, groups of civilians authorized by the government to carry out war-related activities. In practice, they differed little from illegal paramilitary groups. In 1997, José Alirio Arcila, the leader of an Antioquia CONVIVIR known as "Los Sables" implicated Clavijo and other Fourth Brigade officers in a series of murders in Medellín. However, Human Rights Watch is not aware of any on-going investigations of the security force officers named by Arcila.
[70]

Nevertheless, Major Clavijo, for example, has since been promoted to colonel and is now commander of the "Hroes de Majagual" Battalion under the jurisdiction of the Fifth Brigade and based in Barrancabermeja. Most recently, this battalion has been linked in the press to an increase in paramilitary activity and direct attacks on the

civilian population near Cantagallo, Santander. In November 1999, for example, local farmers charged that troops under Clavijo's direct command had coordinated with paramilitaries to seize two noted leaders of displaced people, Gildardo Fuentes and Edgar Quiroga.[71] As of this writing, they remain "disappeared."

The following January, the Peasant Association of the Cimitarra River Valley told local authorities that Clavijo's men were carrying out so-called "anti-drug operations" by attacking civilians along the Cimitarra River. In addition, they claimed that Colombian Navy patrol boats fired on civilian dwellings in the villages of La Victoria, Coroncoro, and Yanacu starting on January 16.[72] Over 150 people fled to Barrancabermeja for safety.[73]

For his part, Major Hernández was arrested, but later, government investigators told Human Rights Watch, was allowed to escape by soldiers under the command of Fourth Brigade Brig. Gen. Eduardo Herrera Verbel.[74] The Colombian press has reported that Hernández now works with the ACCU.[75] Indeed, "Valentín" told government investigators that the officer told his subordinates that he would work for the paramilitaries if he was investigated by the Attorney General's office, since the ACCU had already offered him a car, a ranch, and a high salary.[76]

So far, impunity has been the result of official investigations. The prosecutors and investigators assigned to the case have either recused themselves out of fear or fled Colombia because of threats. One prosecutor told Human Rights Watch that he received credible information indicating that Major Hernández had paid La Terraza the equivalent of $7,000 for his life.[77]

BACK TO THE TOP

---

**THIRTEENTH BRIGADE** (headquarters in Bogotá, the capital)

*I signed one case to authorize an indictment of paramilitaries before lunch, and by the time I returned to my desk after eating, a death threat, hand delivered, was there, with intimate details about the decor of my apartment to let me know the killers had already been inside.*

**Colombian prosecutor**

Attorney General and other investigators said in interviews with Human Rights Watch that they believe that the group behind a series of assassinations and terror campaigns over the last three years has been military intelligence. Although the Twentieth Brigade, which centralized military intelligence, was officially dismantled in 1998 and intelligence units supposedly lost their ability to mount operations, evidence strongly suggests that agents were simply redistributed to intelligence units in existing brigades and battalions. Human Rights Watch has obtained information indicating that intelligence units continue to mount operations where human rights are violated.

The United States trains Colombian Army intelligence officers, but has not provided information publicly about what units they belong to. In FY 1999, for example, the United Sates trained four Air Force intelligence officers and two Army intelligence officers. In FY 1998, the U.S. trained six Army intelligence officers: four were stationed in intelligence headquarters in Bogotá, one was stationed in San Joséé del Guaviare, and one was stationed in the city of Santa Marta.[78]

In one of at least five similar cases, Attorney General investigators linked the 1998 kidnaping and later murder of Benjamin Khoudari, an Israeli businessman, to Thirteenth Brigade intelligence officers. According to the official indictment, Col. Jorge Plazas Acevedo planned and carried out a series of kidnapping for ransom and murder, including Khoudari's, as head of the intelligence unit.[79] In 1999, Plazas was retired from active duty and his case is now before a civilian court.[80]

Even after Acevedo's arrest, government investigators continue to link the Thirteenth Brigade to threats against human rights defenders. "The Thirteenth Brigade remains in crisis," a top government investigator told Human Rights Watch in October 1999.[81]

Surveillance believed to be carried out by military intelligence of human rights groups is open, aggressive, and threatening. One Bogotá group reported being filmed and photographed from a neighboring hotel. Many of the telephones used by human rights groups are openly tapped. Threats are daily occurrences. One office manager told Human Rights Watch that when they are trying to distribute an urgent action, the phone line is cut, preventing them from sending it via email or fax. Also, when they call out, they are frequently connected directly to the Thirteenth Brigade. [82]

In some killings -- like that of the CINEP workers in 1997 and Antioquia human rights defender Valle in 1998 - evidence gathered by government investigators strongly suggests that military intelligence acted in coordination with Carlos Castaño. Since Castaño has no force capable of operating in cities, he will contract out murders to La Terraza.[83]

According to government investigators, Castaño pays La Terraza a monthly retainer. Once a target is identified and a "contract" is negotiated with La Terraza, investigators believe, the killers are given intelligence gathered by the military on the target's whereabouts and movements. Killers are able to travel throughout Colombia, and typically work in pairs. The pair, mounted on a motorcycle, will follow and intended victim until they are ready to carry out an attack.[84]

Government investigators have also tied La Terraza to both the Popular Training Institute (Instituto Popular de Capacitación, IPC) and Senator Piedad Córdoba kidnapings, which they believe were carried out on Castaño's orders. Witnesses have sworn under oath that they recognized among the gunmen the La Terraza leader, Alexander Londoño, alias "El Zarco."[85] The most recent killing being investigated in association with La Terraza and its ties to military intelligence is that of Jaime Garzón, the humorist. A suspected La Terraza gunmen was arrested in Colombia in

January 1999 in connection with the Garzón murder.[86]

Government investigators told Human Rights Watch that the intelligence system maintained by La Terraza is excellent and national in scope. They depend in part on fleets of taxis to collect intelligence, and have been linked to death threats against government investigators, including members of the Technical Investigations Unit (Cuerpo Técnico de Investigaciones, CTI) .[87]

One prosecutor told Human Rights Watch, "I signed one case to authorize an indictment of paramilitaries before lunch, and by the time I returned to my desk after eating, a death threat, hand delivered, was there, with intimate details about the decor of my apartment to let me know the killers had already been inside."[88]

Some formal investigations into key paramilitary leaders and their relationships to the military and La Terraza are made virtually impossible by these types of threats and the lack of protection for prosecutors, investigators, and key witnesses. In 1998 and 1999, a dozen CTI officials were murdered or forced to resign because of threats related to their work on human rights cases. Others have left the country in fear for their lives.[89]

Government investigators told Human Rights Watch that among the cases most damaged by La Terraza threats is the investigation into the murder of human rights defender Valle. One CTI agent investigating Valle's murder was killed soon after the murder. The prosecutor investigating the case fled Colombia. Another CTI investigator was killed in September 1999.[90]

The Thirteenth Brigade was also linked to the May 1998 seizure by authorities of the offices of the Intercongregational Commission on Justice and Peace, a respected human rights group. After retired general and former defense minister Fernando Landazbal was assassinated in Santafé de Bogotá on May 12, 1998, the Twentieth Brigade supplied information to the Attorney General's office linking the crime to activities that took place within Justice and Peace. The following day, Thirteenth Brigade soldiers seized the offices.[91]

Soldiers concentrated their search on the office of "Nunca Más," a research project that is collecting information on crimes against humanity. Soldiers forced employees to kneel at gun point in order to take their pictures, a gesture apparently meant to evoke a summary execution. During the search, soldiers addressed employees as "guerrillas" and filmed them and documents in the office. At one point, soldiers told the employees that they wanted precise details of the office in order to later construct a scale model, apparently to plan further incursions. After human rights defenders gathered outside out of concern, soldiers set up a camera to film them, an act of intimidation.[92]

In a recorded statement to the Colombian radio, Colombia's assistant attorney general, Jaime Córdoba Triviño, confirmed that the search was prompted by "military intelligence, which gave us a report that indicated that there were people associated with the ELN at this location . . . but once the prosecutors realized that

this was an error, they suspended the operation."[93] In later reports, Attorney
General Alfonso Gómez claimed that the Army had purposefully hidden the true
nature of the work done at Justice and Peace from investigators.[94]

BACK TO THE TOP

---

*Human Rights Watch*

*Americas Division*

Human Rights Watch is dedicated to protecting the human rights of people around
the world.

We stand with victims and activists to bring offenders to justice, to prevent
discrimination, to uphold political freedom and to protect people from inhumane
conduct in wartime.

We investigate and expose human rights violations and hold abusers accountable.

We challenge governments and those holding power to end abusive practices and
respect international human rights law.

We enlist the public and the international community to support the cause of human
rights for all.

The staff includes Kenneth Roth, executive director; Michele Alexander,
development director; Reed Brody, advocacy director; Carroll Bogert,
communications director; Barbara Guglielmo, finance director; Jeri Laber, special
advisor; Lotte Leicht, Brussels office director; Patrick Minges, publications director;
Susan Osnos, associate director; Maria Pignataro Nielsen, human resources director;
Jemera Rone, counsel; Malcolm Smart, program director; Wilder Tayler, general
counsel; and Joanna Weschler, United Nations representative. Jonathan Fanton is the
chair of the board. Robert L. Bernstein is the founding chair.

Its Americas division was established in 1981 to monitor human rights in Latin
America and the Caribbean. José Miguel Vivanco is executive director; Joanne
Mariner is deputy director; Joel Solomon is research director; Sebastian Brett and
Robin Kirk are research associates; Monisha Bajaj and Barbara Graves are
associates. Stephen L. Kass is chair of the advisory committee; Marina Pinto
Kaufman and David E. Nachman are vice chairs.

Web Site Address: http://www.hrw.org

Listserv address: To subscribe to the list, send an e-mail message to
majordomo@igc.apc.org with "subscribe hrw-news" in the body of the message
(leave the subject line blank).

---

1. Canal is listed as having trained at the School of the Americas in cadet orientation C-3 from Nov. 7-Nov. 21, 1980.

2. The name of "Elias" has been changed for security reasons. Human Rights Watch interview with "Elias," January 15, 2000.

3. The division includes units operating in the department of Putumayo, among them the 24th Brigade.

4. The ELN claimed in a statement that among the hostages were individuals wanted for drug trafficking by U.S. law enforcement, an affirmation that was never confirmed. Human Rights Watch interview with Attorney General investigator, January 14, 2000; "Los guerrilleros del Eln se tomaron por asalto la iglesia La María; rescatadas 75 personas," *El Tiempo*, May 31, 1999; and "ELN says its hostages include people wanted by US for drug trafficking," *Agence France Presse*, August 23, 1999.

5. Human Rights Watch interview with Attorney General investigator, January 14, 2000.

6. Human Rights Watch interview with "Elias," January 15, 2000.

7. For example, Human Rights Watch obtained much of the cable traffic generated by the embassy and related to the activities of "Los Tangueros," a paramilitary group led by former Medellín Cartel member Fidel Castaño, through a Freedom of Information Act request.

8. Human Rights Watch interview with "Elias," January 15, 2000.

9. Ibid.

10. "Los habitantes de La Moralia y Monteloro viven en medio de la zozobra," *El País* (Cali), August 3, 1999.

11. "Unos 150 hombres de las Autodefensas se tomaron la zona rural: Combate de 'paras' y guerrilla en Tulu," *El País* (Cali), August 3, 1999.

12. Human Rights Watch interview with Attorney General investigator, January 12, 2000.

13. "Familiares de los secuestrados rechazaron acusaciones del grupo guerrillero: 'Es absurda la afirmación del ELN'," *El País* (Cali), September 7, 1999.

14. Information about the Calima Front also circulated in press reports as early as August. Human Rights Watch interview with independent investigator, October 2, 1999; and "Colombia Death Squad Said To Plot Against Peace," Karl Penhaul, *Reuters*, August 15, 1999.

15. "Me dijeron que nos tenamos que ir, porque se iba a formar una guerra

tremenda, y que regresara cuando todo terminara." "A Tulu, San Pedro y Buga llegaron huyendo ayer 460 campesinos: Avalancha de desplazados no cesa," *El País* (Cali), August 5, 1999.

16. "Una mujer fue asesinada: Cuatro personas están desaparecidas," *El País* (Cali), August 10, 1999.

17. "El terror se apoder la zona montañosa del Centro del Valle: Nuevas masacres," *El País* (Cali), September 25, 1999.

18. "generar caos y desinformación." "El general Jaime Cortés se refiere a la situacin que se vive en el Centro del Valle: 'Existen muchas contradicciones'," *El País* (Cali), August 22, 1999.

19. "Por las noches realizan disparos en albergues de Tulu: Sigue el drama de los desplazados," *El País* (Cali), October 28, 1999.

20. "Ya son dos mil los desplazados por la violencia en el Departamento Centro del Valle, albergue del temor," Hans Vargas Pardo, *El País* (Cali), September 25, 1999.

21. Human Rights Watch interviews, January 14 and 19, 2000.

22. Human Rights Watch interview with "Elias," January 15, 2000.

23. Human Rights Watch interview, September 29, 1999.

24. Human Rights Watch interviews, January 14 and 19, 2000.

25. Human Rights Watch interviews, January 14 and 19, 2000.

26. For a summary of this on-going case, see *Comisión de Investigación de los Sucesos Violentos de Trujillo: Caso 11.007 de la Comisión Interamericana de Derechos Humanos* (Santafé de Bogotá: Consejera presidencial para los Derechos Humanos de la República de Colombia, August 1995).

27. Gen. Rafael Hernández, reportedly Colombia's military attache in Chile, was then commander of the Third Brigade. As the primary trial court judge, he acquitted his subordinate, Lt. Col. Luis Becerra Bohórquez, despite compelling evidence of the officer's guilt. Becerra was eventually dismissed from the army. This was not the first atrocity Becerra committed as an Army officer. As the Tenth Brigade intelligence chief, he also helped arrange the 1988 massacres of banana workers in Antioquia's "Honduras" and "La Negra" farms. In October 1998, a military tribunal that had convened to review the Riofrío case ruled that Becerra and two other soldiers were guilty of the crime of "encubrimiento por favorecimiento," in essence concluding that the officers had erred only by protecting themselves by reporting the incident as combat with a guerrilla unit, not the massacre of unarmed civilians. However, the sentence meted out was laughable - twelve months in jail, less than a month per victim. Indeed, Becerra was never incarcerated. Becerra was killed by an unknown gunman in a Cali restaurant on February 14, 1999. For a summary of the case, see *Massacre in Riofro* ((Santafé de Bogotá: Commission of Non-

governmental organizations).

28. Human Rights Watch communication with independent investigator, February 4, 2000.

29. Ospina is listed as having trained at the School of the Americas at least once, in a cadet orientation course held in 1967.

30. The division includes units operating in Meta, Guaviare, and Caquet.

31. Report of the Investigative Unit assigned to the Regional Attorney General's office in Medellín, Antioquia, February 10, 1998.

32. Human Rights Watch interview with Attorney General investigator, October 2, 1999; Attorney General Special Report No. 395, "Aseguramientos y capturas de presuntos miembros de las ACCU en Antioquia," June 10, 1998; and "Aseguran a fiscal por fuga de 'para' ," *El Tiempo*, October 14, 1998.

33. This wasn't the first time the ACCU entered this area. In 1996, the group murdered three people in the hamlets of El Inglés and La Granja. Human Rights Watch interview with Attorney General investigator, Medellín, Antioquia, July 2, 1996.

34. Human Rights Watch interviews with El Aro survivors, Medellín, Antioquia, December 11, 1997; and Human Rights Watch interview with Jesús Valle, president, "Héctor Abad Gómez" Permanent Human Rights Committee, Medellín, Antioquia, December 11, 1997.

35. Javier Arboleda, "Cinco días de infierno en El Aro," *El Colombiano*, November 14, 1997.

36. Amnesty International Urgent Action 01/97, January 3, 1997.

37. "Los desplazados no se vean en el norte de Antioquia," *El Tiempo*, November 6, 1997.

38. Human Rights Watch telephone interview with "Héctor Abad Gómez" Permanent Human Rights Committee, February 27, 1998; and Human Rights Watch interview with Attorney General Alfonso Gómez Méndez, May 7, 1998.

39. Government investigators told Human Rights Watch that La Terraza is descended from the groups that worked on contract for drug kingpin Pablo Escobar in the 1980s. Testimony of Francisco Enrique Villalba Hernández to the Attorney General's office, April 30, 1998; and Human Rights Watch interview with Attorney General investigator, October 2, 1999.

40. Authorities told Human Rights Watch that Salvatore Mancuso Gómez is Carlos Castaño's operational chief within the ACCU. The Attorney General has issued at least two warrants for his arrest related to paramilitary activity and kidnapping. Report on outstanding arrest warrants, Attorney General's office, January 1, 1998.

41. Testimony of Francisco Enrique Villalba Hernández to the Attorney General's office, April 30, 1998.

42. "Estaban planeando la entrada al Aro y como se iba a operar abajo, para que el ejrcito no dejara Paísar a personas o no fuera a pasar comiciones (sic), ni periodismo." Ibid.

43. "Al momentico de tener contacto que duramos tres horas llegó un helicoptero del ejército, ahí nos bajó lo que fue elementos de salud y munición." Ibid.

44. Ibid.

45. "Autodefensas de Urabá niegan barbarie en El Aro," *El Colombiano*, November 15, 1997.

46. "Si le entregamos un guerrillero al Batallón Girardot, por cambio de granadas y munición de R 15... Y el ejército cuando lo recibió le puso camuflado." This is most likely AR-15 ammunition. The AR-15 is the Colt company's name for the M-16 assault rifle. Testimony of Francisco Enrique Villalba Hernández to the Attorney General's office, April 30, 1998.

47. Human Rights Watch interview with Attorney General prosecutor, October 2, 1999.

48. *War Without Quarter: Colombia and International Humanitarian Law* (New York: Human Rights Watch, 1998), pp. 48-49.

49. Human Rights Watch interview with Col. (ret.) Carlos Velásquez, Santafé de Bogotá, May 12, 1997.

50. Human Rights Watch interview with former army officer, Santafé de Bogotá, November 12, 1995.

51. Gen. Ramírez retired from the service in 1999. Tonny Pérez Mier, "Balance de I División del Ejército," *El Tiempo*, December 23, 1997; Human Rights Watch interview with General Bonett, Santafé de Bogotá, December 12, 1997.

52. "Colombian Army's Third in Command Allegedly Led Two Lives: General Reportedly Served as a Key CIA Informant While Maintaining Ties to Death Squads Financed by Drug Traffickers," Douglas Farah and Laura Brooks, *Washington Post*, August 11, 1998.

53. "Cuatro militares a juicio por crimen de Alex Lopera," *El Tiempo*, October 13, 1999.

54. Hernández is listed as having trained twice at the School of the Americas. As a cadet, he took the orientation for combat weapons from March 7-April 19, 1985. As a lieutenant, he trained in "psychological operations" from February 27-May 15, 1991. For safety reasons, we have changed the name of this witness. Testimony by "Valentín" to the Attorney General's office, June 22, 1999.

55. Ibid.

56. "Hernández nos dijo a todos los que estábamos ahí, que mucho cuidado, que él que se tuerza se muere, con toda la familia; dijo que él tenía gente que le hacía ese trabajo." Ibid.

57. Fino is listed as having taken a course on Cadet Orientation C-34 (Mechanized) at the School of the Americas from June 28-July 26, 1989.

58. Testimony by "Valentín" to the Attorney General's office, June 22, 1999.

59. Testimony of Carlos Mario Escudero to the Attorney General's office, June 1, 1999.

60. "(Hernández) le dijo a todos los integrantes del Granaderos como debían declarar, a cada uno le dijo que debía decir." Testimony by "Valentín" to the Attorney General's office, June 22, 1999.

61. Testimony by "Valentín" to the Attorney General's office, June 23, 1999.

62. Testimony by "Valentín" to the Attorney General's office, June 1, 1999.

63. Clavijo was listed as having trained at the School of the Americas from July 1-July 17 of 1981 in an orientation and weapons for cadets (C-3) program.

64. "Normalmente en el rea donde estaba el Mayor Clavijo, haban desaparecidos, muertos, y por donde se Países simpre llegaba citatorias de demandas." Testimony by "Valentín" to the Attorney General's office, June 23, 1999.

65. Ibid.

66. "Por la monitoría escuché gente hablando de combates, pidiendo apoyo, por otro tipo de comunicaciones diferentes a las nuestras, yo reconocí que eran las autodefensas por la forma de hablar... el Mayor Abondano [of the Fourth Brigade] dió la orden a la tropa por radio, que avanzaran, que siguieran con el eje que llevaban, que los primos estaban en combates y necesitaban apoyos." Ibid.

67. Testimony by "Valentín" to the Attorney General's office, June 1, 1999.

68. Cortés is listed as having studied in the course on weapons orientation for cadets (C-3) at the School of the Americas from January 12-26, 1984.

69. Office of Special Investigations-Antioquia region, Report, September 21, 1998.

70. Arcila directed a CONVIVIR, an association of civilians authorized by the government to take part in intelligence-gathering and other activities. Sentencia Anticipada, 3687- (F 21.336), Juzgado Regional de Medellín, August 8, 1997.

71. An official investigation is on-going. Report by the Comisión de Bsqueda de

Edgar Quiroga y Gildardo Fuentes, made up of the Programa por la Paz y Desarrollo del Magdalena Medio, Servicio Jesuita a Refugiados, Ministerio del Interior, Defensora del Pueblo, Red de Solidaridad Social, CREDHOS, Organización Femenina Popular, Comité de Solidaridad con los Presos Políticos, MINGA, U.N. High Commissioner for Human Rights, Peace Brigades International, and the Catholic Church, December 3, 1999.

72. Acción Urgente, "Campesinos del Valle del Ro Cimitarra, en el Magdalena Medio colombiano, son bombardeados y ametrallados por TroPaís Oficiales," CREDHOS and the Peasant Association of the Cimitarra River Valley (Asociación Campesina Del Valle Del Ro Cimitarra, ACVC ), January 18, 2000.

73. "La Casa Campesina, que les sirve de refugio, se quedó pequeña," *Vanguardia Liberal*, January 21, 2000.

74. Human Rights Watch interview, October 2, 1999; and "Cuatro militares a juicio por crimen de Alex Lopera," *El Tiempo*, October 13, 1999.

75. "El mayor David Hernández est sindicado de la muerte de lex Lopera," *El Tiempo*, July 1, 1999.

76. Testimony by "Valentín" to the Attorney General's office, June 1, 1999.

77. Human Rights Watch interview with Attorney General prosecutor, October 2, 1999.

78. U.S. Department of Defense and Department of State, "Foreign Military Training & DOD Engagement Activities of Interest: A Report to Congress for Fiscal Years 1998 and 1999," (Section 581 Report), CD-ROM, 1999.

79. Plazas reportedly attended the School of the Americas and took a course on Small Unit Infantry Tactics from Jan. 24-March 4, 1977. Human Rights Watch interview with Attorney General investigator, October 5, 1999.

80. Col. Bernardo Ruiz, the former Twentieth Brigade commander currently charged with masterminding the 1995 murder of conservative leader lvaro Gómez, told the newsweekly *Semana* that he had worked closely with Plazas. "Revolción en Brigada XIII," *El Espectador*, July 21, 1999; and "Valgo más muerto que vivo," *Semana*, September 13, 1999.

81. Human Rights Watch interview with Attorney General investigator, October 5, 1999.

82. Human Rights Watch interview, October 5, 1999.

83. Human Rights Watch interviews with Attorney General investigators, October 5 and 9, 1999.

84. Ibid.

85. Ibid.

86. Human Rights Watch interviews with Attorney General investigators, October 5; and "Asegurado presunto asesino de Garzón," *El Tiempo*, January 19, 2000.

87. Human Rights Watch interviews with Attorney General investigators, October 5 and 9, 1999.

88. Human Rights Watch interview with Attorney General prosecutor, October 10, 1999.

89. Human Rights Watch interviews with Attorney General investigators, October 5 and 9, 1999.

90. Human Rights Watch interview with Attorney General investigators, October 5, 1999.

91. The link between the information supplied by the Twentieth Brigade and the use made of it by the Thirteenth Brigade was confirmed in government investigations contained in a subsequent Procuradura investigation completed on December 18, 1998. Public Statement, Justice and Peace, May 19, 1998; and "Ejercito busca al ELN en una casa de Paz," *El Espectador*, May 14, 1998.

92. Public Statement, Justice and Peace, May 19, 1998.

93. "Inteligencia militar nos proporcionó un informe que indicaba que en este lugar se encontraban personas asociadas al ELN, por eso realizamos el allanamiento, pero al darse cuenta los fiscales que adelantaban una operación por error, se detuvo la diligencia." Allanamiento a ONG, fue error de inteligencia, advierte Vicefiscal," *RCN broadcast*, May 14, 1998.

94. "A calificar servicios," *Semana*, May 25, 1998

BACK TO THE TOP

# EXHIBIT 7

**Alvaro Uribe's government criticizes sanction imposed on Chiquita Brands in the United States**

Thursday, September 20, 2007

**Argenpress.** The Colombian government criticized the sanction imposed on a US-based multinational banana company that had hired extremist paramilitary groups to provide security in that South American country. None of the directors of the banana company that had done business with the paramilitaries has been put in jail, according to Colombian vice president Francisco Santos, in declarations distributed by the press.

Santos proposed that the 25 million dollar fine imposed by the US judicial system on Chiquita Brands be channeled into a fund to compensate the thousands of victims of paramilitaries in Colombia.

The directors of Chiquita Brands had paid $1.7 million to the Autodefensas Unidas de Colombia (AUC) paramilitaries, he added. Carlos Holguín, Minister of the Interior, stated that the multinational company contributed to the financing of the AUC, a group that the United States government has labeled a terrorist organization.

Chiquita Brands had facilities in northern Colombia, where thousands of local residents abandoned their lands due to AUC-instigated violence. Holguín said that he was disappointed in the US courts' sanctioning of Chiquita Brands, which —he said — funded terrorists.

Ombudsman Vólmar Pérez proposed that the fine be channeled into a reparations fund for displaced persons. Paramilitary bullets had killed poor farmers and unionists, he emphasized.

Former public prosecutor Alfonso Gómez suggested that the government request the extradition of the Chiquita Brands businessmen implicated in the agreements with the AUC, in compliance with international treaties and the US war on terror.

"What would the United States say if a country that had one of the people responsible for the September 11 attacks let him go with only a fine?" asked the former prosecutor.

The directors of the US multinational company said that they hired the AUC to defend them against the guerrillas, but they stressed that the paramilitaries had also extorted them.

The Autodefensas Unidas de Colombia (AUC), which has 31,000 members, demobilized in 2006 through an agreement with the government.

Several AUC leaders are in prison and under prosecution, facing maximum sentences of 8 years in prison even for crimes against humanity.

The victims of the paramilitaries demand that the murders of their family members be investigated, and that the property seized by the paramilitaries be returned.

The AUC are responsible for murdering thousands of people who they suspected of having links to guerrillas or unions in the country.

# Censura el gobierno de Alvaro Uribe la sanción a Chiquita Brands en Estados Unidos

jueves, 20 de septiembre de 2007

Argenpress. El gobierno de Colombia censuró la sanción impuesta a una multinacional bananera en Estados Unidos que había contratado seguridad con paramilitares de extrema derecha en el país sudamericano. Ninguno de los directivos de la bananera que hizo negocio con los paramilitares está en la cárcel, afirmó el vicepresidente colombiano Francisco Santos, en declaraciones difundidas por la prensa.
Santos propuso que los 25 millones de multa que impuso la justicia de Estados Unidos a Chiquita Brands sean canalizados a un fondo de indemnización para los miles de víctimas de los grupos paramilitares en Colombia.

Los directivos de Chiquita Brands habían pagado 1.700.000 dólares a los paramilitares de las Autodefensas Unidas de Colombia (AUC), agregó. El ministro de Interior Carlos Holguín, recordó que la multinacional contribuyó al financiamiento de las AUC, señaladas como una organización terrorista por el gobierno estadounidense.

Chiquita Brands tenía instalaciones en el norte de Colombia, donde miles de lugareños abandonaron sus tierras a causa de la violencia de las AUC. Holguín afirmó que se sentía decepcionado de la justicia estadounidense por la sanción que impuso a Chiquita Brands, que - dijo - financió a terroristas.

El defensor del Pueblo, Vólmar Pérez, propuso que la multa se canalice al fondo de reparación de los desplazados. Las balas de paramilitares mataron a campesinos y sindicalistas, apuntó.

El ex fiscal Alfonso Gómez sugirió que el gobierno solicite la extradición de los empresarios de Chiquita Brands implicados en tratos con las AUC, conforme a tratados internacionales y la lucha de Estados Unidos contra el terrorismo.

'¿Qué diría Estados Unidos si un país que tiene a uno de los responsables de los atentados del 11 de septiembre lo dejara libre con el pago de una multa?', se preguntó el ex fiscal.

Los directivos de la multinacional estadounidense dijeron que contrataron a las AUC para que los defendieran de la guerrilla pero aseguraron que los paramilitares también los extorsionaban.

Tras un acuerdo con el gobierno, las Autodefensas Unidas de Colombia (AUC), de 31.000 integrantes, se desmovilizaron en 2006.

Varios de los jefes de las AUC están en prisión y sometidos a proceso en los que afrontan condenas máximas de ocho años de cárcel aun por crímenes de lesa humanidad.

Las víctimas de los paramilitares demandan el esclarecimiento de los asesinatos de varios de sus familiares así como la devolución de tierras y bienes que les arrebataron los paramilitares.

Las AUC son responsabilizadas de miles de asesinatos de personas con la sola sospecha de que tuvieran nexos con la guerrilla o sindicatos en el país sudamericano.

I, Nora Ferm, swear under penalty of perjury that I am fluent in both English and Spanish and that the translation of the attached document is true and correct.

*Nora Ferm*

Nora Ferm

December 17, 2007

# EXHIBIT 8

# washingtonpost.com

# Colombian Unravels Government-Paramilitary Ties

Imprisoned Ex-Official Is Central Witness in Scandal Shaking U.S. Ally

By Juan Forero
Washington Post Foreign Service
Tuesday, March 20, 2007; A16

BOGOTA, Colombia, March 19 -- Sitting in a dreary 7-by-5-foot cell, Rafael Garc?a predicts that he'll soon be murdered. It's a common threat in one of Colombia's toughest prisons, but it's made all the more real for the uncommon prisoner.

Garc?a is a star witness for prosecutors, revealing secret links between Colombian officials and right-wing paramilitary groups. His testimony has helped trigger the biggest political scandal faced yet by the government of President ?lvaro Uribe, the Bush administration's closest ally in Latin America and recipient of more than $4 billion in American aid.

Once a high-level official in the government's intelligence agency, Garc?a has outlined for investigators how the intelligence chief, Jorge Noguera, funneled classified documents to paramilitary commanders, and how those commanders rigged elections to place their allies in Congress, giving an organization designated a terrorist group by the State Department unprecedented influence in government.

Along with secret paramilitary documents and other witness testimony, the information provided by Garc?a has led to the arrests of Noguera, eight congressmen and the governor of Magdalena state, Trino Luna. Another 15 current and former congressmen, as well as other local officials and military officers, are under investigation.

Garc?a is serving an 11-year prison sentence for money-laundering, conspiracy, and falsifying and destroying documents.

Despite the information he has furnished investigators, Garc?a said in an interview Saturday that authorities have denied his frequent petitions to be placed in a witness protection program. Already, a handful of mid-level paramilitary commanders with deep knowledge about the paramilitary structure have been murdered.

"As long as I'm in a Colombian jail, my death is only a matter of time," Garc?a, 43, said as he sat on the narrow bed in his cell at La Picota prison in Bogota, a bare light bulb hanging over his head.

Garc?a recently wrote Attorney General Mario Iguaran, saying that he would withhold further testimony unless the state offers him, his wife and their son more protection. He said he is not trying to blackmail the government. "This is to preserve my life and the integrity of my 11-year-old son, who is the most important thing I have in this life," he wrote in the letter.

Advertisement
Open Now     Member FDIC
ING DIRECT
Save Your Money
The Orange Savings Account
4.10%
APY
No Fees.
No Minimums.

Officials at the attorney general's office and the Interior Ministry did not return several phone calls on Monday.

U.S. authorities are also interested in hearing from Garc?a; his cooperation is considered important to understanding drug trafficking through Venezuela and alleged support from U.S. corporations for paramilitary groups.

Garc?a has information, for instance, about ties between paramilitary groups and Chiquita Brands International. Last week, the Cincinnati-based banana company agreed to pay $25 million to the Justice Department after admitting to having paid paramilitary groups $1.7 million for protection in the northern Uraba region.

In Alabama, a court is expected to rule soon on whether Garc?a's testimony can be admitted in a lawsuit that accuses Drummond Coal Co. of having paid paramilitary members to kill three union leaders. The company denies the accusations.

"This guy is probably the most endangered guy in all of Colombia, so we're worried about it," said Terry Collingsworth, an attorney representing Drummond workers.

Garc?a was head of information services at the Administrative Security Department, or DAS, as the intelligence agency is known by its Spanish initials. He had access to files on drug traffickers, information about investigations of paramilitary groups and other important documents. In 2005, investigators discovered that Noguera and other DAS officials were providing the United Self-Defense Forces of Colombia, the loose coalition of paramilitary groups known as the AUC, with secret information while illegally destroying case files on the organization's drug trafficking and other crimes.

The AUC, declared a terrorist organization by the United States, had for years massacred peasants and leftist activists while funding its war against Marxist rebels with cocaine trafficking. Garc?a, a university-educated carpenter's son, became a member of the Northern Bloc of the AUC, a powerful militia run by Rodrigo Tovar.

In 2002, Garc?a was among those who helped orchestrate what he calls a "massive electoral fraud" that enabled paramilitary groups to put handpicked candidates into Congress. Those congressmen, close allies of the Uribe administration, helped approve a law that the United Nations criticized as overly generous to paramilitary commanders who took part in a three-year disarmament of the group. Last May, the country's Constitutional Court struck down several articles of the law, ending some concessions shielding the warlords.

Uribe has steadfastly defended his administration, saying he has moved aggressively to dismantle the paramilitary groups. He has also vigorously attacked opposition politicians who have raised questions about his government's ties to paramilitary groups, calling some of them "terrorists in business suits" who ignored the inroads Marxist guerrillas made into Colombian society.

Garc?a's credibility has remained largely unscathed. He believes it is because of his privileged position in the DAS and his AUC membership. "I was part of his government," he said, referring to the Uribe administration. "I was, am and will always be of the right. They can't discredit me like they do all the others."

Garc?a said he still believes in the paramilitary groups' professed mission: to wipe Colombia free of Marxist guerrillas. But he also now believes that the paramilitary groups, by sacking public hospitals,

extorting money and assassinating opponents, have done the country harm.

"I could have said just one thing and gotten benefits," Garc?a said, referring to his cooperation with authorities. "Why did I say so much? Because the region we hurt so much needs another chance."

He said he also wants to leave a different legacy. He recalls that his father, Adaulfo Garc?a, who died of a heart attack last year, had been a humble, honest man.

"My father worked hard to instill working-class values and for some reason, I didn't carry those same values," he said. "So I do this in honor of his memory and to give my son another legacy."

© 2007 The Washington Post Company

**Ads by Google**

**ACSI**
Restroom and shower trailers, skids, combos, rentals.
www.acsi-us.com

**Rice Bowls**
Collect Change. Fill Bowl. Fight Hunger.
www.RiceBowls.org

**Disaster Relief**
Taye Diggs and Brad Pitt Support Tide® Loads of Hope. Learn More!
www.TideLoadsofHope.com

# EXHIBIT 9

# 05-2141

## and

# 05-2326

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

Sakwe Balintulo Khulumani, as personal representative of Saba Balintulo,
Fanekaya Dabula, as personal representative of Lungile Dabula, Nokitsikaye
Violet Dakuse, as personal representative of Tozi Skweyiya, Berlina Duda, as
personal representative of Donald Duda,

**(See inside cover for continued list of parties)**

---

## BRIEF <u>AMICI CURIAE</u> OF INTERNATIONAL LAW SCHOLARS PHILIP ALSTON, WILLIAM S. DODGE, THOMAS FRANCK, HAROLD HONG-JU KOH, ANNE-MARIE SLAUGHTER, AND DAVID WEISSBRODT IN SUPPORT OF APPELLANTS

---

**Ralph G. Steinhardt**
**The George Washington University Law School**
**Burns 421**
**2000 H Street, N.W.**
**Washington, D.C. 20057**
**202.994.5739**

*Counsel to Amici*

Mark Fransch, as personal representative of Anton Fransch, Sherif Mzwandile Gekiso, as personal representative of Ntombizodwa Annestina Nyongwana, Elsi Guga, as personal representative of James Guga, Joyce Hlophe, as personal representative of Jeffrey Hlophe, Nomvula Eunice Kama, as personal representative of Mncedisi Dlokova, Joyce Ledwaba, as personal representative of Samuel Ledwaba, Johana Lerutla, as personal representative of Matthews Lerutla, Frieda Z. Lukhulei, as personal representative of Tokkie Lukhulei, Elizabeth Maake, as personal representative of Jackson Maake, Archinton Madondo, as personal representative of Mandla Madondo, Benjamin Maifadi, Tshemi Makedama, as personal representative of Lugile Makedama, Mabel Makupe, as personal representative of Andrew Makupe, Mabel Malobola, as personal representative of Malobola Mbuso, Evelyn Matiso, as personal representative of Pitsi Matiso, Betty Mgidi, as personal representative of Jeffrey Mgidi, Elizabeth Mkhonwana, as personal representative of Obed Mkhonwana, Catherine Mlangeni, as personal representative of Bheki Mlangeni, Cecil Mlanjeni, as personal representative of Kele Mlanjeni, Samuel Morudu, as personal representative of Sannah P. Leslie, Tshidiso Motasi, as personal representative of John and Penelope Moloke, Willie Nelani, as personal representative of Mongezi Nelani, Catherine Ngqulunga, as personal representative of Brian Ngqulunga, Catherine Phiri, as personal representative Thomas Phiri, Elizabeth Sefolo, as personal representative of Harold Sefolo, Maria Sibaya, as personal representative of Jeffrey Sibaya, Patricial M. Songo, as personal representative of Dipulo Songo, Mpolontsi Tyote, as personal representative of Boyboy Tyote, Nomkhango Skolweni Dyantyi, Clifford Zixelile Fudukile, Windovoel Gaaje, Charles Hlatshwayo, Moses Hlongwane, Lesiba Kekana, Sanaki Mahlatshi, Robert Makana, Zakharia Fikile Mamba, Elliot Sithembiso Marenene, Alfred Masemola, Maureen Thandi Mazibuko, Michael Mbele, Laetitia Nombambo Mfecane, as personal representative of Rubin Mfecane, Dennis Mlandeli, Tefo Mofokeng, Motlaletsatsi Molatedi, Azariel Molebeleli, Simon Molotsi, Lina Moreane, as personal representative of Albert Xaba, Thabiso Samuel Motsie, Sonto Ndlovu, Mangindiva Robert Rhenene, Thobile Sikani, Bubele Stefane, Noluthando Biletile, Leslie Mncedisi Botya, Leon Dukasche, Elsie Gishi, Dorthia Gomo-Pefile, Zamikhaya Bishop Khali, James Magabana, Nosipho Manquba, Notathu Eugenia Matomela, Nomisa Thersia May, Mbongeni Nelson Mbeshu, Mzuhlangena Nama, Elias Ngamani, as personal representative of Elizabeth Nagamani, Geshia Ngoxza, Lucas Ndukwayibuzwa Ngwenyana, Wellinton Mtyukato Nkosiphendule, Vuyani Nongcama, Sindiswa Mirriam Nunu, Thulani Nunu, Boniwe Phalaza, Pathiswa Pringane, as personal representative of Mthozama Theophilus Pringane,

Mthutuzeli Sikani, Noluthando Siletile, Thembeka Victoria Siphaho, Johannes Titus, Mpolontsi Tyotes, Mthuzimele Melford Yamile, Ntunani William Zenani, Thandiwe Shezi, Elias B. Boneng, Dennis Vincent Frederick Brutus, Moraloki A. Kgobe, Reuben Mphela, Lulamile Ralrala,

**Plaintiff-Appellant,**

**v.**

Barclay National Bank Ltd., British Petroleum, PLC., Chevrontexaco Corporation, Chevrontexaco Global Energy, Inc., Citigroup, Inc., Commerzbank, Credit Suisse Group, DaimlerChrysler AG, Deutsche Bank AG, Dresdner Bank AG, ExxonMobil Corporation, Ford Motor Company, Fujitsu, Ltd., General Motors Corporations, International Business Machines Corp., J.P. Morgan Chase, Shell Oil Company and UBS AG,

**Defendants-Appellees,**

AEG Daimler-Benz Industrie, Fluor Corporation, Rheinmetall Group AG, Rio Tinto Group, Total-Fina-Elf and Doe Corporations,

**Defendants.**

---

Lungisile Ntzebesa, Hermina Digwamaje, Andile Mfingwana, F.J. Dlevu, Lwazi Pumelela Kubukeli, Frank Brown, Sylvia Brown, Nyameka Goniwe, Sigqibo Mpendulo, Doroty Molefi, Themba Mequbela, Lobisa Irene Digwamaje, Kaelo Digwamaje, Lindiwe Petunia Leinana, Matshidiso Sylvia Leinana, Kelebogile Prudence Leinana, David Motsumi, Sarah Nkadimeng, Moeketsi Thejane, Moshoeshoe Thejane, Pascalinah Bookie Phoofolo, Khobotle Phoofolo, Gladys Mokgoro, Jongani Hutchingson, Sefuba Sidzumo, Gobusamang Laurence Lebotso, Edward Thapelo Tshimako, Rahaba Mokgothu, Jonathan Makhudu Lediga, Anna Lebese, Sipho Stanley Lebese, William Nbobeni, John Lucas Ngobeni, Clement Hlongwane and Masegale Monnapula,

**Plaintiffs-Appellants,**

Sakwe Balintulo Khulumani, P.J. Olayi, Wellington Baninzi Gamagu, Violations of Pass Laws, unlawful detention 1981-1983, torture subjected to discriminatory labor practices 1981 and William H. Durham,

**Plaintiffs,**

**v.**

Daimler Chrysler Corporation, National Westminster Bank PLC, Colgate Palmolive, Barclays Bank PLC, UBS AG, Citigroup Inc., Deutsche Bank AG, Dresdner Bank AG, Commerzbank AG, Ford Motor Company, Holcim, Inc., Exxon Mobil Corporation, Shell Oil Company, J.P. Morgan, Mennesota Mining and Manufacturing Co. (3M Co.), General Electric Company, Bristol-Meyers Squibb Co., E.I.Dupont de Nemours, Xerox Corporation, IBM, General Motors, Honeywell International, Inc., Bank of America, N.A., The Dow Chemical Company, Coca-Cola Co., Credit Agricole S.A., Hewlett-Packard Company, EMS-Chemie (North America) Inc., Chevron Texaco Corporation, American Isuzu Motors, Inc. and Nestle USA, Inc.,

**Defendants-Appellees,**

Sulzer AG, Schindler Holding AG, Anglo-American Corporation, Debeers Corporation, Novartis AG, Banque Indo Suez, Credit Lyonnais, and Unknown officers and directors of Danu International, Standard Chartered, P.L.C., Corporate Does, Credit Suisse Group, Citigroup AG, Securities Inc., as successor to Morgan Guaranty, Manufacturers Hannover, Chemical Bank & Chase Manhattan Bank, Unisys Corporation, Sperry Corporation, Burroughs Corporation, ICL, Ltd., Amdahl Corp., Computer Companies, John Doe Corporation, Holcin, Ltd., Henry Blodget, Justin Baldauf, Kristen Campbell, Virginia Syer Genereux, Sofia Ghachem, Thomas Mazzucco, Edward McCabe, Deepak Raj, John 1-10 Doe, Oerlikon Contraves AG, Oerlikon Buhrle AG, Corporate Does 1-100,Royal Dutch Petroleum Co., Shell Transport &Trading Company PLC and Shell Petroleum, Inc., Merrill Lynch & Co. Inc., Kenneth Seymour

**Defendants.**

# DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER ENTITIES

## WITH A DIRECT FINANCIAL INTEREST IN LITIGATION

Pursuant to FRAP 26.1, *Amici* make the following disclosure:

1. Is the party a publicly held corporation or other publicly held entity?

    NO.

2. Is the party a parent, subsidiary, or affiliate of, or a trade association representing, a publicly held corporation or other publicly held entity?

    NO.

3. Is there any other publicly held corporation, or other publicly held entity, that has a direct financial interest in the outcome of this litigation?

    NO.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. i

INTEREST OF *AMICI* ..................................................................... 1

SUMMARY OF ARGUMENT .......................................................... 1

ARGUMENT ..................................................................................... 5

I.      THE DISTRICT COURT ERRONEOUSLY ASSUMED THAT
        INTERNATION-AL LAW MUST PROVIDE A CIVIL CAUSE OF
        ACTION FOR AIDING AND ABETTING VIOLATIONS OF HUMAN
        RIGHTS NORMS .................................................................... 5

        A. *Sosa* Establishes that the Common Law, Not the Law of Nations *Per
        Se*, Defines the Cause of Action under the Alien Tort Statute ................ 5

        B. Aiding-and-Abetting Liability is Established under the ATS
        Specifically and at the Common Law Generally ...................................... 9

        C. Aiding-and–Abetting Liability is Generally Recognized at
        International Law for Knowingly Providing Substantial Assistance to
        the Tortfeasor ............................................................................. 14


II.     THE DISTRICT COURT ERRONEOUSLY INTERPRETED AND
        APPLIED THE INTERNATIONAL LAW AUTHORITIES BEFORE
        IT ......................................................................................... 24

        A. The District Court Failed to Distinguish Between Those Wrongs that
        Require State Action and Those that Do Not, as Required by Treaties of
        the United States and Second Circuit Precedent ...................................... 24

**B. The District Court Summarily and Erroneously Disregarded the Evidentiary Value of International Law Authorities as Required in this Circuit** ................................................................................. **28**

**CONCLUSION** ..................................................................................... **32**

**APPENDIX** ......................................................................................... **34**

**CERTIFICATE OF COMPLIANCE** ............................................... **36**

**B. The District Court Summarily and Erroneously Disregarded the Evidentiary Value of International Law Authorities as Required in this Circuit** .......................................................................................... **28**

**CONCLUSION** .................................................................................. **32**

**APPENDIX** ...................................................................................... **34**

**CERTIFICATE OF COMPLIANCE** ............................................... **36**

# TABLE OF AUTHORITIES

## CASES

*Adra v. Clift*, 195 F. Supp. 857 (D. Md. 1961) ........................................................ 25

*In re Agent Orange Product Liability Litigation*, 373 F.Supp.2d 7
   (E.D.N.Y. 2005) ...................................................................................... 12

*Bigio v. Coca-Cola*, 239 F.3d 440 (2d. Cir. 2001) .................................................. 13

*Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 128 (E.D.N.Y. 2000) .............. 12

*Bolchos v. Darrell*, 3 F. Cas. 810 (D.S.C. 1795) .................................................... 25

*Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1247 (N.D. Cal. 2004).. 12

*Burnett v. al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 99-100
   (D.D.C. 2003) ......................................................................................... 12

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) ............................. 11

*Carmichael v. United Tech. Corp.*, 835 F.2d 109 (5th Cir.1988) .......................... 12

*Doe v. Saravia*, 348 F.Supp.2d 1112 (E.D.Cal. 2004) ........................................... 12

*Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1091(S.D. Fla 1997) ............. 12

*Flores v. Southern Peru Copper Corporation*, 343 F.3d 140 (2d Cir. 2003),
    *republished at* 414 F.3d 233, 2003 WL 24122601
    (August 29, 2003) ............................................................................. 2, 8, 31

*In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467 (9th Cir. 1994) ...... 7

*Filártiga v. Peña-Irala*, 630 F.2d 876 (2d. Cir. 1980) ................................... *passim*

*Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir.), *cert. denied*, 513 U.S. 1126
   (1995) ................................................................................................. 12, 27

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), *cert. denied*, 518 U.S. 1005
   (1996) ................................................................................................. *passim*

*Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322 (N.D. Ga 2002) ...................... 12, 19

*Paquete Habana*, 175 U.S. 677 (1900) ............................................... 15, 28, 29, 30

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289
   (S.D.N.Y. 2003) ..................................................................... 8, 12, 19, 23

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ........................................... *passim*

*Talbot v. Jansen*, 3 U.S. (3 Dall.) 133 (1795) ........................................................ 10

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 778 (D.C. Cir. 1984) (*per
    curiam*), *cert. denied*, 470 U.S. 1003 (1985) ............................................ 6

*In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765 (S.D.N.Y.
    2005) .................................................................................... 12
*United States v. Smith*, 5 Wheat. 153 (1820) ................................. 23, 28
*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d. Cir. 2000), *cert. denied*
    532 U.S. 941 (2001) ................................................................ 32

## STATUTES

United States Code, Title 28, Section 1350 .................................... *passim*
United States Code, Title 28, Section 1350 note ................................. 12
United States Code, Title 42, Section 1983 ....................................... 27

## TREATIES AND OTHER INTERNATIONAL DOCUMENTS

Agreement for the Prosecution and Punishment of Major War Criminals of the
    European Axis, and Establishing the Charter of the International Military
    Tribunal, art. 6, 82 U.N.T.S. 279 .............................................. 17
Allied Control Council Law No. 10, Punishment of Persons Guilty of War Crimes,
    Crimes Against Peace and Against Humanity, Dec. 20, 1945, 3 Official
    Gazette of the Control Council For Germany 22, reprinted in 1 Trials of War
    Criminals Before the Nuremberg Military Tribunals Under Control Council
    Law No. 10 xvi (1946-49) ...................................................... 17
Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9,
    1948, 78 U.N.T.S. 277 .......................................................... 32
International Covenant on Civil and Political Rights, Dec. 19, 1996, 999 U.N.T.S.
    171 ............................................................................. 32
Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or
    Punishment, 28 June 1987, 1465 U.N.T.S. 85 ..................................... 32
Statute of the International Court of Justice, art. 38 ........................ 2, 21
Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810
    (1948) ......................................................................... 30

## INTERNATIONAL CASES

*Nottebohm Case (Liech. v. Guat)*, Second Phase, 1955 I.C.J. Rep. 4 ..................... 16

*United States v. Flick*, 6 TRIALS OF WAR CRIMINALS BEFORE THE NUREMBERG
    MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW NO. 10,
    1217 (1952) ........................................................................................ 17

*United States v. Krauch*, 8 TRIALS OF WAR CRIMINALS BEFORE THE NUREMBERG
    MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW NO. 10, 1169
    1948) ................................................................................................... 18

*United States v. Ohlendorf (Einsatzgruppen Case)*, 4 TRIALS OF WAR CRIMINALS
    BEFORE THE NUREMBERG MILITARY TRIBUNALS UNDER CONTROL COUNCIL
    LAW NO. 10, 1, 569 (1949) ............................................................. 17

*In re Tesch*, 13 *Int'l L. Rep.* 250 (1947) ................................................ 18

*Prosecutor v. Delalic* (Case No. IT-96-21-T), Trial Judgment, Nov. 16, 1998 ..... 19

*Prosecutor v. Furundzija* (Case No. IT-95-17/1-T) Judgment,
    June 25, 1999 .......................................................................... 19, 20

*Prosecutor v. Musema* (Case No. ICTR-96-13-T), Judgment, Jan. 27, 2000 ........ 19

*Prosecutor v. Tadic* (Case No. IT-94-1-T) Opinion and Judgment, May 7, 1997 . 18

## EXECUTIVE MATERIALS

1 *Op. Att'y Gen.* 57 (1795) .................................................................. 10

26 *Op. Att'y Gen.* 250 (1907) ............................................................. 26

Military Commission Instruction No.2, Art. 6(A), 6(B), 6(C) (April 30, 2003) ... 21

## MISCELLANEOUS

AMERICAN LAW INSTITUTE, RESTATEMENT (SECOND) OF TORTS §876(b) ...... 12, 13

AMERICAN LAW INSTITUTE, RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS
LAW OF THE UNITED STATES
    § 102 ............................................................................... 15, 22
    § 103 .................................................................................

WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, Book IV,

Chap. 5 (1769) ........................................................................................ 11

H. ODA, JAPANESE LAW 211 (1999) .................................................... 22

W.V.H. ROGERS, ED.,  UNIFICATION OF TORT LAW: MULTIPLE TORTFEASORS
(2004) ..................................................................................................... 22

R. YOUNGS, ENGLISH, FRENCH, AND GERMAN COMPARATIVE LAW 288-9
(1998) .................................................................................................... 22

## INTEREST OF *AMICI*

*Amici* – listed in the appendix – are six of the leading international law scholars in the United States. Their work has been cited by courts at all levels of the federal judiciary for guidance in determining the content and impact of international law in domestic proceedings, including cases under the Alien Tort Statute. *Amici* respectfully submit that the decision on appeal rested on two errors of international law as law of the United States, as to which they can offer the Court particular expertise that may not be available from the parties themselves; indeed, counsel for both plaintiffs and defendants have consented to the filing of this brief *amici curiae*.

## SUMMARY OF ARGUMENT

The decision below rests on two fundamental errors of international law as law of the United States. Either error is sufficient to reverse and remand for reconsideration in light of the proper legal standard.

First, the District Court erroneously assumed that international law must provide a civil cause of action for aiding and abetting violations of human rights norms. International legal norms do not specify the means of their domestic

1

enforcement; therefore, requiring international law to specify the scope of civil accomplice liability for admittedly wrongful acts is to erect a test that the law of nations cannot survive – a clear violation of this Circuit's long-established analysis of alien tort cases, which the Supreme Court endorsed in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). Indeed, the District Court's requirement that international law provide for a civil aiding-and-abetting cause of action is flatly inconsistent with *Sosa*'s holding that the cause of action under the Alien Tort Statute is a creature of the common law, not the law of nations *per se.*

Of course, international law must offer a "specific, universal, and obligatory" norm that the underlying conduct is wrongful, as with torture and crimes against humanity *inter alia.* In consequence, it would be *sufficient* if international treaties, customary international law, or "general principles of law recognized by civilized nations" imposed aiding-and-abetting liability, enforceable in domestic courts.[1] As shown below, international law in these forms does in fact recognize liability for aiding and abetting fundamental violations of international law. It would also be *sufficient* if the common law defined an aiding-and-abetting

---

[1] *See* Statute of the International Court of Justice, art. 38, which defines the authoritative sources of international law. *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 250-51 (2d. Cir. 2003).

2

cause of action in the circumstances of this case. After all, the ATS itself refers not

to "violations of" international law generally but to a "tort only, committed in

violation of" international law, establishing that common law tort doctrine

determines what conduct amounts to an actionable violation of international law

and what conduct does not. As shown below, the common law of torts as

understood in 1789 and today recognizes the existence and determines the scope of

aiding-and-abetting liability. But nothing in the Supreme Court's decision in *Sosa*

or other authorities supports the District Court's more sweeping assumption that it

is *necessary* under the ATS for international law to provide a "specific, universal,

and obligatory" civil cause of action for aiding-and-abetting liability.

Second and equally dispositive, the District Court mishandled the

international law authorities before it. Specifically, although the Court purported to

distinguish between international wrongs that require state action and those that do

not, it failed to apply the distinction in conformity with international treaty

standards as required by *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), *cert.

denied*, 518 U.S. 1005 (1996). In addition, the District Court erroneously

disregarded various international authorities, finding them irrelevant because they

were not by themselves directly binding on the United States, instead of carefully

3

assessing their cumulative value as evidence of customary international law, which has been the proper approach to ATS cases for a quarter-century. *Filártiga v. Peña-Irala*, 630 F.2d 876 (2d. Cir. 1980). In addition, the District Court erroneously applied the self-executing treaty doctrine by ignoring the textual distinction within the ATS between a claim based on the "law of nations" and a claim based on a "treaty of the United States."

The court below stressed the cautionary rhetoric of *Sosa*, but it ignored the careful balance the Supreme Court actually struck between assuring a forum for the advancement of claims like those in *Filártiga* and *Karadzic* and closing the door to overly creative applications of the ATS. The proper understanding of *Sosa* is that excessively restrictive interpretations of the statute and excessively expansive ones are equally disapproved. This case offers this Circuit an opportunity to reaffirm its principled and moderate approach to alien tort cases by articulating the proper standard for the District Court to apply to appellants' claims on remand. *Amici* offer no opinion on how these complaints will fare under that standard.

4

# ARGUMENT

## I. THE DISTRICT COURT ERRONEOUSLY ASSUMED THAT INTERNATIONAL LAW MUST PROVIDE A CIVIL CAUSE OF ACTION FOR AIDING AND ABETTING VIOLATIONS OF HUMAN RIGHTS NORMS.

### A. *Sosa* Establishes that the Common Law, Not the Law of Nations *Per Se*, Defines the Cause of Action under the Alien Tort Statute.

In its modern form, the Alien Tort Statute provides that "the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350 ("ATS" or "Section 1350"). In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court established that the statute does not itself create a cause of action but that it does recognize a cause of action, derived from the common law, for certain violations of international law:

> The jurisdictional grant is best read as having been enacted on the understanding that *the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.*

124 S.Ct. at 2761 (emphasis supplied).

That the cause of action would be defined by the common law and not by the

5

law of nations *per se* is consistent with the hornbook principle that international law does not specify the means of its domestic enforcement. It can define the underlying conduct as wrongful and establish the obligation to assure conformity, without specifying a statute of limitations, or the requirements of standing, or – as in this case – the precise contours of direct and secondary liability. International law "never has been perceived to create or define the civil actions to be made available; by consensus, the states leave that determination to their municipal laws." *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 778 (D.C. Cir. 1984) (*per curiam*), *cert. denied,* 470 U.S. 1003 (1985) (Edwards, J. concurring).[2] Given this, "to require international accord on a right to sue, when in fact the law of nations relegates decisions on such questions to the states themselves, would be to effectively nullify the 'law of nations' portion of section 1350." *Id.*

As of 1789, according to the Supreme Court, three torts were recognized under the common law as being violations of the law of nations with a potential for personal liability: violation of safe conducts, infringement of the rights of ambassadors, and piracy. *Sosa,* 124 S.Ct. at 2761. The Court also found however that the international law violations recognized at federal common law were not

---

[2] The *Sosa* Court cited Judge Edwards' opinion in *Tel-Oren* with approval. 124 S.Ct. at 2766.

6

frozen as of 1789. *Id.* at 2761. The recognition of a claim under the "present-day law of nations" as an element of common law is limited to "norm[s] of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." *Id.* at 2761-62.

What the actionable norms across the centuries have in common is a "specific, universal, and obligatory" character, combined with the "potential for personal liability;" indeed, the essence of the *Sosa* decision is that the ATS authorizes federal courts to develop common law rules of liability where the underlying abuse violates such a norm. This is precisely what the lower courts had done – *Sosa* noted with approval, *id.* at 2766 – in *Filártiga, supra; Karadzic,* 70 F.3d 232, 236 (2d Cir.1995), *cert. denied,* 518 U.S. 1005 (1996); and *In re Estate of Marcos Human Rights Litigation,* 25 F.3d 1467, 1475 (9th Cir. 1994). The *Sosa* Court did not question a single case in which this demanding standard had been satisfied, other than the arbitrary arrest claim advanced by Alvarez-Machain himself. That is because the lower courts have consistently sustained jurisdiction under the ATS only for certain egregious violations of international human rights law in addition to torture, including disappearances, genocide, war crimes, and

7

crimes against humanity *inter* alia. Equally significant, the federal courts have routinely dismissed claims that did not clear this high hurdle. In *Flores v. Southern Peru Copper Corporation*, 343 F.3d 140 (2d Cir. 2003), *republished at* 414 F.3d 233, 2003 WL 24122601 (August 29, 2003), for example, this Court affirmed that ATS claimants were required to allege a violation of "specific, universal, and obligatory" norms. Without calling into question its analysis in *Filartiga* or *Karadzic*, the *Flores* court concluded that environmental torts were not currently in violation of international law.

As a consequence, the rhetoric of caution in *Sosa* – referring for example to the enforceability of "only a very limited set of claims"[3] or "the modest number of international law violations with a potential for personal liability"[4] – is a dramatic

---

[3] 124 S.Ct. at 2759.

[4] 124 S.Ct. at 2761. It can no longer be argued that juridical and natural persons are in principle immune from international law obligations. *Karadzic, supra.* Although the bulk of international law obligations run state-to-state, the "potential for personal liability" is well-established (i) for a narrow class of wrongs that do not require state action (*e.g.* genocide, piracy, certain war crimes, certain acts of terrorism) and (ii) a category of contextual wrongs, in which the person's conduct is sufficiently infused with state action as to engage international standards. *Id. See also*, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289 (S.D.N.Y. 2003), and authorities cited therein. Nothing in *Sosa* alters this analysis. To the contrary, rejecting the aggressive corporate immunity positions advanced by the government and business groups appearing *amicus curiae*, the *Sosa* Court reasoned only that "the determination whether a norm is sufficiently definite to support a cause of action" is "related [to] whether international law extends the

new restriction on ATS litigation only according to those litigants and scholars who systematically exaggerate the reach of the ATS in the first place.

In summary, the ATS requires that the tort be "committed" in violation of international law, not that international law itself recognize a right to sue or define the scope of accomplice liability. The proper question before the District Court was therefore whether the underlying wrongs alleged in the complaints violated "specific, universal, and obligatory" norms of international law with "the potential for personal liability," not whether international law provides a specific, universal, and obligatory civil cause of action for aiding-and-abetting liability in domestic courts. The case must be reversed and remanded for consideration of that question.

### B. Aiding-and-Abetting Liability is Established under the ATS Specifically and at the Common Law Generally.

To require international consensus on aiding-and-abetting liability, as the District Court did, is inconsistent with the use of the word "tort" in the statute , which indicates that principles of tort law would be used to effectuate the jurisdiction granted in the ATS. Had the District Court looked to the correct source

---

scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." 124 S.Ct. at 2766 n.20. This Circuit had undertaken precisely that analysis in *Karadzic*, which the Supreme Court cited with approval. *Id.* See II(A), *infra*.

9

of the rule of decision, it would have considered aiding-and-abetting liability

through the lens of the federal common law of torts, as the Supreme Court directed

in *Sosa*.

The founding generation understood that aiding-and-abetting liability for

violations of international law was accepted under contemporary legal principles.

In an opinion interpreting the ATS, Attorney General Bradford concluded in 1795

that the Act covered liability for "committing, *aiding, or abetting*" violations of the

laws of war arising extraterritorially. *Breach of Neutrality*, 1 Op. Att'y Gen. 57, 59

(1795) (emphasis supplied). There were no law-of-war treaties or customary norms

that defined the "aiding or abetting" standard for these purposes, but the Attorney

General could draw on the common law of tort and the understanding that a rigid

distinction between committing the act and aiding or abetting it was unjustified

given the enormity of the international wrongs at issue. Similarly, the Supreme

Court held in 1795 that a French citizen who had aided a U.S. citizen in unlawfully

capturing a Dutch ship acted in contravention of the law of nations and was civilly

liable for the value of the captured assets, despite the absence of an internationally-

defined standard of secondary liability. *Talbot v. Jansen*, 3 U.S. (3 Dall.) 133

(1795). Blackstone himself recognized that those who aided or abetted piracy, the

paradigmatic ATS norm, were liable as pirates. WILLIAM BLACKSTONE,

COMMENTARIES ON THE LAWS OF ENGLAND, Book IV, Chap. 5 (1769). Here too

there was no treaty or law of nations norm that defined "aiding and abetting"

piracy for these purposes, but there was an understanding that piracy and violations

of the laws of war were wrongs committed in many forms and with varying

degrees of complicity.[5]

By holding that aiding-and-abetting principles are unknown for purposes of

the ATS, the District Court's analysis in this case would mean that the ATS would

cover the pirate who plundered a ship on the high seas, but not the helmsman who

conned the ship. Neither the statute nor *Sosa* can be parsed in this way. To the

contrary, with the single exception of the District Court in this case, every court

post-*Sosa* to address the issue has found that aiding-and-abetting liability is

available under the ATS for tortious violations of international law.[6] That was

---

[5] Nothing in the *Sosa* court's analysis of Blackstone turns on the distinction between civil and criminal law. It was well-understood in 1789 that civil and criminal liability could arise out of a single act. 2 William Blackstone COMMENTARIES, at *123. The *Sosa* Court noted that, although Blackstone's three paradigmatic international law violations were considered criminal, the Framers also understood that "the common law would provide a cause of action" because international law recognized a potential for individual liability. 124 S.Ct. at 2764-65.

[6] *See, e.g., Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005) (the ATS "permit[s] parties injured by acts of torture, crimes against humanity and the

11

certainly the rule prior to *Sosa*,[7] as this Court recognized when it declared that the ATS includes liability for private defendants who have "acted in concert" with a state to commit torture and other egregious human rights violations. *Karadzic*, 70 F.3d at 244-45.[8] Nothing in *Sosa* called that conclusion into question.

Outside the ATS context, the District Court's approach creates an unprincipled exception to American tort law generally. The RESTATEMENT (SECOND) OF TORTS §876(b) explicitly recognizes an aiding-and-abetting standard for civil liability:

---

like to pursue recovery, not only against those who are directly liable, but against those that conspired with or assisted those directly liable on conspiracy or accomplice liability theory.") *Accord, Presbyterian Church of Sudan, supra; Doe v. Saravia*, 348 F.Supp. 2d 1112 (E.D.Cal. 2004); *In re Agent Orange Product Liability Litigation*, 373 F.Supp.2d 7, 2005 WL 729177 (E.D.N.Y. 2005); *In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765, 826 (S.D.N.Y. 2005).

[7] *See e.g., Hilao v. Estate of Marcos,* 103 F.3d 767, 776-77 (9th Cir.1996), *cert. denied*, 513 U.S. 1126 (1995); *Carmichael v. United Tech. Corp.,* 835 F.2d 109, 113-14 (5th Cir.1988); *Bowoto v. Chevron Texaco Corp.,* 312 F. Supp. 2d 1229, 1247 (N.D. Cal. 2004); *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 128 (E.D.N.Y. 2000); *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1091(S.D. Fla. 1997). *Accord, Burnett v. al Baraka Inv. & Dev. Corp.,* 274 F. Supp. 2d 86, 99-100 (D.D.C. 2003); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1355-56 (N.D. Ga. 2002).

[8] In part, the conclusion that federal common law authorizes aiding-and-abetting liability under the ATS for human rights violations is driven by the legislative history of the Torture Victim Protection Act ("TVPA"), 28 U.S.C. §1350 note. *Karadzic, supra*, at 241. *Mehinovich, supra; Doe v. Saravia, supra*.

12

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

This standard does not impose liability by association, nor does it erect a vicarious or strict liability. Certainly nothing in the ATS or its interpretation revokes the law of proximate cause. Mere indirect economic benefit from wrongful conduct does not by itself constitute a tort for these purposes. *Bigio v. Coca-Cola*, 239 F.3d 440, 449 (2d. Cir. 2001). Nor would mere knowledge of the tort combined with some benefit from the tort satisfy the secondary liability standards of the common law. But imposing liability for knowingly providing substantial assistance in the commission of wrongful conduct requires no revolutionary insight. It only requires faithful adherence to the understanding of the ATS at its inception and the application of modern common law principles.

### C. Aiding-and–Abetting Liability is Generally Recognized at International Law for Knowingly Providing Substantial Assistance to the Tortfeasor.

Even on its own terms, the District Court's analysis is erroneous: international law does recognize aiding-and-abetting liability. Indeed, the court below conceded that there is substantial international consensus supporting criminal aiding-and-abetting liability but required plaintiffs also to demonstrate an international consensus that they have a right to sue the aider/abettor for money damages. As shown above, that approach is inconsistent with the Supreme Court's disposition of *Sosa* and federal common law. But even if plaintiffs were required to show that aiding-and-abetting liability is "specific, universal and obligatory" under international law, it is far too late in the development of international human rights standards to contend that individual aiders and abettors of egregious human rights violations escape personal liability.

1. *Custom.* Customary international law provides a "specific, universal, and obligatory" norm against aiding-and-abetting; indeed, the United States government recently instructed U.S. military commissions to apply this standard as pre-existing international law. The fact that these cases arise in a criminal setting cannot be dispositive under *Sosa*: Blackstone's three paradigmatic international

14

law violations were also considered criminal, but the Framers understood that "*the common law would provide a cause of action*" because international law recognized a potential for individual liability. 124 S.Ct. at 2764-65 (emphasis supplied).

In identifying the three offenses that gave rise to liability under the traditional law of nations when the ATS was enacted, the Supreme Court relied on the traditional evidence used to establish the content of international law in U.S. courts:

> where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators.

*The Paquete Habana*, 175 U.S. 677, 700 (1900). In practice, the courts have turned to "diplomatic acts and instructions as well as public measures and other governmental acts and official statements of policy, whether they are unilateral or undertaken in cooperation with other states...." AMERICAN LAW INSTITUTE, RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES ("RESTATEMENT (THIRD)"), § 102(2), comment b at 25. Widely ratified treaties, or a series of treaties in consistent form, may also constitute evidence of customary

15

law in both domestic courts, *Filártiga*, *supra*, and in the International Court of

Justice, *Nottebohm Case (Liech. v. Guat)*, Second Phase, 1955 I.C.J. Rep. 4, 21-23.

Evidentiary weight may be given to resolutions of international organizations, such

as the United Nations or the Organization of American States, the decisions of

international and national courts and arbitral tribunals, as well as the opinions of

prominent scholars, not because they are binding in themselves but because they

can qualify as evidence of customary international law, *i.e.*, uniform state practice

combined with *opinio juris*. In short, courts with ATS cases are obliged to be

"vigilant doorkeep[ers]" according to Justice Souter in *Sosa*, but the standards for

vigilance have been the law of the United States for decades, if not centuries.

These sources establish a standard for aiding-and abetting international

wrongs that is sufficiently "specific, universal, and obligatory" to satisfy the *Sosa*

standard. The concept of secondary or indirect liability is especially well-

developed with respect to genocide, war crimes, and similar wrongs. The Statute of

the International Military Tribunal, established to try Nazi war criminals and

following principles accepted as customary international law, provided that

> [l]eaders, organizers, instigators and accomplices participating in the
>
> formulation or execution of a common plan or conspiracy to commit any of

16

> the foregoing crimes are responsible for all acts performed by any persons in execution of such a plan

Agreement for the Prosecution and Punishment of Major War Criminals of the European Axis, and Establishing the Charter of the International Military Tribunal, art. 6, 82 U.N.T.S. 279.  Allied Control Council Law No. 10, which framed domestic prosecutions of German war criminals, similarly recognized criminal liability for principals who committed war crimes and acts of genocide and for those who were connected with plans or enterprises involving the commission of such crimes. The standard was sufficiently definite to allow both convictions and acquittals, and the cases in aggregate establish that *knowingly providing substantial assistance* in the commission of these crimes – the international version of the Restatement standard for torts, *supra* – has long violated international law.

In *United States v. Ohlendorf*, for example, the United States Military Tribunal concluded that defendant Klingelhoefer could be convicted "as an accessory" because in turning over lists of Communists "he was aware that the people listed would be executed when found." 4 TRIALS OF WAR CRIMINALS BEFORE THE NUREMBERG MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW No. 10 ("TR. WAR CRIM."), 1, 569 (1949).  In *U.S. v. Flick*, Steinbrinck was

17

convicted "under settled legal principles" for "knowingly" contributing money to an organization committing widespread abuses, even though it was "unthinkable" he would "willingly be a party" to atrocities. 6 TR. WAR CRIM., 1217, 1222 (1952). Similarly, in *In re Tesch,* certain industrialists were sentenced to death for selling poison gas to Auschwitz "with knowledge" that the gas would be used to kill prisoners. 13 *Int'l L. Rep.* 250 (1947). By contrast, certain industrialists who ran I.G. Farben were acquitted on the ground that they honestly believed that Zyklon B would be used as a delousing agent. *United States v. Krauch,* 8 TR. WAR CRIM. 1169 (1948).

Drawing in part on the jurisprudence of the Nuremberg Tribunal, the International Criminal Tribunal for the Former Yugoslavia ("ICTY") and the International Criminal Tribunal for Rwanda ("ICTR") have applied the customary international standard for aiding-and-abetting liability in a variety of settings. Because the ICTY is "only empowered to apply" standards that are "beyond any doubt customary law," *Prosecutor v. Tadic* (Case No. IT-94-1-T), Opinion and Judgment, May 7, 1997, at ¶¶ 661-62, its judgements should be accorded "substantial weight" in determining the content of customary international law,

18

RESTATEMENT (THIRD), § 103(2).[9] In *Tadic*, the tribunal conducted "a detailed

investigation" of individual responsibility under international law and articulated

an aiding-and-abetting standard considered customary international law.

*Prosecutor v. Delalic* (Case No. IT-96-21-T), Trial Judgment, Nov. 16, 1998, ¶¶

321, 325-29 (citing *Tadic*, at ¶¶ 669, 674-91).

    The result of this careful review of precedent and other international

authorities is a standard requiring that the assistance be "direct and substantial."

*Tadic*, at ¶¶ 691-2; *Delalic*, at ¶ 326; *Prosecutor v. Furundzija* (Case No. IT-95-

17/1-T) Judgment, June 25, 1999, at ¶ 61. Sspecifically, *Furundzija* defined the

*actus reus* element of aiding-and abetting as "practical assistance, encouragement,

or moral support which has a substantial effect on the perpetration of the crime."

The ICTR's standard similarly finds the *actus reus* in "all acts of assistance in the

form of either physical or moral support" that "substantially contributes to the

commission of the crime." *Prosecutor v. Musema* (Case No. ICTR-96-13-T),

---

[9] Because the United States government "has explicitly endorsed the approach of
the ICTY Statute and the convening of the Tribunal," domestic courts have
routinely found the Tribunals' statutes and jurisprudence to be "particularly
relevant" sources of international law in ATS cases and relied on that jurisprudence
in recognizing aiding-and-abetting liability under the ATS. *Mehinovic*, 198
F.Supp.2d at 1344, and nn. 21, 22, 1355-56; *Presbyterian Church of Sudan, supra.*

Judgment, Jan. 27, 2000, at ¶ 126. Under this standard, "silent approval" or mere presence is not a convictable offence, at least among civilians, though a spectator may aid and abet illegal conduct if he occupies some position of authority. The act in short must have "made some difference to the course of events," *Furundzija*, at ¶ 221, a standard sufficiently definite to support the conviction of a special police force commander for violating the laws of war and the prohibition of torture by substantially contributing to the commission of those wrongs.

*Furundzija* also defines the *mens rea* requirement of aiding-and-abetting liability under international law. The accomplice need not share the *mens rea* of the principal to have a culpable mental state, but he or she must have actual or constructive knowledge that his or her actions would aid in the commission of the offence. Under that standard, defendants who acted as drivers for co-defendants who murdered Allied airmen in World War II were acquitted because they did not know the principals' intentions. By contrast, defendants who are aware of the consequences of their actions may satisfy the *mens rea* requirement.

Without conceding the constitutionality of the military commissions currently in use, *amici* observe only that the United States government itself has recognized that aiding-and-abetting is specifically defined in international law.

20

United States military commissions prosecute aiding-and-abetting a host of crimes,

including war crimes, murder by an unprivileged belligerent, spying, terrorism,

hijacking, and perjury before a military commission. Military Commission

Instruction No.2, Art. 6(A), 6(B), 6(C) (April 30, 2003).  The government defines

aiding-and-abetting *more* broadly than the general international standard in that the

government's definition does not require that assistance have a substantial effect

on the perpetration of the crime. *Id.* at 6(c)(1) (aiding-and-abetting is "in any …

way facilitating the commission" of an offense, with knowledge the act would aid

or abet). The military commission standard "derives from the law of armed

conflict," *i.e.* a branch of international law, and is "declarative of existing law." *Id.*

at art. 3(A). Indeed, the government believes that aiding-and-abetting is so well

established and defined in international law that, although commissions cannot

prosecute offenses that "did not exist prior to the conduct in question,"

commissions may prosecute aiding-and-abetting "crimes that occurred prior to

[the] effective date" of Instruction No. 2. *Id.*

    2. *General principles.* Domestic courts may also consider "general principles

of law recognized by civilized nations" as a source of international law.[10]  Section

---

[10] *See* Statute of the International Court of Justice, art. 38(1)(c).

102(1)(c) of the RESTATEMENT (THIRD) provides that "[a] rule of international law is one that has been accepted as such by the international community of states . . . by derivation from general principles common to the major legal systems of the world." *Amici* have discovered no domestic legal system in the world that fails to recognize civil liability for accomplices and joint-tortfeasors. To the contrary, legal systems in the common law tradition, the civil law tradition, and the Islamic law tradition routinely impose "indirect" liability for contributing to or causing damage to another person. *See generally,* W.V.H. Rogers, ed., UNIFICATION OF TORT LAW: MULTIPLE TORTFEASORS *passim* (2004); H. ODA, JAPANESE LAW 211 (1999); R. YOUNGS, ENGLISH, FRENCH, AND GERMAN COMPARATIVE LAW 288-9 (1998). Although the precise details of secondary liability vary (especially on the vexed question of a joint tortfeasor's responsibility for the entire damage to the victim), at a minimum the common principle – consistent with the international standard and the domestic tort standard *supra* – is that knowingly providing substantial assistance in the commission of wrongful conduct triggers civil sanctions.

The predictable variation at the margins of the international aiding-and-abetting standard – whether within international institutions or among the

22

municipal legal systems around the world – does not undermine its core meaning. In *United States v. Smith*, 5 Wheat. 153 (1820), the Supreme Court had to determine the international definition of piracy. Acknowledging controversy in some particulars, the Court concluded that *"whatever may be the diversity of definitions in other respects*, all writers concur in holding that robbery or forcible depredations upon the sea, *animo furandi* [*i.e.*, with the intention to steal] is piracy."[11] Similarly, the international definition of aiding and abetting for purposes of the ATS includes less settled elements, such as extending "moral support" to the tortfeasor, but addressing the "novel" moral support standard, Judge Cote concluded in *Presbyterian Church, supra*, that:

> The ubiquity of disagreement among courts and commentators regarding the fringes of customary international legal norms is unsurprising. The existence of such peripheral disagreement does not, however, impugn the core principles that form the foundation of customary international legal norms – principles about which there is no disagreement.

374 F. Supp. 2d at 340-1. Judge Cote's approach to the aiding-and-abetting standard is correct and should be the law of this Circuit.

---

[11] 18 U.S. (5 Wheat.) 161 (emphasis supplied).

23

## II. THE DISTRICT COURT ERRONEOUSLY INTERPRETED AND APPLIED THE INTERNATIONAL LAW AUTHORITIES BEFORE IT.

The court below committed reversible error in its consideration of international law in both its treaty and customary form. Each of these errors offers an independent basis for reversing and remanding to the District Court for reconsideration in light of the proper legal standard.

### A. The District Court Failed to Distinguish Between Those Wrongs that Require State Action and Those that Do Not, as Required by Treaties of the United States and Second Circuit Precedent.

In summarizing its holding below, the court below explicitly concluded that the absence of state action in this case required a blanket dismissal of the complaints:

> Because this Court does not find state action, it need not consider whether the actions of the apartheid regime violated the law of nations so as to support jurisdiction under the AT[S].

346 F. Supp. 2d. at 549. Quite apart from the fact that *apartheid* was by definition a state-enforced policy of *de jure* racial discrimination, the Court below erected a barrier in principle to this litigation that contradicts controlling authority in the

24

Circuit: state action is not a prerequisite for ATS jurisdiction, and therefore the absence of state action cannot be grounds for dismissal.

In *Karadzic, supra*, this Court articulated what has become a dominant principle of ATS jurisprudence:

> Certain forms of conduct violate the law of nations whether undertaken by
>
> those acting under the auspices of a state or only as private individuals.

70 F.3d at 239. For centuries, the imposition of individual liability for certain international wrongs has generated little controversy. The framers of the ATS understood that private citizens who infringed the rights of diplomats could be sued under § 1350. *Sosa*, 124 S.Ct., at 2757. Pirates, the exemplar of intended defendants under the ATS, were not necessarily state actors, but their actions clearly violated international law; indeed, one of the earliest exercises of jurisdiction under the ATS involved an unlawful seizure of property by a non-state actor. *Bolchos v. Darrell*, 3 F. Cas. 810 (D.S.C. 1795). The statute subsequently provided jurisdiction over a child custody dispute that involved a breach of the law of nations. *Adra v. Clift*, 195 F. Supp. 857 (D. Md. 1961). Roughly a century ago, the executive branch concluded that corporations are in principle capable of violating the law of nations or a treaty of the United States for purposes of the

25

ATS,[12] and that conclusion is consistent with well-established international norms to which the United States has given its assent in the interim: specific treaties establish the customary norm that private actors may be punished for acts of genocide, slavery, and war crimes, *inter alia. Karadzic*, 70 F.3d at 241-244. These regimes do not distinguish between natural and juridical individuals, and corporations that engage in the slave trade or commit acts of genocide or providecorporate cover for war crimes would not as a matter of law be exempt from liability.

Nothing in *Sosa* undermines this pillar of ATS jurisprudence. To the contrary, the Supreme Court reasoned that "the determination whether a norm is sufficiently definite to support a cause of action" is "related [to] whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." 124 S.Ct. 2739, 2766 n.20 (2004). For these purposes, the Supreme Court contrasted torture – which does require state action to be internationally unlawful – with genocide, which does not. This is precisely the distinction adopted

---

[12] *See* 26 *Op. Att'y Gen.* 250 (1907) (concluding that aliens injured by a private company's diversion of water in violation of a bilateral treaty between Mexico and the United States could sue under the ATS).

26

by this Circuit in *Karadzic* a decade ago, and, since that time, with the striking exception of the District Court in this case, no court has reasoned from the alleged absence of state action *alone* that ATS jurisdiction must be denied. The District Court's failure to consider whether any of the plaintiffs' allegations fall within the category of *per se* wrongs that do not require state action was reversible error.

The District Court also committed reversible error when it short-circuited the determination of whether any of the plaintiffs' allegations fall within a second category of nominally private conduct that is actionable under the ATS: *viz.*, conduct of private actors that is sufficiently infused with or related to state action as to engage international standards. There is certainly no rule that corporations, regardless of their relationship with a government, enjoy immunity for their state-like or state-related activities, as when they interrogate detainees, provide public security, work weapons systems in armed conflict, or run prisons. In defining this second category of cognizable wrongs, courts have consistently turned to the interpretation of Section 1983 of the federal antidiscrimination statutes.[13] Specifically, as this Court noted in *Karadzic*, "[t]he 'color of law' jurisprudence under 42 U.S.C. Sec. 1983 is a relevant guide to whether a defendant has engaged

---

[13] 42 U.S.C. 1983. *See, e.g., Karadzic, supra* at 245; *Hilao, supra.*

27

in official action for purposes of the Alien Tort Act." 70 F. 3d at 245. In this case,

the District Court's conclusory analysis was an unlawful substitute for the requisite

assessment of whether any defendant's conduct fell within this second category of

actionable wrongs.

### B. The District Court Summarily and Erroneously Disregarded the Evidentiary Value of International Law Authorities as Required in this Circuit.

*Sosa* reaffirmed *Paquete Habana*'s methodical approach to customary

international law, and that approach should have governed the lower court's

analysis. On each international law issue presented in *Paquete Habana*, the Court

looked for and found redundancy: state practice, treaties in consistent form,

statements and actions by governments, decisions of domestic courts in various

nations, the work of jurists summarizing the practice of states and attesting to its

legal status.  Similarly, in *United States v. Smith, supra,* cited with approval in

*Sosa*, the Court determined that piracy had been defined by the law of nations

"with reasonable certainty" using similarly redundant authorities:

> What the law of nations on this subject is, may be ascertained by consulting
>
> the works of jurists, writing professedly on public law; or by the general

usage and practice of nations; or by judicial decisions recognizing and enforcing that law.[14]

There followed in *Smith* an encyclopedic analysis of these authorities in various nations and languages. Applying the evidentiary standard later articulated in *Paquete Habana,* the *Smith* court found a consensus that piracy was a "crime of settled and determinate nature."

In determining that international law prohibited a state from torturing its own citizens, this Court in *Filártiga* engaged in a similar evidentiary process. The court considered the practice of states, including the condemnation of torture in diplomatic exchanges and in the laws, constitutions, and high court decisions of the various nations, which reinforced the position of the United States government. The court's conclusion was also grounded in the prohibition of torture in various treaties around the world, invoked not because they were binding on the United States but because they qualified as evidence that other nations of the world considered torture illegal. Additionally, international organizations had adopted various resolutions and declarations in consistent form, addressing legal issues, and accepted by consensus or without significant opposition, establishing the illegality

---

[14] 5 Wheat., at 160-61.

29

of torture. The Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 (1948), though not binding in itself, was an authoritative interpretation of states' human rights obligations and therefore helped to define the content of customary law . Similarly authoritative were the submissions of publicists that were consistent with the conclusion from these other sources that a state's treatment of its own citizens was no longer a matter of legitimate political diversity but had become a matter of international law. As in *Paquete Habana*, the *Filártiga* court also addressed the appearance of exceptions, noting that some states did commit torture, but declined to allow that behavior – generally unacknowledged and undefended – to undermine the actionability of the international prohibition of torture; indeed, the defenses offered by governments accused of torture constituted additional evidence of an entrenched state practice establishing the illegality of torture.

Notably, not one of these authorities was directly binding upon the United States, but they were not for that reason irrelevant. They were instead authoritative in the process of determining the content of the law of nations, and they offered probative evidence of the underlying norm. No government objected to the approach or the result in *Filártiga*, suggesting that the court's reliance on these

sources did not lead the court into error on the dispositive issue of whether torture violated the "law of nations or a treaty of the United States."

The lower court's approach to customary international law in this case violates these standards and should be reversed and remanded for the proper analysis. It is one thing to say that a particular provision of the Universal Declaration does not apply to a given set of facts as in *Sosa* or is "vague and amorphous" as in *Flores*. It is quite another to dismiss the Universal Declaration itself on the perfunctory ground that it "creates no legal obligations," as the court below concluded, 346 F. Supp. 2d at 553. The right question is whether a particular provision of the Universal Declaration evidences customary international law as part of the general practice of states, *Flores* at *23. The lower court made no effort to meet that standard in this case.

It was equally erroneous for that court to disregard the evidentiary value of treaties on the ground that they are non-self-executing. 346 F. Supp. 2d at 552. In this Circuit, a non-self-executing treaty "does not create a private cause of action in United States courts," *Flores*, at *27, but they are not for that reason irrelevant; indeed, from *Filartiga* onward, non-self-executing treaties – even treaties to which the United States is not a party – have been considered partial evidence of the law

31

of nations, probative to the extent that they are consistent with other forms of state practice. To disregard the International Covenant on Civil and Political Rights and the Conventions against Genocide and Torture, as the District Court did, is not only inconsistent with this Circuit's careful handling of international authority, it collapses the law of nations clause of the ATS into the treaty clause of the ATS: the statute explicitly distinguishes between a tort "committed in violation of the law of nations" and a tort "committed in violation of ...a treaty of the United States." Whatever the relevance of the non-self-executing treaty doctrine may be with respect to treaty claims under the ATS, there is no argument that a treaty "creates the cause of action," *Flores, supra*, with respect to claims under the law of nations. For that reason, the self-executing treaty doctrine as understood in this Circuit, cannot have the dispositive effect in this case that the lower court gave it.

## CONCLUSION

This Court has a respected history of reversing and remanding district court judgments that rest on overly restrictive interpretations of Section 1350, as in *Filártiga, Karadzic,* and *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88 (2d

32

Cir. 2000), *cert. denied* 532 U.S. 941 (2001), *inter alia.* For the reasons

submitted, that is the prudent disposition of this case as well.

Respectfully submitted,

Date: 30 August 2005

Ralph G. Steinhardt
The George Washington University Law School
Burns 421
2000 H Street, N.W.
Washington, D.C. 20057
202.994.5739

Counsel to *Amici Curiae*

33

# APPENDIX

N.B. Institutional affiliations are for identification purposes only.

**Philip Alston** is Professor of Law and Director of the Center for Human Rights and Global Justice, at New York University Law School. His many publications in the field include INTERNATIONAL HUMAN RIGHTS IN CONTEXT: LAW, POLITICS, MORALS (2d ed. Oxford University Press, 2000) (with Henry Steiner) and THE FUTURE OF U.N. HUMAN RIGHTS TREATY MONITORING (Cambridge University Press, 2000) (with James Crawford). He chaired the UN Committee on Economic, Social and Cultural Rights from 1991 to 1998 and has been Editor-in-chief of the *European Journal of International Law* since 1996.

**William S. Dodge** is Professor of Law at the University of California, Hastings College of the Law, where he teaches courses in international law and business. He is the co-author, with Detlev Vagts and Harold Koh of TRANSNATIONAL BUSINESS PROBLEMS (3d ed., Foundation Press, 2003). He has written extensively on the history of the Alien Tort Claims Act, including "The Historical Origins of the Alien Tort Statute: A Response to the 'Originalists'," 19 *Hastings Int'l & Comp. L. Rev.* 221, 239 (1996) and "The Constitutionality of the Alien Tort Statute: Some Observations on Text and Context," 42 *Va. J. Int'l L.* 687, 701 (2002).

**Thomas Franck** is Murry and Ida Becker Professor of Law *Emeritus* at New York University Law School, where he was also the Director of the Center for International Studies. He was one of legal scholars whose submissions this Circuit explicitly invoked in its decision in the *Filartiga* case, *infra*. The American Society of International Law has awarded Professor Franck Certificates of Merit for four of his books: UNITED STATES FOREIGN RELATIONS LAW: DOCUMENTS AND SOURCES; NATION AGAINST NATION: WHAT HAPPENED TO THE U.N. DREAM AND WHAT THE U.S. CAN DO ABOUT IT; POLITICAL QUESTIONS/JUDICIAL ANSWERS: DOES THE RULE OF LAW APPLY TO FOREIGN AFFAIRS?; and FAIRNESS IN INTERNATIONAL LAW AND INSTITUTIONS.

34

**Harold Hong-ju Koh** is Dean of Yale Law School, where he is also the Gerard C. and Bernice Latrobe Smith Professor of International Law. From 1998-2001, he served as the Assistant Secretary of State for Democracy, Human Rights and Labor. He is a member of the American Law Institute and the author of numerous books and articles, including DELIBERATIVE DEMOCRACY AND HUMAN RIGHTS (with Ronald C. Slye) (1999), "Is International Law Really State Law?," 111 *Harv. L. Rev.* 1824 (1998), and "Why Do Nations Obey International Law?," 106 *Yale L.J.* 2599 (1997)

**Anne-Marie Slaughter** is the Dean of the Woodrow Wilson School of Public and International Affairs at Princeton University. She previously served as J. Sinclair Armstrong Professor of International, Foreign, and Comparative Law and Director of the International Legal Studies Program at Harvard Law School. She is the former President of the American Society of International Law and currently serves on the board of the Council on Foreign Relations and as Co-Chair of the ABA Committee on Public International Law. She received the Francis Deak Prize from the *American Journal of International Law* for her article, "The Alien Tort Statute and Judiciary Act of 1789: A Badge of Honor."

**David Weissbrodt** is the Fredrikson & Byron Professor of Law at the University of Minnesota Law School . He is the co-author of one of the most widely used coursebooks in the field and has served as the United States member of the United Nations Sub-Commission on the Promotion and Protection of Human Rights from 1996 through 2003, including one year as Chairman. He has participated widely in the work of human rights non-governmental organizations, and he currently serves on the International Executive Committee of Amnesty International. He wrote an *amicus* brief for Amnesty International and other non-governmental organizations in *Filartiga* and has filed affidavits and briefs in several of the principal ATS cases.

35

## Certificate of Compliance

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

[ X ] this brief contains 6,968 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[    ] this brief uses a monospaced typeface and contains [_____] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [WordPerfect 10] in [14-point, Times New Roman], or

[    ] this brief was prepared in a monospaced typeface using [WordPerfect 12] with [_____].

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

August 30, 2005          _Ralph G. Steinhardt (jg )_

                         Counsel for *Amici Curiae*

36

# DECLARATION OF SERVICE

I, Orlando Gudino, being over 18 years of age and not a party to this action, declare under penalty of perjury that I did cause the Brief of *Amici Curiae* of International Law Scholars in Support of Plaintiffs-Appellants to be served upon counsel for all parties in this action by causing two copies of the same to be posted to counsel for each party via regular United States mail on August 30, 2005. I further certify that I caused to serve 10 copies of said Brief to the Clerk of the Court, United States Court of Appeal, Second Circuit, 40 Foley Square, Room 1803, New York, New York 10007.

New York, New York
August 30, 2005

Orlando Gudino
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6470

I certify that I served two copies of said Brief upon the following counsel:

| | |
|---|---|
| Paul L. HoffmanSchonbrun DeSimone Seplow Harris & Hoffman LLP723 Ocean Front WalkVenice, CA 90291 Attorneys for Plaintiffs-Appellants | Diane E. Sammons, Esq.Nagel Rice & Mazie, LLP103 Eisenhower ParkwayRoseland, New Jersey 07068Attorneys for Plaintiffs-Appellants |
| Paul M. Ngobeni, Esq.Law Offices of Paul M. NgobeniP.O. Box 380760East Hartford, CT 06138-0760Attorneys for Plaintiffs-Appellants | Michael D. Hausfeld, Esq.Cohen Milstein Hausfeld & Toll, P.L.L.C.1100 New York Avenue, NWWest Tower, Suite 500Washington, DC 2005-3964Attorneys for Plaintiffs-Appellants |
| Francis P. Barron, Esq.Cravath Swaine & Moore, LLPWorldwide Plaza825 Eighth AvenueNew York, NY 10019-1000Attorneys for Defendant, UBS AG | Owen C. Pell, Esq.White & Case, LLP1155 Avenue of the AmericasNew York, NY 10036Attorneys for Defendant Citigroup, Inc. |
| Sean Reid, Esq.Covington & Burling1201 | William F. Sheehan, Esq.Goodwin |

| | |
|---|---|
| Pennsylvania Avenue, NWWashington, DC 20004Attorneys for Defendant Minnesota Mining and Manufacturing Co. (3M Co.) | Proctor901 New York Avenue, NWWashington, D.C. 20001Attorneys for Defendant General Electric Company |
| James T. Conlon, Esq.Sedgwick, Detert, Moran & Arnold125 Board Street, 39th FloorNew York, New York 10004Attorneys for Defendant Bristol-Myers Squibb | Terry Myers, Esq.Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C.One Pennsylvania Plaza, 37th FloorNew York, New York 10119Attorneys for Defendant Commerzbank AG and Dresdner Bank AG |
| Evan R. Chesler, Esq.Cravath, Swaine & Moore, LLPWorldwide Plaza825 Eighth AvenueNew York, New York 10019-7475Attorneys for Defendant, E.I. Dupont de Nemours | Rory O. Millson, Esq.Cravath, Swaine & Moore, LLPWorldwide Plaza825 Eighth AvenueNew York, New York 10019-7475Attorneys for Defendant, Shell Oil Company |
| Sandra C. Goldstein, Esq.Cravath, Swaine & Moore, LLPWorldwide Plaza825 Eighth AvenueNew York, New York 10019-7475Attorneys for Defendant, Xerox Corporation | Keith R. Hummel, Esq.Cravath, Swaine & Moore, LLPWorldwide Plaza825 Eighth AvenueNew York, New York 10019-7475Attorneys for Defendant IBM |
| Jayant W. Tambe, Esq.Jones Day222 East 41st StreetNew York, New York 10017Attorneys for Defendants General Motors and ChevronTexaco Corporation | Robert S. Walker, Esq.Jones DayNorth Point901 Lakeside AvenueCleveland, Ohio 44114Attorneys for Defendant General Motors |
| Christopher Landau, Esq.Kirkland & Ellis, LLP655 Fifteenth Street, NWSuite 1200Washington, DC 20005Attorneys for Defendant Honeywell International, Inc. | Konrad L. Cailteux, Esq.Weil, Gotshal & Manges, LLP767 Fifth AvenueNew York, New York 10153Attorneys for Defendant ExxonMobil Corporation |
| Jeffrey Barist, Esq.Milbank, Tweed, Hadley & McCloyOne Chase Manhattan PlazaNew York, New York 10005-1413Attorneys for Defendant Deutsche Bank AG | Peter C. Hein, Esq.Wachtell, Lipton, Rosen & Katz51 West 52nd StreetNew York, New York 10019Attorneys for Defendant Colgate-Palmolive |
| Kevin J. Walsh, Esq.Lord Bissell & Brook, LLP885 Third AvenueNew York, New York 10022Attorneys for Defendant National Westminster Bank Plc | John H. Beisner, Esq.O'Melveny & Myers, LLP1625 Eye Street, NWWashington, D.C. 20006Attorneys for Defendant Bank of America, N.A., The Dow Chemical Company, and Ford Motor Company |
| Marc J. Gottridge, Esq.Lovells900 Third Avenue, 16th FloorNew York, New York 10022Attorneys for Defendant Barclays Bank | Alan M. Grimaldi, Esq.Howrey LLP1299 Pennsylvania Avenue, N.W.Washington, D.C. 20004Attorneys for Defendant Coca- |

| PLC | Cola Co. |
|---|---|
| Rae Lindsay, Esq.Clifford Chance US, LLP31 West 52nd StreetNew York, NY 10019-6131Attorneys for Defendant, J.P. Morgan Chase & Co. | Frederick T. Davis, Esq.Shearman & Sterling, LLP599 Lexington AvenueNew York, New York 10022-6069Attorneys for Defendant Credit Agricole Indosuez |
| Michael J. Holston, Esq.Morgan Lewis & Bockius1701 Market StreetPhiladelphia, PA 19103Attorneys for Defendant Hewlett-Packard Company | Jerome S. Hirsch, Esq.Skadden, Arps, Slate, Meagher & Flom, LLPFour Times SquareNew York, New York 10036-6522Attorneys for Defendant DaimlerChrysler Corporation |
| Graeme W. Bush, Esq.Zuckerman Spaeder, LLP1800 M Street, N.W.Suite 1000Washington, D.C. 20036-5802Attorneys for Defendant EMS-Chemie (North America) Inc. | Robert A. Mittelstaedt, Esq.Jones Day555 California Street 26th Fl.San Francisco, CA 94104-1501Attorneys for Defendant, ChevronTexaco Corporation |
| William J. Mendrzycki, Esq.Malaby, Carlisle & Bradley, LLC<br>150 Broadway, Suite 600<br>New York, New York 10038<br>Attorneys for Defendant, American Isuzu Motors, Inc. | Thomas M. Mueller, Esq.Michael O. Ware, Esq.Mayer, Brown, Rowe & Maw, LLP1675 BroadwayNew York, New York 10019Attorneys for Defendant, Nestlé USA, Inc. |
| David J. Cynamon, Esq.Pillsbury Winthrop Shaw Pittman, LLP2300 N Street N.W.Washington, D.C. 20037-1128Attorneys for Defendant, Holcim (US) Inc. | James W. Quinn, Esq.<br>Arvin Maskin, Esq<br>Weil, Gotshal & Manges, LLP.<br>767 Fifth Ave.<br>New York, New York 10153<br>Attorneys for Defendant ExxonMobil Corp. |
| Roger M. Witten, Esq.<br>Wilmer, Cutler, Pickering, Hale & Dorr<br>399 Park Avenue<br>New York, NY 10022 | Mark P. Ladner, Esq.<br>Oliver P. Metzger, Esq.<br>Morrison & Foerster LLP<br>1290 Avenue of the Americas<br>New York, New York 10104-0050 |
| John L. Warden, Esq.<br>Bruce E. Clark, Esq.<br>Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, New York 10004-2498 | |

# EXHIBIT 10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOE I, et al.,                      )
                                         )
            Plaintiffs                   )
                                         )        Civil Action No. 01-1357 (LFO)
      v.                                 )
                                         )
EXXON MOBIL CORPORATION, et al.,         )
                                         )
            Defendants                   )
_____  )

MEMORANDUM

Currently pending in the above-captioned case is Plaintiffs' Motion to Amend the

Complaint [dkt no. 123] and Defendants' Opposition to Plaintiffs' Motion to Amend the

Complaint [dkt no. 125]. For the following reasons, plaintiffs' Motion to Amend is granted.

Treating defendants' Opposition as a Motion to Dismiss, their Motion is granted in part with

respect to plaintiffs' negligent infliction of emotional distress claims, and otherwise denied

without prejudice.[1]

I.      **Subject Matter Jurisdiction**

Plaintiffs have amended their Complaint to plead diversity jurisdiction pursuant to 28

U.S.C. § 1332(a)(2). Allegedly, plaintiffs are citizens of a foreign state (Indonesia), defendants

are citizens of the United States, and the amount in controversy exceeds $75,000. See Am.

Comp. ¶ 4. Defendants do not dispute these allegations. See Defs' Mot. for Leave to File

Surreply in Opp. to Pltffs' Mot. to Amend Compl. (3/1/06), at 2. Therefore, subject matter

---

[1]The factual allegations and procedural history of this case appear at Doe v. Exxon Mobil
Corp., 393 F. Supp. 2d 20 (D.D.C. 2005).

jurisdiction exists over plaintiffs' claims pursuant to 28 U.S.C. § 1332(a)(2) based on the diversity of the parties' citizenship.

## II.     Choice of Law

The parties have fully briefly the issue of what law should apply to plaintiffs' remaining state tort law claims.  As explained below, the law of the forum – the District of Columbia – will apply to all tort law claims, except that Delaware law will apply to plaintiffs' wrongful death claim.  It is assumed *arguendo* that Indonesian law differs from U.S. state tort law.

"To determine the applicable law in a diversity case, a federal court must follow the choice of law rules of the forum state."  Klaxon Co. v. Stentor Elec. Mgf. Co., 313 U.S. 487, 496 (1941).  The District of Columbia uses a "governmental interests" analysis.

> Under this analysis, when the policy of one state would be advanced by
> application of its law, and that of another state would not be advanced by
> application of its law, a false conflict appears and the law of the interested state
> prevails.  A true conflict arises when both states have an interest in applying their
> own laws to the facts of the case, in which case the law of the forum will be
> applied unless the foreign state has a greater interest in the controversy.  In order
> to facilitate the governmental interests analysis, we consider four factors: a) the
> place where the injury occurred; b) the place where the conduct causing the injury
> occurred; c) the domicile, residence, nationality, place of incorporation and place
> of business of the parties; and d) the place where the relationship is centered.

Herbert v. D.C., 808 A.2d 776, 779 (D.C. 2002) (citations and internal quotation marks omitted). This test equally applies in balancing the interests of the United States in the matter as against that of another nation.  See Tramontana v. Varig Airlines, 350 F.2d 468, 471 (D.C. Cir. 1965).

The first question is whether Indonesian or U.S. state law governs.

Applying the Herbert analysis, the injury occurred in Indonesia.  Some (perhaps most) of the conduct occurred in Indonesia, although plaintiffs argue that ExxonMobil knew about and

participated in, indeed directed, from the United States the allegedly culpable conduct to the

detriment of plaintiffs. The place of incorporation and place of business of all the defendants are

in the United States, except that Indonesia is the principal place of business of Exxon Mobil Oil

Indonesia, albeit a United States (Delaware) corporation. The relationship between it and

plaintiffs is likely centered in Indonesia.

Although these factors tilt in favor of Indonesia, the United States has an overriding

interest in applying its own laws to defendants, all of whom are U.S. companies. Indeed, this

Court's October 14, 2005 opinion explained that the proper focus of this litigation is whether

U.S. companies violated U.S. law by its conduct in protecting their pipeline in Indonesia. See

Doe, 393 F. Supp. 2d at 29-30. Moreover, U.S. law provides for punitive damages, which are

particularly appropriate to apply if the question is whether to sanction U.S. companies.

Indonesian law does not authorize punitive damages. See Winarta Decl. ¶ 4 (12/9/05); Hornick

Decl. ¶ 18 (2/3/06). Ultimately, the United States, the leader of the free world, has an

overarching, vital interest in the safety, prosperity, and consequences of the behavior of its

citizens, particularly its super-corporations conducting business in one or more foreign countries.

In sum, Indonesia's interest in applying its own law here is not as strong as the interest of

the United States. See De Aguilar v. Boeing Co., 47 F.3d 1404 (5th Cir. 1995) (Texas had greater

interest in applying its own law when Mexican plaintiffs sued Texas companies for Mexicana

airliner crash in Mexico); Friends for All Children, Inc. v. Lockheed Aircraft Corp., 587 F. Supp.

180, 191 (D.C. law applied when Vietnamese orphans injured in plane crash in Vietnam sued

U.S. corporations; "[f]oreign jurisdictions have no interest in applying their law to damages

issues if it would result in less protection to their nationals in a suit against a United States

3

corporation.") (citations omitted).  U.S. law would also be easier for this court to apply.  Cf. In re Korean Air Lines Disaster of Sept. 1, 1983, 935 F. Supp. 10, 14 (D.D.C. 1996).  Because the United States has a stronger interest (see Herbert, 808 A.2d at 779), U.S. law is the proper one to apply.

The next question is what U.S. state tort law to apply.

Based on the parties' submissions, the only conflict between D.C. law and the law of other states is regarding the wrongful death claim.  At this point it appears that the actions of Exxon Mobil Oil Indonesia, a Delaware corporation, are the most relevant to this question.  As a result, the law of Delaware will apply to the wrongful death claim.  D.C. law, as the law of the forum, will otherwise apply.

## III.    Defendants' Motion to Dismiss

Defendants filed an Opposition to Plaintiffs' Motion to Amend the Complaint.  Their sole objection is that amendment would be futile because plaintiffs have failed to state a claim.  Accordingly, defendants' Motion will be treated as one to dismiss the complaint for failure to state a claim.  Defendants' arguments are addressed below.

### A.    The Foreign Affairs Doctrine

Defendants move to dismiss the Complaint based on the foreign affairs doctrine.  Under this doctrine, state laws are preempted when there is a conflict between the state law and the "exercise of the federal executive authority."  Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 421 (2003).  In Garamendi, California's Holocaust Victim Insurance Relief Act of 1999 mandated disclosure by insurance companies of any policies issued in Europe between 1920 and 1945.  The statute was designed to facilitate relief for families of Holocaust victims who were not

4

compensated under their insurance policies.  The federal government, meanwhile, was reaching a comprehensive agreement with Germany on how to settle Nazi-era insurance claims.  The Court held that the California statute conflicted with the federal government's powers to regulate and manage foreign affairs.  Id. at 420.

As plaintiffs note and Garamendi holds, this doctrine relates to the federal government's preemption over state governments when a case concerns areas of foreign affairs.  The doctrine is compelled by respect for the constitutional grant of power to the executive branch – and not state governments – to control the United States' foreign relations with other countries.  Here, in contrast, no state government has passed any statute in conflict with U.S. foreign policy.  The Garamendi analysis is simply not applicable here, because there is no encroachments by any state on to the federal field of foreign affairs.[2]  Accordingly, defendants' argument in this regard must be rejected.

B.    Failure to Allege Causation

Defendants maintain that plaintiffs fail to allege that defendants controlled the actions of the Indonesian military; the Indonesian soldiers were not employees of defendants, and defendants are not liable for their conduct.  Plaintiffs counter that D.C. law does not require a showing of control to establish liability under its theory of the case.

Plaintiffs are largely correct.  Plaintiffs have alleged that defendants knew that the

_____

[2]Defendants rely on Mujica v. Occidental Petroleum Corp., 381 F. Supp. 2d 1164 (C.D. Cal. 2005) and In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig., 340 F. Supp. 2d 494 (S.D.N.Y. 2004) to press the point that the doctrine precludes state tort law claims as well.  For the foregoing reasons, Mujica misconstrues and misapplies the foreign affairs doctrine.  To the extent defendants are arguing that finding Exxon liable would interfere with U.S. foreign policy in general (as in Assicurazioni), this issue of course has already been decided, and is now the law of the case.  See Doe, 393 F. Supp. 2d at 28-29.

Indonesian soldiers had been committing human rights abuses, but nevertheless hired them to provide security for the pipeline. These allegations, if true, in general are sufficient to establish liability based on the allegations that the soldiers acted as defendants' independent contractors and engaged in inherently dangerous activity. See Restatement (Second) of Torts § 411 (1965) ill. 1.

The general rule is that employers are not liable for the actions of their independent contractors. But several exceptions apply. See Wilson v. Good Humor Corp., 757 F.2d 1293 (D.C. Cir. 1985). In Wilson, the D.C. Circuit (applying D.C. local law) held that the employer was liable because of the "inherently dangerous" exception to the no-liability rule. In that case, Good Humor before 1980 directly hired individuals to work as vendors, selling ice cream products from Good Humor trucks. During this time it undertook extensive safety training measures, recognizing that selling ice cream in an urban high-traffic environment could be potentially dangerous to its young customers. However, in 1980 it adopted a new employment model and sought to establish its vendors as independent contractors. Under this arrangement, "vendors 'purchased' their trucks from Good Humor, with the aid of Good Humor financing, and entered into a 'vendor's agreement' authorizing them to sell Good Humor products which they bought wholesale from Good Humor. The vendors could then sell ice cream at any price and at any location, they were not on the company payroll, and Good Humor did not supervise their day-to-day activities." Id. at 1296. Pursuant to its independent contractor plan, after 1980 Good Humor dropped its safety program, and otherwise did nothing to train its independent contractors on the safety risks involved.

On June 24, 1981, a girl was struck by a car as she was crossing the street and attempting

6

to reach a Good Humor ice cream truck.  The girl died, and her family brought suit against, <u>inter alia</u>, Good Humor.  The district court entered a directed verdict in favor of Good Humor, on the theory that the evidence presented by the plaintiff did not establish the vicarious or direct liability of Good Humor for the actions of its vendors.

The court of appeals reversed.  It recognized that as a general rule employers are not liable for the actions of its contractors, although there is an exception if independent contractors perform "inherently dangerous" work.  <u>Id.</u> at 1303 (citations omitted).  Work is inherently dangerous either if (1) it is "generically" hazardous, in that it is dangerous regardless of the skill level with which it is performed; or (2) it is dangerous in the particular circumstances in which it is to be performed.  <u>Id.</u>  "The applicability of the 'inherent danger' exception, then, depends not only on the generic nature of an independent contractor's work but also on the fact-specific, particular circumstances under which any task is to be performed."  <u>Id.</u> at 1304.  In sum,

> one who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, *or which he contemplates or has reason to contemplate when making the contract*, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

<u>Id.</u> (quoting Restatement (Second) of Torts § 427 (1965)) (emphasis added by court).  The appellate court concluded that Good Humor could be liable under this doctrine because it knew of the dangers to its customers of a curbside ice cream vendor service, but did nothing to alleviate or address this risk.

Defendants only cite this case in passing, and do not discuss its substantive holding.  Nor do they rebut the idea that providing security in a country afflicted by civil war may be inherently dangerous.

7

Plaintiffs have adequately alleged that defendants knew or had to reason to know that paying the Indonesian military personnel to provide security for defendants' pipeline posed a danger to others as evidenced by the alleged history of human rights abuses by Indonesian soldiers. For that reason, except as stated below, defendants' motion to dismiss is denied.[3]

C.    Negligent Infliction of Emotional Distress

Defendants contend that plaintiffs' claim of negligent infliction of emotional distress based on an underlying intentional tort cannot proceed. The case of Brown v. Argenbright Sec., Inc., 782 A.2d 752 (D.C. 2001) controls this issue. In that case, a twelve-year-old girl, who was accused of shoplifting, alleged that she was sexually touched by a security guard at Safeway as he frisked her. The girl's mother filed suit on her behalf against Safeway and Argenbright, the security guard's employer; she did not sue the security guard. She brought claims for negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. The trial court dismissed the complaint, ruling that Safeway and Argenbright are not liable as a matter of law for the actions of the security guard. The court of appeals reversed as to Argenbirght only, holding that it was vicariously liable. However, it affirmed the trial court's dismissal of the negligent infliction of emotional distress claim based on the security guard's alleged sexual misconduct. It held that

> damages for negligent infliction of emotional distress are recoverable only 'if the plaintiff was in the zone of physical danger and was caused by [the] defendant's negligence to fear for his or her own safety' . . . . [S]ince the conduct alleged, even when viewed in the light most favorable to appellant, is not negligence but an intentional tort, appellant cannot recover damages for negligent infliction of

---

[3]At the motion to dismiss stage, it is sufficient that there is one legal theory to support liability. This ruling is without prejudice to parties' right to plead at the summary judgment level that defendants are or are not liable under the inherent danger exception or other theories.

8

emotional distress based on that conduct.

Id. at 759 n.9 (citations omitted).  In other words, the security guard's intentional act of sexually touching the girl cannot support a claim of negligent infliction of emotional distress.

Similarly, here plaintiffs claim negligent infliction of emotional distress against the employer-defendants, but the cause of the distress for these purposes was the intentional act of Indonesian soldiers.  Defendants did not create the zone of danger or commit the act that directly caused plaintiffs emotional distress.  Consistent with Brown, this claim must be dismissed.[4]

D.  Conversion

Defendants also seek to dismiss the conversion claims raised by John Does II and V based on their homes being burned down on the theory that conversion under D.C. law concerns only the wrongful taking of personal – not real – property.  See, e.g., Duggan v. Keto, 554 A.2d 1126, 1137 (1989) (citation and internal quotation marks omitted).  Real property is "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land."  Black's Law Dictionary 1254 (8th ed. 2004).

Plaintiffs respond that, even under defendants' theory, conversion includes the personal property inside their homes.  Moreover, plaintiffs argue that some other tort, like trespass, would cover destruction of plaintiffs' homes.  Plaintiffs did not plead trespass, however.  Nevertheless, defendants' motion to dismiss the conversion claims will be denied, because this claim arguably covers the property inside the plaintiffs' homes, which was allegedly destroyed or taken by the Indonesian soldiers.  See Amen. Compl. ¶¶ 68; 71; 141-43.

---

[4]To the extent that Parker v. Grand Hyatt Hotel, 124 F. Supp. 2d 79, 96-97 (D.D.C. 2000) is to the contrary, the D.C. Court of Appeals' holding in Brown is binding on this Court.

9

E.    John Doe V

Defendants argue that John Doe V did not sufficiently state a claim for battery, assault, or false arrest.  Plaintiffs concede this point, noting that listing John Doe V as a victim of these torts was a typographical error.  Accordingly, plaintiffs have filed a corrected version of the amended Complaint.  John Doe V's only claims are for conversion and intentional infliction of emotional distress.

IV.    Conclusion

In an Order accompanying this memorandum, Plaintiffs' Motion to Amend the Complaint is granted.  Defendants' Opposition to Plaintiffs' Motion to Amend the Complaint, to the extent it seeks dismissal of plaintiffs' Complaint, is denied, except that plaintiffs' claims for negligence infliction of emotional distress are dismissed.



/s/

Louis F. Oberdorfer
UNITED STATES DISTRICT JUDGE

Dated: March 2, 2006

10