**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JANE / JOHN DOES 1-144** | |
| **Plaintiffs,** | |
| **v.** | **No. 1:07-cv-01048-PLF** |
| **CHIQUITA BRANDS INTERNATIONAL, INC., and DAVID DOES 1-10.** | |
| **Defendants.** | |

<u>**DEFENDANT'S REPLY IN SUPPORT OF
MOTION TO DISMISS COMPLAINT**</u>

Eric H. Holder, Jr. (D.C. Bar No. 303115)
John E. Hall (D.C. Bar No. 415364)
James M. Garland (D.C. Bar No. 475509)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 662-5372 (telephone)
(202) 778-5372 (facsimile)
eholder@cov.com

*Attorneys for Defendant Chiquita Brands
International, Inc.*

## <u>TABLE OF CONTENTS</u>

I.      PLAINTIFFS DO NOT AND CANNOT PLEAD AN EXTRAJUDICIAL KILLING
        CLAIM AGAINST CHIQUITA FOR ANY OF THE 173 ALLEGED MURDERS......... 4

        A.      Plaintiffs Do Not Allege Facts Demonstrating that Any of the Underlying Alleged
                Murders Constitutes an Actionable Extrajudicial Killing...................................... 4

                1.      Plaintiffs' generalized allegations of connections between the AUC and
                        the government of Colombia are legally insufficient to show state action
                        for each murder........................................................................................... 4

                2.      Even if plaintiffs could allege facts to show state action as to some of the
                        murders, the claims are not justiciable....................................................... 7

                3.      Plaintiffs cannot evade the state action requirement by characterizing the
                        173 alleged murders as "war crimes." ....................................................... 8

        B.      Plaintiffs Do Not Plead a Cognizable Theory of Derivative Liability Against
                Chiquita for Any of the Alleged Murders............................................................ 12

                1.      Plaintiffs' central claim that Chiquita "aided and abetted" the murders by
                        paying money to the AUC and the FARC fails as a matter of law........... 12

                2.      Plaintiffs' conspiracy and agency claims are baseless.............................. 17

II.     PLAINTIFFS' TVPA CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE
        A CLAIM.................................................................................................................. 20

III.    PLAINTIFFS HAVE PLED NEITHER THE ELEMENTS OF THEIR STATE LAW
        CLAIMS NOR GROUNDS FOR TOLLING THE APPLICABLE LIMITATIONS
        PERIOD. ................................................................................................................... 20

        A.      Plaintiffs Fail to Plead Facts in Support of Their Tolling Theories...................... 20

        B.      Plaintiffs Ignore the Elements of the State Law Torts They Have Alleged.......... 23

        C.      Plaintiffs' Have Obviated the Need for a Choice-Of-Law Analysis by Pleading
                Their State Law Claims Under Only D.C. Law, Which Would Not Apply
                Extraterritorially to the Conduct at Issue............................................................ 24

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005) .........................6

*Almog v. Arab Bank*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007) ........................................14

*Alperin v. Vatican Bank*, 410 F.3d 538 (9th Cir. 2005) ....................................................8

*America Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40 (1999) ..........................6

*BMW of N. America, Inc. v. Gore*, 517 U.S. 559 (1996) ...................................................25

*Bergen v. Rothschild*, 648 F. Supp. 582 (D.D.C. 1986)....................................................21

*Blum v. Yaretsky*, 457 U.S. 991 (1982)........................................................................6

*Brentwood Academy v. Tenn. Secondary Sch. Athletic Association*,
        531 U.S. 288 (2001)........................................................................................5

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) ....................................................18

*Corrie v. Caterpillar, Inc.*, 503 F.3d 974 (9th Cir. 2007)....................................................8

*Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005) .............................................5, 20

*Droysen v. Hansen*, 59 F.R.D. 483 (E.D. Wis. 1973).....................................................17

*Echostar DBS Corp. v. Gemstar-TV Guide Int'l, Inc.*, No. 05 Civ. 8510 (DAB),
        2007 WL 438088 (S.D.N.Y. Feb. 8, 2007).........................................................17

*Estate of Rodriguez v. Drummond Co.*, 256 F. Supp. 2d 1250 (N.D. Ala. 2003)....................6, 11

*Felter v. Kempthorne*, 473 F.3d 1255 (D.C. Cir. 2007)................................................22

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ....................................................15

*In re Global Crossing Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 1907005
        (S.D.N.Y. Aug. 8, 2005) ............................................................................19

*In re Sinaltrainal Litigation*, 474 F. Supp. 2d 1273 (S.D. Fla. 2006) ................................. *passim*

*Kadic v. Karadzic*, 70 F.3d 232 (2d. Cir. 1995) ..........................................................9

*Khulumani v. Barclay National Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007) ........................... *passim*

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994)...................................................19

*Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 829 (8th Cir. 2003) ............................................16

*Lauritzen v. Larsen*, 345 U.S. 571 (1953) .................................................................................25

*Linde v. Arab Bank PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005)..................................................15

*Maruho Co., Ltd. v. Miles, Inc.*, 13 F.3d 6 (1st Cir. 1993) ...........................................................19

*Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 56 F.3d 726 (6th Cir. 1995) ...........................19

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 633
    (S.D.N.Y. 2006)......................................................................................................................14

*Rayburn ex. rel. Rayburn v. Hogue*, 241 F.3d 1341 (11th Cir. 2001) .............................................6

*Russell v. Witham*, No. 1:07 CV 2890, 2007 WL. 4561609 (N.D. Ohio Dec. 21, 2007) .............21

*Saperstein v. Palestinian Authority*, No. 1:04-cv-20225-PAS, 2006 WL. 3804718 (S.D.
    Fla. Dec. 22, 2006)................................................................................................................10

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)................................................................ *passim*

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) ................................................1

*Terrell v. Pena,* No. Civ.A. 96-1634 (RCL), 1997 WL. 349999 (D.D.C. June 11, 1997) ............21

*Tolbert v. National Harmony Mem'l Park*, 520 F. Supp. 2d 209 (D.D.C. 2007)...........................22

*Village of Bensenville v. Federal Aviation Admin.*, 457 F.3d 52 (D.C. Cir. 2006) ........................6

## STATE CASES

*Beard v. Edmonson & Gallagher,* 790 A.2d 541 (D.C. 2002) .......................................................22

*District of Columbia v. Coleman,* 667 A.2d 811 (D.C. 1995) .......................................................24

*Flax v. Schertler,* 935 A.2d 1091 (D.C. 2007)..............................................................................23

*Giles v. Shell Oil Corp.,* 487 A.2d 610 (D.C. 1985)......................................................................23

*Hill v. Medlantic Health Care Group,* 933 A.2d 314 (D.C. 2007).................................................23

## DOCKETED CASES

*America Isuzu Motors, Inc. v. Ntsebeza,* No. 07-919 ....................................................13

*Doe I v. Exxon Mobil Corp.,* No. 01-cv-1357 (LFO) (D.D.C.) ...................................24

*Romero v. Drummond Co.,* No. CV-03-BE-0575-W (N.D. Ala.) ................................24

## FEDERAL STATUTES

42 U.S.C. § 1983 ..........................................................................................................4

18 U.S.C. § 2333 ........................................................................................................15

Rome Statute art. 30(1) ..............................................................................................11

## STATE STATUTES

N.J. Stat. Ann. § 2A:31-1 (2007) ...............................................................................24

## MISCELLANEOUS

Curtis A. Bradley et. al., *Sosa, Customary International Law, and the Continuing
    Relevance of Erie,* 120 Harv. L. Rev. 869, 927 n.305 (2007)......................................13

Jean-Marie Henckaerts & Louise Doswald-Beck, Int'l Comm. of the Red Cross, I
    Customary International Humanitarian Law (2005)....................................................11

Restatement (Second) of Torts § 876.........................................................................14, 15

Plaintiffs' opposition brief portrays their Complaint as a conventional application of settled law.  It is nothing of the kind.  Despite their attempt to present their claims as 173 separate "extrajudicial killings," there can be no doubt that plaintiffs' substantive theory is that by paying money to private armed groups in Colombia, Chiquita is liable for the death of *any* (and, indeed, *every*) person alleged to have been killed by these terrorist organizations.[1]

As Chiquita noted in its opening brief, such broad and unconstrained "terrorism financing" claims have been rejected by courts as falling outside the narrow jurisdiction conferred by the ATS.  (*See* Opening Br. 25.)  To sustain such a theory would mean that "every alleged victim of violence of the counter-revolutionaries" across the globe would be "entitled to their day in the courts of the United States."  *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 826 (D.C. Cir. 1984) (Robb, J., concurring).  Under the Supreme Court's strict mandate in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 725, 729 (2004), that lower courts must act as "vigilant doorkeep[ers]" and exercise "judicial caution when considering the kinds of individual claims that might implement the jurisdiction" conferred by the ATS, this case should be dismissed.

Plaintiffs cannot evade dismissal by casting their pleading as multiple, individual claims of "extrajudicial killings" for which Chiquita is alleged to be indirectly liable.  Their makeweight argument that "there has never been any question that extrajudicial killing is one of those universally recognized international norms that is actionable under the ATS" (Pls.' Opp'n 7) does nothing to immunize them from *Sosa*'s scrutiny.  The issue is not whether, as a general principle of law, a claim of "extrajudicial killing" is cognizable.  The issue is whether plaintiffs

---

[1]     Although the present Complaint seeks relief for 173 alleged victims, if the case is permitted to proceed, plaintiffs' counsel has indicated that he will seek to add claims on behalf of scores of additional alleged victims.  This is because plaintiffs' theory has no limiting principle, as plaintiffs effectively concede.  (*See* Pls.' Opp'n 7 ( "[t]housands of innocent civilians were murdered" and plaintiffs' relatives "were among them.").)

can circumvent the authority rejecting terrorist financing claims merely by relabeling their claims as dozens or hundreds of "extrajudicial killings." They cannot. The substance of the pleading is what matters, not the legal terminology plaintiffs choose to employ.

In any event, plaintiffs' attempt to plead their case in the language of "extrajudicial killing" forces them to defend two untenable propositions: (i) that murders purportedly committed by private armed groups — groups outlawed by the government of Colombia and which, according to plaintiffs' own allegations, engaged in widespread criminal activity — can be deemed state-sanctioned executions, and (ii) that a corporation can be held civilly liable under customary international law for aiding and abetting such murders.

The better reasoned view, adopted in this District, is that direct state action is necessary for an extrajudicial killing claim, and it can neither be supplanted by generalized "color of law" allegations nor excused by conclusory assertions that the murder was a "war crime," as plaintiffs attempt to do here. Likewise, civil aiding and abetting claims against corporations do not fall within the "very limited set" of international law norms universally "accepted by the civilized world and defined with a specificity" comparable to the "historical paradigms familiar when [the ATS] was enacted." *Sosa,* 542 U.S. at 720, 725, 732.

Plaintiffs inaccurately suggest that the viability of aiding and abetting liability claims under the ATS — a proposition central to their case against Chiquita — is no longer open to debate. The truth is that few courts have analyzed the issue post-*Sosa*, and there is no controlling authority mandating recognition of such claims in this Circuit. Moreover, the Second Circuit's recent divided-panel ruling in *Khulumani v. Barclay National Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007), upholding the theory for jurisdictional purposes, is now before the Supreme Court on a petition for a writ of certiorari, and the Solicitor General has just filed an amicus brief

supporting the petition and urging reversal of the court of appeals' decision. *See infra* at 12-13.

For the reasons stated in those briefs, copies of which are attached, Chiquita submits that this

Court should also conclude that aiding and abetting liability is foreclosed by *Sosa*.

However, even if the Court were to assume that "color of law" and "aiding and

abetting" theories are viable as a theoretical matter, the Complaint is still deficient because it

does not contain facts sufficient to support the application of those doctrines to the murders

alleged here, especially in view of the rigorous pleading requirements imposed by the ATS (*see*

Opening Br. 8-9), the application of which plaintiffs do not dispute. Having alleged 173

individual claims for 173 separate murders, *each plaintiff* must plead facts sufficient to support

those theories as to *each specific murder*. Yet, no such particularized facts are alleged here.

Indeed, apart from supplying the date each murder occurred, there are no facts *of any kind*

provided for *any* of the alleged murders — no facts about what happened; where it happened;

who allegedly perpetrated the killing; the complicity of state actors; the circumstances of the

victim; whether and how the particular murder can be said to constitute a "war crime;" or how

the particular murder may be linked to Chiquita or to Chiquita's payment of money to the AUC

or FARC, especially in view of the vast resources of these organizations.

Thus, even accepting at face value plaintiffs' nominal attempt to plead liability for

173 extrajudicial killings, the absence of particularized allegations for each of the alleged

murders is fatal for ATS purposes. The same pleading inadequacies doom plaintiffs' TVPA

claims, in particular the failure to make specific color of law allegations for each alleged killing.

Plaintiffs' state law claims fail as well, not only because of the failure to plead the necessary

elements of those claims for each alleged killing, but also because D.C. tort law does not apply

extraterritorially and the statutes of limitation have run on all but a handful of the alleged murders.

## I.    PLAINTIFFS DO NOT AND CANNOT PLEAD AN EXTRAJUDICIAL KILLING CLAIM AGAINST CHIQUITA FOR ANY OF THE 173 ALLEGED MURDERS.

While plaintiffs proclaim their case to be "substantially different" from other ATS cases because Chiquita pled guilty to "making substantial payments to the terrorist organization that murdered the family members of the Doe Plaintiffs" (Pls.' Opp'n 1), plaintiffs have not pled a claim against Chiquita for financing a terrorist organization, nor could they, as they effectively admit.  Accordingly, what makes this case "substantially different" is not that Chiquita has admitted to making payments to the AUC or the FARC, but rather plaintiffs' assertion that this fact alone is sufficient to support claims against Chiquita for 173 alleged murders.  It is not.

### A.    Plaintiffs Do Not Allege Facts Demonstrating that Any of the Underlying Alleged Murders Constitutes an Actionable Extrajudicial Killing.

To transform what otherwise would be 173 separate acts of criminal murder into state-sanctioned extrajudicial killings in violation of international law, plaintiffs must allege sufficient facts establishing the requisite state action.  As an initial matter, plaintiffs admit that they do not and cannot allege *direct* state action — *i.e.*, that either the AUC or the FARC was an arm of the Colombian government.  Instead, relying upon "color of law" jurisprudence from cases arising under 42 U.S.C. § 1983, plaintiffs seek to impute state action to the AUC, or, alternatively, to avoid the state action requirement entirely by their cryptic, passing allegation that all of the murders constituted "war crimes."  Neither theory is availing.

#### 1.    *Plaintiffs' generalized allegations of connections between the AUC and the government of Colombia are legally insufficient to show state action for each murder.*

This District has determined that "[g]rafting § 1983 color of law analysis onto international law claims would be an end-run around the accepted principle that most violations

of international law can be committed only by states." *Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 26 (D.D.C. 2005).  Plaintiffs make no effort to challenge the logic of the court's opinion in *Exxon*; their extrajudicial killing claims should be dismissed on this basis alone.

However, even if "color of law" claims are cognizable, plaintiffs' claims still fail because they make no attempt to demonstrate that each particular murder was committed by someone acting under "color of law."[2]  Instead, plaintiffs point only to general allegations that the AUC was "assisted by government military officials" (Pls.' Opp'n 13), and that payments to the AUC were collected through private *convivir* organizations created to assist local police and the military in providing security (Pls.' Opp'n 12).[3]

Whether, as a general matter, there were links between the AUC — an organization declared illegal in Colombia — and certain members of that country's government or military is not the pertinent issue in a "color of law" analysis.  The law is clear that generalized allegations of a relationship between a private party and a state actor do not establish that the private party was acting under "color of law" in committing a particular violation.

---

[2]     Because plaintiffs concede that they cannot demonstrate that the FARC acted under "color of law" (Pls.' Opp'n 32), and because plaintiffs do not and cannot plead a war crime violation, *see* Section I.A.3., *infra*, all claims of killings "by FARC" must be dismissed.  (*See* Compl. ¶¶ 52, 57-58, 80, 85, 96-100, 102, 104-109, 111-112, 114-119, 124, 126, 128, 130, 134-136, 138-141, 145, 148, 155, 157, 160, 164, 166, 169-170, 177.)

[3]     Beyond its generality, plaintiffs' *convivir* argument is simply illogical.  The pertinent actor for purposes of a "color of law" analysis is the party that allegedly committed the murder — *i.e.*, the AUC, not the *convivir*.  There are no allegations that the *convivirs* were involved in the murders.  Moreover, the "public function" on which plaintiffs base their "color of law" arguments — that the *convivirs* were charged with protecting Colombian citizens — is directly at odds with a finding that the *convivirs* somehow acted with the Colombian government to carry out the 173 separate murders alleged in the Complaint.  *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 303-304 (2001) ("Even facts that suffice to show public action (or standing alone, would require such a finding) may be outweighed in the name of some value at odds with finding public accountability in the circumstances. . . . The state-action doctrine does not convert opponents into virtual agents.") (citation omitted).

Rather, there must be a "close nexus" between the state actor and the private entity such that the

state could be held "*responsible* for the *specific conduct* of which the plaintiff complains."

*Village of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 62 (D.C. Cir. 2006) (citing *Blum v.*

*Yaretsky*, 457 U.S. 991, 1004 (1982)) (second emphasis added); *see also Rayburn ex. rel.*

*Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001) (citing *Am. Mfrs. Mut. Ins. Co. v.*

*Sullivan*, 526 U.S. 40, 51 (1999)).  As courts have recognized in the section 1983 context:

> If a thread of commonality is to be drawn from the various forms
> in which state action can manifest itself through the conduct of
> private parties, it is that attribution is not fair when bottomed solely
> on a *generalized relation with the state*.  Rather, private conduct is
> fairly attributable only when the state has had some affirmative
> role . . . in the *particular conduct* underlying a claimant's civil
> rights grievance.

*Rayburn*, 241 F.3d at 1348 (citations omitted and emphases added).  Thus, a court must begin its

analysis of whether private action was under "color of law" by identifying the "specific conduct"

that plaintiffs challenge in their complaint, and then assessing the involvement of state actors in

that conduct.  *Village of Bensenville*, 457 F.3d at 64.  This is consistent with the decisions cited

by plaintiffs holding that "color of law" allegations were sufficient in ATS cases to support

claims of state action at the pleading stage.[4]

          Beyond plaintiffs' failure to plead facts demonstrating state involvement in the

particular murders, plaintiffs do not allege any facts to show who actually committed each

---

[4]     *See Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1249-50 (11th Cir.
2005) (plaintiffs adequately pled state action where complaint alleged that a named state actor
(the Mayor) actively participated in the alleged wrongdoing; noting that "[t]he Mayor's 'mere
presence' may not establish state action, but his alleged participation in the forcible events
could") (citation omitted); *Estate of Rodriguez v. Drummond Co.*, 256 F. Supp. 2d 1250, 1265
(N.D. Ala. 2003) ("Because the union alleges that some of the paramilitaries that murdered the
union leaders were dressed in Colombian military uniforms and were members of the Colombian
military, the court finds that sufficient allegations of state action are present through the direct
actions of those paramilitaries who were also members of the Colombian military at this time.").

murder. Putting aside plaintiffs' untenable theory that "the AUC is the Colombian government," plaintiffs' failure even to identify the alleged perpetrators of each murder is fatal to their claims. At a minimum, all of the claims alleging extrajudicial killings committed (i) by unidentified "paramilitaries" or (ii) by the AUC *before* the AUC was formed (not to mention, *before* Chiquita starting making payments to the AUC) are obviously deficient. (*See* Opening Br. 6, 8, 21.)[5]

Even for those killings alleged to have been committed "by the AUC," there must be particularized allegations to support that claim. *Compare In re Sinaltrainal Litig.*, 474 F. Supp. 2d 1273, 1279-81 (S.D. Fla. 2006) (court dismissed complaint for failure to plead violations of international law on theories similar to those asserted here even though the complaint contained far more detailed allegations of AUC involvement in the specific murders, including that plaintiff had personally received death threats from AUC members, that plaintiff's name appeared on an AUC "hit-list" published in a local newspaper, and that plaintiff alleged that he was blindfolded and taken to a dark room where a man who identified himself as an AUC member threatened to kill plaintiff if he persisted with union activities). Here, plaintiffs plead no such facts or circumstances of the incidents to show that any of the killings were actually committed by someone acting for or on behalf of the AUC.

### 2. Even if plaintiffs could allege facts to show state action as to some of the murders, the claims are not justiciable.

Even if this Court were to recognize the "color of law" doctrine as a viable means of pleading state action in an ATS case, and even if plaintiffs could allege the necessary facts to show state involvement in some of the alleged murders, granting leave to amend for that purpose would be futile. Adjudication of claims that the Colombian government was involved in the

---

[5]    (*See* Compl. ¶¶ 11-12, 19, 27-29, 35, 37, 47, 51, 53, 67, 79, 81-82, 90, 113, 120, 122, 129, 147, 149-151, 158-159, 162, 165, 172-173, 180-181.)

summary execution of its own citizens would necessarily insert the Court into foreign policy matters beyond its jurisdiction, would be at odds with the Executive's foreign-policy stance toward Colombia, and would be impractical and unmanageable. Far from being "extremely critical" of Colombia (Pls.' Opp'n 16), the United States has frequently touted Colombia's record as a partner in the war against terrorism and has downplayed allegations of links between the AUC and the Colombian state.[6] In such circumstances, deference to the Executive justifies dismissal of such claims as nonjusticiable. *See Sosa*, 542 U.S. at 733 n.21 (calling for "case-specific deference to the political branches"); *Corrie v. Caterpillar, Inc.*, 503 F.3d 974 (9th Cir. 2007) (dismissing ATS claims as nonjusticiable); *Alperin v. Vatican Bank*, 410 F.3d 538, 548, 555-56 (9th Cir. 2005) (dismissing ATS claims as nonjusticiable, notwithstanding non-intervention by State Department).[7]

### 3.   *Plaintiffs cannot evade the state action requirement by characterizing the 173 alleged murders as "war crimes."*

Reflecting their inability to plead facts showing the involvement of state actors in each of the alleged murders, plaintiffs resort to arguing that these purported extrajudicial killings

---

[6]    The statements cited in Chiquita's Opening Brief (at 19-20 nn.6-7) are authoritative statements of the foreign policy of the United States, set out by the President of the United States and by other senior foreign policy officials. These statements clearly demonstrate that the foreign policy of the United States is to support the government of Colombia in the domestic challenges it faces. The reports upon which plaintiffs rely, in contrast, are bureaucratic observations regarding circumstances alleged to have existed in certain regions of Colombia, as compiled by mid-level State Department personnel pursuant to a congressional mandate. The observations in these reports in no way refute the proposition that a judicial finding of state action in this case would be at odds with the clearly articulated foreign policy stance of the Executive Branch toward the government of Colombia.

[7]    Plaintiffs' reliance (Pls.' Opp'n 15-16) on *Khulumani v. Barclay National Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007), a case in which the Second Circuit expressly *refused* to consider the justiciability arguments raised by the parties, is inapposite. *See id.* at 263 ("We declined to address these case-specific prudential doctrines now and instead remand to the district court to allow it to engage in the first instance in the careful 'case-by-case' analysis that questions of this type require.").

were "war crimes, which obviates the need to show state action." (Pls.' Opp'n 9.) But plaintiffs' "war crimes" argument provides them no refuge, inasmuch as it depends upon allegations even more superficial, generalized, and contradictory than their state action argument.

Essentially, plaintiffs contend that because they allege that there was an "armed conflict" in Colombia, they can bring any claim of murder — even ones dating back 30 years or more — without the need to plead any details of the incident or any facts to show state action, simply by making generalized and conclusory allegations that the victim was a "noncombatant" and the murder was "in the course of hostilities." (Pls.' Opp'n 10.) If that were true, the state action requirement, which is at the heart of almost all recognized international law violations, would be eviscerated. Plaintiffs' argument simply cannot be squared with *Sosa*'s restrained interpretation of the ATS.

Plaintiffs describe *Kadic v. Karadzic*, 70 F.3d 232 (2d. Cir. 1995) as the "seminal case" involving war crimes. (Pls.' Opp'n 9.) But the war crime claim alleged in *Kadic* is not even remotely similar to what plaintiffs assert here. In *Kadic*, the plaintiffs were victims (or representatives of victims) of "brutal acts of rape, forced prostitution, forced impregnation, torture, and summary execution, carried out by Bosnian-Serb military forces as part of a genocidal campaign conducted in the course of the Bosnian civil war." *Id.* at 236-37. The defendant in *Kadic* was the president of the Bosnian-Serb republic with "ultimate command authority over the Bosnian-Serb military forces, and the injuries perpetrated upon plaintiffs were committed as a part of a pattern of systemic human rights violations that was directed by [the defendant] and carried out by the military forces under his command." *Id.* at 237. To suggest that *Kadic* supports plaintiffs' bluster that there is "no question" (Pls.' Opp'n 10) that they have pled 173 "war crimes" is preposterous.

9

Besides rhetoric, plaintiffs offer no answer to Chiquita's argument that the Complaint is barren of facts demonstrating that each of the 173 alleged murders was committed in furtherance of war hostilities. (*See* Opening Br. 15-18.) Plaintiffs must state more than that murders were carried out in Colombia during the period of an alleged civil conflict; rather, they must advance facts to show that the particular killing occurred "in furtherance of" the conflict — that is, to advance the war objectives of a party to the conflict. Bare assertions that a civilian was murdered in the course of an armed conflict, without specific facts connecting the murder to the armed conflict, are insufficient and "would be in direct contravention of the Supreme Court's specific prudential guidance admonishing lower courts to be cautious in creating new offenses under the law of nations." *Saperstein v. Palestinian Auth.*, No. 1:04-cv-20225-PAS, 2006 WL 3804718, at *8 (S.D. Fla. Dec. 22, 2006).

Moreover, plaintiffs simply ignore Chiquita's argument that the alleged reason for Chiquita's collaboration with the AUC — "to ensure that [its] business ran smoothly" (Compl. ¶ 220) — is inconsistent with any war crimes allegation. (Opening Br. 18) The court in *Sinaltrainal* flatly rejected a similar theory, noting that allegations that Coke bottlers "'affirmatively acted to benefit from the civil war by making arrangements to have the paramilitaries target their union leaders'" are not the same as allegations that the bottlers jointly acted or agreed "to orchestrate hostilities, [as] is required to adequately plead a violation of the law of nations on the basis of war crimes." 474 F. Supp. 2d at 1289 (citation omitted). The same is true here.

Plaintiffs' obligation to assert facts that establish that each of the 173 alleged murders occurred in the course of war hostilities is particularly significant in this case, where plaintiffs concede that the AUC is not a single, cohesive organization but rather a collection of

different groups with varying agendas. (*See* Pls.' Opp'n Ex. 5 ("Although some paramilitary groups reflect rural residents' desire to organize solely for self-defense, most are vigilante organizations, and still others are actually the paid private armies of narcotics traffickers or large land owners."); Compl. ¶ 215 (paramilitaries were involved in a variety of illegal activities in Colombia, including narcotics trafficking and random vigilante activities).) The Complaint thus provides no basis to conclude that the 173 murders at issue occurred in the course of an armed conflict instead of for some other purpose.

Moreover, even with respect to the most basic element of a war crime, the Complaint relies upon a single, generalized allegation that "the victims were innocent civilians." (Compl. ¶ 235.) There are no facts alleged to support that conclusory assertion as to each of the alleged victims, and it is at odds with plaintiffs' often-repeated theory that "the AUC-Chiquita plan was to drive all leftist groups out of the banana belt." (Pls.' Opp'n 6.)[8] Plaintiffs must plead facts with respect to every alleged victim to demonstrate that he or she was a noncombatant, which they uniformly fail to do. *Cf. Drummond*, 256 F. Supp. 2d at 1265 (setting forth specific allegations regarding specific trade union leaders, who plaintiffs described individually as nonparticipants in the civil conflict, and who were alleged victims of the AUC). Plaintiffs thus fall far short of pleading cognizable war crimes claims.

---

[8]    Plaintiffs must also allege facts demonstrating that the AUC had the requisite *mens rea* to commit a war crime — that is, the AUC committed murders *knowing* that the victims were non-combatants. *See* Rome Statute art. 30(1); Jean-Marie Henckaerts & Louise Doswald-Beck, Int'l Comm. of the Red Cross, I Customary International Humanitarian Law 574 (2005) ("[W]ar crimes are violations that are committed willfully, *i.e.*, either intentionally (*dolus directus*) or recklessly (*dolus eventualis*).").

**B.     Plaintiffs Do Not Plead a Cognizable Theory of Derivative Liability Against Chiquita for Any of the Alleged Murders.**

Plaintiffs contend that Chiquita should be held derivatively liable for the murders committed by the AUC under theories of aiding and abetting, conspiracy, and agency, but nowhere do plaintiffs allege — *with respect to each alleged victim* — that Chiquita directed, encouraged, or hired the AUC to commit the specific murder; or that Chiquita intended or sought to facilitate the commission of the murder; or that Chiquita participated in or had knowledge of the murder; or that the victim had any connection to Chiquita, Chiquita's business operations in Colombia, Chiquita's banana farms, or labor unions representing Chiquita employees. Moreover, with respect to the alleged FARC-related murders, plaintiffs concede that they can make *no* allegations demonstrating why Chiquita should be held liable for those murders; their claims must be dismissed on that basis alone. (*See* Pls.' Opp'n 32.) Although plaintiffs assert that they are merely applying "settled principles of law" (Pls.' Opp'n 17), their claims go well-beyond anything previously recognized by any court under the ATS.

**1.     Plaintiffs' central claim that Chiquita "aided and abetted" the murders by paying money to the AUC and the FARC fails as a matter of law.**

Plaintiffs gloss over the controversy that has arisen following *Sosa* regarding the viability of aiding and abetting liability under the ATS and instead rely on several cases that were either decided pre-*Sosa* or failed to consider the implications of *Sosa* on aiding and abetting claims. (Pls.' Opp'n 18-19.) As several judges have concluded, and as the United States Government has argued, aiding and abetting liability is simply inconsistent with the restrained conception of ATS jurisdiction articulated in *Sosa*. (*See* Opening Br. 23-26.)

The issue of whether aiding and abetting liability is consistent with *Sosa*'s narrow construction of the ATS has been squarely presented to the Supreme Court in a petition for writ of certiorari by the defendants in *Khulumani v. Barclay National Bank, Ltd.* (Ex. A to Hall

Decl., at 22-33, filed Jan. 10, 2008, *sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, No. 07-919);

*see id.* at 13-14, 27 ("Civil aiding and abetting liability does not fall within that "very limited

set" of international law norms "that this Court described in *Sosa*.").  The United States recently

filed an amicus curiae brief in support of the petition for writ of certiorari.  (*See* Ex. B to Hall

Decl., filed Feb. 11, 2008); *see id.* at 5 ("The court of appeals' decision [upholding aiding and

abetting liability] represents a dramatic expansion of U.S. law that is inconsistent with well-

established presumptions that Congress does not intend to authorize civil aiding and abetting

liability or extend U.S. law extraterritorially.").[9]

       Even if aiding and abetting claims against corporations for alleged international

law violations were viable under the ATS, plaintiffs offer no response to Chiquita's argument

that plaintiffs have failed to allege facts that would support an aiding and abetting claim for any

of the 173 extrajudicial killings alleged here.  Taking every allegation in the Complaint as true,

plaintiffs simply have not pled, with respect to any of the 173 victims, the requisite facts to

establish (i) that Chiquita provided practical assistance to the AUC that had a *substantial effect*

on the perpetration of any of the alleged murders, and (ii) that Chiquita provided such assistance

---

[9]    Plaintiffs' passing reference to the 1795 opinion of Attorney General William Bradford (Pls.' Opp'n 20), which addressed the criminal liability of American citizens who assisted French naval forces in attacks on British interests, is unpersuasive.  Several judges and commentators have rejected the notion that the Bradford opinion, when placed in its proper historical context, establishes aiding and abetting liability under the ATS.  *See, e.g., Khulumani*, 504 F.3d at 329 (Korman, J., dissenting in part and concurring in part) (noting that the Bradford opinion did not distinguish between primary and secondary liability and likely treated "the perpetrators as joint tortfeasors, as that term was understood at the time"); *see also* Curtis A. Bradley et. al., *Sosa, Customary International Law, and the Continuing Relevance of Erie*, 120 Harv. L. Rev. 869, 927 n.305 (2007) ("The aiding and abetting language in the 1795 [Bradford] opinion . . . was not referring to the ATS or even to civil liability; rather, it was referring to potential criminal liability."); Br. of United States as Amicus Curiae in *Am. Isuzu Motors, Inc. v. Ntsebeza*, No. 07-919 (the *Khulumani* litigation) (Ex. B to Hall Decl.), at 10 n.3.

with the *intent* or *purpose* of facilitating the commission of any such murders.  (*See* Opening Br. 27-28.)[10]

### a)    Mens Rea

Plaintiffs' primary theory appears to be that Chiquita "was not happy investing in region [sic] under the control of guerillas and communists" and therefore supported the AUC "to drive the FARC and leftist sympathizers out of the banana region" so that Chiquita's business "ran smoothly."  (Pls.' Opp'n 24.)  Such allegations are entirely conclusory, as plaintiffs do not identify a single factual allegation demonstrating that Chiquita in fact sought to eliminate "leftist sympathizers," "guerillas," "communists," or the FARC.  Moreover, plaintiffs' allegation that Chiquita was ideologically aligned with the AUC to drive out FARC sympathizers is completely at odds with plaintiffs' competing allegation that Chiquita was in a "joint venture" or "agency" relationship with the FARC for eight years.  (Pls.' Opp'n 32-33.)

Even accepting such conclusory allegations, however, none of the plaintiffs alleges, with respect to the specific murder(s) for which he or she seeks relief, that Chiquita provided assistance to the AUC with the intent or purpose to facilitate the commission of *that specific extrajudicial killing or war crime.  See Presbyterian Church*, 453 F. Supp. 2d at 668 (plaintiffs must show that "defendant acted with the intent to assist [the primary] violation, that is, the defendant specifically directed his acts to assist in the *specific violation*") (emphasis

---

[10]    Plaintiffs' contention that the "federal common law standard" for aiding and abetting liability — as opposed to the international law standard — applies to their claims is without merit.  (*See* Pls.' Opp'n 21) (citing Restatement (Second) of Torts, § 876(b).)  Post-*Sosa*, every court to consider the issue has concluded that international law provides the appropriate standard for aiding and abetting claims under the ATS (to the extent such claims are recognized at all). *See, e.g., Khulumani*, 504 F.3d at 268-69 (Katzmann, J., concurring); *id.* at 331-32 (Korman, J., concurring in part and dissenting in part); *Almog v. Arab Bank*, 471 F. Supp. 2d 257, 285-86 (E.D.N.Y. 2007); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 633, 668 (S.D.N.Y. 2006).

added); *Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring) (plaintiff must show defendant provided assistance with "the purpose of facilitating the *commission of [the] crime*") (emphasis added). To the contrary, plaintiffs rely on abstract and highly-generalized assertions of *mens rea, i.e.*, that Chiquita was "fully aware of the *campaign of violence*" and that Chiquita knew the AUC would cause "the *deaths of many innocent people* who resided in the area." (Pls.' Opp'n 24 (emphasis added); *see also, e.g.,* Compl. ¶ 2 ("[Chiquita was] knowingly engaged in an ongoing campaign of terror against [individuals living in Colombia's banana-growing regions].").) Indeed, notwithstanding their own claims that Chiquita sought to "drive the leftists and communists out of the banana belt," plaintiffs do not even allege that any of the decedents were "leftists" or "communists," or that they were killed because of their political views or union activities. Such broad and generalized allegations, which make no effort whatsoever to connect Chiquita's purported culpable mental state to any of the specific 173 murders at issue, do not adequately plead the *mens rea* for aiding and abetting claims.[11]

        *b)*     *Substantial Effect*

        Nor do plaintiffs' arguments establish that Chiquita's payments to the AUC had a "substantial effect" on the commission of the *particular* wrongful conduct at issue. *See Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring) (plaintiffs must show that defendant

---

[11]     Both cases plaintiffs rely on in support of their aiding and abetting claims are inapplicable, as neither involved claims under the ATS or applied the international law standard for aiding and abetting. (*See* Pls.' Opp'n 24-25 (citing *Halberstam v. Welch,* 705 F.2d 472 (D.C. Cir. 1983) (applying Restatement (Second) of Torts § 876) and *Linde v. Arab Bank PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) (same)).) Moreover, plaintiffs erroneously cite *Linde* for the proposition that "Chiquita need not have intended the specific murders alleged in the Complaint." (Pls.' Opp'n 25.) However, *Linde* involved a claim of aiding and abetting acts of "international terrorism" within the meaning of the Anti-Terrorism Act, 18 U.S.C. § 2333, *see* 384 F. Supp. 2d at 584, not a claim for aiding and abetting an extrajudicial killing or war crime. Thus, in *Linde*, there was no need for plaintiffs to plead facts linking the defendant's culpable mental state to any particular act of murder, as is clearly required here.

"provides practical assistance to the principal which has a substantial effect on the *perpetration of the crime*") (emphasis added). Even accepting plaintiffs' far-fetched and conclusory allegations that Chiquita was the "financial founder" of the AUC, plaintiffs make no attempt to demonstrate how that financial assistance had a "substantial effect" on the 173 distinct murders alleged in the Complaint. Merely asserting that Chiquita's assistance to the AUC was "prolonged, steady, and substantial" does not satisfy plaintiffs' pleading burden. (Pls.' Opp'n 23.)[12]

More generally, plaintiffs allege no facts establishing the significance of the $1.7 million that Chiquita paid relative to the overall resources of the AUC, an organization estimated to have earned several hundred million dollars of income *annually*. (*See* Opening Br. 6 n.4.) Plaintiffs in effect seek to hold Chiquita liable for murders committed by the AUC solely because Chiquita provided a small fraction of the revenue the group otherwise earned from extortion, drug trafficking, kidnapping, and other unlawful activities. Plaintiffs must do much

---

[12] The "prolonged, steady, and substantial" language is not contained in plaintiffs' Complaint, but rather is a quote from the Department of Justice's Sentencing Memorandum. (Pls.' Opp'n 9-10.) Although plaintiffs mischaracterize the quote as a "finding" from the criminal proceeding, it is, of course, merely argument, and is not subject to judicial notice on a motion to dismiss. *See Kushner v. Beverly Enters., Inc.*, 317 F.3d 829, 829-30 (8th Cir. 2003) ("The government's sentencing memorandum is a position paper offered here by the investors for the truth of the matters asserted therein, which the defendants dispute. Such disputed papers should not be the subject of judicial notice on a motion to dismiss."). In any event, the fact that the prosecutor chose to characterize the $1.7 million paid to the AUC as "substantial" with respect to the criminal matter, which involved the general prohibition of engaging in transactions with a terrorist group, says absolutely nothing about whether the payments had a "substantial effect" in causing any of the individual alleged murders pled in this Complaint. Plaintiffs allege no facts to suggest that it did.

more to establish that Chiquita's payment of $1.7 million to the AUC had a "substantial effect" on the 173 specific murders alleged in the Complaint.[13]

### 2.    *Plaintiffs' conspiracy and agency claims are baseless.*

Plaintiffs' alternative theories of derivative liability — conspiracy and agency — are equally defective.  These claims amount to no more than thinly-veiled attempts to cast in different legal jargon the same, single (and ultimately unavailing) allegation underlying plaintiffs' aiding-and-abetting theory, *i.e.*, that because Chiquita paid the AUC, it should be liable for any and all crimes allegedly perpetrated by the AUC.  But plaintiffs cannot resuscitate an otherwise baseless claim simply by labeling it as a different cause of action.  Whether sounding in theories of conspiracy or agency, plaintiffs' alternative derivative liability claims fail to satisfy the ATS's heightened pleading requirements.

Plaintiffs simply do not address Chiquita's argument that conspiracy to commit an extrajudicial killing is not actionable under *Sosa*, nor do they plead any facts to support such a theory (if it were cognizable) on a tort-by-tort basis.  (See Opening Br. 33-35.)  For example, plaintiffs make no attempt to demonstrate (i) how any of the 173 murders related to a conspiracy

---

[13]    Plaintiffs offer no response to Chiquita's contention that their allegation regarding Banadex's purported involvement in an arms shipment to the AUC is flatly contradicted by the very sources plaintiffs rely on in their Complaint.  (*See* Opening Br. 4-6.)  Instead, plaintiffs cite *Droysen v. Hansen*, 59 F.R.D. 483, 484 (E.D. Wis. 1973), for the proposition that a defendant's "affidavits which dispute the factual allegations have no bearing on such a motion [to dismiss]." (Pls.' Opp'n 23 n.17.)  Of course, Chiquita has introduced no such affidavit but properly relies on the same document that plaintiffs incorporated by reference into their Complaint.  *See, e. g.*, *Echostar DBS Corp. v. Gemstar-TV Guide Int'l, Inc.*, No. 05 Civ. 8510 (DAB), 2007 WL 438088, at *4 (S.D.N.Y. Feb. 8, 2007) ("[I]f the allegations of a complaint are contradicted by the documents incorporated in the complaint, the documents control and the court need not accept the allegations of the complaint as true.").

between the AUC[14] and Chiquita; (ii) whether the AUC and Chiquita conspired to commit any of the murders; or (iii) the manner in which any of the murders furthered the objectives of any conspiracy.  (*See* Opening Br. 6, 35.)

While plaintiffs allege that Chiquita and the AUC agreed to "drive [out] leftists out of the banana sector," plaintiffs here do not even allege that any of the decedents were "suspected sympathizers with the leftists" or that they were killed because of their political views or union activities.  (Pls.' Opp'n 27.)  The mere fact that there were payments to the AUC is not enough to allege a conspiracy.  *See Sinaltrainal*, 474 F. Supp. 2d at 1300 (court accepted as true plaintiffs' allegation that defendants paid paramilitaries "$200.000 (Colombian pesos) a month in return for various services, including the intimidation of [union] leaders and the eradication of the . . . union itself," but still dismissed conspiracy claims, noting that "none of the individuals involved in the kidnapping are identified, and it is not clear whether these individuals were among those 'paramilitary forces, *including*, the AUC' that were paid") (emphasis in original).  As the court in *Sinaltrainal* emphasized, "some level of specificity is required to link the explicit agreement between [defendant] and the [AUC] to the horrible acts that occurred," especially in the context of a country "torn by a long-standing civil war, where the murder of trade unionists and civilians at large is common."  *Id.* at 1295-96.  That "level of specificity" is found nowhere in the Complaint.[15]

---

[14]    Plaintiffs effectively acknowledge that their conspiracy allegations pertain only to the AUC, not the FARC.  (Pls.' Opp'n 32.)

[15]    Plaintiffs' reliance on *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005), is entirely unfounded.  (*See* Pls.' Opp'n 27.)  In *Cabello*, the Eleventh Circuit affirmed a civil conspiracy verdict where plaintiffs presented specific and detailed evidence linking the defendant to a conspiracy to commit the *specific* murder of Winston Cabello.  402 F.3d at 1159-60 (evidence demonstrated that (i) defendant had made several statements acknowledging his role in plan to commit violence against political opponents; (ii) defendant had led squad that had (continued…)

Nor do plaintiffs address Chiquita's argument that they have failed to allege any facts to support their claims that Chiquita "hired" the AUC and "directed the general mission of the AUC." (*See* Opening Br. 37 (discussing the requirements to plead an agency relationship)); *see also Sinaltrainal*, 474 F. Supp. 2d at 1293 & n.27 (rejecting a virtually identical allegation of an agency relationship between Coca-Cola and the AUC). Perhaps most obvious, plaintiffs do not point to a single fact demonstrating that the AUC was acting under the control of Chiquita generally, much less with respect to the specific 173 murders at issue. *See, e.g., In re Global Crossing Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 1907005, at *9-10 (S.D.N.Y. Aug. 8, 2005) (dismissing agency claim where plaintiffs "provide[d] nothing more than recitations of the legal standard of agency" but no made specific allegations of control). Rather than plead specific facts to support their claim that Chiquita "hired" the AUC or "directed" the AUC, plaintiffs simply assert the legal conclusion that the AUC acted as the "agent" of Chiquita. Such conclusory allegations fail to state a claim for civil conspiracy. *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (on a motion to dismiss, court does not "accept legal conclusions cast in the form of factual allegations").[16]

---

killed fifteen prisoners at another prison; (iii) defendant had likely assisted in selecting civilian prisoners to murder; and (iv) defendant himself directly participated in the murder of Cabello or, alternatively, that his military colleagues had participated in the murder). By contrast, plaintiffs here have made no attempt to allege facts connecting their conspiracy claim to any specific murder.

[16]    Plaintiffs' belated contention that Chiquita and the AUC were engaged in a profit-sharing "joint venture," an allegation found nowhere in the Complaint, is specious. (Pls.' Opp'n 30.) Even assuming that Chiquita and the AUC were co-equal partners in a "joint venture" designed to "maximize [the] shipment of bananas" (*id.*), plaintiffs do not allege a single fact — nor could they — demonstrating that Chiquita had the right to control that joint venture as a general matter, let alone the right to exercise control with respect to any particular murder alleged in the Complaint. *See Maruho Co., Ltd. v. Miles, Inc.*, 13 F.3d 6, 11 (1st Cir. 1993) (dismissing joint venture claims where there was "no evidence of any statement, or action, by [defendant] that suggest any right to control [alleged co-venturer's] activity"); *see also Miller's Bottled Gas, Inc.* (continued…)

## II.    PLAINTIFFS' TVPA CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

Because plaintiffs fail to establish a valid claim under the ATS, the Court is without jurisdiction to entertain plaintiffs' TVPA claims. (*See* Opening Br. 39-41.) Indeed, plaintiffs apparently concede that if they fail to establish a valid claim for extrajudicial killing under the ATS, including the critical state action requirement, their TVPA claims fail as well. (Pls.' Opp'n 34.)

The only issue raised in Chiquita's opening brief that plaintiffs challenge is whether a corporation may be held liable under the TVPA. Plaintiffs acknowledge that the only case in this jurisdiction to address this issue, *Exxon*, 393 F. Supp. 2d at 28, *rejected* the application of the TVPA to corporations, yet they argue that this Court should depart from the *Exxon* decision and other cases that have refused to recognize corporate liability under the TVPA. Chiquita respectfully submits that this Court should follow the recent decisions that reflect the weight of authority in this area and disallow the application of the TVPA to Chiquita. (*See* Opening Br. 41.)[17]

## III.    PLAINTIFFS HAVE PLED NEITHER THE ELEMENTS OF THEIR STATE LAW CLAIMS NOR GROUNDS FOR TOLLING THE APPLICABLE LIMITATIONS PERIOD.

### A.    Plaintiffs Fail to Plead Facts in Support of Their Tolling Theories.

All but a handful of plaintiffs' state law claims are plainly time-barred on the face of the Complaint. Nevertheless, plaintiffs argue that these claims — even for injuries dating as

---

*v. Borg-Warner Corp.*, 56 F.3d 726, 736-37 (6th Cir. 1995) (noting that the "essential element of a joint venture is the element of joint control").

[17]    Plaintiffs' reference to the ten individual Doe Defendants named in the Complaint is a red herring. The inclusion of individual defendants cannot justify plaintiffs' attempt to hold a corporation liable under the TVPA, in contravention of the statute's plain language.

far back as 1975 — should go forward because under the discovery rule, they did not accrue until

a criminal Information was filed against Chiquita on March 13, 2007.  Alternatively, plaintiffs

invoke an equitable tolling theory to contend that their claims did not accrue until they learned in

June 2007 that they could file suit in a U.S. court using pseudonyms.  But to the extent plaintiffs

seek to rely on tolling theories to justify bringing otherwise time-barred claims, they must plead

facts sufficient to invoke those theories in their Complaint:

> Plaintiff argues that equity should toll the limitation period.
> Plaintiff does not, however, make this argument until her Response
> to Defendants' Motion to Dismiss.  Indeed, plaintiff attempts to
> support her argument with allegations that were never made in
> either her original complaint or her amended complaint.  While
> courts liberally construe factual allegations that indicate equitable
> tolling, those allegations must be made in a pleading.

*Terrell v. Pena*, No. Civ.A. 96-1634 (RCL), 1997 WL 349999, at *1 n.4 (D.D.C. June 11,

1997).[18]  Indeed, Rule 9(b) requires any plaintiff asserting fraudulent concealment to plead "with

as much particularity as possible" the circumstances of the alleged fraud and the plaintiff's

resulting failure to discover the operative facts.  *See Bergen v. Rothschild*, 648 F. Supp. 582, 587

(D.D.C. 1986).  Plaintiffs' contention that "[i]t is Defendants' burden to demonstrate that

Plaintiffs knew or should have known before the public disclosure" is simply wrong.  (Pls.'

Opp'n 44.)  The burden is on each plaintiff, and this Complaint is utterly devoid of particularized

---

[18]   *See also Russell v. Witham*, No. 1:07 CV 2890, 2007 WL 4561609, at *5 n.6 (N.D. Ohio
Dec. 21, 2007) ("A Rule 12 motion on statute of limitations grounds is an appropriate way to
dispose of a claim that, on its face, is time-barred. . . . The Court is limited to the allegations in
the complaint because, the burden is on [plaintiff] to plead circumstances which would indicate
why the [cause of action] was not discovered earlier and which would indicate why the statute
should be tolled.") (quotation marks and citation omitted).

allegations about *each plaintiff's* resulting failure to discover that Chiquita paid money to Colombian paramilitaries prior to the filing of the criminal Information.[19]

Plaintiffs' further argument — that their claims should be deemed timely under an equitable tolling principle because they did not have "access to justice" until U.S. plaintiffs' lawyers traveled to Colombia and informed them "that they could file a case in U.S. federal court using pseudonyms" — is incorrect as a matter of law. (Pls.' Opp'n 45.) To benefit from equitable tolling, each plaintiff "must demonstrate (1) that [he has] been pursuing [his] rights diligently, and (2) that some extraordinary circumstance stood in [his] way." *Felter v. Kempthorne*, 473 F.3d 1255, 1260 (D.C. Cir. 2007) (citation and quotations omitted). Nowhere in the Complaint does any plaintiff allege the steps he or she took to pursue diligently his or her rights up until the time U.S. plaintiffs' lawyers traveled to Colombia and solicited their participation in this lawsuit. *See Beard v. Edmonson & Gallagher*, 790 A.2d 541, 546 (D.C. 2002) ("[T]he plaintiff does not have *carte blanche* to defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm."). Nor do plaintiffs allege any "extraordinary circumstance" standing in their way, other than ignorance of their ability to bring this suit in a U.S. court — and ignorance does not justify tolling of the limitations period. *See Tolbert v. Nat'l Harmony Mem'l Park*, 520 F. Supp. 2d 209, 212 (D.D.C. 2007) ("A cause of action accrues when the potential plaintiff has knowledge of *some* injury, its cause, and related wrongdoing . . . . Knowledge of fact, and not knowledge of the legal significance of those facts, controls the time of accrual.") (citations and quotations

---

[19]    Even if plaintiffs were granted leave to amend to allege particularized facts in support of their tolling theories, it is unlikely that any plaintiff could do so, given that Chiquita first publicly disclosed that it had made payments to Colombian paramilitaries on May 10, 2004 — more than three years before the Complaint was filed — a disclosure that was widely publicized in Colombia.

omitted).  Accordingly, because the vast majority of plaintiffs' claims are time-barred on the face

of the Complaint, they should be dismissed.[20]

> **B.    Plaintiffs Ignore the Elements of the State Law Torts They Have Alleged.**

Plaintiffs' state tort law claims also fail on the merits.  With respect to plaintiffs'

intentional tort claims, all of which are pled under D.C. law (*see* Compl. ¶¶ 267-78 (IIED,

battery, and assault)), plaintiffs suggest that if they have "properly alleged aiding and abetting,

conspiracy, and joint action and/or agency" under the ATS, they also have properly alleged

claims for any intentional tort under D.C. law.[21]  (Pls.' Opp'n 38.)  This suggestion is unfounded.

Plaintiffs have not alleged a single fact that would establish respondeat superior liability under

D.C. law for any of the 173 alleged injuries — *i.e.*, that Chiquita exercised control over the

particular paramilitary members involved in *each* killing (and controlled the manner in which

those individuals performed their activities), and that the paramilitary members were acting

within the scope of their "employment" when they committed *each* of the 173 alleged murders.

(*See* Opening Br. 42-43 (citing *Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C. 1985)).)

Plaintiffs' negligence-based claims (*see* Compl. ¶¶ 243-66 (negligence, negligent

hiring, negligent supervision)) all rest on the insufficient and conclusory presumption that

Chiquita "employed" the particular AUC members involved in *each* of the alleged killings

---

[20]    The assault, battery, and intentional infliction of emotional distress ("IIED") claims of
each plaintiff (*see* Compl. ¶¶ 11-183) should be dismissed pursuant to D.C.'s 1-year statute of
limitations.  (Opening Br. 45.)  All but four of the plaintiffs' negligence-based and wrongful
death claims (*see* Compl. ¶¶ 11-24, 26-35, 37-53, 55-167, 169-83) should be dismissed pursuant
to D.C.'s 3-year statute of limitations.  (*See* Opening Br. 45.)

[21]    In their Complaint, plaintiffs did not allege aiding and abetting or conspiracy as bases for
Chiquita's liability under state law.  (*See* Compl. ¶¶ 240-78.)  Even if they had, D.C. courts have
not recognized civil aiding and abetting liability, *see Flax v. Schertler*, 935 A.2d 1091, 1107
(D.C. 2007), and any allegation of a civil conspiracy suffers from the same flaws as plaintiffs'
ATS conspiracy theory, *see Hill v. Medlantic Health Care Group*, 933 A.2d 314, 334 (D.C.
2007) (discussing elements of civil conspiracy).

(Opening Br. 43), and further fail insofar as they allege no relationship between any of the victims and Chiquita from which a "duty" owed by Chiquita to the victims might arise (*id.* 43-44).

Because Chiquita bears no responsibility for any of these underlying torts, plaintiffs' wrongful death claims, which plaintiffs belatedly assert are governed by New Jersey law, also fail. *See* N.J. Stat. Ann. § 2A:31-1 (2007) ("*[T]he person who would have been liable in damages for the injury if death had not ensued* shall be liable in a[] [wrongful death] action for damages") (emphasis added).

### C.   Plaintiffs' Have Obviated the Need for a Choice-Of-Law Analysis by Pleading Their State Law Claims Under Only D.C. Law, Which Would Not Apply Extraterritorially to the Conduct at Issue.

Finally, plaintiffs respond to Chiquita's argument that D.C. law does not apply extraterritorially by asserting that Chiquita "confuse[s] extraterritoriality with choice of law." (Pls.' Opp'n 39.)  But plaintiffs pled all of their state law tort claims (except for wrongful death) exclusively under D.C. law,[22] thereby rendering Colombian law inapplicable.  *See, e.g.*, *Romero v. Drummond Co.*, No. CV-03-BE-0575-W, slip. op. at 2 (N.D. Ala. Mar. 5, 2007) (attached as Exhibit M to Opening Br.) (dismissing plaintiffs' state law claims for extraterritorial conduct "[b]ecause Plaintiffs pursued [these] claims . . . exclusively under Alabama law.").  Plaintiffs' reliance on Judge Oberdorfer's decision in *Doe I v. Exxon Mobil Corp.*, No. 01-cv-1357 (LFO) (D.D.C. Mar. 6, 2006) — where plaintiffs invited a choice-of-law analysis by pleading their state law claims under the laws of D.C. and other states as well as Indonesia (where the alleged torts

---

[22]   Chiquita's extraterritoriality argument would apply equally to the application of New Jersey law to plaintiffs' wrongful death claim.  *See Dist. of Columbia v. Coleman*, 667 A.2d 811, 817 n.10 (D.C. 1995) (D.C. law cannot apply in action against D.C. police officer where "decedent is a Maryland resident, the alleged[] negligen[ce] . . . occurred in Maryland, and the relationship of the parties was centered in Maryland").

occurred), and where the defendant did not advance an extraterritoriality argument in its motion

to dismiss — is thus misplaced. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 n.16

(1996) ("Laws have no force of themselves beyond the jurisdiction of the State which enacts

them."); *Lauritzen v. Larsen*, 345 U.S. 571, 590-91 (1953) (state cannot "draw into control of its

law otherwise foreign controversies on slight connections, because it is a forum").

## **CONCLUSION**

For the foregoing reasons, Chiquita respectfully requests that the Court dismiss

plaintiffs' Complaint for lack of jurisdiction pursuant to Rule 12(b)(1) and for failure to state a

claim upon which relief can be granted pursuant to Rule 12(b)(6).

Respectfully submitted,

_____/s/ Eric H. Holder, Jr._____
Eric H. Holder, Jr. (D.C. Bar No. 303115)
John E. Hall (D.C. Bar No. 415364)
James M. Garland (D.C. Bar No. 475509)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 662-5372 (telephone)
(202) 778-5372 (facsimile)
eholder@cov.com

Date:  February 15, 2008

*Attorneys for Defendant Chiquita Brands*
*International, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JANE / JOHN DOES 1-144** | |
| **Plaintiffs,** | **No. 1:07-cv-01048-PLF** |
| **v.** | |
| **CHIQUITA BRANDS INTERNATIONAL, INC.,** **and DAVID DOES 1-10.** | |
| **Defendants.** | |

## <u>DECLARATION OF JOHN E. HALL</u>

I, John E. Hall, of full age, hereby declare as follows:

1.      I am a partner at Covington & Burling LLP and counsel for Defendant Chiquita Brands International, Inc. ("Chiquita") in this action.  I make this Declaration in support of Chiquita's reply in support of its motion to dismiss plaintiffs' Complaint.

2.      Attached as Exhibit A is a true and correct copy the petition for writ of certiorari filed by the defendants-petitioners on January 10, 2008, in *Am. Isuzu Motors, Inc. v. Ntsebeza*, No. 07-919 (seeking review of *Khulumani v. Barclay National Bank, Ltd.*, 504 F.3d 254 (2d Cir. 2007)).

3.      Attached as Exhibit B is a true and correct copy of an amicus curiae brief filed by the United States on February 11, 2008, in support of the petition for writ of certiorari filed by the defendants-petitioners in *Am. Isuzu Motors, Inc. v. Ntsebeza*, No. 07-919.

I declare under penalty of perjury that the foregoing is true and correct.

John E. Hall

Executed on:   February 15, 2008

# EXHIBIT A

**No.**

# In the Supreme Court of the United States

———————

AMERICAN ISUZU MOTORS INC., BANK OF AMERICA,
N.A., BARCLAYS BANK PLC, BRISTOL-MYERS SQUIBB
COMPANY, BP P.L.C., CHEVRONTEXACO CORPORATION,
*ET AL.*

*Petitioners*,

v.

LUNGISILE NTSEBEZA , HERMINA DIGWAMAJE,
KHULUMANI SUPPORT GROUP, *ET AL.*

*Respondents.*

———————

**On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Second Circuit**

———————

**PETITION FOR A WRIT OF CERTIORARI**

———————

KENNETH S. GELLER
MARC R. COHEN
ANDREW J. PINCUS
CHARLES A. ROTHFELD
 *Mayer Brown LLP*
 *1909 K Street, NW*
 *Washington, DC 20006*
 *(202) 263-3000*

FRANCIS P. BARRON
 *Counsel of Record*
DAVID GREENWALD
 *Cravath, Swaine &*
 *Moore LLP*
 *825 Eighth Avenue*
 *New York, NY 10019*
 *(212) 474-1000*

[Additional Counsel listed on signature page]

i

## QUESTIONS PRESENTED

These lawsuits were filed on behalf of all persons living in South Africa between 1948 and 1994 claiming injury from that nation's system of apartheid. The defendants are more than 50 U.S. and foreign corporations that allegedly did business in South Africa during that era. Plaintiffs contend that, by conducting business in South Africa, the defendants aided and abetted violations of international law committed by the apartheid-era South African government and, for that reason, may be held liable under the Alien Tort Statute (ATS), 28 U.S.C. § 1350.

The questions presented are:

1. Whether, in light of the opposition to this litigation expressed by the Executive Branch, by South Africa, and by other nations – because plaintiffs' suits effectively seek to overturn South Africa's post-apartheid policy of reconciliation as well as the policies of the United States and other nations – the cases should be dismissed on grounds of case-specific deference to the political branches, political question, or international comity.

2. Whether a private defendant may be sued under the ATS for aiding and abetting a violation of international law by a foreign government in its own territory.

3. Whether a private defendant may be held directly liable under the ATS for violating international law standards codified in a ratified treaty that Congress expressly provided does not create enforceable rights.

ii

## RULE 14.1(b) STATEMENT

Defendants who were parties to the appeal include: American Isuzu Motors Inc.; Bank of America, N.A.; Barclays Bank PLC; Bristol-Myers Squibb Company; BP p.l.c.; ChevronTexaco Corporation; Chevron Texaco Global Energy, Inc.; Citigroup, Inc.; The Coca-Cola Company; Colgate-Palmolive Company; Commerzbank AG; Credit Suisse Group; Daimler AG; Deutsche Bank AG; The Dow Chemical Company; Dresdner Bank AG; E.I. Dupont deNemours; EMS-Chemie (North America) Inc.; Exxon Mobil Corporation; Ford Motor Company; Fujitsu Limited; General Electric Company; General Motors Corp.; Hewlett-Packard Company; Holcim (US) Inc.; Honeywell International Inc.; International Business Machines Corporation; JPMorgan Chase & Co.; 3M Co.; National Westminster Bank Plc; Nestlé USA, Inc.; Shell Oil Company; UBS AG; and Xerox Corporation.

Defendants below that were not served or that contested service or personal jurisdiction include: Anglo-American PLC; Banque Indosuez; CALTEX; Credit Lyonnais; DeBeers Corp.; Fluor Corp.; Holcim Ltd; Novartis AG; Oerlikon Buhrle; Oerlikon Contraves; Rheinmetall Group AG; Rio Tinto Group; Royal Dutch Petroleum Co.; Shell Transport & Trading Co. Plc; Schindler A.G.; Standard Chartered Bank; Sulzer AG; Total SA; Unisys Corp.; and Volkswagen A.G.

## RULE 29.6 STATEMENT

Petitioner Isuzu Motors America, Inc., as successor in interest to American Isuzu Motors Inc., states that its parent corporation is Isuzu Motors Limited, and further states that, aside from the aforemen-

iii

tioned parent corporation, no publicly held company owns 10% or more of its stock.

Petitioner Bank of America, N.A. states that it is an indirect subsidiary of Bank of America Corporation, and that it is 100% owned by Bank of America Corporation.

Petitioner Barclays Bank PLC states that its parent corporation is Barclays PLC and further states that, aside from the aforementioned parent corporation, no publicly held company owns 10% or more of its stock.

Petitioner Bristol-Myers Squibb Company states it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner BP p.l.c. states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner ChevronTexaco Corporation states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner Chevron Texaco Global Energy, Inc. states that its parent corporation is Texaco Overseas Holding, Inc. and further states that, aside from the aforementioned parent corporation, no publicly held company owns 10% or more of its stock.

Petitioner Citigroup, Inc. states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock. The *Digwamaje* plaintiffs have named "Citicorp/Citibank." Citicorp and Citibank, N.A. are wholly-owned indirect subsidiaries of Citigroup, Inc. and are not publicly traded.

iv

Petitioner The Coca-Cola Company states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner Colgate-Palmolive Company states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner Commerzbank AG states that it has no parent corporation and that no publicly held company owns 10% or more of its stock.

Petitioner Credit Suisse Group states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner Daimler AG states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner Deutsche Bank AG states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner The Dow Chemical Company states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner Dresdner Bank AG states that its parent corporation is Allianz Societas Europaea, München, Germany (Allianz SE) and further states that, aside from the aforementioned parent corporation, no publicly held company owns 10% or more of its stock.

Petitioner E.I. Dupont deNemours states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner EMS-Chemie (North America) Inc. is a subsidiary of EMS-Grilon Holding Inc., Wilmington, and EMS-Chemie AG, Domat/Ems Switzerland.

v

EMS Grilon Holding Inc. is wholly owned by EMS-Chemie Holding AG and EMS-Chemie AG, Domat/Ems Switzerland. EMS-Chemie Holding AG, Domat/Ems Switzerland is wholly owned by EMS-Chemie Holding AG. EMS-Chemie Holding AG is publicly traded in Switzerland.

Petitioner Exxon Mobil Corporation states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner Ford Motor Company states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner Fujitsu Limited states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner General Electric Company states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner General Motors Corp. states that it has no parent corporation. Except for a subsidiary of State Street Corporation, called the State Street Bank and Trust Company, which owns General Motors Corp. common stock in fiduciary capacities for employee benefit plans, no publicly held corporation owns 10% or more of General Motors Corp. stock.

Petitioner Hewlett-Packard Company states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner Holcim (US) Inc. states that its parent corporation is Holcim Ltd, and further states that, aside from the aforementioned parent corporation, no publicly held company owns 10% or more of its stock.

vi

Petitioner Honeywell International Inc. states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Petitioner International Business Machines Corporation states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner JPMorgan Chase & Co. states that it has no parent corporation and further states that no publicly held company owns 10% or more of its stock.

Petitioner 3M Co. states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Petitioner National Westminster Bank Plc states that it is a wholly owned subsidiary of The Royal Bank of Scotland plc, which in turn is a wholly owned subsidiary of The Royal Bank of Scotland Group plc, which is publicly traded on the FTSE.

Petitioner Nestlé USA, Inc. states that its parent corporation, through an intermediate holding company, is Nestlé S.A., and further states that, aside from the aforementioned parent corporation, no publicly held company owns 10% or more of its stock.

Petitioner Shell Oil Company states that it is a wholly owned subsidiary of Shell Petroleum Inc., which is an indirect wholly owned subsidiary of Royal Dutch Shell plc, and further states that, aside from that indirect, ultimate parent corporation, no publicly held company owns 10% or more of its stock.

Petitioner UBS AG states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

vii

Petitioner Xerox Corporation states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

viii

## TABLE OF CONTENTS

**Page**

QUESTIONS PRESENTED ..........................................i

RULE 14.1(b) STATEMENT ......................................ii

RULE 29.6 STATEMENT ..........................................ii

TABLE OF AUTHORITIES ......................................xi

OPINIONS BELOW .................................................1

JURISDICTION.........................................................1

STATUTORY PROVISION INVOLVED ...................1

STATEMENT..............................................................1

    A. Apartheid And Its Aftermath ..........................2

    B. Proceedings Below............................................5

REASONS FOR GRANTING THE PETITION .......13

I.    THE SECOND CIRCUIT'S FAILURE TO
    DISMISS THIS CASE IN LIGHT OF ITS
    SIGNIFICANT AND IMMEDIATE EFFECT ON
    FOREIGN RELATIONS REQUIRES REVIEW BY
    THIS COURT.......................................................14

    A. The Very Pendency Of This Litigation
    Is A Source Of Diplomatic Friction And
    Interferes With U.S. Foreign Policy. .............15

    B. Courts Must Address At The Earliest
    Opportunity Whether To Dismiss Cases
    That Threaten Interference With
    Foreign Relations. ..........................................16

    C. Dismissal Is Warranted Now Because
    This Suit Undermines The Foreign
    Policy Prerogatives Of The Political
    Branches. .........................................................20

ix

## TABLE OF CONTENTS—continued

Page

II. AIDING AND ABETTING CLAIMS ARE NOT
COGNIZABLE UNDER THE ATS. .......................... 22

A. The Lower Courts Need Guidance On
Whether Aiding And Abetting Claims
May Be Asserted Under the ATS. ................. 23

B. The Second Circuit's Recognition Of
Civil Aiding And Abetting Liability Is
Inconsistent With This Court's
Decisions And Has No Basis In
International Law. ......................................... 27

III. COURTS MAY NOT IMPOSE DIRECT
LIABILITY UNDER THE ATS IN THE FACE OF
CONTRARY INSTRUCTIONS FROM CONGRESS. ...... 33

CONCLUSION.......................................................... 35

## APPENDIX TABLE OF CONTENTS

Page

APPENDIX A: Opinion of the Second Cir-
cuit Court of Appeals, dated October 12,
2007 ......................................................................... 1a

APPENDIX B:   Opinion of the District
Court for the Southern District of New
York, dated Nov. 28, 2004 ................................... 181a

APPENDIX C: Opinion of the Second Cir-
cuit Court of Appeals Denying Defen-
dants' Motion to Stay the Mandate, dated
November 27, 2007 ............................................... 214a

APPENDIX D: Statement of Interest of
the United States, submitted to the Dis-

x

## TABLE OF CONTENTS—continued

**Page**

trict Court for the Southern District of New York on October 30, 2003 ............................ 236a

APPENDIX E: Brief of the Republic of South Africa as Amicus Curiae, submitted to the Second Circuit Court of Appeals on October 14, 2005 ............................................. 283a

APPENDIX F: Statement of the Republic of South Africa in Response to the October 12, 2007, Opinion of the Second Circuit Court of Appeals, dated October 19, 2007 ...................................................................... 310a

APPENDIX G:  Statement in National Assembly of President Mbeki, dated November 8, 2007 ..................................................... 312a

xi

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aldana* v. *Del Monte Fresh Produce, N.A.*,
  416 F.3d 1242 (11th Cir. 2005) ...........................25

*American Insurance Ass'n* v. *Garamendi*,
  539 U.S. 396 (2003) .............................................22

*Arbaugh* v. *Y & H Corp.*, 546 U.S. 500 (2006).........28

*Baker* v. *Carr*, 369 U.S. 186 (1962) ...........................21

*Banco Nacional de Cuba* v. *Sabbatino*,
  376 U.S. 398 (1964) .................................14, 21, 22

*Bell Atlantic Corp.* v. *Twombly*,
  127 S. Ct. 1955 (2007) .........................................27

*Bi* v. *Union Carbide Corp.*, 984 F.2d 582
  (2d Cir. 1993) .......................................................21

*Cabello* v. *Fernandez-Larios*,
  402 F.3d 1148 (11th Cir. 2005) ...........................25

*Central Bank of Denver, N.A.* v. *First
  Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) .................................30, 31, 32

*Chicago & Southern Air Lines, Inc.* v.
  *Waterman Steamship Corp.*, 333 U.S. 103
  (1948) ....................................................................21

*Corrie* v. *Caterpillar, Inc.*, 403 F. Supp. 2d
  1019  (W.D. Wash. 2005), *aff'd on other
  grounds*, 503 F.3d 974 (2007), *and petition
  for reh'g filed*, No. 05-36210 (9th Cir. Oct.
  9, 2007)..................................................................24

*Corrie* v. *Caterpillar, Inc.*, 503 F.3d 974 (2007),
  *petition for reh'g filed*, No. 05-36210
  (9th Cir. Oct. 9, 2007).......................17, 18, 21, 23

xii

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Doe I* v. *Unocal Corp.*, 395 F.3d 932 (2002),
    *reh'g en banc granted*, 395 F.3d 978 (2003),
    *and vacated and appeal dismissed*,
    403 F.3d 708 (9th Cir. 2005) .........................25, 26

*Doe* v. *Exxon Mobil Corp.*, 393 F. Supp. 2d 20
    (D.D.C. 2005), *appeal dismissed*,
    473 F.3d 345 (D.C. Cir.), *petition for cert.
    filed*, 76 U.S.L.W. 3050 (U.S. July 20, 2007)
    (No. 07-81).............................................24

*Dura Pharmaceuticals, Inc.* v. *Broudo*,
    544 U.S. 336 (2005) ..............................27

*EEOC* v. *Arabian American Oil Co.*,
    499 U.S. 244 (1991) ..............................33

*Enahoro* v. *Abubakar*,
    408 F.3d 877 (7th Cir. 2005) .................28, 34, 35

*Hunter* v. *Bryant*, 502 U.S. 224 (1991)....................18

*Hwang Geum Joo* v. *Japan*, 413 F.3d 45
    (D.C. Cir. 2005).........................................17, 20, 21

*Merrill Lynch, Pierce, Fenner & Smith,
    Inc.* v. *Dabit*, 547 U.S. 71 (2006).........................27

*Oetjen* v. *Central Leather Co.*,
    246 U.S. 297 (1918) ..............................15

*Presbyterian Church of Sudan* v.
    *Talisman Energy, Inc.*,
    374 F. Supp. 2d 331 (S.D.N.Y. 2005) .................25

*Puerto Rico Aqueduct & Sewer
    Authority* v. *Metcalf & Eddy, Inc.*,
    506 U.S. 139 (1993) ..............................18

xiii

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Sinochem International Co.* v. *Malaysia International Shipping Corp.*, 127 S. Ct. 1184 (2007) ...............................................................17

*Sosa* v. *Alvarez-Machain*, 542 U.S. 692 (2004) ...................................*passim*

*Tenet* v. *Doe*, 544 U.S. 1 (2005)...........................17, 18

*Verlinden B.V.* v. *Central Bank of Nigeria*, 461 U.S. 480 (1983) ..............................................26

*Will* v. *Hallock*, 546 U.S. 345 (2006) ........................19

## STATUTES AND TREATIES

18 U.S.C. § 1091....................................................34

18 U.S.C. § 1092.............................................10, 34

28 U.S.C. § 1254(1) ...................................................1

28 U.S.C. § 1331....................................................28

28 U.S.C. § 1350....................................................1, 5

Comprehensive Anti-Apartheid Act of 1986, Pub. L. No. 99-440, 100 Stat. 1086 (repealed 1993) ......................................................3

Convention on the Prevention and Punishment of the Crime of Genocide, Nov. 4, 1988, 102 Stat. 3045, 78 U.N.T.S. 277 ............................................10, 11

Genocide Convention Implementation Act of 1987, Pub. L. No. 100-606, 102 Stat. 3045 (codified at 18 U.S.C. § 1091)..............................34

Torture Victim Protection Act, 28 U.S.C. § 1350 note.........................................................35

xiv

## TABLE OF AUTHORITIES — continued

**Page(s)**

**LEGISLATIVE MATERIALS**

S. Rep. No. 99-370 (1986) ..........................................3

*State Department Report to Congress on
    Industrialized Democracies' Relations
    With and Measures Against
    South Africa* (1987)...............................................3

**ADMINISTRATIVE MATERIALS**

Executive Order No. 12,532, 50 Fed. Reg.
    36,861 (Sept. 9, 1985) ...........................................3

**INTERNATIONAL MATERIALS**

*AZAPO* v. *President of the Republic of
    South Africa* 1996 (8)
    BCLR 1015 (CC) (S. Afr.) .....................................4

*United States* v. *von Weizsaecker*
    (Ministries Case), 14 Trials of War
    Criminals Before the Nurnberg Military
    Tribunals 621-22
    (Military Tribunal IV A 1949)...........................31

S. AFR. (Interim) CONST. 1993 ...................................4

The Promotion of National Unity and
    Reconciliation Act 34 of 1995 ...............................4

**MISCELLANEOUS**

Andrews, *Reparations for Apartheid's Victims:
    The Path to Reconciliation?,* 53 DEPAUL L.
    REV. 1155 (2004)...................................................4

*Barboza* v. *Drummond Co.*, No. 06-CV-61527,
    Compl. (S.D. Fla. Oct. 10, 2006).........................24

xv

# TABLE OF AUTHORITIES—continued

**Page(s)**

Bradley *et al.*, Sosa*, Customary International Law, and the Continuing Relevance of* Erie*,* 120 HARV. L. REV. 869 (2007) ..........................................23, 30

*Doe* v. *Nestlé, S.A.*, No. 05-CV-5133, Compl. (C.D. Cal. July 15, 2005).........................24

*Doe* v. *Wal-Mart Stores, Inc.*, No. 05-CV-7307, First Am. Compl. (C.D. Cal. Dec. 28, 2005)........24

*Does* v. *Chiquita Brands International, Inc.*, No. 07-CV-10300, Compl. (S.D.N.Y. Nov. 14, 2007)..............................................................23

*Mastafa* v. *Australian Wheat Board Ltd.*, No. 07-CIV-7955, Compl. (S.D.N.Y. Sept. 11, 2007)..............................................................24

*Mohamed* v. *Jeppesen Dataplan, Inc.*, No. 5:07-CV-02798, First Am. Compl. (N.D. Cal. Aug. 1, 2007).........................24

Ratner, *Corporations and Human Rights: A Theory of Legal Responsibility,* 111 YALE L.J. 443 (2001) ......................................................23

*Xiaoning* v. *Yahoo! Inc.*, No. 07-CV-2151, Second Am. Compl. (N.D. Cal. July 30, 2007)..................................................................24

## OPINIONS BELOW

The opinion of the court of appeals is reported at 504 F.3d 254 and is reprinted in the Appendix to this petition. (App. 1a-180a). The order denying the motion to stay the mandate (App. 214a-235a) is not reported but is available at 2007 WL 4180152 (2d Cir. Nov. 27, 2007). The opinion of the district court (App. 181a-213a) is reported at 346 F. Supp. 2d 538.

## JURISDICTION

The judgment of the court of appeals was entered on October 12, 2007. This Court's jurisdiction rests on 28 U.S.C. § 1254(1).

## STATUTORY PROVISION INVOLVED

The Alien Tort Statute (ATS), 28 U.S.C. § 1350, provides:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

## STATEMENT

These cases purport to be brought on behalf of tens of millions of residents of South Africa claiming harm from that country's former policy of apartheid. Invoking the ATS, 28 U.S.C. § 1350, plaintiffs sued more than 50 U.S. and foreign corporations on the theory that, by doing business in or with South Africa, defendants "aided and abetted" violations of international law committed by the apartheid-era regime. This litigation has been condemned repeatedly by South Africa's current, democratically elected government as a "completely unacceptable" infringement of that nation's sovereignty that is incon-

2

sistent with its domestic policy of reconciliation. App. 312a. The United States has also objected to continuation of these suits, explaining that the litigation has created tension in this country's relations with South Africa and other allies, is inconsistent with the United States' strong support for South Africa's reconciliation policy, and undermines the policy of commercial engagement that often is an important element of U.S. diplomacy. App. 236a-282a. Citing the views expressed by South Africa and the United States, this Court previously identified *these particular cases* as ones where "a policy of case-specific deference to the political branches" could well preclude "relief in the federal courts for violations of customary international law." *Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004).

In the decision below, however, a divided panel of the Second Circuit refused to defer to the position of the Executive Branch or, indeed, even to address the views expressed by the U.S. and South African governments. Instead, the court held that the ATS confers jurisdiction to resolve plaintiffs' claims and remanded for what is certain to be years of additional litigation. This ruling is causing *present* injury to important interests of the United States and the Republic of South Africa. It undercuts decisions taken by the political branches on matters of foreign policy. And it encourages what already was a growing flood of creative litigation under the ATS, disregarding *Sosa*'s admonition that novel theories of international law do not support an ATS action. Review by this Court is imperative.

## A. Apartheid And Its Aftermath

1.   South Africa's system of apartheid was strongly condemned by other nations. The best way

3

to achieve reform in South Africa, however, was the subject of considerable debate in the United States and other nations. The United States ultimately adopted a policy of "constructive engagement," determining that commerce with South Africa would help end apartheid.

President Reagan, by Executive Order, encouraged U.S. companies doing business in South Africa to follow "fair labor principles," and restricted trade only in limited categories of goods. Exec. Order No. 12,532, §§ 2(a), (c), 50 Fed. Reg. 36,861, 36,862-63 (Sept. 9, 1985). Similarly, the Comprehensive Anti-Apartheid Act of 1986, Pub. L. No. 99-440, 100 Stat. 1086 (repealed 1993) – which "set[] out United States policy toward the Government of South Africa, the victims of apartheid, and the other states in southern Africa," and established "a comprehensive and complete framework to guide the efforts of the United States" toward South Africa (100 Stat. at 1089) – imposed targeted sanctions on specific types of trade but otherwise generally permitted commerce with South Africa. Congress rejected competing bills calling for stricter sanctions. See S. Rep. No. 99-370, at 5 (1986).

Most other developed nations likewise rejected wholesale economic withdrawal from South Africa. See *State Department Report to Congress on Industrialized Democracies' Relations With and Measures Against South Africa* (1987). Although regulation of South African commerce took diverse forms, all of the home countries of the foreign corporations that are defendants here permitted commerce generally in and with South Africa. *Ibid.*

2. Apartheid began to crumble in the late 1980s. South Africa adopted an interim Constitution in

4

1993 and elected its first multiracial democratic government, led by President Nelson Mandela, in 1994. See App. 301a.

A central goal of the new government was, as the interim Constitution put it, the "pursuit of national unity," which required "reconciliation" of South Africa's people and "reconstruction" of its society. S. AFR. (Interim) CONST. 1993 at ch. 15 § 250. To that end, Parliament established a Truth and Reconciliation Commission (TRC) charged with "promot[ing] national unity and reconciliation in a spirit of understanding which transcends the conflicts and divisions of the past." The Promotion of National Unity and Reconciliation Act 34 of 1995, ch. 2 s. 3(1) (TRC Act). Parliament also created a systematic process for addressing reparations (see TRC Act, ch. 5), as "part of the broader project of national reconciliation and nation building." Andrews, *Reparations for Apartheid's Victims: The Path to Reconciliation?*, 53 DEPAUL L. REV. 1155, 1163 (2004). The President eventually authorized and Parliament approved payment of reparations to some 20,000 individual victims identified by the TRC. *Ibid.*

Reviewing this process, the Constitutional Court of South Africa concluded: "without a firm and generous commitment to reconciliation and national unity," the difficult task of building a new democratic order could not have been achieved. *AZAPO v. President of the Republic of South Africa* 1996 (8) BCLR 1015 (CC) at 1196 (S. Afr.). That approach has been widely lauded as a model for other nations making a transition to democracy. See Andrews, *supra*, at 1158.

5

### B.  Proceedings Below

1.  This litigation involves eleven suits brought purportedly on behalf of all persons living in South Africa between 1948 and 1994 who were injured by apartheid.  Defendants are more than 50 major U.S. and foreign corporations that allegedly did business in South Africa during the apartheid era.  Plaintiffs seek to recover under the ATS, which grants federal courts jurisdiction over claims brought by aliens "for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  They assert that apartheid violated international law and that the ATS allows a U.S. court to impose liability on any corporation that operated in South Africa, on the theory that such a corporation "aided and abetted" apartheid.

None of plaintiffs' many complaints and amended complaints alleges that defendants took specific steps for the purpose of furthering apartheid or asserts a causal connection between any particular plaintiff's injuries and any defendant's conduct. Instead, as the dissenting judge below accurately characterized them, the complaints contend generally that, had defendants not done business in South Africa, "'[a]partheid would not have occurred *in the same way*.'"  App. 83a (opinion of Korman, J., quoting one complaint; emphasis by court).  Thus, "car companies are accused of selling cars, computer companies are accused of selling computers, banks are accused of lending money, oil companies are accused of selling oil, and pharmaceutical companies are accused of selling drugs."  App. 82a.  Along with other forms of relief, plaintiffs seek damages exceeding $400 billion.

6

2. The South African government – after "an extensive discussion both at Cabinet committee level and in the full Cabinet" (App. 304a) – submitted to the district court an unsolicited sworn declaration of its Minister of Justice and Constitutional Development setting forth its view that, "as these proceedings interfere with a foreign sovereign's efforts to address matters in which it has the predominant interest, such proceedings should be dismissed" (App. 298a).[1]   This declaration described the extensive measures taken since 1994 by the democratically elected governments of South Africa to address the legacy of apartheid.  It explained that, "[i]n taking these constitutionally-mandated steps, the government deliberately avoided a 'victors' justice' approach to the crimes of apartheid and chose instead one based on confession and absolution, informed by the principles of reconciliation, reconstruction, reparation and good will." App. 299a.

The current litigation, the South African government continued, "will intrude upon and disrupt our own efforts to achieve reconciliation and reconstruction," interfere with "matters of domestic policy which are pre-eminently South African," and "discourage much-needed direct foreign investment in

---

[1] When the issue was debated in South Africa's parliament, the Minister of Trade and Industry stated:  "[W]e are opposed to and indeed contemptuous of attempts to use unsound extraterritorial legal precepts in the [United States] to seek personal financial gain in South Africa. * * * The government rejects the actions of legal practitioners in the USA to exploit our history." App. 96a (citing C.A. App. A00754-55).  The Minister of Education stated: "South Africa must settle this issue for [itself] and does not need the help of ambulance chasers and contingency fee operators, whether [in European countries] or the United States of America." App. 97a (citing C.A. App. A00758).

7

South Africa." App. 308a. Quoting South African President Thabo Mbeki, the declaration stated that the South African government considers it "completely unacceptable that matters * * * central to the future of our country should be adjudicated in foreign courts which bear no responsibility for the well being of our country." App. 312a.

The United States also urged dismissal, expressing concern that "continued adjudication * * * risks potentially serious adverse consequences for significant interests of the United States." App. 244a. It explained that

> we are sensitive to the views of the South African government that adjudication of these cases will interfere with its policy goals, especially in the areas of reparations and foreign investment, and we can reasonably anticipate that adjudication of these cases will be an irritant in U.S.-South African relations.

App. 245a. The United States further noted that other foreign governments "have expressed their profound concern" about the effect of this litigation on their corporate citizens, raising the prospect of "continuing tensions in our relations with these countries over the litigation." App. 245a. And the United States described the broader adverse economic and diplomatic implications of these suits, observing that the litigation will "discourage" corporations "from investing in many areas of the developing world, where investment is most needed and can have the most forceful and positive impact on both economic and political conditions." App. 246a.

8

3. Defendants moved to dismiss the suits. While the motions were pending, this Court decided *Sosa*. The Court held that the ATS is a jurisdictional statute that "enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." 542 U.S. at 712. *Sosa* instructed that, before recognizing any new category of ATS claim, a court must determine whether the alleged violation of international law has "definite content and acceptance among civilized nations" equivalent to those of the limited number of 18th-century violations (such as piracy) that the statute was enacted to address. *Id.* at 732. In addition, a court must consider "the practical consequences of making that cause [of action] available to litigants in the federal courts," including the problems that can occur when U.S. courts make decisions directly affecting diplomatic relations and foreign policy. *Id.* at 732-33.

*Sosa* also explained that "[t]his requirement of clear definition is not meant to be the only principle limiting the availability of relief in the federal courts for violations of customary international law." *Id.* at 733 n.21. Suggesting that adjudication of ATS cases could be denied based on "a policy of case-specific deference to the political branches," the Court offered these cases as an illustration of litigation raising particular diplomatic and political concerns:

> [T]here are now pending in Federal District Court several class actions seeking damages from various corporations alleged to have participated in, or abetted, the regime of apartheid that formerly controlled South Africa. The Government of South Africa has said that these cases interfere with the pol-

9

icy embodied by its Truth and Reconciliation
Commission[.] * * * The United States has
agreed. In such cases, there is a strong ar-
gument that federal courts should give seri-
ous weight to the Executive Branch's view of
the case's impact on foreign policy.

*Ibid.* (citations omitted).

4. The district court dismissed the cases. App.
213a. Relying on *Sosa*, the court found "that aiding
and abetting international law violations" is not "it-
self an international law violation that is universally
accepted as a legal obligation." App. 197a. And cit-
ing *Sosa*'s reference to "case-specific deference to the
political branches," the district court also held that
the "collateral consequences" of permitting the cases
to go forward mandate dismissal. App. 200a. The
court placed "great weight" on the submissions of
South Africa and the United States describing how
this litigation would interfere with South Africa's
ability to "handle domestic matters" and "hamper the
policy of encouraging positive change in developing
countries via economic investment." App. 205a-206a.

5. On plaintiffs' appeal, South Africa and the
United States submitted briefs reiterating their view
that these suits should be dismissed. But a divided
panel of the Second Circuit reversed dismissal of the
complaints. App. 20a.

The majority ruled that the ATS establishes ju-
risdiction over plaintiffs' claims, holding "that in this
Circuit, a plaintiff may plead a theory of aiding and
abetting liability under the [ATS]." App. 12a. The
members of the majority, however, disagreed on the
source of and standard governing that rule. Judge
Katzmann looked primarily to *international criminal*

10

law, concluding that an ATS plaintiff must show that the defendant acted with the purpose of facilitating the primary violation (App. 32a-48a); Judge Hall grounded his rule in *domestic civil* law of secondary liability and would not require a showing of purpose to assist the violation (App. 65a-71a, 76a).

The majority concluded that these determinations were sufficient to establish jurisdiction under the ATS, but declined to address the practical considerations that might militate against recognition of a cause of action for aiding and abetting.  See App. 14a-18a.

In addition, the majority upheld jurisdiction over the ATS claims seeking to hold defendants *directly* liable for genocide under the Convention on the Prevention and Punishment of the Crime of Genocide, Nov. 4, 1988, 102 Stat. 3045, 78 U.N.T.S. 277, despite Congress's enactment of 18 U.S.C. § 1092, which precludes private actions for enforcement of that Convention.  App. 60a-61a & n.18, 76a.

Notwithstanding the submissions of the United States and South Africa, the majority refused to address the related doctrines of "case-specific deference," political question, and international comity, asserting that the district court had not considered those issues.  App. 14a-18a.  Suggesting that plaintiffs may seek to amend their complaints on remand, the majority invited the district court "to solicit anew the views of" the United States and South Africa.  App. 18a n.3.

Judge Korman dissented in substantial part.  App. 79a-180a.  He took issue with the separate analyses of ATS aiding and abetting liability offered by both members of the majority (App. 154a-180a)

11

and with their view that direct liability could be pursued under the Genocide Convention (App. 142a-143a).

Judge Korman also explained, in detail, his view that the litigation should have been dismissed on grounds of case-specific deference "at the threshold" (App. 115a):

> (1) the Supreme Court in *Sosa* * * * has instructed us that this is the very sort of case in which jurisdiction should not be exercised; (2) the State Department has filed a persuasive Statement of Interest in this matter urging dismissal because of the adverse effect the continued prosecution of these cases would have on the interests of the United States and our relations with other countries; and (3) the Republic of South Africa, a democratically elected government representative of all South Africans, including the victims of apartheid, has asserted the right to define and finalize issues related to reparations for apartheid-era offenses within its own legal framework – thus making this lawsuit an insult to the post-apartheid, black majority government of a free people.

App. 86a.

6. The panel, again by a divided vote, denied defendants' motion to stay the mandate.  App. 214a-235a.  Repeating its view that the issues of political question and case-specific deference had not been addressed by the district court, the majority instructed the district court on remand to assess the validity of the interests asserted by the United States and by the elected government of South Africa

12

by considering "the competing views" about South Africa's sovereign interests and U.S. foreign policy expressed by various South African nongovernmental entities supporting plaintiffs. App. 220a n.2.

Judge Korman again dissented. Noting "what can only be described as an extraordinary discussion of" this litigation in *Sosa*, Judge Korman explained that the district court *did* apply the doctrine of case-specific deference (App. 223a, 227a-232a) and concluded that "[t]he continued prosecution of this matter constitutes a continuing insult to the Republic of South Africa and a continuing irritant to our relationship with the post-apartheid government" (App. 225a). He also noted the danger that "the Republic of South Africa could be forced into an evidentiary hearing to defend the validity of its objection," explaining that "the majority contemplates a remand that would subject a foreign democratic nation to the indignity of having to defend policy judgments that have been entrusted to it by a free people against an attack by private citizens and organizations who have lost the political battle at home. This dispute is not the business of the Judicial Branch of the United States." App. 226a-227a. He concluded that "this case is worthy of certiorari." App. 234a.

7. Within a week after the Second Circuit released its decision, the South African government expressly condemned the holding, reaffirming its view "that the case is directly related to the sovereignty of the South African state and should be resolved through South Africa's own democratic processes. We submit that another country's courts should not determine how ongoing political processes in South Africa should be resolved." App. 310a (quo-

13

tations omitted).  President Mbeki subsequently reiterated this view on the floor of South Africa's National Assembly, denouncing the decision as "judicial imperialism" that denied "the sovereign right of the people of South Africa to decide their future."  App. 316a.  President Mbeki approvingly quoted Judge Korman's observation that allowing this litigation to proceed would "send the message that the United States does not respect the ability of South African society to administer justice."  App. 313a.

## REASONS FOR GRANTING THE PETITION

This litigation, in which plaintiffs effectively ask a U.S. court to replace South Africa's democratically adopted policy of reconciliation with a massive program of reparations overseen by a U.S. judge, involves issues of the most fundamental practical and doctrinal importance.  The government of South Africa, repeatedly and insistently, has labeled adjudication of these suits in U.S. courts an affront to its sovereignty that threatens to disturb its program of political reconciliation and impair its economic growth.  The United States has added that these suits cause tension in this Nation's foreign relations and undermine its diplomacy.  The Second Circuit's response was to propose remand proceedings that will put on trial the legitimacy of the South African government's consistently stated view about the effects of this litigation on its sovereignty.  This holding misunderstands the judicial role and threatens to undermine vital interests of the United States.

The court of appeals was equally wrong in holding that civil liability for aiding and abetting a foreign nation's alleged violation of international law in its own territory is the sort of universally recognized norm of international law that this Court described

14

in *Sosa*. This ruling, which will accelerate a disturbing trend in the lower courts, takes the ATS well beyond the boundaries fixed in *Sosa*. It will encourage further litigation that does not belong in U.S. courts and that adversely affects U.S. foreign policy.

It has been more than four years since the State Department warned that "continued adjudication" of this matter "risks potentially serious adverse consequences for significant interests of the United States" (App. 244a), and nearly as long since this Court declared that "the Executive Branch's view of the case's impact on foreign policy" should be given "serious weight" (*Sosa*, 542 U.S. at 733 n.21) – precisely what the district court did. It is now time to bring this litigation to a close. As in other cases presenting matters of similar importance and sensitivity, the Court should "grant[] certiorari because the issues involved bear importantly on the conduct of the country's foreign relations and more particularly on the proper role of the Judicial Branch." *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 407 (1964).

## I.   THE SECOND CIRCUIT'S FAILURE TO DISMISS THIS CASE IN LIGHT OF ITS SIGNIFICANT AND IMMEDIATE EFFECT ON FOREIGN RELATIONS REQUIRES REVIEW BY THIS COURT.

In *Sosa*, the Court noted the importance of "deference to the political branches" on matters relating to the foreign relations of the United States, specifically identifying *this litigation* as a good candidate for deference. 542 U.S. at 733 n.21. But the Second Circuit expressly declined this Court's suggestion, instead remanding the matter for what certainly will be years of additional litigation.

15

This holding was wrong in two fundamental respects. The court of appeals' refusal to consider the deference question at the outset – thus prolonging litigation whose very pendency is an irritant to U.S. foreign relations – was itself a serious error. And appropriate deference does, in fact, mandate dismissal of the case. Review by this Court would do more than correct these errors; it also would provide essential guidance for the disposition of a growing category of cases that, by definition, involve difficult, important, and sensitive issues.

### A. The Very Pendency Of This Litigation Is A Source Of Diplomatic Friction And Interferes With U.S. Foreign Policy.

This is a case where immediate resolution of the deference issue is essential because the litigation touches on matters "committed by the Constitution to the executive and legislative – 'the political' – departments of the government." *Oetjen* v. *Central Leather Co.*, 246 U.S. 297, 302 (1918).

The continued litigation of this matter, not just its possible outcome, is *itself* a direct intrusion on South Africa's sovereignty and an ongoing, significant irritant to the United States' relations with that nation. The South African government repeatedly has condemned these lawsuits as U.S. judicial overreaching that interferes with South Africa's reconciliation process – twice in express statements by that country's President. Yet the court below disregarded South Africa's views, adding to the insult by directing remand proceedings contemplating evidentiary hearings on the legitimacy of South Africa's domestic policy. App. 14a & n.8, 219a-220a & n.2, 226a-227a. It is difficult to imagine litigation that interferes with more fundamental domestic interests

16

of another nation or that more directly disturbs U.S. relations with that nation.

The decision below will have other unfortunate consequences for U.S. diplomacy. As the United States has stated, the ruling creates tension with many of the United States' key allies and trading partners, which have expressed "profound concern" (App. 245a) about their corporate citizens being haled into U.S. courts and forced to litigate whether they violated U.S. or international law by engaging in conduct that their home governments permitted and often encouraged.

At the same time, the Second Circuit's decision will disrupt the broader conduct of U.S. diplomacy: by threatening greatly expanded ATS liability, premised on ordinary commercial activity by multinational corporations, it will discourage companies from participating in international commerce and economic development in the many nations whose governments have imperfect human rights records, even where it is the explicit policy of the United States and other democracies to encourage commercial engagement as the best means of promoting social and political change.

**B. Courts Must Address At The Earliest Opportunity Whether To Dismiss Cases That Threaten Interference With Foreign Relations.**

In declining to address whether these cases should be dismissed on deference grounds at the "threshold," as Judge Korman urged (App. 115a), the Second Circuit intimated that it could not reach the deference issue without first deciding ATS jurisdiction. See App. 77a (Hall, J.) (criticizing Judge Kor-

17

man for "conflating the anterior question of the existence of subject-matter jurisdiction with the posterior question of justiciability"). But "'[i]t is hardly novel for a federal court to choose among threshold grounds'" for declining to reach the merits, even if those grounds are not, strictly speaking, jurisdictional. *Tenet* v. *Doe*, 544 U.S. 1, 6 n.4 (2005) (citation omitted). Accord *Sinochem Int'l Co.* v. *Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184, 1191 (2007). Compelling considerations rooted in the Constitution's allocation of foreign affairs authority to the Executive Branch and Congress should have led the court of appeals to address *at the threshold* the matter of deference to the political branches.

Indeed, in sharp contrast to the Second Circuit, other courts of appeals have given proper weight to foreign policy considerations and dismissed ATS suits on political question grounds at the outset, even before reaching other arguments – including jurisdictional arguments – in support of a motion to dismiss.

Thus, in *Hwang Geum Joo* v. *Japan*, 413 F.3d 45 (D.C. Cir. 2005), the D.C. Circuit found dispositive the Executive's statement that continued litigation would be detrimental to U.S. foreign policy, holding that "[t]he Executive's judgment that adjudication by a domestic court would be inimical to the foreign policy interests of the United States is compelling and renders this case nonjusticiable under the political question doctrine." *Id.* at 52 (citation omitted). The court chose to dispose of the case on that ground rather than address the existence of subject matter jurisdiction under the Foreign Sovereign Immunities Act. *Id.* at 47-48. Similarly, in *Corrie* v. *Caterpillar, Inc.,* 503 F.3d 974 (2007), *petition for reh'g filed*, No.

18

05-36210 (9th Cir. Oct. 9, 2007), the Ninth Circuit pretermitted further adjudication of the many other issues in an ATS suit when it determined that "[a] court could not find in favor of the plaintiffs without implicitly questioning, and even condemning, United States foreign policy." *Id.* at 984. The court dismissed the case as presenting a nonjusticiable political question because the "foreign policy decision [at issue] is committed under the Constitution to the legislative and executive branches." *Id.* at 983.

This Court has recognized in a variety of contexts the importance of deciding at the threshold whether to terminate litigation that threatens significant national or governmental interests. In *Tenet*, for example, the Court, before addressing any other issue, affirmed the dismissal of plaintiffs' case under the "*Totten* bar," which precludes spies from suing the government to enforce secret espionage agreements. Allowing the case to proceed, the Court explained, would be "inconsistent" with a rule "designed not merely to defeat the asserted claims, but to preclude judicial inquiry." 544 U.S. at 6 n.4. Similarly, in cases involving governmental defendants, the Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation" (*Hunter* v. *Bryant*, 502 U.S. 224, 227 (1991)) because "the central benefits" of immunity "would be forfeited" if courts delayed making a final decision on its availability (*Puerto Rico Aqueduct & Sewer Auth.* v. *Metcalf & Eddy, Inc.*, 506 U.S. 139, 143-44 (1993)).

The deference principle applicable here operates similarly, counseling against judicial inquiry in cases, like this one, where the litigation itself intrudes upon the political branches' conduct of foreign

19

affairs. Just as the value of sovereign immunity is lost if foreign states are compelled to endure the burdens of litigation before dismissal, so too would the purpose of deference be frustrated if litigation that harms foreign relations were unnecessarily prolonged. Accordingly, if a decision whether to dismiss this litigation is not made promptly, the central interests served by deferring to the Executive's primacy in foreign affairs will be forfeited and a "substantial public interest" "imperil[ed]." *Will* v. *Hallock*, 546 U.S. 345, 353 (2006).

The majority below also indicated that it was not addressing the political question and case-specific deference points because they had not been considered by the district court. App. 15a-18a, 220a n.2. But, as Judge Korman demonstrated, that simply is not so. App. 112a-114a, 229a-232a. And more fundamentally, as Judge Korman also showed, the importance of the interests at stake here means that the Second Circuit should have resolved this issue – which does not require development or consideration of a factual record – regardless of whether the district court addressed it. App. 114a-116a, 227a-229a. The Second Circuit accordingly erred when it refused to address the deference question. Correction of that error by this Court would reconcile the differing approaches of the court below and the District of Columbia and Ninth Circuits, providing valuable instruction on how the lower courts should treat matters of such sensitivity.

20

**C.  Dismissal Is Warranted Now Because This Suit Undermines The Foreign Policy Prerogatives Of The Political Branches.**

The Second Circuit not only should have reached the question whether this litigation should continue, it also should have affirmed dismissal of these cases on deference grounds.  For a federal court to disregard the judgment of the Executive Branch in these circumstances "would be imprudent to a degree beyond [the court's] power."  *Hwang Geum Joo*, 413 F.3d at 53.  Three related doctrines, those of case-specific deference, comity, and political question, limit the authority of federal courts to adjudicate matters that bear directly on international affairs and diplomatic relations.  Each is implicated here.

1. In the specific ATS context, the Court has recognized a set of "principle[s] limiting the availability of relief in the federal courts for violations of customary international law," among them the "policy of case-specific deference to the political branches."  *Sosa*, 542 U.S. at 733 n.21.  Whether regarded as precluding recognition of a cause of action or as foreclosing a plaintiff's claim on justiciability grounds, this limitation means that courts should be "particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs."  *Id*. at 727.  Closely related considerations of comity, which take account of the interests of other nations, also strongly support this conclusion.  See App. 93a-94a, 222a-223a (Korman, J.).  Avoiding "adverse foreign policy consequences" thus can provide a compelling basis for dismissing particular ATS claims.  *Sosa*, 542 U.S. at 728, 733 n.21.

21

More generally, as the D.C. and Ninth Circuits recognized in *Hwang Geum Joo* and *Corrie*, cases that would bring the Judiciary into conflict with the sovereign interests of foreign nations also may involve non-justiciable political questions because the resolution of such disputes "frequently turn[s] on standards that defy judicial application, or involve[s] the exercise of a discretion demonstrably committed to the executive or legislature." *Baker* v. *Carr*, 369 U.S. 186, 211 (1962). Adjudicating such cases "may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." *Sabbatino*, 376 U.S. at 423. These decisions are "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility." *Chicago & S. Air Lines, Inc.* v. *Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

2. This is an especially compelling example of litigation that the federal courts should not adjudicate because it so directly threatens the dangers identified in *Sosa*: it is a profound affront to South Africa's sovereignty, directly challenging that nation's right to decide how to complete the transition to an open, multiracial society. Plaintiffs would use the U.S. courts to obtain the type of large-scale monetary reparations that the South African government explicitly rejected in post-apartheid legislative and executive determinations. See App. 296a-309a. It would seem obvious that such a matter is not susceptible to "judicial handling" (*Baker*, 369 U.S. at 211-12), and is wholly inconsistent with comity principles (see *Bi* v. *Union Carbide Corp.*, 984 F.2d 582, 586 (2d Cir. 1993)). Any effort to reverse South Africa's post-apartheid policy of reconciliation should be resolved by the South African people

22

through their democratic system, not by a trial in a U.S. court.

This litigation also would require judicial second-guessing of the "constructive engagement" policy implemented by the United States and the home countries of the defendant companies during apartheid; indeed, plaintiffs' claims rest on the view that defendants' actions in accordance with this policy violated international law. The Court has noted the "serious and far-reaching consequences" that would flow from a judicial finding squarely at odds with the way in which the political branches have chosen to conduct international affairs. *Sabbatino*, 376 U.S. at 432. Deciding whether a rogue foreign government is better confronted with "an iron fist" or with "kid gloves" simply is not the "business" of the federal judiciary. *American Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 427 (2003). That, presumably, is why *Sosa* pointed to this litigation as one in which "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." 542 U.S. at 733 n.21. The Court should now confirm what it strongly suggested in *Sosa*.

## II. AIDING AND ABETTING CLAIMS ARE NOT COGNIZABLE UNDER THE ATS.

The Second Circuit made a second significant error by holding that civil aiding and abetting claims satisfy the *Sosa* standard as ones that "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" of piracy, assault on ambassadors, and safe conduct. *Sosa*, 542 U.S. at 725. The profoundly important question presented by the Second Circuit's holding –

23

which will both encourage and confuse ATS litiga-
tion – has in recent years been the subject of a sub-
stantial and burgeoning volume of litigation and con-
siderable academic commentary.[2]    The question
whether an aiding and abetting claim may be stated
under the ATS is an important one in its own right.
The Court would bring needed clarity to broader ATS
law by answering it.

### A. The Lower Courts Need Guidance On Whether Aiding And Abetting Claims May Be Asserted Under The ATS.

1. The *Sosa* Court emphasized repeatedly its ex-
pectation that courts would permit litigation under
the ATS only of an exceedingly "narrow," "modest,"
and "limited" category of claims (542 U.S. at 715,
720, 721, 724, 729) and would exercise "great caution
in adapting the law of nations to private rights" (*id.*
at 728).    Although the Court said the door for such
claims is "still ajar," it must be "subject to vigilant
doorkeeping."    *Id.* at 729.    Since *Sosa* was decided,
however, many plaintiffs and some lower courts have
instead ripped the door from its hinges.    In particu-
lar, claimants have filed a large and rapidly increas-
ing number of lawsuits asserting ATS claims for aid-
ing and abetting violations of international law.[3]

---

[2] See, *e.g.*, Bradley *et al.*, Sosa*, Customary International Law,
and the Continuing Relevance of* Erie, 120 HARV. L. REV. 869
(2007); Ratner, *Corporations and Human Rights:  A Theory of
Legal Responsibility*, 111 YALE L.J. 443, 500-504 (2001).

[3] See, *e.g., Corrie, supra* (allegations that Caterpillar aided and
abetted international law violations by selling to Israeli mili-
tary bulldozers used to demolish Palestinians' homes); *Does* v.
*Chiquita Brands Int'l, Inc.*, No. 07-CV-10300, Compl. ¶¶ 495-
499 (S.D.N.Y. Nov. 14, 2007) (allegations that food companies
aided and abetted Colombian terrorists by paying them "protec-

24

These suits have brought confusion and uncertainty about the standards governing such claims. Some judges, like Judge Korman and the district court here (App. 164a-171a, 197a-200a), have concluded that accessorial liability does not satisfy *Sosa*'s strict standard. *Corrie* v. *Caterpillar, Inc.* 403 F. Supp. 2d 1019, 1026-27 (W.D. Wash. 2005), *aff'd on other grounds*, 503 F.3d 974 (2007), *and petition for reh'g filed,* No. 05-36210 (9th Cir. Oct. 9, 2007); *Doe* v. *Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 24 (D.D.C. 2005), *appeal dismissed*, 473 F.3d 345 (D.C. Cir.), *petition for cert. filed*, 76 U.S.L.W. 3050 (U.S. July 20, 2007) (No. 07-81).  Other lower courts disagree – although for varying reasons, as the separate

---

tion" money); *Mastafa* v. *Australian Wheat Bd. Ltd.*, No. 07-CIV-7955, Compl. ¶¶ 29-45 (S.D.N.Y. Sept. 11, 2007) (allegations that Australian entity and French bank aided and abetted human rights violations of Saddam Hussein's regime by making illicit fee payments to Iraq in connection with U.N. oil-for-food program); *Mohamed* v. *Jeppesen Dataplan, Inc.*, No. 5:07-CV-02798, First Am. Compl. ¶¶ 256, 263 (N.D. Cal. Aug. 1, 2007) (allegations that Boeing subsidiary aided and abetted abuses by providing services to flights involved in the CIA's rendition program); *Xiaoning* v. *Yahoo! Inc.*, No. 07-CV-2151, Second Am. Compl. ¶ 2 (N.D. Cal. July 30, 2007) (allegations that Yahoo aided and abetted torture by providing access to human rights activist's electronic records; case settled); *Barboza* v. *Drummond Co.*, No. 06-CV-61527, Compl. ¶ 49 (S.D. Fla. Oct. 10, 2006) (allegations that coal company aided and abetted paramilitary forces suppressing labor activism; case dismissed); *Doe* v. *Wal-Mart Stores, Inc.*, No. 05-CV-7307, First Am. Compl. ¶¶ 47, 172-177 (C.D. Cal. Dec. 28, 2005) (allegations that Wal-Mart aided and abetted international law violations by failing to stop suppliers from committing labor abuses; case dismissed, appeal pending); *Doe* v. *Nestlé, S.A.*, No. 05-CV-5133, Compl. ¶¶ 35-37 (C.D. Cal. July 15, 2005) (allegations that defendants aided and abetted child labor abuses by purchasing cocoa and providing logistical support to cocoa farmers).

25

opinions below illustrate[4] – or simply fail to consider the impact of *Sosa* on the aiding and abetting issue.[5]

2. The need for guidance from this Court therefore is clear – especially because, for the reasons identified in *Sosa* itself, allowing ATS suits to proceed outside the narrow categories described in *Sosa* damages the broader national interest. As this case demonstrates, ATS suits often "raise risks of adverse foreign policy consequences" (542 U.S. at 728), even when the defendants are non-governmental entities. Such litigation threatens to establish U.S. courts as roving referees of foreign human rights disputes, assessing other nations' practices and reviewing the political branches' decisions regarding the propriety of commercial engagement with those nations. The magnitude of the potential impact on U.S. foreign relations is startling: pending ATS cases involve numerous countries, from Israel to China, Australia to Colombia. See *supra* note 3.

A civil aiding and abetting theory would greatly expand the reach and number of ATS actions. Traditionally, ATS suits have been curtailed by sovereign immunity and the principle that only nations are

---

[4] Compare App. 32a-48a (Katzmann, J., concurring) (international law supplies aiding and abetting norm), *Presbyterian Church of Sudan* v. *Talisman Energy, Inc.*, 374 F. Supp. 2d 331, 337-41 (S.D.N.Y. 2005) (same), and *Doe I* v. *Unocal Corp.*, 395 F.3d 932, 949-51 (2002) (same), *reh'g en banc granted*, 395 F.3d 978 (2003), *and vacated and appeal dismissed*, 403 F.3d 708 (9th Cir. 2005) with App. 65a-76a (Hall, J., concurring) (federal common law), and *Unocal*, 395 F.3d at 965 (Reinhardt, J., concurring) (same).

[5] See, *e.g.*, *Aldana* v. *Del Monte Fresh Produce, N.A.*, 416 F.3d 1242, 1248 (11th Cir. 2005); *Cabello* v. *Fernandez-Larios*, 402 F.3d 1148, 1157-58 (11th Cir. 2005).

26

bound by most international law norms.  See, *e.g.*, *Sosa*, 542 U.S. at 720; *Verlinden B.V.* v. *Central Bank of Nigeria*, 461 U.S. 480, 488-89 (1983).  Permitting aiding and abetting claims enables plaintiffs to sue instead any of a universe of private parties who may bear some connection (however tenuous) to the alleged wrong – even when these parties could not themselves have violated the international law norm directly.

Moreover, in an aiding and abetting claim, accusations of direct human rights abuses are supplanted by far broader and more diffuse allegations – for example, that defendants "gave encouragement," provided "moral support," or "supplied resources" to governments engaged in violations of international law, or that they "benefited from" such violations.  See, *e.g.*, App. 83a-84a, 187a; *Doe I*, 395 F.3d at 951-52 & nn.28-29.  These sorts of allegations are easy to make but time-consuming and expensive to refute, and often impossible to defeat at the pleading or summary judgment stage.

If not cabined by clear and well-defined limits, moreover, ATS suits are uniquely subject to abuse.  Corporations doing business across national borders often are attractive deep pockets for plaintiffs (and lawyers) inclined to bring strike suits.  Because the allegations in these suits often turn on events occurring in far corners of the developing world, discovery is extraordinarily burdensome and expensive.  In addition, the adverse publicity entailed by the inflammatory allegations enables plaintiffs to press for coercive settlements.  The prospect of such strike suit payments will, in turn, spur the filing of many more such actions.  For these reasons, ATS claims pose an even greater risk of vexatiousness than the securities

27

and antitrust class actions that this Court has seen the need to restrain.  See, *e.g.*, *Bell Atlantic Corp.* v. *Twombly*, 127 S. Ct. 1955, 1967 (2007); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit*, 547 U.S. 71, 86 (2006); *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 347 (2005).

**B. The Second Circuit's Recognition Of Civil Aiding And Abetting Liability Is Inconsistent With This Court's Decisions And Has No Basis In International Law.**

The Second Circuit's aiding and abetting ruling misunderstood and misapplied this Court's decisions. *Sosa* permits a cause of action only for violations of a narrow set of international law norms that are universally "accepted by the civilized world and defined with a specificity" comparable to the "historical paradigms familiar when [the ATS] was enacted."  542 U.S. at 725, 732.  The Court explained that "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably, must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts."  *Id*. at 732.  See also *id*. at 727 (adverse "collateral consequences" of ATS litigation).

Civil aiding and abetting liability does not fall within that "very limited set" of international law norms.  *Id*. at 720.  That is especially clear when the "practical consequences" of such claims are taken into account.  The Second Circuit's contrary holding departs from *Sosa* and applies a standard that greatly, and improperly, expands the scope of the ATS.

28

1.  While holding that an aiding and abetting
claim satisfies the *Sosa* standard, the panel majority
purported to decide only whether the ATS creates *ju-
risdiction*, leaving open the question whether practi-
cal or other limiting considerations might preclude
recognition of an aiding and abetting *cause of action*
under the ATS.  App. 12a, 17a n.12.  The Second Cir-
cuit majority understood *Sosa* to mean that ATS ju-
risdiction is proper only if the plaintiff's claim rests
on allegations that satisfy *Sosa*'s requirement of a
universally recognized norm – but that this jurisdic-
tional inquiry is entirely divorced from any consid-
eration of the limiting factors that might lead a court
to decline to recognize a common law cause of action.

As Judge Korman showed and as other courts of
appeals have recognized, however, this separation of
the jurisdictional and cause of action inquiries mis-
understands the ATS, which "is one of a number of
statutes" in which "subject matter jurisdiction turns
on whether the complaint states a cause of action."
App. 117a (citing *Arbaugh* v. *Y & H Corp.*, 546 U.S.
500, 516 n.11 (2006)).  See *Enahoro* v. *Abubakar*, 408
F.3d 877, 884 (7th Cir. 2005) ("Because the ATS pro-
vides jurisdiction over a very limited number of
claims and the jurisdictional grant is so closely tied
to the claim, we need to examine whether there is a
claim in this case which allows for the exercise of ju-
risdiction.").[6]

---

[6] If the ATS were viewed, instead, as paralleling 28 U.S.C.
§ 1331, establishing jurisdiction whenever the plaintiff states a
nonfrivolous claim, that too would provide no support for the
approach taken below, which held the existence of jurisdiction

29

The Second Circuit's error on this point does more than confuse the law of jurisdiction. Its artificial division of the ATS analysis into jurisdictional and nonjurisdictional elements completely disregards this Court's admonition in *Sosa* that the determination whether an international law norm is sufficiently definite "inevitably must" take into account the practical consequences of permitting a cause of action. 542 U.S. at 732.

Moreover, the Second Circuit's approach creates considerable mischief. A separate ATS jurisdictional inquiry of the sort the Second Circuit purported to conduct here is a fruitless exercise as a practical matter because the existence of ATS jurisdiction is important only insofar as it allows adjudication of a cognizable common law cause of action. But precisely because the court of appeal's jurisdictional inquiry is divorced from the practical considerations that counsel caution in the creation of actionable rights grounded in international law, its analysis inevitably will – as it did in this case – litter the law with essentially advisory holdings establishing that particular norms of international law *are* sufficiently accepted and definite to satisfy *Sosa*'s standard. Such an approach is calculated to invite and prolong litigation. This Court's guidance therefore is urgently needed to clarify the law of ATS jurisdiction.

2. That is not the end of the Second Circuit's error: its misunderstanding of *Sosa*'s standard led to its erroneous determination that aiding and abetting claims *do* satisfy the "definite content and accep-

---

to turn on *satisfaction* of *Sosa*'s acceptance and specificity standards.

30

tance" standard.  In fact, a purported international
law norm imposing civil liability upon alleged aiders
and abettors falls further outside the "very limited
set" of actionable international law standards than
the proposed rule against arbitrary detention that
the Court rejected in *Sosa*.  542 U.S. at 734-38.

As Judge Korman showed (App. 138a-154a) and
as commentators have explained, the "gap between
international aspirations and enforceable ATS claims
that was too large in *Sosa* is significantly larger with
respect to corporate [civil] aiding and abetting liabil-
ity for human rights abuses."  Bradley *et al.*, Sosa,
*Customary International Law, and the Continuing
Relevance of* Erie, 120 HARV. L. REV. 869, 928 (2007).
No treaty ratified by the United States imposes such
liability; the Restatement (Third) of Foreign Rela-
tions Law of the United States does not recognize it;
and other nations do not uniformly and regularly
impose it.  *Ibid*.  Even as a matter of *domestic* law,
where aiding and abetting is "an ancient criminal
law doctrine," its application in civil law "has been at
best uncertain" and "there is no general presumption
that the plaintiff may * * * sue aiders and abettors."
*Central Bank of Denver, N.A.* v. *First Interstate Bank
of Denver, N.A.*, 511 U.S. 164, 181-82 (1994).  Where,
as here, creating a private right of action would re-
quire "exercising innovative authority over substan-
tive law," the decision to do so is "better left to legis-
lative judgment."  *Sosa*, 542 U.S. at 726, 727.

3. The lack of uniformity in the relevant body of
law is reflected in the divergent – but equally insup-
portable – approaches taken by the two members of
the Second Circuit majority.  In his concurrence,
Judge Katzmann disregarded the complete absence

31

of international authorities imposing *civil* aiding and abetting liability by looking instead to international authorities involving *criminal* law. See App. 32a-48a. But leaping from criminal to civil aiding and abetting liability is inappropriate. While prosecutorial discretion and heightened procedural safeguards protect against the risk of indiscriminate and disproportionate liability in the criminal setting, anyone who asserts injury can commence a civil aiding and abetting action. *Cf. Sosa*, 542 U.S. at 727 ("The creation of a private right of action raises issues * * * [such as whether] to permit enforcement without the check imposed by prosecutorial discretion."). The Court made just that point in the domestic context in *Central Bank*. 511 U.S. at 181-82.[7] Moreover, the vastly different contexts in which international law authorities discuss criminal aiding and abetting do not furnish answers to a variety of complicated questions associated with civil liability, such as the operation of doctrines like joint and several liability. There could hardly be a clearer example of a tort claim that lacks the "definite content" required by *Sosa*.

Judge Hall, in contrast, derived civil aiding and abetting liability from domestic rather than international law principles. App. 65a-76a. That approach,

---

[7] In addition, as Judge Korman recognized, even if the international criminal cases were relevant, they provide no basis for the recognition of aiding and abetting liability here. App. 164a-180a. See *United States* v. *von Weizsaecker* (Ministries Case), 14 Trials of War Criminals Before the Nurnberg Military Tribunals 621-22 (Military Tribunal IV A 1949) (rejecting the standard of accessorial liability the Second Circuit accepted here).

32

however, disregards *Sosa*'s requirement that "*international law* extend[] the scope of liability for a violation of a given norm to the perpetrator being sued." 542 U.S. at 732 n.20 (emphasis added). Moreover, even if domestic law could properly be invoked to define a tort claim for violating the "law of nations," this Court's decision in *Central Bank* – and its holding that there is no presumptive aiding and abetting liability even where "Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm" (511 U.S. at 182) – requires the rejection of such liability here.

Both members of the Second Circuit majority, moreover, disregarded the district court's careful consideration of the practical consequences of recognizing an aiding and abetting cause of action. App. 194a, 200a. Even if the definiteness of the international law norm were a closer question, these considerations would preclude recognition of aiding and abetting claims.

4. Finally, one additional consideration militates powerfully against application of the ATS in this context. Plaintiffs seek to use the federal courts to hold private parties liable for actions taken by a foreign sovereign in its own territory with respect to its own citizens, and in which the challenged primary conduct took place outside the United States. Indeed, their claims rest entirely on extraterritorial application – to conduct occurring in South Africa – of a common law cause of action created by a federal court. It is fundamental, however, that domestic legislation is presumed to apply only within the territorial jurisdiction of the United States. See, *e.g.*,

33

*EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).

So far as the ATS in particular is concerned, restrictions on the authority of courts to recognize new rights of action are at their zenith where the rule being enforced would "claim a limit on the power of foreign governments over their own citizens"; such claims should be "undertaken, if at all, with great caution." 542 U.S. at 727-28. See *id.* at 761 (Breyer, J., concurring). That enterprise is all the more dubious where, as here, the successor to the objectionable government, despite having repudiated its predecessor's policies, has expressed its steadfast opposition to the U.S. litigation. To proceed with an ATS suit in the face of these concerns would transform a statute designed to ease international tension (see *id.* at 715-18) into a device for exacerbating it. See *id.* at 761 (Breyer, J., concurring). It seems most improbable that this is the sort of "vigilant doorkeeping" the Court intended in *Sosa*.

## III. COURTS MAY NOT IMPOSE DIRECT LIABILITY UNDER THE ATS IN THE FACE OF CONTRARY INSTRUCTIONS FROM CONGRESS.

In addition to permitting plaintiffs' aiding and abetting claims to go forward, the panel majority also permitted plaintiffs to attempt to hold petitioners liable for *directly* violating international law by committing genocide. App. 60a-61a & n.18, 76a. Like its expansive holding on aiding and abetting, that ruling misunderstands the primacy of Congress and the limited judicial role in the creation of common law causes of action. It also cannot be reconciled with the Seventh Circuit's holding that action by Congress in a particular area precludes judicial creation of a

34

common law cause of action under the ATS in that same area.

When Congress enacted the Genocide Convention Implementation Act of 1987, it made genocide a criminal offense. See Pub. L. No. 100-606, 102 Stat. 3045 (codified at 18 U.S.C. § 1091). At the same time, however, Congress expressly barred private parties from pursuing civil claims for genocide. It provided that the creation of criminal liability was not to "be construed as creating any substantive or procedural right enforceable by law by any party in any proceeding." 18 U.S.C. § 1092.

That congressional determination is fatal to the direct liability claim in this case. As *Sosa* explained, courts should generally "look for legislative guidance before exercising innovative authority under substantive law" (542 U.S. at 726), and "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases" (*id*. at 727). The force of these warnings is most compelling where, as here, a court would be acting not merely against a backdrop of congressional silence, but in the teeth of "a clear indication from the political branches that a 'specific, universal, and obligatory' norm against genocide is not to be enforced through a private damages action." *Id*. at 749 (Scalia, J., concurring). The panel majority did not heed these warnings, however, and instead opened the door to private liability for genocide under the ATS.

This important issue is independently worthy of review. Not only is the majority's determination in palpable tension with *Sosa*, it also conflicts with the Seventh Circuit's decision in *Enahoro*, which held that Congress, by expressly providing a cause of ac-

35

tion for torture in the Torture Victim Protection Act, 28 U.S.C. § 1350 note, *precluded* the federal courts from recognizing a separate common law cause of action for torture under the ATS. See 408 F.3d at 884-86. The same principle that makes it "hard to imagine" that common law claims for torture are permissible where Congress "has specifically provided a cause of action" (*id*. at 886) surely also precludes recognition of common law genocide claims where Congress has specifically decided *not* to provide such a cause of action. Here, as in other aspects of its other holding, the Second Circuit substituted judicial judgment for that of the political branches. That error warrants this Court's attention.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted.

KENNETH S. GELLER
MARC R. COHEN
ANDREW J. PINCUS
CHARLES A. ROTHFELD
  *Mayer Brown LLP*
  *1909 K Street, NW*
  *Washington, DC 20006*
  *(202) 263-3000*

FRANCIS P. BARRON
  *Counsel of Record*
DAVID GREENWALD
  *Cravath, Swaine &*
  *Moore LLP*
  *825 Eighth Avenue*
  *New York, NY 10019*
  *(212) 474-1000*

*Counsel for UBS AG*

36

DAVID T. BIDERMAN
JASON A. YURASEK
*Perkins Coie LLP*
*Four Embarcadero Center*
*Suite 2400*
*San Francisco, CA 94111*
*(415) 344-7000*
*Counsel for American Isuzu Motors Inc.*

JOHN H. BEISNER
KARL R. THOMPSON
*O'Melveny & Myers LLP*
*1625 Eye Street, NW*
*Washington, DC 20006*
*(202) 383-5300*
*Counsel for Bank of America, N.A., The Dow Chemical Company, and Ford Motor Company*

MARC J. GOTTRIDGE
*Lovells LLP*
*590 Madison Avenue*
*New York, NY 10022*
*(212) 909-0600*
*Counsel for Barclays Bank PLC*

JOSHUA DYCKMAN
*Counsel*
*Bristol-Myers Squibb Company*
*345 Park Avenue*
*New York, NY 10154*
*(212) 546-4258*
*Counsel for Bristol-Myers Squibb Company*

JOHN L. WARDEN
BRUCE E. CLARK
*Sullivan & Cromwell LLP*
*125 Broad Street*
*New York, NY 10004*
*(212) 558-4000*
*Counsel for BP p.l.c.*

JAYANT W. TAMBE
ROBERT A. MITTELSTAEDT
*Jones Day*
*222 East 41st Street*
*New York, NY 10017*
*(212) 326-3939*
*Counsel for Chevron-Texaco Corporation and Chevron Texaco Global Energy, Inc.*

37

OWEN C. PELL
KAREN M. ASNER
   *White & Case LLP*
   *1155 Avenue of the*
      *Americas*
   *New York, NY 10036*
   *(212) 819-8200*
   *Counsel for Citigroup,*
      *Inc.*

ALAN M. GRIMALDI
PATRICIA G. BUTLER
   *Howrey LLP*
   *1299 Pennsylvania*
      *Avenue, N.W.*
   *Washington, DC 20004*
   *(202) 383-6989*
   *Counsel for The Coca-*
      *Cola Company*

PETER C. HEIN
WILLIAM EDWARDS
   *Wachtell, Lipton, Rosen*
      *& Katz*
   *51 West 52nd Street*
   *New York, NY 10019*
   *(212) 403-1000*
   *Counsel for Colgate-*
      *Palmolive Company*

TERRY MYERS
ANTHONY A. DEAN
THOMAS R. VALEN
JEFFREY L. NAGEL
   *Gibbons P.C.*
   *One Pennsylvania Plaza*
   *37th Floor*
   *New York, NY 10119*
   *(212) 613-2000*
   *Counsel for Commerz-*
      *bank AG and*
         *Dresdner Bank AG*

`

38

| | |
|---|---|
| ROGER M. WITTEN<br>LOUIS R. COHEN<br>JOHN A. TRENOR<br>PAUL M. WINKE<br>KEVIN L. OBERDORFER<br>  *Wilmer Cutler Pickering*<br>    *Hale and Dorr LLP*<br>  *399 Park Avenue*<br>  *New York, NY 10022*<br>  *(212) 230-8800*<br>  *Counsel for Credit*<br>    *Suisse Group* | JEROME S. HIRSCH<br>SUSAN L. SALTZSTEIN<br>  *Skadden, Arps, Slate,*<br>    *Meagher & Flom LLP*<br>  *Four Times Square*<br>  *New York, NY 10036-*<br>    *6522*<br>  *(212) 735-3000*<br>  *Counsel for Daimler AG* |
| JEFFREY BARIST<br>SANDER BAK<br>FELIX WEINACHT<br>  *Milbank Tweed*<br>  *One Chase Manhattan*<br>    *Plaza*<br>  *New York, NY 10005*<br>  *(212) 530-5000*<br>  *Counsel for Deutsche*<br>    *Bank AG* | EVAN R. CHESLER<br>  *Cravath, Swaine &*<br>    *Moore LLP*<br>  *Worldwide Plaza*<br>  *825 Eighth Avenue*<br>  *New York, NY 10019-*<br>    *7475*<br>  *(212) 474-1000*<br>  *Counsel for E.I. Dupont*<br>    *deNemours* |

39

GRAEME W. BUSH
ELIZABETH G. TAYLOR
   *Zuckerman Spaeder*
      *LLP*
   *1800 M Street, N.W.*
   *Washington, D.C. 20036*
   *(202) 778-1800*
   *Counsel for EMS-*
      *Chemie (North Amer-*
      *ica) Inc.*

JAMES W. QUINN
ARVIN MASKIN
KONRAD L. CAILTEUX
CAITLIN HALLIGAN
   *Weil, Gotshal & Manges*
      *LLP*
   *767 Fifth Avenue*
   *New York, NY 10153*
   *(212) 310-8000*
   *Counsel for Exxon Mobil*
      *Corporation*

MARK D. MCPHERSON
   *Morrison & Foerster*
      *LLP*
   *1290 Avenue of the*
      *Americas*
   *New York, NY 10104*
   *(212) 468-8000*
   *Counsel for Fujitsu*
      *Limited*

PAUL R. FRIEDMAN
JOHN TOWNSEND RICH
WILLIAM F. SHEEHAN
   *Goodwin Procter LLP*
   *901 New York Avenue,*
      *NW*
   *Washington, D.C. 20001*
   *(202) 346-4000*
   *Counsel for General*
      *Electric Company*

ROBERT S. WALKER
   *Jones Day*
   *North Point*
   *901 Lakeside Avenue*
   *Cleveland, Ohio 44114*
   *(216) 586-7249*
   *Counsel for General Mo-*
      *tors Corp.*

JAYANT W. TAMBE
   *Jones Day*
   *222 East 41st Street*
   *New York, NY 10017*
   *(212) 326-3939*
   *Counsel for General Mo-*
      *tors Corp*

40

JOHN F. SCHULTZ
KRISTOFOR T. HENNING
  *Morgan, Lewis &*
    *Bockius LLP*
  *1701 Market Street*
  *Philadelphia, PA 19103*
  *(215) 963-5000*
  *Counsel for Hewlett-*
    *Packard Company*

ALEX C. LAKATOS
KEVIN S. RANLETT
ALICIA K. KINSEY
  *Mayer Brown LLP*
  *1909 K Street, NW*
  *Washington, D.C. 20006*
  *(202) 263-3000*
  *Counsel for Holcim (US)*
    *Inc.*

CHRISTOPHER LANDAU,
P.C.
BRANT W. BISHOP
JOHN K.D. CRISHAM
  *Kirkland & Ellis LLP*
  *655 Fifteenth Street,*
    *NW*
  *Suite 1200*
  *Washington, DC 20005*
  *(202) 879-5000*
  *Counsel for Honeywell*
    *International Inc.*

KEITH R. HUMMEL
  *Cravath, Swaine &*
    *Moore LLP*
  *Worldwide Plaza*
  *825 Eighth Avenue*
  *New York, NY 10019-*
    *7475*
  *(212) 474-1000*
  *Counsel for Interna-*
    *tional Business Ma-*
    *chines Corporation*

JAMES B. WEIDNER
RAE LINDSAY
  *Clifford Chance US*
    *LLP*
  *31 West 52d Street*
  *New York, NY 10019-*
    *6131*
  *(212) 878-8000*
  *Counsel for JPMorgan*
    *Chase & Co.*

JOHN E. HALL
FUAD RANA
  *Covington & Burling*
    *LLP*
  *1201 Pennsylvania*
    *Avenue, N.W.*
  *Washington, DC 20004*
  *(202) 662-6000*
  *Counsel for 3M Co.*

41

<div style="display:flex">
<div>

KEVIN J. WALSH
  *Locke Lord Bissell &*
    *Liddell LLP*
  *885 Third Avenue*
  *New York, NY 10022*
  *(212) 947-4700*
  *Counsel for National*
    *Westminster Bank*
    *Plc*

</div>
<div>

MICHAEL O. WARE
BRIAN M. WILLEN
  *Mayer Brown LLP*
  *1675 Broadway*
  *New York, NY 10019*
  *(212) 506-2500*
  *Counsel for Nestlé USA,*
    *Inc.*

</div>
</div>

<div style="display:flex">
<div>

RORY O. MILLSON
  *Cravath, Swaine &*
    *Moore LLP*
  *Worldwide Plaza*
  *825 Eighth Avenue*
  *New York, NY 10019-*
    *7475*
  *(212) 474-1000*
  *Counsel for Shell Oil*
    *Company*

</div>
<div>

SANDRA C. GOLDSTEIN
  *Cravath, Swaine &*
    *Moore LLP*
  *Worldwide Plaza*
  *825 Eighth Avenue*
  *New York, NY 10019-*
    *7475*
  *(212) 474-1000*
  *Counsel for Xerox Cor-*
    *poration*

</div>
</div>

JANUARY 2008.

# EXHIBIT B

No. 07-919

# In the Supreme Court of the United States

AMERICAN ISUZU MOTORS, INC., ET AL., PETITIONERS

*v.*

LUNGISILE NTSEBEZA, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF PETITIONERS**

JOHN B. BELLINGER, III
  *Legal Adviser
  Department of State*

RUSSELL MUNK
  *Assistant General Counsel
    for International
    Affairs
  Department of the
    Treasury*

JOHN J. SULLIVAN
  *General Counsel
  Department of Commerce*

PAUL D. CLEMENT
  *Solicitor General
    Counsel of Record*

JEFFREY S. BUCHOLTZ
  *Acting Assistant Attorney
    General*

EDWIN S. KNEEDLER
  *Deputy Solicitor General*

DOUGLAS HALLWARD-DRIEMEIER
  *Assistant to the Solicitor General*

DOUGLAS N. LETTER
ROBERT M. LOEB
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  (202) 514-2217*

## QUESTIONS PRESENTED

These lawsuits were filed on behalf of all persons living in South Africa between 1948 and 1994 who were injured by that nation's system of apartheid. Petitioners are more than 50 United States and foreign corporations that allegedly did business in South Africa during that era. Respondents contend that, by conducting business in South Africa, petitioners aided and abetted violations of international law committed by the apartheid-era South African government and, for that reason, may be held liable in a federal common law action under the Alien Tort Statute (ATS), 28 U.S.C. 1350. The questions presented are:

1. Whether, in light of the opposition to this litigation expressed by the Executive Branch, by South Africa, and by other nations—because respondents' suits effectively seek to overturn South Africa's post-apartheid policy of reconciliation as well as the foreign policies of the United States and other nations—the cases should be dismissed on grounds of case-specific deference to the political branches, political question, or international comity.

2. Whether a private defendant may be sued under the ATS for aiding and abetting a violation of international law by a foreign government in its own territory.

3. Whether a private defendant may be held directly liable under the ATS for violating international law standards codified in a ratified treaty that Congress expressly provided does not create enforceable rights.

(I)

## TABLE OF CONTENTS

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.   The court of appeals' extension of the ATS is
     inconsistent with principles of judicial restraint and
     raises serious foreign policy concerns  . . . . . . . . . . . . 6

     A.  *Sosa* requires "judicial caution" in recogniz-
         ing new causes of action under the ATS  . . . . . . . . 6

     B.  Recognizing aiding and abetting liability
         constitutes an improper expansion of judicial
         authority to fashion federal common law . . . . . . . . 8

     C.  Extraterritorial aiding and abetting liability
         under the ATS interferes with the nation's
         foreign relations  . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II.  The Court should grant review to decide whether
     suits may be entertained under the ATS based on
     aiding and abetting a foreign state's conduct in its
     own territory  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     A.  The court of appeals definitively decided
         the aiding and abetting issue, but did not
         resolve the first and third questions
         presented  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     B.  The court of appeals' aiding and abetting
         holding has significant adverse foreign
         policy consequences that warrant the
         Court's review at this time  . . . . . . . . . . . . . . . . . . 18

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Appendix A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1a
Appendix B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2a
Appendix C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7a
Appendix D  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10a
Appendix E  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12a

(III)

IV

## TABLE OF AUTHORITIES

Cases:                                                        Page

*American Constr. Co.* v. *Jacksonville, Tampa & Key West Ry.*, 148 U.S. 372 (1893) . . . . . . . . . . . . . . . . . . . . . . 18

*Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bolchos* v. *Darrel*, 3 F. Cas. 810 (S.C. 1795) (No. 1607) . . . 16

*Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) . . . . . . . . . . 3, 8, 9, 11

*Cutter* v. *Wilkinson*, 544 U.S. 709 (2005) . . . . . . . . . . . . . . 19

*EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244 (1991) . . . . . . 12

*F. Hoffman-La Roche Ltd.* v. *Empagran*, 542 U.S. 155 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Gratz* v. *Bollinger*, 539 U.S. 244 (2003) . . . . . . . . . . . . . . . . 19

*Jones* v. *R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Moxon* v. *The Fanny*, 17 F. Cas. 942 (Pa. 1793) (No. 9895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Norfolk S. Ry.* v. *Kirby*, 543 U.S. 14 (2004) . . . . . . . . . . . . . 19

*Rose* v. *Himely*, 8 U.S. (4 Cranch) 241 (1808) . . . . . . . . . . 12

*Saudi Arabia* v. *Nelson*, 507 U.S. 349 (1993) . . . . . . . . . . . 15

*Sosa* v. *Alvarez-Machain*, 542 U.S. 692 (2004) . . . . . *passim*

*Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*, 128 S. Ct. 761 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*Tel-Oren* v. *Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984), cert. denied, 470 U.S. 1003 (1985) . . . . . . . . . 15

*The Apollon*, 22 U.S. (9 Wheat.) 362 (1824) . . . . . . . . . . . . 12

*United States* v. *Bowman*, 260 U.S. 94 (1922) . . . . . . . . . . . 13

*United States* v. *The La Jeune Eugenie*, 26 F. Cas. 832 (D. Mass. 1822) (No. 15,551) . . . . . . . . . . . . . . . . . . . . 14, 15

V

Cases—Continued:                                          Page

   *United States* v. *Palmer*, 16 U.S. (3 Wheat.) 610
     (1818) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13
   *United States* v. *Smith*, 18 U.S. (5 Wheat.) 153 (1820) . . . . 13

Convention and statutes:

   Convention on the Prevention and Punishment of the
     Crime of Genocide, *adopted*, Dec. 9, 1948, 78
     U.N.T.S. 277 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
   Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 76 . . . . . . . . . . . . . . 6
   Act of Mar. 3, 1819, ch. 77, § 5, 3 Stat. 513 . . . . . . . . . . . . . 13
   Alien Tort Statute, 28 U.S.C. 1350 . . . . . . . . . . . . . . . *passim*
   Comprehensive Anti-Apartheid Act of 1986, Pub. L.
     No. 99-440, 100 Stat. 1086:
        § 4, 100 Stat. 1089 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        § 101, 100 Stat. 1089 . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        §§ 304-305, 100 Stat. 1099-1100 . . . . . . . . . . . . . . . . . 21
   18 U.S.C. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   28 U.S.C. 1605(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Miscellaneous:

   President George W. Bush, Address to the United
     Nations General Assembly (Sept. 25, 2007)
       <http://www.whitehouse.gov/news/releases/2007/09
       /20070925-4.html> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
   National Security Decision Directive 187 (Sept. 7,
     1985) <http://www.fas.org/irp/offdocs/nsdd/nsdd-
     187. htm> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   *Breach of Neutrality,* 1 Op. Att'y Gen. 57 (1795) . . . 10, 13, 15

VI

Miscellaneous—Continued:                              Page

Restatement (Second) of Torts (1991)  . . . . . . . . . . . . . . . . . . 4
Robert L. Stern et al, *Supreme Court Practice* (8th ed.
    2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# In the Supreme Court of the United States

---

No. 07-919

AMERICAN ISUZU MOTORS, INC., ET AL., PETITIONERS

*v.*

LUNGISILE NTSEBEZA, ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

---

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**
**IN SUPPORT OF PETITIONERS**

---

### INTEREST OF THE UNITED STATES

This case presents the question whether private corporations may be sued under the Alien Tort Statute (ATS), 28 U.S.C. 1350, for aiding and abetting the system of apartheid imposed by the former government of South Africa. Because so dramatic an extension of United States law would have serious consequences for the Nation's foreign relations, the United States has a substantial interest in that question.

### STATEMENT

1. Respondents filed these class actions under the ATS against various multinational corporations that did business in South Africa during the apartheid regime. Respondents claim that petitioners provided "resources,

(1)

2

such as technology, money, and oil, to the South African government," which it used "to further its policies of oppression and persecution of the African majority." Pet. App. 187a. Respondents allege, *inter alia*, violations of international law norms regarding apartheid, forced labor, genocide, torture, sexual assault, unlawful detention, extrajudicial killings, war crimes, and racial discrimination. *Id.* at 194a. Respondents contend that petitioners "aided and abetted the apartheid regime in the commission of these violations." *Ibid.* Respondents seek damages in excess of $400 billion. *Id.* at 85a.

In the district court, the government of South Africa filed a statement by its Minister of Justice urging dismissal of the litigation. Pet. App. 297a-309a. The statement explained that the South African government views the litigation as an "attempt[] to undermine South African sovereignty," *id.* at 304a (citation omitted), and stated that "the litigation could have a destabilising effect" because it would "discourage much-needed direct foreign investment in South Africa," thereby undermining both "economic growth and employment." *Id.* at 308a-309a. The United States also filed a Statement of Interest, advising that the suit "risks potentially serious adverse consequences for significant interests of the United States" by "imped[ing] South Africa's on-going efforts at reconciliation and equitable economic growth." *Id.* at 244a-245a. In addition, recognition of aiding and abetting liability would undermine United States policy, which "relies, in significant part, on economic ties and investment to encourage and promote positive change in the domestic policies of developing countries." *Id.* at 245a.

The district court granted petitioners' motion to dismiss. Pet. App. 181a-213a. Relying on this Court's cau-

3

tionary admonitions in *Sosa* v. *Alvarez-Machain*, 542 U.S. 692 (2004), and its holding in *Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), the court held that aiding and abetting claims are not actionable under the ATS.  Pet. App. 199a-200a.  It explained that "[i]n a world where many countries may fall considerably short of ideal economic, political, and social conditions, this Court must be extremely cautious in permitting suits here based upon a corporation's doing business in countries with less than stellar human rights records, especially since the consequences of such an approach could have significant, if not disastrous, effects on international commerce." *Id*. at 206a.

2.  On appeal, the governments of the United States and South Africa appeared as amici to urge affirmance. The United States argued that recognizing a federal common law cause of action under the ATS for aiding and abetting a foreign state's violation of international law with respect to its own citizens risked serious consequences for the Nation's foreign relations and would limit the political Branches' ability to use economic investment as a tool of foreign policy.  South Africa restated its position that "[t]hese foreign litigations fundamentally interfere with South Africa's independence and sovereignty," and its chosen policy for dealing with the wrongs of apartheid, and could "disrupt the growth of the South African economy."  Pet. App. 290a, 292a.

A divided panel of the court of appeals reversed.  Pet. App. 1a-180a.  Judges Katzmann and Hall definitively held that "a plaintiff may plead a theory of aiding and abetting liability" under the ATS.  *Id*. at 12a (per curiam).  They rejected the district court's conclusion that *Central Bank* precludes recognition of civil aiding

4

and abetting liability in the absence of statutory authorization. *Id.* at 57a–58a (Katzmann, J., concurring); *id.* at 70a n.5 (Hall, J., concurring). They further held that "a private actor may be held responsible for aiding and abetting the violation of a norm that requires state action or action under color of law." *Id.* at 55a–56a (Katzmann, J., concurring); *id.* at 72a (Hall, J., concurring).

Judge Katzmann concluded that the appropriate standard for proving civil aiding and abetting liability under the ATS is that applied by international tribunals for criminal liability, which, he stated, makes a defendant liable "for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." Pet. App. 47a. District Judge Korman, sitting by designation, disagreed that the ATS authorizes aiding and abetting suits against private defendants where the relevant international law norm applies only to states, *id.* at 157a, 164a–165a, but he concurred in Judge Katzmann's articulation of the international law standard, in order to provide a controlling opinion on remand, *id.* at 170a.[1]

The majority declined to "affirm the dismissal of plaintiffs' [ATS] claims on the basis of the prudential concerns raised by the defendants." Pet. App. 14a (per curiam). The court concluded that such considerations were appropriate to the question whether "to recognize a cause of action," which the majority viewed as distinct

---

[1] Judge Hall believed that the appropriate aiding and abetting standard should be drawn from the Restatement (Second) of Torts § 876 (1991).

5

from the question whether the international law norm was sufficiently universal and definite, a question the majority viewed as jurisdictional. *Id.* at 12a, 14a; *id.* at 48a (Katzmann, J., concurring). The majority concluded that the district court had not yet considered "case-specific prudential doctrines" and "remand[ed] to the district court to allow it to engage in the first instance in the careful 'case-by-case' analysis that questions of this type require." *Id.* at 18a.

District Judge Korman dissented. In addition to disagreeing on aiding and abetting liability, he stated that several case-specific factors required dismissal. Pet. App. 86a-122a.

### DISCUSSION

The court of appeals' decision allows an unprecedented and sprawling lawsuit to move forward and represents a dramatic expansion of U.S. law that is inconsistent with well-established presumptions that Congress does not intend to authorize civil aiding and abetting liability or extend U.S. law extraterritorially. The decision does so, moreover, in an area fraught with foreign relations perils, where "judicial caution" is especially appropriate before "exercising innovative authority over substantive law." *Sosa*, 542 U.S. at 726. The consequence is to invite lawsuits challenging the conduct of foreign governments toward their own citizens in their own countries—conduct as to which the foreign states are themselves immune from suit—through the simple expedient of naming as defendants those private corporations that lawfully did business with the governments. Such lawsuits inevitably create tension between the United States and foreign nations, as the present litigation demonstrates. See pp. 19-22, *infra*.

6

This Court should grant certiorari on the second question presented to review the court of appeals' extension of the ATS to encompass claims of aiding and abetting a foreign state's violation of international law in its own territory. Although the court left open the possibility that the district court might yet dismiss the lawsuit based on "case-specific prudential doctrines," Pet. App. 18a, it has categorically held that "a plaintiff may plead a theory of aiding and abetting liability under the [ATS]," *id.* at 12a. That holding invites similar lawsuits to be filed and will preclude their early dismissal, which, in turn, will undermine efforts to encourage foreign investment.

I. **THE COURT OF APPEALS' EXTENSION OF THE ATS IS INCONSISTENT WITH PRINCIPLES OF JUDICIAL RESTRAINT AND RAISES SERIOUS FOREIGN POLICY CONCERNS**

    A. *Sosa* **Requires "Judicial Caution" In Recognizing New Causes Of Action Under The ATS**

The ATS was first enacted by Congress in the Judiciary Act of 1789. Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 76. As presently codified, it provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. 1350. In *Sosa*, the Court held that "the ATS is a jurisdictional statute creating no new causes of action," but that it was "enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." *Sosa*, 542 U.S. at 724.

7

Recognizing the Court's "practice * * * to look for legislative guidance before exercising innovative authority over substantive law," the Court identified a number of factors that counseled special "judicial caution" and a "restrained conception of the discretion a federal court should exercise in considering a new cause of action" under Section 1350. *Sosa*, 542 U.S. at 725-726. In particular, the Court noted that "the decision to create a private right of action" raises significant questions beyond defining a substantive norm to govern primary conduct, such as whether "to permit enforcement without the check imposed by prosecutorial discretion." *Id.* at 727. In addition, the Court recognized the "potential implications for the foreign relations of the United States" that "should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs," especially if the court would be called upon to pronounce "a limit on the power of foreign governments over their own citizens, and to hold that a foreign government or its agent has transgressed those limits." *Ibid.* Accordingly, the Court stressed that devising new federal common law causes of action based on international law "should be undertaken, if at all, with great caution." *Id.* at 727-728.

The Court declined to recognize a new cause of action based on international law in *Sosa*. It explained that "[w]hatever the ultimate criteria for accepting a cause of action subject to jurisdiction under § 1350, * * * federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted": piracy, violation of safe conducts, and assaults against ambassadors. *Sosa*,

8

542 U.S. at 719, 732. The Court held that the asserted prohibition against arbitrary arrest and detention was not "so well defined as to support the creation of a federal remedy." *Id.* at 738.[2]

**B.  Recognizing Aiding And Abetting Liability Constitutes An Improper Expansion Of Judicial Authority To Fashion Federal Common Law**

As this Court has explained, the creation of civil aiding and abetting liability is a legislative act separate and apart from the recognition of a cause of action against the primary actor, and one that the courts should not undertake without congressional direction. *Central Bank*, 511 U.S. at 182. Such "a vast expansion of federal law," *id.* at 183, is all the more inappropriate where, as here, it raises significant "risks of adverse foreign policy consequences," *Sosa*, 542 U.S. at 728.

1. In *Central Bank*, the Court explained that "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." 511 U.S. at 182. To the contrary, the adoption of aiding and abetting liability is a "vast expansion of federal law" that federal courts must eschew in the absence "of congressional direction to do so." *Id.* at 183.

---

[2] The Court also noted related questions that might be raised in other cases: "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued"; whether there is a requirement that "the claimant must have exhausted any remedies available in the domestic legal system"; and whether "case-specific deference to the political branches" might counsel against recognizing a claim. *Id.* at 732 n.20, 733 n.21.

9

*Central Bank* rejected the argument that civil aiding and abetting liability is appropriate wherever it is recognized in the criminal context. The Court noted that "[a]iding and abetting is an ancient criminal law doctrine," 511 U.S. at 181, and that, in 18 U.S.C. 2, Congress has enacted "a general aiding and abetting statute applicable to all federal criminal offenses," 511 U.S. at 181. The Court found more significant, however, the fact that Congress "has not enacted a general civil aiding and abetting statute," *id.* at 182, and that "the doctrine has been at best uncertain in application" in the civil context, *id.* at 181. That difference reflects the judgment that while aiding and abetting is a useful tool for prosecutors, it vastly expands liability to allow private parties, unconstrained by prosecutorial discretion, to sue alleged aiders and abettors. Cf. *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*, 128 S. Ct. 761, 771 (2008) (noting that Congress responded to *Central Bank* by authorizing the SEC, but not private parties, to sue aiders and abettors).

2. In holding that courts may impose aiding and abetting liability as a matter of federal common law, the court of appeals majority categorically dismissed *Central Bank*'s analysis as irrelevant. Judge Katzmann characterized this Court's "instruction in *Central Bank*" as "inapposite" because "the relevant norm" under the ATS "is provided not by domestic statute but by the law of nations, and that law extends responsibility for the violations of its norms to aiders and abettors." Pet. App. 57a-58a. He also found *Central Bank*'s refusal to extend *criminal* aiding and abetting principles to the *civil* context inapplicable to international law norms. *Id.* at 33a n.5.

10

Judge Hall likewise concluded that *Central Bank* "poses no bar" to aiding and abetting liability. Pet. App. 70a n.5. He concluded that, because the ATS's "textual brevity and dearth of legislative history leave us with inconclusive evidence of Congress's intent to include or exclude aiding and abetting liability," *Central Bank*'s "reasoning cannot apply to the [ATS]." *Ibid.* He instead relied on Congress's provision for aiding and abetting liability in certain early criminal statutes. *Ibid.*[3]

3. Both members of the majority misapplied *Central Bank* and veered far off course under the ATS. By relying on the *absence* of evidence of Congress's intent to allow aiding and abetting liability, Judge Hall's reasoning turns *Central Bank* on its head. Nor, contrary to Judge Katzmann's view, does the fact that the ATS refers to substantive norms of international law render *Central Bank* "inapposite." Pet. App. 57a-58a. As this Court made clear in *Sosa*, causes of action recognized under the ATS are "federal common law" causes of action, 542 U.S. at 732, and the fashioning of such law must be guided by *Central Bank*. Indeed, *Sosa* not only acknowledged the Court's "general practice" to look for legislative guidance before fashioning federal common law; it observed that "[i]t would be remarkable to take

---

[3] Judge Hall also cited (Pet. App. 70a n.5) Attorney General Bradford's opinion, *Breach of Neutrality*, 1 Op. Att'y Gen. 57, 59 (1795). That opinion, however, makes clear that the American citizens did far more than aid and abet another's wrongdoing in the broad sense the court of appeals used that phrase. Rather, they had "voluntarily *joined, conducted*, aided, and abetted a French fleet in attacking the settlement, and plundering or destroying the property of British subjects." *Id.* at 58 (emphasis added); see *ibid.* (describing "acts of hostility committed by American citizens"). The attacks were not the Americans' private criminal acts, but were part of a foreign power's act of war, and thus constituted a breach of the United States' neutrality.

11

a more aggressive role in exercising a jurisdiction [under the ATS] that remained largely in shadow for much of the prior two centuries." *Id.* at 726.

The fact that courts have previously considered decisions of international criminal tribunals as evidence of the "law of nations" for purposes of the ATS, see Pet. App. at 33a n.5 (Katzmann, J., concurring), does not diminish the force of *Central Bank*. Whatever relevance principles of criminal liability have in informing the substantive content of international law for purposes of the ATS, the question of the relevance of criminal-law principles of secondary liability for civil actions is settled by *Central Bank*. *Central Bank* makes clear that the existence of criminal aiding and abetting liability does not support civil liability, 511 U.S. at 181-183, because civil aiding and abetting liability "has been at best uncertain in application," *id.* at 181, would represent a "vast expansion of federal law," *id.* at 183, and would eliminate the check of prosecutorial discretion, *ibid.*; *Stoneridge*, *supra*. Thus, *Central Bank* speaks directly to the relevance of criminal aiding and abetting liability under international law to the existence of civil liability under the ATS. Moreover, the absence of a prosecutorial check has special salience as a reason to reject civil aiding and abetting liability in the ATS context. See *Sosa*, 542 U.S. at 727 (judicial caution required because a cause of action under the ATS entails "permit[ting] enforcement without the check imposed by prosecutorial discretion").

12

### C. Extraterritorial Aiding And Abetting Liability Under The ATS Interferes With The Nation's Foreign Relations

When construing a federal statute, there is a strong presumption that Congress does not intend to extend U.S. law over conduct that occurs in foreign countries. See *EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). That presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Ibid. A fortiori*, there should be a compelling presumption against recognizing a power in the courts to project U.S. law into foreign countries through the fashioning of federal common law. The court of appeals not only ignored that presumption, it exacerbated the risk of "international discord" by endorsing aiding and abetting suits in which the primary conduct at issue is the foreign state's own conduct in its own territory, and the sovereign is itself immune from civil suit in our domestic courts. Recognition of ATS liability in such circumstances is the antithesis of the "great caution" that this Court admonished the courts to use in exercising their modest federal-common-law-making authority under the ATS. *Sosa*, 542 U.S. at 728.

1. The presumption against extraterritorial legislation was well-established at the time the ATS was adopted. See *The Apollon*, 22 U.S. (9 Wheat.) 362, 370 (1824); *Rose* v. *Himely*, 8 U.S. (4 Cranch) 241, 279 (1808). That presumption was applied with respect to statutes adopted by Congress to enforce the laws of nations. In *United States* v. *Palmer*, 16 U.S. (3 Wheat.) 610 (1818), for example, this Court held that an early federal statute punishing piracy—one of the paradigmatic 18th century norms of international law—did not

13

apply to conduct of foreign nationals on a foreign ship
that did not threaten American interests. *Id.* at 630-631.
Similarly, the 1795 opinion of Attorney General Brad-
ford, to which this Court referred in *Sosa*, 542 U.S. at
721, states that insofar as "the transactions complained
of originated or took place in a foreign country, they are
not within the cognizance of our courts; nor can the ac-
tors be legally prosecuted or punished for them by the
United States." 1 Op. Att'y Gen. 57, 58 (1795).[4]

The presumption against extraterritorial application
of U.S. law avoids the "serious risk of interference with
a foreign nation's ability independently to regulate its
own commercial affairs." *F. Hoffmann-La Roche Ltd.*
v. *Empagran*, 542 U.S. 155, 165 (2004). Those concerns
are fully present here, and, in fact, foreign governments
have protested that respondents' claims seek to hold
petitioners liable for doing business with South Africa,
which "was in accordance with the domestic laws of all
the countries concerned" at the time. App., *infra*, 11a,

---

[4] In his concurring opinion in *Sosa*, Justice Breyer stated there was
an international consensus as to "the jurisdictional principle that any
nation that found a pirate could prosecute him." 542 U.S. at 762.
Attorney General Bradford's opinion reflects that that consensus
extended only to "crimes committed on the high seas," *i.e.*, where no
national sovereign was in place, and not to crimes that "took place in a
foreign country." 1 Op. Att'y Gen. at 58. *United States* v. *Smith*, 18
U.S. (5 Wheat.) 153 (1820), also cited by Justice Breyer, which con-
cerned the post-*Palmer* piracy statute, also applied to any person who
committed piracy "upon the high seas." *Id.* at 157 (quoting Act of Mar.
3, 1819, ch. 77, § 5, 3 Stat. 513). *Smith* illustrates that the presumption
against extraterritoriality does not apply where Congress has enacted
criminal laws that either expressly apply outside the United States or
cannot logically be limited to its territorial bounds. See, *e.g.*, *United
States* v. *Bowman*, 260 U.S. 94, 98 (1922).

14

13a (diplomatic notes from Governments of the United Kingdom and Federal Republic of Germany).

Concerns for international friction are even greater when domestic courts purport to sit in judgment over the conduct of the foreign state itself, especially in its own territory. Justice Story reflected the understanding of the framing generation in *United States* v. *La Eugenie*, 26 F. Cas. 832 (D. Mass. 1822) (No. 15,551): "No one [nation] has a right to sit in judgment generally upon the actions of another; at least to the extent of compelling its adherence to all the principles of justice and humanity in its domestic concerns." *Id.* at 847. "No nation," he explained, "has ever yet pretended to be the *custos morum* of the whole world; and though abstractedly a particular regulation may violate the law of nations, it may sometimes, in the case of nations, be a wrong without a remedy." *Ibid.* But that is precisely the result created by the Second Circuit decision below, which virtually invites an ATS action in New York whenever there are allegations of human rights violations anywhere in the world.

2. The court of appeals ignored such concerns, however, and proceeded to hold that "a private actor may be held responsible for aiding and abetting the violation of a norm that requires state action or action under color of law." Pet. App. 55a-56a (Katzmann, J., concurring); *id.* at 72a (Hall, J., concurring). The court recognized that, in order to make out an aiding and abetting claim, the plaintiff must prove "a predicate offence by someone other than the accomplice, in this case, a state actor or someone acting under color of law." *Id.* at 56a (quotation marks omitted). But it apparently did not trouble the court that, under its holding, the federal courts would be called upon to adjudicate the legality under

15

international law of the conduct of foreign states as to
which Congress has conferred sovereign immunity from
civil suits. See 28 U.S.C. 1605(a)(5) (abrogating immu-
nity only for torts "occurring in the United States");
*Saudi Arabia* v. *Nelson*, 507 U.S. 349, 363 (1993) (abuse
by police within Saudi Arabia immune from suit); *Argen-
tine Republic* v. *Amerada Hess Shipping Corp.*, 488
U.S. 428, 436-438 (1989) (no jurisdiction over foreign
states under ATS). Principles of foreign sovereign im-
munity reflect and implement Justice Story's concerns,
while the court of appeals' aiding and abetting holding
provides a clear means for effectively circumventing
those limits.

3. The court of appeals' disregard for the serious
foreign policy consequences of its ruling is directly con-
trary to the purposes for which the ATS was enacted
and with this Court's admonishment that courts must
use "great caution" in exercising their authority under
that statute. *Sosa*, 542 U.S. at 728. The founding gener-
ation had no intention of ordaining the courts of the new
Nation as the "*custos morum* of the whole world." *La
Eugenie*, 26 F. Cas. at 847. Rather, "those who drafted
the Constitution and the Judiciary Act of 1789 wanted to
open federal courts to aliens for the purpose of *avoiding*,
not provoking, conflicts with other nations." *Tel-Oren* v.
*Libyan Arab Republic*, 726 F.2d 774, 812 (D.C. Cir.
1984) (Bork, J., concurring) (emphasis added), cert. de-
nied, 470 U.S. 1003 (1985). Enactment of the ATS was
motivated in large part by assaults on foreign ambassa-
dors *in the United States* that had caused international
incidents. See *Sosa*, 542 U.S. at 716-717. And the only
early references to the statute lend no support to the
notion that it could be invoked to regulate conduct or
redress injury in a foreign country. See 1 Op. Att'y Gen.

16

at 58-59 (ATS suit could be brought against American citizens for breaching neutrality with Britain only if acts did not "t[ake] place in a foreign country"); *Bolchos* v. *Darrel*, 3 F. Cas. 810 (S.C. 1795) (No. 1607) (claim by French privateer for seizure of property in contravention of treaty from ship in U.S. port); *Moxon* v. *The Fanny*, 17 F. Cas. 942 (Pa. 1793) (No. 9895) (seizure of British ship by French privateer in U.S. waters).

*Sosa* provides no support for expanding the ATS in so dramatic a fashion. The Court specifically questioned whether a court should entertain "at all" a suit under the ATS seeking to enforce "a limit on the power of foreign governments over their own citizens." 542 U.S. at 727-728. Rather than supporting the court of appeals' vast expansion of ATS liability, *Sosa* calls for "vigilant doorkeeping" with respect to the "narrow class of international norms" to which the ATS may appropriately be applied. *Id.* at 729. The court of appeals' decision is incompatible with *Sosa*'s "restrained conception" of the judicial function under the ATS. *Id.* at 725.

## II. THE COURT SHOULD GRANT REVIEW TO DECIDE WHETHER SUITS MAY BE ENTERTAINED UNDER THE ATS BASED ON AIDING AND ABETTING A FOREIGN STATE'S CONDUCT IN ITS OWN TERRITORY

### A. The Court Of Appeals Definitively Decided The Aiding And Abetting Issue, But Did Not Resolve The First And Third Questions Presented

The court of appeals definitively held that "a plaintiff may plead a theory of aiding and abetting liability" under the ATS. Pet. App. 12a (per curiam). Although the court of appeals left open the possibility that respondents' complaints might later be dismissed on other grounds, it conclusively rejected the reasoning of the

17

district court and arguments of petitioners and United States that aiding and abetting should not be recognized as a viable theory of liability under the ATS. As discussed above, the majority summarily rejected arguments based on *Central Bank*, *id.* at 57a-58a (Katzmann, J., concurring); *id.* at 70a n.5 (Hall, J., concurring). The majority further ruled out the contention that a private actor could not be held responsible for "aiding and abetting the violation of a norm that requires state action or action under color of law." *Id.* at 56a (Katzmann, J., concurring); *id.* at 72a (Hall, J., concurring). As we explain in Point II.B, *infra*, this Court should grant review on the aiding and abetting issue.

By contrast, the court of appeals expressly declined to resolve the first and third questions presented in the petition. With respect to the first question, the court of appeals determined that the district court had "explicitly refrained from addressing" petitioners' political question argument, and the court of appeals declined to address that and other "case-specific prudential doctrines now," choosing instead to allow the district court to "engage in the first instance in the careful 'case-by-case' analysis that questions of this type require." Pet. App. 16a, 18a (per curiam). See *id.* at 219a (denial of stay) ("This Court has not ruled adversely to the Corporations on the issues of case-specific deference or the political question doctrine."). Likewise, the court of appeals did not consider the third question: *viz.*, whether the legislation by which Congress implemented the Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277, precludes recognizing a cause of action for genocide. Although Judge Korman, in dissent, stated that the implementing legislation should preclude a common law cause of action

18

for genocide, Pet. App. 143a, the majority specifically declined to resolve that issue, "leav[ing] it to the district court to address in the first instance," *id.* 61a n.18 (Katzmann, J., concurring); accord *id.* at 76a (Hall, J., concurring). In the view of the United States, because there is no decision of the court of appeals on those issues, review by this Court of those issues is not warranted at this time.

### B. The Court Of Appeals' Aiding And Abetting Holding Has Significant Adverse Foreign Policy Consequences That Warrant The Court's Review At This Time

This Court noted in *Sosa* the "risks of adverse foreign policy consequences" of recognizing new private causes of action for violating international law, and cautioned that "the potential implications for the foreign relations of the United States * * * should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." 542 U.S. at 727-728. The court of appeals' vast expansion of the ATS to reach claims against private parties who are alleged to have aided and abetted a foreign state's violation of international law in its own territory poses serious risks to the United States' relations with foreign states and to the political Branches' ability to conduct the Nation's foreign policy.

The Court has not hesitated to review an interlocutory decision when "it is necessary to prevent extraordinary inconvenience and embarrassment in the conduct of the cause." *American Constr. Co.* v. *Jacksonville, Tampa & Key West Ry.*, 148 U.S. 372, 384 (1893). When "there is some important and clear-cut issue of law that is fundamental to the further conduct of the case and that would otherwise qualify as a basis for certiorari, the

19

case may be reviewed despite its interlocutory status." Robert L. Stern et al., *Supreme Court Practice* 259 (8th ed. 2002).[5]

1. As discussed above, suits brought under the court of appeals' theory of liability will require federal courts to sit in judgment of the conduct of foreign states when Congress has determined those states should be immune from suit. Such litigation will inevitably give rise to tension in relations between the United States and the country whose conduct is at issue. Even when the government whose acts are under scrutiny has been removed from power, a suit brought in United States court to redress those wrongs is not a proper function of a United States court and will often be viewed by the foreign state's new government as an infringement on its sovereignty.

This litigation vividly illustrates that point. The democratically elected government of South Africa has repeatedly objected to this litigation as interfering with its sovereign authority to address the wrongs according to its own policy judgments. Pet. App. 300a, 307a-308a. After the court of appeals ruled, the President of South Africa spoke forcefully before that country's National Assembly expressing his government's view that it is "completely unacceptable that matters that [a]re central to the future of our country should be adjudicated upon in foreign courts which [bear] no responsibility for the wellbeing of our country and the observance of the perspective contained in our Constitution on the promotion of national reconciliation." *Id.* at 312a-313a. And South Africa has reaffirmed that position in diplomatic corre-

---

[5] See, *e.g.*, *Cutter* v. *Wilkinson*, 544 U.S. 709 (2005); *Norfolk S. Ry.* v. *Kirby*, 543 U.S. 14 (2004); *Jones* v. *R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004); *Gratz* v. *Bollinger*, 539 U.S. 244 (2003).

20

spondence. App., *infra*, 1a (diplomatic note). Other countries have similarly protested that the assertion of authority over their own nationals with regard to their conduct in a third country is "inconsistent with established principles of international law," *id.* at 7a (Aide Memoire from the Government of Switzerland), and that such assertion "infringes the sovereign rights of States to regulate their citizens and matters within their territory," *id.* 4a (letter to Secretary of State from British Ambassador, on behalf of the Government of the United Kingdom, with concurrence of the Government of Germany) (U.K. letter).

2. The pendency of this case and the prospect of such litigation more broadly has further and current real world consequences. As the President recently said in his address to the United Nations, "In the long run, the best way to lift people out of poverty is through trade and investment. * * * Open markets ignite growth, encourage investment, increase transparency, strengthen the rule of law, and help countries help themselves." President George W. Bush, Address to the United Nations General Assembly (Sept. 25, 2007) <http:// www. whitehouse.gov/news/releases/2007/09/20070925-4. html>. Civil aiding and abetting liability would, however, have a deterrent effect on the free flow of trade and investment, because it would create uncertainty for those operating in countries where abuses might occur. As foreign governments have noted in protest, the prospect of costly litigation under so expansive a theory of liability "may hinder global investment in developing economies, where it is most needed, and inhibit efforts by the international community to encourage positive changes in developing countries." App., *infra*, 5a (U.K letter). The mere prospect of such litigation can frus-

21

trate governments' ability to achieve their policy objectives. The government of South Africa, for example, has warned that the present "litigation could have a destabilising effect on the South African economy as investment is not only a driver of growth, but also of employment." Pet. App. 308a.

Litigation such as this would also interfere with the ability of the U.S. government to employ the full range of foreign policy options when interacting with regimes whose policies the United States would like to influence. In general, the U.S. government supports open markets and trade and investment with other countries. But in certain circumstances, the U.S. government may determine that more limited commercial interaction is desirable in encouraging reform and pursuing other policy objectives. Indeed, in the 1980s, the United States supported economic ties with black-owned companies and urged companies to use their influence to press for change away from apartheid, while at the same time using limited sanctions to encourage the South African government to end apartheid. See Pub. L. No. 99-440, §§ 4, 101, 304-305, 100 Stat. 1089, 1099-1100; National Security Decision Directive 187 (Sept. 7, 1985) <http:// www.fas.org/irp/offdocs/nsdd/nsdd-187.htm>. Such policies would be greatly undermined if the corporations that invest or operate in the foreign country are subjected to lawsuits under the ATS as a consequence.

The adverse consequences of the decision below and additional such litigation are not confined to South Africa, and would not be met by the possibility that this case might be dismissed at some time in the future on the basis of case-specific deference to the Executive's assessment of foreign relations consequences. To the contrary, such a case-by-case approach could complicate

22

the Nation's foreign relations still further and exacer-
bate the present apprehension and its deterrent effect
on international trade and investment.

3. The court of appeals' decision also merits this
Court's review at this time because of the precedential
effect it has on other pending litigation. A search of the
Westlaw database indicates that 24 lower court decisions
involving ATS claims since *Sosa* have included aiding
and abetting claims. The decision below will preclude
any district courts within the Second Circuit from dis-
missing such claims, involving conduct in foreign coun-
tries, on the ground that aiding and abetting is not an
available theory of liability. And because that Circuit
covers New York, which is central to the Nation's do-
mestic and international commerce, the decision invites
plaintiffs to bring many such suits in that forum in the
future.

In *Sosa*, the Court recognized the need for "caution"
and "vigilant doorkeeping" in ensuring that the self-evi-
dent potential for ATS suits to interfere with foreign
policy should not become a reality. 542 U.S. at 725, 729.
Those same considerations justify an exercise of the
Court's certiorari jurisdiction at this juncture in the
case.

23

**CONCLUSION**

The petition for a writ of certiorari should be granted on the second question presented.

Respectfully submitted.

PAUL D. CLEMENT
*Solicitor General*

JOHN B. BELLINGER, III
*Legal Adviser*
*Department of State*

JEFFREY S. BUCHOLTZ
*Acting Assistant Attorney*
*General*

RUSSELL MUNK
*Assistant General Counsel*
*for International*
*Affairs*
*Department of the*
*Treasury*

EDWIN S. KNEEDLER
*Deputy Solicitor General*

DOUGLAS HALLWARD-DRIEMEIER
*Assistant to the Solicitor General*

JOHN J. SULLIVAN
*General Counsel*
*Department of Commerce*

DOUGLAS N. LETTER
ROBERT M. LOEB
*Attorneys*

FEBRUARY 2008

**APPENDIX A**

[Letterhead Omitted]

Ref:   BL1/USA/3/A24.29

The Embassy of the Republic of South Africa presents its compliments to the Department of State and has the honour to refer to the lawsuit Khulumani v. Barclay's National Bank, Ltd. (a.k.a. Apartheid Court Case).

The Embassy of the Republic of South Africa wishes to confirm to the Department of State that the position of the Republic of South Africa concerning the litigation has not changed.  Taking into account Supreme Court Rule 37(2)(a), the Embassy of the Republic of South Africa reaffirms that no final decision has been made whether to file an amicus curiae brief at the present Petition stage.  The Embassy of the Republic of South Africa furthermore wishes to advise that if the petition for a writ of certiorari is granted, the Republic of South Africa will, at the merits stage, reaffirm its position.

The Embassy of the Republic of South Africa avails itself of this opportunity to renew to the Department of State the assurances of its highest consideration.

Washington D.C.                    [Seal Omitted]
8 February 2008

(1a)

2a

## APPENDIX B

[Letterhead Omitted]

30 January 2008

Dr. Condoleezza Rice
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520
United States of America

*Dear Madam Secretary,*

Khulumani et al v Barclay National Bank et al,
Ntsebeza et al v Daimler Chrysler Corp et al

I refer to Diplomatic Note No 126/2007 dated 13 December 2007 in which Her Britannic Majesty's Embassy, together with the Embassy of the Federal Republic of Germany, urged the United States Government to support the petition for certiorari seeking Supreme Court review of the judgment of 12 October 2007 of the United States Court of Appeals for the Second Circuit in the above mentioned cases, also known as the South Africa 'Apartheid' cases.

I write to confirm the continuing concern of the Government of the United Kingdom at the application of the Alien Tort Statute to British defendants in this case. I understand that the issue before the Supreme Court is whether to grant the petition for certiorari, rather than to decide the underlying issues of substance raised by this case. Given the present procedural juncture, and in the interests of international comity, the Government of the United Kingdom is reluctant to file a brief as amicus

3a

curiae in order to bring its concerns to the attention of the Court. However, this decision should not be understood to represent any waning of concern felt and previously expressed by the Government of the United Kingdom.

The Government of the United Kingdom believes that it is important that the United States Government should intervene in these cases given our concerns set out below. I understand that the Solicitor General may recommend to the Supreme Court that it should grant certiorari in a particular case, either on invitation from the Court or of his own initiative. Given this practice, the Government of the United Kingdom writes to urge the United States Government to recommend to the Supreme Court that certiorari be granted in this case and to request that it inform the Court of our considerable concerns.

I reiterate the Government's opposition, in principle, to broad assertions of extraterritorial jurisdiction over British persons and entities arising out of activities that take place outside of the State asserting jurisdiction. Such litigation can interfere with national sovereignty, create legal uncertainty and costs, and risks damaging international relations with several affected foreign countries including close allies of the United States. These concerns have previously been expressed to the U.S. Supreme Court by the Government of the United Kingdom, in amicus briefs filed in *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) and *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).

The present litigation treats the Alien Tort Statue as a broad charter to extend United States jurisdiction beyond the limits well established and widely recognised

4a

under customary international law. Plaintiffs, who are present or former residents of South Africa, have brought proceedings asserting corporate liability for the acts and omissions of the previous South African Government. The Government of the United Kingdom takes no position on the factual claims and statements made by the parties. However, I note that the allegations made by the plaintiffs are principally that the corporate defendants did business in South Africa during the apartheid era. This attempt to hold private parties liable for actions taken by a foreign State in its own territory, with respect to its own citizens, based on conduct by the defendants that took place outside the United States, infringes the sovereign rights of States to regulate their citizens and matters within their territory. This is despite the fact that the defendants' conduct is not alleged to have been at variance with the domestic laws of South Africa or any other of the countries concerned. The judgment of the Second Circuit Court of Appeals therefore calls into question decisions and laws made decades ago by the United Kingdom, the United States, and many other countries.

The Government of the United Kingdom also notes that the Government of South Africa expressed its concern at these proceedings in a submission to the District Court, in which it observed that the litigation will 'intrude upon and disrupt [its] own efforts to achieve reconciliation and reconstruction', and that it will 'interfere with matters of domestic policy which are pre-eminently South African'. I am also aware that, since the Court of Appeals handed down its judgment, the Government of South Africa has repeated its concerns in unambiguous terms.

5a

The Government of the United Kingdom respectfully concurs with the assessment of the Government of South Africa when it stated that matters central to the future of that country should not be adjudicated in foreign courts. The democratically-elected Government of South Africa is charged with responsibility for dealing with the legacy of apartheid and is entitled to do so free from interference by these proceedings. I understand, from the judgment of the Second Circuit Court of Appeals, that it is common ground that the plaintiffs would be entitled to seek relief from the South African courts, which the Government of the United Kingdom maintains is the forum that can consider claims of this nature most appropriately. The Government of the United Kingdom agrees with the statement by the Government of the United States to the Second Circuit that '[i]t would be extraordinary to give U.S. law an extraterritorial effect in [these] circumstances . . . by rendering private defendants liable for the sovereign acts of the apartheid government of South Africa.'

The Government of the United Kingdom is troubled that the judgment of the Second Circuit Court of Appeals has allowed this case to continue. The very existence of this litigation infringes upon sovereign interests of the United Kingdom, South Africa and other States. Litigation of this nature may hinder global investment in developing economies, where it is most needed, and inhibit efforts by the international community to encourage positive changes in developing countries. Whatever the appropriate approach, be it case-specific deference to the political branches, the political question doctrine, or consideration of the practical consequences of permitting the cause of action claimed, the Government of the

6a

United Kingdom would urge an interpretation of the Alien Tort Statute that allows cases that pose a threat to international relations to be reviewed as soon as possible and dismissed as appropriate.

In view of these concerns, the Government of the United Kingdom respectfully considers this litigation at odds with the deference encouraged by principles of international comity and judicial caution urged by the Supreme Court in *Sosa v. Alvarez-Machain*, where it suggested, in its careful guidance, that the courts should exercise deference to the political branches in respect of this case:  542 U.S. at 733, n 21.

In light of the foregoing, I urge the Government of the United States to take action consistently with its previously stated views and intervene in the U.S. Supreme Court proceedings to recommend that certiorari be granted.

Knowing of the Federal Republic of Germany's concerns, we have shared this letter with them.  The Federal Republic of Germany has asked us to inform you that they share the concerns we express herein.

May I take this opportunity to renew to the U.S. Department of State the assurances of the Government of the United Kingdom's highest consideration.

I am copying this letter to Solicitor General Paul D. Clement and His Excellency Klaus Scharioth, Ambassador of the Federal Republic of Germany.

*Yours faithfully,*

*Dominick Chilcott*

**pp Nigel Sheinwald**

7a

## APPENDIX C

*December 2007*

### <u>Aide Memoire</u>

The Government of Switzerland wishes to express its concern regarding the October 12 decision of the Court of Appeals for the Second Circuit in the South Africa "Apartheid" cases. The result appears to us to be inconsistent with well-accepted principles of international comity and jurisdiction. Accordingly, we request the United States Government to urge the U.S. Supreme Court to review this important case.

In its decision, the Second Circuit by a 2-1 majority decided that claims for aiding and abetting violations of customary international law could form the basis of a civil claim against corporate defendants under the U.S. Alien Torts Statute. The panel majority declined to consider the positions expressed by the United States and South Africa that the cases should not be permitted to go forward because to do so would impermissibly infringe on the sovereign interests of those and other governments contrary to the doctrine of international comity.

We believe that the Second Circuits decision is in error for important legal and policy reasons.

First, the extraterritorial assertion of jurisdiction in this case is inconsistent with established principles of international law. The Government of Switzerland recognizes and supports the view that individuals who commit human rights violations should be held criminally accountable before an appropriate tribunal. Such tribunals must be properly constituted and exercise their jurisdiction according to the rule of law. But a broad as-

8a

sertion of jurisdiction to provide civil remedies for viola-
tions perpetrated by foreign corporations against aliens
in foreign places is inconsistent with international law
and may indeed undermine efforts to promote human
rights and their protection. International law does not
recognize the principle of universal civil jurisdiction ov-
er the foreign conduct of foreign defendants not affect-
ing the forum State, unless the States involved have ex-
pressly consented to it.

The case at issue asserts claims on behalf of alien
plaintiffs with the aim of imposing civil liabilities under
U.S. law on numerous non-U.S. defendants for foreign
activities that have no effect in the United States, based
on allegations that the defendants were "doing business"
in South Africa, with no causal connection to the plain-
tiffs' injuries. Such an assertion of extraterritorial juris-
diction interferes with the sovereignty of foreign na-
tions. In addition, such claims subject foreign nationals
and enterprises to a risk of conflicting legal commands
and proceedings, as well as to uncertainties pertaining
to the defense of their rights in a foreign forum.

Second, the case impinges on South African sover-
eignty. South Africa has made one of the most success-
sful and peaceful political transitions in history, support-
ed in no small part by policies adopted by the United
States and other western democracies. As South Africa
and the United States explained to the courts below, this
success was based on a truth and reconciliation process,
as opposed to a "victors justice." The South African
government repeatedly and recently has made clear that
the pendency of the U.S. litigation at issue here is in-
compatible with the process South Africans have chosen
to address their country's past.

9a

The Government of Switzerland believes that review of the case by the Supreme Court would give an opportunity to put an end to the mounting international uncertainty surrounding the Alien Tort Statute and thus minimize the potential conflicts with other sovereign States that may arise from assertions of jurisdiction under that statute.  We hope that the Department of State agrees and that it will take the necessary actions to cause the United States Government to present its views on certiorari to the Supreme Court.

10a

## APPENDIX D

Note No: 126/2007

Her Britannic Majesty's Embassy and the Embassy of the Federal Republic of Germany present their compliments to the Department of State. The Government of the Federal Republic of Germany and Her Britannic Majesty's Government ('the Governments') write jointly to urge the United States Government to support the petition for certiorari seeking Supreme Court review of the judgment of 12 October 2007 of the United States Court of Appeals for the Second Circuit in the South Africa 'Apartheid' cases, captioned *Khulumani et al v Barclay National Bank et al, Ntsebeza et al v Daimler Chrysler Corp et al.*

The Governments are concerned at the application of the Alien Tort Statute to British and German corporations in this case. The Governments reiterate their opposition, in principle, to broad assertions of extraterritorial jurisdiction over British and German persons and entities arising out of activities that take place outside of the State asserting jurisdiction. Such litigation can interfere with national sovereignty, create legal uncertainty and costs, and risks damaging international relations. These concerns have previously been expressed to the U.S. Supreme Court by Her Britannic Majesty's Government, in amicus briefs submitted in *Hoffman-La Roche Ltd v Empagran,* No 03-724, and *Sosa v Alvarez-Machain,* No 03-339.

The judgment of the Second Circuit Court of Appeals allows proceedings asserting corporate liability for the acts and omissions of the previous South African Government to continue, based on claims that the corporate

11a

defendants did business in South Africa during the apartheid era. This is despite the fact that such activity was in accordance with the domestic laws of all the countries concerned. The judgment therefore calls into question decisions and laws made decades ago by the Governments, the United States and many other countries. It may impair investment in emerging economies, and recognizes the liability of corporations for aiding and abetting which, under international law, is neither generally accepted nor clearly defined.

The Governments concur completely with the statement by the United States Government to the Second Circuit, that '[i]t would be extraordinary to give U.S. law an extraterritorial effect in [these] circumstances . . . by rendering private defendants liable for the sovereign acts of the apartheid government of South Africa.'

Accordingly, we urge the United States Government to take action and intervene in the United States Supreme Court proceedings concerning this case.

The Governments avail themselves of this opportunity to renew to the Department of State the assurances of their highest consideration.

BRITISH EMBASSY [Seal Omitted]
WASHINGTON, DC
13 December 2007

12a

**APPENDIX E**

RK 520. SE Khulumani

*Note Verbale 168/07*

The Embassy of the Federal Republic of Germany and Her Britannic Majesty's Embassy present their compliments to the Department of State.

The Government of the Federal Republic of Germany and Her Britannic Majesty's Government ('the Governments') write jointly to urge the United States Government to support the petition for certiorari seeking Supreme Court review of the judgment of 12 October 2007 of the United States Court of Appeals for the Second Circuit in the South Africa 'Apartheid' cases, captioned *Khulumani et al* v *Barclay National Bank et al, Ntsebeza et al* v *Daimler Chrysler Corp et al.*

The Governments are concerned at the application of the Alien Tort Statute to British and German corporations in this case. The Governments reiterate their opposition, in principle, to broad assertions of extraterritorial jurisdiction over British and German persons and entities arising out of activities that take place outside of the State asserting jurisdiction. Such litigation can interfere with national sovereignty, create legal uncertainty and costs, and risks damaging international relations. These concerns have previously been expressed to the U.S. Supreme Court by Her Britannic Majesty's Government, in amicus briefs submitted in *Hoffman-La Roche Ltd v Empagran,* No 03-724, and *Sosa* v *Alvarez-Machain,* No 03-339.

13a

The judgment of the Second Circuit Court of Appeals allows proceedings asserting corporate "liability for the acts and omissions of the previous South African Government to continue, based on claims that the corporate defendants did business in South Africa during the apartheid era.  This is despite the fact that such activity was in accordance with the domestic laws of all the countries concerned.  The judgment therefore calls into question decisions and laws made decades ago by the Governments, the United States and many other countries.  It may impair investment in emerging economies, and recognizes the liability of corporations for aiding and abetting which, under international law, is neither generally accepted nor clearly defined.

The Governments concur completely with the statement by the United States Government to the Second Circuit, that '[i]t would be extraordinary to give U.S. law an extraterritorial effect in [these] circumstances . . . by rendering private defendants liable for the sovereign acts of the apartheid government of South Africa.'

Accordingly, we urge the United States Government to take action and intervene in the United States Supreme Court proceedings concerning this case.

14a

The Governments avail themselves of this opportunity to renew to the Department of State the assurances of their highest consideration.

Washington, DC, December 13, 2007

L.S.

United States
    Department of State
        Washington, D.C.

cc:  German Desk

[Seal Omitted]